# UNITED STATES DISTRICT COURT

## DISTRICT OF NEW JERSEY

| | |
|---|---|
| SARATOGA ADVANTAGE TRUST ENERGY & BASIC MATERIALS PORTFOLIO, Derivatively on Behalf of Nominal Defendant EXXON MOBIL CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>DARREN W. WOODS, ANDREW P. SWIGER, DAVID S. ROSENTHAL, JEFFREY J. WOODBURY, STEVEN S. REINEMUND, MICHAEL J. BOSKIN, SAMUEL J. PALMISANO, KENNETH C. FRAZIER, URSULA M. BURNS, HENRIETTA H. FORE, WILLIAM C. WELDON, REX W. TILLERSON, WILLIAM W. GEORGE, LARRY R. FAULKNER, DOUGLAS R. OBERHELMAN, and PETER BRABECK-LETMATHE,<br><br>Defendants,<br><br>and<br><br>EXXON MOBIL CORPORATION, a New Jersey Corporation,<br><br>Nominal Defendant. | Case No.<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, UNJUST ENRICHMENT, AND VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

TABLE OF CONTENTS

Page

I.      NATURE AND SUMMARY OF THE ACTION ................................................................1

II.     JURISDICTION AND VENUE ......................................................................................5

III.    PARTIES ..........................................................................................................................6

IV.     DUTIES OF THE INDIVIDUAL DEFENDANTS .......................................................12

V.      BACKGROUND ............................................................................................................13

        A.      Oil and Gas Industry Background...........................................................................13

                1.      Upstream Operators' Capital Investment...................................................13

                2.      Reporting Requirements for "Proved" Oil and Gas Reserves ...................14

                3.      Capitalized Oil and Gas Projects Impairments .........................................17

        B.      Exxon's Business Operations .................................................................................18

                1.      Crude Bitumen............................................................................................19

                2.      Natural Gas Expansion ...............................................................................20

                3.      Proxy Cost of Carbon.................................................................................21

        C.      Relevant GAAP and SEC Accounting and Disclosure Rules................................22

                1.      Materiality of Misstatements and Omissions: SEC Staff
                        Accounting Bulletin No. 99 – Materiality ("SAB 99") ............................22

                2.      ASC 360-10-35, Impairment or Disposal of Long-Lived Assets ..............24

                3.      ASC 275 – Risks and Uncertainties............................................................25

                4.      SEC Regulation S-K Item 303– Management's Discussion
                        and Analysis................................................................................................26

VI.     SUBSTANTIVE ALLEGATIONS ................................................................................27

        A.      Oil and Gas Prices Began to Decline in 2014, Leading Many of Exxon's
                Peers to Writedown Assets .....................................................................................27

        B.      The Commercial Viability of Exxon's Assets Deteriorated due to the
                Decline in Commodity Prices .................................................................................29

          1.       Canadian Bitumen Operations ................................................................30

          2.       Rocky Mountain Dry Gas Operations........................................................31

   C.     The Individual Defendants Caused the Company to Issue Misleading Statements About the Value of its Assets.................................................................................32

   D.     The Public Statements About Exxon's Assets Violated GAAP and SEC Disclosure Requirements .........................................................................................................62

VII.   THE TRUTH BEGINS TO EMERGE AND THE INDIVIDUAL DEFENDANTS CONTINUE TO ISSUE MISLEADING STATEMENTS................................................64

VIII.  THE TRUTH FULLY EMERGES ...................................................................................70

IX.   DAMAGES....................................................................................................................74

X.    DERIVATIVE AND DEMAND ALLEGATIONS ..........................................................75

Plaintiff Saratoga Advantage Trust Energy & Basic Materials Portfolio, by and through its undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant, Exxon Mobil Corporation ("Exxon" or the "Company"), against certain members of its Board of Directors (the "Board") and certain of its executive officers, seeking to remedy defendants' breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and violations of Sections 10(b), 21D, and 29(b) of the Securities Exchange Act of 1934 ("the Exchange Act").  Plaintiff alleges the following based upon personal knowledge as to itself and its own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through its attorneys, which included the review and analysis of: (a) public filings made by Exxon with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) press releases and other publications disseminated by certain of the Individual Defendants (defined herein) and other related non-parties; and (c) other publicly available information concerning Exxon and Defendants.

I.      **NATURE AND SUMMARY OF THE ACTION**

1.      Exxon explores and produces crude oil and natural gas and manufactures and sells crude oil, natural gas, petroleum products, petrochemicals, and a wide variety of specialty products.

2.      The Company's most valuable assets are its oil and gas reserves.  Because of their significance to the Company's valuation, oil and gas reserves are subject to disclosure requirements under SEC rules and specific accounting rules.

3.      Exxon's business is vulnerable to climate change related risks, such as reduced demand for fossil fuels as consumers opted for renewable energy resources or regulatory policies implemented to combat climate change, and operational disruptions caused by climate change such as increased severe weather and sea level rise.  Shareholders have sought further disclosures from

1

Exxon regarding the anticipated impact of climate change to its reserves and long-term prospects. One such shareholder resolution settled with Exxon releasing a report entitled "Energy and Carbon – Managing the Risks" (the "MTR Report") on March 31, 2014, which purported to "address important questions raised recently by several stakeholder organizations on the topics of global energy demand and supply, climate change policy, and carbon asset risk."

4.      According to the MTR Report, Exxon "makes long-term investment decisions based in part on [its] rigorous, comprehensive annual analysis of the global outlook for energy" (the "Outlook").  The Outlook "embedded" a "proxy cost of carbon," a metric which purportedly reflected the financial impact of climate change-related risks and regulatory policies that governments could implement, such as emissions restrictions, "relating to the exploration, development, production, transportation or use of carbon-based fuels."  As a result, Exxon was "confident that none of [its] hydrocarbon reserves are now or will become 'stranded.'"

5.      In the countries part of the Organisation for Economic Cooperation and Development ("OECD"), which include Canada and United States, Exxon applied a "proxy cost that is about $80 per ton in 2040," according to Exxon's "Energy and Climate" Report (the "E&C Report") issued on March 31, 2014.  The E&C Report stated that "[t]his GHG [i.e., greenhouse gas] proxy cost is integral to ExxonMobil's planning."

6.      Beginning in 2014, oil and gas prices declined as record supply growth coincided with weaker demand for fossil fuels and increased competition from renewable energy resources. Prices remained repressed and were not expected to increase, leading many of Exxon's peers to write off more than $200 billion worth of reserves that were no longer capable of generating a profit.  In contrast, Exxon was adamant that a writedown of its assets was unnecessary because the Company's investment decisions had already accounted for price fluctuations, as the Company

viewed the decline in commodity prices to be temporary.  Then-Chief Executive Officer Rex W. Tillerson insisted, "We don't do write-downs."

7.      Seeking to preserve Exxon's treasured AAA credit rating ahead of its $12 billion debt offering in March 2016, which would raise capital to fund operations and pay shareholder dividends, Exxon's directors made public statements that understated the risks to the business and overstated the quality and profitability of its assets.

8.      In reality, Exxon was susceptible to the same challenges faced by its peers operating in the same geographic areas, and by the end of fiscal 2015, its reserves were no longer profitable and likely to be written off.  On October 28, 2016, Exxon finally acknowledged that the declining commodity prices had negatively impacted its business; it disclosed that nearly 20% of its assets might no longer meet the SEC definition of "proved reserves" (i.e., generate revenue that exceeds the operational costs) and would be "de-booked."  The Company also cautioned that if the average commodity prices remained at depressed levels, "certain quantities of oil, such as those associated with the Kearl oil sands operation in Canada, will not qualify as proved reserves at year-end 2016."

9.      On this news, the Company's share price fell $3.60 per share, or more than 4%, over two trading sessions, wiping out $14.9 billion in market capitalization.

10.     However, the debooking of certain assets was nearly certain, even if prices increased significantly.  On January 31, 2017, Exxon disclosed that it would record a $2 billion impairment charge for its Rocky Mountains dry gas operations and that its Kearl assets would be de-booked.

11.     On this news, the Company's share price fell nearly $2 per share, or more than 2%.

12.     These revelations precipitated the filing of a securities class action in the United States District Court for the Northern District of Texas, captioned *Ramirez Jr. v. Exxon Mobil*

3

*Corporation, et al.*, Civil Action No. 3:16-cv-03111-K (the "Securities Class Action").  On August 14, 2018, U.S. District Judge Kinkeade denied Exxon's motion to dismiss because the amended complaint sufficiently alleged that the Company issued material misstatements regarding: (i) its use of proxy costs of carbon in its investment and business decisions; (ii) the value of its Rocky Mountain dry gas operations in 2015, which was impaired due to falling commodity prices; (iii) the profitability of its bitumen reserves in Canada, which were operating at a loss for three months; (iv) the profitability of its Kearl reserves, which  was no longer expected to generate sufficient revenue to recover project costs and would therefore be debooked by the end of fiscal 2016; and (v) the proxy cost of carbon used in internal strategic decisions, which was significantly lower than publicly reported.

13.     On October 24, 2018, the New York Office of Attorney General ("NYOAG") filed a complaint against Exxon alleging violations of the Martin Act Securities Fraud (New York General Business Law §§ 352 *et seq.*), persistent fraud and illegality (New York Executive Law § 63(12)), actual fraud, and equitable fraud (the "NYOAG Action").  The NYOAG Action alleges that Exxon "employed internal practices that were inconsistent with its representations, were undisclosed to investors, and exposed the [C]ompany to greater risk from climate change regulation than investors were led to believe."   Based on information disclosed in internal Exxon documents and a sworn affirmation provided by the NYOAG, the Company's public statements were misleading because: (i) Exxon's internal policies used proxy costs of carbon that were significantly lower than those identified in public statements; (ii) proxy costs were not considered when evaluating certain projects or their impairment tests; and (iii) proxy costs were not used in impairment tests of reserve assets until at least 2016.  On June 12, 2019, Justice Barry Ostrager dismissed key affirmative defenses Exxon had raised in the NYOAG Action, including a First

4

Amendment claim, conflict of interest of the attorney general, prosecutorial misconduct, thus increasing the likelihood that the Company will face liability in the action.

14.     On November 16, 2018, Plaintiff sent a litigation demand to the Board, demanding that the Board "investigate whether Exxon's officers and directors committed non-exculpable violations and/or breaches of fiduciary duties or other violation of applicable law."

15.     Four months after the Demand was sent, Plaintiff sought an update on the Board's progress in considering the Demand.  Counsel for the Company gave little details as to the status of the Board's investigation into the matters raised by the Demand.  Under New Jersey law, the Board had 90 days to investigate the Demand.  The Board's failure to act despite the Company's increasing risk of liability in the Securities Class Action and the NYOAG Action is not a valid exercise of business judgment, especially since the Board's delay could severely prejudice Exxon's potential claims against individuals who breached their fiduciary duties due to the expiration of the statute of limitations of certain claims.

16.     For these reasons and as set forth in greater detail herein, including the Board's unreasonable delay in investigating these matters, Plaintiff now files this action against the Individual Defendants who abandoned their fiduciary duties and should now be held accountable for the financial and reputational harm suffered by Exxon and its shareholders.

## II.     **JURISDICTION AND VENUE**

17.     The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that the Complaint states a federal question: violations of Sections 10(b), 21D, and 29(b) of the Exchange Act.  The Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

18.     This Court has jurisdiction over each Defendant herein because each Defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

19.     Venue is proper in this Court in accordance with 28 U.S.C. § 1391(a) because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this district by engaging in numerous activities that had an effect in this District.

III.     **PARTIES**

**Plaintiff**

20.     Plaintiff Saratoga Advantage Trust Energy & Basic Materials Portfolio has been a shareholder of Exxon since 2013, has continuously been a shareholder since that time, and is a current Exxon shareholder

**Nominal Defendant**

21.     Nominal Defendant Exxon is incorporated under the laws of New Jersey with its principal executive offices located at 5959 Las Colinas Blvd., Irving, Texas.  As of December 31, 2016, the number of regular employees at Exxon was 71,100, and the number of Company-operated retail sites employees was 1,600.  The Company's stock trades on the New York Stock Exchange under the symbol "XOM."

**Individual Defendants**

22.     Defendant Darren W. Woods ("Woods") has served as Chief Executive Officer and Chairman of the Board since January 2017.  Woods is, and was at all relevant times, a member of Exxon's Management Committee.   Exxon paid Woods the following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | Option Awards | Change in Pension Value | Total |
|------|--------|-------|--------------|---------------|-------------------------|-------|
| 2016 | $1,000,000 | $1,232,000 | $12,014,215 | $2,179,208 | $421,505 | $16,846,928 |
| 2015 | $736,667 | $1,219,000 | $7,241,492 | $954,492 | $143,221 | $10,294,872 |

23.     Defendant Andrew P. Swiger ("Swiger") has served as Principal Financial Officer since January 2013 and as Senior Vice President since April 2009.  Swiger is, and was at all relevant times, a member of Exxon's Management Committee.  Defendant Swiger is named as a defendant in a Related Securities Class Action complaint that alleges he violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934.  Exxon paid Defendant Swiger the following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | Option Awards | Change in Pension Value | Total |
|------|--------|-------|--------------|---------------|-------------------------|-------|
| 2016 | $1,287,500 | $986,000 | $9,330,748 | $3,805,931 | $146,568 | $15,556,747 |
| 2015 | $1,228,750 | $1,409,000 | $8,648,192 | $3,489,861 | $126,559 | $14,902,362 |
| 2014 | $1,142,500 | $1,876,000 | $8,644,160 | $4,355,277 | $116,619 | $16,134,556 |

24.     Defendant David S. Rosenthal ("Rosenthal") has served as Vice President since October 2008 and as Controller since September 2014.  Defendant Rosenthal is named as a defendant in a Related Securities Class Action complaint that alleges he violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934.

25.     Defendant Jeffrey J. Woodbury ("Woodbury") served as Vice President of Investor Relations and Secretary from September 2014 to July 2018.  Woodbury is named as a defendant in a Related Securities Class Action complaint that alleges he violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934.

26.     Defendant Steven S. Reinemund ("Reinemund") has served as Presiding Director of the Board since May 2016 and has served as a director since May 2007.  He served as a member of the Audit and Finance Committees from at least April 2013.  Exxon paid Reinemund the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2016 | $115,989 | $193,000 | $239 | $309,228 |
| 2015 | $110,000 | $231,075 | $340 | $341,415 |
| 2014 | $110,000 | $250,175 | $338 | $360,513 |

27.     Defendant Michael J. Boskin ("Boskin") served as a director of the Company from January 1996 to May 2018.  Boskin was also the Chairman of the Audit Committee from at least April 2013 to at least April 2014.  Exxon paid Boskin the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2016 | $110,000 | $193,000 | $239 | $303,239 |
| 2015 | $110,000 | $231,075 | $340 | $341,415 |
| 2014 | $114,093 | $250,175 | $338 | $364,606 |

28.     Defendant Samuel J. Palmisano ("Palmisano") has served as a director of the Company since January 2006.  Palmisano was Exxon's Presiding Director from May 2008 to May 2013.  Exxon paid Palmisano the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2016 | $120,000 | $193,000 | $239 | $313,239 |
| 2015 | $120,000 | $231,075 | $340 | $351,415 |
| 2014 | $120,000 | $250,175 | $338 | $370,513 |

29.     Defendant Kenneth C. Frazier ("Frazier") has served as a director of the Company since May 2009.  Exxon paid Frazier the following compensation as a director:

8

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2016 | $110,000 | $193,000 | $239 | $303,239 |
| 2015 | $110,000 | $231,075 | $340 | $341,415 |
| 2014 | $110,000 | $250,175 | $338 | $360,513 |

30.     Defendant Ursula M. Burns ("Burns") has served as a director of the Company since November 2012.  Burns was the Chairman of Exxon's Audit Committee since at least May 2017 and a member of that committee from at least April 2013 to at least May 2017.  Exxon paid Burns the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2016 | $110,000 | $193,000 | $239 | $303,239 |
| 2015 | $110,000 | $231,075 | $340 | $341,415 |
| 2014 | $110,000 | $250,175 | $338 | $360,513 |

31.     Defendant Henrietta H. Fore ("Fore") served as a director of the Company from February 2012 to December 2017.  Fore was a member of Exxon's Audit Committee  from at least April 2017 to at least May 2017.  Exxon paid Fore the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2016 | $110,000 | $193,000 | $239 | $303,239 |
| 2015 | $110,000 | $231,075 | $340 | $341,415 |
| 2014 | $110,000 | $250,175 | $338 | $360,513 |

32.     Defendant William C. Weldon ("Weldon") has served as a director of the Company since May 2013.  Weldon was a member of Exxon's Audit Committee from at least May 2017.  Exxon paid Weldon the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2016 | $110,000 | $193,000 | $239 | $303,239 |
| 2015 | $110,000 | $231,075 | $340 | $341,415 |
| 2014 | $110,000 | $250,175 | $338 | $360,513 |

33.     Defendant Rex W. Tillerson ("Tillerson") was Exxon's Chief Executive Officer and Chairman from January 2006 to December 2016, a director from March 2004 to December 2016, President from March 2004 to January 2016, and has held various positions with the Company and its predecessors beginning in 1975.  He was a member of Exxon's Management Committee from at least April 2005 until his retirement on December 31, 2016.  Tillerson is named as a defendant in a Securities Class Action complaint that alleges he violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934.  Tillerson is a citizen of Texas.  Exxon paid Tillerson the following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | Option Awards | Change in Pension Value | Total |
|------|--------|-------|--------------|---------------|-------------------------|-------|
| 2016 | $3,167,000 | $1,670,000 | $19,731,375 | $2,249,342 | $575,850 | $27,393,567 |
| 2015 | $3,047,000 | $2,386,000 | $18,288,000 | $3,036,167 | $540,291 | $27,297,458 |
| 2014 | $2,867,000 | $3,670,000 | $21,420,000 | $4,683,892 | $455,420 | $33,096,312 |

34.     Defendant William W. George ("George") served as a director of the Company from May 2005 to May 2015.  He was also a member of Exxon's Audit Committee from at least April 2014 to at least April 2015.  Exxon paid George the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|-------------|-------------------|--------------|------------------------|-------|
| 2015 | $44,726 | $231,075 | $142 | $275,943 |
| 2014 | $110,000 | $250,175 | $338 | $360,513 |

35.     Defendant Larry R. Faulkner ("Faulkner") served as a director of the Company from January 2008 to May 2017. Faulkner was also the Chairman of Exxon's Audit Committee from at least April 2015 to at least April 2017 and a member of that committee from at least April 2013 to at least April 2017. Exxon paid Faulkner the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|-------------|-------------------|--------------|------------------------|-------|

10

| 2016 | $120,000 | $193,000 | $239 | $313,239 |
| 2015 | $120,000 | $231,075 | $340 | $351,415 |
| 2014 | $115,907 | $250,175 | $338 | $366,420 |

36.    Defendant Douglas R. Oberhelman ("Oberhelman") has served as a director of the Company since May 2015.  Since at least May 2015, Oberhelman has been a member of the Audit Committee and Finance Committee.  Exxon paid Oberhelman the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2016 | $110,000 | $193,000 | $239 | $303,239 |
| 2015 | $65,274 | $682,640 | $193 | $748,107 |

37.    Defendant Peter Brabeck-Letmathe ("Brabeck-Letmathe") served as a director of the Company from May 2010 to May 2017.  He was also a member of Exxon's Audit Committee and Finance Committee from at least April 2013 to at least April 2017.  Exxon paid Brabeck-Letmathe the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2016 | $110,000 | $193,000 | $239 | $303,239 |
| 2015 | $110,000 | $231,075 | $340 | $341,415 |
| 2014 | $110,000 | $250,175 | $338 | $360,513 |

38.    The defendants identified in ¶¶ 22-25, 33 are referred to herein as the "Officer Defendants."  The defendants identified in ¶¶ 22, 26-37 are referred to herein as the "Director Defendants."  The defendants identified in ¶¶ 26-27, 30-32, 34-37 are referred to herein as the "Audit Committee Defendants."  The Defendants identified in ¶¶ 23-25, 33 are referred to herein as the "Class Action Defendants."  Collectively, the Defendants identified in ¶¶ 22-37 are referred to herein as the "Individual Defendants."

