# EXHIBIT A
# Part 1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| In the Matter of the Application of the<br><br>PEOPLE OF THE STATE OF NEW YORK, by ERIC T. SCHNEIDERMAN, Attorney General of the State of New York,<br><br>Petitioner,<br><br>- against –<br><br>PRICEWATERHOUSECOOPERS LLP and EXXON MOBIL CORPORATION,<br><br>Respondents. | Index No. 451962/2016<br><br>IAS Part 61<br>Hon. Barry R. Ostrager<br><br>Motion Sequence No. 4 |

**AFFIRMATION OF JOHN OLESKE IN OPPOSITION TO EXXON'S MOTION TO QUASH AND IN SUPPORT OF THE OFFICE OF THE ATTORNEY GENERAL'S CROSS-MOTION TO COMPEL**

JOHN OLESKE, under penalty of perjury, affirms:

1. I am Senior Enforcement Counsel to the Office of the Attorney General of the State of New York ("OAG"), counsel for Petitioner. I have personal knowledge of the matters set forth herein.

2. I make this affirmation in opposition to Exxon Mobil Corporation's ("Exxon") motion to quash OAG's investigative subpoenas, and in support of OAG's cross-motion to compel Exxon's compliance with those subpoenas.[1]

3. The facts below relate to three critical issues: (i) OAG's factual basis to believe that Exxon may have violated New York law by making false and misleading representations

[1] For the convenience of the Court and the parties, OAG addresses all facts relevant to both Exxon's motion and OAG's cross-motion in this affirmation in lieu of two separate submissions.

about its risk-management practices, investment practices and valuation practices; (ii) Exxon's bad-faith pattern of obstruction and document destruction in response to OAG's November 4, 2015 subpoena duces tecum (the "2015 Subpoena"); and (iii) the relationship between the subpoenas OAG issued on May 8, 2017, OAG's ongoing inquiries, and the relief needed to allow OAG to proceed with its concededly proper investigation.

## I. <u>OAG's Factual Basis for its Ongoing Investigation of Exxon</u>

### *A. OAG's Pre-Existing Monitoring Of Potentially-Misleading Corporate Representations Concerning The Impact Of Climate Change*

4. OAG is responsible for enforcing New York's anti-fraud laws, including General Business Law §§ 352 *et seq.* (the "Martin Act"), which empowers OAG to take remedial action to protect investors from false and misleading statements made in connection with the sale and purchase of securities.

5. When a company makes disclosures about the impact of climate change and related government policies on that company's core business, New York law requires it do so accurately. It may not present a picture to investors, regulators and the public that is materially at odds with what the company or its executives have concluded internally. OAG has conducted numerous investigations to ensure that corporate statements about environmental issues comply with New York laws governing commercial disclosures. For example:

- In 2008 and 2009, OAG announced the successful settlement of three investigations of potentially misleading statements by three companies operating in New York, Dynegy Inc., Excel Energy Inc. and AES Corporation, about the impact of climate change on their business.
- In 2014, OAG announced the successful settlement of two investigations of potentially misleading statements by two companies, Anadarko Petroleum Corp. and EOG Resources, Inc., concerning the financial impact of the use of hydraulic fracturing as part of the natural gas extraction process.
- In 2015, OAG announced the successful settlement of an investigation of Peabody Energy (formerly Peabody Coal). As a result of the settlement, Peabody was prohibited

Case 3:20-cv-02995-K Document 1-1 Filed 08/06/19 Page 4 of 99 PageID 94

from making the following misleading statements to investors: (1) stating that it could not predict the potential impact of climate regulations on its business when, in fact, Peabody *had* projected internally that such regulations would have severe negative impacts on coal demand, and (2) claiming that an International Energy Agency report had found government action affecting demand for coal unlikely, and that such demand would remain high, when the report had not, in fact, drawn that conclusion.

***B. The Publication Of "Energy And Carbon–Managing The Risks" And Other Representations Related To Exxon's Purported Proxy-Cost Analysis***

6. For several years prior to 2014, shareholders of several major fossil-fuel energy companies doing business in New York began proposing shareholder resolutions calling for increased disclosures concerning potential risks to the companies' value posed by the risk of future climate-change-related regulations.

7. In March 2014, Exxon negotiated the withdrawal of one such resolution proposed by a group of its shareholders in exchange for the company's agreement to publish a report concerning such risks.

8. The report, *Energy and Carbon–Managing the Risks* ("the MTR Report"), was published later that month. According to its opening paragraph, the MTR Report "seeks to address important questions raised recently by several stakeholder organizations on the topics of global energy demand and supply, climate change policy, and carbon asset risk." A true and correct copy of *Energy and Carbon–Managing the Risks* is attached as Exhibit 1.

9. In the MTR Report, Exxon represented that it "does not believe current investment in new reserves are exposed to the risk of stranded assets" and that it is "confident that none of our hydrocarbon reserves are now or will become 'stranded.'" (Ex. 1, MTR Report at 1, 19.)

10. The MTR Report specifies how Exxon purports to manage risk relating to prospective climate-change-related regulation:

> We also address the potential for future climate-related controls, including the potential for restriction on emissions, through the use of a proxy cost of carbon. This proxy cost of carbon is embedded in our current *Outlook for Energy*, and has been a feature of the report for several years. The proxy cost seeks to reflect all types of actions and policies that governments may take over the Outlook period relating to the exploration, development, production, transportation or use of carbon-based fuels. Our proxy cost, which in some areas may approach $80/ton over the Outlook period, is not a suggestion that governments should apply specific taxes . . . Perhaps most importantly, we require that all our business segments include, where appropriate, GHG costs in their economics when seeking funding for capital investments. *We require that investment proposals reflect the climate-related policy decisions we anticipate governments making during the Outlook period and therefore incorporate them as a factor in our specific investment decisions.*

(*Id.* at 17-18) (emphasis added).

11. The MTR Report's proxy cost representations followed years of similar representations by Exxon. In its annual *Outlook for Energy* reports starting in 2008, Exxon stated that it anticipated that governments would impose a cost of greenhouse gas emissions (GHGs). Exxon Mobil Corp., *2008 The Outlook for Energy: A View To 2030*, at 12. Over time, these representations grew more specific. By the 2010 *Outlook for Energy*, Exxon set out specific GHG prices, on specific timelines, that it expected as a result of regulatory action. Exxon Mobil Corp., *2010 The Outlook for Energy: A View To 2040*, at 9, 29-31. These representations grew even more detailed in the 2012 *Outlook for Energy*, in which Exxon represented that these expectations were "integral to [its] forecasts" for hydrocarbon demand. Exxon Mobil Corp., *2012 The Outlook for Energy: A View To 2040*, at 30.

12. After the MTR Report was published in March 2014, and continuing to the present, Exxon has represented that the core risk-management statements in the MTR Report

concerning the application of a proxy cost of GHGs to investment decisions apply to Exxon's business practices over the past decade, reflecting company policy going back to 2007. In reports, speeches, and on its website, Exxon has frequently repeated the representations made in the MTR Report and referred investors back to representations made in the MTR Report.

13. For example, in November 2014, Exxon published an article on its *Perspectives* website, in which it stated that "ExxonMobil's Outlook for Energy" assumes a proxy cost of carbon of $80 per ton. Exxon Mobil Corp., *More On Divestment: A Letter to Tim Wirth* (Nov. 6, 2014), http://www.exxonmobilperspectives.com/2014/11/06/more-on-divestment. In a December 2, 2015 article on the same website, Exxon stated that "ExxonMobil has included a proxy price on carbon in our business planning since 2007." Exxon Mobil Corp., *ExxonMobil and the Carbon Tax* (Dec. 2, 2015), https://energyfactor.exxonmobil.com/corporate-citizenship-sustainability/exxonmobil-and-the-carbon-tax/.

14. Likewise, in a 2016 report entitled "Meeting Global Needs – Managing Climate Change Business Risks," Exxon stated that "in most OECD nations, we assume an implied cost of carbon dioxide ("CO2") emissions that will reach about $80 per metric ton in 2040," and that "this GHG proxy cost is integral to Exxon's planning." Exxon Mobil Corp., *Meeting Global Needs – Managing Climate Change Business Risks,* http://corporate.exxonmobil.com/en/current-issues/climate-policy/climate-perspectives/managing-climate-change-business-risks.

15. Exxon's proxy notices to shareholders contained similar representations. In Exxon's April 13, 2016 notice of the company's 2016 annual shareholder meeting, Exxon repeated the representations in the MTR Report quoted *supra* at ¶ 10, and also represented that the "proxy cost of carbon is embedded in our *Outlook for Energy*, and has been a feature of the report since 2007." Exxon Mobil Corp., *Notice of 2016 Annual Meeting & Proxy Statement*

(Apr. 13, 2016), http://cdn.exxonmobil.com/~/media/global/files/investor-reports/2016/2016_Proxy_Statement.pdf.

16. On May 25, 2016, Exxon's then-Chairman and CEO Rex Tillerson told attendees at Exxon's annual shareholder meeting that the company's "price of carbon gets put into all of our economic models when we make investment decisions as well. It's a proxy… So we choose to put it in as a cost. *So we have accommodated that uncertainty in the future, and everything gets tested against it.*" (emphasis added). A true and correct copy of the relevant portion of the transcript of this meeting is attached as Exhibit 2.

17. In Exxon's April 13, 2017 notice of the company's 2017 annual shareholder meeting, Exxon recommended that shareholders vote against two proposals relating to the integration of climate-regulatory risk, referring shareholders to the MTR Report for a description of "how the Company integrates consideration of climate change risks into planning processes and investment evaluation." Exxon Mobil Corp., *Notice of 2017 Annual Meeting & Proxy Statement*, at 66 (Apr. 13, 2017), http://cdn.exxonmobil.com/~/media/global/files/investor-reports/2017/2017_proxy_statement.pdf.

18. On May 31, 2017, Exxon shareholders voted in favor of a proposal that the company publish an annual assessment of the long-term financial impacts of climate change. At the shareholder meeting itself, Exxon's CEO Darren Woods stated that Exxon's *Outlook for Energy* is consistent with the Paris Accord and that all of Exxon's businesses are required to include where appropriate an estimate of the costs associated with greenhouse gas emissions.

19. Exxon has repeated its proxy cost representations in multiple 10-Ks, multiple submissions to the Carbon Disclosure Project (CDP)[2], its annual *Outlook for Energy* public reports, and a separate report it issued in March 2017 entitled *2016 Energy and Carbon Summary*.

20. Evidence reviewed by the OAG to date indicate that Exxon's major oil and gas projects often span multiple decades, and that the proxy cost of GHGs can have a material effect on the long-term profitability of Exxon's projects and the value of its assets.

***C. Evidence Indicates That Exxon's Internal Proxy Cost Policies Were Inconsistent With Its Representations***

21. The investigation to date has uncovered evidence that, from 2010 through June 2014, the proxy cost Exxon set out in its internal policies was lower than the proxy cost the company publicly represented that it used in investment decisions. In other words, Exxon represented to investors and the public that it was incorporating higher costs of GHG regulation into its business decisions than documents indicate that it actually was using, thereby potentially misleading investors and the public about the extent to which it was protecting its business from regulatory risks related to climate change.

22. In particular, Exxon publicly stated in the MTR Report and its *Outlook for Energy* reports that for projects in developed countries, it applied proxy costs that reached $60/ton of GHGs by 2030, and $80/ton by 2040. In fact, the proxy cost figures used for Exxon's internal planning and budgeting reached only $40/ton by 2030. *See infra* at ¶ ¶ 23-25, Exs. 3-5.

---

[2] The Carbon Disclosure Project ("CDP") is a United Kingdom-based nongovernmental organization that runs a global disclosure system that enables companies and governments to measure and manage their environmental impacts. CDP's data enables its network of investors, supply chain purchasers and policy makers to link environmental integrity, fiduciary duty and public interest to make better-informed decisions on climate action. Thousands of corporations voluntarily report their GHGs to the CDP. Each year Exxon submits answers to questions about climate change posed by the CDP.

23. It appears that this discrepancy was known at Exxon's highest levels. As one example, an email from Exxon's Corporate Greenhouse Gas Manager acknowledged as early as 2010 that the publicly disclosed proxy cost figures were "more realistic" than those that Exxon actually used. A true and correct copy of this correspondence, EMC 000339155, is attached as Exhibit 3.

24. As another example, a 2011 email states that CEO Rex Tillerson was "happy with the difference" because using a lower proxy cost was "conservative" from the perspective of investing in projects, like carbon capture and storage, that allow Exxon to claim emissions-reduction credits. The email acknowledged, however, that using a lower cost than publicly disclosed was "not conservative . . . from the perspective of debiting actions that increase emissions," such as investing in oil and gas development projects. A true and correct copy of this correspondence, EMC 000354827, is attached as Exhibit 4.

25. It was not until June 2014 that Exxon sought to eliminate this glaring inconsistency between external and internal figures. At that time, Exxon's new Corporate Greenhouse Gas Manager acknowledged in an internal presentation that the proxy costs that Exxon used internally were "non-conservative" with respect to projects that increase carbon emissions, and admitted that, in public reports, "we have implied that we use the [publicly-disclosed] basis for proxy cost of carbon when evaluating investments." A true and correct copy of this presentation, EMC 000539921, is attached as Exhibit 5.

26. According to documents produced from the custody of Jason Iwanika, a Development Planner at Imperial Oil Limited ("Imperial"), Exxon's majority-owned subsidiary in Canada, another planner at another Exxon affiliate referred to the 2014 alignment of external

and internal proxy cost figures as a "huge change." A true and correct copy of this correspondence, EMC 000556782, is attached as Exhibit 6.

27. Exxon did not inform investors about the undisclosed variation in its use of proxy-cost formulas when it represented in 2016 that it had been applying its publicly-touted proxy-cost analysis since 2007. *Supra* at ¶ 15.

### *D. Exxon's Documents Indicate That Exxon Often Did Not Apply Any Proxy Cost Of Ghgs*

28. Compounding the discrepancy between Exxon's public representations and its internal policies, it now seems apparent that Exxon has not applied a proxy cost of GHGs at all with respect to many of its oil and gas projects. This understanding is based both on documents Exxon has produced, and on documents that Exxon has failed to produce but that OAG would have expected to see if Exxon's much-touted proxy cost analysis was consistently implemented.

#### 1. Evidence Reveals A Corporate Decision To Abandon Proxy-Cost Analysis For Its Canadian Oil Sands Projects

29. The investigation to date has uncovered evidence that indicates that, by 2015, the company faced a problem with respect to its multi-decade, multi-billion-dollar oil sands projects in Alberta, Canada. These projects, which have a significant impact on the company's bottom line, apparently have not been as profitable as Exxon expected. As described above, Exxon had in mid-2014 increased the proxy cost of GHGs in its internal analyses to match those that it had been touting to the public for years. This change would have affected the projected profitability of all of Exxon's projects, including its oil sands projects, and, according to evidence reviewed by OAG, may have rendered at least one of its major oil sands projects unprofitable over the life of the project.

Case 3:20-cv-02995-K Document 1-1 Filed 08/06/19 Page 11 of 99 PageID 101

30. Evidence reviewed to date indicates that the company's response was not to faithfully apply the proxy-cost analysis and recognize losses as appropriate. Rather, evidence indicates that Exxon decided in the fall of 2015 to abandon the proxy-cost figures applicable to Alberta projects that were set out in its internal policies, and decided instead to apply the current, much lower GHG tax that existed under Alberta law at that time.

31. The proxy cost analysis set out in Exxon's internal policies required the incorporation of an escalating GHG cost, reaching $80/ton of carbon dioxide (or CO2 equivalent in other GHGs) by 2040, into the company's economic forecasting for purposes of corporate decision-making. Instead of applying this analysis, Exxon applied the Alberta GHG tax, which did not exceed $24/ton (U.S. currency), and held that figure flat indefinitely into the future. Further, Exxon applied this cost of carbon to only a small percentage of emissions – 15% to 20% – specified under existing Alberta law, resulting in an effective cost of less than $4/ton.

32. Applying a GHG tax that already exists is not a "proxy" for anything, and does not "address the potential for future climate-related controls," as Exxon repeatedly represented that its proxy cost of GHGs was intended to do. (*See* ¶ 10 *supra*.) The apparent discrepancy between Exxon's words and actions is particularly significant where, as here, the actual GHG costs Exxon applied were both significantly lower than its purported proxy costs, and applied only to a very limited percentage of its GHGs.

33. Indeed, evidence shows that Jason Iwanika, the Imperial Development Planner discussed *supra* in ¶ 26, sought direction from Exxon concerning how to apply the GHG assumptions set out in the Corporate Plan Dataguide to the Canadian oil sands projects, and questioned Exxon's directions that he deviate from those assumptions. Nonetheless, it appears

that Exxon ignored his concerns and instructed him to disregard the proxy-cost assumptions set out in its internal policies.

### 2. Exxon Has Produced No Documents Reflecting Consistent Application of Proxy-Cost Analysis to Investment Decisions

34. It appears that Exxon's proxy-cost risk-management process may be a sham based on the fact that the company has failed to produce certain documents it would have had to create to accomplish its publicly-stated representations.

35. Notwithstanding the numerous deficiencies in its subpoena compliance, Exxon has produced approximately 450,000 documents, including documents from a number of custodians who should have been involved in the application and management of the proxy-cost analysis described in Exxon's public representations. These documents appear to be devoid of evidence that Exxon applied any consistent proxy-cost analysis – whether the publicly-stated figures or its secret internal version – to its major investment decisions.

36. The two documents Exxon points to in its motion papers do not provide any evidence of Exxon actually doing what it told investors. First, Exxon cites a two-page insert that it published annually in its Corporate Dataguide Appendix, which does little more than list the purportedly-applicable proxy costs across geographic regions and timeframes. However, as set out above, it appears that this internal policy clashed with Exxon's public representations for years, and that Exxon did not even follow this policy in many instances. Beyond these two pages, Exxon has not produced any company-wide or region-specific procedures, guidance, or analysis related to the proxy cost of GHGs, undermining any notion that Exxon implemented its touted proxy-cost analysis across a meaningfully wide spectrum of investment or planning decisions. Further, evidence reviewed by OAG reveal a widespread lack of awareness among employees of the proxy cost policy, or how it should be applied.

37. Second, the single instance in which Exxon has affirmatively identified to OAG and this Court its purported application of the proxy-cost analysis concerned a single, unusual project in which applying the proxy cost was to the company's benefit. For this project, Exxon sold CO2 to other operators rather than releasing it into the atmosphere, generating GHG credits rather than added costs. Thus, the evidence shows that Exxon applied it proxy-cost analysis to generate additional profit, but failed to apply it in cases that would have reduced profits or increased losses. This in no way constitutes the kind of risk-management exercise for future oil and gas development and production as described by Exxon's proxy-cost representations, and in any event concerns only a single project. (Feb. 11, 2017 Toal Letter to OAG at 2; Mar. 16, 2017 Toal Letter to Court at 4.) True and correct copies of this correspondence are attached as Exhibits 7 and 8.

### 3. Evidence Indicates That It Excluded 90% of Emissions When Applying Its Purported Proxy-Cost Analysis

38. Exxon represented to investors that its proxy-cost analysis included emission from the end use of its fossil fuels, *i.e.,* Scope 3 emissions, when it stated in the MTR Report (and elsewhere) that "[t]he proxy cost seeks to reflect all types of actions and policies that governments may take over the Outlook period relating to the… *transportation or use* of carbon-based fuels". (*e.g.*, Ex. 1, MTR Report at 17.)