IV.    **DUTIES OF THE INDIVIDUAL DEFENDANTS**

39.    By reason of their positions as officers, directors, and/or fiduciaries of Exxon and because of their ability to control the business and corporate affairs of Exxon, at all relevant times defendants owed Exxon and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were required to use their utmost ability to control and manage Exxon in a fair, just, honest, and equitable manner.  Defendants were required to act in furtherance of the best interests of Exxon and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to Exxon and its shareholders a fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

40.    Defendants, because of their positions of control and authority as directors and/or officers of Exxon, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with Exxon, each of the defendants had knowledge of material non-public information regarding the Company.

41.    To discharge their duties, the officers and directors of Exxon were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors of Exxon were required to, among other things:

a)    Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

b)    Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules,

12

regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority.

c)    Exercise good faith to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion;

d)    When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

## V.    BACKGROUND

### A.    Oil and Gas Industry Background

42.    Exxon is considered a "supermajor" because it is one of the largest oil and gas companies engaged in both upstream and downstream operations.   Upstream operations encompass the exploration, acquisition, development, and extraction of raw oil and gas commodities.   Midstream operators gather and transport the raw upstream products from often remote petroleum-producing regions in the world, to the downstream operators, where the products can be refined, marketed, and sold.

43.    Three components of Exxon's financial reporting are relevant to this Action: (i) the size and nature of the capital investments and various costs associated with an upstream oil and gas operation; (ii) the definition and significance of "proved reserves"; and (iii) the recognition of asset impairment charges in connection with capitalized oil and gas reserves.

44.    An oil and gas company's financial performance is significantly impacted by changes in crude oil and natural gas prices and by changes in the profit margins of refined petroleum products in the downstream segment.   As such, increases in supply or reductions in demand for petroleum-based commodities can materially impact earnings negatively.

### 1.    Upstream Operators' Capital Investment

45.    The size of petroleum deposits in an area or reservoir impacts the profitability of oil and gas companies, and upstream operators make significant investments in developing large,

technologically complex projects.   This capital investment and associated operating costs ("upstream costs") are classified into four categories:

    (i)    Acquisition costs.  Costs incurred in acquiring the rights to explore for, drill and produce oil and natural gas.

    (ii)    Exploration costs.  Costs incurred in exploring a property, often with geophysical techniques, or by drilling test wells.

    (iii)    Development costs.  Costs incurred in preparing proved reserves for production, including costs of development wells, installing facilities for extracting and treating, gathering and storing oil and gas.

    (iv)    Production costs.  Costs to lift the oil and gas to the surface and in gathering, treating and storing the oil or gas.  These costs also include the costs to operate and maintain the plant and equipment, as well as royalties, transportation costs, certain taxes, GHG emission-related expenses, and certain administrative costs.

46.   As much as half of a complex project's total cost consists of acquisition, exploration, and development costs.  Under the "full cost" method of accounting, these costs are capitalized and amortized over the anticipated production life of a given project.  Under the "successful efforts" method of accounting, which Exxon employs, only exploration costs generally attributable to successful exploration efforts are capitalized and amortized, in addition to all of the acquisition and development costs.  Under either method, all production costs are generally not capitalized but rather are expensed as incurred.

    2.    **Reporting Requirements for "Proved" Oil and Gas Reserves**

47.   The total estimated amount of oil or gas in a petroleum reservoir is referred to as the volume of petroleum "in place."  An oil and gas company's most valuable asset (i.e., "reserves") is the portion of the petroleum in place that is technologically and commercially feasible to recover.

48.   "Commercially feasible reserves" are those assets for which the total estimated revenue exceeds the sum of upstream costs and an acceptable margin or profit.  Based on the

14

likelihood that the commercially feasible reserve will yield an economically profitable recovery, it is further classified as either "proved," "probable," or "possible."

49.     "Proved reserves" are the most relevant to the investing public because they represent the future cash flow of an upstream oil and gas company. The successful discovery, development, production, and ongoing replacement of such proved oil and gas reserves are all critical factors to the financial survival of an upstream oil and gas company. Indeed, because Wall Street research analysts and investors use reported proved reserve amounts to value upstream companies and make predictions concerning their revenue and earnings, the quantity, type, and replacement ratio of proved reserves have a significant effect on an oil and gas company's stock price.

50.     "Proved oil and gas reserves" is defined in Regulation S-X Rule 4-10(a)(22):

Proved oil and gas reserves. Proved oil and gas reserves are those quantities of oil and gas, which, by analysis of geoscience and engineering data, can be estimated with reasonable certainty to be economically producible-from a given date forward, from known reservoirs, and under existing economic conditions, operating methods, and government regulations-prior to the time at which contracts providing the right to operate expire, unless evidence indicates that renewal is reasonably certain, regardless of whether deterministic or probabilistic methods are used for the estimation.

51.     Critically, to be a proven reserve, the quantities of oil and gas reserves must be economically producible under the economic conditions existing as of the date of the financial statement. "Economically producible" means production is expected to generate revenue that exceeds, or is reasonably expected to exceed, the costs of the operation.

52.     Whether a reserve can be "economically" produced at a profit is determined by expected sales price and costs. Under SEC Rule 4-10(a)(22)(v), the assumed future sales price is the "lookback" arithmetic average price of the first-day-of-the-month prices for the prior 12 months of the reporting period, unless future sales price commitments are defined by contractual

15

arrangements.  The first-day-of-the-month prices must be adjusted to reflect the physical location and quality of the proved reserves, but not to reflect forecasted petroleum prices, futures prices, or inflation.

53.    The estimated cost is the period end cost level applied to each year for which there will be production of the proved reserves.  The estimated cost is adjusted to reflect known cost changes, such as tax and royalty changes and major maintenance, but not to reflect inflation.

54.    If previously classified proved reserves are no longer economically producible under the economic conditions existing at the end of a new reporting period, SEC rules require the company to disclose this revision, or "de-booking" of proved reserves, in the supplement to the notes to the financial statements as a negative revision to the beginning-of-the-year proved reserves quantities.

55.    Interim financial statements are not required to disclose reserves unless adverse events that significantly affect proved reserve quantities.  According to ASC 932-270-50-1:

> The disclosures set forth in Subtopic 932-235 are not required in interim financial reports.  However, interim financial reports shall include information about a major discovery or other favorable or adverse event that causes a significant change from the information presented in the most recent annual financial report concerning oil and gas reserve quantities.

56.    Additionally, FASB Financial Accounting Standards Codification Topic 932, Extractive Activities – Oil and Gas ("ASC 932") requires supplemental reporting of information about oil and gas reserves, including: (i) proved oil and gas reserve quantities; (ii) capitalized costs relating to oil and gas producing activities; (iii) costs incurred for property acquisition, exploration, and development activities; (iv) results of operations for oil and gas producing activities; and (v) a standardized measure of discounted future net cash flows relating to proved oil gas reserve amounts.

### 3.   Capitalized Oil and Gas Projects Impairments

57.    Reserves are recorded as assets based on the capitalized costs associated with the investment and represent resources that are expected to generate future cash flows in excess of the capitalized costs associated with the project.  If the project's forecasted future net cash flows are no longer expected to exceed the capitalized project costs, the asset must be written down to its actual fair value, i.e., the company records an impairment charge against its earnings.

58.    The most common cause of asset impairment charges in the oil and gas industry is persistently low oil and gas prices because they affect expected future petroleum price levels, which in turn, impacts future cash flow and profitability and, therefore, whether the company is likely to recover its acquisition and development costs.

59.    An oil or gas "benchmark" refers to a specific, established hydrocarbon product with a defined chemical composition that is bought and sold at a specific regional location. Commodities are priced based on a benchmark price for a known composition for a known location that is adjusted for a "differential" which reflects the commodity's quality compared to the benchmark and the additional transportation costs associated with the specific location at which the particular commodity is purchased.

60.    The "breakeven price" is the average price required for an operator to cover its costs before turning a profit and can be defined either on a "full cycle costs" basis or a "current cash costs" basis.

61.    The "full cycle costs" for an upstream project is the sum of the costs, estimated for the complete life of the project, plus a reasonable return on investment (including a risk premium for investing in the oil business).

62.    The "full cycle breakeven price" is the quotient of the total full cycle costs over the life of the project divided by the estimated total barrels of reserves expected to be available over

the life of the project.  This estimates the average per barrel sales price required over the life of the project to recover costs and profit over the project's expected life.  A project is sustainable over time only if the commodity is sold for a price greater than or equal to the full cycle breakeven price.

63.     The "cash breakeven price" is the average per barrel sales price required at a given point in time to cover the operation's current out-of-pocket expenses (i.e., the expenses and costs associated with the actual production and sale of the particular operation's hydrocarbon.)

B.     **Exxon's Business Operations**

64.     Exxon has three primary business segments: (1) an upstream segment, which includes its exploration and production ("E&P"); (2) a downstream segment, which includes its refineries and retail operations; and (3) a chemicals segment, which includes the manufacturing and sale of various petrochemicals.

65.     Most of the Company's profits are derived from its upstream business segment. For example, in 2014, Exxon's upstream operations generated approximately $27.5 billion of net income or nearly 85% of the Company's total net income of $32.5 billion.

66.     Its upstream operations require significant capital investments in acquiring and developing large oil and gas fields that generate an acceptable rate of return.  Historically, the Company's upstream growth has been through acquisitions, rather than organic growth.  Exxon's "Reserves Replacement" statistic indicates its long-term ability to maintain or expand crude and gas output, underscoring the need to acquire new resources.

67.     The SEC requires E&P companies to disclose their oil and gas reserves on an annual basis.  These reserves reports include all oil and gas reserves, both proved reserves and overall reserves.  During the relevant period, Exxon disclosed declining year-end reserves of billion oil-equivalent barrels (2014), 24.8 billion (2015), and 20 billion (2016).

68.     Exxon's performance is marked by a history of consistent shareholder dividends and a strong credit rating.  Exxon has increased its dividend for 34 consecutive years, with an annual increase of 10% per year over the past ten years; for the last five years, on average, $0.40 of every dollar generated by Exxon has been distributed to shareholders. Moreover, Exxon has had a AAA credit rating from S&P since July 1949.

### 1.  **Crude Bitumen**

69.     Exxon has two upstream projects in Alberta, Canada that process bitumen-based crude oil: (i) the "Kearl Operation" and (ii) the "Cold Lake Operation" (collectively, the "Canadian Bitumen Operations").

70.     Bitumen is one of the world's most costly hydrocarbons to produce because it requires significantly more processing than light crude oil before it can be used by refineries to produce usable fuels such as gasoline and diesel.  The world's largest crude bitumen reserves are in northern Alberta, Canada.

71.     Canada's bitumen-based crude sells at a very high discount relative to other global crude streams because it must be blended with diluent, an expensive light-petroleum based mixing agent, to enable the bitumen to flow through a pipeline.  About three barrels of diluent is necessary for ten barrels of raw bitumen. In addition, there are high costs to transport and to refine the material.

72.     The Kearl Operation occupies a seventy-five square mile leased tract of land in a remote forested area fifty miles northeast of Fort McMurray in Alberta, Canada.  The Kearl Operation first began production in mid-2013.  The Kearl Operation is co-owned by, Imperial Oil Limited ("Imperial"), which holds a 70.96% interest, and ExxonMobil Canada, which holds the remaining 29.04% interest.  Exxon owns 69.9% of Imperial, a publicly traded company whose

operations are fully consolidated onto Exxon's financial statements. ExxonMobil Canada is Exxon's wholly-owned subsidiary.

73.     Exxon invested more than $20 billion to acquire, explore, and develop the Kearl Operation, significantly outsizing the $23.4 billion spent on the acquisition, exploration, and development of all its projects in 2015. In addition to the capital expenditure, Exxon incurred $1.4 billion annual production costs for the Kearl Operation.

74.     The Cold Lake Operation is one of the largest, longest-running bitumen operations in Alberta, Canada and is wholly owned by Imperial.

75.     Alberta has implemented regulations to combat climate change. To minimize carbon dioxide ("CO2") emissions, the Specific Gas Emitters Regulation ("SGER") established the Climate Change and Emissions Management Fund ("CCEMC"), which is funded by a carbon pricing initiative or carbon tax. Subject to these regulations, Exxon has been well over the minimum threshold. Then, in 2017, Alberta implemented a supplemental carbon tax that applied to greenhouse gases not covered under the existing carbon pricing initiative.

## 2.     **Natural Gas Expansion**

76.     Exxon reported low reserve replacement rates in 2007 through 2009. In 2008, Exxon reported a reserve replacement rate of 108%, which included unconventional sources such as controversial oil sands (e.g., bitumen). However, without these sources, Exxon's reserve replacement rate was only 27% in 2008.

77.     To grow its business, Exxon began strategic acquisitions. In 2009, it acquired XTO Energy, Inc. ("XTO"), which had reported 14.8 trillion cubic feet of proved reserves of natural gas. Over 80% of XTO's production was derived from tight gas, conventional gas, and coal-bed methane reservoirs, as opposed to conventional shale gas. After the acquisition, Exxon was the

largest domestic natural gas producer in the United States.   As of 2017, Exxon owned approximately 1.7 million acres of land for dry gas production in the U.S. Rocky Mountain region.

### 3.   Proxy Cost of Carbon

78.     To address climate change risks, related policies, and consumer decisions that could impact Exxon's operations, the Individual Defendants claimed that a "proxy cost of carbon" was factored into the Company's investment decisions, internal reserve estimates, and impairment decisions.   The "proxy cost of carbon" is "embedded" in the Company's Outlook, an energy forecast issued by Exxon that formed the basis for its investment planning and business decisions.

79.     According to Exxon, the proxy cost of carbon assumed that future government policies to reduce GHG emissions would become more restrictive over time.   The proxy cost is intended to "reasonably reflect the types of actions and policies that governments may take over the outlook period relating to the exploration, development, production, transportation, or use of carbon-based fuels."   In submissions to the Carbon Disclosure Project ("CDP"), Exxon stated that "approximately 90 percent of petroleum-related GHG emissions are generated when customers use our products and the remaining 10 percent are generated by industry operations."

80.     In 2010, Exxon's Outlook modeled the cost of CO2 emissions to double over ten years, reaching $30 per ton by 2020 and $60 per ton in 2030, as OECD nations sought to deter CO2 emissions.   Exxon acknowledged that "[a]s CO2 costs go up, economics shift. . . .   This shift becomes even more pronounced if CO2 costs rise to $60 per ton, which is where we anticipate policies in the OECD will drive costs by 2030."

81.     In 2012, Exxon's Outlook predicted the cost of CO2 emissions to reach $80 per ton by 2040 because the Company anticipated governments would set policies imposing costs on CO2 and other emissions, an expectation "integral" to the Company's forecast.

82.     In 2013, acknowledging that "OECD countries will continue to lead the way in adopting [emissions] policies, with developing nations gradually following, led by China," the Individual Defendants assured investors that the increasingly stringent proxy cost had been "embedded in our outlook since 2007" and that Exxon's "investment decisions are based on our long-term business outlook."

83.     Exxon has refused to conduct impairment analysis for its assets when prices declined on at least one occasion.  In 2012, natural gas price began to decline, falling as low as $1.82 per million BTUs, and Tillerson admitted that "We are all losing our shirts today. . . .  We're making no money.  It's all in the red."  However, when the SEC approached Exxon about an impairment analysis for its assets, the Company represented that it "does not view temporarily low prices or margins as a trigger event for conducting impairment tests."  Exxon also stated that its upstream assets "were not subject to a significant decrease in market value" and "did not undergo a significant adverse change in the extent or manner in which they were being used" or "in the legal environment, the business climate, or action by a regulator."