39. Emissions from the end-use of fossil fuels, synonymous with Scope 3 emissions, account for approximately 90% of all fossil-fuel-related greenhouse gases, as Exxon acknowledged in its submission to the CDP. (*See*, *e.g.*, Exxon's 2015 submission to the CDP at 23, Answer CC14.4c) ("approximately 90 percent of petroleum-related GHG emissions are generated when customers use our products and the remaining 10 percent are generated by

industry operations.") A true and correct copy of Exxon's 2015 submission to the Carbon Disclosure Project is attached as Exhibit 9.

40. Yet Exxon's documents indicate that even in the few instances where Exxon tried to apply some semblance of a proxy-cost, Exxon failed to include costs relating to end use, or Scope 3, emissions, thus ensuring that even in Exxon's most robust application of proxy cost it failed to account for 90% of the "use" of its fossil fuels. (*e.g.*, EMC 000548250.) A true and correct copy of one example, EMC 000548250, is attached as Exhibit 10.

### *E. Documents Produced By Pwc And Exxon Indicate That Exxon Failed To Apply The Proxy-Cost Analysis To Its Impairment Decisions Prior To 2016*

41. As set forth above, Exxon's internal policies concerning its application of a proxy cost of GHGs were inconsistent with its representations to investors. In addition, its actual practices with respect to major investment decisions were inconsistent with both internal policies and representations to investors. The evidence OAG has reviewed to date indicates that, at least until 2016, Exxon failed to apply a proxy cost of GHGs in determining whether its long-lived assets, such as oil and gas reserves and resources, were impaired, rendering its representations false and misleading.

#### 1. Standards Governing Impairment

42. Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") 360 governs the accounting for the impairment of long-lived assets under U.S. generally-accepted accounting principles ("GAAP"). A true and correct copy of relevant excerpts from ASC 360 is attached as Exhibit 11. As set out below, Exxon represents in its public filings that it follows the guidance set out in ASC 360.

43. ASC 360 sets out a three-step process for identifying and measuring the impairment of long-lived assets or asset groups.

44. First, a company must routinely assess whether indicators of impairment are present. Examples of such indicators, also known as "impairment triggers," include:

a. a "significant decrease in the market price of a long-lived asset";

b. a "significant adverse change in legal factors or in the business climate that could affect the value of a long-lived asset . . . including an adverse action or assessment by a regulator";

c. an "accumulation of costs significantly in excess of the amount originally expected for the acquisition or construction of a long-lived asset"; and

d. a "current-period operating or cash flow loss combined with a history of operating or cash flow losses or a projection or forecast that demonstrates continuing losses associated with the use of a long-lived asset[.]"

(Ex. 11, ASC 360-10-31-21.) Exxon has repeatedly represented to investors and to the public that it meets these accounting requirements by "perform[ing] asset valuation analyses on an ongoing basis as a part of its asset management program" to determine whether events and circumstances such as those set out in ASC 360-10-31-21 are present. (*See, e.g.*, Exxon's 2015 Form 10-K at 57, 69.) A true and correct copy of Exxon's 2015 Form 10-K is attached as Exhibit 12.

45. Second, if one or more impairment triggers are present, a company must test the asset in question to determine whether the balance sheet carrying amount of the asset exceeds the sum of the undiscounted future cash flows expected to result from the use and disposition of the asset. (Ex. 11, ASC 360-10-35-17, 360-10-35-21.) Exxon has represented to investors and to

the public that it has complied with its obligations under this accounting requirement. (*See, e.g.,* Ex. 12, Exxon Mobil Corp., 2015 Form 10-K at 57, 70.)

46. Third, if it is determined that the carrying amount of a long-lived asset is not recoverable, a company must determine the fair value of the asset and calculate an impairment loss based on this fair value. ASC 360-10-35-17. Exxon has represented to investors and to the public that it has complied with its obligations under this accounting requirement. (*See, e.g., id.* at 57, 70.)

47. In developing future cash flow estimates for impairment analyses, accounting standards require that a company must "incorporate the entity's own assumptions . . . and shall consider all available evidence." (Ex. 11, ASC 360-10-35-30.) Further, "[t]he assumptions used in developing those estimates shall be reasonable in relation to the assumptions used in developing other information used by the entity for comparable periods, such as internal budgets and projections, accruals related to incentive compensation plans, or information communicated to others." *Id*. Exxon has represented to investors and to the public that it has met this obligation as well. (*See, e.g.,* Ex. 12, Exxon Mobil Corp., 2015 Form 10-K at 70) ("Cash flows used in impairment evaluations . . . make use of the Corporation's price, margin, volume, and cost assumptions developed in the annual planning and budgeting process, and are consistent with the criteria management uses to evaluate investment opportunities.").

**2. Exxon's Omission of Proxy Cost of GHGs in Impairment Decisions**

48. Because Exxon refused to produce documents relating to valuation of its assets for impairment purposes, OAG subpoenaed the company's accountants, PricewaterhouseCoopers LLP ("PwC") in October 2016, and has since received approximately 38,000 documents from PwC.

49. The evidence to date indicates no attempt at all, by Exxon or by PwC, to incorporate a proxy cost of GHGs into the economic models of cash flows used in determining whether a trigger for impairment testing existed or whether Exxon's assets were actually impaired prior to 2016. To the contrary, these documents indicate that Exxon and PwC only began incorporating proxy cost assumptions into some of Exxon's impairment-related accounting analyses in 2016, after OAG first subpoenaed Exxon.

50. Exxon's apparent failure to incorporate a proxy cost of GHGs into its impairment-related decisions is particularly important in light of Exxon's stated accounting approach to low oil and gas prices. Exxon has stated that it "does not view temporarily low prices or margins as a trigger event for conducting impairment tests." (Ex. 12, Exxon Mobil Corp., 2015 Form 10-K at 57.) Exxon has also asserted that it instead considers prices over the "long term," *id*., and that its "assessment is that its operations will exhibit strong performance over the long term." (*Id.* at 42.) Indeed, documents produced by PwC show that, with oil and gas prices at low levels, Exxon relied on long-term cash flow models to forecast that certain of its projects, even if losing money currently and in the near-to-medium term, will ultimately generate cash flows that exceed their balance sheet carrying values, and thus are not impaired or do not exhibit triggers for impairment evaluation.

51. Such forecasts must abide by Exxon's representations, and GAAP requirements, that the company use the same assumptions in its impairment decisions that it uses (or purports to use) in its other business decisions, including the application of a proxy cost of GHGs that grows over time. *See supra*. To the extent that Exxon did not do so, it seems clear that the company misled investors about the value of the company's assets and its risk management

processes in light of the dual challenges of ongoing low oil and gas prices and growing GHG costs over time.

52. Exxon's apparent failure to incorporate a proxy cost of GHGs into its impairment-related cash flow models is even more relevant given its public stance with respect to the question of whether its long-lived assets could become stranded or uneconomical to produce due to rising GHG costs. In the MTR Report, Exxon represented that it was "confident that none of [its] hydrocarbon reserves are now or will become 'stranded'" (Ex. 1 at 1) and that "the company does not believe current investments in new reserves are exposed to the risk of stranded assets[.]" (*Id.* at 19.) The MTR Report originally contained a footnote addressing impairment, but that footnote was removed at the request of David Rosenthal, Exxon's Vice President for Investor Relations, after he stated in a March 25, 2014 email: "[t]hat word gives folks on the third floor heartburn." A true and correct copy of that correspondence, at EMC 001198245 is attached as Exhibit 13.

**3. The Importance of Production of Exxon's Impairment-Related Documents**

53. OAG has received impairment-related documents from PwC, but without documents from Exxon itself, OAG's window into Exxon's impairment-related decisions is limited. Documents produced by PwC indicate that Exxon has not shared with PwC all relevant documents on this topic, including many of the cash flow models Exxon uses for impairment-related purposes. In other cases, PwC was shown such documents, but Exxon did not permit PwC to retain them. Further, PwC does not appear to possess drafts of relevant Exxon documents such as impairment memoranda and asset recoverability reviews. Nor does PwC possess related internal Exxon communications. Such documents are reasonably related–indeed, highly relevant–to OAG's inquiry.

54. Additionally, despite the First Department's May 23, 2017 Decision and Order unanimously affirming this Court's order granting OAG's October 14, 2016 petition to compel Exxon and PwC to comply with OAG's subpoena notwithstanding any purported accountant-client privilege, PwC has still not produced the documents that were withheld on that basis, as Exxon has sought and received a stay from the First Department. There is likely to be some (though not complete) overlap between the withheld PwC documents and responsive documents in Exxon's possession, and therefore requiring Exxon to produce such documents would avoid further delays.

## II. Exxon Failed to Conduct a Compliant Subpoena Response, Resulting in the Still-Unexplained Destruction of Documents from Key Custodians

55. Exxon's compliance with the original subpoena has been marked by delays, obstruction, and the destruction of untold numbers of documents from over a dozen key custodians.

56. The root of Exxon's apparent destruction of subpoenaed documents was the failure of its Law Department to observe basic requirements in document preservation, collection, production, and recovery. These failures have also contributed to numerous other delays and deficiencies in Exxon's document production.

57. In an attempt to understand the scope of these failures and their impact on the prospective completion of Exxon's document production, and as specifically ordered by the Court at the March 23, 2017 conference, OAG solicited affidavits and took testimony from two witnesses proffered by Exxon: Connie Feinstein of Exxon's Information Technology Department ("EMIT") and Michelle Hirshman of Paul, Weiss.

58. Neither witness could testify to the topics for testimony stated in the subpoenas issued to Exxon. True and correct copies of the subpoenas for testimony issued to Exxon are attached as Exhibits 14 and 15.

59. Indeed, the totality of these witnesses' testimony confirms Exxon's Law Department failed to search for, collect, and preserve documents responsive to the 2015 Subpoena, resulting in the destruction of unknown number of Exxon documents from key custodians.

60. However, neither Ms. Feinstein nor Ms. Hirshman were able to provide key information about the scope of Exxon's past compliance failures or the company's conduct in attempting to recover the destroyed documents.

### *A. Exxon's External Counsel Was Insufficiently Involved in the Process of Subpoenas Compliance*

61. An important preliminary fact was confirmed in the witness testimony: Exxon's external counsel did not supervise important aspects of Exxon's subpoena compliance.

62. Specifically, external counsel played no part in the process of interviewing potential Exxon document custodians, including top managers, their assistants, and other key custodians. (Ex. 17, May 3, 2017 Toal Letter to OAG, Ex. B; Hirshman Tr. 60-61.) A true and correct copy of the testimony taken of Michele Hirshman, dated March 10, 2017 is attached as Exhibit 16.

63. External counsel also failed to familiarize themselves with Exxon's information-technology department or Exxon's data storage and management practices. (*See*, *e.g.*, Ex. 16, Hirshman Tr. 119-20, 123-24, 131-32, 159-61, 174-78.)

64. External counsel failed to even learn the details of, let alone supervise, Exxon's preservation-hold process, failed to reiterate preservation instructions to potential custodians who

received preservation holds, and failed to monitor those potential custodians' actual compliance with the preservation holds. (*See*, *e.g.*, Ex. 16, Hirshman Tr. 36-49, 50-52, 142-44.)

65. In the absence of external supervision, Exxon's in-house Law Department repeatedly violated established compliance obligations.

### *B. Exxon Failed to Interview Key Custodians, Contrary to Prior Representations to OAG*

66. Exxon repeatedly represented in its correspondence with OAG that its procedure for document collection began, as required, with witness interviews to identify likely repositories of responsive documents. *See, e.g.,* Ex. 18, Apr. 18, 2016 Hirshman Letter to OAG, at 6-7 ("As we have repeatedly explained, ExxonMobil is conducting a custodian-by custodian search for documents. *Documents are collected from the data sources identified by a custodian as containing potentially responsive documents*."); Ex. 19, Dec. 5, 2016 Toal Letter to Court, at 5 ("ExxonMobil crafted its custodian list through comprehensive research, witness interviews, and document review."); Ex. 20, Dec. 9, 2016 Hearing Tr. 23:13-16 (Toal: "We have asked custodians, we've interviewed custodians, we've asked them where they store documents, we asked them if they store documents on shared drives."); Ex. 21, Revised Hirshman Cert. ¶ 28 ("ExxonMobil identified the[] custodians through comprehensive research, witness interviews, and document review."). *Cf.* Ex. 17, May 3, 2017 Toal Letter to OAG at Ex. B (confirming that Management Committee members and their assistants were not interviewed until March or April of 2017, and some not at all). A true and correct copy of these letters are attached as Exhibits 17 through 21.

67. As confirmed in the witness' testimony, Exxon did not interview any of its Management Committee members or their assistants to identify the locations of responsive documents prior to March 2017. (Ex. 16, Hirshman Tr. 62,146-49.)

68. Several such custodians, including former Chairman and CEO Rex Tillerson, had left the company by that time, and apparently they were never interviewed at all. (Ex. 17, May 3, 2017 Toal Letter to OAG, Ex. B; Ex. 16, Hirshman Tr. 64-65.)

69. Exxon also did not interview custodians of reserves-related documents until at least July or August of 2016, and in some cases, has still not done so. (Ex. 17, May 3, 2017 Toal Letter to OAG, Ex. B.)

### *C. Exxon Failed to Preserve Documents it Knew Were Potentially Relevant, Despite OAG's Repeated Questioning of Inadequate Preservation*

70. Partly as a consequence of the its failure to interview key custodians, Exxon failed to place on preservation hold documents from those and other custodians.

71. Exxon failed in this respect despite correspondence from OAG that Exxon's preservation efforts appeared inadequate. (*See, e.g.*, Ex. 16, Hirshman Tr. 154-55.)

#### 1. Management-Committee Documents

72. Exxon failed to preserve documents from multiple custodians who it knew might possess relevant documents relating to the communications and work of the company's Management Committee.

##### *a) Wayne Tracker*

73. Exxon knew at the time the 2015 Subpoena was issued that Mr. Tillerson used a secondary email account, wayne.tracker@exxonmobil.com, in addition to his "official" email account rex.w.tillerson@exxonmobil.com.

74. Exxon knew that in its internal computer systems relating to identity-management, the company had assigned the wayne.tracker@exxonmobil.com email account not to Mr. Tillerson, but to an information-technology employee named Ramona Helble.

75. Exxon did not place Ms. Helble on a preservation hold, or otherwise take any action to ensure that documents stored with respect to the wayne.tracker@exxonmobil.com email account would be preserved.

76. During Ms. Hirshman's testimony, she testified that she personally knew in "early 2016" that there existed a second email address for Rex Tillerson – the Wayne Tracker email address, and that she believed Exxon's failure to inform OAG of this alias email address would constitute "an interesting test of whether the Attorney General's office is reading the documents." (Ex. 16, Hirshman Tr. 134.) However, Ms. Hirshman further testified that neither she nor her firm made any attempt to look further into the preservation, collection or production of documents of the Wayne Tracker email address at that time, leading to months of automatic destruction of relevant correspondence. (*Id.* at 141-42.)

*b) Management-Committee Assistants*

77. Exxon also knew that assistants to its Management-Committee members were highly knowledgeable of and involved in their principals' communications.

78. In previous litigations where Exxon preserved Management-Committee documents, it also placed management assistants on preservation hold.

79. Here, Exxon did not place any management assistants on preservation hold until March 2017.

*c) Management-Committee Member Donald Humphreys*

80. Exxon's outside counsel affirmed that management custodians requested in the 2015 Subpoena were placed on hold and their documents collected. This was not true.

81. Donald D. Humphreys served as a Senior Vice President on Exxon Mobil's Management Committee from January 1, 2006 to February 1, 2013.

82. Based on Exxon's representations, Exxon appears to have made no effort to preserve or collect Mr. Humphreys' documents.

*d) Imperial President Richard Kruger*

83. Exxon's outside counsel affirmed that management custodians requested in the 2015 Subpoena were placed on hold and their documents collected. OAG had also requested, and Exxon has produced and placed on hold responsive documents of employees of Exxon and its affiliates.

84. To date over 750 documents from the custody of Imperial employees have been produced to the OAG. Another almost 1800 documents to or from custodians with an 'esso.ca' email address (one of Imperial's domains) were also produced. *See also infra* ¶ 133.

85. Imperial President Kruger is shown in Exxon's documents as having routine contact with Exxon's Management Committee. In 2015, Mr. Kruger sent an email to the Management Committee promising detailed information about the impact of Alberta GHG regulations, including the low carbon tax Exxon used in place of a proxy cost, with respect to Exxon's oil sands projects, stating that Imperial was "turning our immediate focus to a detailed examination of the announcement and its impact on our existing operations and possible future projects in Alberta." A true and correct copy of this correspondence, EMC 001844415, is attached as Exhibit 22.

86. Despite that fact, Exxon did not place the documents of Mr. Kruger and his executive assistant on hold until April 2017, 18 months after the subpoena was issued, presumably resulting in the destruction of more than a year's worth of their documents.

**2. Reserves-Related Documents**

87. Exxon also knew that the 2015 Subpoena called for, and that OAG had specifically requested, documents from custodians responsible for analyzing the company's oil and gas reserves estimates.

88. Exxon did not place any such custodians on preservation hold until July 2016, and OAG believes that some relevant custodians have never been placed on hold.

89. This is in part because Exxon has refused to identify members of various reserves-related committees that existed prior to 2016. Because of Exxon's refusal, OAG cannot presently determine what potential reserves custodians' documents Exxon has failed to preserve. (*See* ¶ 126, *infra*).

***D. Potentially Relevant Documents from Key Custodians Have Been Destroyed***

90. As a direct consequence of these failures, an unknown number of documents from Exxon's Management-Committee and reserves custodians have been destroyed.

91. Specifically, Exxon has disclosed that its document-management software automatically "sweeps" (deletes) emails and attached documents from custodians after a period of 395 days, unless the subject email accounts are placed on a preservation hold. (Anderson Ex. Q, Amended Feinstein Aff. ¶ 51, n.4.) Non-email documents (electronic or paper) may also have been destroyed during this time by the key custodians not notified of the preservation hold.

92. Because emails and attached documents from the wayne.tracker@exxonmobil.com email account, the management assistants, Mr. Humphreys, Mr. Kruger, and relevant custodians of reserve documents were not placed on a preservation hold until March 2017, at the earliest, at least a full year's worth of emails, attached documents and

non-email documents from each of those sources during the pendency of the 2015 Subpoena have been destroyed.

### *E. Exxon Falsely Represented that it Conducted a Compliant Search for Management Documents While Its Document Destruction was Ongoing*

93. Exxon represented that its document production protocol began with witness interviews and otherwise conformed to its compliance obligations, including through the application of agreed-upon Boolean search terms. (*See supra* at ¶ 66; *see also* Ex. 23, Dec. 22, 2015 Jansen Letter, at 1 ("[I]n your December 16, 2015 correspondence, you suggested several modifications to the search terms that ExxonMobil is using to identify potentially relevant electronic data. ExxonMobil confirms that we have incorporated all of your suggested modifications."); Ex. 19, Dec. 5, 2016 Toal Letter to Court, at 5 n.4 ("Here, the parties did 'carefully craft' the set of search terms."). A true and correct copy of December 22, 2015 Jansen Letter is attached as Exhibits 23.