C.     **Relevant GAAP and SEC Accounting and Disclosure Rules**

84.     The SEC requires publicly traded companies to file quarterly and annual financial statements prepared in accordance with generally accepted accounting principles ("GAAP").

1.     **Materiality of Misstatements and Omissions: SEC Staff Accounting Bulletin No. 99 – Materiality ("SAB 99")**

85.     According to SAB 99, an "omission or misstatement of an item in a financial report is material if, in the light of surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion or correction of the item."

> Evaluation of materiality requires a registrant and its auditor to consider all the relevant circumstances, and the staff believes that there are numerous

circumstances in which misstatements below 5% could well be material. Qualitative factors may cause misstatements of quantitatively small amounts to be material; as stated in the auditing literature.

86.     A quantitatively small misstatement of a financial statement item can nevertheless be material if it masks a change in earnings or other trends; hides an earnings miss; changes a loss into income or vice versa; or concerns a segment of business that plays a significant role in the business operations or profitability.

87.     Moreover, an intentional misstatement, even if quantitatively small, can be material:

> For the reasons noted above, the staff believes that a registrant and the auditors of its financial statements should not assume that even small intentional misstatements in financial statements, for example those pursuant to actions to "manage" earnings, are immaterial. ***While the intent of management does not render a misstatement material, it may provide significant evidence of materiality. The evidence may be particularly compelling where management has intentionally misstated items in the financial statements to "manage" reported earnings. In that instance, it presumably has done so believing that the resulting amounts and trends would be significant to users of the registrant's financial statements. The staff believes that investors generally would regard as significant a management practice to over- or under-state earnings up to an amount just short of a percentage threshold in order to "manage" earnings. Investors presumably also would regard as significant an accounting practice that, in essence, rendered all earnings figures subject to a management-directed margin of misstatement.***

SAB 99 (footnotes omitted).

88.     If management represents that a particular segment is important to future profitability, a misstatement of even a relatively small business segment will likely be material:

> The materiality of a misstatement may turn on where it appears in the financial statements. For example, a misstatement may involve a segment of the registrant's operations. In that instance, in assessing materiality of a misstatement to the financial statements taken as a whole, registrants and their auditors should consider not only the size of the misstatement but also the significance of the segment information to the financial statements taken as a whole. "A misstatement of the revenue and operating profit of a relatively small segment that is represented by management to be important to the future profitability of the entity" is more likely to be material to investors than a misstatement in a segment that management has not identified as especially important.

23

(Footnotes omitted.)

2.     **ASC 360-10-35, Impairment or Disposal of Long-Lived Assets**

89.     A long-lived asset is impaired if its carrying amount exceeds its fair value, where carrying amount is the asset's cost less the accumulated depreciation or amortization. ASC 360-10-20.  Under ASC 360-10-35, Impairment or Disposal of Long-Lived Assets, the carrying amount of long-lived assets "shall be tested for recoverability whenever events or changes in circumstances indicate that its carrying amount may not be recoverable."

a)     **Trigger Events**

90.     "Trigger events" are events and circumstances that indicate an asset may be impaired. These include:

(i)     A significant decrease in the market price of a long-lived asset (asset group);

(ii)     A significant adverse change in the extent or manner in which a long-lived asset (asset group) is being used or in its physical condition; and

(iii)     A significant adverse change in legal factors or in the business climate that could affect the value of a long-lived asset (asset group), including an adverse action or assessment by a regulator.

91.     Impairment triggers specific to the oil and gas industry include:

(i)     Lower expected future oil and gas prices (such as the prices used by management in evaluating whether to develop or acquire properties);

(ii)     Actual or expected future development or operating costs are significantly more than previously anticipated for a group of properties (*e.g.*, significant authority for expenditure overruns or higher oil field or other service costs with no significant upward revisions in reserve estimates); and

(iii)     Significant adverse change in legislative or regulatory climate.

24

Petroleum Accounting 7th ed., pp. 322-23.

### b)   Impairment Testing and Loss Recognition

92.   Whenever a company identifies trigger events, it must perform a "recoverability test" to determine whether the asset's carrying amount is recoverable by estimating whether the undiscounted net cash flow exceeds the carrying value.  The asset is impaired if the sum of undiscounted net cash flow does not exceed the carrying value of the asset on the company's books.  An impairment loss, equivalent to the excess of the carrying amount over the asset's fair value, is recorded against the capitalized cost of the asset and reduces net income for the corresponding period.

93.   The cash flow estimates must include all available evidence, including the entity's own assumptions about the use of the asset:

> Estimates of future cash flows used to test the recoverability of a long-lived asset (asset group) shall incorporate the entity's own assumptions about its use of the asset (asset group) and shall consider all available evidence.  The assumptions used in developing those estimates shall be reasonable in relation to the assumptions used in developing other information used by the entity for comparable periods, such as internal budgets and projections, accruals related to incentive compensation plans, or information communicated to others.

### 3.   ASC 275 – Risks and Uncertainties

94.   Estimates are inherent in financial statement preparation.  Accordingly, ASC 275 requires management to disclose all relevant facts when it is reasonably possible that a significant estimate underlying an item of the financial statements is likely to change in the next 12 months and the effect of such change will be material.

95.   This disclosure must include an estimate of the effect of a change in a condition, situation, or set of circumstances that existed at the date of the financial statements and an indication that it is at least reasonably possible that a change in the estimate will occur in the near term.  The requisite disclosures are described in ASC 275-10-50-6:

Certain Significant Estimates:

This Subtopic requires discussion of estimates when, based on known information available before the financial statements are issued or are available to be issued (as discussed in Section 855-10-25), it is reasonably possible that the estimate will change in the near term and the effect of the change will be material. The estimate of the effect of a change in a condition, situation, or set of circumstances that existed at the date of the financial statements shall be disclosed and the evaluation shall be based on known information available before the financial statements are issued or are available to be issued (as discussed in Section 855-10-25).

96.    Notably, the "reasonably possible" threshold for such required disclosure is relatively low. ASC 275-10-20 defines "reasonably possible" as merely "[t]he chance of the future event or events occurring is more than remote but less than likely."

97.    In addition, ¶ 8.162 of Audit & Accounting Guide: Entities With Oil and Gas Producing Activities (AICPA 2014), which assists management in preparing financial statements in conformity with GAAP, identifies risks and uncertainties of special significance to accurate reporting of oil and gas reserves and their effect of estimates of future cash flows:

FASB ASC 275, Risks and Uncertainties, and paragraphs 50-54 of FASB ASC 360-10-55 require disclosure of significant estimates and concentrations. The auditor should evaluate the appropriateness of the entity's disclosures related to significant concentrations and estimates. Significant estimates prevalent in the oil and gas industry include, but are not limited to, the following:

- Proved oil and gas reserve and cash flow estimates, including DD&A, impairments and purchase price allocations, which are all affected by oil and gas reserve estimates.

### 4.    SEC Regulation S-K Item 303– Management's Discussion and Analysis

98.    SEC Regulation S-K Item 303 ("Item 303") requires a discussion of results of operations and other information necessary to an understanding of a registrant's financial condition, changes in financial condition and results of operations. According to the SEC, "[t]his includes unusual or infrequent transactions, known trends or uncertainties that have had, or might reasonably be expected to have, a favorable or unfavorable material effect on revenue, operating

income or net income and the relationship between revenue and the costs of the revenue."  The

SEC has stated that the MD&A requirements are intended to satisfy the following three principal

objectives:

- provide a narrative explanation of a company's financial statements that enables investors to see the company through the eyes of management;

- enhance the overall financial disclosure and provide the context within which financial information should be analyzed; and

- provide information about the quality of, and potential variability of, a company's earnings and cash flow, so that investors can ascertain the likelihood that past performance is indicative of future performance.

## VI.    SUBSTANTIVE ALLEGATIONS

### A.    Oil and Gas Prices Began to Decline in 2014, Leading Many of Exxon's Peers to Writedown Assets

99.     In 2015, many of Exxon's competitors recorded impairment charges because oil

and gas prices declined significantly and were not expected to recover in the near-term.  By June

2015, over 60 oil and gas producers took impairment charges totaling $59.8 billion, and an IHS

analyst predicted that "[t]here will be pricing impairments for the next two quarters, at least."  In

the first two quarters of the year, U.S. oil and gas companies had already "written down the value

of their drilling fields by more in 2015 than any full year in history, as the rout in commodity prices

makes properties across the country not worth drilling," as reported by *The Wall Street Journal*.

By year-end 2015, U.S. oil companies, many with significant Canadian oil sands holdings, took

almost $200 billion in project-related asset impairments.

100.    The bleak outlook for future prices was attributed to increased supply coinciding

with weaker demand for oil and gas.  As, the International Energy Agency ("IEA") reported in its

2015 Medium-Term Oil Market Report: "[u]nlike earlier price drops, this one is both supply- and

demand-driven, with record non-OPEC supply growth in 2014 providing only one of the factors

27

behind it, unexpectedly weak demand growth another. . . .  The global economy, reshaped by the information technology revolution, has generally become less fuel intensive.  Concerns over climate change are recasting energy policies."  Moreover, Exxon's independent accounting firm, PricewaterhouseCoopers LLP ("PwC"), predicted that conditions would continue to deteriorate: "The sensational drop in oil prices—below US$40 per barrel at the end of 2015, down more than 60 percent from their high in the summer of 2014—reflects rampant supply and weak global demand amid concerns over slowing economic growth around the world, especially in China.  This imbalance is only going to worsen this year."

101.    Increased competition from renewable energy resources further dampened demand for oil and gas.  Highlighting the significance of shift from fossil fuels, the chief economist of the IEA noted: "'Oil and gas was the largest investment source for 100 years.  This changed in 2016 . . . .  With robust investment in renewable energy, increased investment into electricity networks, electricity is now the biggest area of capital investment.'"

102.    The expectation of persisting trends impacting the industry had drastic consequences resulting in massive cost cutting measures, layoffs, and project cancellations.  As PwC observed: "Twelve months later, upstream profits had been wiped out.  In response, companies are slashing outlays.  They are expected to cut capital expenditures by 30 percent in 2016.  Already, some $200 billion worth of projects have been canceled or postponed."

103.    Global prices fell at least 75% by 2016.  The benchmark for oil produced by Exxon's Canadian Bitumen Operations, WCS, fell a staggering 83% from its June 2014 high of $87.23 per barrel to $14.50 per barrel in January 2016.  The Henry Hub benchmark price for gas fell $6.52 per million BTU, or 80%, from February 2014 to December 2015 when it reached $1.63 per million BTU.

104.    In response to these price declines and the deteriorating conditions, many companies recorded billions of dollars in impairment charges, including for oil sands assets in the same Canadian regions where Exxon was operating.  For example, Royal Dutch Shell recorded a $2 billion impairment charge and de-booked 420 million barrels of proved bitumen reserves for a major oil sands project in northern Alberta.  At least 17 large oil sands projects were canceled or indefinitely postponed by Canadian operators.  Between 2012 and early 2017, companies recorded over $20 billion in impairment charges for oil sands assets in Canada.   Moreover, a significant portion of the multi-billion dollar impairment charges taken in 2014 or 2015 by each of ConocoPhillips, Total S.A., Chevron, BP plc, CNOOC, PetroChina, Devon Energy Corp., and Murphy Oil Corp was related to oil sands projects.

105.    Natural gas companies also recorded impairment charges for assets in the Rocky Mountain region in 2014 and 2015: Ultra Petroleum Corp. ($3.1 billion impairment charge); Vanguard Natural Resources, LLC ($1.8 billion impairment charge); and Breitburn Energy Partners LP ($2.4 billion impairment charge, including $147.9 million related to Rocky Mountain natural gas).  The impairment charges were primarily due to the declining prices, according to the operators' SEC filings.

B.    **The Commercial Viability of Exxon's Assets Deteriorated due to the Decline in Commodity Prices**

106.    The declining prices and trends in the industry were detrimental to Exxon's operations, as its upstream segment revenue fell by 46% over two years,  from $37.2 billion in 2014 to $20.2 billion in 2016, and upstream segment earnings fell by 99%, from $27.5 billion in 2014 to just $200 million in 2016.  Cash flows from operations also plummeted $15 billion, or 33%, from 2014 to 2015, and the Company was forced to borrow significant funds, causing its long-term debt to surge from $6.9 billion in 2013 to $19.9 billion at year-end 2015.  Due to

29

declining operations and shortage of capital, Exxon quietly postponed plans to expand its Kearl mine.

1.     **Canadian Bitumen Operations**

107.   As a result of the declining prices, the Canadian Bitumen Operations could no longer be expected to be profitable, i.e., receive sufficient proceeds to cover its out-of-pocket expenses.

108.   For the Canadian Bitumen Operations, the current-period out-of-pocket expenses include, at a minimum, the operations' production and royalty costs.  It excludes capitalized costs associated with the acquisition, exploration, or development of the asset and expected future development costs.

109.   For 2015 and 2016, these production and royalty costs were disclosed in Imperial's annual report 51-101F1; using the daily end-of-day Canadian exchange rates provided by Bank of Canada, these costs can be converted from Canadian Dollar to U.S. Dollar.  As set forth below, the average minimum Western Canadian Select ("WCS") cash breakeven price is the sum of the average current-period out-of-pocket expenses and the average quarterly WCS price discount differentials.   The average minimum WCS cash breakeven price represents the minimum benchmark price necessary before Exxon could make a profit from its Canadian Bitumen Operations:

**Canadian Bitumen Operations' Average Minimum WCS Cash Breakeven Price (USD/bbl) for 2015-2016**

|  | 2015 | | | | 2016 | | | |
|---|---|---|---|---|---|---|---|---|
|  | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 |
| Avg. Total Production And Royalty Cost/bbl | 27.24 | 24.31 | 20.61 | 17.94 | 17.57 | 20.75 | 22.24 | 21.41 |
| Avg. WCS Price Discount Differential | 11.32 | 4.48 | 3.63 | 9.19 | 10.55 | 6.86 | 5.15 | 5.99 |
| Avg. Minimum WCS Breakeven Price | 38.56 | 28.80 | 24.23 | 27.12 | 28.13 | 27.61 | 27.40 | 27.39 |

110.    Between November 12, 2015 and April 18, 2016, the daily spot price for WCS crude fell below the minimum WCS cash breakeven price for the Canadian Bitumen Operations on all but eight days.  Therefore, during this period, Exxon would have been unable to cover its current period out-of-pocket costs, let alone recoup any of its capitalized costs, thus operating at a loss.

111.    Moreover, the Kearl Operations likely would not have satisfied the SEC's definition for proved reserves at the end of fiscal 2015.  At December 31, 2015, if the average WCS benchmark spot price fell by more than $1.52/bbl, the Kearl Operations proved reserves would have been debooked.  If Exxon applied proxy costs of carbon, then there was even less room for error, and it was more likely that the increased costs would have precluded the Kearl Operation's reserves from satisfying the SEC's definition for proved reserves at year-end 2015.

2.    **Rocky Mountain Dry Gas Operations**

112.    Persistently low gas prices and Exxon's proxy cost of carbon should have caused the Company to recognize an impairment for its Rocky Mountain gas operations at the end of fiscal 2015.  These factors should have indicated that the future net cash flows associated with the Rocky Mountain dry gas operations were no longer expected to exceed the capitalized costs over the life of the assets.

113.    The Henry Hub price, the benchmark used for natural gas spot prices, had declined nearly 80% between February 2014 and December 2015, indicating the plunging prices were not merely temporary fluctuations.  Exxon's executives should have considered this to be a trigger event and conducted an impairment analysis of its assets, like the Company's peers did.

114.    Moreover, the Rocky Mountain dry gas operations were impaired at the end of fiscal 2015.  During fiscal 2016, the Henry Hub price began to rebound, reaching $3.71 per million

BTU  by December 30, 2016 or a 62% year-over-year increase.  At the end of fiscal 2016, Exxon

reported an impairment charge for the Rocky Mountain assets, but because prices were higher than

they had been the previous year, *a fortiori*, the assets were impaired at the end of fiscal 2015.

115.    Moreover, using a $10 per ton proxy cost of carbon in 2018 would have increased

costs by approximately $0.53 per million BTU; this proxy cost would rise linearly to $60 per ton

in 2030, increasing costs by approximately $3.19 per million BTU.  When the Henry Hub spot

price was only $2.28 per million BTU at the end of fiscal 2015, these estimated increases in costs

would have significantly impacted the expected profitability of assets, further indicating that the

Rocky Mountain assets were impaired.

C.    **The Individual Defendants Caused the Company to Issue Misleading
      Statements About the Value of its Assets**

116.    Despite the palpable impact of negative industry trends on its operations, Exxon

was the lone "supermajor" oil and gas company that refused to writedown its assets during the

prolonged price collapse, which was striking given that its peers who had recorded impairments

operated in the same geographic areas, were subject to the same market forces, and followed the

same accounting standards as Exxon.

117.    On March 31, 2014, the Company issued the MTR Report, which claimed that its

"proxy cost" of carbon properly accounted for climate change-related risks to its assets.  The MTR

Report stated, in relevant part:

> As detailed below, ExxonMobil makes long-term investment decisions based in
> part on our rigorous, comprehensive annual analysis of the global outlook for
> energy, an analysis that has repeatedly proven to be consistent with the International
> Energy Agency *World Energy Outlook*, the U. S. Energy Information
> Administration *Annual Energy Outlook*, and other reputable, independent sources.
> For several years, our *Outlook for Energy* has explicitly accounted for the prospect
> of policies regulating greenhouse gas emissions (GHG).  This factor, among many
> others, has informed investments decisions that have led ExxonMobil to become
> the leading producer of cleaner-burning natural gas in the United States, for
> example.