94. In fact, as was only disclosed in March 2017, Exxon had actually conducted document collection and production of Management-Committee documents in a wholly undisclosed and non-compliant fashion prior to that time.

95. Specifically, Exxon did not interview Management-Committee custodians, nor their assistants, to identify likely locations of responsive documents.

96. Instead, Exxon's Law Department gave still-undisclosed instructions directly to the Management-Committee assistants directing them to collect paper documents and an unspecified range of electronic documents.

97. Separately, Exxon's Law Department purportedly instructed an EMIT employee named Bob Lauck to conduct a noncompliant search of the individual management custodians' documents in Microsoft Outlook, a method which has severe technical deficiencies in collecting

all relevant documents – including those observed by courts[3] – rather than Exxon's own document collection software and processes.

98. Based on what Exxon has been able to explain thus far, these searches did not employ the agreed-upon Boolean search terms,[4] and otherwise failed to meet basic standards for e-discovery compliance.

### *F. Exxon's Failure to Explain the Scope of the Document Destruction or its Remediation Efforts, Requires Testimony From Additional Witnesses*

99. Even though OAG made its specific need for witness testimony to assess the scope and remediation of Exxon's document destruction clear at the conference before the Court on March 23, 2017, in multiple letters and emails leading up to both witnesses' testimony, and in the noticed topics for testimony, Exxon failed to proffer witnesses who could explain the full scope of Exxon's document destruction and the details of how it came about, the nature and operation of Exxon's data backup systems, or the efforts Exxon has made to recover documents known to have been destroyed.

---

3 *See*, *e.g.*, *Nat'l Day Laborer Org. Network v. U.S. Immigration & Customs Enforcement Agency*, 877 F. Supp. 2d 87, 106-07 (S.D.N.Y. 2012) ("Seemingly minor decisions – whether intentional or not – will have major consequences. Choosing 'subject field' rather than 'subject field and message body' during a search using the Microsoft Outlook email client will dramatically change its scope and results."); *see also T.A. Ahern Contrs. Corp. v. Dormitory Auth. of State of N.Y.*, 875 N.Y.S.2d 862, 865 (N.Y. Sup. Ct. N.Y. Cnty. 2009) ("Microsoft Outlook… does not allow for mailbox-wide searches which could potentially locate project-specific e-mails and/or documents."); *Burke v. Ryan*, No. OCN-L-1642-13, 2013 N.J. Super. Unpub. LEXIS 2331, at *7 (N.J. Law Div. Sept. 17, 2013) ("In order to search for records [defendant] uses the search engine which will only search the sender's name and subject line. She explained that Outlook will not search the actual attachment itself.")

4 The "simple" search terms used by Exxon to search documents in Outlook were in some cases narrower than the compound terms. For example: "anthropogenic emissions" is not a simplified term for "anthropogenic"; "climate model" and "climate research" are not simplified terms for the following terms: climate! /5 (skeptic! or deni! or model! or research! or fund! or support! or warming or low or science); "climate change," "climate model," and "climate research" are not simplified terms for the following terms: climate /5 uncertain!; the terms "stranded asset" and "stranded reserve" will not collect the plurals of the following agreed-upon terms: stranded /5 (asset! or reserve!). (*See* Anderson Ex. Q, Amended Feinstein Aff. Ex. A.)

100. Only three paragraphs in the Feinstein Affidavit were based exclusively on Ms. Feinstein's personal knowledge. In fact, 30 of 60 paragraphs in the Feinstein Affidavit listed other individuals, and not Ms. Feinstein, as having personal knowledge concerning the noticed topics for testimony. A true and correct copy of the April 19, 2017 Toal Letter to OAG and its Exhibit A is attached as Exhibit 24.

101. During her examination, Ms. Feinstein admitted that she did not know basic information concerning the identification, preservation, collection, destruction, or recovery of documents in connection with Exxon's response to the 2015 Subpoena. On almost 200 occasions, Ms. Feinstein testified that she did not know the requested details on the six topics in OAG's subpoena. *See, e.g.,* Feinstein Tr. 17, 27, 29, 42-43, 45-46, 49-50, 52, 54-55, 57-59, 62-63, 70, 74, 87, 89, 92-94, 96, 100, 102-03, 107, 117, 119-20, 127-29, 131-38, 141-42, 143, 148-49, 152, 155, 158-61, 164, 167, 169-76, 178, 183-85, 193, 195, 197, 199, 202-07, 209-12, 224, 226, 230, 232-37, 242-43, 246, 251, 253, 255-56, 259-62, 272-73, 275-78, 280, 282, 285-86, 289, 297-98, 300, 302. A true and correct copy of Ms. Feinstein's testimony, taken April 26, 2017, is attached as Exhibit 25.

102. Specifically, while Ms. Feinstein testified that she knew of CEO Tillerson's alias wayne.tracker@exxonmobil.com email account, and also knew that the company's new CEO Darren Woods was also assigned a secondary email account – j.e.gray@exxonmobil.com, she testified that she did not know details of the preservation, collection, destruction, or recovery of emails from those accounts. She did know, however, that Exxon had assigned these accounts' identities to a different EMIT employee, Ramona Helble, who Ms. Feinstein testified worked closely with the Management Committee. Ms. Feinstein testified that Ms. Helble would have the relevant information. (*See*, *e.g.*, Ex. 25, Feinstein Tr. 201-08, 265-67, 273-74.)

103. Ms. Feinstein also testified that she did not know details of Exxon's improper identification and search for Management Committee documents described in paragraphs 7 to 39 of her affidavit. (Anderson Ex. Q, Revised Hirshman Cert. ¶ ¶ 7-39.) Ms. Feinstein responded to dozens of OAG's questions seeking these details by stating that another EMIT employee, Bob Lauck, would have the relevant information. (*See*, *e.g.*, Ex. 25, Feinstein Tr. 73, 116, 126, 139-40, 148, 153-55, 171-182, 250-53.) Indeed, Ms. Feinstein referred to Mr. Lauck nearly 50 times in her examination and Mr. Lauck was listed as having personal knowledge as to 15 of the paragraphs in Ms. Feinstein's affidavit. (*Id.*; Ex. 24, Apr. 19, 2017 Toal Letter to OAG, Ex. A.)

104. Ms. Feinstein also testified that she did not know details of Exxon's email preservation, automatic destruction, backup, and recovery systems and capabilities. With respect to virtually every question OAG asked about these critical topics, Ms. Feinstein testified that another EMIT employee in the Email Collaboration Services unit, Cynthia Leong, would have the relevant information. (*See*, *e.g.*, Ex. 25, Feinstein Tr. 60-62, 83-84, 93-94, 143, 151-52, 158-59, 222-23, 226.) Indeed, Ms. Feinstein referred to Ms. Leong nearly 17 times in her examination and Ms. Leong was listed as having personal knowledge as to 11 of the paragraphs in Ms. Feinstein's affidavit. (*Id.*; Ex. 24, Apr. 19, 2017 Toal Letter to OAG, Ex. A.)

105. Finally, Ms. Feinstein testified that she did not know details of Exxon's instructions to its employees in connection with subpoena compliance. In particular, while Ms. Feinstein was generally aware that Exxon had directed Management-Committee assistants to collect documents, she could not explain what those instructions were or what they were based on, given that Exxon never interviewed the custodians or the assistants. When questioned on these topics, Ms. Feinstein testified that Daniel Bolia of Exxon's Law Department would have the relevant information. (*See*, *e.g.*, Ex. 25, Feinstein Tr. 73, 75-79, 168-69, 182-83.) Indeed,

Mr. Bolia was listed as having personal knowledge as to 29 of the paragraphs in Ms. Feinstein's affidavit. (Ex. 24, Apr. 19, 2017 Toal Letter to OAG, Ex. A.)

106. For her part, Ms. Hirshman's testimony revealed that she does not know any specific information about Exxon's preservation, backup, or recovery of the documents destroyed by Exxon during the pendency of the subpoena, and she was unable to provide any of the information Ms. Feinstein did not have, and for which Ms. Feinstein referred OAG to the four other Exxon employees identified above. (*See*, *e.g.*, Ex. 16, Hirshman Tr. 162-65.)

## III. <u>OAG's May 8, 2017 Subpoenas Are Reasonably Related to OAG's Investigation</u>

### *A. May 8, 2017 Subpoena Duces Tecum for Documents and Information*

107. OAG's May 8, 2017 subpoena duces tecum includes requests for both information ("Interrogatories") and documents. (Anderson Ex. T.)

108. The Interrogatories seek details about Exxon's purported application of a proxy cost of GHGs to its investment decisions and evaluation of assets, along with the identification of individuals assigned to various committees overseeing the company's reserves.

109. The Interrogatories are targeted first at eliciting specific information as to whether Exxon applied a proxy cost analysis to its investment decisions, impairment decisions, and internal reserves estimates. (*See* Interrogatory Nos. 1, 3, 4, and 6.)

110. The Interrogatories then follow up, in cases where Exxon did apply a proxy-cost analysis, with requests for information that may indicate practices that make Exxon's proxy cost representations meaningless and deceptive, such as: (i) applying a lower proxy cost than it publicly represented to investors; (ii) applying a proxy cost to only a fraction of GHG emissions from a given project; (iii) applying a proxy cost to only certain GHGs and not others; (iv) applying a proxy cost to only direct emissions as opposed to emissions stemming from end use

of the oil and gas; and/or (v) assuming that it could pass-through most or all of the proxy cost to its customers, while unreasonably assuming that such pass-through would have no effect on demand for its products. (Interrogatory Nos. 2, 5, and 7.) OAG has evidence from its investigation that Exxon engaged in each these practices.

111. If anything, Exxon's responses to the Interrogatories should narrow, rather than expand, the need for additional documents by focusing on instances in which Exxon actually applied proxy costs to its investment or impairment decisions.

112. The document requests seek four major categories of documents.

113. First, OAG seeks documents relating to the use and application of the proxy cost analysis from the post-November 2015 period. Such documents are relevant to Exxon's continuing proxy-cost-related representations, and any related changes in the company's practices.

114. Second, OAG seeks documents that Exxon previously produced to the Securities and Exchange Commission ("SEC") relating to impairment decisions, reserves calculations, and climate change. Such documents are relevant to the evaluation of Exxon's apparent failure to use a proxy-cost analysis in valuing assets for impairment purposes.

115. Third, OAG seeks documents that were exchanged between Exxon and banks or other financial institutions relating to impairment decisions, reserves calculations, and climate change. Such documents are relevant to the importance that investors ascribe to climate change issues in their investment decisions.

116. Finally, OAG seeks documents related to the company's asset valuation and impairment practices for its long lived assets, particularly its hydrocarbon assets, again given

Exxon's apparent failure to use a proxy-cost analysis in its valuation and impairment practices. Documents produced by PwC are insufficient in this regard, as set out in ¶ ¶ 41-49 above.

***B. May 8, 2017 Testimonial Subpoenas***

117. Four of the testimonial subpoenas were issued for the witnesses discussed in ¶ ¶ 99-106, above, who were identified by Ms. Feinstein as having key information she was unable to provide about Exxon's improper preservation of and search for management documents, its consequent destruction of those documents, and its incomplete data-recovery efforts: Ms. Helble, Mr. Lauck, Ms. Leong and Mr. Bolia. (Anderson Exs. U-X.)

118. Four testimonial subpoenas were issued for fact witnesses employed directly by Exxon, all of whom are shown by Exxon's documents to have had responsibility for development and/or implementation of the proxy-cost analysis Exxon represented it applied (as well as knowledge as to other OAG theories of liability, including but not limited to other misstatements in the MTR Report[5]).

119. The remaining testimonial subpoena was issued for Jason Iwanika, an employee of Exxon's majority-owned subsidiary Imperial. A true and correct copy of the testimonial subpoena for Mr. Iwanika is attached as Exhibit 26.

120. Exxon produced approximately 670 documents from Mr. Iwanika's custody. These documents show that Mr. Iwanika was centrally involved in the instances described supra

[5] For example, among other things, OAG is investigating whether the "Substantial Costs for $CO_2$ Mitigation" data used by Exxon in the MTR Report was erroneously attributed to the Massachusetts Institute of Technology. *See* Ex. 1, MTR Report at 9. The MIT researcher whose study was cited in the MTR Report, John Reilly, informed the report's authors at Exxon as early as July 1, 2015 that critical figures used in the chart "[we]re not numbers we report in that study… that the chart's "numbers were extremely high," and that the overall impression created by the chart was "misleading." A true and correct copy of this correspondence, EMC 001189007, is attached as Exhibit 27. As Reilly explained to reporters just this week, his "work would not come up with that number or anywhere near it," and the data's presentation "may lend some readers to believe that that number is based on our work." A true and correct copy of the May 30, 2017 E&E News, *MIT Researcher Says Exxon Report Inflated His Data* article is attached as Exhibit 28.

at ¶ ¶ 26, 29-33, in which Exxon applied existing GHG taxes instead of the company's purported proxy costs to its Canadian oil sands assets, deviating from the company's representations and underrepresenting the company's risks.

### *C. OAG Attempted to Meet And Confer Regarding Exxon's Prospective Compliance with the May 8, 2017 Subpoenas*

121. Prior to Exxon filing this motion, OAG initiated and attempted to conduct a meet-and-confer session with Exxon concerning its prospective compliance with the subpoenas.

122. Specifically, OAG raised the issue of a conference to discuss the subpoena on the afternoon of May 10, 2017, during an in-person discussion with Exxon's counsel after Ms. Hirshman's testimony had concluded for the day.

123. Exxon's counsel responded on May 12, 2017 that it would be available only for a telephonic meet and confer, and no earlier than Thursday, May 18, 2017, two business days before the return date of the May 8, 2017 subpoena duces tecum.

124. The parties conducted a teleconference on May 19, 2017 regarding Exxon's prospective compliance with the May 8, 2017 subpoenas.

125. During that conference, Exxon refused to consider complying with *any* of the requests in the subpoena duces tecum.

126. When OAG pointed out that Interrogatory 9 asked only for a list of names of individuals on Exxon's reserves-related committees that were predecessors to a similar committee that came into existence in 2015, Exxon refused, citing "overarching fundamental concerns."

127. When OAG pointed out that Document Request No. 5 would require Exxon to do nothing more than copy a CD previously produced to the SEC, Exxon again declined, on the same basis.

128. When OAG asked whether Exxon would consider responding to any more limited requests, Exxon stated that it would only negotiate such limitations *after* OAG withdrew its subpoena.

129. Exxon also stated that the record-witness subpoenas were unnecessary on the grounds that Ms. Feinstein's and Ms. Hirshman's affidavits and testimony complied with the Court's prior orders and purportedly satisfied all of OAG's needs concerning Exxon's subpoena compliance, and in particular, its admitted destruction of documents and its requisite recovery efforts.

130. Finally, Exxon contended that despite producing many relevant documents from Mr. Iwanika on its own volition, it could not yet confirm whether Exxon would produce Mr. Iwanika for testimony.

131. Less than an hour after this teleconference, Exxon filed this motion to quash the subpoena duces tecum and the four records-witness subpoenas for testimony from Ms. Helble, Mr. Lauck, Ms. Leong and Mr. Bolia

132. After filing this motion, Exxon told OAG that it will also not comply with the subpoena for testimony for Mr. Iwanika. Exxon followed up by letter confirming its position.

133. As discussed *supra*, Exxon has produced hundreds of documents from Iwanika's custody (¶ 120), Exxon's Law Department interviewed him (Ex. 17, May 3, 2017 Toal Letter Ex. B), and Exxon has produced privilege logs for communications purportedly containing legal advice on which Mr. Iwanika and other Imperial employees appear. Documents from other Imperial employees have been produced by Exxon, other Imperial employees have been interviewed by Exxon's Law Department, and 27 other Imperial employees have been placed on

preservation hold by Exxon's Law Department. (Ex. 17, May 3, 2017 Toal Letter Ex. B; *supra* at ¶ 84.)

134. After Exxon filed its motion, OAG sent a letter to Exxon asking the company to withdraw it, and to actually meet and confer in good faith regarding Exxon's prospective compliance.

135. Exxon responded by again rejecting any obligation to make any effort at all to negotiate the scope or timing of Exxon's prospective responses before seeking to quash OAG's subpoenas on the grounds it has advanced here.

## IV. <u>Additional Attachments</u>

136. A true and correct copy of an excerpt of the Public Papers of Governor Lehman, dated August 15, 1933, is attached as Exhibit 29. A true and correct copy of an excerpt of the Annual Report of the Attorney-General for the Year Ending Dec. 31, 1933 is attached as Exhibit 30.

137. A true and correct copy of the former N.Y.C. Admin. Code § B1-5.0 is attached as Exhibit 31.

138. A true and correct copy of the former New York State Executive Law § 11 is attached as Exhibit 32.

139. A true and correct copy of a transcript of Exxon's fourth quarter 2016 earnings call is attached as Exhibit 33.

140. No previous application has been made to this Court or any other court for the relief requested herein.

Dated: New York, New York
June 2, 2017

______/s____________________
John Oleske

# Exhibit 1

**Energy and Carbon -- Managing the Risks**

ExxonMobil[1] engages in constructive and informed dialogue with a wide variety of stakeholders on a number of energy-related topics. This report seeks to address important questions raised recently by several stakeholder organizations on the topics of global energy demand and supply, climate change policy, and carbon asset risk.

As detailed below, ExxonMobil makes long-term investment decisions based in part on our rigorous, comprehensive annual analysis of the global outlook for energy, an analysis that has repeatedly proven to be consistent with the International Energy Agency *World Energy Outlook*, the U.S. Energy Information Administration *Annual Energy Outlook*, and other reputable, independent sources. For several years, our *Outlook for Energy* has explicitly accounted for the prospect of policies regulating greenhouse gas emissions (GHG). This factor, among many others, has informed investments decisions that have led ExxonMobil to become the leading producer of cleaner-burning natural gas in the United States, for example.

Based on this analysis, we are confident that none of our hydrocarbon reserves are now or will become "stranded." We believe producing these assets is essential to meeting growing energy demand worldwide, and in preventing consumers – especially those in the least developed and most vulnerable economies – from themselves becoming stranded in the global pursuit of higher living standards and greater economic opportunity.

---

[1] As used in this document, "ExxonMobil" means Exxon Mobil Corporation and/or one or more of its affiliated companies. Statements of future events or conditions in this report are forward-looking statements. Actual future results, including economic conditions and growth rates; energy demand and supply sources; efficiency gains; and capital expenditures, could differ materially due to factors including technological developments; changes in law or regulation; the development of new supply sources; demographic changes; and other factors discussed herein and under the heading "Factors Affecting Future Results" in the Investors section of our website at: www.exxonmobil.com. The information provided includes ExxonMobil's internal estimates and forecasts based upon internal data and analyses, as well as publicly available information from external sources including the International Energy Agency. Citations in this document are used for purposes of illustration and reference only and any citation to outside sources does not necessarily mean that ExxonMobil endorses all views or opinions expressed in or by those sources.

### 1. Strong Correlation between Economic Growth and Energy Use

The universal importance of accessible and affordable energy for modern life is undeniable. Energy powers economies and enables progress throughout the world. It provides heat for homes and businesses to protect against the elements; power for hospitals and clinics to run advanced, life-saving equipment; fuel for cooking and transportation; and light for schools and streets. Energy is the great enabler for modern living and it is difficult to imagine life without it. Given the importance of energy, it is little wonder that governments seek to safeguard its accessibility and affordability for their growing populations. It is also understandable that any restrictions on energy production that decrease its accessibility, reliability or affordability are of real concern to consumers who depend upon it.