Based on this analysis, we are confident that none of our hydrocarbon reserves are now or will become "stranded."

\* \* \*

Each year, ExxonMobil analyzes trends in energy and publishes our forecast of global energy requirements in our *Outlook for Energy*.  The Outlook provides the foundation for our business and investment planning, and is compiled from the breadth of the company's worldwide experience in and understanding of the energy industry.  It is based on rigorous analyses of supply and demand, technological development, economics, and government policies and regulations, and it is consistent with many independent, reputable third-party analyses.

ExxonMobil's current *Outlook for Energy* extends through the year 2040 and contains several conclusions that are relevant to questions raised by stakeholder organizations.  Understanding this factual and analytical foundation is crucial to understanding ExxonMobil's investment decisions and approach to the prospect of further constraints on carbon.

\* \* \*



We also address the potential for future climate-related controls, including the potential for restriction on emissions, through the use of a proxy cost of carbon. This proxy cost of carbon is embedded in our current *Outlook for Energy* and has been a feature of the report for several years.  The proxy cost seeks to reflect all types of actions and policies that governments may take over the Outlook period relating to the exploration, development, production, transportation or use of carbon-based fuels.

118.     The statements in the MTR Report were materially misleading because they failed to disclose that: (i) Exxon's internal policies used proxy costs of carbon that were significantly lower than those identified in public statements; (ii) proxy costs were not considered when evaluating certain projects, including the Canadian Bitumen Operations since as early as fall 2015; (iii) proxy costs were not used in asset impairment tests of reserve assets until at least 2016; and (iv) as a result of the foregoing, the Individual Defendants did not adequately evaluate the potential impact of climate change-related risks on the value of Exxon's assets and its long-term business prospects.

119.     The same day, the Company also released the E&C Report, which stated that Exxon's Board and Management Committee reviewed and discussed the Outlook "extensively" before release.  The E&C Report also stated that Exxon "requires that all business units use a consistent corporate planning basis, including the proxy cost of carbon . . . , in evaluating capital expenditures and developing business plans." which stated in relevant part:

> Each year ExxonMobil develops and publishes its views on energy sources, requirements and trends.  This Outlook provides the foundation for our business and investment planning and is compiled from the breadth of the company's worldwide experience in and understanding of the energy industry and is based on rigorous analyses of demands, technology, economics and policies. Our most recent Outlook spans the period through 2040. ***The Outlook is reviewed and discussed extensively with the company's Management Committee and Board prior to its release.***
>
> \* \* \*
>
> A key factor in assessing the world's energy outlook is the impact of public policies. One area of significant interest in recent years relates to policies enacted to reduce greenhouse gas (GHG) emissions.
>
> Today there are policies in effect that are designed to limit GHG growth, and we anticipate additional policies developing over time.  We expect OECD nations to continue to lead the way in adopting these policies, with developing nations gradually following, led by countries like China and Mexico.

34

Future policies related to limiting GHG emissions remain uncertain and likely will vary over time and from country to country.  However, for our Outlook we use a cost of carbon as a proxy to model a wide variety of potential policies that might be adopted by governments to help stem GHG emissions.  ***For example, in the OECD nations [which include Canada and the United States], we apply a proxy cost that is about $80 per ton in 2040.***

* * *

This GHG proxy cost is integral to ExxonMobil's planning, and we believe the policies it reflects will increase the pace of efficiency gains and the adoption by society of lower-carbon technologies through the Outlook period, as well as accelerate the growth of lower carbon sources of energy like natural gas and renewables, while suppressing the global use of coal.

120.    The statements in the E&C Report were materially misleading because they failed to disclose that: (i) Exxon's internal policies used proxy costs of carbon that were significantly lower than those identified in public statements; (ii) proxy costs were not considered when evaluating certain projects, including the Canadian Bitumen Operations since as early as fall 2015; (iii) proxy costs were not used in asset impairment tests of reserve assets until at least 2016; and (iv) as a result of the foregoing, the Individual Defendants did not adequately evaluate the potential impact of climate change-related risks on the value of Exxon's assets and its long-term business prospects.

121.    On February 23, 2015, Exxon announced that it had replaced 104% of its 2014 production by adding proved oil and gas reserves totaling 1.5 billion oil-equivalent barrels, including a 162% replacement ratio for crude oil and other liquids.  At year-end 2014, Exxon's proved reserves totaled 25.3 billion oil-equivalent barrels, which was made up of 54% liquids and 46% natural gas.  Natural gas additions totaled approximately 300 million oil-equivalent barrels for a 42% replacement ratio.  In Canada, reserve additions totaled almost 700 million barrels as a result of the Kearl resource.  Moreover, Tillerson stated that "ExxonMobil's diverse global portfolio of attractive opportunities puts us in a unique position to execute our strategy to identify,

35

evaluate and develop new energy supplies," and "[o]ur ability to achieve an industry-leading record of long-term reserves replacement is made possible by the size and diversity of ExxonMobil's resource base along with its project execution and technical capabilities."

122.    The statements on February 23, 2015 were materially misleading because they failed to disclose that: (i) Exxon's internal policies used proxy costs of carbon that were significantly lower than those identified in public statements; (ii) proxy costs were not considered when evaluating certain projects; (iii) proxy costs were not used in asset impairment tests of reserve assets; and (iv) as a result of the foregoing, the Individual Defendants did not adequately evaluate the potential impact of climate change-related risks on the value of Exxon's assets and its long-term business prospects.

123.    On February 25, 2015, Tillerson, Swiger, Rosenthal, Boskin, Brabeck-Letmathe, Burns, Faulkner, Fore, Frazier, George, Palmisano, Reinemund, and Weldon signed and caused the Company to file its annual report on Form 10-K with the SEC for the period ended December 31, 2014 (the "2014 10-K").  Regarding the climate change-related policies, the 2014 10-K stated, in relevant part:

> ExxonMobil includes estimates of potential costs related to possible public policies covering energy-related greenhouse gas emissions in its long-term Outlook for Energy, which is used as a foundation for assessing the business environment and in its investment evaluations.
>
> The information provided in the Long-Term Business Outlook includes ExxonMobil's internal estimates and forecasts based upon internal data and analyses as well as publicly available information from external sources including the International Energy Agency.

124.    The statements on February 25, 2015 were materially misleading because they failed to disclose that: (i) Exxon's internal policies used proxy costs of carbon that were significantly lower than those identified in public statements; (ii) proxy costs were not considered when evaluating certain projects, including the Canadian Bitumen Operations since as early as fall

36

2015; (iii) proxy costs were not used in asset impairment tests of reserve assets until at least 2016; and (iv) as a result of the foregoing, the Individual Defendants did not adequately evaluate the potential impact of climate change-related risks on the value of Exxon's assets and its long-term business prospects.

125.    On March 4, 2015, the Company held an analyst meeting during which Tillerson stated that Exxon's investment decisions were "[i]nformed by [its] energy outlook and tested across a broad range of economic parameters including a broad range of commodity prices," which "underpins and guides our company's business strategies and our investments" and "position[s] the Corporation for long- term performance across a broad range of business conditions."

126.    Moreover, Tillerson stated that the bitumen reserves in the Kearl Operation helped Exxon achieve a "proved reserve replacement ratio [of] 104%, marking the 21st consecutive year [Exxon] added more oil and natural gas reserves than [Exxon] produced."

127.    The statements on March 4, 2015 were materially misleading because they failed to disclose that: (i) Exxon's internal policies used proxy costs of carbon that were significantly lower than those identified in public statements; (ii) proxy costs were not considered when evaluating certain projects; (iii) proxy costs were not used in asset impairment tests of reserve assets; and (iv) as a result of the foregoing, the Individual Defendants did not adequately evaluate the potential impact of climate change-related risks on the value of Exxon's assets and its long-term business prospects.

128.    On April 30, 2015, during a conference call with analysts and investors held in connection with Exxon's first quarter 2015 financial results, Woodbury stated that Exxon was "fairly confident, given the range of variables that we test [in the Outlook for Energy], that we're looking at about a 35% growth in energy demand between 2010 and 2040.  Fundamentally, that is

how Exxon-Mobil sets its investment plans, and obviously, we continue to test that not only annually but periodically."

129.    The statements on April 30, 2015 were materially misleading because they failed to disclose that: (i) Exxon's internal policies used proxy costs of carbon that were significantly lower than those identified in public statements; (ii) proxy costs were not considered when evaluating certain projects; (iii) proxy costs were not used in asset impairment tests of reserve assets; and (iv) as a result of the foregoing, the Individual Defendants did not adequately evaluate the potential impact of climate change-related risks on the value of Exxon's assets and its long-term business prospects.

130.    On May 27, 2015, at Exxon's annual shareholder meeting, Tillerson and Woodbury highlighted the Company's $32.5 billion earnings and 104% reserve replacement ratio for fiscal 2014.  Tillerson again represented that Exxon's "investment decisions are based on a long-term view informed by our energy outlook, and they are tested across a broad range of economic parameters including a broad range of commodity prices."

131.    During the same meeting, Tillerson emphasized the importance of the Outlook, which "underpins" Exxon's business strategies and investments and "anticipate[s] that government policies would impose rising cost[s] on carbon dioxide emissions," because climate change is a "risk management problem" and "in risk management, you have to consider the range of possible consequences and be prepared for those."

132.    The statements on May 27, 2015 were materially misleading because they failed to disclose that: (i) Exxon's internal policies used proxy costs of carbon that were significantly lower than those identified in public statements; (ii) proxy costs were not considered when evaluating certain projects; (iii) proxy costs were not used in asset impairment tests of reserve assets; and (iv)

as a result of the foregoing, the Individual Defendants did not adequately evaluate the potential impact of climate change-related risks on the value of Exxon's assets and its long-term business prospects.

133.    On July 31, 2015, the Company held a conference call to discuss its second quarter 2015, during which Woodbury represented that Exxon's historical record with reserves replacement would continue:

> **[Paul Sankey - Wolfe Research - Analyst:]** One thing I'm worried about Jeff, is reserves replacement.  Just insofar as I don't think you've had any FIDs this year.  And I also noticed that your reserves booking last year were heavily dominated by the US. Could you update us on where we stand as regard to reserves replacement?
>
> **[Jeff Woodbury - ExxonMobil Corporation - VP of IR and Secretary:]** Yes, well, obviously that's an annual process.  And we're–we've fully replaced our production for 21 straight years.  We've got a very good inventory that we're working on, to convert to an FID decision in proved reserves, as well as a very active exploration program.  So we've been very successful, as the history shows, and I'd say that the prognosis in the future will remain the same.

134.    During the same call, Woodbury suggested that Exxon was unlikely to record impairment charges to its assets as a result of the declining commodity prices:

> **[John Herrlin - Societe Generale - Analyst:]** Most things have been asked, Jeff, but you have seen a lot of your IOC peers, as well as some large cap E&Ps take significant impairments. You have a very robust resource base, as you've stated. Are there any issues for, say, intermediate term projects coming off the books on a long-term basis for Exxon?
>
> **[Jeff Woodbury - ExxonMobil Corporation - VP of IR and Secretary:]** Well, there's two parts to your question. One is, if we've got resources that are in a resource base that ultimately we don't see the long-term value, as I indicated earlier, John, we will look for ways to monetize them, which may include some level of divestment. In terms specifically of impairments, as you know, we live in a commodity price environment that has great volatility. But as I've said several times in our annual outlook, the longer-term market fundamentals remain unchanged, and the lifespan of our assets really are measured in decades. Therefore, long-term price views are more stable, and quite frankly, more meaningful for future cash flows and market value. So we expect the business to more than recover the carrying value of the assets on the books. Obviously in the course of our ongoing asset management efforts, we do confirm that asset values fully cover carrying costs.

**[John Herrlin - Societe Generale - Analyst:]** Great, that's what I wanted to hear.

135.    The statements on July 31, 2015 were materially misleading because they failed to disclose that: (i) Exxon's internal policies used proxy costs of carbon that were significantly lower than those identified in public statements; (ii) proxy costs were not considered when evaluating certain projects; (iii) proxy costs were not used in asset impairment tests of reserve assets; and (iv) as a result of the foregoing, the Individual Defendants did not adequately evaluate the potential impact of climate change-related risks on the value of Exxon's assets and its long-term business prospects.

136.    On October 30, 2015, the Company held a conference call to discuss its third quarter 2015 financial results, during which Woodbury asserted that major new project developments, such as the Kearl Operation, were contributing to production rates and provided "a very strong foundation to our production, but importantly a valuable foundation that contributes significant cash flow."

137.    The statements on October 30, 2015 were materially misleading because they failed to disclose that: (i) Exxon's internal policies used proxy costs of carbon that were significantly lower than those identified in public statements; (ii) proxy costs were not considered when evaluating certain projects; (iii) proxy costs were not used in asset impairment tests of reserve assets; and (iv) as a result of the foregoing, the Individual Defendants did not adequately evaluate the potential impact of climate change-related risks on the value of Exxon's assets and its long-term business prospects.

138.    On February 2, 2016, the Individual Defendants caused the Company to issue its fourth quarter and full year 2015 financial results in a press release, which stated as to "Estimated Key Financial and Operating Data":

40

**Exxon Mobil Corporation**
**Fourth Quarter 2015**
(millions of dollars, unless noted)

| | Fourth Quarter | | Twelve Months | |
|---|---|---|---|---|
| | 2015 | 2014 | 2015 | 2014 |
| **Earnings / Earnings Per Share+** | | | | |
| Total revenues and other income | 59,807 | 87,276 | 268,882 | 411,939 |
| Total costs and other deductions | 57,179 | 78,434 | 246,916 | 360,309 |
| Income before income taxes | 2,628 | 8,842 | 21,966 | 51,630 |
| Income taxes 1 | (202) | 2,060 | 5,415 | 18,015 |
| Net income including noncontrolling interests | 2,830 | 6,782 | 16,551 | 33,615 |
| Net income attributable to noncontrolling interests | 50 | 212 | 401 | 1,095 |
| Net income attributable to ExxonMobil (U.S. GAAP) | 2,780 | 6,570 | 16,150 | 32,520 |
| Earnings per common share (dollars) | 0.67 | 1.56 | 3.85 | 7.60 |

139.    The statements on February 2, 2016 were materially misleading because they failed to disclose that: (i) Exxon's internal policies used proxy costs of carbon that were significantly lower than those identified in public statements; (ii) the persistently low gas prices constituted a trigger event, requiring an impairment analysis; (iii) as a result of low prices, certain assets, including the Rocky Mountain gas operations, were impaired (i.e. the future net cash flows was not expected to exceed the capital costs); (iv) as a result of the foregoing, the reported financial results did not accurately reflect the value of Exxon's assets; and (v) the executives and directors were motivated to conceal the required impairment analysis to maintain the Company's AAA credit rating ahead of a debt offering necessary to fund Exxon's operations and shareholder dividends.

140.    On February 2, 2016, the Company held a conference call with analysts to discuss its fourth quarter 2015 financial results, during which Woodbury stated that Exxon "feel[s] very good about the resource potential" of the Kearl Operation and that it "[has] built [its] business to ensure that it is durable in a low-price environment."  Woodbury reiterated that commodity prices had been factored into the investment decision, stating: "we still feel very good about the long-

41

term financial performance of these assets.  Because remember, when we make the final investment decision, we're testing those investments across a wide range of economic parameters, including price.  And as I said earlier, our fundamental focus has been making sure that our Business is viable and durable in a low-price environment."

141.    During the same call, Woodbury also stated:

The way we have prudently managed our cash, our disciplined investment and our leading financial and operating results, all of which has allowed us the financial flexibility to invest through the cycle as we've been discussing.

I tell you that the current environment is clearly tough, but we've managed the business to be durable on the low end of commodity prices. We're very well positioned to continue the same level of superior performance in the future, and we think that all underpins the strong credit rating that we have.

142.    During the same call, Woodbury stated, despite the plunge in prices over approximately 18 months, Exxon had not revised the range of prices it uses to evaluate investment decisions, stating that "we continue to see that the [existing] range is applicable."

143.    The statements on February 2, 2016 were materially misleading because they failed to disclose that: (i) the Individual Defendants did not adequately evaluate the potential impact of climate change-related risks on the value of Exxon's assets and its long-term business prospects; (ii) the Canadian Bitumen Operations were operating at a loss; (iii) the Kearl Operation was reasonably unlikely to be a proved reserve at the end of fiscal 2016; and (iv) the Rocky Mountain dry gas operations were impaired.

144.    On February 19, 2016, the Individual Defendants issued a press release entitled "ExxonMobil Announces 2015 Reserves Additions," which stated in relevant part:

[Exxon] added 1 billion oil-equivalent barrels of proved oil and gas reserves in 2015, replacing 67 percent of production, including a 219 percent replacement ratio for crude oil and other liquids.

At year-end 2015, ExxonMobil's proved reserves totaled 24.8 billion oil-equivalent barrels.

42

* * *

"ExxonMobil has a successful track record of proved reserves replacement over the long term, demonstrating the strength of our global strategy to identify, evaluate, capture and advance high-quality opportunities," said Rex W. Tillerson, chairman and chief executive officer.

"Our proved reserves represent a diverse portfolio that positions us to create shareholder value as we supply long-term energy demand growth. We will continue to apply our disciplined, paced investing approach as we develop our industry-leading resource base."

145.    The statements on February 19, 2016 were materially misleading because they failed to disclose that: (i) the Individual Defendants did not adequately evaluate the potential impact of climate change-related risks on the value of Exxon's assets and its long-term business prospects; (ii) the Canadian Bitumen Operations were operating at a loss; (iii) the Kearl Operation was reasonably unlikely to be a proved reserve at the end of fiscal 2016; and (iv) the Rocky Mountain dry gas operations were impaired.