## 2. World Energy Needs Keep Growing

Each year, ExxonMobil analyzes trends in energy and publishes our forecast of global energy requirements in our *Outlook for Energy*. The Outlook provides the foundation for our business and investment planning, and is compiled from the breadth of the company's worldwide experience in and understanding of the energy industry. It is based on rigorous analyses of supply and demand, technological development, economics, and government policies and regulations, and it is consistent with many independent, reputable third-party analyses.

ExxonMobil's current *Outlook for Energy* extends through the year 2040, and contains several conclusions that are relevant to questions raised by stakeholder organizations. Understanding this factual and analytical foundation is crucial to understanding ExxonMobil's investment decisions and approach to the prospect of further constraints on carbon.

World population increases. Ultimately, the focus of ExxonMobil's *Outlook for Energy* – indeed, the focus of our business – is upon people, their economic aspirations and their energy requirements. Accordingly, our analysis begins with demographics. Like many independent analyses, ExxonMobil anticipates the world's population will add two billion people to its current total of seven billion by the end of the Outlook period. The majority of this growth will occur in developing countries.

World GDP grows. The global economy will grow as the world's population increases, and it is our belief that GDP gains will outpace population gains over the Outlook period, resulting in higher living standards. Assuming sufficient, reliable and affordable energy is available, we see world GDP growing at a rate that exceeds population growth through the Outlook period, almost tripling in size from what it was globally in 2000.[2] It is

[2] We see global GDP approaching $120 trillion, as compared to $40 trillion of global GDP in 2000 (all in constant 2005 USA$'s). GDP per capita will also grow by about 80 percent between 2010 and 2040, despite the increase in population.

Case 3:16-cv-03111-K Document 36-1 Filed 07/26/17 Page 41 of 553 PageID 468

largely the poorest and least developed of the world's countries that benefit most from this anticipated growth. However, this level of GDP growth requires more accessible, reliable and affordable energy to fuel growth, and it is vulnerable populations who would suffer most should that growth be artificially constrained.




Energy demand grows with population and GDP. As the world becomes more populous and living standards improve over the Outlook period, energy demand will increase as well. We see the world requiring 35 percent more energy in 2040 than it did in 2010. The pace of this energy demand increase is higher than the population growth rate, but less than global GDP growth rate. Greater energy efficiency is a key reason why energy demand growth trails economic growth. We see society implementing policy changes that will promote energy efficiency, which will serve to limit energy demand growth. We also see many governments adopting policies that promote the switch to less carbon-intensive fuels, such as natural gas. As noted in the chart above, energy demand in 2040 could be almost double what it would be without the anticipated efficiency gains.

ExxonMobil believes that efficiency is one of the most effective tools available to manage greenhouse gas emissions, and accordingly our company is making significant contributions to energy efficiency, both in our own operations and in our products.

Energy-related CO2 emissions stabilize and start decreasing. As the world's population grows and living standards increase, we believe GHG emissions will plateau and start decreasing during the Outlook period. In the OECD countries, energy-based GHG emissions have already peaked and are declining. Our views in this regard are similar to other leading, independent forecasts.[3]




As part of our Outlook process, we do not project overall atmospheric GHG concentration, nor do we model global average temperature impacts.[4] However, we do project an energy-related CO2 emissions profile through 2040, and this can be compared

[3] For example, the IEA predicts that energy-related emissions will grow by 20%, on trend but slightly higher than our Outlook. See www.worldenergyOutlook.org.
[4] These would require data inputs that are well beyond our company's ability to reasonably measure or verify.

to the energy-related CO2 emissions profiles from various scenarios outlined by the Intergovernmental Panel on Climate Change (IPCC). When we do this, our Outlook emissions profile through 2040 would closely approximate the IPCC's intermediate RCP 4.5 emissions profile pathway in shape, but is slightly under it in magnitude.[5]

All economic energy sources are needed to meet growing global demand. In analyzing the evolution of the world's energy mix, we anticipate renewables growing at the fastest pace among all sources through the Outlook period. However, because they make a relatively small contribution compared to other energy sources, renewables will continue to comprise about 5 percent of the total energy mix by 2040. Factors limiting further penetration of renewables include scalability, geographic dispersion, intermittency (in the case of solar and wind), and cost relative to other sources.




5 The IPCC RCP 4.5 scenario extends 60 years beyond our Outlook period to the year 2100, and incorporates a full carbon cycle analysis. The relevant time horizons differ and we do not forecast potential climate impacts as part of our Outlook, and therefore cannot attest to their accuracy.

The cost limitations of renewables are likely to persist even when higher costs of carbon are considered.




## 3. Climate Change Risk

ExxonMobil takes the risk of climate change seriously, and continues to take meaningful steps to help address the risk and to ensure our facilities, operations and investments are managed with this risk in mind.

Many governments are also taking these risks seriously, and are considering steps they can take to address them. These steps may vary in timing and approach, but regardless, it is our belief they will be most effective if they are informed by global energy demand and supply realities, and balance the economic aspirations of consumers.

**4. Carbon Budget and Carbon Asset Risk Implications**

One focus area of stakeholder organizations relates to what they consider the potential for a so-called carbon budget. Some are advocating for this mandated carbon budget in order to achieve global carbon-based emission reductions in the range of 80 percent through the year 2040, with the intent of stabilizing world temperature increases not to exceed 2 degrees Celsius by 2100 (i.e., the "low carbon scenario"). A concern expressed by some of our stakeholders is whether such a "low carbon scenario" could impact ExxonMobil's reserves and operations – i.e., whether this would result in unburnable proved reserves of oil and natural gas.

<u>The "low carbon scenario" would require CO2 prices significantly above current price levels.</u> In 2007, the U.S. Climate Change Science Program published a study that examined, among other things, the global CO2 cost needed to drive investments and transform the global energy system, in order to achieve various atmospheric CO2 stabilization pathways. The three pathways shown in the chart below are from the MIT IGSM model used in the study, and are representative of scenarios with assumed climate policies that stabilize GHGs in the atmosphere at various levels, from 650 ppm CO2 down to 450 ppm CO2, a level approximating the level asserted to have a reasonable chance at meeting the "low carbon scenario." Meeting the 450 ppm pathway requires large, immediate reductions in emissions with overall net emissions becoming negative in the second half of the century. Non-fossil energy sources, like nuclear and renewables, along with carbon capture and sequestration, are deployed in order to transform the energy system. Costs for CO2 required to drive this transformation are modeled. In general, CO2 costs rise with more stringent stabilization targets and with time. Stabilization at 450 ppm would require CO2 prices significantly above current price levels, rising to over $200 per ton by 2050. By comparison, current EU Emissions Trading System prices are approximately $8 to $10 per ton of CO2.

In the right section of the chart below, different levels of added CO2 are converted to estimated added annual energy costs for an average American family earning the median

income. For example, by 2030 for the 450ppm CO2 stabilization pathway, the average American household would face an added CO2 cost of almost $2,350 per year for energy, amounting to about 5 percent of total before-tax median income. These costs would need to escalate steeply over time, and be more than double the 2030 level by mid-century. Further, in order to stabilize atmospheric GHG concentrations, these CO2 costs would have to be applied across both developed and developing countries.




In 2008, the International Energy Agency estimated that reducing greenhouse gas emissions to just 50 percent below 2005 levels by 2050 would require $45 trillion in added energy supply and infrastructure investments.[6] In this scenario, the IEA estimated that *each year* between 2005 and 2050 the world would need to construct 24 to 32 one-thousand-megawatt nuclear plants, build 30 to 35 coal plants with carbon capture and

---

[6] See *IEA Energy Technology Perspectives 2008, Scenarios & Strategies to 2050*.

sequestration capabilities, and install 3,700 to 17,800 wind turbines of four megawatt capacity.

Transforming the energy system will take time. Energy use and mix evolve slowly due to the vast size of the global energy system. As shown in the chart below, biomass like wood was the primary fuel for much of humanity's existence. Coal supplanted biomass as the primary energy source around 1900; it was not until the middle of the 20th century before oil overtook coal as the primary source of energy. We believe the transition to lower carbon energy sources will also take time, despite rapid growth rates for such sources. Traditional energy sources have had many decades to scale up to meet the enormous energy needs of the world. As discussed above, renewable sources, such as solar and wind, despite very rapid growth rates, cannot scale up quickly enough to meet global demand growth while at the same time displacing more traditional sources of energy.



<u>A "low carbon scenario" will impact economic development.</u> Another consideration related to the "low carbon scenario" is that capping of carbon-based fuels would likely harm those least economically developed populations who are most in need of affordable, reliable and accessible energy.[7] Artificially restricting supplies can also increase costs, and increasing costs would not only impact the affordability and accessibility of energy, especially to those least able to pay, it could impact the rate of economic development and living standards for all. Increasing energy costs leads to a scarcity of affordable, reliable and accessible energy and can additionally lead to social instability. While the risk of regulation where GHG emissions are capped to the extent contemplated in the "low carbon scenario" during the Outlook period is always possible, it is difficult to envision governments choosing this path in light of the negative implications for economic growth and prosperity that such a course poses, especially when other avenues may be available, as discussed further below.




[7] According to the International Energy Agency, 2.6 billion people still rely on biomass for cooking and over 15% of the world's population lacks access to electricity (http://www.iea.org/topics/energypoverty/).

Even in a "low carbon scenario," hydrocarbon energy sources are still needed. The IEA in its World Energy Outlook 2013 examined production of liquids from currently-producing fields, in the absence of additional investment, versus liquids demand, for both their lead "*New Policies Scenario*" and for a "*450 Scenario.*" As shown in the chart above, in both scenarios, there remains significant liquids demand through 2035, and there is a need for ongoing development and investment. Without ongoing investment, liquids demand will not be met, leaving the world short of oil.

ExxonMobil believes that although there is always the possibility that government action may impact the company, the scenario where governments restrict hydrocarbon production in a way to reduce GHG emissions 80 percent during the Outlook period is highly unlikely. The Outlook demonstrates that the world will require all the carbon-based energy that ExxonMobil plans to produce during the Outlook period.[8] Also, as discussed above, we do not anticipate society being able to supplant traditional carbon-based forms of energy with other energy forms, such as renewables, to the extent needed to meet this carbon budget during the Outlook period.

## 5. Managing the Risk

ExxonMobil's actions. ExxonMobil addresses the risk of climate change in several concrete and meaningful ways. We do so by improving energy efficiency and reducing emissions at our operations, and by enabling consumers to use energy more efficiently through the advanced products we manufacture. In addition, we conduct and support extensive research and development in new technologies that promote efficiency and reduce emissions.

[8] ExxonMobil's proved reserves at year-end 2013 are estimated to be produced on average within sixteen years, well within the Outlook period. See Exxon Mobil Corporation 2013 Financial & Operating Review, p. 22. It is important to note that this sixteen year average reserves-to-production ratio does not mean that the company will run out of hydrocarbons in sixteen years, since it continues to add proved reserves from its resource base and has successfully replaced more than 100% of production for many years. See Item 2 Financial Section of ExxonMobil's 2013 Form 10-K for ExxonMobil's proved reserves, which are determined in accordance with current SEC definitions.

In our operations, we apply a constant focus on efficiency that enables us to produce energy to meet society's needs using fewer resources and at a lower cost.

For example, ExxonMobil is a leader in cogeneration at our facilities, with equity ownership in more than 100 cogeneration units at more than 30 sites with over 5200 megawatts of capacity. This capacity, which is equivalent to the electricity needs of approximately 2.5 million U.S. households, reduces the burden on outside power and grid suppliers and can reduce the resulting emissions by powering ExxonMobil's operations in a more efficient and effective manner.

We also constantly strive to reduce the emission intensity of our operations. Cumulative savings, for example, between 2009 and 2012 amounted to 8.4 million metric tons of greenhouse gases.

Many of ExxonMobil's products also enable consumers to be more energy efficient and therefore reduce greenhouse gas emissions. Advancements in tire liner technology developed by ExxonMobil allow drivers to save fuel. Our synthetic lubricants also improve vehicle engine efficiency. And lighter weight plastics developed by ExxonMobil reduce vehicle weights, further contributing to better fuel efficiency. [9]

ExxonMobil is also the largest producer of natural gas in the United States, a fuel with a variety of consumer uses, including heating, cooking and electricity generation. Natural gas emits up to 60 percent less CO2 than coal when used as the source for power generation.

Research is another area in which ExxonMobil is contributing to energy efficiency and reduced emissions. We are on the forefront of technologies to lower greenhouse gas emissions. For example, ExxonMobil operates one of the world's largest carbon capture

[9] Using ExxonMobil fuel-saving technologies in one-third of U.S. vehicles, for example, could translate into a saving of about 5 billion gallons of gasoline, with associated greenhouse gas emissions savings equivalent to taking about 8 million cars off the road.

and sequestration (CCS) operations at our LaBarge plant in Wyoming. It is a co-venturer in another project, the Gorgon natural gas development in Australia, which when operational will have the largest saline reservoir CO2 injection facility in the world. The company is leveraging its experience with CCS in developing new methods for capturing CO2, which can reduce costs and increase the application of carbon capture for society. ExxonMobil also is actively engaged, both internally and in partnership with renowned universities and institutions, in research on new break-through technologies for energy.

The company also engineers its facilities and operations robustly with extreme weather considerations in mind. Fortification to existing facilities and operations are addressed, where warranted due to climate or weather events, as part of ExxonMobil's Operations Integrity Management System.

ExxonMobil routinely conducts life cycle assessments (LCAs), which are useful to understand whether a technology can result in environmental improvements across a broad range of factors. For example, in 2011 we conducted a LCA in concert with Massachusetts Institute of Technology and Synthetic Genomics Inc. to assess the impact of algal biofuel production on GHG emissions, land use, and water use. The study demonstrated the potential that algae fuels can be produced with freshwater consumption equivalent to petroleum refining, and enable lower GHG emissions. A more recent LCA demonstrated that "well-to-wire" GHG emissions from shale gas are about half that of coal, and not significantly different than emissions of conventional gas.

In addition, ExxonMobil is involved in researching emerging technologies that can help mitigate the risk of climate change. For example, the company has conducted research into combustion fundamentals with automotive partners in order to devise concepts to improve the efficiency and reduce emissions of internal combustion engines.

ExxonMobil has also developed technology for an on-board hydrogen-powered fuel cell that converts other fuels into hydrogen directly under a vehicle's hood, thereby eliminating the need for separate facilities for producing and distributing hydrogen. This

technology can be up to 80 percent more fuel efficient and emit 45 percent less $CO_2$ than conventional internal combustion engines. The company is also a founding member of the Global Climate and Energy Project at Stanford University, a program that seeks to develop fundamental, game-changing scientific breakthroughs that could lower GHG emissions.

Government policy. Addressing climate risks is one of many important challenges that governments face on an ongoing basis, along with ensuring that energy supplies are affordable and accessible to meet societal needs.

Energy companies like ExxonMobil can play a constructive role in this decision-making process by sharing our insights on the most effective means of achieving society's goals given the workings of the global energy system and the realities that govern it.

The introduction of rising $CO_2$ costs will have a variety of impacts on the economy and energy use in every sector and region within any given country. Therefore, the exact nature and pace of GHG policy initiatives will likely be affected by their impact on the economy, economic competitiveness, energy security and the ability of individuals to pay the related costs.

Governments' constraints on use of carbon-based energy sources and limits on greenhouse gas emissions are expected to increase throughout the Outlook period. However, the impact of these rising costs of regulations on the economy we expect will vary regionally throughout the world and will not rise to the level required for the "low carbon scenario." These reasonable constraints translate into costs, and these costs will help drive the efficiency gains that we anticipate will serve to curb energy growth requirements for society as forecasted over the Outlook period.

We also see these reasonable constraints leading to a lower carbon energy mix over the Outlook period, which can serve to further reduce greenhouse gas emissions. For example, fuel switching to cleaner burning fuels such as natural gas has significantly

contributed to the United States reducing greenhouse gas emissions last year to levels not seen since 1994. Furthermore, the impact of efficiency is expected to help stabilize and eventually to reduce GHG emissions over the Outlook period, as discussed previously. These constraints will also likely result in dramatic global growth in natural gas consumption at the expense of other forms of energy, such as coal.

We see the continued focus on efficiency, conservation and fuel switching as some of the most effective and balanced ways society can address climate change within the Outlook period in a manner that avoids the potentially harmful and destabilizing consequences that the artificial capping of needed carbon-based energy sources implied within the "low carbon scenario" can cause.[10]

**6. Planning Bases and Investments**

ExxonMobil is committed to disciplined investing in attractive opportunities through the normal fluctuations in business cycles. Projects are evaluated under a wide range of possible economic conditions and commodity prices that are reasonably likely to occur, and we expect them to deliver competitive returns through the cycles. We do not publish the economic bases upon which we evaluate investments due to competitive considerations. However, we apply prudent and substantial safety margins in our planning assumptions to help ensure robust returns. In assessing the economic viability of proved reserves, we do not believe a scenario consistent with reducing GHG emissions by 80 percent by 2050, as suggested by the "low carbon scenario," lies within the "reasonably likely to occur" range of planning assumptions, since we consider the scenario highly unlikely.

The company also stress tests its oil and natural gas capital investment opportunities, which provides an added margin of safety against uncertainties, such as those related to technology, costs, geopolitics, availability of required materials, services, and labor, etc.

[10] Permitting the freer trade and export of natural gas is but one way, for example, where countries that rely on more carbon-intense forms of energy can increase their use of cleaner-burning fuels.

Such stress testing differs from alternative scenario planning, such as alternate Outlooks, which we do not develop, but stress testing provides us an opportunity to fully consider different economic scenarios in our planning and investment process. The Outlook is reviewed at least annually, and updated as needed to reflect changes in views and circumstances, including advances in technology.




We also address the potential for future climate-related controls, including the potential for restriction on emissions, through the use of a proxy cost of carbon. This proxy cost of carbon is embedded in our current *Outlook for Energy*, and has been a feature of the report for several years. The proxy cost seeks to reflect all types of actions and policies that governments may take over the Outlook period relating to the exploration, development, production, transportation or use of carbon-based fuels. Our proxy cost,

which in some areas may approach $80/ton over the Outlook period[11], is not a suggestion that governments should apply specific taxes. It is also not the same as a "social cost of carbon," which we believe involves countless more assumptions and subjective speculation on future climate impacts. It is simply our effort to quantify what we believe government policies over the Outlook period could cost to our investment opportunities. Perhaps most importantly, we require that all our business segments include, where appropriate, GHG costs in their economics when seeking funding for capital investments. We require that investment proposals reflect the climate-related policy decisions we anticipate governments making during the Outlook period and therefore incorporate them as a factor in our specific investment decisions.

When governments are considering policy options, ExxonMobil advocates an approach that ensures a uniform and predictable cost of carbon; allows market prices to drive solutions; maximizes transparency to stakeholders; reduces administrative complexity; promotes global participation; and is easily adjusted to future developments in climate science and policy impacts. We continue to believe a revenue-neutral carbon tax is better able to accommodate these key criteria than alternatives such as cap-and-trade.