146.    On February 24, 2016, Tillerson, Swiger, Rosenthal, Boskin, Brabeck-Letmathe, Burns, Faulkner, Fore, Frazier, Palmisano, Reinemund, Oberhelman, Woods, and Weldon signed and caused the Company to file its annual report on Form 10-K with the SEC for the period ended December 31, 2015 (the "2015 10-K"). The report reiterated that Exxon's Outlook anticipates climate change-related policies to forecast its operations, stating in relevant part:

For many years, the Corporation has taken into account policies established to reduce energy-related greenhouse gas emissions in its long-term Outlook for Energy, which is used as a foundation for assessing the business environment and business strategies and investments. The climate accord reached at the recent Conference of the Parties (COP 21) in Paris set many new goals, and while many related policies are still emerging, the Outlook for Energy continues to anticipate that such policies will increase the cost of carbon dioxide emissions over time. For purposes of the Outlook for Energy, we continue to assume that governments will enact policies that impose rising costs on energy-related $CO_2$ emissions, which we assume will reach an implied cost in OECD nations of about $80 per tonne in 2040. China and other leading non-OECD nations are expected to trail OECD policy initiatives. Nevertheless, as people and nations look for ways to reduce risks of global climate change, they will continue to need practical solutions that do not

43

jeopardize the affordability or reliability of the energy they need.  Thus, all practical and economically viable energy sources, both conventional and unconventional, will be needed to continue meeting global energy needs–because of the scale of worldwide energy demand.

The information provided in the Long-Term Business Outlook includes ExxonMobil's internal estimates and forecasts based upon internal data and analyses as well as publicly available information from external sources including the International Energy Agency.

147.   The statements in the 2015 10-K were materially misleading because they failed to disclose that: (i) Exxon's internal policies used proxy costs of carbon that were significantly lower than those identified in public statements; (ii) proxy costs were not considered when evaluating certain projects, including the Canadian Bitumen Operations since at least fall 2015; (iii) proxy costs were not used in asset impairment tests of reserve assets for 2015; and (iv) as a result of the foregoing, the Individual Defendants did not adequately evaluate the potential impact of climate change-related risks on the value of Exxon's assets and its long-term business prospects.

148.   The 2015 10-K also stated:

In general, ***the Corporation does not view temporarily low prices or margins as a trigger event for conducting impairment tests.***  The markets for crude oil, natural gas and petroleum products have a history of significant price volatility.  Although prices will occasionally drop significantly, industry prices over the long term will continue to be driven by market supply and demand.  On the supply side, industry production from mature fields is declining, but this is being offset by production from new discoveries and field developments.  OPEC production policies also have an impact on world oil supplies.  The demand side is largely a function of global economic growth.  The relative growth/decline in supply versus demand will determine industry prices over the long term, and these cannot be accurately predicted.

If there were a trigger event, the Corporation estimates the future undiscounted cash flows of the affected properties to judge the recoverability of carrying amounts.  Cash flows used in impairment evaluations are developed using estimates for future crude oil and natural gas commodity prices, refining and chemical margins, and foreign currency exchange rates.  Volumes are based on projected field and facility production profiles, throughput, or sales.  These evaluations ***make use of the Corporation's price, margin, volume, and cost assumptions developed in the annual planning and budgeting process and are consistent with the criteria management uses to evaluate investment opportunities.***  Where unproved reserves

exist, an appropriately risk-adjusted amount of these reserves may be included in the evaluation.

An asset group would be impaired if its undiscounted cash flows were less than the asset's carrying value. Impairments are measured by the amount by which the carrying value exceeds fair value. Cash flow estimates for impairment testing exclude the effects of derivative instruments.

In light of continued weakness in the upstream industry environment in late 2015, the Corporation undertook an effort to assess its major long-lived assets most at risk for potential impairment. The results of this assessment confirm the absence of a trigger event and indicate that the future undiscounted cash flows associated with these assets substantially exceed the carrying value of the assets. The assessment reflects crude and natural gas prices that are generally consistent with the long-term price forecasts published by third-party industry experts. Critical to the long-term recoverability of certain assets is the assumption that either by supply and demand changes, or due to general inflation, prices will rise in the future. Should increases in long-term prices not materialize, certain of the Corporation's assets will be at risk for impairment. Due to the inherent difficulty in predicting future commodity prices, and the relationship between industry prices and costs, it is not practicable to reasonably estimate a range of potential future impairments related to the Corporation's long-lived assets.

(Emphasis added.)

149.    The statements in the 2015 10-K were materially misleading because they failed to disclose that: (i) proxy costs were not used in asset impairment tests of reserve assets in 2015; and (ii) a significant portion of the Rocky Mountain dry gas operations was impaired at the end of fiscal 2015.

150.    In its 2015 10-K, Exxon reported 4.56 billion barrels ("bbls") of proved reserves from the Canadian Bitumen Operations, roughly 75% from the Kearl Operations and the remainder from the Cold Lake Operations. The Canadian Bitumen Operations accounted for 31% of Exxon's total liquids proved reserves and 18% of combined liquids and natural gas worldwide proved reserves.

151.    Furthermore, according to the 2015 10-K, the Canadian Bitumen Operation were the largest proved reserve additions for Exxon, adding 669 million bbls and 433 million bbls in

45

2014 and 2015, respectively.   These additions substantially increased the reported reserve replacement ratios, which were reported as 67% and 104% for 2014 and 2015, respectively; without the Canadian Bitumen Operations, these ratios would only have been 59% and 39%, respectively.

152.    Under "Summary of Oil and Gas Reserves at Year-End 2015," the 2015 10-K stated, in relevant part:

| | Crude Oil (million bbls) | Natural Gas Liquids (million bbls) | Bitumen (million bbls) | Synthetic Oil (million bbls) | Natural Gas (billion cubic ft) | Oil-Equivalent Basis (million bbls) |
|---|---|---|---|---|---|---|
| **Proved Reserves** | | | | | | |
| **Developed** | | | | | | |
| **Consolidated Subsidiaries** | | | | | | |
| United States | 1,155 | 272 | - | - | 13,353 | 3,652 |
| Canada/South America | 92 | 9 | 4,108 | 581 | 552 | 4,882 |
| Europe | 158 | 34 | - | - | 1,593 | 458 |
| Africa | 738 | 162 | - | - | 750 | 1,025 |
| Asia | 1,586 | 121 | - | - | 4,917 | 2,526 |
| Australia/Oceania | 73 | 34 | - | - | 1,962 | 434 |
| Total Consolidated | 3,802 | 632 | 4,108 | 581 | 23,127 | 12,977 |
| | | | | | | |
| **Equity Companies** | | | | | | |
| United States | 221 | 7 | - | - | 156 | 254 |
| Europe | 25 | - | - | - | 6,146 | 1,049 |
| Asia | 802 | 349 | - | - | 15,233 | 3,690 |
| Total Equity Company | 1,048 | 356 | - | - | 21,535 | 4,993 |
| Total Developed | 4,850 | 988 | 4,108 | 581 | 44,662 | 17,970 |
| | | | | | | |
| **Undeveloped** | | | | | | |
| **Consolidated Subsidiaries** | | | | | | |
| United States | 1,233 | 396 | - | - | 6,027 | 2,624 |
| Canada/South America | 168 | 6 | 452 | - | 575 | 722 |
| Europe | 26 | 8 | - | - | 363 | 95 |
| Africa | 225 | 5 | - | - | 43 | 237 |
| Asia | 1,239 | - | - | - | 412 | 1,308 |
| Australia/Oceana | 52 | 31 | - | - | 5,079 | 929 |
| Total Consolidated | 2,933 | 446 | 452 | - | 12,499 | 5,915 |
| | | | | | | |
| **Equity Companies** | | | | | | |
| United States | 33 | 6 | - | - | 64 | 50 |
| Europe | - | - | - | - | 1,757 | 293 |
| Asia | 275 | 52 | - | - | 1,228 | 531 |
| Total Equity Company | 308 | 58 | - | - | 3,049 | 874 |
| Total Undeveloped | 3,241 | 504 | 452 | - | 15,548 | 6,789 |
| **Total Proved Reserves** | 8,091 | 1,492 | 4,560 | 581 | 60,210 | 24,759 |

153.    The 2015 10-K also announced Exxon's transfer of approximately 2.7 billion oil equivalent barrels of reserve assets from proved undeveloped to proved developed reserves, mostly attributable to transfers relating to the Kearl Operation.

154.    In addition, the 2015 10-K stated that "Management views the Corporation's financial strength as a competitive advantage," and further stated:

> The Corporation has an active asset management program in which underperforming assets are either improved to acceptable levels or considered for divestment.  The asset management program includes a disciplined, regular review to ensure that all assets are contributing to the Corporation's strategic objectives. The result is an efficient capital base, and the Corporation has seldom had to write down the carrying value of assets, even during periods of low commodity prices.

155.    The above statements made in the 2015 10-K were materially misleading because they failed to disclose that: (i) the Individual Defendants did not adequately evaluate the potential impact of climate change-related risks on the value of Exxon's assets and its long-term business prospects; (ii) the Canadian Bitumen Operations were operating at a loss; (iii) the Kearl Operation was reasonably unlikely to be a proved reserve at the end of fiscal 2016; and (iv) the Rocky Mountain dry gas operations were impaired.

156.    Lastly, the 2015 Form 10-K stated:

> When crude oil and natural gas prices are in the range seen in late 2015 and early 2016 for an extended period of time, under the SEC definition of proved reserves, certain quantities of oil and natural gas, such as oil sands operations in Canada and natural gas operations in North America could temporarily not qualify as proved reserves. Amounts that could be required to be de-booked as proved reserves on an SEC basis are subject to being re-booked as proved reserves at some point in the future when price levels recover, costs decline, or operating efficiencies occur. Under the terms of certain contractual arrangements or government royalty regimes, lower prices can also increase proved reserves attributable to ExxonMobil. We do not expect any temporary changes in reported proved reserves under SEC definitions to affect the operation of the underlying projects or to alter our outlook for future production volumes.

157.    The above statements made in the 2015 10-K were materially misleading because they failed to disclose that: (i) the Canadian Bitumen Operations were operating at a loss; and (ii) the Kearl Operation was reasonably unlikely to be a proved reserve at the end of fiscal 2016.

158.    In March 2016, Exxon completed an eight-tranche $12 billion public debt offering to fund its operations and shareholder dividends. Maintaining a AAA credit rating was crucial to completing this offering, and reserves are critical to assess the financial health and prospects of oil and gas companies like Exxon.

159.    A downgrade to Exxon's credit rating would increase the costs associated with raising debt, including the covenant terms, required disclosures, and access to financial markets. The Individual Defendants were aware that Exxon was on the verge of losing its credit rating: on February 2, 2016, S&P placed Exxon's long-term corporate credit rating on "CreditWatch" with "negative" implications, and on February 25, 2016, Moody's dropped Exxon's outlook from "stable" to "negative" due to concerns over Exxon's "'reserve replacement and production profile in the latter part of this decade.'"

160.    On March 2, 2016, Defendants filed a final prospectus with the SEC in connection with the March 2016 Debt Offering.  The prospectus supplemented the shelf registration statement filed on Form S-3 with the SEC on March 17, 2014, which signed by Tillerson, Swiger, Boskin, Brabeck-Letmathe, Burns, Faulkner, Fore, Frazier, George, Palmisano, Reinemund, Weldon, Jay S. Fishman, Edward E. Whitacre, Jr., and Patrick T. Mulva. The prospectus used to complete the March 2016 Debt Offering expressly incorporated by reference Exxon's 2015 Form 10-K.  As such, these documents were materially false and misleading for the same reasons set forth above.

161.    On March 2, 2016, at Exxon's 2016 Analyst Meeting, Tillerson stated that the following slide demonstrated that, although "the business environment ha[d] changed

49

dramatically, even since . . . last year, with a sharp decrease in crude oil and natural gas prices," Exxon was "uniquely suited to endure these conditions and outperform competition, leaving [Exxon] best- positioned to capture value in the upturn," due to its "operational integrity" and "reliability."



162.   At the meeting, Tillerson also claimed that, unlike its peers, the value of Exxon's reserves were not impaired because of the Company's "disciplined investment approach, effective project management and innovative technologies," stating in pertinent part as follows:



The quality of ExxonMobil's portfolio is also evident relative to significant recent asset impairments by our competitor group.  Not shown [on the graph] are the North American pure play E&P companies, which, if you look at the last couple of years, took impairments of over $120 billion; and if you look at the last eight years, took impairments of over $200 billion.

50

Now, while these impairments will improve competitor return on capital employed performance in the future years, they represent a significant destruction of shareholder assets.  Our investment discipline delivers industry-leading returns and a portfolio that is durable across a wide range of commodity prices.  Effective project execution provides the lowest installed capital cost, which, along with optimized operations, creates a long-term value that simply outpaces our competitors.



This chart provides perspective on the quality of our upstream assets.  Upstream capital efficiency underpins long-term financial performance.  The plot illustrates ExxonMobil's structural advantage in capital employed per barrel of crude reserves, which leads competition at $6.50 a barrel.  Our high-quality, efficient capital base is an outcome of our investment approach, consistently applied for decades.  Importantly, 73% of our proved reserves are developed and are in production, contributing to the bottom line.

Next I will discuss reserve replacement, which is an outcome of our disciplined investment approach.  ExxonMobil has a successful track record of long-term proved reserve additions, demonstrating the strength of our global strategy to identify, evaluate, capture and advance high-quality opportunities.   The Corporation has a diverse resource base of 91 billion oil equivalent barrels, all in various stages of evaluation, design and development.  As you can see in the graphic, we consistently convert sizable portions of the resource base along with newly acquired resources into proved reserves, which currently total 25 billion oil-equivalent barrels.



We have consistently added about 1.5 billion to 2 billion oil equivalent barrels of resource to proved reserves each year, replacing over 100% of production for over two decades. We have a long reserve life of 16 years at current production rates, which does lead to competition. Last year, we replaced 67% of production, adding 1 billion oil-equivalent barrels of proved reserves in both oil and gas, but that reflects also a 219% replacement of crude oil and other liquids.

The level of reserve replacement in any given year is an outcome of our investment choices, and it is not an objective. We are value-focused, making the best long-term decisions for our shareholders, progressing opportunities at the right time and deploying capital efficiently to create that long-term shareholder value, even if it means interrupting a 21-year trend.

The quality of our resource opportunities remains strong into the future. They have not diminished in the current business climate. ExxonMobil maintains a rigorous reserves evaluation process. And as with all aspects of our business, we approach the reporting of reserve balances with the highest integrity.

163.    At the same meeting on March 2, 2016, Tillerson emphasized Exxon's commitment

to evaluating the risk of climate change and related policies:



Now let's take a look at our approach to environmental protection. We recognize that meeting the world's growing energy needs while protecting the environment is one of today's grand challenges. We are committed to lowering emissions, reducing spills, and minimizing waste to mitigate the environmental impact of our operations. We have developed and deployed advanced technologies and enhanced products that have lowered greenhouse gas emissions across the value chain.

Sustainable improvements in our operations have reduced cumulative greenhouse gases by more than 20 million metric tons over the past decade. For example, we have increased our energy efficiency significantly over time by installing additional cogeneration facilities in our operations, making us an industry leader with current gross capacity of 5.5 gigawatts. And products we produce, like cleaner-burning natural gas, also help to reduce global emissions.

At ExxonMobil, we do take the risk of climate change seriously. We have studied climate change for almost 40 years, and we consistently collaborate and share our research with leading scientific institutions, top universities, the United Nations and other public stakeholders. We also engage in constructive dialogue on climate change policy options with NGOs, industry and policymakers.

164.    The statements on March 2, 2016 were materially misleading because they failed to disclose that: (i) the Individual Defendants did not adequately evaluate the potential impact of climate change-related risks on the value of Exxon's assets and its long-term business prospects.

165.    On March 30, 2016, in its 2015 Corporate Citizenship Report, the Company stated that its proven hydrocarbon reserves would not become "stranded" because the transition to lower emissions sources would take "many decades." The report also stated, in relevant part, as follows:

By 2040, the world's population is projected to reach 9 billion—up from about 7.2 billion today—and global GDP will have more than doubled. As a result, we see global energy demand rising by about 25 percent from 2014 to 2040. In order to meet this demand, we believe all economic energy sources, including our existing hydrocarbon reserves, will be needed. We also believe that the transition of the global energy system to lower-emissions sources will take many decades due to its enormous scale, capital intensity and complexity. As such, we believe that none of our proven hydrocarbon reserves are, or will become, stranded.

ExxonMobil's long-range annual forecast, The Outlook for Energy, examines energy supply and demand trends for approximately 100 countries, 15 demand sectors and 20 different energy types. The Outlook forms the foundation for the company's business strategies and helps guide our investment decisions. In response to projected increases in global fuel and electricity demand, our 2016 Outlook estimates that global energy-related CO2 emissions will peak around 2030 and then begin to decline. A host of trends contribute to this downturn—including slowing population growth, maturing economies and a shift to cleaner fuels like natural gas and renewables—some voluntary and some the result of policy.

ExxonMobil addresses the potential for future climate change policy, including the potential for restrictions on emissions, by estimating a proxy cost of carbon. This cost, which in some geographies may approach $80 per ton by 2040, has been included in our Outlook for several years. This approach seeks to reflect potential policies governments may employ related to the exploration, development, production, transportation or use of carbon-based fuels. We believe our view on the potential for future policy action is realistic and by no means represents a "business-as-usual" case. We require all of our business lines to include, where appropriate, an estimate of greenhouse gas-related emissions costs in their economics when seeking funding for capital investments.

We evaluate potential investments and projects using a wide range of economic conditions and commodity prices. We apply prudent and substantial margins in our planning assumptions to help ensure competitive returns over a wide range of market conditions. We also financially stress test our investment opportunities, which provides an added margin against uncertainties, such as those related to technology development, costs, geopolitics, availability of required materials, services and labor. Stress testing further enables us to consider a wide range of market environments in our planning and investment process.