Our views are based on our many years of successful energy experience worldwide and are similar to long-term energy demand forecasts of the International Energy Agency. As discussed previously, we see population, GDP and energy needs increasing for the world over the Outlook period, and that *all* economically viable energy sources will be required to meet these growing needs. We believe that governments will carefully balance the risk of climate change against other pressing social needs over the Outlook period, including the need for accessible, reliable and affordable energy, and that an artificial capping of carbon-based fuels to levels in the "low carbon scenario" is highly unlikely.

[11] As noted in our Outlook, this amount varies from country to country, with that amount generally equating to OECD countries, and lower amounts applying to non-OECD countries.

## 7. Capital Allocation

ExxonMobil maintains capital allocation discipline with rigorous project evaluation and investment selectivity, while consistently returning cash to our shareholders. Our capital allocation approach is as follows:

I. Invest in resilient, attractive business opportunities
II. Pay a reliable and growing dividend
III. Return excess cash to shareholders through the purchase of shares.

Although the company does not incorporate the "low carbon scenario" in its capital allocation plans, a key strategy to ensure investment selectivity under a wide range of economic assumptions is to maintain a very diverse portfolio of oil and gas investment opportunities. This diversity – in terms of resource type and corresponding development options (oil, gas, NGLs, onshore, offshore, deepwater, conventional, unconventional, LNG, etc.) and geographic dispersion is unparalleled in the industry. Further, the company does not believe current investments in new reserves are exposed to the risk of stranded assets, given the rising global need for energy as discussed earlier.

## 8. Optional Reserves Disclosure under SEC Rules

Some have suggested that ExxonMobil consider availing itself of an optional disclosure available to securities issuers under Item 1202 of SEC Regulation S-K. [12] That SEC item provides, among other things, that "the registrant may, but is not required to, disclose, in the aggregate, an estimate of reserves estimated for each product type based on different price and cost criteria, such as a range of prices and costs that may reasonably be

[12] The rules were subject to comment at the time that they were proposed. See Modernization of Oil and Gas Reporting, Securities and Exchange Commission, 17 CFR Parts 210, 211, 229, and 249 [Release Nos. 33-8995; 34-59192; FR-78; File Nos. S7-15-08] at p. 66. (***www.sec.gov****/rules/final/2008/33-8995.pdf)* ExxonMobil also provided comments to the proposed provision. See Letter of Exxon Mobil Corporation to Ms. Florence Harmon, Acting Secretary, Securities and Exchange Commission, September 5, 2008, File Number S7-15-08 – Modernization of the Oil and Gas Reporting Requirements at p. 24.

achieved, including standardized futures prices or management's own forecasts." Proponents ask the company to use this option to identify the price sensitivity of its reserves, with special reference to long-lived unconventional reserves such as oil sands.

We believe the public reporting of reserves is best done using the historical price basis as required under Item 1202(a) of Regulation S-K, rather than the optional sensitivity analysis under Item 1202(b), for several reasons. First and most importantly, historical prices are a known quantity and reporting on this basis provides information that can be readily compared between different companies and over multiple years.[13] Proved reserve reporting using historical prices is a conservative approach that gives investors confidence in the numbers being reported.

Using speculative future prices, on the other hand, would introduce uncertainty and potential volatility into the reporting, which we do not believe would be helpful for investors. In fact, we believe such disclosure could be misleading. Price forecasts are subject to considerable uncertainty. While ExxonMobil tests its project economics to ensure they will be robust under a wide variety of possible future circumstances, we do not make predictions or forecasts of future oil and gas prices. If reserves determined on a speculative price were included in our SEC filings, we believe such disclosure could potentially mislead investors, or give such prices greater weight in making investment decisions than would be warranted.

We are also concerned that providing the optional sensitivity disclosure could enable our competitors to infer commercial information about our projects, resulting in commercial harm to ExxonMobil and our shareholders. We note that none of our key competitors to our knowledge provide the Item 1202(b) sensitivity disclosure.

[13] We note the rules under 1202(a) use an average of monthly prices over the year rather than a single "spot" price, thus helping to reduce the effects of short-term volatility that often characterize oil and gas prices.

Lastly, we note that even when sensitivity disclosure under Item 1202(b) is included in a filing, the price and cost assumptions must be ones the company believes are reasonable. This disclosure item is therefore not intended or permitted to be a vehicle for exploring extreme scenarios.

For all the above reasons, we do not believe including the sensitivity disclosure under Item 1202(b) in our SEC filings would be prudent or in the best interest of our shareholders.

**9. Summary**

In summary, ExxonMobil's *Outlook for Energy* continues to provide the basis for our long-term investment decisions. Similar to the forecasts of other independent analysts, our Outlook envisions a world in which populations are growing, economies are expanding, living standards are rising, and, as a result, energy needs are increasing. Meeting these needs will require all economic energy sources, especially oil and natural gas.

Our *Outlook for Energy* also envisions that governments will enact policies to constrain carbon in an effort to reduce greenhouse gas emissions and manage the risks of climate change. We seek to quantify the cumulative impact of such policies in a proxy cost of carbon, which has been a consistent feature of our *Outlook for Energy* for many years.

We rigorously consider the risk of climate change in our planning bases and investments. Our investments are stress tested against a conservative set of economic bases and a broad spectrum of economic assumptions to help ensure that they will perform adequately, even in circumstances that the company may not foresee, which provides an additional margin of safety. We also require that all significant proposed projects include a cost of carbon – which reflects our best assessment of costs associated with potential GHG regulations over the Outlook period – when being evaluated for investment.

Case 3:20-cv-02995-K Document 1-1 Filed 08/06/19 Page 59 of 99 PageID 149

Our *Outlook for Energy* does not envision the "low carbon scenario" advocated by some because the costs and the damaging impact to accessible, reliable and affordable energy resulting from the policy changes such a scenario would produce are beyond those that societies, especially the world's poorest and most vulnerable, would be willing to bear, in our estimation.

In the final analysis, we believe ExxonMobil is well positioned to continue to deliver results to our shareholders and deliver energy to the world's consumers far into the future. Meeting the economic needs of people around the world in a safe and environmentally responsible manner not only informs our *Outlook for Energy* and guides our investment decisions, it is also animates our business and inspires our workforce.

**10. Additional Information**

There were additional information requests raised by some in the course of engagement with the groups with whom we have been dialoguing. These are addressed in the Appendix.

# Appendix

| **Topic** | **Page** |
| --- | --- |
| **Proved Reserves** | **24** |
| **Resource Base** | **25** |
| **Oil & Gas Production Outlook** | **26** |
| **CAPEX Outlook** | **27** |
| **Oil & Gas Exploration and Production Earnings and Unit Profitability** | **28** |
| **Production Prices and Production Costs** | **29** |
| **Wells-to-Wheels GHG emissions seriatim** | **30** |

# EXXONMOBIL PROVED RESERVES - AT DECEMBER 31, 2013

| | United States | Canada/ S. Amer. (2) | Europe | Africa | Asia | Australia/ Oceania | Total | Worldwide | Canada/ S. Amer. (2) | Canada/ S. Amer. (2) | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Crude Oil | | | | | | | Natural Gas Liquids (2) | Bitumen | Synthetic Oil | |
| Total liquids proved reserves (1) **(millions of barrels)** | 2,338 | 284 | 273 | 1,193 | 3,308 | 155 | 7,551 | 1,479 | 3,630 | 579 | 13,239 |
| | Natural Gas | | | | | | | | | | |
| Total natural gas proved reserves (1) **(billions of cubic feet)** | 26,301 | 1,235 | 11,694 | 867 | 24,248 | 7,515 | 71,860 | - | - | - | 71,860 |
| Oil-Equivalent Total All Products (3) **(millions of oil-equivalent barrels)** | 6,722 | 490 | 2,222 | 1,338 | 7,349 | 1,407 | 19,528 | 1,479 | 3,630 | 579 | 25,216 |

**Proved Reserves Distribution** (4)
*(percent, oil equivalent barrels)*

**By Region**




**By Resource Type**




**By Hydrocarbon Type**




*(1) Source: ExxonMobil 2013 Form 10-K (pages 103 and 106).*
*(2) Includes total proved reserves attributable to Imperial Oil Limited, in which there is a 30.4 percent noncontrolling interest. Refer to ExxonMobil 2013 Form 10-K (pages 103, 104, and 106) for more details.*
*(3) Natural gas is converted to oil-equivalent basis at six million cubic feet per one thousand barrels.*
*(4) Source: ExxonMobil 2013 Financial and Operating Review (page 22).*

# EXXONMOBIL RESOURCE BASE – AT DECEMBER 31, 2013 (1)




*(1) Source: 2013 ExxonMobil Financial & Operating Review (page 21) and 2014 Analyst Meeting (slide 49).*

**Note:** ExxonMobil's resource base includes quantities of oil and gas that are not yet classified as proved reserves under SEC definitions, but that we believe will ultimately be developed. These quantities are also not intended to correspond to "probable" or "possible" reserves under SEC rules.

# EXXONMOBIL OIL & GAS PRODUCTION OUTLOOK (1)




| | | | | | |
|---|---|---|---|---|---|
| Total | 4.0 | 4.0 | 4.1 | 4.2 | 4.3 |

- Total production outlook
  - 2014: Flat
  - 2015 – 2017: up 2-3% per year
- Liquids outlook
  - 2014: up 2%
  - 2015 – 2017: up 4% per year
- Gas outlook
  - 2014: down 2%
  - 2015 – 2017: up 1% per year

*(1) Source 2014 ExxonMobil Analyst Meeting (slide 32).*

*(2) 2013 production excludes the impact of UAE onshore concession expiry and Iraq West Qurna 1 partial divestment. Production outlook excludes impact from future divestments and OPEC quota effects. Based on 2013 average price ($109 Brent).*

**EXXONMOBIL CAPEX OUTLOOK (1)**




- Expect to invest $39.8B in 2014
  - Reduced Upstream spending
  - Selective Downstream and Chemical investments
- Average less than $37B per year from 2015 to 2017

*(1) Source 2014 ExxonMobil Analyst Meeting (slide 33).*

# EXXONMOBIL OIL & GAS EXPLORATION AND PRODUCTION EARNINGS AND UNIT PROFITABILITY (1)

The revenue, cost, and earnings data are shown both on a total dollar and a unit basis, and are inclusive of non-consolidated and Canadian oil sands operations.

| | Total Revenues and Costs, Including Non-Consolidated Interests and Oil Sands | | | | | | | Revenues and Costs per Unit of Sales or Production (2) | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | United States | Canada/ South America | Europe | Africa | Asia | Australia/ Oceania | Total | United States | Canada/ South America | Outside Americas | Worldwide |
| **2013** | | | | *(millions of dollars)* | | | | *(dollars per unit of sales)* | | | |
| Revenue | | | | | | | | | | | |
| Liquids | 13,350 | 7,558 | 6,751 | 18,811 | 28,440 | 1,596 | 76,506 | 84.87 | 75.28 | 101.92 | 95.25 |
| Natural gas | 3,880 | 360 | 11,384 | 6 | 13,477 | 539 | 29,646 | 3.00 | 2.80 | 8.77 | 6.86 |
| | | | | | | | | *(dollars per barrel of net oil-equivalent production)* | | | |
| Total revenue | 17,230 | 7,918 | 18,135 | 18,817 | 41,917 | 2,135 | 106,152 | 46.20 | 63.93 | 78.86 | 69.66 |
| Less costs: | | | | | | | | | | | |
| Production costs excluding taxes | 4,742 | 3,965 | 3,318 | 2,396 | 2,423 | 654 | 17,498 | 12.72 | 32.02 | 8.56 | 11.48 |
| Depreciation and depletion | 5,133 | 989 | 2,050 | 3,269 | 2,635 | 334 | 14,410 | 13.76 | 7.99 | 8.07 | 9.46 |
| Exploration expenses | 413 | 386 | 260 | 288 | 997 | 92 | 2,436 | 1.11 | 3.12 | 1.59 | 1.60 |
| Taxes other than income | 1,617 | 94 | 4,466 | 1,583 | 9,146 | 427 | 17,333 | 4.33 | 0.74 | 15.21 | 11.37 |
| Related income tax | 1,788 | 542 | 4,956 | 6,841 | 14,191 | 202 | 28,520 | 4.79 | 4.38 | 25.50 | 18.72 |
| Results of producing activities | 3,537 | 1,942 | 3,085 | 4,440 | 12,525 | 426 | 25,955 | 9.49 | 15.68 | 19.93 | 17.03 |
| Other earnings (3) | 662 | (495) | 302 | 59 | 234 | (118) | 644 | 1.77 | (4.00) | 0.47 | 0.42 |
| Total earnings, excluding power and coal | 4,199 | 1,447 | 3,387 | 4,499 | 12,759 | 308 | 26,599 | 11.26 | 11.68 | 20.40 | 17.45 |
| Power and coal | (8) | - | - | - | 250 | - | 242 | | | | |
| **Total earnings** | 4,191 | 1,447 | 3,387 | 4,499 | 13,009 | 308 | 26,841 | 11.23 | 11.68 | 20.64 | 17.61 |
| | | | | | | | | Unit Earnings Excluding NCI Volumes (4) | | | 18.03 |

(1) *Source: ExxonMobil 2013 Financial and Operating Review (page 56).*
(2) *The per-unit data are divided into two sections: (a) revenue per unit of sales from ExxonMobil's own production; and, (b) operating costs and earnings per unit of net oil-equivalent production. Units for crude oil and natural gas liquids are barrels, while units for natural gas are thousands of cubic feet. The volumes of crude oil and natural gas liquids production and net natural gas production available for sale used in this calculation are shown on pages 48 and 49 of ExxonMobil's 2013 Financial & Operating Review. The volumes of natural gas were converted to oil-equivalent barrels based on a conversion factor of 6 thousand cubic feet per barrel.*
(3) *Includes earnings related to transportation operations, LNG liquefaction and transportation operations, sale of third-party purchases, technical services agreements, other nonoperating activities, and adjustments for noncontrolling interests.*
(4) *Calculation based on total earnings (net income attributable to ExxonMobil) divided by net oil-equivalent production less noncontrolling interest (NCI) volumes.*

# EXXONMOBIL

## PRODUCTION PRICES AND PRODUCTION COSTS (1)

The table below summarizes average production prices and average production costs by geographic area and by product type.

| | United States | Canada/ S. America | Europe | Africa | Asia | Australia/ Oceania | Total |
|---|---|---|---|---|---|---|---|
| **During 2013** | | | | *(dollars per unit)* | | | |
| **Total** | | | | | | | |
| Average production prices (2) | | | | | | | |
| Crude oil, per barrel | 95.11 | 98.91 | 106.49 | 108.73 | 104.98 | 107.92 | 104.01 |
| NGL, per barrel | 44.24 | 44.96 | 65.36 | 75.24 | 61.64 | 59.55 | 56.26 |
| Natural gas, per thousand cubic feet | 3.00 | 2.80 | 9.59 | 2.79 | 8.53 | 4.20 | 6.86 |
| Bitumen, per barrel | - | 59.63 | - | - | - | - | 59.63 |
| Synthetic oil, per barrel | - | 93.96 | - | - | - | - | 93.96 |
| Average production costs, per oil-equivalent barrel - total (3) | 12.72 | 32.02 | 12.42 | 13.95 | 4.41 | 16.81 | 11.48 |
| Average production costs, per barrel - bitumen (3) | - | 34.30 | - | - | - | - | 34.30 |
| Average production costs, per barrel - synthetic oil (3) | - | 50.94 | - | - | - | - | 50.94 |

*(1) Source: ExxonMobil 2013 Form 10-K (page 9)*

(2) *Revenue per unit of sales from ExxonMobil's own production. (See ExxonMobil's 2013 Financial & Operating Review, page 56.) Revenue in this calculation is the same as in the Results of Operations disclosure in ExxonMobil's 2013 Form 10-K (page 97) and does not include revenue from other activities that ExxonMobil includes in the Upstream function, such as oil and gas transportation operations, LNG liquefaction and transportation operations, coal and power operations, technical service agreements, other nonoperating activities and adjustments for noncontrolling interests, in accordance with Securities and Exchange Commission and Financial Accounting Standards Board rules.*

(3) *Production costs per unit of net oil-equivalent production. (See ExxonMobil's 2013 inancial & Operating Review, page 56.) The volumes of natural gas were converted to oil-equivalent barrels based on a conversion factor of 6 thousand cubic feet per barrel. Production costs in this calculation are the same as in the Results of Operations disclosure in ExxonMobil's 2013 Form 10-K (page 97) and do not include production costs from other activities that ExxonMobil includes in the Upstream function, such as oil and gas transportation operations, LNG liquefaction and transportation operations, coal and power operations, technical service agreements, other nonoperating activities and adjustments for noncontrolling interests, in accordance with Securities and Exchange Commission and Financial Accounting Standards Board rules. Depreciation & depletion, exploration costs, and taxes are not included in production costs.*


Seriatim of crudes processed in US in 2012
Well-to-wheels GHG emissions: Oil sands compared to other crude oils
(Wide boundary—kgCO2e/barrel of refined product)
kgCO2e/barrel of refined product
Avg. barrel refined in the US, 2005 IHS Est. (505)
Avg. barrel refined in the US, 2012 IHS Est. (502)
Avg. barrel refined in the US, (2005 DOE/NETL) (487)
Source: IHS CERA
Draft and subject to change
400
599
455
0%
10%
20%
30%
40%
50%
60%
70%
80%
90%
100%
Percentage of total US crude consumed (volume basis)
Cameroon Lokele
Venezuela Petrozuata
US: Avg. California Heavy
Can. oil sands: Cold Lake Dilbit
Can. Oil sands: Mining SCO (Syncrude Sweet)
Venezuela Boscan
US: Alaska North Slope (ANS CARB)
Can. Bitumen Blend
Nigeria Bonny Light
Iraq Basrah Light
North African Light
Can. oil sands: Primary CHOPS
US: Mars
Mexico Maya
US: Bakken Blend
Arab Light
Trinidad Calypso
Arab Medium
US: Other domestic crude
North Sea Ekofisk
North Sea Forties
US: Eagle Ford Tight Oil
Kearl Bitumen
Kearl Dilbit
In order from left to right
- Angola Girassol
- Russian Espo
- North Sea Mariner
In order from left to right
- Brazil Extra Heavy
- Ecuador Napo
- Angola Dalia
- Russian Urals
- Ecuador Oriente
- Kuwait Eocene
- Australia Pyrenees
- Colombia Castilla
- Iraq Kirkuk
- Brazil Marlim
- Angola Plutonio
- Kuwait Ratawi
- Canadian Mixed Sweet
- Colombia Vasconia

Case 3:16-cv-03111-K Document 36-1 Filed 07/26/17 Page 68 of 553 PageID 495

# Exhibit 2

ProQuest

# Report Information from ProQuest

February 08 2017 16:20

# Table of contents

1. Exxon Mobil Corp Annual Shareholders Meeting - Final.......... 1

## Exxon Mobil Corp Annual Shareholders Meeting - Final

ProQuest document link

**Links:** Check for full text via 360 Link

**Full text:**
Presentation
REX TILLERSON, CHAIRMAN, CEO, EXXONMOBIL CORPORATION: Good morning, ladies and gentlemen. If you'd please take your seats.
I'm Rex Tillerson, I'm the Chairman and Chief Executive Officer of the Exxon Mobil Corporation. And I am pleased to welcome each of you that made the effort to join us today in person. I also, though, want to welcome our shareholders around the world who are joining us by way of the Internet.
I do hope you had the opportunity to meet some of our employees in person while visiting the displays in the foyer this morning. These Exxon Mobil employees are among the over 73,000 people who are working 24 hours a day, seven days a week, 365 days a year on your behalf. And many of them are working in challenging locations to deliver the energy and products needed by consumers around the world.
The financial and operating results that I bring to you today are really their results, and I have the privilege of presenting them to you on their behalf.
Seated next to me is Jeff Woodbury, Vice President of Investor Relations and our Corporate Secretary. He will assist me in running the meeting today. I'll introduce the other members of the board to you a little later in the meeting.
As mentioned on Page 2 of the proxy statement, it is the policy of the corporation to provide confidential voting to shareholders. For shareholders who returned their proxy cards without written comments, the voted proxies have not been seen by nor reported to the corporation except in aggregate numbers. Anyone turning in a proxy card at this meeting who wishes to keep his or her votes secret, may obtain an envelope from the ushers. Proxy cards will be collected later in the meeting. A list of shareholders entitled to vote at this meeting or at any adjournment thereof is available for inspection. If anyone wishes to examine this list, an usher will be pleased to direct you to the proper location.
Shirley Nessralla and Paula Buckley of Computershare Trust Company have been appointed Inspectors of the Election for this meeting. They have taken an oath of office that has been delivered to the Secretary for filing with the minutes of the meeting. Notice of this meeting has been properly given, and the Inspectors of Election have determined that a quorum is present. There are 3.5 billion shares represented at this meeting, equating to approximately 85% of the issued and outstanding shares of stock of the corporation that are entitled to vote. I directed the inspector's written determination as to the number of shares entitled to vote at the meeting be filed with the minutes. I declare a quorum present and the meeting ready for business.
I'd now like to explain our plan for conducting the meeting today. First, Secretary Woodbury will outline the rules of conduct and how to gain recognition. Then, I'll make some brief comments about our business results and the future we see for your company. After that, the items of business comprised of 14 proposals from the Board of Directors and shareholders will be presented. As described in the Annual Meeting program, discussion on the items of business will be deferred until all items have been presented. Time permitting, we may also have time to respond to some of the questions submitted ahead of time via proxy cards and the Internet. Upon completion of the discussion on the items of business and voting, the polls will be closed, the formal business of this year's Annual Meeting will be concluded, and the Inspectors of Election will prepare this preliminary voting report. While this is occurring, there may be time for additional comments or questions regarding our business. When the inspectors are ready, I'll ask them to give us their voting report. We will then conclude the meeting.