166.    The statements on March 30, 2016 were materially misleading because they failed to disclose that: (i) Exxon's internal policies used proxy costs of carbon that were significantly lower than those identified in public statements; (ii) proxy costs were not considered when evaluating certain projects, including the Canadian Bitumen Operations since at least the fall of

54

2015; (iii) proxy costs were not used in asset impairment tests of reserve assets in 2015; and (iv) as a result of the foregoing, the Individual Defendants did not adequately evaluate the potential impact of climate change-related risks on the value of Exxon's assets and its long-term business prospects.

167.     On April 13, 2016, Tillerson, Boskin, Brabeck-Letmathe, Burns, Faulkner, Fore, Frazier, Palmisano, Reinemund, Oberhelman, Woods, and Weldon issued a definitive proxy statement soliciting stockholder votes in advance of the Company's annual meeting to be held May 25, 2015.  The proxy statement further recommended that shareholders vote against a number of climate change-related proposals, stating, in relevant part:

> ExxonMobil published the report, Energy and Carbon–Managing the Risks, to address questions raised on the topic of global energy demand and supply, climate change policy and carbon asset risks.  This report further described how the Company integrates consideration of climate change risks into planning processes and investment evaluation.  The Board is confident that the Company's robust planning and investment processes adequately contemplate and address climate change related risks.

> Each year, we update our long-term energy demand projection in our Outlook for Energy–taking into account the most up-to-date demographic, economic, technological, and climate policy information available.  This analysis serves as a foundation for our long-term business strategies and investments and is generally consistent with other forecasting organizations such as the International Energy Agency.  Our Outlook by no means represents a "business as usual" case and it includes a significant reduction in projected energy use and greenhouse gas (GHG) emissions due to energy efficiency initiatives.  Because we assume policy action will become increasingly more stringent over time, our Outlook projects lower future energy-related $CO2$ emissions through 2040 than would be implied by a "no policy scenario" where limited GHG reduction policies and regulations are implemented.

> * * *

> Projects are evaluated under a wide range of possible economic conditions and commodity prices that are reasonably likely to occur.  The Company does not publish the economic bases upon which we evaluate investments due to competitive considerations; however, it applies prudent and substantial safety margins in our planning assumptions to help ensure robust returns.

* * *

> The Company addresses the potential for future climate-related policy, including
> the potential for restriction on emissions, through the use of a proxy cost of carbon.
> The proxy cost seeks to reasonably reflect the types of actions and policies that
> governments may take over the outlook period relating to the exploration,
> development, production, transportation or use of carbon-based fuels. This proxy
> cost of carbon is embedded in our Outlook for Energy, and has been a feature of
> the report since 2007.  All business segments are required to include, where
> appropriate, an estimate of the costs associated with greenhouse gas emissions in
> their economics when seeking funding for capital investments.

168.   The 2016 proxy also stated that the Board was "confident that the Company's robust planning and investment processes adequately contemplate and address climate change related risks, ensuring the viability of its assets" and that "none of our proven hydrocarbon reserves are, or will become, stranded."

169.   The statements in the 2016 proxy were materially misleading because they failed to disclose that: (i) Exxon's internal policies used proxy costs of carbon that were significantly lower than those identified in public statements; (ii) proxy costs were not considered when evaluating certain projects, including the Canadian Bitumen Operations since at least the fall of 2015; (iii) proxy costs were not used in asset impairment tests of reserve assets in 2015; and (iv) as a result of the foregoing, the Individual Defendants did not adequately evaluate the potential impact of climate change-related risks on the value of Exxon's assets and its long-term business prospects.

170.   On April 29, 2016, the Individual Defendants caused the Company to issue its first quarter 2016 financial results in a press release, which stated as to "Estimated Key Financial and Operating Data":

**Exxon Mobil Corporation**
**First Quarter 2016**
(millions of dollars, unless noted)

56

|  | First Quarter | |
|---|---|---|
| **Earnings/Earnings Per Share** | **2016** | 2015 |
| Total revenues and other income | **48,707** | 67,618 |
| Total costs and other deductions | **46,977** | 60,983 |
| Income before income taxes | **1,730** | 6,635 |
| Income taxes | **(51)** | 1,560 |
| Net income including noncontrolling interests | **1,781** | 5,075 |
| Net income attributable to noncontrolling interests | **(29)** | 135 |
| Net income attributable to ExxonMobil (U.S. GAAP) | **1,810** | 4,940 |
| Earnings per common share (dollars) | **0.43** | 1.17 |

171.    The statements on April 29, 2016 were materially misleading because they failed to disclose that: (i) Exxon's internal policies used proxy costs of carbon that were significantly lower than those identified in public statements; (ii) the persistently low gas prices constituted a trigger event, requiring an impairment analysis; (iii) as a result of low prices, certain assets, including the Rocky Mountain gas operations, were impaired (i.e. the future net cash flows was not expected to exceed the capital costs); (iv) as a result of the foregoing, the reported financial results did not accurately reflect the value of Exxon's assets; and (v) the executives and directors were motivated to conceal the required impairment analysis to maintain the Company's AAA credit rating ahead of a debt offering necessary to fund Exxon's operations and shareholder dividends

172.    On April 29, 2016, the Company held a conference call with analysts to discuss its first quarter 2016 financial results, during which Woodbury stated that, despite low commodity prices, Exxon's assets remained profitable:

> **[Paul Sankey - Wolfe Research - Analyst:]** Okay, Jeff, because of time constraints, I'll just jump into another one.  You again, mentioned return on capital employed.

I really struggle with you losing money in the upstream on an earnings basis, particularly in the U.S., and how you reconcile that with the measure of the return on capital employed. Typically, we don't look at that, we look at the cash flow measure. Can you help us with the DD&A upstream particularly in the U.S., so we can get to the cash returns that you're making as opposed to these losses upstream?

**[Jeff Woodbury - ExxonMobil Corporation - VP of IR and Secretary:]** We've got a very strong portfolio in the upstream and remember that we invest with a long-term view that's informed by our long-term energy demand outlook. All of our assets were managed to maximize returns through the life cycle with the objective of maintaining positive cash flow in low price environments. We'll continue to focus on those things that we control, cost, reliability, operational integrity.

Importantly, we'll invest in attractive opportunities throughout the cycle that further enhance the asset profitability, and we see significant value in our assets, so, yes, there is a low price. We're in a low-price period like we've been in the past. As I've said, we've really designed these assets to be very durable during a low price environment.

They continue to generate—our producing assets continue to generate cash flow, and over the long-term we will continue to demonstrate, industry leading returns on capital employed.

173. The statements made on April 29, 2016 were materially misleading because they failed to disclose that: (i) the Individual Defendants did not adequately evaluate the potential impact of climate change-related risks on the value of Exxon's assets and its long-term business prospects; (ii) the Canadian Bitumen Operations were operating at a loss; (iii) the Kearl Operation was reasonably unlikely to be a proved reserve at the end of fiscal 2016; and (iv) the Rocky Mountain dry gas operations were impaired.

174. On May 12, 2016, during the Company's annual executive compensation conference call, Woodbury assured investors that Exxon's methods of evaluating proved reserves remained sound and that the Company adequately accounted for climate change-related policies, stating in relevant part:

To address questions raised on the topics of global energy demand and supply, climate change policy and carbon asset risk, the Company previously published a comprehensive report entitled, Energy and Carbon—Managing the Risks. I'll also highlight that our outlook for energy which details our forward assessment of

58

energy demand and supply, is updated annually and considers many key demand-based variables, including the most up-to-date climate policy information available.

Both of these documents, which are available on our website, provide to the shareholders an important insight into the merits of our business model and the rigor that underpins our investment plans to create shareholder value.

* * *

So in this regard we address the potential for future climate-related policy, including the expectation that future government policies to reduce greenhouse gas emissions will become more restrictive by using a proxy cost of carbon which has been embedded in our outlook since 2007.  These factors have positioned Exxon Mobil consistently as an industry leader in return on capital employed, being unrelenting in our commitment to shareholder value.

* * *

Finally, I'll note that our annual outlook for energy includes a significant reduction in projected energy use and greenhouse gas emissions, due to the efficiency initiatives and continuing policy action.  In short, our outlook by no means represents a business as usual case and is generally consistent with other forecasting organizations such as the International Energy Agency.

* * *

I mentioned earlier that the Company previously published the report, Energy and Carbon–Managing the Risks.  This report demonstrates the Board's focus on the importance of assessing the resiliency of the Company's resource portfolio.

* * *

The Board believes that The Company's current processes sufficiently test its portfolio to ensure long-term shareholder value.  Framed by the report I just mentioned, and assessed annually through stress testing and our outlook for energy and in investment planning, we remain confident in the commercial viability of our portfolio.  It should also be noted that all of our proved reserves fully comply with SEC definitions and requirements, as detailed in our annual 10-K filing.

It is also important to note that our outlook is consistent with other forecasting organizations, such as the International Energy Agency, as well as the commitments made under the Paris agreement.  In other words, the aggregation of intended nationally determined contributions, which were submitted by governments as part of the Paris agreement, indicates a greenhouse gas trajectory similar to that anticipated in our outlook.

Further, the outlook includes an expectation that future government policies to reduce greenhouse gas emissions will become increasingly stringent over time and has used a proxy cost of carbon to assess investments since 2007.

175.    The statements on May 12, 2016 were materially misleading because they failed to disclose that: (i) Exxon's internal policies used proxy costs of carbon that were significantly lower than those identified in public statements; (ii) proxy costs were not considered when evaluating certain projects, including the Canadian Bitumen Operations since at least the fall of 2015; (iii) proxy costs were not used in asset impairment tests of reserve assets in 2015; and (iv) as a result of the foregoing, the Individual Defendants did not adequately evaluate the potential impact of climate change-related risks on the value of Exxon's assets and its long-term business prospects.

176.    On May 25, 2016, the Company held its annual shareholder meeting, during which Tillerson stated, in relevant part:

> [E]very year, Exxon Mobil shares its long-term view of global energy demand and supply, which guides our company's business strategies and our investments, and we publish that as our outlook for energy. This document confirms the wisdom of these investments and help provide the world with reliable and affordable energy necessary to advance economic prosperity and improve living standards well into the future.
>
> * * *
>
> We have, unlike many of our competitors, we have for many years included a price of carbon in our outlook. And that price of carbon gets put into all of our economic models when we make investment decisions as well.
>
> It's a proxy. We don't know how else to model what future policy impacts might be. But whatever policies are, ultimately they come back to either your revenues or your cost. So we choose to put it in as a cost.
>
> So we have accommodated that uncertainty in the future, and everything gets tested against it.

177.    The statements on May 25, 2016 were materially misleading because they failed to disclose that: (i) Exxon's internal policies used proxy costs of carbon that were significantly lower than those identified in public statements; (ii) proxy costs were not considered when evaluating

certain projects, including the Canadian Bitumen Operations since at least the fall of 2015; (iii) proxy costs were not used in asset impairment tests of reserve assets in 2015; and (iv) as a result of the foregoing, the Individual Defendants did not adequately evaluate the potential impact of climate change-related risks on the value of Exxon's assets and its long-term business prospects.

178.    On July 29, 2016, the Individual Defendants caused the Company to issue its second quarter 2016 financial results in a press release, which stated as to "Estimated Key Financial and Operating Data":

### Exxon Mobil
### Second Quarter
(millions of dollars, unless noted)

| | Second Quarter | | First Half | |
| | **2016** | 2015 | **2016** | 2015 |
| --- | --- | --- | --- | --- |
| **Earnings / Earnings Per Share** | | | | |
| Total revenues and other income | **57,694** | 74,113 | **106,401** | 141,731 |
| Total costs and other deductions | **55,298** | 67,159 | **102,275** | 128,142 |
| Income before income taxes | **2,396** | 6,954 | **4,126** | 13,589 |
| Income taxes | **715** | 2,692 | **664** | 4,252 |
| Net income including noncontrolling interests | **1,681** | 4,262 | **3,462** | 9,337 |
| Net income attributable to noncontrolling interests | **(19)** | 72 | **(48)** | 207 |
| Net income attributable to ExxonMobil (U.S. GAAP) | **1,700** | 4,190 | **3,510** | 9,130 |
| Earnings per common share (dollars) | **0.41** | 1.00 | **0.84** | 2.17 |

179.    The statements on July 29, 2016 were materially misleading because they failed to disclose that: (i) Exxon's internal policies used proxy costs of carbon that were significantly lower than those identified in public statements; (ii) the persistently low gas prices constituted a trigger event, requiring an impairment analysis; (iii) as a result of low prices, certain assets, including the Rocky Mountain gas operations, were impaired (i.e. the future net cash flows was not expected to exceed the capital costs); (iv) as a result of the foregoing, the reported financial results did not

accurately reflect the value of Exxon's assets; and (v) the executives and directors were motivated to conceal the required impairment analysis to maintain the Company's AAA credit rating ahead of a debt offering necessary to fund Exxon's operations and shareholder dividends

>  D.    **The Public Statements About Exxon's Assets Violated GAAP and SEC Disclosure Requirements**

180.    The Individual Defendants' public statements on behalf of Exxon violated GAAP and SEC disclosure rules because they failed to disclose that the Canadian Bitumen Operations were operating at a loss, that the Kearl Operation were not likely to be proved reserves at the end of fiscal year 2016, and that the Company's investment decisions did not account for the proxy costs of carbon. .

181.    Given the significant losses incurred by the Canadian Bitumen Operations beginning as early as mid-November 2015, when the Company filed its 2015 10-K it was "reasonably possible," as defined by ASC 275, that the Company's estimates of future profitability, price, and cost levels would change within the next 12 months and would have a materially negative impact on, among other things, Exxon's net profits and proved bitumen reserve levels.  Moreover, the significant losses incurred by the Canadian Bitumen Operations were a known trend or uncertainty that could reasonably be expected to have a material unfavorable impact on revenues or income from continuing operations and was thus required to be disclosed pursuant to Item 303.  Therefore, Exxon's failure to disclose in its 2015 Form 10-K that the Canadian Bitumen Operations were operating at a loss constituted a violation of both ASC 275 and Item 303.

182.    Moreover, such violations were clearly material, as defined by SAB 99.  First, the Canadian Bitumen Operations were an extremely important segment or portion of Exxon's business because they constituted approximately 31% of Exxon's total liquids proved reserves and

18% of the Company's combined worldwide proved reserves.  Second, the fact that such an important segment was operating at a loss was a materially unfavorable trend concerning Exxon's earnings.  Third, the Canadian Bitumen Operations  significantly contributed to Exxon's reserve replacement ratio in 2014 and 2015..

183.    ASC 932 requires the disclosure of adverse events that would cause significant downward estimates in proved reserves, but the Company's 2015 10-K and quarterly reports for 2016 failed to disclose that de-booking the Kearl Operation proved reserves was nearly certain. When the Company filed these reports, the Individual Defendants would have known that Exxon's estimates of proved reserves were likely to change within the next 12 months and that such change would have a materially negative impact on its worldwide proved reserve levels.  However, the quarterly and annual reports failed to disclose such information, thus violating ASC 275 and Item 303.

184.    The failure to disclose that proxy costs of carbon were not incorporated into investment decisions concerning the Canadian Bitumen Operations violated ASC 275 because the failure to include such costs materially overstated the value of the assets.

185.    In order to qualify as proved reserves, ASC 932-10-S99 and SEC in Regulation S-X Rule 4-10 require that the quantities of oil and gas reserves must be economically producible under current economic conditions.  By excluding the proxy costs of carbon in its analysis of economic producibility, the Individual Defendants understated the costs of producing proved reserves and overstated the future net cash inflows from producing proved oil and gas reserves, thus failing to properly account for the Company's proved reserve quantities in connection with the Canadian Bitumen Operations.

186.     In addition, Exxon's failure to include the clearly material GHG "proxy costs" in the Company's investment and asset valuation processes affected numerous accounts and estimates in Exxon's financial statements, including, inter alia, operating costs, depreciation, depletion, and amortization (DD&A), liabilities, impairment, asset retirement obligations and earnings.

187.     As also noted supra, pursuant to ASC 360-10-35-30, Exxon was required to use all available evidence, including assumptions used in long-range budgeting and planning processes, when developing future cash flow estimates for impairment analysis.

188.     Based on the foregoing, each of Exxon's Form 10-K and Form 10-Q reports filed violated ASC 360, ASC 932, and SEC Regulation S-X Rule 4-10 requirements.

## VII.    THE TRUTH BEGINS TO EMERGE AND THE INDIVIDUAL DEFENDANTS CONTINUE TO ISSUE MISLEADING STATEMENTS

189.     In November 2015, in response to Exxon's failure to record impairments despite prolonged price declines in the industry, New York Attorney General Eric T. Schneiderman ("NY AG Schneiderman") subpoenaed Exxon seeking documents and information concerning, among other things, Exxon's investment and valuation processes regarding its oil and gas reserves.

190.     On November 9, 2015, *The Guardian* reported that the NYOAG investigation concerned whether Exxon lied to investors about the climate change-related risks impacting the business, focusing on "any inconsistencies between the company's knowledge of climate change . . . and its filings to the Securities Exchange Commission and other government regulatory agencies."

191.     On this news, the Company's stock price fell $2.52 per share, nearly 3%.

192.     On January 20, 2016, *Los Angeles Times* reported that California Attorney General Kamala Harris was investigating Exxon for similar claims and whether the Company's actions

64

193.    On this news, the Company's stock price fell $3.22 per share, more than 4%.

194.    In March 2016, NY AG Schneiderman and the attorneys general of 17 other states and territories formed a formal coalition to pursue climate change litigation against big energy companies, including Exxon.

195.    On August 19, 2016, *The New York Times* reported that the NYOAG investigation was scrutinizing the MTR Report, which had stated that climate change-related policies would not cause the Company to declare its reserves as "stranded assets."  The article doubted the accuracy of Exxon's reserves valuation, stating it was "off by a significant amount," because "if the world were to burn even just a portion of the oil in the ground that the industry declares on its books, the planet would heat up to such dangerous levels that there[ would be] no one left to burn the rest."