And I'm going to talk a little bit about the Items 11 and 12 today and talk specifically about some of the peer groups that were mentioned, peer companies and their recognition of the 2-degree scenario. Specifically, I want to talk about one, which is Saudi Aramco. Saudi Arabia has made it clear that they are seeking to monetize their oil reserves now, regardless of the impact on price.

Minister Al-Naimi said that he could live with $20 per barrel. The Deputy Crown Prince has said $30 per barrel or $70 per barrel, it's all the same to them. And he has furthermore announced plans, a plan called Vision 2030, in which he wants to wean his country off of oil by the year 2030 or sooner.

Given the global signals of the end of the oil era, from low commodity prices to recent statements and decisions from Saudi Aramco to start selling shares publicly to build up a $2 trillion sovereign wealth fund, we're concerned about some of the claims of the future of energy will look very much like the past.

I think you've talked a little bit today about 2040 scenarios. My question is, what do the Saudis -- or why do the Saudis see the future of oil -- future of energy so differently than the leadership of ExxonMobil? What do they know that we are not considering? Furthermore, what specifically are you doing to ensure the business model of ExxonMobil is nimble enough to withstand low carbon demand scenarios, including disruptions, be they technological regulatory or market-based?

REX TILLERSON: Well, as to Saudi Aramco's views or the Kingdom of Saudi Arabia, I -- you would have to ask them. I can't speak on their behalf. I think we showed you today a number of things that we're doing in terms of remaining flexible to alternative outcomes in the future.

We have, unlike many of our competitors, we have for many years included a price of carbon in our outlook. And that price of carbon gets put into all of our economic models when we make investment decisions as well. It's a proxy. We don't know how else to model what future policy impacts might be. But whatever policies are, ultimately they come back to either your revenues or your cost. So we choose to put it in as a cost.

So we have accommodated that uncertainty in the future, and everything gets tested against it. As to other actions, it's the research areas you see in terms of our understanding of the issue. And we probably have been engaged in the scientific study of this longer than any of our peers for four decades now. And we continue to be engaged, so we are very, very aware and up-to-date on the current scientific understanding. And we fund a number of research areas, both academically and institutionally, that are areas where people are investigating possible breakthroughs, whether it'd be in battery technologies or alternative fuel technologies or what's the next possible game-changing technology.

We do that so we're aware of whether that is something that has potential or not. And so we monitor all of that, and we invest and run our programs accordingly. And should something evolve, we have the capacity to become engaged in that if we see it is in the interest of our shareholders. So that's how we're responding.

So back over here.

HUNTER MARTIN, SHAREHOLDER: Mr. Tillerson, my name is [Hunter Martin]. My wife and I have been driving up here from Houston for more than 25 years, going back to Larry Rawl's days for the meetings. And I think I bought my first shares of the company probably the year you were born. And I don't presume --

REX TILLERSON: I wish my dad had bought some shares the year I was born.

HUNTER MARTIN: I do not presume to forecast what's going to happen over the next 12 months. But [Lori] and I want to thank you and compliment you on your stewardship of our company.

Applying whatever parameters one would choose, you personify all that is best in America and world industry, and the lives of all of us shareholders are more secure and in return, happier because of you.

Our thanks embrace the employees as well as the board. At the top, of course, is you and your superlative guidance. Congratulations on your achievements, Mr. Tillerson, and thanks for your dedication to all of us.

REX TILLERSON: Thank you for those kind words. Right here.

ANNA KOLINSKI: CEO Tillerson, it's good to have the opportunity to speak to you. So my name is [Anna Kolinski] and my grandfather, James F. Black, was a scientist for Exxon for over 40 years. He started with

Case 3:20-cv-02995-K Document 1-1 Filed 08/06/19 Page 73 of 99 PageID 163

# Exhibit 3

**Robert W Bailes/Dallas/Mobil-Notes**

04/30/2010 10:45 PM

To: Tom R Eizember/Dallas/ExxonMobil@xom
cc: Brian P Flannery/Dallas/ExxonMobil@xom, R A Mire/Houston/Mobil-Notes@xom
bcc:
Subject: Re: PROP: 2010 Plan GHG Guidance

**Note: 1 Attachment(s) removed from this message**

Proprietary

Tom---

Some potential wording offered in the attached (in red). On the quantitative guidance:

- Agree that there has not been enough net action (in either direction) over the past year to justify a change to the 2030 cost of $40/T CO2. Recognize that it is a conservative (low) estimate appropriate for P&B purposes. EO assumption of $60/T is likely more realistic. Best intelligence on K-G-L price collar indicates upper limit of $65/T in 2030. Some EU estimates for Phase 3 have notably higher price forecasts than $40 in the nearer-term (this decade).
- Agree with proposal to raise EU ETS cost to $30/T with onset of Phase 3.
- Agree with Rick's suggestion that likely justified to move "rest of OECD" start date on out to 2015. Could avoid annual 1-year slides, and prognosis not encouraging for near-term breakthrough. K-G-L does not bring our industry in until 2016. May not matter that much as either 2013 or 2015 get us out of the Plan years.
- **Strongly agree with Rick's suggestion that non-OECD should be required to provide a sensitivity at "rest of OECD" prices to reflect impact of international offsets opening up through some national program, if not CDM.**

---Bob

1ECP G-G Plan Guidance)_rwb.doc

R. W. (Bob) Bailes
Corporate Greenhouse Gas Manager
Exxon Mobil Corporation
5959 Las Colinas Blvd., Room 3322
Irving, TX 75039
(972) 444-1811

Tom R Eizember/Dallas/ExxonMobil

**Tom R Eizember/Dallas/ExxonMobil**

04/30/10 01:33 PM

To: Robert W Bailes/Dallas/Mobil-Notes@xom, R A Mire/Houston/Mobil-Notes@xom, Brian P Flannery/Dallas/ExxonMobil@xom
cc:
Subject: PROP: 2010 Plan GHG Guidance

Proprietary

Attached is my thinking on GHG guidance for this year's Plan. Comments please

[attachment "10CP GHG Plan Guidance).ppt" deleted by Robert W Bailes/Dallas/Mobil-Notes]

Tom R. Eizember
Planning Manager, Corporate Strategic Planning
Exxon Mobil Corporation
tom.r.eizember@exxonmobil.com
972-444-1789 fax: 972-444-1679

# Exhibit 4

**Tom R Eizember/Dallas/ExxonMobil**

04/22/2011 05:13 PM

To Robert W Bailes/Dallas/Mobil-Notes@xom
cc Brian P Flannery/Dallas/ExxonMobil@xom, Sherri K Stuewer/Dallas/ExxonMobil@xom
bcc
Subject Re: PROP: GHG emission cost planning basis

Proprietary

I have pointed out the difference in past reviews - we've been at $60 for the EO and $40 for the plan circa 2030 for several years. Rex has seemed happy with the difference previously - appeared to feel it provides a "conservative" basis (but only if viewed from the perspective of claiming economics credits to reduce emissions; it is not conservative vs EO from the perspective of debiting actions that increase emissions).

I will point out the difference this year again if the consensus is to stay with $40.

Tom R. Eizember
Planning Manager, Corporate Strategic Planning
Exxon Mobil Corporation
tom.r.eizember@exxonmobil.com
972-444-1789 fax: 972-444-1679

Robert W Bailes/Dallas/Mobil-Notes



**Robert W Bailes/Dallas/Mobil-Notes**

04/22/2011 09:55 AM

To Tom R Eizember/Dallas/ExxonMobil@xom
cc Brian P Flannery/Dallas/ExxonMobil@xom, Sherri K Stuewer/Dallas/ExxonMobil@xom
Subject Re: PROP: GHG emission cost planning basis

**Note: 1 Attachment(s) removed from this message**

Proprietary

I agree there is no "compelling" reason to change, and that is consistent with EO assumption discussion we had on Tuesday. I think we can wait another year on deciding whether to push non-EU OECD beyond 2015 ... that's still far enough out to be feasible, but this is a very slow train.

One potential change I would like for us to discuss/consider is whether to harmonize P&B assumptions with EO assumptions. I recognize they serve two different purposes, but I think it would provide more clarity and alignment throughout organization. I also think the $60/T is a rational point to be in striking distance of power sector CCS traunche, whereas $40/T feels like no-man's land that won't really drive much 20 years from now (though it would drive fuel switching). I also don't think the extra $20/T risks unduly justifying more capital investments, though it would give another minor nudge to energy efficiency and/or emission reduction projects.

R. W. (Bob) Bailes
Corporate Greenhouse Gas Manager
Exxon Mobil Corporation

5959 Las Colinas Blvd., Room 3322
Irving, TX 75039
(972) 444-1811
Tom R Eizember/Dallas/ExxonMobil

**Tom R Eizember/Dallas/ExxonMobil**

04/22/11 09:39 AM

To Robert W Bailes/Dallas/Mobil-Notes@xom
cc Brian P Flannery/Dallas/ExxonMobil@xom, Sherri K Stuewer/Dallas/ExxonMobil@xom
Subject PROP: GHG emission cost planning basis

Proprietary

We need to settle on a basis for this year's plan - combined Plan basis review with MC is late May. At this point, I don't see a compelling reason to change last year's basis (attached). Your thoughts?

[attachment "10CP GHG Plan Guidance.ppt" deleted by Robert W Bailes/Dallas/Mobil-Notes]

Tom R. Eizember
Planning Manager, Corporate Strategic Planning
Exxon Mobil Corporation
tom.r.eizember@exxonmobil.com
972-444-1789 fax: 972-444-1679

# Exhibit 5

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)

# GHG Emissions Background

DRAFT

**Proprietary**

### EU-Emissions Trading System Credit Prices

**Monthly Average Spot Prices**




## EU-Emissions Trading Scheme (ETS)

- Remains the world's largest carbon market
- Allowance values depressed by oversupply due to economic slump and overlapping directives
- EC implemented "backloading" policy February 2014 in attempt to buoy price; limited market response experienced or expected

## Activities outside the EU

- Advancement of U.S. federal GHG regulations under the CAA likely in 2014 for power plants and methane emissions; broad market-based system unlikely in near-term
- California Cap & Trade to add mobile sources in 2015; became linked with Quebec program January 2014
- Anticipate price and intensity reduction target increase for Alberta SGRE program in 2014/15; currently at $15/T and 12% reduction
- Australia program to convert to market-based Cap & Trade July 2015 with linkage to EU, if not repealed by Abbott government
- New Zealand remains linked with EU

ExxonMobil

EMC 000539921

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)

# GHG Emissions Planning Basis

DRAFT

**Proprietary**




- Propose aligning 2015 Corporate Planning basis with EO for EU ETS @ $60/T CO2e in 2030
- For locations covered by the EU or NZ ETS, include in project and operational economics: $10/T CO2e for 2014-18, then rising linearly to $60/T in 2030
- For Australia, include: $24/T CO2e in 2014 and $25/T in 2015, then falling to EU ETS price in 2016
- For California, include: $12/T CO2e in 2014, rising with floor price escalation (5%/yr) through 2018, then merging with EU / NZ ETS
- For OECD areas not covered by the EU, NZ, AU, or CA programs, include: EU / NZ pricing basis for CO2 and Methane beginning in 2018, or local specifics if known to differ from EU price basis
- For non-OECD areas, do not include a GHG cost/credit in base economics; include a sensitivity case where there is a material possibility of domestic GHG regulation (e.g. Kazakhstan, China)
- Identify where GHG costs or credits are material to decision economics
- Identify where GHG emissions are material to total corporate emissions

ExxonMobil

# GHG Emissions Planning Basis

DRAFT

Proprietary




- Propose aligning 2015 Corporate Planning basis with EO for EU ETS @ $60/T CO2e in 2030
- For locations covered by the EU or NZ ETS, include in project and operational economics: $10/T CO2e for 2014-18, then rising linearly to $60/T in 2030
- For Australia, include: $24/T CO2e in 2014 and $25/T in 2015, then falling to EU ETS price in 2016
- For California, include: $12/T CO2e in 2014, rising with floor price escalation (5%/yr) through 2018, then merging with EU / NZ ETS
- For OECD areas not covered by the EU, NZ, AU, or CA programs, include: EU / NZ pricing basis for CO2 and Methane beginning in 2018, or local specifics if known to differ from EU price basis
- For non-OECD areas, do not include a GHG cost/credit in base economics: include a sensitivity case where there is a material possibility of domestic GHG regulation (e.g. Kazakhstan, China)
- Identify where GHG costs or credits are material to decision economics
- Identify where GHG emissions are material to total corporate emissions

ExxonMobil

- Over the past several years, the Corporate Plan and Energy Outlook GHG emissions costs basis have been disconnected (CP $40/T and EO $60/T in 2030). The likely rational for this was to provide a conservative CP basis for evaluating energy conservation / emissions reductions projects. We propose to bring these prices together in 2014 for the following reasons:
  1. While using a lower cost basis in the CP provides a conservative view for evaluating energy conservation / emissions reduction investments, it provides an non-conservative view for evaluating capacity growth investments that involve GHG emission creation (combustion / venting / flaring etc.)
  2. In recent reports released by EM ("Energy and Climate" and "Energy and Carbon – Managing the risk") we have implied that we use the EO basis for proxy cost of carbon when evaluating investments.

- The direction and slope of the EU/NZ ETS line is driven by reaching $80/T in 2040. This is our outlook price for CCS on new coal fired power plants.

- EU ETS outlook pricing basis remains flat through 2018, then begins to increasing in 2019, reflecting a decision at the Conference of Parties meeting in Paris (COP 21). At this meeting, binding GHG reduction commitments should be made by member nations for implementation in 2020, consistent with 2011 COP 17 Durban Platform.

- Australia outlook reflects current regulation where as Cap & Trade program transitions from effective fixed price to market based, versus discussed regulatory repeal

- California outlook reflects credit pricing 10% above regulated floor price, consistent with demonstrated market performance (January 2013 – current). The market is currently over supplied with allowances and is expected to remain oversupplied for the next several year. The over supply was mainly driven by reduced power consumption as a result of the economic downturn.

- In 2013 we showed OECD areas adopting regulation and linking with the EU ETS in 2016. Due to lack of regulatory activity, we have shifted this start date to 2019. We are also requesting that methane emissions be included as well as CO2.

- For non-OECD we are not including GHG cost or credits in base economics. We are however requesting that a sensitivity case be included where there is a material possibility of domestic GHG regulation (e.g. Kazakhstan, China). We are also requesting that any material options to reduce GHG emissions that could be attractive at 75% of EU-ETS price basis which might be captured through international offsets: Likely long term mechanism to tie programs together, despite recent CDM market collapse

Case 3:20-cv-02995-K Document 1-1 Filed 08/06/19 Page 83 of 99 PageID 173

# Exhibit 6

**From:** Powell, Guy A
**Sent:** Thursday, October 30, 2014 5:01 PM
**To:** Iwanika, Jason D
**CC:** Luckasavitch, Richard J; Fisk, Norma; Weppler, Jim; Cornish, Lucie M; Dunn, Edward J
**Subject:** RE: PROP:RE: Seeking Guidance for GHG Treatment in DevPlanning Economics/Opportunities

Jason – Please see the responses below. It is probably worth a quick chat to talk through the cogen economics. In general your assessment is correct in that cogen should receive a "credit" vs. the alternative power source, but it is a firm economic impact vs. a social impact.

Guy A. Powell
Exxon Mobil Corporation
Corporate Greenhouse Gas Manager
5959 Las Colinas Blvd., Room 3322
Irving, TX 75039
(972) 444-1811

---

**From:** Iwanika, Jason D
**Sent:** Thursday, October 30, 2014 11:38 AM
**To:** Powell, Guy A
**Cc:** Luckasavitch, Richard J; Fisk, Norma; Weppler, Jim; Cornish, Lucie M; Dunn, Edward J
**Subject:** FW: PROP:RE: Seeking Guidance for GHG Treatment in DevPlanning Economics/Opportunities

Guy, I'm contacting you in regards to your role in GHG emissions and Corporate Strategic Planning.
Please see the dialogue below between myself and Jim Weppler (or EMDC-DevPlanning Economic STP).

In summary, I'm looking for clarity on:

1. Application to Heavy Oil Projects in Western Canada. Looks like guidance is to follow new EU GHG costs. Please confirm – That is correct. Beginning in 2020, the price is $24.30/T, then increases to $100/T by 2050.
2. The GHG update was released under Corporate Plan (P&B); what is the direction for use go-forward with Financial (funding) decisions? GHG costs / credits should be included in project economics. If these costs / credits look like they will be material to the funding decisions, we should have a more in depth discussion.
3. What is the guidance on evaluating GHG costs related to power projects (specifically Cogen). In Alberta, COGEN displaces coal generation … thus in effect being a GHG offset to the province (social impact). – Let talk through this one.