196.    On September 16, 2016, *The Wall Street Journal* confirmed that the NYOAG Investigation involved the Company's reserve values and its knowledge of the impact of climate change on its business, noting that Exxon had "for years . . . kept the value of its huge oil and gas reserves steady in the face of slumping energy prices while rivals since 2014 have slashed $200 billion off their combined holdings."

197.    On September 20, 2016, *The Wall Street Journal* reported that Exxon was subject to an SEC investigation concerning its reserve accounting and its failure to record impairment charges despite declining commodity prices.  Citing "people familiar with matter," the article reported that the SEC was especially concerned with the proxy costs of carbon used in Exxon's investment decisions because low prices could be used to overstate the commercial viability of reserves:

> A potential sticking point in the probe is what price Exxon uses to assess the "price of carbon"—the cost of regulations such as a carbon tax or a cap-and-trade system to push down emissions—when evaluating certain future oil and gas prospects,

people familiar with the matter said. The SEC is asking how Exxon's carbon price affects its balance sheet and the outlook for its future, the people said.

When such a theoretical price for carbon is low, more oil and gas wells would be commercially viable. Conversely, a high carbon price would make more of Exxon's assets look uneconomic to pull out of the ground in future years.

198.    On October 28, 2016, in connection with its third quarter 2016 financial results, the Individual Defendants caused the Company to disclose that nearly 20% of the Company's proved oil and gas reserves might no longer satisfy the SEC's proved reserves definition at year-end, which would require such assets to be "de-booked" as proved reserves.  The press release stated, in relevant part:

> If the average prices seen during the first nine months of 2016 persist for the remainder of the year, under the SEC definition of proved reserves, certain quantities of oil, such as those associated with the Kearl oil sands operations in Canada, will not qualify as proved reserves at year-end 2016. In addition, if these average prices persist, the projected end-of-field-life for estimating reserves will accelerate for certain liquids and natural gas operations in North America, resulting in a reduction of proved reserves at year-end 2016. Quantities that could be required to be de-booked as proved reserves on an SEC basis amount to approximately 3.6 billion barrels of bitumen at Kearl, and about 1 billion oil-equivalent barrels in other North America operations.

* * *

**Exxon Mobil
Corporation Third
Quarter 2016
(millions of dollars, unless noted)**

|                                                          | Third Quarter |        | Nine Months |         |
| -------------------------------------------------------- | ------------: | -----: | ----------: | ------: |
|                                                          | **2016**      | 2015   | **2016**    | 2015    |
| **Earnings / Earnings Per Share**                        |               |        |             |         |
| Total revenues and other income                          | **58,677**    | 67,344 | **165,078** | 209,075 |
| Total costs and other deductions                         | **55,451**    | 61,595 | **157,726** | 189,737 |
| Income before income taxes                               | **3,226**     | 5,749  | **7,352**   | 19,338  |
| Income taxes                                             | **337**       | 1,365  | **1,001**   | 5,617   |
| Net income including noncontrolling interests            | **2,889**     | 4,384  | **6,351**   | 13,721  |
| Net income attributable to noncontrolling interests      | **239**       | 144    | **191**     | 351     |
| Net income attributable to ExxonMobil (U.S. GAAP)        | **2,650**     | 4,240  | **6,160**   | 13,370  |

| Earnings per common share (dollars) | **0.63** | 1.01 | **1.47** | 3.18 |

199.    On this news, the Company's share price fell $3.60 per share, or more than 4%, over two trading sessions.

200.    The statements on October 28, 2016 were materially misleading because they failed to disclose that: (i) Exxon's internal policies used proxy costs of carbon that were significantly lower than those identified in public statements; (ii) the persistently low gas prices constituted a trigger event, requiring an impairment analysis; (iii) as a result of low prices, certain assets, including the Rocky Mountain gas operations, were impaired (i.e. the future net cash flows was not expected to exceed the capital costs); (iv) the Individual Defendants knew the Kearl Operation would not satisfy the definition of proved reserves even if prices increased significantly; and (v) proxy costs of carbon were not considered when evaluating the Canadian Bitumen Operations since at least the fall of 2015.

201.    The same day, the Company held a conference call to discuss its third quarter 2016 financial results with analysts, during which Woodbury suggested that Exxon was unlikely to record impairment charges to its assets as a result of the declining commodity prices:

> Our results are in accordance with the rules and standards of SEC and the Financial Accounting Standards Board. Starting with our oil and gas crude reserves.
>
> As I indicated, our reporting is consistent with SEC rules, which prescribe technical standards as well as a pricing basis for calculation of reported reserves. This pricing basis is a historical 12-month average of first day of the month prices in a given year.
>
> As such, the low price environment impacted our 2015 reserves replacement, resulting in its 67% replacement ratio.  This was the net result of natural gas reserves being reduced by 834 million oil crude and barrel, primarily in the US, reflecting the change in natural gas prices, offset by liquid additions of 1.9 billion barrels.  Given that year-to-date crude prices are down further from 2015 by almost 25% on the SEC pricing basis, we anticipate that certain quantities of currently booked reserves, such as those associated with our Canadian oil sands, will not qualify as crude reserves at year-end 2016.

In addition, if these price levels persist, reserves associated with end-of-field life production for certain other liquids and natural gas operations in North America also may not qualify. However, as you know, amounts required to be de-booked on an SEC basis are subject to being rebooked in the future when price levels recover, or when future operating or cost efficiencies are implemented. We do not expect the de-booking of reported reserves under the SEC definitions to affect operations of these assets, or to alter our outlook for future production volumes. And you can find further details of our reserves reporting in our 2015 10-K.

Now regarding asset impairments. We follow US GAAP successful efforts, and under this standard assessments are made using crude and natural gas price outlooks consistent with those that Management uses to evaluate investment opportunities. This is different than the SEC price basis for reserves that I just described.

As detailed in our 2015 10-K, last year, we undertook an effort to assess our major long-life assets most at risk for potential impact. The price basis used in this assessment was generally consistent with long-term price forecasts published by third-party industry and government experts. The results of this analysis indicated that the future undiscounted cash flows associated with these assets exceeded their carrying value. Again, this is detailed in our 2015 10-K.

In light of continued weakness in the upstream industry environment and in connection with our annual planning and budgeting process, we will again perform an assessment of our major long-life assets. Similar to the exercise undertaken in 2015. We will complete this assessment in the fourth quarter and report any impacts in our year-end financial statements.

202. The statements on October 28, 2016 were materially misleading because they failed to disclose that: (i) Exxon did not incorporate proxy costs of carbon in its asset impairment tests of reserves; and (ii) a significant portion of the Rocky Mountain dry gas operations were impaired by the end of fiscal 2015.

203. On November 3, 2016, the Individual Defendants caused the Company to file its quarterly report on Form 10-Q with the SEC for the period ended September 30, 2016, which stated as to impairment of Exxon's assets, in relevant part:

In light of continued weakness in the upstream industry environment during 2016, and as part of its annual planning and budgeting process which is currently in progress, the Corporation will perform an assessment of its major long-lived assets, similar to the exercise undertaken in late 2015, including North America natural gas assets and certain other assets across the remainder of its operations. The assessment will reflect crude and natural gas price outlooks consistent with those

68

that management uses to evaluate investment opportunities and generally consistent with the long-term price forecasts published by third-party industry and government experts.  Development of future undiscounted cash flow estimates requires significant management judgment, particularly in cases where an asset's life is expected to extend decades into the future.  An asset group would be impaired if its estimated undiscounted cash flows were less than the asset's carrying value, and impairment would be measured by the amount by which the carrying value exceeds fair value.  The Corporation will complete its asset recoverability assessment and analyze the conclusions of that assessment in connection with the preparation and review of the Corporation's year-end financial statements for inclusion in its 2016 Form 10-K.  Until these activities are complete, it is not practicable to reasonably estimate the existence or range of potential future impairments related to the Corporation's long-lived assets.

204.    The statements identified in ¶ 203 were materially misleading because they failed to disclose that: (i) Exxon's internal policies used proxy costs of carbon that were significantly lower than those identified in public statements; (ii) the persistently low gas prices constituted a trigger event, requiring an impairment analysis; (iii) as a result of low prices, certain assets, including the Rocky Mountain gas operations, were impaired (i.e. the future net cash flows was not expected to exceed the capital costs); and (iv) that the required impairment charge would materially impact Exxon's financial results.

205.    By failing to report a ASC 360-10 impairment charge for its Rocky Mountain dry gas operations prior to 2016, Exxon improperly and materially misstated certain line item amounts in the Company's 2015 10-K financial statement sections titled "Consolidated Statement of Income" and "Disclosures about Segments and Related Information," as set forth below.

| Line items misstated in Exxon's 2015 and 2015 Financial Statements file with the SEC | | | | | |
|---|---|---|---|---|---|
| Financial statement line item in 10-K and 10-Q | Amounts as originally report *In billions, except per share amounts* | | | | Misstatement Type |
| | 10-K, ended 12/31/15 | 10-Q, ended 3/31/16 | 10-Q, ended 6/30/16 | 10-Q, ended 9/30/16 | |
| Depreciation and Depletion Expense (if impairment reported as subtotal of this income statement time) | $18,048 | $4,765 | $4,821 | $4,605 | Understated |
| Net income Attributable to Exxon | $16,150 | $1,180 | $1,700 | $2,650 | Overstated |
| Earnings Per Common Share | $3.85 | $0.43 | $0.41 | $0.63 | Overstated |

| | | | | | |
|---|---|---|---|---|---|
| Comprehensive Income Attributable to Exxon | $11,596 | $4,937 | $1,340 | $2,928 | Overstated |

## VIII.  **THE TRUTH FULLY EMERGES**

206.    On January 31, 2017, the Company disclosed a $2 billion impairment charge primarily related to its Rocky Mountain dry gas operations.

207.    On this news, the Company's share price declined $1.92 per share, or more than 2%.

208.    On February 22, 2017, Exxon disclosed that the Kearl Operation proved reserve would be de-booked.

209.    Due to these revelations, on May 24, 2017, S&P issued a negative outlook for the Company's credit rating, indicating a "potential for a downgrade" without improvement.

210.    Internal documents show that Exxon's executives knew the Company's disclosures regarding the impact of climate change related risks on its long-term business and the use of proxy costs of carbon were misleading.  On March 13, 2017, the NYOAG submitted a letter to the Honorable Barry Ostrager presiding over the NYOAG Action, which revealed that Tillerson used an alias email account Wayne.Tracker@ExxonMobil.com "from at least 2008 through 2015" to discuss sensitive "risk-management issues related to climate change" and reserve asset valuation process with Exxon's senior management.  The letter further revealed that "neither Exxon nor its counsel have ever disclosed that this separate email account was a vehicle for Mr. Tillerson's relevant communications at Exxon, and no documents appear to have been collected from this email account, which also does not appear on Exxon's list of preserved custodial sources for its privilege logs."  Although Exxon's outside attorneys were aware the Wayne Tracker account existed as of the first part of 2016, a full year's worth of emails were destroyed because the attorneys failed to place the account under a preservation hold.

70

211.    On June 2, 2017, the NYOAG filed the Affirmation of John Oleske and supporting

exhibits (the "Oleske Affirmation"), which show that Exxon's disclosures regarding the impact of

climate change related risks on its long-term business and the use of proxy costs of carbon were

misleading.  A true and correct copy of the Oleske Affirmation is attached hereto as Exhibit A.

According to the documents:

(i)     Exxon's internal policies mandate the use of a separate, undisclosed set of carbon
        proxy costs that were significantly lower than those described public disclosures
        regarding Exxon's investment and asset valuation processes (see Oleske
        Affirmation, ¶¶ 21-27);

(ii)    "Exxon has not applied a proxy cost of GHGs at all with respect to many of its oil
        and gas projects," including the Canadian Bitumen Operations (*id*., ¶¶ 28-37);

(iii)   "[I]n the few instances where Exxon tried to apply some semblance of a proxy-
        cost, Exxon failed to include costs relating to end use, or Scope 3, emissions,"
        contrary to Defendants' public representations that "[t]he proxy cost seeks to reflect
        all types of actions and policies that governments may take over the Outlook period
        relating to . . . transportation or use of carbo-based fuels" (*id*., ¶¶ 38-40; Oleske
        Affirmation, Ex. 1); and

(iv)    "[A]t least until 2016, Exxon failed to apply a proxy cost of GHGs in determining
        whether its long-lived assets, such as oil and gas reserves and resources, were
        impaired, rendering its representations false and misleading" (Oleske Affirmation,
        ¶¶ 41-52).

212.    The Oleske Affirmation and supporting documents show that the proxy costs of

carbon used in investment decisions were significantly lower than those reported in public

disclosures:

[F]rom 2010 through June 2014, the proxy cost Exxon set out in its internal policies
was lower than the proxy cost the company publicly represented that it used in
investment decisions. In other words, Exxon represented to investors and the public
that it was incorporating higher costs of GHG regulation into its business decisions
than documents indicate that it actually was using, thereby potentially misleading
investors and the public about the extent to which it was protecting its business
from regulatory risks related to climate change.

In particular, Exxon publicly stated in the MTR Report and its Outlook for Energy
reports that for projects in developed countries, it applied proxy costs that reached

$60/ton of GHGs by 2030, and $80/ton by 2040. In fact, the proxy cost figures used for Exxon's internal planning and budgeting reached only $40/ton by 2030.

Oleske Affirmation, ¶¶ 21-22; see also Oleske Affirmation, Exs. 3-5.

213.   Internal emails show that this discrepancy "was known at the highest levels." Oleske Affirmation, ¶¶ 23-24.  For example, as early as April 2011, Exxon's Corporate Strategic Planning Manager had pointed out the discrepancy to Tillerson, who seemed "happy" with the difference:

> I have pointed out the difference in past reviews – we've been at $60 for the [Outlook] and $40 for the plan circa 2030 for several years. Rex [Tillerson] has seemed happy with the difference previously – appeared to feel it provides a "conservative" basis (but only if viewed from the perspective of claiming economics credits to reduce emissions; it is not conservative vs [Outlook[ from the perspective of debiting actions that increase emissions).

Oleske Affirmation, Ex. 4 (email dated April 22, 2011 from Corporate Strategic Planning Manager to Corporate Greenhouse Gas Manager).

214.   The same Employees had previously acknowledged that the publicly disclosed proxy costs were "more realistic" than those used in Exxon's investment decisions.   Oleske Affirmation ¶ 23; Oleske Affirmation, Ex. 3.

215.   In June 2014, Exxon "sought to eliminate this glaring inconsistency between external and internal figures."  Oleske Affirmation ¶ 25.  At the time, Exxon's new Corporate Greenhouse Gas Manager recognized that the internally used  proxy costs of carbon were "non-conservative" and that "we have miplied that we use the [publicly-disclosed] basis for proxy cost of carbon when evaluating investments."  *Id.*  The alignment of external and internal proxy cost figures was a "huge  change," Oleske Affirmation ¶ 6; Oleske Affirmation, Ex. 6, but the Company had already made important investment decisions, including the Canadian Bitumen Operations and XTO acquisition, using the "non-conservative" proxy costs.

72

216.     Also, Exxon had "not applied a proxy cost of GHGs at all with respect to many of

its oil and gas projects."  Oleske Affirmation, ¶ 28.   Indeed, "by 2015, [Exxon] faced a problem

with respect to" the profitability of the Canadian Bitumen Operations, and applying the publicly-

disclosed proxy costs of carbon "may have rendered at least one of its major oil sands projects [in

the Canadian Bitumen Operations] unprofitable over the life of the project."  *Id.* at ¶ 29. Rather

than "faithfully apply[ing] the proxy-cost analysis and recogniz[ing] the lsoses as appropriate,"

Exxon abandoned the internal proxy costs and applied the "much lower GHG tax that existed under

Alberta law at that time."  *Id.* at ¶ 30.  Specifically:

> The proxy cost analysis set out in Exxon's internal policies required the
> incorporation of an escalating GHG cost, reaching $80/ton of carbon dioxide (or
> CO2 equivalent in other GHGs) by 2040, into the company's economic forecasting
> for purposes of corporate decision-making.   Instead of applying this analysis,
> Exxon applied the Alberta GHG tax, which did not exceed $24/ton (U.S. currency),
> and held that figure flat indefinitely into the future . . . [in a manner that] result[ed]
> in an effective cost of less than $4/ton.

Oleske Affirmation, ¶ 31.

217.     By applying the existing costs, Exxon had not "model[led] a wide variety of

*potential* policies that might be adopted by governments" nor used "a proxy cost that is about $80

per tone in 2040," contradicting public disclosures including the E&C Report.

218.     Moreover, "at least until 2016, Exxon failed to apply a proxy cost of GHGs in

determining whether its long-lived assets, such as oil and gas reserves and resources, were

impaired, rendering its representations false and misleading."  Oleske Affirmation, ¶ 41.  Exxon

made "no attempt at all . . . to incorporate a proxy cost of GHGs into the economic models of cash

flows used in determining whether a trigger for impairment testing existed or whether Exxon's

assets were actually impaired prior to 2016."  Oleske Affirmation, ¶¶ 47-49.  This contradicts

public disclosures, such as the 2015 10-K, which stated that "[c]ash flows used in impairment

evaluations . . . make use of the Corporation's price, margin, volume, and cost assumptions

73

developed in the annual planning and budgeting process and are consistent with the criteria management uses to evaluate investment opportunities."