Thanks,

**Jason Iwanika**
**Development Planning Supervisor**
Oil Sands Development & Research, Imperial
Quarry Park | W4C.196
jason.d.iwanika@exxonmobil.com **P** 587.476.2347

---

**From:** Weppler, Jim
**Sent:** Thursday, October 30, 2014 8:21 AM
**To:** Iwanika, Jason D
**Cc:** Griffith, Michael G; Sullivan, Michael B; Allain, Gwenael P
**Subject:** PROP:RE: Seeking Guidance for GHG Treatment in DevPlanning Economics/Opportunities

See my responses below.

The much higher CO2 unit pricing for the 2014 plan is directly out of the 2014 Energy Outlook which reads **(my bolding/underlining).**

*"Today there are some policies in effect that limit GHG growth, and we anticipate* ***stronger policies*** *developing over time. OECD nations will continue to lead the way in adopting these policies, with developing nations gradually following, led by China.*

*While policies related to carbon remain uncertain, for our Outlook we use a cost of carbon as a proxy to model a wide variety of potential policies that might be adopted by governments to help stem GHG emissions. For example, in the OECD nations,* ***we expect costs to rise to about $80 per ton in 2040.*** *The developing world will have a range of policy costs with the most wealthy ones reaching about $30/ton.*

*Naturally, as we go forward, the exact nature and the pace of GHG policy initiatives will likely be affected by their impact on the economy, economic competitiveness, energy security and the ability of individuals to pay related-costs."*

I suspect the change is related to EM's enhanced approach rolled out earlier this year to address GHG risks in response to shareholder increasing queries and concerns (but I might be wrong).

**Jim Weppler**
OML 133 Select Stage Manager
Development Planning

**Mobil Producing Nigeria**
Mobil House, 1 Lekki Expressway
Lagos, Nigeria
234-(0)1-2801100 ext. 22144 Tel
713-431-8500 ext. 22144 Tel (U.S)
234-(0)817 206 7656 Mobile

---

**From:** Iwanika, Jason D
**Sent:** Tuesday, October 28, 2014 2:44 PM
**To:** Weppler, Jim; Griffith, Michael G
**Cc:** Cornish, Lucie M
**Subject:** Seeking Guidance for GHG Treatment in DevPlanning Economics/Opportunities

Jim/Mike, good seeing you both at the DevPlanning offsite.
I have a request for guidance/clarity on GHG treatment for DevPlanning economics supporting P&B and funding steps.

If you feel it is easier to discuss via phone-call, please let me know and I'll set up a telecom.
Note, I have talked to a few DevPlanning supervisors on this topic, and received varying advice/input…….., seeking both your guidance as STPs.

**Background**
Recently, our team in Calgary (post P&B submission) was notified (by EMPC, current model owners of our Insitu Thermal Economic Model and Kearl Economic Model) of changes to the GHG guidance provided per CP14 Dataguide Appendices: EMDC Planning & Budget/Reference Documents/Instructions and Guidelines. (note, pages 31&32 in the Appendices, directing Alberta to follow EU '14 Plan)

Case 3:20-cv-02995-K Document 1-1 Filed 08/06/19 Page 86 of 99 PageID 176




| | |
|---|---|
| 2014 | 10.0 |
| 2015 | 10.0 |
| 2016 | 10.0 |
| 2017 | 13.6 |
| 2018 | 17.1 |
| 2019 | 20.7 |
| 2020 | 24.3 |
| 2021 | 27.9 |
| 2022 | 31.4 |
| 2023 | 35.0 |
| 2024 | 38.6 |
| 2025 | 42.1 |
| 2026 | 45.7 |
| 2027 | 49.3 |
| 2028 | 52.9 |
| 2029 | 56.4 |
| 2030 | 60.0 |
| 2031 | 62.0 |
| 2032 | 64.0 |
| 2033 | 66.0 |
| 2034 | 68.0 |
| 2035 | 70.0 |
| 2036 | 72.0 |
| 2037 | 74.0 |
| 2038 | 76.0 |
| 2039 | 78.0 |
| 2040 | 80.0 |
| EU Basis | $/T CO2 2014 Real |

Looking into our EMDC Guidelines (EMDC Economics Evaluation Guidelines), guidance remains (in most current version online) to continue to estimate Carbon and Greenhouse Gas (GHG) Emission Costs based on ExxonMobil 2008 Corporate Guidance (section 3.2.3), which follows the ~40$/tonne CO2 long-term cost basis.




**Request/Questions:**

1. Can you please confirm what the standard practice is for EMDC DevPlanning, for both Planning Basis (CP14) and forward Funding Actions for Upstream N.America opportunities?
    a. We are looking for clarity on approach to remain consistent with the treatment across our DevPlanning portfolio. The intent of the Economic Evaluation Guidelines is to use prevailing Corporate Planning CO2 unit cost basis. Over the past few years, the annual CSP guidance had remained on the order of the 2008 guidance of reaching $40/te (real) by 2030, so we didn't see a big need to change our Eco Guidelines. But as you have highlighted, there has now been a huge change in the 2014 Corporate outlook (to $60/te in 2030, then to $80/te in 2040) that was rolled out in June 2014 for the 2014 P&B (even the May 2014 draft Corporate guidance still reflected the old $40/te level used through the 2013 P&B, though it indicated a change was coming out in June).
2. What guidance is given post 2030 (old basis) and post 2040 (EU) basis? Continue to escalate? Or keep flat at 40 $/tonne ; 80$/tonne? We recommend not increasing the real price beyond the published guidance (e.g. staying at $80/te real beyond 2040), since there is no guidance that the projected real trend will continue. And these are real prices, so we still recommend to use the Corporate Plan CPI inflation (roughly the 2.5% / yr we see in the nominal oil price forecasts)
3. What guidance is given for evaluating Power (Cogen) Opportunities; do these 'social' projects take the brunt of the full GHG impact? I don't know, but it is a good question. The 2014 Dataguide suggests " Questions related to GHG emissions should be referred to Guy Powell (972-444-1811) in Corporate Strategic Planning (CSP) - Environmental Policy and Planning (EPP)." So I recommend giving him a call to discuss.

**Jason Iwanika**
**Development Planning Supervisor**
Oil Sands Development & Research, Imperial
Quarry Park | W4C.196
jason.d.iwanika@exxonmobil.com **P** 587.476.2347

# Exhibit 7

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

1285 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10019-6064

TELEPHONE (212) 373-3000

LLOYD K. GARRISON (1946-1991)
RANDOLPH E. PAUL (1946-1956)
SIMON H. RIFKIND (1950-1995)
LOUIS S. WEISS (1927-1950)
JOHN F. WHARTON (1927-1977)

WRITER'S DIRECT DIAL NUMBER

212-373-3869

WRITER'S DIRECT FACSIMILE

212-492-0868

WRITER'S DIRECT E-MAIL ADDRESS

dtoal@paulweiss.com

UNIT 3601, OFFICE TOWER A, BEIJING FORTUNE PLAZA
NO. 7 DONGSANHUAN ZHONGLU
CHAOYANG DISTRICT
BEIJING 100020
PEOPLE'S REPUBLIC OF CHINA
TELEPHONE (86-10) 5828-6300

12TH FLOOR, HONG KONG CLUB BUILDING
3A CHATER ROAD, CENTRAL
HONG KONG
TELEPHONE (852) 2846-0300

ALDER CASTLE
10 NOBLE STREET
LONDON EC2V 7JU, U.K.
TELEPHONE (44 20) 7367 1600

FUKOKU SEIMEI BUILDING
2-2 UCHISAIWAICHO 2-CHOME
CHIYODA-KU, TOKYO 100-0011, JAPAN
TELEPHONE (81-3) 3597-8101

TORONTO-DOMINION CENTRE
77 KING STREET WEST, SUITE 3100
P.O. BOX 226
TORONTO, ONTARIO M5K 1J3
TELEPHONE (416) 504-0520

2001 K STREET, NW
WASHINGTON, DC 20006-1047
TELEPHONE (202) 223-7300

500 DELAWARE AVENUE, SUITE 200
POST OFFICE BOX 32
WILMINGTON, DE 19899-0032
TELEPHONE (302) 655-4410

EDWARD T. ACKERMAN
JACOB A. ADLERSTEIN
ALLAN J. ARFFA
ROBERT A. ATKINS
DAVID J. BALL
SCOTT A. BARSHAY
JOHN F. BAUGHMAN
LYNN B. BAYARD
CRAIG A. BENSON
MITCHELL L. BERG
MARK S. BERGMAN
DAVID M. BERNICK
JOSEPH J. BIAL
BRUCE BIRENBOIM
H. CHRISTOPHER BOEHNING
ANGELO BONVINO
JAMES L. BROCHIN
DAVID W. BROWN
SUSANNA M. BUERGEL
PATRICK S. CAMPBELL*
JESSICA S. CAREY
JEANETTE K. CHAN
GEOFFREY R. CHEPIGA
ELLEN N. CHING
WILLIAM A. CLAREMAN
LEWIS R. CLAYTON
JAY COHEN
KELLEY A. CORNISH
CHRISTOPHER J. CUMMINGS
CHARLES E. DAVIDOW
THOMAS V. DE LA BASTIDE III
ARIEL J. DECKELBAUM
ALICE BELISLE EATON
ANDREW J. EHRLICH
GREGORY A. EZRING
LESLIE GORDON FAGEN
ROSS A. FIELDSTON
ANDREW C. FINCH
BRAD J. FINKELSTEIN
BRIAN P. FINNEGAN
ROBERTO FINZI
PETER E. FISCH
ROBERT C. FLEDER
MARTIN FLUMENBAUM
ANDREW J. FOLEY
ANDREW J. FORMAN*
HARRIS B. FREIDUS
MANUEL S. FREY
ANDREW L. GAINES
KENNETH A. GALLO
MICHAEL E. GERTZMAN
ADAM M. GIVERTZ
SALVATORE GOGLIORMELLA
ROBERT D. GOLDBAUM
NEIL GOLDMAN
ROBERTO J. GONZALEZ*
CATHERINE L. GOODALL
ERIC GOODISON
CHARLES H. GOOGE, JR.
ANDREW G. GORDON
UDI GROFMAN
NICHOLAS GROOMBRIDGE
BRUCE A. GUTENPLAN
ALAN S. HALPERIN
JUSTIN G. HAMILL
CLAUDIA HAMMERMAN
BRIAN S. HERMANN
MICHELE HIRSHMAN
MICHAEL S. HONG
DAVID S. HUNTINGTON
AMRAN HUSSEIN
LORETTA A. IPPOLITO
JAREN JANGHORBANI
BRIAN M. JANSON
MEREDITH J. KANE
ROBERTA A. KAPLAN
BRAD S. KARP
PATRICK N. KARSNITZ
JOHN C. KENNEDY
BRIAN KIM
DAVID M. KLEIN
ALAN W. KORNBERG
DANIEL J. KRAMER
DAVID K. LAKHDHIR
STEPHEN P. LAMB*
JOHN E. LANGE
GREGORY F. LAUFER
BRIAN C. LAVIN
DANIEL J. LEFFELL
XIAOYU GREG LIU
JEFFREY D. MARELL
MARCO V. MASOTTI
EDWIN S. MAYNARD
DAVID W. MAYO
ELIZABETH R. McCOLM
MARK F. MENDELSOHN
CLAUDINE MEREDITH-GOUJON
WILLIAM B. MICHAEL
JUDIE NG SHORTELL*
CATHERINE NYARADY
JANE B. O'BRIEN
ALEX YOUNG K. OH
BRAD R. OKUN
KELLEY D. PARKER
VALERIE E. RADWANER
CARL L. REISNER
LORIN L. REISNER
WALTER G. RICCIARDI
WALTER RIEMAN
RICHARD A. ROSEN
ANDREW N. ROSENBERG
JACQUELINE P. RUBIN
CHARLES F. "RICK" RULE*
RAPHAEL M. RUSSO
ELIZABETH M. SACKSTEDER
JEFFREY D. SAFERSTEIN
JEFFREY B. SAMUELS
DALE M. SARRO
TERRY E. SCHIMEK
KENNETH M. SCHNEIDER
ROBERT B. SCHUMER
JOHN M. SCOTT
STEPHEN J. SHIMSHAK
DAVID R. SICULAR
MOSES SILVERMAN
STEVEN SIMKIN
JOSEPH J. SIMONS
AUDRA J. SOLOWAY
SCOTT M. SONTAG
TARUN M. STEWART
ERIC ALAN STONE
AIDAN SYNNOTT
RICHARD C. TARLOWE
MONICA K. THURMOND
DANIEL J. TOAL
LIZA M. VELAZQUEZ
LAWRENCE G. WEE
THEODORE V. WELLS, JR.
STEVEN J. WILLIAMS
LAWRENCE I. WITDORCHIC
MARK B. WLAZLO
JULIA MASON WOOD
JENNIFER H. WU
BETTY YAP*
JORDAN E. YARETT
KAYE N. YOSHINO
TONG YU
TRACEY A. ZACCONE
TAURIE M. ZEITZER
T. ROBERT ZOCHOWSKI, JR.

*NOT ADMITTED TO THE NEW YORK BAR

February 11, 2017

***Via Email***

John Oleske, Esq.
Senior Enforcement Counsel
Office of the Attorney General
State of New York
120 Broadway, 26th Floor
New York, NY 10271

Re: *In the Matter of the Application of the People of the State of New York, by Eric T. Schneiderman, Index No. 451962/2016.*

Dear John:

We write in response to your letter of February 6, 2017.

*First*, contrary to your suggestion, Justice Ostrager has never held or even suggested that gate review packages, EMCAPS manuals, and P&B Economic Guidelines "are relevant and responsive" to the November 4, 2015 subpoena issued by your office. In fact, at the January 9, 2017 hearing, when your office moved to compel the production of these specific documents, Justice Ostrager expressly denied the motion. He clarified that applying a set of supplemental search terms to the previously agreed upon and supplemental custodians identified by the NYAG "could *not possibly not yield* every document that [you] could possibly be interested in." (Jan. 9, 2017 Hr'g Tr. at 12:26–13:2-3 (emphasis added).) He went so far as to repeatedly underscore that ExxonMobil's discovery obligation was limited to "produc[ing] the documents from the application of the search terms to the custodians you've identified and *that should be the end of this*." (*Id.* at 8:26–9:4 (emphasis added); *accord, e.g.*, 14:12-14.) By February 15, 2017, ExxonMobil will be in full compliance with this order. And, at that point, the NYAG's office will possess "all the documents [that it] could possibly need for th[is] investigation." (*Id.* at 14:22-23). Whatever gate review packages, EMCAPS manuals, and P&B

Economic Guidelines have been produced at that point—the result of a massive and extraordinarily burdensome search by ExxonMobil—are those to which the NYAG is entitled.

*Second*, the NYAG's office contends that it does not possess documents that "represent the actual incorporation of a proxy cost of carbon or any other greenhouse gas into a project economics decision." Not so. Contained within the documents produced to date are (a) ExxonMobil Dataguide Appendices, *i.e.*, internal policy documents that specify precisely how ExxonMobil applies its proxy cost of carbon in every jurisdiction worldwide through the year 2040 (*see, e.g.*, EMC 002571948), and (b) numerous documents that reflect the actual application of the precise figures used in the Dataguide Appendices to Company-sponsored projects (*see, e.g.*, EMC 000137097). More fundamentally, the thousands of "proxy cost" documents produced to date show that the information contained in ExxonMobil's internal documents is entirely consistent with its public statements—including, for example, ExxonMobil's 2014 *Outlook for Energy*. No further documentation showing how the Company applies a proxy cost of carbon is required. Indeed, the NYAG would have no reasonable basis for believing that ExxonMobil has failed to apply its proxy cost of carbon in precisely the manner described in its public statements and its internal policies, let alone that any supposed failure affected any New York consumer or investor. The NYAG is not entitled to demand "every document," spreadsheet, or line item reflecting an application of the proxy cost of carbon across the entire company, particularly when his request reflects nothing more than idle curiosity or groundless suspicion.[1] (Dec. 9, 2016 Hr'g Tr. at 23:20-22.) This is just another example of the NYAG's office "throwing darts against the wall," (*id.* at 23:24-25),[2] a practice for which it has already been admonished.

*Third*, your letter inaccurately claims both that Justice Ostrager required ExxonMobil to search shared locations for responsive documents, and that ExxonMobil nonetheless has refused to do so. To the contrary, in advance of the January 9, 2017 hearing, ExxonMobil voluntarily agreed to search more than half of the twenty shared locations requested by the NYAG. (Dec. 16, 2016 letter from Daniel J. Toal to John Oleske 3–4.) As your colleague Ms. Sheth acknowledged at the hearing, that left just three shared sites in dispute. (Jan. 9, 2017 Hr'g Tr. at 4:15-20.) Although ExxonMobil was not ordered to produce documents from any of them, it nonetheless agreed after the hearing to produce responsive documents from all remaining shared locations requested by the NYAG, thereby substantially exceeding its discovery obligations. (Jan. 27, 2017 email from Daniel J. Toal to Katherine Milgram.) And in your effort to argue that the NYAG somehow has been denied "project-specific documents," you mistakenly assert that ExxonMobil limited its search for responsive documents "exclusively" to "e-mail inboxes." Nothing could be further from the truth. As you are well aware, ExxonMobil

---

1 *See, e.g.*, *AAA Vascular Care, PLLC* v. *Integrated Healthcare Mgmt., LLC*, 99 A.D.3d 642, 643 (2d Dep't 2012) (affirming protective order "on grounds that those requests were redundant"); *Mabry* v. *Coughlin*, 196 A.D.2d 931, 931 (3d Dep't 1993) (affirming denial of requests to produce "irrelevant or redundant" documents); *Great Am. Ins. Co.* v. *Veteran's Support Org.*, 2015 WL 10633939, at *6 (S.D. Fla. Aug. 24, 2015) (party need not produce *all* documents "generated, maintained, or received" relating to a specific policy).

2 "Discovery should not be permitted to continue indefinitely merely because a requesting party can point to undiscovered documents . . . ." Sedona Conf., *The Sedona Principles (Second Edition): Best Practices Recommendations & Principles for Addressing Electronic Document Production* 38 (2007).

has collected and produced responsive documents from not only email inboxes, but also personal hard drives, network hard drives, and multiple shared databases and locations, including numerous "TeamSites" and "I: / Drives." Indeed, this is well understood by your office since, at your request, we regularly provide you with "Data Source" lists specifying the locations searched for each custodian. These searches have resulted in the production of a large number of project-specific documents that are responsive to the NYAG's subpoena. As Justice Ostrager has repeatedly recognized, the NYAG is entitled to no more.

*Fourth*, ExxonMobil's conduct and record of compliance, including throughout the recent meet-and-confer process, has been entirely reasonable, and the law requires nothing more. To date, and in accordance with the NYAG's investigative priorities, ExxonMobil has collected and produced documents from 121 custodians and twelve shared locations (untethered to specific custodians), running the exceedingly broad search terms agreed to on December 6, 2015, and the even broader and, in our view, "unreasonable" supplemental search strings that we agreed to apply on January 17, 2017. (Jan. 9, 2017 Hr'g Tr. at 13:10.) As of January 31, 2017, ExxonMobil has produced over 2.5 million pages of documents from the custodians and shared locations most central to the NYAG's investigation. The custodial list reaches into almost every corner of the Company and includes the scientists who conducted ExxonMobil's climate change research, employees who developed ExxonMobil's principal communications regarding the relevance of climate change, individuals involved in accounting and valuation, personnel engaged in the planning and execution of oil and gas development projects, senior management, and even ExxonMobil's current and former Chief Executive Officers. This was a list created with the NYAG's knowledge, participation, and consent. Notably, at no point did ExxonMobil refuse to add a single custodian requested by the NYAG, even agreeing to substitute one of the nine additional custodians requested by your office with yet another custodian. This hardly reflects ExxonMobil's refusal to meaningfully participate in the meet-and-confer process. To the contrary, the record confirms that ExxonMobil has repeatedly worked to accommodate requests from the NYAG's office, often notwithstanding ExxonMobil's conviction that the NYAG had no entitlement to the information sought.