IX.   **DAMAGES**

219.   As a direct and proximate result of the Individual Defendants' actions, Exxon has been seriously harmed and will continue to be. Such harm includes, but is not limited to:

      a.   Legal fees and costs incurred in connection with the NYAOG complaint for violations of the Martin Act Securities Fraud, Persistent Fraud and Illegality, Actual Fraud, and Equitable Fraud;

      b.   Legal fees incurred in connection with the Securities Class Action;

      c.   Any funds paid to settle the Securities Class Action; and

      d.   Excessive compensation and benefits paid to the defendants who have breached their duties to Exxon

220.   In addition, Exxon's business, goodwill, and reputation with its business partners, regulators, and shareholders have been gravely impaired.  The Company still has not fully admitted the nature of its misleading statements and the true condition of its business.  The credibility and motives of management are now in serious doubt.

221.   The actions complained of herein have irreparably damaged Exxon's corporate image and goodwill.  For at least the foreseeable future, Exxon will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Exxon's ability to raise equity capital or debt on favorable terms in the future is now impaired.

222.   The Individual Defendants wrongful conduct has and will continue to cause Exxon to pay substantial amounts of money from costs incurred from increased future debt offerings and borrowing costs, which include the loss of its AAA credit rating.

X.      **DERIVATIVE AND DEMAND ALLEGATIONS**

223.    Plaintiff brings this action derivatively in the right and for the benefit of Exxon to redress injuries suffered, and to be suffered, by Exxon as a direct result of breaches of fiduciary duties, waste of corporate assets, unjust enrichment, as well as the aiding and abetting thereof, and violations of the federal securities laws by the Individual Defendants.   Exxon is named as a nominal defendant solely in a derivative capacity.   This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

224.    Plaintiff will adequately and fairly represent the interests of Exxon in enforcing and prosecuting his rights.

225.    Plaintiff was a shareholder of Exxon at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current Exxon shareholder.

226.    Plaintiff made a demand on the Board to investigate and remedy the violations of the law described herein as required by New Jersey law.   As detailed below, the Board's conduct in response to the Demand shows that it rejected the Demand without evaluating its merits in good faith based on all information reasonably available to it.   And, as alleged below, the Board did not in fact independently in its review of the Demand.   The Board's conduct upon receipt of the Demand and thereafter demonstrates not only that the Board did not fully inform itself during its consideration of the Demand, but also that the Board never considered the Demand in good faith, and rejected it for reasons unrelated to the merits of the claims and Exxon's best interests. Accordingly, the Board's refusal of the Demand is not a protected exercise of business judgment.

227.    On November 16, 2018, plaintiff sent the Demand to the Board. The Demand states plaintiff owns 1,445 shares of Exxon and has owned them during the wrongdoing discussed in the Demand.   The Demand alleges that, as detailed above and admitted by the Company, Exxon misrepresented its processes for evaluating enterprise risks with respect to climate change,

including employing a proxy cost of carbon lower than what was publicly disclosed and concealed the negative developments affecting the Rocky Mountain and Canadian operations despite impairments recognized by peers operating in similar regions. Moreover, the Demand states that Exxon's executives were motivated to conceal these negative trends to complete a $12 billion debt offering that was necessary to support the Company's operations and pay the shareholder dividend. The Demand further stated that these allegations survived a motion to dismiss a securities class action seeking damages for the $80 billion loss of market capital.

228.     The Demand asks the Board to "investigate whether Exxon's officers and directors committed non-exculpable violations and/or breaches of fiduciary duties or other violations of applicable law connecting with the foregoing."

229.     In a letter dated November 28, 2018, counsel at Simpson Thacher & Bartlett LLP ("Simpson Thacher") stated that certain "members of the Exxon Board of Directors ha[d] been appointed to look into the issues raised by the NYAG and the pending securities litigation" and that they would "consider the outcome of the trial in the NYAG Action, currently scheduled for October 2019." The letter further requests, without basis, documentation evidencing plaintiff's Exxon shareholdings.

230.     Plaintiff, in a good faith effort to ensure the Demand received review by the Board, undertook the lengthy process required to obtain the requested proof of share ownership even though the Company's request was entirely without legal basis. On December 18, 2018, plaintiff's counsel sent a letter to Simpson Thacher enclosing the unnecessary additional proof. In this letter, plaintiff's counsel observed that any delay in responding to the Demand, such as to consider the outcome of the NYAG Action, could severely prejudice Exxon's potential claims against individuals who breached their fiduciary duties due to the expiration of the statute of limitations

of certain claims.  Therefore, plaintiff's counsel "urge[d] the Board to immediately convene an independent committee to investigate and respond to the allegations" in the Demand.

231.    Counsel at Simpson Thacher responded that the Board appointed a "working group" of three directors to review the issues raised by the NYAG Action and the Securities Class Action.  .

232.    Without signs of progress in an investigation, Plaintiff sought to ensure that the Board was responding to the Demand.  Plaintiff's counsel sent a letter on April 5, 2019 observing that because more than ninety days had expired since the board received plaintiff's demand, plaintiff was permitted to file a derivative action on the basis of wrongful demand refusal.  The letter stated, "[a]ssuming the board is responding to the demand in good faith, [plaintiff] is willing to allow a reasonable amount of additional time for it to do so."  The letter asked Simpson Thacher to confirm whether the full board, the "working group," or other committee was investigating the matters raised by the Demand.  The letter concluded:

> Please confirm whether the full board, the working group, or some other committee is investigating the claims in the demand and plans to issue a response. If you so confirm, please also provide us with the identities of the directors, an update on the progress of the investigation, the number of times the directors have met to discuss the demand, and the charter or delegation of authority for the committee or group responding to the demand.

233.    On April 9, 2019, counsel at Simpson Thacher responded that that "in response to your inquiries, the Board created a Working Group" comprised of purportedly outside directors Angela F. Braly, Kenneth C. Frazier, and William C. Weldon was investigating issues "concerning reserves, the impact of climate change, the Company's disclosures regarding climate change regulation, and related issues of corporate governance."  The April 9, 2019 letter generally asserted that the Working Group "held regular meetings," but did not provide additional detail about the

investigation and did not provide the charter or delegation of authority, if any, under which the Working Group operated.

234.     Under New Jersey law, the Board had 90 days to investigate the Demand.

235.     A majority of the directors who received the Demand were not independent and disinterested.   The Board received in-depth briefings and actively discussed Exxon's financial position and operational risks of climate change, so the directors knew of the fraud alleged herein. Specifically, when denying-in-part Exxon's motion to dismiss the Securities Class Action, Judge Kinkeade found that the amended complaint sufficiently alleged that Exxon made material misstatements regarding (1) the use of proxy costs in formulating business and investment plans; (2) the impairment analysis for its Rocky Mountain Dry Gas Operations; (3) the Canadian Bitumen Operations' lack of profitability; and (4) lack of proved reserves at the Kearl Operations. Moreover, the Court found that Tillerson and Swiger would have known that the proxy cost of carbon used in internal analysis was different from public representations because, as members of the Management Committee, they "extensively" reviewed the Outlook before publication.   The Court could also strongly infer that Tillerson, Swiger, Woodbury, and Rosenthal would have known that Exxon's public statements were materially misleading because these directors were motivated to maintain the Company's AAA credit rating to secure the Debt Offering and pay shareholder dividends.   As a result of these findings, Exxon is reasonably likely to face substantial liability in the Securities Class Action, and the directors knew or should have known that the Company's public statements were materially misleading.

236.     Exxon is increasingly likely to face liability in the NYAG Action.   On June 12, 2019, Judge Ostrager presiding over the NYAG Action dismissed most of Exxon's key defenses in the suit, including First Amendment, conflict of interest, and prosecutorial misconduct.

237.    Additionally, Tillerson, Swiger, Rosenthal, Boskin, Brabeck-Letmathe, Burns, Faulkner, Fore, Frazier, George, Palmisano, Reinemund, and Weldon signed Exxon's 2014 Form 10-K.  Also, Tillerson, Swiger, Rosenthal, Boskin, Brabeck-Letmathe, Burns, Faulkner, Fore, Frazier, Oberhelman, Palmisano, Reinemund, Weldon, and Woods signed Exxon's 2015 Form 10-K.  Since they discussed Exxon's financial condition, these directors had reason to know that these financial statements were materially misleading for the reasons alleged herein.

238.    Thus, the Board's failure to act in the face of the foregoing is not a valid exercise of business judgment.  The Board claims that the Working Group is overseeing an investigation of the issues raised by the Demand.  However, Exxon is increasingly likely to incur substantial costs and fees in connection with the Securities Class Action and the NYAG Action, and the Board's failure to act severely prejudices Exxon's potential claims against individuals who breached their fiduciary duties due to the expiration of the statute of limitations of certain claims.

239.    The Working Group is not disinterested in the Demand.  It is an administrative body that lacks the authority to make a decision on behalf of the Company with respect to the claims alleged herein.  Indeed, as the April 9, 2019 letter acknowledges, the Working Group merely "assist[s] the Board in determining the appropriate action."

240.    Accordingly, a majority of the Board were aware or recklessly disregarded that Exxon's representations to investors were materially false and misleading and omitted material information necessary to properly evaluate the Company's financial condition, and therefore could not have independently considered the Demand.

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duty

241.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

242.    The Individual Defendants owed and owe Exxon fiduciary duties.  By reason of their fiduciary relationships, the Individual Defendants specifically owed and owe Exxon the highest obligation of care, loyalty, and good faith.  Defendants also had specific fiduciary duties as defined by the Company's corporate governance documents and principles that, had they been discharged in accordance with the Board's obligations, could have prevented the misconduct and consequential harm to Exxon alleged herein.

243.    The Individual Defendants and each of them, violated and breached their fiduciary duties of care, loyalty and good faith by creating a culture of lawlessness within Exxon, and consciously failing to prevent the Company from engaging in the unlawful acts and wrongdoing complained of herein.

244.    The Officer Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration.  By their actions and by engaging in the wrongdoing described herein, the Officer Defendants abandoned and abdicated their responsibilities and duties with regard to prudently managing the business of Exxon in a manner consistent with their fiduciary duties.  Specifically, the Officer Defendants either knew, were reckless, or were grossly negligent in not knowing: (i) Exxon's actual investment and asset valuation processes did not incorporate GHG or carbon "proxy costs" in a manner that was consistent with the Company's public representations or Exxon's own internal policies; (ii) Exxon did not incorporate GHG or carbon "proxy costs" into their asset impairment evaluation processes; (iii) Exxon's Canadian Bitumen Operations were operating at a loss; (iv) Exxon knew the Kearl Operation could not satisfy the SEC definition for proved reserves at year-end 2016, absent an extraordinary, and, by Exxon's own internal estimates, unexpected rise in the price of oil; and (v) a significant portion of Exxon's Rocky Mountain dry gas operations were impaired by no later

than year-end 2015, thus requiring the Company to record an asset impairment charge in its financial statements. Accordingly, the Officer Defendants breached their fiduciary duties of care, loyalty, and good faith owed to Exxon.

245.   The Director Defendants either knew or were reckless, in disregarding the illegal activity of such substantial magnitude and duration. By their actions and by engaging in the wrongdoing described herein, the Director Defendants abandoned and abdicated their responsibilities and duties with regard to prudently managing the business of Exxon in a manner consistent with their fiduciary duties. The Director Defendants breached their fiduciary duties by recklessly issuing or recklessly permitting the Company to issue improper statements. Specifically, the Director Defendants knew or were reckless in not knowing that: (i) Exxon's actual investment and asset valuation processes did not incorporate GHG or carbon "proxy costs" in a manner that was consistent with the Company's public representations or Exxon's own internal policies; (ii) Exxon did not incorporate GHG or carbon "proxy costs" into their asset impairment evaluation  processes; (iii) Exxon's Canadian Bitumen  Operations were operating at a loss; (iv) Exxon knew the Kearl Operation could not satisfy the SEC's definition for proved reserves at year-end 2016, absent an extraordinary and, by Exxon's own internal estimates, unexpected rise in the price of oil; and (v) a significant portion of Exxon's Rocky Mountain dry gas operations were impaired by no later than year-end 2015, thus requiring the Company to record an asset impairment charge in its financial statements. The Director Defendants also breached their fiduciary duties by failing to cause the Company to take a timely impairment charge. Accordingly, the Director Defendants breached their fiduciary duties of loyalty and good faith owed to Exxon.

246.   The Audit Committee Defendants breached their fiduciary duty of loyalty and good faith by approving the statements described herein which were made during their tenure on the

Audit Committee, which they knew or were reckless in not knowing contained improper statements and omissions.  The Audit Committee Defendants completely and utterly failed in their duty of oversight and failed in their duty to appropriately review financial results, as required by the Audit Committee Charter in effect at the time.

247.    By committing and permitting the misconduct alleged herein, the Individual Defendants breached their fiduciary duties in the management and administration of Exxon's affairs and in the use and preservation of Exxon's assets.

248.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary duties, Exxon has sustained significant damages, as alleged herein, not only monetarily, but also to its corporate image and goodwill.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

249.    Plaintiff, on behalf of Exxon, has no adequate remedy at law.

## COUNT II

### Against the Individual Defendants for Waste of Corporate Assets

250.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

251.    As a result of the misconduct described above, the Individual Defendants have wasted corporate assets by forcing the Company to expend valuable resources in defending itself in the Related Securities Class Action, the NYOAG investigation, and the NYOAG Subpoena Action that they caused with their improper conduct, statements and omissions.

252.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

253.    Plaintiff, on behalf of Exxon, has no adequate remedy at law.

## COUNT III

**Against the Individual Defendants for Unjust Enrichment**

254.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

255.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Exxon.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Exxon.

256.    Plaintiff, as a shareholder and representative of Exxon, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

257.    Plaintiff, on behalf of Exxon, has no adequate remedy at law.

## COUNT IV

**Against the Class Action Defendants for Contribution under Section 10(b) and 21D of the Exchange Act**

258.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

259.    The Class Action Defendants, along with the Company, are all named defendants in the Related Securities Class Action alleging the Company and the Class Action Defendants violated Section 10(b) and 20(a) Exchange Act.

260.    If the Company is found liable for violating the aforementioned federal securities laws, the Company's liability will be a direct result of the intentional, knowing, or reckless acts or omissions of some or all of the Class Action Defendants.

261.     As directors and officers of Exxon, the Class Action Defendants had the power and/or ability to, and did, directly or indirectly control or influence the Company's general affairs, including the content of public statements about Exxon and had the power and/or ability directly or indirectly to control or influence the specific corporate statements and conduct that violated section 10(b) of the Exchange Act and SEC Rule 10b-5 as alleged above.

262.     Moreover, the Class Action Defendants, themselves, are liable under Section 10(b) of the Exchange Act, pursuant to which there is a private right of action for contribution, and Section 21D of the Exchange Act, which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.

263.     Thus, the Company is entitled to all appropriate contribution or indemnification from the Class Action Defendants.

## COUNT V

**Against the Class Action Defendants for Violations of Section 29(b) of the Exchange Act**

264.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

265.     The Class Action Defendants, along with the Company, are all named defendants in the Related Securities Class Action alleging the Company and the Class Action Defendants violated Section 10(b) and 20(a) Exchange Act during the time they entered into contracts with Exxon regarding their compensation.

266.     If Exxon attempts to recover compensation from the Class Action Defendants, these Defendants might assert a breach of contract claim and/or seek severance.

267.     Section 29(b) of the Exchange Act provides equitable remedies that include, among other things, provisions allowing for the voiding of contracts where the performance of the contract involved violation of any provision of the Exchange Act.

84

268.   The Class Action Defendants violated provisions of the Exchange Act while performing their duties arising under various employment and other contracts they entered into with Exxon.

269.   Exxon was, and is, an innocent party with respect to the Exchange Act violations of the Class Action Defendants.

270.   Plaintiff, on behalf of Exxon, seeks rescission of the contracts between Exxon and the Class Action Defendants due to these Defendants' violations of the Exchange Act while performing their job duties.

271.   Even if the contracts are not rescinded by the Court as a result of the Exchange Act violations of the Class Action Defendants, the Court can, and should, award equitable remedies in the form of injunctive relief barring these Defendants from asserting breach of contract by Exxon in any action by Plaintiff on behalf of Exxon to return compensation from these Defendants.

272.   Plaintiff seeks only declaratory, injunctive, and equitable relief in this claim.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of Exxon, demands judgment as follows:

A.   Against all of the Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B.   Directing Exxon to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Exxon and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote, resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote of the following Corporate Governance Policies:

1.       a proposal to strengthen Board oversight and supervision over Exxon's proxy costs;

2.       a proposal to strengthen the Company's controls over financial reporting;

3.       a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

4.       a provision to permit the shareholder of Exxon to nominate at least three candidates for election to the Board; and

5.       a proposal to strengthen Exxon's oversight of its disclosure procedures;

C.       Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Exxon has an effective remedy;

D.       Awarding to Exxon restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

E.       Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.       Granting such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury.

Dated: August 6, 2019                    By:    _s/ James E. Cecchi_

                                         **CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY & AGNELLO, P.C.**
                                         James E. Cecchi
                                         Donald Ecklund
                                         5 Becker Farm Road
                                         Roseland, New Jersey 07068
                                         Telephone: (973) 994-1700

                                         **FINKELSTEIN & KRINSK LLP**
                                         Jeffrey R. Krinsk
                                         550 West C Street, Suite 1760
                                         San Diego, California 32101
                                         Telephone: (619) 238-1333
                                         E-mail: jrk@classactionlaw.com

                                         **GLANCY PRONGAY & MURRAY LLP**
                                         Matthew M. Houston
                                         Benjamin I. Sachs-Michaels
                                         712 Fifth Avenue
                                         New York, New York 10019
                                         Telephone:  (212) 935-7400
                                         E-mail: bsachsmichaels@glancylaw.com

                                                         -and-

                                         Robert V. Prongay
                                         Lesley F. Portnoy
                                         Pavithra Rajesh
                                         1925 Century Park East, Suite 2100
                                         Los Angeles, California 90067
                                         Telephone:  (310) 201-9150
                                         E-mail:  rprongay@glancylaw.com

                                         *Attorneys for Plaintiff*