Now the NYAG demands that ExxonMobil identify specific documents within its production to ease the office's burden of sifting through the numerous "false positives" that it requested. (Jan. 9, 2017 Hr'g Tr. at 18:10-18.) We plainly have no obligation to do so. But, in any event, your letter fails to note that ExxonMobil offered to review any search terms used by your office to identify the gate review packages that you claim to seek, going so far as to offer to provide suggestions that might help you locate others. You have refused to respond to this proposal, yet, remarkably, condemn ExxonMobil's conduct as "unproductive." We respectfully disagree. Compliance with the NYAG's subpoena does not require ExxonMobil to provide support services. It is not incumbent on us to now search through the massive volume of documents produced for those that were truly of interest to the NYAG all along. Nor must we respond to the NYAG's informal questions about the locations of documents to which he is not entitled.

ExxonMobil has made repeated concessions in an effort to accommodate the NYAG's improper investigative demands. Particularly in light of this record, we disagree with your claim that anything more is required of the Company.

Sincerely,

*/s/ Daniel J. Toal*
Daniel J. Toal

cc: Manisha Sheth, Esq.
Katherine Milgram, Esq
Mandy DeRoche, Esq.
Patrick Conlon, Esq.
Theodore V. Wells, Jr., Esq.
Michele Hirshman, Esq.

Case 3:20-cv-02995-K Document 1-1 Filed 08/06/19 Page 93 of 99 PageID 183

# Exhibit 8

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

1285 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10019-6064

TELEPHONE (212) 373-3000

UNIT 3601, OFFICE TOWER A, BEIJING FORTUNE PLAZA
NO. 7 DONGSANHUAN ZHONGLU
CHAOYANG DISTRICT
BEIJING 100020
PEOPLE'S REPUBLIC OF CHINA
TELEPHONE (86-10) 5828-6300

12TH FLOOR, HONG KONG CLUB BUILDING
3A CHATER ROAD, CENTRAL
HONG KONG
TELEPHONE (852) 2846-0300

ALDER CASTLE
10 NOBLE STREET
LONDON EC2V 7JU, U.K.
TELEPHONE (44 20) 7367 1600

FUKOKU SEIMEI BUILDING
2-2 UCHISAIWAICHO 2-CHOME
CHIYODA-KU, TOKYO 100-0011, JAPAN
TELEPHONE (81-3) 3597-8101

TORONTO-DOMINION CENTRE
77 KING STREET WEST, SUITE 3100
P.O. BOX 226
TORONTO, ONTARIO M5K 1J3
TELEPHONE (416) 504-0520

2001 K STREET, NW
WASHINGTON, DC 20006-1047
TELEPHONE (202) 223-7300

500 DELAWARE AVENUE, SUITE 200
POST OFFICE BOX 32
WILMINGTON, DE 19899-0032
TELEPHONE (302) 655-4410

LLOYD K. GARRISON (1946-1991)
RANDOLPH E. PAUL (1946-1956)
SIMON H. RIFKIND (1950-1995)
LOUIS S. WEISS (1927-1950)
JOHN F. WHARTON (1927-1977)

MATTHEW W. ABBOTT
EDWARD T. ACKERMAN
JACOB A. ADLERSTEIN
ALLAN J. ARFFA
ROBERT A. ATKINS
DAVID J. BALL
SCOTT A. BARSHAY
JOHN F. BAUGHMAN
LYNN B. BAYARD
DANIEL J. BELLER
CRAIG A. BENSON
MITCHELL L. BERG
MARK S. BERGMAN
DAVID M. BERNICK
JOSEPH J. BIAL
BRUCE BIRENBOIM
H. CHRISTOPHER BOEHNING
ANGELO BONVINO
JAMES L. BROCHIN
RICHARD J. BRONSTEIN
DAVID W. BROWN
SUSANNA M. BUERGEL
PATRICK S. CAMPBELL*
JESSICA S. CAREY
JEANETTE K. CHAN
GEOFFREY R. CHEPIGA
ELLEN N. CHING
WILLIAM A. CLAREMAN
LEWIS R. CLAYTON
JAY COHEN
KELLEY A. CORNISH
CHRISTOPHER J. CUMMINGS
CHARLES E. DAVIDOW
THOMAS V. DE LA BASTIDE III
ARIEL J. DECKELBAUM
ALICE BELISLE EATON
ANDREW J. EHRLICH
GREGORY A. EZRING
LESLIE GORDON FAGEN
MARC FALCONE
ROSS A. FIELDSTON
ANDREW C. FINCH
BRAD J. FINKELSTEIN
BRIAN P. FINNEGAN
ROBERTO FINZI
PETER E. FISCH
ROBERT C. FLEDER
MARTIN FLUMENBAUM
ANDREW J. FOLEY
ANDREW J. FORMAN*
HARRIS B. FREIDUS
MANUEL S. FREY
ANDREW L. GAINES
KENNETH A. GALLO
MICHAEL E. GERTZMAN
ADAM M. GIVERTZ
SALVATORE GOGLIORMELLA
ROBERT D. GOLDBAUM
NEIL GOLDMAN
ROBERTO J. GONZALEZ*
CATHERINE L. GOODALL
ERIC GOODISON
CHARLES H. GOOGE, JR.
ANDREW G. GORDON
UDI GROFMAN
NICHOLAS GROOMBRIDGE
BRUCE A. GUTENPLAN
GAINES GWATHMEY, III
ALAN S. HALPERIN
JUSTIN G. HAMILL
CLAUDIA HAMMERMAN
BRIAN S. HERMANN
MICHELE HIRSHMAN
MICHAEL S. HONG
DAVID S. HUNTINGTON
AMRAN HUSSEIN
LORETTA A. IPPOLITO
JAREN JANGHORBANI
BRIAN M. JANSON
MEREDITH J. KANE
JONATHAN S. KANTER
ROBERTA A. KAPLAN
BRAD S. KARP
PATRICK N. KARSNITZ
JOHN C. KENNEDY
BRIAN KIM
ALAN W. KORNBERG
DANIEL J. KRAMER
DAVID K. LAKHDHIR
STEPHEN P. LAMB*
JOHN E. LANGE
GREGORY F. LAUFER
DANIEL J. LEFFELL
XIAOYU GREG LIU
JEFFREY D. MARELL
MARCO V. MASOTTI
EDWIN S. MAYNARD
DAVID W. MAYO
ELIZABETH R. McCOLM
MARK F. MENDELSOHN
CLAUDINE MEREDITH-GOUJON
WILLIAM B. MICHAEL
TOBY S. MYERSON
JUDIE NG SHORTELL*
CATHERINE NYARADY
JANE B. O'BRIEN
ALEX YOUNG K. OH
BRAD R. OKUN
KELLEY D. PARKER
VALERIE E. RADWANER
CARL L. REISNER
LORIN L. REISNER
WALTER G. RICCIARDI
WALTER RIEMAN
RICHARD A. ROSEN
ANDREW N. ROSENBERG
JACQUELINE P. RUBIN
CHARLES F. "RICK" RULE*
RAPHAEL M. RUSSO
ELIZABETH M. SACKSTEDER
JEFFREY D. SAFERSTEIN
JEFFREY B. SAMUELS
DALE M. SARRO
TERRY E. SCHIMEK
KENNETH M. SCHNEIDER
ROBERT B. SCHUMER
JOHN M. SCOTT
STEPHEN J. SHIMSHAK
DAVID R. SICULAR
MOSES SILVERMAN
STEVEN SIMKIN
JOSEPH J. SIMONS
AUDRA J. SOLOWAY
SCOTT M. SONTAG
TARUN M. STEWART
ERIC ALAN STONE
AIDAN SYNNOTT
MONICA K. THURMOND
DANIEL J. TOAL
LIZA M. VELAZQUEZ
LAWRENCE G. WEE
THEODORE V. WELLS, JR.
STEVEN J. WILLIAMS
LAWRENCE I. WITDORCHIC
MARK B. WLAZLO
JULIA MASON WOOD
JENNIFER H. WU
BETTY YAP*
JORDAN E. YARETT
KAYE N. YOSHINO
TONG YU
TRACEY A. ZACCONE
TAURIE M. ZEITZER
T. ROBERT ZOCHOWSKI, JR.

*NOT ADMITTED TO THE NEW YORK BAR

WRITER'S DIRECT DIAL NUMBER

212-373-3089

WRITER'S DIRECT FACSIMILE

212-492-0089

WRITER'S DIRECT E-MAIL ADDRESS

twells@paulweiss.com

March 16, 2017

***By NYCSEF***

The Honorable Barry R. Ostrager
Supreme Court of the State of New York
Commercial Division
60 Centre Street, Room 629
New York, NY 10007

*Re: In the Matter of the Application of the People of the State of New York, by Eric T. Schneiderman, Index No. 451962/2016.*

Dear Justice Ostrager:

On March 13, 2017, the New York Attorney General filed a letter with this Court regarding former CEO Rex Tillerson's use of multiple ExxonMobil email accounts. That letter marked the first time ExxonMobil learned of the Attorney General's concern about Mr. Tillerson's email accounts. The fact that Mr. Tillerson used two email accounts was readily apparent from documents produced in this matter over the past year. While there is nothing improper about using more than one account to organize and prioritize emails, it is entirely improper for the Attorney General to raise this issue for the first time in a letter filed publicly with the Court. Not only did that letter violate this Court's requirement that parties attempt to resolve disputes before bringing them to the Court, it has unfairly prejudiced ExxonMobil in the eyes of the public based on sensational coverage in the press. A simple question about subpoena compliance should not have been handled this way.

***The "Wayne Tracker" Email Account***

At times during his tenure as CEO, Mr. Tillerson used two email accounts on the ExxonMobil platform: a primary account identified by his first and last name and a secondary account for priority emails identified by the name "Wayne Tracker." When complying with the subpoena issued by the New York Attorney General (the "NYAG"), ExxonMobil searched the

Wayne Tracker email account, along with Mr. Tillerson's primary account. As fully disclosed to the NYAG in prior communications, ExxonMobil's collection and production efforts have focused on specific *custodians* (*i.e.*, employees and officers of the company), not specific *email accounts*. In keeping with that approach, Mr. Tillerson was designated a custodian, which means that the ExxonMobil email accounts he used were within the scope of ExxonMobil's search for responsive documents. The search of documents from Mr. Tillerson thus reached not only his primary ExxonMobil email account, but also the Wayne Tracker account.

None of this should come as a surprise to the NYAG. ExxonMobil produced emails sent to the Wayne Tracker account for the first time on February 20, 2016, and it has continued to do so over the last year. Mr. Tillerson's use of the Wayne Tracker account is evident from the face of a number of those emails, several of which were transparently addressed to or signed by "Rex" or "RWT" in the body of the email.

Notwithstanding insinuations to the contrary, Mr. Tillerson's use of the Wayne Tracker account was entirely proper. It allowed a limited group of senior executives to send time-sensitive messages to Mr. Tillerson that received priority over the normal daily traffic that crossed the desk of a busy CEO. The purpose was efficiency, not secrecy. Were it otherwise, emails to the Wayne Tracker account would have scrupulously avoided any reference to Mr. Tillerson as the intended recipient. Instead, numerous emails to the Wayne Tracker account are expressly addressed to Mr. Tillerson or contain his initials in the body of the email. And, while some of those emails pertain to climate change, the Wayne Tracker account was not established for the purpose of discussing that or any other particular topic. It was a general purpose means of sending priority communications to the CEO of the company.

In light of the questions raised by the Attorney General in his March 13 letter, ExxonMobil reexamined the Wayne Tracker account in connection with the NYAG's subpoena. ExxonMobil confirmed that it searched for potentially responsive documents from both Mr. Tillerson's primary account and the Wayne Tracker account in January 2016, approximately two months after the NYAG issued his subpoena. Those searches were conducted against the emails that were in the accounts at that point in time. In addition, ExxonMobil confirmed that it also searched both accounts again after the parties agreed to a supplemental set of search terms in January 2017.

In the course of this process, ExxonMobil confirmed that it placed a litigation hold on Mr. Tillerson promptly after receipt of the NYAG subpoena. The legal hold process at ExxonMobil, which was designed and implemented prior to this subpoena, engages a technology that protects emails in accounts from automated processes for persons subject to legal hold. ExxonMobil determined, however, that despite the company's intent to preserve the relevant emails in both of Mr. Tillerson's accounts, due to the manner in which email accounts had been configured years earlier and how they interact with the system, these technological processes did not automatically extend to the secondary email account. ExxonMobil is in the process of determining whether this preexisting technology process design had any impact on the production process. A number of factors suggest that any possible impact will not be significant. First, ExxonMobil searched the Wayne Tracker account within two months of receiving the

NYAG's subpoena. Second, many of the emails sent to or from the Wayne Tracker account included Mr. Tillerson's primary account as a recipient, which means email would appear in both accounts. Third, a limited number of senior executives used the Wayne Tracker address to communicate with Mr. Tillerson, and many of them—including, as relevant here, those who work on matters related to climate change—are on litigation hold. As ExxonMobil's evaluation of this issue continues, we will provide the Court and the NYAG with further information.

Obtaining publicity, not information, appears to have been the real goal of the NYAG's March 13 letter. Under this Court's rules, discovery disputes such as this one should be resolved bilaterally, between the parties, prior to being raised with the Court. But the Attorney General did not do so, raising his concerns about the Wayne Tracker email account for the first time in a public filing received by the Court, ExxonMobil, and the press at the same time. Such an approach does not serve the productive resolution of discovery disputes, but it does serve the NYAG's well-established preference to litigate his case in the press rather than court. That objective also explains the NYAG's decision to portray an innocuous business practice unfairly and inaccurately as a sinister effort to withhold information.

The NYAG knows better. To date, ExxonMobil has produced more than 2.4 million pages of documents in connection with the NYAG's climate-change investigation and has worked diligently to respond to the NYAG's extraordinarily broad and, in our view, often unreasonable and improper, investigative demands. So far the NYAG has found no evidence of the far-flung campaign to mislead the public that he routinely claims has been going on for decades. The NYAG now suggests that a single email account might house the evidence that his 18-month investigation has yet to uncover. The suggestion is preposterous. If the Wayne Tracker account was used to communicate with other ExxonMobil executives about climate change, those emails would reside in the accounts of the other executives. But the NYAG nowhere claims that the emails he has seen involving the Wayne Tracker account are of any significance whatsoever. All that remains is false innuendo and suspicion. Predictably, ExxonMobil received press inquiries within minutes of receiving the NYAG's letter, and advocacy groups allied with the NYAG in his campaign against the company quickly issued press releases denouncing ExxonMobil's purported misdeeds, going so far as to suggest that the Wayne Tracker account was used to conceal information about climate change. The facts, as known to the NYAG, come nowhere near supporting such allegations. And ultimately no amount of distortion and dissembling can distract from the NYAG's failure to develop any evidence supporting the allegations he has been pressing for the last year and a half.

***The NYAG's Other Concerns***

The NYAG raises three other challenges to ExxonMobil's production that are either frivolous, premature, or both. None is worthy of this Court's consideration at this time.

*First*, the NYAG falsely contends that ExxonMobil "delayed and obstructed" the production of documents from its top executives. Ltr. 1. The record says otherwise, as ExxonMobil has worked with the NYAG to address an ever widening and ever changing scope of demands and questions about the production. In keeping with that approach, ExxonMobil will

shortly produce additional Management Committee documents to the NYAG on March 17, 2017. The NYAG should not be heard to complain about the adequacy of this production until he has at least taken the time to review it.[1]

*Second*, the NYAG erroneously argues that 34 additional email accounts contain information that should have been produced to his office. Ltr. 2-3. The NYAG first expressed interest in these accounts a mere 24 hours before filing his March 13 letter, and this request amounts to nothing more than an impermissible attempt to expand the number of custodians beyond the limit expressly ordered by this Court. ExxonMobil is not required to produce documents from every employee within the company, and the NYAG offers no reason to believe that the identified individuals or email addresses are reasonably likely to possess unique responsive documents, as the law requires.

*Third*, the NYAG wrongly contests ExxonMobil's public statements regarding the manner in which it incorporates a "proxy cost of carbon" into its business operations. Ltr. 3. This argument is refuted by the record. Contained within the documents produced to date are (a) ExxonMobil Dataguide Appendices, *i.e.*, internal policy documents that specify precisely how ExxonMobil applies its proxy cost of carbon in every jurisdiction worldwide through the year 2040 (*see, e.g.*, EMC 002571948), and (b) numerous documents that reflect the actual application of the precise figures used in the Dataguide Appendices to Company-sponsored projects (*see, e.g.*, EMC 000137097). More fundamentally, the thousands of "proxy cost" documents produced to date show that the information contained in ExxonMobil's internal documents is entirely consistent with its public statements—including, for example, ExxonMobil's 2014 *Outlook for Energy*.[2]

---

1 The NYAG's March 12, 2017 email demanded answers to five questions in just 22 hours. When ExxonMobil informed the NYAG that it would provide a response "promptly," but would not meet the NYAG's arbitrarily short deadline, instead of responding, his office filed a letter with the Court approximately two hours later.

2 The NYAG simply has no reasonable basis for believing that ExxonMobil has failed to apply its proxy cost of carbon in precisely the manner described in its public statements and its internal policies, let alone that any supposed failure affected any New York consumer or investor. As the NYAG is well aware, even among the companies that do utilize internal proxy costs of carbon, it is a matter of public record that the highest carbon prices used by ExxonMobil are in most cases higher than those reported by other energy companies, and among the highest reported by any company. *See, e.g.*, Carbon Disclosure Project, *Putting a Price on Risk: Carbon Pricing in the Corporate World* at 6 (Sept. 2015), *available at* https://www.oceanfdn.org/sites/default/files/CDP%20Carbon%20Pricing%20in%20the%20corporate%20world.compressed.pdf (last visited Mar. 15, 2017); *see also* Cntr. for Amer. Progress, *Proxy Carbon Pricing: A Tool for Fiscally Rational and Climate-Compatible Governance* at 7 (Apr. 2016), *available at* https://cdn.americanprogress.org/wp-content/uploads/2016/04/13143140/CarbonPricing.pdf (last visited Mar. 15, 2017). This simply underscores that the proxy cost of carbon utilized by ExxonMobil is eminently reasonable. In view of this fact, and the NYAG's acknowledgement that companies utilize a range of proxy costs for carbon, ExxonMobil is once again left to conclude that the NYAG's investigation has more to do with the identity of the subject than with any good faith theory that the Company has violated any law.

Respectfully Submitted,

/s/ Theodore V. Wells, Jr.
Theodore V. Wells, Jr.

cc: Manisha Sheth, Esq.
Katherine Milgram, Esq.
Mandy DeRoche, Esq.
Patrick Conlon, Esq.
Daniel J. Toal, Esq.
Michele Hirshman, Esq.

# Exhibit 9