# EXHIBIT A
# Part 2

CDP DRIVING SUSTAINABLE ECONOMIES

# Climate Change 2015 Information Request
# Exxon Mobil Corporation

## Module: Introduction

### Page: Introduction

**CC0.1**
**Introduction**
**Please give a general description and introduction to your organization.**

ExxonMobil is the world's largest publicly traded international oil and gas company. We hold an industry-leading inventory of global oil and gas resources. We are the world's largest integrated refiner and manufacturer of lube basestocks, a leading marketer of petroleum products and finished lubricants, and one of the largest chemical companies in the world. We are also a technology company, applying science and innovation to find better, safer and cleaner ways to deliver the energy the world needs.

Our Upstream business encompasses high-quality exploration opportunities across all resource types and geographies, an industry-leading resource base, a portfolio of world-class projects, and a diverse set of producing assets. We have an active exploration or production presence in 36 countries. We sell natural gas in almost all major and developing markets. Our total net oil and gas production available for sale in 2014 averaged 4.0 million oil-equivalent barrels per day.

As the largest global integrated refiner and lube basestock manufacturer, ExxonMobil has interests in 30 refineries in 17 countries. We market our fuels products to millions of customers worldwide through more than 19,000 retail service stations and four Fuels Marketing business lines—Retail, Wholesale, Aviation, and Marine. We are the world's largest manufacturer of lubricant base stocks and a market leader of high-technology and globally recognized synthetic lubricant brands, such as Mobil 1 and Mobil SHC. We are also a leading supplier of asphalt and specialty products. In 2014, refinery throughput averaged 4.5 million barrels per day and petroleum product sales were 5.9 million barrels per day.

ExxonMobil Chemical Company is one of the largest chemical companies in the world. Our product portfolio is a unique combination of commodity and specialty businesses that have been developed through proprietary technology. We are one of the largest producers of aromatics and olefins, the basic petrochemical building blocks, and polyolefins, including plastics such as polyethylene and polypropylene. Our world-scale, integrated facilities allow us to produce a diverse set of less cyclical specialty products that deliver advanced performance and value to our customers in a broad array of applications. In 2014, chemical prime product sales totaled 24.2 million metric tons.

Note: The term 'project' as used in this report does not necessarily have the same meaning as under any government payment transparency reporting rules

**CC0.2**
**Reporting Year**
**Please state the start and end date of the year for which you are reporting data.**
**The current reporting year is the latest/most recent 12-month period for which data is reported. Enter the dates of this year first.**
**We request data for more than one reporting period for some emission accounting questions. Please provide data for the three years prior to the current reporting year if you have not provided this information before, or if this is the first time you have answered a CDP information request. (This does not apply if you have been offered and selected the option of answering the shorter questionnaire). If you are going to provide additional years of data, please give the dates of those reporting periods here. Work backwards from the most recent reporting year.**
**Please enter dates in following format: day(DD)/month(MM)/year(YYYY) (i.e. 31/01/2001).**

| Enter Periods that will be disclosed |
|---|
| Wed 01 Jan 2014 - Wed 31 Dec 2014 |

**CC0.3**
**Country list configuration**

**Please select the countries for which you will be supplying data. If you are responding to the Electric Utilities module, this selection will be carried forward to assist you in completing your response.**

| Select country |
|---|
| Rest of world |

**CC0.4**
**Currency selection**

**Please select the currency in which you would like to submit your response. All financial information contained in the response should be in this currency.**

USD($)

**CC0.6**
**Modules**
**As part of the request for information on behalf of investors, electric utilities, companies with electric utility activities or assets, companies in the automobile or auto component manufacture sub-industries, companies in the oil and gas sub-industries, companies in the information technology and telecommunications sectors and companies in the food, beverage and tobacco industry group should complete supplementary questions in addition to the main questionnaire.**
**If you are in these sector groupings (according to the Global Industry Classification Standard (GICS)), the corresponding sector modules will not appear below but will automatically appear in the navigation bar when you save this page. If you want to query your classification, please email respond@cdp.net.**
**If you have not been presented with a sector module that you consider would be appropriate for your company to answer, please select the module below. If you wish to view the questions first, please see https://www.cdp.net/en-US/Programmes/Pages/More-questionnaires.aspx.**

Further Information

## Module: Management

### Page: CC1. Governance

**CC1.1**

**Where is the highest level of direct responsibility for climate change within your organization?**

Board or individual/sub-set of the Board or other committee appointed by the Board

**CC1.1a**

**Please identify the position of the individual or name of the committee with this responsibility**

The Board of Directors is comprised of eleven independent directors and one executive director. The Board's Public Issues and Contributions Committee is responsible for the oversight of safety, health, and environmental performance, including issues associated with the risks of climate change. This committee reviews the effectiveness of the Corporation's policies, programs, and practices on safety, health and the environment, and social responsibility. The Committee hears reports relating to operating units' safety and environmental activities and also visits operating sites to observe and comment on current operating practices. All members of the Committee are independent within the meaning of the NYSE listing standards. The Committee's charter is available on the Corporate Governance section of our website. Corporate governance is managed with systems and standards for all aspects of our business. With regard to management, the Chairman of the Board and Chief Executive Officer and the members of the Management Committee have responsibility for climate change matters. Specific to environmental issues including climate change, there are timely interactions with members of the Management Committee as well as updates at least annually with the ExxonMobil Board of Directors and the Public Issues and Contributions Committee. On the subject of the risks of climate change, the full ExxonMobil Board of Directors receives in depth briefings at least annually that cover updates on public policy, scientific and technical research, as well as company positions and actions in this area. In addition, the Chairman of the Board and Chief Executive Officer and members of the Management Committee are actively engaged in discussions relating to greenhouse gas emissions and the risks of climate change on an ongoing basis.

**CC1.2**

**Do you provide incentives for the management of climate change issues, including the attainment of targets?**

Yes

**CC1.2a**

**Please provide further details on the incentives provided for the management of climate change issues**

| Who is entitled to benefit from these incentives? | The type of incentives | Incentivized performance indicator | Comment |
|---|---|---|---|
| Other: Board Chairman, CEO, Management Committee, and all management, professional, and technical employees | Monetary reward | Other: See Comment | Environmental performance (including GHG emissions and energy efficiency) is assessed and recognized through the annual planning and budget process. During this process, key strategies and objectives are established for each business line for both the short and long term. Results are regularly stewarded against prior commitments. Each year the businesses and individual sites are assessed on how well they are executing the strategies outlined for their operating unit. They are assessed on the performance of the Corporation overall and each of the respective business lines for which they have responsibility, on both an absolute basis and relative to companies of comparable size and scope of business activities. Performance is assessed throughout the year during specific business reviews and other meetings that provide reports on strategy development; operating and financial results; safety, health, and environmental results, including GHG emissions and energy efficiency; business controls; and other areas pertinent to the general performance of the Company. In assessing the performance, weights are not assigned to the factors considered. Performance in environmental stewardship areas is used in our merit-driven employee development and compensation systems. |

**Further Information**

## Page: CC2. Strategy

**CC2.1**

**Please select the option that best describes your risk management procedures with regard to climate change risks and opportunities**

Integrated into multi-disciplinary company wide risk management processes

**CC2.1a**

**Please provide further details on your risk management procedures with regard to climate change risks and opportunities**

| Frequency of monitoring | To whom are results reported? | Geographical areas considered | How far into the future are risks considered? | Comment |
|---|---|---|---|---|
| Annually | Board or individual/sub-set of the Board or committee appointed by the Board | We consider risks associated with climate change across our global operations | > 6 years | |

**CC2.1b**

**Please describe how your risk and opportunity identification processes are applied at both company and asset level**

ExxonMobil is committed to conducting business in a manner that is compatible with the environmental and economic needs of the communities in which we operate, and that protects the safety, security, and health of our employees, those involved with our operations, our customers, and the public. These commitments are documented in our Safety, Health, Environment, and Product Safety policies. These policies are put into practice through a disciplined management framework called the Operations Integrity Management System (OIMS).

ExxonMobil's OIMS Framework establishes common worldwide expectations for addressing risks inherent in our business. The term Operations Integrity (OI) is used by ExxonMobil to address all aspects of its business that can impact personnel and process safety, security, health, and environmental performance, including energy efficiency and risks from climate change.

The OIMS Framework includes 11 Elements. Each Element contains an underlying principle and a set of Expectations. The OIMS Framework also includes the characteristics of, and processes for, evaluating and implementing OI Management Systems.

Application of the OIMS Framework is required across all of ExxonMobil, with particular emphasis on design, construction and operations. Management is responsible for ensuring that management systems satisfying the Framework are in place. The scope, priority and pace of management system implementation should be consistent with the risks associated with the business.

The eleven elements of OIMS are:

1. Management, Leadership, and Accountability
2. Risk Assessment and Management
3. Facilities Design and Construction
4. Information/Documentation
5. Personnel and Training
6. Operations and Maintenance
7. Management of Change
8. Third-Party Services
9. Incident Investigation and Analysis
10. Community Awareness and Emergency Response
11. Operations Integrity Assessment and Improvement

**CC2.1c**
**How do you prioritize the risks and opportunities identified?**

ExxonMobil applies established OIMS systems and process to assess risks and opportunities, identify potential actions and prioritize the rate and pace of implementation.

**CC2.2**
**Is climate change integrated into your business strategy?**

Yes

**CC2.2a**
**Please describe the process of how climate change is integrated into your business strategy and any outcomes of this process**

Society continues to face the dual challenge of expanding energy supplies to support economic growth and improve living standards, while simultaneously addressing the societal and environmental risks posed by rising greenhouse gas (GHG) emissions and climate change. Our climate change risk management strategy includes four components: engaging on climate change policy and planning; mitigating GHG emissions in our operations; developing future technology; and developing products that reduce GHG emissions for customers.

Managing the risks of climate change requires the participation of governments, private companies, consumers and other stakeholders. We engage a variety of stakeholders — including policymakers, investors, consumers, academia, NGOs and the public — on climate change issues of direct relevance to the company to encourage sound policy solutions for addressing these risks.

ExxonMobil is committed to mitigating greenhouse gas emissions in our operations. We have a robust set of processes designed to improve efficiency, reduce emissions and contribute to effective long-term solutions to manage climate change risks. In the near term, we are working to increase energy efficiency while reducing flaring, venting and fugitive emissions in our operations. In the medium term, we are deploying proven technologies such as cogeneration and, where technically and economically feasible, carbon capture and sequestration. Longer term, we are conducting and supporting research to develop breakthrough, game-changing technologies.

ExxonMobil is conducting scientific research to discover innovative approaches to developing existing and next-generation energy sources, while at the same time developing products that can enable more efficient energy consumption. We spend approximately $1 billion per year on research and technology development and have approximately 11,000 active patents. ExxonMobil's Corporate Strategic Research (CSR) laboratory is a fundamental research institution, with approximately 150 Ph.D. scientists and engineers focused on addressing the company's long-range science needs. The laboratory's scientists are recognized as world experts and authorities in their field. Our research portfolio includes a broad array of programs, including alternative energy, CCS, biofuels, life-cycle analysis, climate science and materials science.

One of the greatest opportunities for society to reduce GHG emissions is through the use of natural gas in power generation. On a life-cycle basis, from extraction through electricity consumption, using natural gas emits 50 percent fewer GHG emissions than coal. It is also the ideal partner for intermittent renewable energy sources, such as solar or wind, as it can provide power when these renewable sources are not available. As the world moves toward a lower carbon-intensive energy mix over the coming decades, natural gas will be one of the most important fuels to enable reductions in GHG emissions. Since our merger with XTO Energy in 2010, ExxonMobil has been one of the largest natural gas producers in the world. Coupled with our leadership in the development and production of liquefied natural gas (LNG), ExxonMobil is well-positioned to meet growing demand for this clean energy source.

**CC2.2c**
**Does your company use an internal price of carbon?**

Yes

**CC2.2d**
**Please provide details and examples of how your company uses an internal price of carbon**

We update our long-term energy outlook each year — taking into account the most up-to-date demographic, economic and technological information available. This analysis serves as a foundation for our long-term business strategies and investments. We address the potential for future climate change policy, including the potential for restrictions on emissions, by estimating a proxy cost of carbon. This cost, which in some geographies may approach $80 per ton by 2040, has been included in our Outlook for several years. This approach seeks to reflect potential policies governments may employ related to the exploration, development, production, transportation or use of carbon-based fuels. We believe our view on the potential for future policy action is realistic and, by no means represents a "business as usual" case. We require all of our business lines to include, where appropriate, an estimate of GHG-related emissions costs in their economics when seeking funding for capital investments.

**CC2.3**
**Do you engage in activities that could either directly or indirectly influence public policy on climate change through any of the following? (tick all that apply)**

Direct engagement with policy makers
Trade associations
Funding research organizations

**CC2.3a**
**On what issues have you been engaging directly with policy makers?**

| Focus of legislation | Corporate Position | Details of engagement | Proposed legislative solution |
|---|---|---|---|
| | Support | | |

| Focus of legislation | Corporate Position | Details of engagement | Proposed legislative solution |
|---|---|---|---|
| Other: Sound Climate Policy | | We engage with policymakers directly and through trade associations around the world to encourage sound policy solutions for addressing the risks of climate change. We also fund research organizations such as the MIT Joint Program on Global Change to enhance integrated assessment modelling of policy and climate change. Our scientists are directly involved in the IPCC reports on climate science. | Climate change presents serious risks that are worthy of cost-effective action by individuals, companies, and policymakers. Effective policy steps should promote global participation while recognizing the priorities of the developing world and limiting the consequences of differing national policies on competitiveness; maximize transparency; minimize complexity and administrative costs; provide flexibility to adjust to developments in climate science and the economic impacts of climate policies |
| Other: Clean Energy Technology | Support | In addition to our own extensive internal research and development, we sponsor research organizations that are involved in fundamental clean energy technology R&D such as Stanford's GCEP program and MIT's Carbon Sequestration Initiative. | Promote fundamental energy research to enable cost-effective technology alternatives.. |

**CC2.3b**

**Are you on the Board of any trade associations or provide funding beyond membership?**

Yes

**CC2.3c**

**Please enter the details of those trade associations that are likely to take a position on climate change legislation**

| Trade association | Is your position on climate change consistent with theirs? | Please explain the trade association's position | How have you, or are you attempting to, influence the position? |
|---|---|---|---|
| International Petroleum Industry Environmental Conservation Association (IPIECA) | Consistent | In June 2015, IPIECA published a series of position paper on climate change under the title: "The Paris Puzzle - The pathway to a low-emissions future. These papers are available on the IPIECA website. ExxonMobil's views are generally consistent with those expressed in these position papers, which express an industry consensus positon. | ExxonMobil actively participates in multiple IPIECA work activities, including those related to crafting climate change policy positions |
| International Oil & Gas Producers (IOGP) | Consistent | In November 2014, an "IOGP position paper on climate change" was published and is available on the IOGP website. ExxonMobil's views are generally consistent with those expressed in this position paper, which express an industry consensus positon | ExxonMobil actively participates in multiple IOGP work activities, including those related to crafting climate change policy positions. |

**CC2.3d**

**Do you publicly disclose a list of all the research organizations that you fund?**

Yes

**CC2.3e**

**Do you fund any research organizations to produce or disseminate public work on climate change?**

Yes

**CC2.3f**

**Please describe the work and how it aligns with your own strategy on climate change**

ExxonMobil engages a variety of stakeholders — including policymakers, investors, consumers, academia, NGOs and the public — on climate change issues of direct relevance to the company. We contribute to a wide range of academic and policy organizations that research and promote dialogue on domestic and foreign policy issues. We annually review our support of tax-exempt organizations and make appropriate adjustments. We publish a list of the 501(c)(3) organizations we support on our website and update the list annually. http://corporate.exxonmobil.com/en/community/worldwide-giving/worldwide-giving-report

**CC2.3h**

**What processes do you have in place to ensure that all of your direct and indirect activities that influence policy are consistent with your overall climate change strategy?**

We align our internal positions and external communications via a corporate-wide global climate change and GHG issue management team with national and regional sub-teams. This team applies corporate level policy principles and positions to external issues that arise at local, state, national and regional levels to ensure consistency across the globe.

**CC2.4**

**Would your organization's board of directors support an international agreement between governments on climate change, which seeks to limit global temperature rise to under two degree Celsius from pre-industrial levels in line with IPCC scenarios such as RCP2.6?**

**CC2.4a**

**Please describe your board's position on what an effective agreement would mean for your organization and activities that you are undertaking to help deliver this agreement at the 2015 United Nations Climate Change Conference in Paris (COP 21)**

Managing the risks of climate change requires the participation of governments, private companies, consumers and other stakeholders. We engage stakeholders directly and through trade associations around the world to encourage sound policy solutions for addressing these risks.

ExxonMobil believes the long-term objective of a climate change policy should be to reduce the risk of serious impacts to humanity and ecosystems at minimum societal cost, while recognizing the importance of abundant, reliable and affordable energy to enable improved living standards worldwide. Both developed and developing countries need to work together in crafting policies aimed at mitigating global $CO_2$ emissions, while recognizing the potential for differing priorities. If policymakers choose to take action to address the risks of climate change, we believe effective policies will be those that:

• Promote global participation;
• Let market prices drive the selection of solutions;
• Ensure a uniform and predictable cost of GHG emissions across the economy;
• Minimize complexity and administrative costs;

- Maximize transparency; and
- Provide flexibility for future adjustments to react to developments in climate science and the economic impacts of climate policies.

We believe a properly designed, revenue-neutral carbon tax is a more effective policy option for imposing a cost on carbon than cap-and-trade schemes, regulations, mandates or standards. Properly designed, a revenue-neutral carbon tax:

- Is a more efficient means of reflecting the cost of carbon in all economic decisions, and thus is more transparent and predictable;
- More easily lends itself to global application;
- Avoids the complexity of building additional carbon security markets;
- Can be implemented through the existing tax infrastructure; and
- Is better-suited for setting a uniform standard to hold all nations accountable.

**Further Information**

For question CC2.1, ExxonMobil reviews the risk of climate change with its full Board of Directors annually

## Page: CC3. Targets and Initiatives

**CC3.1**
**Did you have an emissions reduction target that was active (ongoing or reached completion) in the reporting year?**

No

**CC3.1e**
**Please explain (i) why you do not have a target; and (ii) forecast how your emissions will change over the next five years**

ExxonMobil understands the importance of progressing solutions to address greenhouse gas (GHG) emissions and the risks of climate change. As ExxonMobil seeks to increase production of oil and gas to meet growing global energy demand, the Company continues to take steps to improve efficiency, reduce emissions and contribute to effective long-term solutions to manage climate change risks. ExxonMobil accomplishes this through a robust set of processes designed to drive long-term, sustainable improvement. These processes include, where appropriate, setting tailored objectives at the business, site and equipment level and then stewarding progress toward meeting these objectives. ExxonMobil believes that this rigorous bottom-up approach is a more effective way to drive efficiency improvement and GHG emissions reduction than setting top-down corporate targets.

ExxonMobil has provided extensive public disclosure on its approach to managing climate change risks in its annual Corporate Citizenship Report and Carbon Disclosure Project (CDP) submission, which are posted on its external website at exxonmobil.com/climate. Included in these reports is information regarding GHG emissions performance, steps the Company is taking to mitigate GHG emissions in its operations, technology the Company is developing and deploying to improve the GHG emissions performance of its operations as well as those of its customers, and the process and governance by which the Company manages climate-related risks.

In the near-term, ExxonMobil is working to increase energy efficiency and reduce flaring, venting and fugitive emissions in its operations. In the medium-term, the company is deploying proven technologies such as cogeneration. Longer term, ExxonMobil is progressing breakthrough, game-changing technologies. Through its Corporate Strategic Research (CSR) laboratory, ExxonMobil conducts fundamental research on a broad range of scientific topics including alternative energy, carbon capture and sequestration, advanced biofuels, lifecycle analysis, climate science and materials science. The Company also conducts strategic research with leading universities around the world focused on developing fundamental game-changing scientific breakthroughs that could lead to lower GHG emissions and a less carbon-intensive global energy system. Examples include the MIT Energy Initiative and Global Climate and Energy Project at Stanford University.

In general, energy is required to produce and process oil and gas, so increases in production volumes that are needed to meet the world's rising need for energy will lead to increases in emissions from our operations and from end use by customers. To be accurate, goals for absolute GHG emissions would need to reflect the coincident impact of largely unforeseeable factors that influence year-to-year changes in market demand, including macroeconomic issues, weather, and responses by national oil companies. Goals that reflect so many variables would be impractical for guiding business performance.

**CC3.2**
**Does the use of your goods and/or services directly enable GHG emissions to be avoided by a third party?**

Yes

**CC3.2a**
**Please provide details of how the use of your goods and/or services directly enable GHG emissions to be avoided by a third party**

ExxonMobil does not collect data related to the emissions avoided by a third party due to the inability to accurately and consistently calculate these numbers. ExxonMobil believes producers, refiners, distributors, and end-users should each be responsible for managing and reporting the emissions generated from activities under their control.

However, one of the greatest opportunities for society to reduce GHG emissions is through the use of natural gas in power generation. Natural gas is a flexible, abundant and low-emissions fuel that is available across the globe. On a life-cycle basis, from extraction through electricity consumption, using natural gas emits 50 percent fewer GHG emissions than coal. It is also the ideal partner for intermittent renewable energy sources, such as solar or wind, as it can provide power when these renewable sources are not available. As the world moves toward a lower carbon-intensive energy mix over the coming decades, natural gas will be one of the most important fuels to enable reductions in GHG emissions.

Since our merger with XTO Energy in 2010, ExxonMobil has been one of the largest natural gas producers in the world. Coupled with our leadership in the development and production of liquefied natural gas (LNG), ExxonMobil is well-positioned to meet growing demand for this clean energy source.

Sustainability is an ongoing journey at ExxonMobil. Our employees are committed to innovation and continuous improvement. In both our Downstream and Chemical businesses, we have sustainability steering teams that meet regularly to drive our longer-term vision into multiyear strategic plans to improve our own operations, as well as provide sustainability benefits, such as increasing efficiency and reducing waste, for the entire value chain. We have the ability to make a sizable positive impact on society. Our products help customers and consumers conserve energy and reduce raw material use, which in turn can help reduce costs and lower greenhouse gas (GHG) emissions around the world.

Among the many product offerings in our Chemical business, our materials used in automotive applications provide manufacturers and consumers with quantifiable benefits. For example, we manufacture butyl rubber — invented by ExxonMobil researchers in 1937 — which is utilized to produce tire innerliners. This material helps maintain optimal tire air pressure, which in turn contributes to improved vehicle fuel economy, tire durability and performance. Our next-generation tire innerliner materials have the potential to deliver further leading-edge air retention performance. Tires incorporating these new technologies provide the potential to reduce weight in the innerliner by up to 90 percent, while also improving rolling resistance and fuel efficiency.

In the United States, it is estimated that 25 percent of vehicle tires are underinflated, leading to inefficient driving. If drivers in the United States kept their tires properly inflated, they could save up to 1 billion gallons of gasoline per year. Our ongoing development of lighter, more efficient products aims to address this problem.

ExxonMobil products can be found in a variety of automotive parts. Plastic parts are typically much lighter than comparable metal parts, allowing drivers to save on fuel costs and reduce their cars' emissions. To learn more, view this American Chemistry Council video. https://www.youtube.com/watch?v=B6RyBHG51VQ

We also are developing innovative resins for use in plastic packaging products. According to a recent life cycle study, substituting a variety of plastics packaging with non-plastic alternatives — such as glass, paper, aluminum or steel — would increase the amount of packaging generated annually in the United States by 55 million tons. Plastics help significantly reduce packaging weight, which results in more products per shipment, fewer trucks on the road, less energy used, fewer GHG emissions and less material to reuse, recover and/or recycle.

ExxonMobil Chemical is continuing to help the food packaging industry "do more with less." Innovations such as our ExceedTM and EnableTM metallocene polyethylene (mPE) product lines have allowed the average film thickness of high-performance heavy-duty bags to decrease from 200 microns in 1990 to 80 microns today, while providing similar or sometimes better performance. In a peer-reviewed study conducted by ExxonMobil Chemical researchers, heavy-duty sacks used for packaging made with our ExceedTM mPE product use 45 percent less energy, 70 percent less water, weigh half as much and provide more protection to the product as compared with a similar paper sack.

**CC3.3**

**Did you have emissions reduction initiatives that were active within the reporting year (this can include those in the planning and/or implementation phases)**

Yes

**CC3.3a**

**Please identify the total number of projects at each stage of development, and for those in the implementation stages, the estimated CO2e savings**

| Stage of development | Number of projects | Total estimated annual CO2e savings in metric tonnes CO2e (only for rows marked *) |
|---|---|---|
| Under investigation | 9 | 1000000 |
| To be implemented* | 2 | 210000 |
| Implementation commenced* | 0 | 0 |
| Implemented* | 3 | 370000 |
| Not to be implemented | 2 | 300000 |

**CC3.3b**

**For those initiatives implemented in the reporting year, please provide details in the table below**

| Activity type | Description of activity | Estimated annual CO2e savings (metric tonnes CO2e) | Scope | Voluntary/ Mandatory | Annual monetary savings (unit currency - as specified in CC0.4) | Investment required (unit currency - as specified in CC0.4) | Payback period | Estimated lifetime of the initiative | Comment |
|---|---|---|---|---|---|---|---|---|---|
| Energy efficiency: Processes | Energy Efficiency: We use our Global Energy Management System in our Downstream and Chemical businesses and our Production Operations Energy Management System in our Upstream businesses to identify and act on energy savings Opportunities. | | Scope 1 | Voluntary | | | | Ongoing | In 2014, energy used in our operations totaled 1.6 billion gigajoules, which is similar to our 2013 energy usage. Despite an increase in energy intensity in some parts of our business, our focus on efficiency has allowed energy consumption to remain essentially flat over the past five years. Energy consumed in our operations generates more than 80 percent of our direct GHG emissions and is one of our largest operating costs. As such, we have focused on energy efficiency for several decades. |
| Energy efficiency: Processes | Flaring Reduction: Consistent with the Global Gas Flaring Reduction Initiative, of which ExxonMobil is a charter member, and as specified in our Upstream Flaring and Venting Reduction Environmental Standard for Projects, our aim is to avoid routine flaring and venting of natural gas in new projects and reduce flaring in our existing operations flaring in our existing operations. | | Scope 1 | Voluntary | | | | Ongoing | In 2014, flaring volume from our combined Upstream, Downstream and Chemical operations totaled 4.5 million metric tons. This represents an increase of 0.8 million metric tons compared with our 2013 performance. The increase in flaring in 2014 was primarily due to typical startup activities at our new LNG facility in Papua New Guinea, and assuming operatorship of the existing Usan production field in Nigeria, where we previously did not report flaring emissions since we did not operate the field. |

| Activity type | Description of activity | Estimated annual CO2e savings (metric tonnes CO2e) | Scope | Voluntary/ Mandatory | Annual monetary savings (unit currency - as specified in CC0.4) | Investment required (unit currency - as specified in CC0.4) | Payback period | Estimated lifetime of the initiative | Comment |
|---|---|---|---|---|---|---|---|---|---|
| Energy efficiency: Processes | Venting and Fugitive Emissions Reduction: We continue to look for cost-effective ways to reduce methane and other hydrocarbon emissions in our operations, such as replacing high-bleed pneumatic devices with lower-emission technology and conducting green well completions in targeted Upstream operations. | | Scope 1 | Voluntary | | | | Ongoing | While venting and fugitive emissions, most of which are methane, represent less than 5 percent of our GHG emissions, we recognize the importance of reducing these emissions. |
| Energy efficiency: Processes | Cogeneration: We have interests in approximately 5,500 megawatts of cogeneration capacity in more than 100 installations at more than 30 locations around the world. In 2014, we added 250 megawatts of additional capacity at our Kearl and Cold Lake sites in Alberta, Canada, as well as 30 megawatts of additional capacity at our Grossenkneten facility in Germany. Since 2005, we have invested more than $1 billion in cogeneration projects, and we continue to develop additional investment opportunities. | 7000000 | Scope 1 | Voluntary | | | | Ongoing | Through the ongoing incorporation of cogeneration into many of our facilities, ExxonMobil is able to generate power more efficiently than many local utilities. Cogeneration captures heat generated from the production of electricity for use in production, refining and chemical processing operations. Due to its inherent energy efficiency, the use of cogeneration also leads to reduced GHG emissions; our cogeneration facilities alone enable the avoidance of approximately 7 million metric tons per year of GHG emissions. |
| Other | Carbon Capture and Sequestration (CCS) involves capturing, transporting and sequestering CO2 in underground geologic formations such as saline reservoirs, depleted oil or gas reservoirs, or deep coal beds. In the future, CCS will likely be one of several important technologies used to help reduce CO2 emissions, with the greatest opportunity being in the coal- and natural gas-fired power sectors. ExxonMobil has extensive operating experience with the component technologies of carbon capture and sequestration. | 7000000 | Scope 1 | Voluntary | | | | Ongoing | In 2014, ExxonMobil captured 7 million metric tons for sequestration. Our LaBarge plant in Wyoming, which sells CO2 to third parties for enhanced oil recovery, is one of the largest CO2 capture operations in the world. We have also successfully concluded operations at our Controlled Freeze ZoneTM (CFZTM) commercial demonstration unit at LaBarge. The technology is ready for commercial deployment and could provide a more cost-efficient approach to separating CO2 from natural gas, allowing for the CO2 to be geosequestered or used in enhanced oil recovery. |

**CC3.3c**

**What methods do you use to drive investment in emissions reduction activities?**

| Method | Comment |
|---|---|
| Other | Adherence to internal standards and objectives: Our Operations Integrity Management System (OIMS) provides a systematic and disciplined approach to managing safety, security, health, environmental, and social risks. OIMS is consistent with the standard for environmental management systems established by the International Organization for Standardization (ISO14001:2004). Together, our Corporate Environment Policy and OIMS Framework set an expectation that all projects will be developed, constructed, maintained, and operated in compliance with all applicable environmental laws and regulations and with responsible standards where laws and regulations are not adequately protective. Our Protect Tomorrow Today initiative outlines |

| Method | Comment |
|---|---|
| | our expectations for each business to deliver superior environmental performance, drive environmental incidents with real impact to zero, and achieve industry-leading performance in focus areas of importance to each business. Progress toward these goals is managed through our Environmental Business Planning (EBP) process, which integrates environmental improvement into overall business plans and strategies. The businesses use EBP to identify key environmental drivers, set targets in high-priority focus areas, and identify actions to achieve these targets. |
| Internal price of carbon | ExxonMobil addresses the potential for future climate-related controls, including the potential for restriction on emissions, through the use of a proxy cost of carbon. This proxy cost of carbon is embedded in our current Outlook for Energy, and has been a feature of the report for several years. The proxy cost seeks to reflect all types of actions and policies that governments may take over the Outlook period relating to the exploration, development, production, transportation or use of carbon-based fuels. Our proxy cost, which in some areas may approach $80/ton over our Outlook period, is our effort to quantify what we believe government policies could cost to our investment opportunities. Perhaps most importantly, we require that all our business segments include, where appropriate, GHG costs in their economics when seeking funding for capital investments. We require that investment proposals reflect the climate-related policy decisions we anticipate governments making during the Outlook period and therefore incorporate them as a factor in our specific investment decisions. |

**Further Information**

For Question 3.3a, only our cogeneration projects are represented. These projects are developed based on financial return, but also result in significant GHG emission reductions.

## Page: CC4. Communication

**CC4.1**

**Have you published information about your organization's response to climate change and GHG emissions performance for this reporting year in places other than in your CDP response? If so, please attach the publication(s)**

| Publication | Status | Page/Section reference | Attach the document |
|---|---|---|---|
| In mainstream financial reports but have not used the CDSB Framework | Complete | 37 (SAR) | https://www.cdp.net/sites/2015/36/6136/Climate Change 2015/Shared Documents/Attachments/CC4.1/03.19.15_2014_XOM_Summary_Annual_Report_POST-processed.pdf |
| In mainstream financial reports but have not used the CDSB Framework | Complete | 8, 21 (FinStat) | https://www.cdp.net/sites/2015/36/6136/Climate Change 2015/Shared Documents/Attachments/CC4.1/2014 Financials.pdf |
| In mainstream financial reports but have not used the CDSB Framework | Complete | 1, 3, 41, 54 (10k) | https://www.cdp.net/sites/2015/36/6136/Climate Change 2015/Shared Documents/Attachments/CC4.1/xom10k2014.htm |
| In mainstream financial reports but have not used the CDSB Framework | Complete | 2, 3, 33-42, 72-75 (CCR) | https://www.cdp.net/sites/2015/36/6136/Climate Change 2015/Shared Documents/Attachments/CC4.1/2014_CCR_Full_Digital_approved.pdf |
| In mainstream financial reports but have not used the CDSB Framework | Complete | 7, 39-41 (EO) | https://www.cdp.net/sites/2015/36/6136/Climate Change 2015/Shared Documents/Attachments/CC4.1/2015 Outlook for Energy_print resolution.pdf |
| In voluntary communications | Complete | 1-30 | https://www.cdp.net/sites/2015/36/6136/Climate Change 2015/Shared Documents/Attachments/CC4.1/2014_Exxonmobil Report - Energy and Carbon - Managing the Risks.pdf |
| In voluntary communications | Complete | 1-21 | https://www.cdp.net/sites/2015/36/6136/Climate Change 2015/Shared Documents/Attachments/CC4.1/2014_ExxonMobil Report - Energy and Climate.pdf |

**Further Information**

# Module: Risks and Opportunities

## Page: CC5. Climate Change Risks

**CC5.1**

**Have you identified any inherent climate change risks that have the potential to generate a substantive change in your business operations, revenue or expenditure? Tick all that apply**

Risks driven by changes in regulation
Risks driven by changes in physical climate parameters
Risks driven by changes in other climate-related developments

**CC5.1a**

**Please describe your inherent risks that are driven by changes in regulation**

| Risk driver | Description | Potential impact | Timeframe | Direct/ Indirect | Likelihood | Magnitude of impact | Estimated financial implications | Management method | Cost of management |
|---|---|---|---|---|---|---|---|---|---|
| International agreements | The climate policy debate has shifted from a focus primarily on targets to limit near-term emissions to also include consideration of long-term emissions pathways that | Increased operational cost | 1 to 3 years | Direct | Unknown | Unknown | Technological, political, and regulatory risks have been inherent in the oil and gas industry since its earliest beginnings. The uncertainties associated with | ExxonMobil will respond to these uncertainties and developments using our traditional approach: disciplined planning and investment, | Our investments in energy efficiency, cogeneration, developing energy-efficient products, flaring / venting reduction, and production of lower carbon |

| Risk driver | Description | Potential impact | Timeframe | Direct/ Indirect | Likelihood | Magnitude of impact | Estimated financial implications | Management method | Cost of management |
|---|---|---|---|---|---|---|---|---|---|
| | ultimately stabilize GHG concentrations. As well, International and national attention has turned to focus on adaptation as a strategy to mitigate risk. There has been extensive international focus on the costs and benefits of policies to reduce GHG emissions and address the risk of climate change. Throughout the world, national and regional policymakers are considering a variety of legislative and regulatory options to mitigate GHG emissions and to develop capacity to adapt to potential impacts. | | | | | | these regulatory risks impede assessment of potential financial implications. | financial strength, efficient and reliable operations, and research and development. | resources all contribute to preparing for these risks. |
| Carbon taxes | If policy makers choose to address the risks of climate change, ExxonMobil believes that a properly designed, revenue-neutral carbon tax is more effective policy option to impose a cost on carbon to reduce GHG emissions than an emissions Cap and Trade scheme or regulations, mandates and standards. | Increased operational cost | Up to 1 year | Direct | Likely | Unknown | Technological, political, and regulatory risks have been inherent in the oil and gas industry since its earliest beginnings. The uncertainties associated with these regulatory risks impede assessment of potential financial implications. | ExxonMobil will respond to these uncertainties and developments using our traditional approach: disciplined planning and investment, financial strength, efficient and reliable operations, and research and development. | Our investments in energy efficiency, cogeneration, developing energy-efficient products, flaring / venting reduction, and production of lower carbon resources all contribute to preparing for these risks. |
| Cap and trade schemes | Cap-and-trade systems inevitably introduce unnecessary cost and complexity, as well as unpredictable price volatility, as evidenced recently by the EU ETS. It is important to remember that a cap-and-trade system requires a new market infrastructure for traders to trade emissions allowances. | Increased operational cost | Up to 1 year | Direct | Very likely | Unknown | Technological, political, and regulatory risks have been inherent in the oil and gas industry since its earliest beginnings. The uncertainties associated with these regulatory risks impede assessment of potential financial implications. | ExxonMobil will respond to these uncertainties and developments using our traditional approach: disciplined planning and investment, financial strength, efficient and reliable operations, and research and development. | Our investments in energy efficiency, cogeneration, developing energy-efficient products, flaring / venting reduction, and production of lower carbon resources all contribute to preparing for these risks. |
| Emission reporting obligations | Current and pending greenhouse gas regulations may increase our compliance | Increased operational cost | Up to 1 year | Direct | Very likely | Low | Technological, political, and regulatory risks have been inherent in the oil and gas | ExxonMobil will respond to these uncertainties and developments | Our investments in energy efficiency, cogeneration, developing |

| Risk driver | Description | Potential impact | Timeframe | Direct/ Indirect | Likelihood | Magnitude of impact | Estimated financial implications | Management method | Cost of management |
|---|---|---|---|---|---|---|---|---|---|
| | costs, such as monitoring and reporting. These requirements could make our products more expensive and reduce demand for hydrocarbons, as well as shifting hydrocarbon demand toward relatively lower-carbon sources such as natural gas. | | | | | | industry since its earliest beginnings. The uncertainties associated with these regulatory risks impede assessment of potential financial implications. | using our traditional approach: disciplined planning and investment, financial strength, efficient and reliable operations, and research and development. | energy-efficient products, flaring / venting reduction, and production of lower carbon resources all contribute to preparing for these risks. |
| Product efficiency regulations and standards | Efficiency or specific product regulations or standards (e.g. CAFE, LCFS, RPS, RFS), may exceed the technological or economic limitations of specific processes or products thereby increasing costs to consumers or reducing supplies in the marketplace. Standards or mandates generally result in higher cost emission reductions versus establishing a price on emissions and allowing the market to select the solutions. | Increased operational cost | Up to 1 year | Direct | More likely than not | Unknown | Technological, political, and regulatory risks have been inherent in the oil and gas industry since its earliest beginnings. The uncertainties associated with these regulatory risks impede assessment of potential financial implications. | ExxonMobil will respond to these uncertainties and developments using our traditional approach: disciplined planning and investment, financial strength, efficient and reliable operations, and research and development. | Our investments in energy efficiency, cogeneration, developing energy-efficient products, flaring / venting reduction, and production of lower carbon resources all contribute to preparing for these risks. |
| Uncertainty surrounding new regulation | ExxonMobil's financial and operating results are subject to a variety of risks inherent in the global oil and gas business. Many of these risk factors are not within the Company's control and could adversely affect our business, our financial and operating results or our financial condition. Due to concern over the potential risk of climate change, a number of countries have adopted, or are considering the adoption of, regulatory frameworks to reduce greenhouse gas emissions. These include adoption of cap and trade regimes, carbon taxes, increased efficiency | Increased operational cost | Up to 1 year | Direct | More likely than not | Unknown | Technological, political, and regulatory risks have been inherent in the oil and gas industry since its earliest beginnings. The uncertainties associated with these regulatory risks impede assessment of potential financial implications. | ExxonMobil will respond to these uncertainties and developments using our traditional approach: disciplined planning and investment, financial strength, efficient and reliable operations, and research and development. | Our investments in energy efficiency, cogeneration, developing energy-efficient products, flaring / venting reduction, and production of lower carbon resources all contribute to preparing for these risks. |

| Risk driver | Description | Potential impact | Timeframe | Direct/ Indirect | Likelihood | Magnitude of impact | Estimated financial implications | Management method | Cost of management |
|---|---|---|---|---|---|---|---|---|---|
| | standards, and incentives or mandates for renewable energy. These requirements could make our products more expensive and reduce demand for hydrocarbons, as well as shifting hydrocarbon demand toward relatively lower-carbon sources such as natural gas. Current and pending greenhouse gas regulations may also increase our compliance costs, such as monitoring or sequestering emissions. | | | | | | | | |
| General environmental regulations, including planning | Throughout the world, national and regional policymakers are considering a variety of legislative and regulatory options to mitigate GHG emissions and to develop capacity to adapt to potential impacts. Policy options and their overall effect upon the Corporation vary greatly from country to country and are not predictable. These requirements could make our products more expensive and reduce demand for hydrocarbons, as well as shifting hydrocarbon demand toward relatively lower-carbon sources such as natural gas. | Increased operational cost | 1 to 3 years | Direct | More likely than not | Unknown | Technological, political, and regulatory risks have been inherent in the oil and gas industry since its earliest beginnings. The uncertainties associated with these regulatory risks impede assessment of potential financial implications. | ExxonMobil will respond to these uncertainties and developments using our traditional approach: disciplined planning and investment, financial strength, efficient and reliable operations, and research and development. | Our investments in energy efficiency, cogeneration, developing energy-efficient products, flaring / venting reduction, and production of lower carbon resources all contribute to preparing for these risks. |
| Renewable energy regulation | Several jurisdictions have implemented or are considering regulations that require a designated amount of electricity to come from renewable sources. Similarly, several jurisdictions are requiring designated amounts of biofuels in transport fuel, or | Reduced demand for goods/services | Up to 1 year | Direct | Very likely | Unknown | Technological, political, and regulatory risks have been inherent in the oil and gas industry since its earliest beginnings. The uncertainties associated with these regulatory risks impede assessment of potential financial implications. | ExxonMobil will respond to these uncertainties and developments using our traditional approach: disciplined planning and investment, financial strength, efficient and reliable operations, and research and development. | Our investments in energy efficiency, cogeneration, developing energy-efficient products, flaring / venting reduction, and production of lower carbon resources all contribute to preparing for these risks. |

| Risk driver | Description | Potential impact | Timeframe | Direct/ Indirect | Likelihood | Magnitude of impact | Estimated financial implications | Management method | Cost of management |
|---|---|---|---|---|---|---|---|---|---|
| | low carbon fuel standards. Other mechanisms for similar ends are subsidies, feed-in-tariffs, etc. These regulations force higher cost GHG mitigation solutions, thus costing society more for fewer emission reductions. Market-based mechanisms can be far more effective in achieving the greatest emission reductions at the least cost and maintaining a level playing field. When evaluating the benefits of various renewable energy sources, policymakers should ensure full lifecycle analyses are used to evaluate the benefits, including indirect land use change effects. | | | | | | | | |

**CC5.1b**

**Please describe your inherent risks that are driven by change in physical climate parameters**

| Risk driver | Description | Potential impact | Timeframe | Direct/ Indirect | Likelihood | Magnitude of impact | Estimated financial implications | Management method | Cost of management |
|---|---|---|---|---|---|---|---|---|---|
| Uncertainty of physical risks | Current scientific understanding provides limited guidance on the likelihood, magnitude, and timeframe of physical risks such as sea level rise, extreme weather events, temperature extremes, and precipitation. While these potential climate change impacts are slow-evolving, they could impact our operations. There is more uncertainty at the regional or local level versus global averages. In addition to potential production disruptions, these impacts can lead to | Reduction/disruption in production capacity | >6 years | Direct | Unknown | Unknown | ExxonMobil's operations around the world include both onshore and offshore activities that can experience weather extremes and storms, large sea level variations and wave height, and temperature and precipitation extremes. We design, construct and operate our facilities to withstand a variety of extreme weather conditions, including much of the range of potential outcomes. | At ExxonMobil, risks are mitigated with appropriate contingency planning and the application of a comprehensive risk management system. Known risks are mitigated first of all by factoring them into equipment and facility design, construction and operations. Business continuity planning and emergency preparedness are two essential elements to manage risks of business disruption, so that we can continue supplying fuels for transportation and electrical power as well as chemicals | Regular updates to our engineering standards and operating practices incorporate new knowledge on extreme conditions and events, which can impact capital and operating costs. |

| Risk driver | Description | Potential impact | Timeframe | Direct/ Indirect | Likelihood | Magnitude of impact | Estimated financial implications | Management method | Cost of management |
|---|---|---|---|---|---|---|---|---|---|
| | increased costs. | | | | | | | for consumer products. | |

**CC5.1c**
**Please describe your inherent risks that are driven by changes in other climate-related developments**

| Risk driver | Description | Potential impact | Timeframe | Direct/ Indirect | Likelihood | Magnitude of impact | Estimated financial implications | Management method | Cost of management |
|---|---|---|---|---|---|---|---|---|---|
| Reputation | Effective management of business and operational risks, including risks related to greenhouse gas emissions, is essential to promoting and maintaining a good corporate reputation. A reputation for effective, responsible and ethical management, in turn, is an important component of the corporation's dealings with governments, business partners, employees and shareholders. Any lack of effective management can negatively impact reputation. | Other: Increased regulatory, capital and other costs. | >6 years | Direct | Unknown | Unknown | ExxonMobil believes that our ability to consistently deliver strong returns to shareholders is a direct result of our ability to effectively manage risk. Risk cannot be eliminated, but it can be managed. | ExxonMobil manages risk through a capable and committed workforce with clear accountability, well-developed and clearly defined policies and procedures, high standards of design, rigorously applied management systems, employee and contractor training, and a systematic approach to assessing performance that drives continuous improvement. ExxonMobil employs our Operations Integrity Management System (OIMS). OIMS is the cornerstone of our commitment to managing risks to safety, security, health, and the environment. It guides the activities of each of our employees and contractors around the world. OIMS is a rigorous, 11-element system designed to identify hazards and manage risks. It covers: design, construction and maintenance of facilities; preparation of employees and communities for natural disaster or other incidents; and thorough investigations into accidents and safety incidents. | The costs associated with our management systems are not considered to be incremental, but instead inherent costs of running the business. |

**Further Information**

## Page: CC6. Climate Change Opportunities

**CC6.1**
**Have you identified any inherent climate change opportunities that have the potential to generate a substantive change in your business operations, revenue or expenditure? Tick all that apply**

Opportunities driven by changes in regulation
Opportunities driven by changes in other climate-related developments

**CC6.1a**
**Please describe your inherent opportunities that are driven by changes in regulation**

| Opportunity driver | Description | Potential impact | Timeframe | Direct/Indirect | Likelihood | Magnitude of impact | Estimated financial implications | Management method | Cost of management |
|---|---|---|---|---|---|---|---|---|---|
| General environmental regulations, | ExxonMobil's strength in management | Other: Improved competitive position | Up to 1 year | Direct | Unknown | Unknown | Technological, political, and regulatory | ExxonMobil will respond to these | Our investments in energy |

| Opportunity driver | Description | Potential impact | Timeframe | Direct/Indirect | Likelihood | Magnitude of impact | Estimated financial implications | Management method | Cost of management |
|---|---|---|---|---|---|---|---|---|---|
| including planning | systems provides us an ongoing opportunity to comply with emerging regulations in a manner that is more efficient and provides an economic advantage with respect to competitors. Examples include our leadership in energy efficiency through the Global Energy Management System. | | | | | | risks have been inherent in the oil and gas industry since its earliest beginnings. The uncertainties associated with the physical and regulatory risks impede assessment of potential financial implications. | uncertainties and developments using our traditional approach: disciplined planning and investment, risk management, financial strength, efficient and reliable operations, and research and development. | efficiency, cogeneration, developing energy-efficient products, flaring / venting reduction, and production of lower carbon resources all contribute to preparing for these opportunities. |
| Emission reporting obligations | ExxonMobil's strength in management systems provides us an ongoing opportunity to comply with emerging regulations in a manner that is more efficient and provides an economic advantage with respect to competitors. | Other: Improved competitive position | Up to 1 year | Direct | Unknown | Unknown | Technological, political, and regulatory risks have been inherent in the oil and gas industry since its earliest beginnings. The uncertainties associated with the physical and regulatory risks impede assessment of potential financial implications. | ExxonMobil will respond to these uncertainties and developments using our traditional approach: disciplined planning and investment, risk management, financial strength, efficient and reliable operations, and research and development. | Our investments in energy efficiency, cogeneration, developing energy-efficient products, flaring / venting reduction, and production of lower carbon resources all contribute to preparing for these opportunities. |
| Product efficiency regulations and standards | Innovations in the chemicals industry play an important role in meeting the world's energy and environmental challenges. Through lightweight plastics and other products that enable consumers to use energy more efficiently, ExxonMobil is helping reduce emissions associated with energy use. In fact, a recent study – industry-commissioned and independently validated – concluded that for every unit of greenhouse gas (GHG) emitted by the chemical industry during production, more than two | New products/business services | 1 to 3 years | Indirect (Client) | Unknown | Unknown | Technological, political, and regulatory risks have been inherent in the oil and gas industry since its earliest beginnings. The uncertainties associated with the physical and regulatory risks impede assessment of potential financial implications. | ExxonMobil will respond to these uncertainties and developments using our traditional approach: disciplined planning and investment, risk management, financial strength, efficient and reliable operations, and research and development. | Our investments in energy efficiency, cogeneration, developing energy-efficient products, flaring / venting reduction, and production of lower carbon resources all contribute to preparing for these opportunities. |

| Opportunity driver | Description | Potential impact | Timeframe | Direct/Indirect | Likelihood | Magnitude of impact | Estimated financial implications | Management method | Cost of management |
|---|---|---|---|---|---|---|---|---|---|
| | units of GHGs are saved by society through the use of products and technologies enabled by our industry. As a leader in the global petrochemical industry, ExxonMobil is focused on providing value and improving the efficiency of our customers throughout the supply chain. | | | | | | | | |
| Other regulatory drivers | The adoption of climate policies by countries or regions could shift hydrocarbon demand toward relatively lower-carbon sources such as natural gas. ExxonMobil is the largest producer of natural gas in the U.S. and one of the largest in the world. | Increased demand for existing products/services | >6 years | Direct | Likely | Medium-high | Technological, political, and regulatory risks have been inherent in the oil and gas industry since its earliest beginnings. The uncertainties associated with the physical and regulatory risks impede assessment of potential financial implications. | ExxonMobil will respond to these uncertainties and developments using our traditional approach: disciplined planning and investment, risk management, financial strength, efficient and reliable operations, and research and development. | Our investments in energy efficiency, cogeneration, developing energy-efficient products, flaring / venting reduction, and production of lower carbon resources all contribute to preparing for these opportunities. |

**CC6.1c**

**Please describe the inherent opportunities that are driven by changes in other climate-related developments**

| Opportunity driver | Description | Potential impact | Timeframe | Direct/ Indirect | Likelihood | Magnitude of impact | Estimated financial implications | Management method | Cost of management |
|---|---|---|---|---|---|---|---|---|---|
| Reputation | The risk associated with major energy projects and the day-to-day operations we undertake are considerable. The importance of risk management has been brought back into the market spotlight as a variety of sectors in the global economy have experienced significant challenges stemming from the failure to assess and manage risk effectively. ExxonMobil is experienced in managing the financial, technological, market, and operational risks that are | Other: Improved reputation | >6 years | Direct | Unknown | Unknown | Meeting the dual challenge of supplying the world the energy it needs to support economic growth and raise living standards, while minimizing impact on the environment will require new technologies. | To develop new technologies, ExxonMobil was the founding sponsor of the Global Climate and Energy Project (GCEP) at Stanford University. We have since contributed over three-quarters of our $100 million commitment to the program. This pioneering research program is focused on identifying breakthrough energy technologies that reduce GHG emissions and that could be developed on a large scale within a 10-to-50-year timeframe. GCEP has sponsored | ExxonMobil's commitment to invest in technology enables us to develop innovative solutions to improve safety, minimize environmental impact, and maximize resource levels. We have invested approximately $8 billion in research and development during the past 10 years, and almost $2 billion on technologies related to safety and the environment. |

Case 3:20-cv-02995-K Document 1-2 Filed 08/06/19 Page 17 of 121 PageID 206

| Opportunity driver | Description | Potential impact | Timeframe | Direct/ Indirect | Likelihood | Magnitude of impact | Estimated financial implications | Management method | Cost of management |
|---|---|---|---|---|---|---|---|---|---|
| | inherent to our industry. Long-term planning is fundamental to our approach to risk management. Our long-term view also guides our commitment to technology. Technology gives us the confidence in our ability to deliver new solutions, to invest in unconventional resources, and to continue to deliver operational excellence. Technology also enables us to operate with less impact on the environment. | | | | | | | more than 40 research programs in Australia, Europe, Japan, and the United States. In addition, ExxonMobil researchers are active in technology development. | |
| Changing consumer behaviour | Perhaps the most obvious opportunity created by the concern over climate change lies in the enhanced use of natural gas to reduce emissions growth in electric power generation. As the leading private equity holder of gas reserves and a leader in LNG and tight gas technologies, ExxonMobil is well positioned to play a leading role in meeting rising demand for natural gas. Global demand for energy will continue to rise especially in developing countries where about 2.5 billion people who still rely on traditional biomass fuels for heating and cooking. We are well positioned to respond to this opportunity and challenge to develop and utilize efficient and clean energy technologies and products that meet growing demand. | Increased demand for existing products/services | Up to 1 year | Direct | Unknown | Unknown | Meeting the dual challenge of supplying the world the energy it needs to support economic growth and raise living standards, while minimizing impact on the environment will require new technologies. | To develop new technologies, ExxonMobil was the founding sponsor of the Global Climate and Energy Project (GCEP) at Stanford University. We have since contributed over three-quarters of our $100 million commitment to the program. This pioneering research program is focused on identifying breakthrough energy technologies that reduce GHG emissions and that could be developed on a large scale within a 10-to-50-year timeframe. GCEP has sponsored more than 40 research programs in Australia, Europe, Japan, and the United States. In addition, ExxonMobil researchers are active in technology development. | ExxonMobil's commitment to invest in technology enables us to develop innovative solutions to improve safety, minimize environmental impact, and maximize resource levels. We have invested approximately $8 billion in research and development during the past 10 years, and almost $2 billion on technologies related to safety and the environment. |

CC6.1e

**Please explain why you do not consider your company to be exposed to inherent opportunities driven by physical climate parameters that have the potential to generate a substantive change in your business operations, revenue or expenditure**

We view potential changes to physical climate parameters as risks to be managed, similar to multiple other risks we successfully manage.

**Further Information**

## Module: GHG Emissions Accounting, Energy and Fuel Use, and Trading

### Page: CC7. Emissions Methodology

CC7.1

**Please provide your base year and base year emissions (Scopes 1 and 2)**

| Scope | Base year | Base year emissions (metric tonnes CO2e) |
|---|---|---|
| Scope 1 | Sat 01 Jan 2005 - Sat 31 Dec 2005 | 139000000 |
| Scope 2 | Sat 01 Jan 2005 - Sat 31 Dec 2005 | 9000000 |

CC7.2

**Please give the name of the standard, protocol or methodology you have used to collect activity data and calculate Scope 1 and Scope 2 emissions**

| Please select the published methodologies that you use |
|---|
| IPIECA's Petroleum Industry Guidelines for reporting GHG emissions, 2nd edition, 2011 |
| American Petroleum Institute Compendium of Greenhouse Gas Emissions Methodologies for the Oil and Natural Gas Industry, 2009 |

CC7.2a

**If you have selected "Other" in CC7.2 please provide details of the standard, protocol or methodology you have used to collect activity data and calculate Scope 1 and Scope 2 emissions**

CC7.3

**Please give the source for the global warming potentials you have used**

| Gas | Reference |
|---|---|
| CO2 | IPCC Fourth Assessment Report (AR4 - 100 year) |
| CH4 | IPCC Fourth Assessment Report (AR4 - 100 year) |
| Other: N2O | IPCC Fourth Assessment Report (AR4 - 100 year) |

CC7.4

**Please give the emissions factors you have applied and their origin; alternatively, please attach an Excel spreadsheet with this data at the bottom of this page**

| Fuel/Material/Energy | Emission Factor | Unit | Reference |
|---|---|---|---|
| Natural gas | 130.07 | lb CO2e per million BTU | API GHG Compendium, 2009 |
| Refinery gas | 133.82 | | API GHG Compendium, 2009 |
| Petroleum coke | 237.00 | | API GHG Compendium, 2009 |
| Distillate fuel oil No 4 | 176.81 | | API GHG Compendium, 2009 |
| Residual fuel oil | 182.76 | | API GHG Compendium, 2009 |
| Other: Low BTU Gas | 278.00 | | API GHG Compendium, 2009 |

**Further Information**

CC7.4 - The Fuel/Material/Energy categories listed comprise over 95% of our energy sources. Our operations utilize the most accurate emission factors available to them beginning with the API GHG Compendium emission factors, then applying locally regulated emission factors where required, and finally, by applying site specific emission factors, if determined to be more accurate than API.

### Page: CC8. Emissions Data - (1 Jan 2014 - 31 Dec 2014)

CC8.1

**Please select the boundary you are using for your Scope 1 and 2 greenhouse gas inventory**

Equity share

CC8.2

**Please provide your gross global Scope 1 emissions figures in metric tonnes CO2e**

121000000

CC8.3

**Please provide your gross global Scope 2 emissions figures in metric tonnes CO2e**

8000000

**CC8.4**
**Are there are any sources (e.g. facilities, specific GHGs, activities, geographies, etc.) of Scope 1 and Scope 2 emissions that are within your selected reporting boundary which are not included in your disclosure?**

No

**CC8.5**
**Please estimate the level of uncertainty of the total gross global Scope 1 and 2 emissions figures that you have supplied and specify the sources of uncertainty in your data gathering, handling and calculations**

| Scope | Uncertainty range | Main sources of uncertainty | Please expand on the uncertainty in your data |
|---|---|---|---|
| Scope 1 | More than 5% but less than or equal to 10% | Metering/ Measurement Constraints<br>Other: Published Emissions Factors | ExxonMobil has conducted a rigorous analysis of our GHG reporting uncertainty. The study showed that our reported Scope 1 emissions have an uncertainty of 5-10%. The degree of uncertainty varies by type, age, and location of facility. |
| Scope 2 | More than 30% but less than or equal to 40% | Assumptions<br>Other: Unknown due to global power sector variations | ExxonMobil has not undertaken an analysis of Scope 2 uncertainty. However, recent studies on electric power generation grid factor uncertainty, such as the one described in the paper by Christopher Weber, etal from Carnegie Mellon University in 2009, indicate that uncertainty across the U.S. grid CO2 emission factors maybe in the range of 40%. |

**CC8.6**
**Please indicate the verification/assurance status that applies to your reported Scope 1 emissions**

Third party verification or assurance complete

**CC8.6a**
**Please provide further details of the verification/assurance undertaken for your Scope 1 emissions, and attach the relevant statements**

| Type of verification or assurance | Attach the statement | Page/section reference | Relevant standard | Proportion of reported Scope 1 emissions verified (%) |
|---|---|---|---|---|
| Reasonable assurance | https://www.cdp.net/sites/2015/36/6136/Climate Change 2015/Shared Documents/Attachments/CC8.6a/2014 CCR Pages 71-75.pdf | Page 71-75 | ISAE3000 | 100 |

**CC8.7**
**Please indicate the verification/assurance status that applies to your reported Scope 2 emissions**

Third party verification or assurance complete

**CC8.7a**
**Please provide further details of the verification/assurance undertaken for your Scope 2 emissions, and attach the relevant statements**

| Type of verification or assurance | Attach the statement | Page/Section reference | Relevant standard | Proportion of reported Scope 2 emissions verified (%) |
|---|---|---|---|---|
| Reasonable assurance | https://www.cdp.net/sites/2015/36/6136/Climate Change 2015/Shared Documents/Attachments/CC8.7a/2014 CCR Pages 71-75.pdf | Page 71-75 | ISAE3000 | 100 |

**CC8.8**
**Please identify if any data points have been verified as part of the third party verification work undertaken, other than the verification of emissions figures reported in CC8.6, CC8.7 and CC14.2**

| Additional data points verified | Comment |
|---|---|
| No additional data verified | |

**CC8.9**
**Are carbon dioxide emissions from biologically sequestered carbon relevant to your organization?**

No

**Further Information**

CC8.2: ~6 percent of ExxonMobil's Scope 1 emissions (7 million metric tonnes) are associated with electricity generated in company owned power plants or cogeneration facilities that is exported to others. Therefore, from a net emissions perspective, ExxonMobil's Scope 1 + Scope 2 emissions (less the Scope 1 emissions associated with export power) = 121 + 8 -7 = 122 million metric tonnes. We believe net emissions are a more appropriate measure of a company's or facility's GHG emissions performance. Net emissions are reported in our Corporate Citizenship Report.

## Page: CC9. Scope 1 Emissions Breakdown - (1 Jan 2014 - 31 Dec 2014)

**CC9.1**
**Do you have Scope 1 emissions sources in more than one country?**

Yes

**CC9.1a**
**Please break down your total gross global Scope 1 emissions by country/region**

| Country/Region | Scope 1 metric tonnes CO2e |
|---|---|
| Americas | 62000000 |
| Europe, Middle East and Africa (EMEA) | 41000000 |
| Asia Pacific (or JAPA) | 18000000 |

**CC9.2**
**Please indicate which other Scope 1 emissions breakdowns you are able to provide (tick all that apply)**

By business division
By GHG type

**CC9.2a**
**Please break down your total gross global Scope 1 emissions by business division**

| Business division | Scope 1 emissions (metric tonnes CO2e) |
|---|---|
| Upstream | 57000000 |
| Downstream | 45000000 |
| Chemicals | 19000000 |

**CC9.2c**
**Please break down your total gross global Scope 1 emissions by GHG type**

| GHG type | Scope 1 emissions (metric tonnes CO2e) |
|---|---|
| CO2 | 114000000 |
| CH4 | 6000000 |
| Other: Other GHG Combined | 1000000 |

**Further Information**

## Page: CC10. Scope 2 Emissions Breakdown - (1 Jan 2014 - 31 Dec 2014)

**CC10.1**
**Do you have Scope 2 emissions sources in more than one country?**

Yes

**CC10.1a**
**Please break down your total gross global Scope 2 emissions and energy consumption by country/region**

| Country/Region | Scope 2 metric tonnes CO2e | Purchased and consumed electricity, heat, steam or cooling (MWh) | Purchased and consumed low carbon electricity, heat, steam or cooling accounted for in CC8.3 (MWh) |
|---|---|---|---|
| Americas | 5000000 | 19400000 | 0 |
| Europe, the Middle East, Africa and Russia (EMEAR) | 2000000 | 21200000 | 0 |
| Asia Pacific (or JAPA) | 1000000 | 2600000 | 0 |

**CC10.2**
**Please indicate which other Scope 2 emissions breakdowns you are able to provide (tick all that apply)**

By business division

**CC10.2a**
**Please break down your total gross global Scope 2 emissions by business division**

| Business division | Scope 2 emissions (metric tonnes CO2e) |
|---|---|
| Upstream | 3000000 |
| Downstream | 2000000 |
| Chemicals | 3000000 |

**Further Information**

## Page: CC11. Energy

**CC11.1**
**What percentage of your total operational spend in the reporting year was on energy?**

More than 20% but less than or equal to 25%

**CC11.2**
**Please state how much fuel, electricity, heat, steam, and cooling in MWh your organization has purchased and consumed during the reporting year**

| Energy type | MWh |
|---|---|
| Fuel | 333000000 |

| Energy type | MWh |
|---|---|
| Electricity | 67000000 |
| Heat | |
| Steam | |
| Cooling | |

**CC11.3**
**Please complete the table by breaking down the total "Fuel" figure entered above by fuel type**

| Fuels | MWh |
|---|---|
| Other: Blended mix of own produced and purchased fuel | 333000000 |

**CC11.4**
**Please provide details of the electricity, heat, steam or cooling amounts that were accounted at a low carbon emission factor in the Scope 2 figure reported in CC8.3**

| Basis for applying a low carbon emission factor | MWh associated with low carbon electricity, heat, steam or cooling | Comment |
|---|---|---|
| No purchases or generation of low carbon electricity, heat, steam or cooling accounted with a low carbon emissions factor | 0 | |

**Further Information**

## Page: CC12. Emissions Performance

**CC12.1**
**How do your gross global emissions (Scope 1 and 2 combined) for the reporting year compare to the previous year?**

Decreased

**CC12.1a**
**Please identify the reasons for any change in your gross global emissions (Scope 1 and 2 combined) and for each of them specify how your emissions compare to the previous year**

| Reason | Emissions value (percentage) | Direction of change | Comment |
|---|---|---|---|
| Emissions reduction activities | 2 | Decrease | Improved energy efficiency through projects and operational optimizations in our Refining and Chemicals businesses. Last year 3,000,000 tCO2e were reduced by our emissions reduction activities, and our total S1 and S2 emissions in the previous year was 148,000,000 tCO2e, therefore we arrived at 2% through (3,000,000/148,000,000)*100= 2% |
| Divestment | 7 | Decrease | Partial year effect of divestment of Hong Kong Power interest and divestment of remaining Japanese refining interest |
| Acquisitions | 0 | No change | |
| Mergers | 0 | No change | |
| Change in output | 0 | No change | |
| Change in methodology | 5 | Decrease | Change reflects removal of inter-company transfers of power; previously reflected as scope 2 emissions |
| Change in boundary | 0 | No change | Assuming operatorship of the existing Usan production field in Nigeria and startup activities at our new LNG facility in Papua New Guinea, offset by emissions improvements in other operations |
| Change in physical operating conditions | 0 | No change | |
| Unidentified | 0 | No change | |
| Other | 1 | Increase | Mix of upstream production resources more energy-intensive |

**CC12.2**
**Please describe your gross global combined Scope 1 and 2 emissions for the reporting year in metric tonnes CO2e per unit currency total revenue**

| Intensity figure | Metric numerator | Metric denominator | % change from previous year | Direction of change from previous year | Reason for change |
|---|---|---|---|---|---|
| .00031 | metric tonnes CO2e | unit total revenue | 7 | Decrease | Reported emissions decreased by 13% while revenue decreased by 6%. Revenue can vary significantly with the cyclic nature of the oil and gas industry. Emissions/Revenue is not a useful intensity measure for our industry. |

**CC12.3**
**Please describe your gross global combined Scope 1 and 2 emissions for the reporting year in metric tonnes CO2e per full time equivalent (FTE) employee**

| Intensity figure | Metric numerator | Metric denominator | % change from previous year | Direction of change from previous year | Reason for change |
|---|---|---|---|---|---|
| 1713 | metric tonnes CO2e | FTE employee | 13 | Decrease | Reported emissions decreased by 13% while headcount increased by 0.4%. The oil and gas industry is a capital intensive industry rather than a labor intensive industry. Emissions/FTE is not a useful intensity measure for our industry. |

**CC12.4**
**Please provide an additional intensity (normalized) metric that is appropriate to your business operations**

| Intensity figure | Metric numerator | Metric denominator | % change from previous year | Direction of change from previous year | Reason for change |
|---|---|---|---|---|---|
| .191 | metric tonnes CO2e | metric tonne of product | 3 | Decrease | REFINING: Improved energy efficiency through projects and operational optimizations |
| .535 | metric tonnes CO2e | metric tonne of product | 6 | Decrease | CHEMICAL: Improved energy optimization from Singapore plants and Increased cogeneration utilization |
| .230 | metric tonnes CO2e | | 3 | Increase | UPSTREAM: Energy-intensity of new developments to meet energy demand largely offset by reduction in existing operations base due to asset-level stewardship against goals |

**Further Information**

Normalization factors facilitate a level of comparison over time among similar business operations within the company. We believe that measuring GHG intensity in this way (metric tons of CO2-e per unit production volume or throughput) is a more useful measure for our industry than normalization per US$ total revenue or employee FTEs. It does however significantly oversimplify the drivers of emissions, which, for example in the case of refining, include the complexity of the refinery, how much processing is done between the input crude and the finished slate of products (which can vary widely between facilities). In addition, we use net (Scope 1 + Scope 2 - Exports) in the numerator. We believe net emissions is a more appropriate measure of a company's or facility's GHG emissions performance as it fully comprehends trade-offs between steam and power choices and fully reflects the benefits of increased cogeneration. Net emissions are reported in our Corporate Citizenship Report.

## Page: CC13. Emissions Trading

**CC13.1**
**Do you participate in any emissions trading schemes?**

Yes

**CC13.1a**
**Please complete the following table for each of the emission trading schemes in which you participate**

| Scheme name | Period for which data is supplied | Allowances allocated | Allowances purchased | Verified emissions in metric tonnes CO2e | Details of ownership |
|---|---|---|---|---|---|
| European Union ETS | Wed 01 Jan 2014 - Wed 31 Dec 2014 | 14081000 | 2837000 | 17195000 | Facilities we own and operate |
| California's Greenhouse Gas Cap and Trade Program | Wed 01 Jan 2014 - Wed 31 Dec 2014 | 2302000 | 1028000 | 3023000 | Facilities we own and operate |
| New Zealand ETS | Wed 01 Jan 2014 - Wed 31 Dec 2014 | 0 | 1725000 | 4037000 | Other: Products Sold |

**CC13.1b**
**What is your strategy for complying with the schemes in which you participate or anticipate participating?**

ExxonMobil's strategy is to manage compliance obligations of our regulated facilities through comprehensive measurement and reporting, ongoing assessment and implementation of cost effective energy efficiency and environmental improvements and ratable purchase and sale of allowances. ExxonMobil has traded allowances in regulated emissions trading schemes when cost-effective for compliance and expects to continue to do so in the future.

We comply with all applicable laws and regulations, including the existing programs in the European Union, New Zealand, California.

**CC13.2**
**Has your organization originated any project-based carbon credits or purchased any within the reporting period?**

Yes

**CC13.2a**
**Please provide details on the project-based carbon credits originated or purchased by your organization in the reporting period**

| Credit origination or credit purchase | Project type | Project identification | Verified to which standard | Number of credits (metric tonnes of CO2e) | Number of credits (metric tonnes CO2e): Risk adjusted volume | Credits cancelled | Purpose, e.g. compliance |
|---|---|---|---|---|---|---|---|
| Credit Purchase | Other: Various wind, biogas, fuel switching projects | UNFCCC Reference Number: 325, 425, 426, 431, 668, 689, 799, 812, 842, 845, 1116, 1228, 1293, 1307, 1320, 1729, 1833, 1859, 1896, 1898, 1960, 2088, 2118, 2215, 2382, 2383, 2396, 2441, 2744, 2744, 2777, 2811, 2827, 2829, 2831, 3092, 3107, 3153, 3241, 3251, 3470, 3529, 3569, 3624, 3688, 3736, 3965, 4004, 4172, 4178, 4734, 4784, 5211, 5233, 5235, 5491, 5587 | CDM (Clean Development Mechanism) | 2777000 | 2777000 | No | Compliance |

**Further Information**

## Page: CC14. Scope 3 Emissions

**CC14.1**
**Please account for your organization's Scope 3 emissions, disclosing and explaining any exclusions**

| Sources of Scope 3 emissions | Evaluation status | metric tonnes CO2e | Emissions calculation methodology | Percentage of emissions calculated using data obtained from suppliers or value chain partners | Explanation |
|---|---|---|---|---|---|
| Purchased goods and services | | | | | |
| Capital goods | | | | | |
| Fuel-and-energy-related activities (not included in Scope 1 or 2) | | | | | |
| Upstream transportation and distribution | | | | | |
| Waste generated in operations | | | | | |
| Business travel | | | | | |
| Employee commuting | | | | | |
| Upstream leased assets | | | | | |
| Downstream transportation and distribution | | | | | |
| Processing of sold products | | | | | |
| Use of sold products | Relevant, calculated | 291760000 | New Zealand GHG Regulation & U.S. EPA GHG Mandatory Reporting Rule | 0.00% | NOTE: THIS IS NOT TOTAL CORPORATION DATA. ONLY NEW ZEALAND & U.S. SCOPE 3 SUBMITTED UNDER REGULATORY REPORTING REQUIREMENT. According to the International Energy Agency, approximately 90 percent of petroleum-related GHG emissions are generated when customers use our products and the remaining 10 percent are generated by industry operations. |
| End of life treatment of sold products | | | | | |
| Downstream leased assets | | | | | |
| Franchises | | | | | |
| Investments | | | | | |
| Other (upstream) | | | | | |
| Other (downstream) | | | | | |

**CC14.2**
**Please indicate the verification/assurance status that applies to your reported Scope 3 emissions**

Third party verification or assurance underway for the reporting year but not yet complete - last year's statement attached

**CC14.2a**
**Please provide further details of the verification/assurance undertaken, and attach the relevant statements**

| Type of verification or assurance | Attach the statement | Page/Section reference | Relevant standard | Proportion of Scope 3 emissions verified (%) |
|---|---|---|---|---|
| Third party verification/assurance underway | https://www.cdp.net/sites/2015/36/6136/Climate Change 2015/Shared Documents/Attachments/CC14.2a/ALG GHG Verification Report - ExxonMobil Fuel Supplier 2013 with Attachments (1).pdf | 1-89 | Other: California ARB | |

**CC14.3**
**Are you able to compare your Scope 3 emissions for the reporting year with those for the previous year for any sources?**

Yes

**CC14.3a**
**Please identify the reasons for any change in your Scope 3 emissions and for each of them specify how your emissions compare to the previous year**

| Sources of Scope 3 emissions | Reason for change | Emissions value (percentage) | Direction of change | Comment |
|---|---|---|---|---|
| Processing of sold products | Change in output | 0.4 | Decrease | Lower refinery throughput and product sales |

CC14.4

**Do you engage with any of the elements of your value chain on GHG emissions and climate change strategies? (Tick all that apply)**

Yes, our suppliers
Yes, our customers

CC14.4a

**Please give details of methods of engagement, your strategy for prioritizing engagements and measures of success**

In our oil & gas operations, the vast majority of our emissions are not in our supply chain, and therefore we choose to focus our GHG reduction efforts on our own internal operations vs suppliers and customers. In our lubricants and chemical businesses, we focus our efforts on customers that can benefit from the energy-saving/GHG reducing properties of our chemical and lubricant products.

CC14.4b

**To give a sense of scale of this engagement, please give the number of suppliers with whom you are engaging and the proportion of your total spend that they represent**

| Number of suppliers | % of total spend | Comment |
|---|---|---|

CC14.4c

**If you have data on your suppliers' GHG emissions and climate change strategies, please explain how you make use of that data**

| How you make use of the data | Please give details |
|---|---|

Further Information

According to the International Energy Agency, approximately 90 percent of petroleum-related GHG emissions are generated when customers use our products and the remaining 10 percent are generated by industry operations. Only Scope 3 emissions that have been reported under mandatory reporting regulations where consistent definitions are assured are included in this submission. U.S. EPA Scope 3 reporting rules include products that go into non-emissive uses such as asphalt and plastics. We report here consistent with those EPA reporting rules.

## Module: Sign Off

### Page: CC15. Sign Off

CC15.1

**Please provide the following information for the person that has signed off (approved) your CDP climate change response**

| Name | Job title | Corresponding job category |
|---|---|---|
| Mr. Rex W. Tillerson | Chairman of the Board and Chief Executive Officer Exxon Mobil Corporation | Board chairman |

Further Information

## Module: Oil & Gas

### Page: OG0. Reference information

OG0.1

**Please identify the significant petroleum industry components of your business within your reporting boundary (select all that apply)**

Exploration, production & gas processing
Storage, transportation & distribution
Specialty operations
Refining
Retail & marketing

Further Information

### Page: OG1. Production & reserves by hydrocarbon type - (1 Jan 2014 - 31 Dec 2014)

OG1.1

**Is your organization involved with oil & gas production or reserves?**

Yes

OG1.2

**Please provide values for annual production by hydrocarbon type (in units of BOE) for the reporting year in the following table. The values required are aggregate values for the reporting organization. The values required for the next reporting year are forward-looking estimates**

| Product | Production (BOE) - Reporting year | Production (BOE) - Next reporting year estimate |
|---|---|---|
| Natural gas condensate<br>Natural gas liquids (NGL)<br>Liquefied Petroleum Gas (LPG)<br>Light oil<br>Medium oil<br>Heavy oil | 770515000 | |

| Product | Production (BOE) - Reporting year | Production (BOE) - Next reporting year estimate |
|---|---|---|
| Extraheavy oil<br>Bitumen (oil sands)<br>Shale oil<br>Synthetic oil<br>Tight oil | | |
| Conventional non-associated natural gas<br>Associated natural gas<br>Shale gas<br>Tight gas | 677987000 | |

**OG1.3**

**Please provide values for reserves by hydrocarbon type (in units of BOE) for the reporting year. Please indicate if the figures are for reserves that are proved, probable or both proved and probable. The values required are aggregate values for the reporting organization**

| Product | Country/region | Reserves (BOE) | Date of assessment | Proved/Probable/Proved+Probable |
|---|---|---|---|---|
| Natural gas condensate<br>Natural gas liquids (NGL)<br>Light oil<br>Medium oil<br>Heavy oil<br>Extraheavy oil<br>Shale oil<br>Tight oil | Rest of world | 8946000000 | Wed 31 Dec 2014 | Proved |
| Bitumen (oil sands)<br>Synthetic oil | Rest of world | 4767000000 | Wed 31 Dec 2014 | |
| Conventional non-associated natural gas<br>Associated natural gas<br>Shale gas<br>Tight gas | Rest of world | 11556000000 | Wed 31 Dec 2014 | |

**OG1.4**

**Please explain which listing requirements or other methodologies you have used to provide reserves data in OG1.3. If your organization cannot provide data due to legal restrictions on reporting reserves figures in certain countries, please explain this**

Proved reserves in this submission are based on current SEC definitions.

**OG1.5**

**Please provide the average breakeven cost of current production used in estimation of proven reserves**

| Hydrocarbon/project | Breakeven cost/BOE | Comment |
|---|---|---|

**OG1.6**

**In your economic assessment of hydrocarbon reserves and resources, do you conduct scenario analysis consistent with global developments to avoid dangerous climate change by reducing GHG emissions?**

Yes, other

**OG1.6a**

**Please describe your analysis and the implications for your capital expenditure plans**

ExxonMobil believes producing our existing hydrocarbon reserves is essential to meeting growing global energy demand. We enable consumers — especially those in the least-developed and most-vulnerable economies — to pursue higher living standards and greater economic opportunity. We believe all economic energy sources will be necessary to meet growing demand, and the transition of the energy system to lower carbon sources will take many decades due to its enormous scale, capital intensity and complexity. As such, we believe that none of our proven hydrocarbon reserves are, or will become, stranded.

ExxonMobil makes long-term investment decisions based in part on our comprehensive annual analysis that underpins our global Outlook for Energy. We project an energy-related CO2 emissions profile through 2040. This can be compared with the energy-related CO2 emissions profiles from various scenarios outlined by the IPCC. When we do this, our Outlook emissions profile would closely approximate the IPCC’s intermediate Representative Concentration Pathways 4.5 emissions profile in shape, but is slightly under it in magnitude.

We address the potential for future climate change policy, including the potential for restrictions on emissions, by estimating a proxy cost of carbon. This cost, which in some geographies may approach $80 per ton by 2040, has been included in our Outlook for several years. This approach seeks to reflect potential policies governments may employ related to the exploration, development, production, transportation or use of carbon-based fuels. We believe our view on the potential for future policy action is realistic and, by no means represents a “business as usual” case. We require all of our business lines to include, where appropriate, an estimate of GHG-related emissions costs in their economics when seeking funding for capital investments.

We evaluate potential investments and projects using a wide range of economic conditions and commodity prices. We apply prudent and substantial margins in our planning assumptions to help ensure competitive returns over a wide range of market conditions. We also financially “stress test” our investment opportunities, which provides an added margin against uncertainties, such as those related to technology development, costs, geopolitics, availability of required materials, services and labor. Stress testing, which differs from alternative scenario planning, further enables us to consider a wide range of market environments in our planning and investment process.

**Further Information**

Anti-trust laws in the United States and other jurisdictions require that companies avoid providing information about levels of future business activity which could be competitively sensitive; therefore, data has not been provided for future years.

## Page: OG2. Emissions by segment in the O&G value chain - (1 Jan 2014 - 31 Dec 2014)

**OG2.1**

**Please indicate the consolidation basis (financial control, operational control, equity share) used to report the Scope 1 and Scope 2 emissions by segment in the O&G value chain. Further information can be provided in the text box in OG2.2**

| Segment | Consolidation basis for reporting Scope 1 emissions | Consolidation basis for reporting Scope 2 emissions |
|---|---|---|
| Exploration, production & gas processing | Equity Share | Equity Share |
| Refining | Equity Share | Equity Share |
| Specialty operations | Equity Share | Equity Share |

**OG2.2**

**Please provide clarification for cases in which different consolidation bases have been used and the level/focus of disclosure. For example, a reporting organization whose business is solely in storage, transportation and distribution (STD) may use the text box to explain why only the STD row has been completed**

ExxonMobil consolidates GHG emissions information by business unit (Upstream, Downstream and Chemicals) for the oil and gas sectors with the specific activities of storage, transportation and distribution integrated into the respective business unit. Therefore, our submission includes upstream activities listed under "Exploration, production & gas processing" , Downstream activities listed under "refining" and chemicals activities under “Specialty operations”.

**OG2.3**

**Please provide masses of gross Scope 1 GHG emissions in units of metric tonnes CO2e for the organization’s owned/controlled operations by value chain segment. The values required for the next reporting year are forward-looking estimates**

| Segment | Gross Scope 1 emissions (metric tonnes CO2e) - Reporting year | Gross Scope 1 emissions (metric tonnes CO2e) - Next reporting year estimate |
|---|---|---|
| Exploration, production & gas processing | 57000000 | |
| Refining | 45000000 | |
| Specialty operations | 19000000 | |

**OG2.4**

**Please provide masses of gross Scope 2 GHG emissions in units of metric tonnes CO2e for the organization’s owned/controlled operations by value chain segment. The values required for the next reporting year are forward-looking estimates**

| Segment | Gross Scope 2 emissions (metric tonnes CO2e) – Reporting year | Gross Scope 2 emissions (metric tonnes CO2e) – Next reporting year estimate |
|---|---|---|
| Exploration, production & gas processing | 3000000 | |
| Refining | 2000000 | |
| Specialty operations | 3000000 | |

**Further Information**

Anti-trust laws in the United States and other jurisdictions require that companies avoid providing information about levels of future business activity which could be competitively sensitive; therefore, data has not been provided for future years.

## Page: OG3. Scope 1 emissions by emissions category - (1 Jan 2014 - 31 Dec 2014)

**OG3.1**

**Please confirm the consolidation basis (financial control, operational control, equity share) used to report Scope 1 emissions by emissions category**

| Segment | Consolidation basis for reporting Scope 1 emissions by emissions category |
|---|---|
| Exploration, production & gas processing | Equity Share |
| Refining | Equity Share |
| Specialty operations | Equity Share |

**OG3.2**

**Please provide clarification for cases in which different consolidation bases have been used to report by emissions categories (combustion, flaring, process emissions, vented emissions, fugitive emissions) in the various segments**

Equity share is applied for our GHG emissions; no further clarification required.

**OG3.3**

**Please provide masses of gross Scope 1 GHG emissions released into the atmosphere in units of metric tonnes CO2e for the whole organization broken down by emissions categories: combustion, flaring, process emissions, vented emissions, fugitive emissions. The values required for the next reporting year are forward-looking estimates**

| Category | Gross Scope 1 emissions (metric tonnes CO2e) – Reporting year | Gross Scope 1 emissions (metric tonnes CO2e) – Next reporting year estimate |
|---|---|---|
| Combustion | 114000000 | |
| Flaring | | |
| Process emissions | | |
| Vented emissions | | |

| Category | Gross Scope 1 emissions (metric tonnes CO2e) – Reporting year | Gross Scope 1 emissions (metric tonnes CO2e) – Next reporting year estimate |
|---|---|---|
| Fugitive emissions | 6000000 | |

**Further Information**

Anti-trust laws in the United States and other jurisdictions require that companies avoid providing information about levels of future business activity which could be competitively sensitive; therefore, data has not been provided for future years.

## Page: OG4. Transfers & sequestration of CO2 emissions - (1 Jan 2014 - 31 Dec 2014)

OG4.1
**Is your organization involved in the transfer or sequestration of CO2?**

Yes

OG4.2
**Please indicate the consolidation basis (financial control, operational control, equity share) used to report transfers and sequestration of CO2 emissions**

| Activity | Consolidation basis |
|---|---|
| Transfers | Equity Share |
| Sequestration of CO2 emissions | Equity Share |

OG4.3
**Please provide clarification for cases in which different consolidation bases have been used (e.g. for a given activity, capture, injection or storage pathway)**

Equity share is applied for our GHG emissions; no further clarification required.

OG4.4
**Using the units of metric tonnes of CO2, please provide gross masses of CO2 transferred in and out of the reporting organization (as defined by the consolidation basis). Please note that questions of ownership of the CO2 are addressed in OG4.6**

| Transfer direction | CO2 transferred – Reporting year |
|---|---|
| CO2 transferred in | 0 |
| CO2 transferred out | 13300000 |

OG4.5
**Please provide clarification on whether any oil reservoirs and/or sequestration system (geological or oceanic) have been included within the boundary of the reporting organization. Provide details, including degrees to which reservoirs are shared with other entities**

Saline reservoir for CO2 injection from Sleipner field in Norway is included within our boundary in this report. We have a 32% equity interest in Sleipner, which is operated by Statoil. Our equity share of oil reservoirs in Texas and New Mexico where CO2 is injected for Enhanced Oil Recovery (EOR) is included within our boundary. Also included within our boundary is the acid gas injection well at our Labarge, Wyoming facility where we are the 100% owner and operator.
CO2 transferred noted in Question OG4.4 represents CO2 purchased from 3rd parties to use in our own EOR operations. The 3rd party source is not included within our boundary, but our EOR operations are. CO2 transferred out in Question OG4.4 represents CO2 from our facilities that is sold to others, primarily for Enhanced Oil Recovery (EOR). Their EOR storage is not included within our boundary in this report.

OG4.6
**Please explain who (e.g. the reporting organization) owns the transferred emissions and what potential liabilities are attached. In the case of sequestered emissions, please clarify whether the reporting organization or one or more third parties owns the sequestered emissions and who has potential liability for them**

The CO2 that is sold (transferred out) from our facilities and any associated responsibilities are owned by the purchasers. We retain our 32% equity ownership of the CO2 sequestered at Sleipner and 100% ownership of the CO2 sequestered via acid gas injection at Labarge, as well as our varying equity interests in the Texas and New Mexico EOR fields.

OG4.7
**Please provide masses in metric tonnes of gross CO2 captured for purposes of carbon capture and sequestration (CCS) during the reporting year according to capture pathway. For each pathway, please provide a breakdown of the percentage of the gross captured CO2 that was transferred into the reporting organization and the percentage that was transferred out of the organization (to be stored)**

| Capture pathway in CCS | Captured CO2 (metric tonnes CO2) | Percentage transferred in | Percentage transferred out |
|---|---|---|---|
| Gas stream separation from natural gas purification | 7000000 | 8% | 92% |

OG4.8
**Please provide masses in metric tonnes of gross CO2 injected and stored for purposes of CCS during the reporting year according to injection and storage pathway**

| Injection and storage pathway | Injected CO2 (metric tonnes CO2) | Percentage of injected CO2 intended for long-term (>100 year) storage | Year in which injection began | Cumulative CO2 injected and stored (metric tonnes CO2) |
|---|---|---|---|---|
| | 212000 | 100% | 1996 | 4900000 |

| Injection and storage pathway | Injected CO2 (metric tonnes CO2) | Percentage of injected CO2 intended for long-term (>100 year) storage | Year in which injection began | Cumulative CO2 injected and stored (metric tonnes CO2) |
|---|---|---|---|---|
| CO2 injected into a geological formation or saline formation for long-term storage | | | | |
| Acid gas injection (CO2 and H2S co-injected into a production reservoir) | 382000 | 100% | 2005 | 2900000 |
| CO2 used for enhanced oil recovery (EOR) or enhanced gas recovery (EGR) | 2171000 | 100% | 1980 | |

OG4.9

**Please provide details of risk management performed by the reporting organization and/or third party in relation to its CCS activities. This should cover pre-operational evaluation of the storage (e.g. site characterisation), operational monitoring, closure monitoring, remediation for CO2 leakage, and results of third party verification**

Our Operations Integrity Management System (OIMS) is the cornerstone to managing the safety, security, health and environmental risks in our operations and achieving excellence in performance. As such, OIMS is rigorously applied in our CCS activities. The Sleipner project involved extensive storage site characterization prior to injection. Operational monitoring is extensive using 2-D, 3-D and 4-D seismic, time-lapse, and gravity monitoring. Monitoring has been and continues to be supported by various consortia including SACS, CO2STORE and CO2REMOVE, and the results are shared broadly to promote learning, and advance technology and best practices. Extensive dispersion modeling and reservoir characterization was used to select the injection site for the Labarge, Wyoming acid gas injection facilities. Rigorous state agency permitting requirements were met. Extensive pressure monitoring and continuous air monitoring with alarms have been applied throughout the operation. Comprehensive personnel training has been applied and refresher training is on-going. Rigorous mechanical integrity testing is conducted annually.

Further Information

## Page: OG5. Sales and emissions intensity - (1 Jan 2014 - 31 Dec 2014)

OG5.1

**Please provide values for annual sales of the hydrocarbon types (in units of BOE) for the years given in the following table. The values required are aggregate values for the reporting organization. The values for the next reporting year are forward-looking estimates**

| Product | Sales (BOE) - Reporting year | Sales (BOE) - Next reporting year estimate |
|---|---|---|
| Refined products | 2140000000 | |
| Other: Natural Gas Available for Sale | 677000000 | |

OG5.2

**Please provide estimated emissions (Scope 1 + Scope 2) intensities for the a) exploration, production and gas processing, b) storage, transportation and distribution, and c) refining associated with current production and operations**

| Year ending | Emissions intensity: exploration, production & gas processing (metric tonnes CO2e per thousand BOE) | Emissions intensity: storage, transportation & distribution (metric tonnes CO2e per thousand BOE) | Emissions intensity: refining (metric tonnes CO2e per thousand BOE) |
|---|---|---|---|
| 2009 | 20.1 | | 21.0 |
| 2010 | 20.5 | | 20.8 |
| 2011 | 20.7 | | 20.1 |
| 2012 | 22.3 | | 19.5 |
| 2013 | 22.4 | | 19.7 |
| 2014 | 23.0 | | 19.1 |

OG5.3

**Please clarify how each of the emissions intensities has been derived and supply information on the methodology used where this differs from information already given in answer to the methodology questions in the main information request**

Emissions intensities are based on greenhouse gas emissions (net equity, CO2-equivalent emissions) normalized to 100 metric tons of throughput (Refining) or production (Upstream)

Further Information

Anti-trust laws in the United States and other jurisdictions require that companies avoid providing information about levels of future business activity which could be competitively sensitive, therefore, data has not been provided for future years

## Page: OG6. Development strategy - (1 Jan 2014 - 31 Dec 2014)

OG6.1

**For each relevant strategic development area, please provide financial information for the reporting year**

| Strategic development area | Describe how this relates to your business strategy | Sales generated | EBITDA | Net assets | CAPEX | OPEX | Comment |
|---|---|---|---|---|---|---|---|

OG6.2

**Please describe your future capital expenditure plans for different strategic development areas**

| Strategic development area | CAPEX | Total return expected from CAPEX investments | Comment |
|---|---|---|---|

OG6.3

**Please describe your current expenses in research and development (R&D) and future R&D expenditure plans for different strategic development areas**

| Strategic development area | R&D expenses – Reporting year | R&D expenses – Future plans | Comment |
|---|---|---|---|

**Further Information**

ExxonMobil addresses the risk of climate change in several concrete and meaningful ways. We do so by improving energy efficiency and reducing emissions at our operations, and by enabling consumers to use energy more efficiently through the advanced products we manufacture. In addition, we conduct and support extensive research and development in new technologies that promote efficiency and reduce emissions. In our operations, we apply a constant focus on efficiency that enables us to produce energy to meet society's needs using fewer resources and at a lower cost. For example, ExxonMobil is a leader in cogeneration at our facilities, with equity ownership in more than 100 cogeneration units at more than 30 sites with over 5500 megawatts of capacity. This capacity, which is equivalent to the electricity needs of approximately 2.5 million U.S. households, reduces the burden on outside power and grid suppliers and can reduce the resulting emissions by powering ExxonMobil's operations in a more efficient and effective manner. We also constantly strive to reduce the emission intensity of our operations. Cumulative savings between 2005 and 2014 were 21.5 million metric tons (net equity) of CO2e from ExxonMobil actions, including flare reduction, cogeneration and energy efficiency. Many of ExxonMobil's products also enable consumers to be more energy efficient and therefore reduce greenhouse gas emissions. Advancements in tire liner technology developed by ExxonMobil allow drivers to save fuel. Our synthetic lubricants also improve vehicle engine efficiency. And lighter weight plastics developed by ExxonMobil reduce vehicle weights, further contributing to better fuel efficiency. ExxonMobil is also the largest producer of natural gas in the United States, a fuel with a variety of consumer uses, including heating, cooking and electricity generation. Natural gas emits up to 60 percent less CO2 than coal when used as the source for power generation. Research is another area in which ExxonMobil is contributing to energy efficiency and reduced emissions. We are on the forefront of technologies to lower greenhouse gas emissions. For example, ExxonMobil operates one of the world's largest carbon capture and sequestration (CCS) operations at our LaBarge plant in Wyoming. In a co-venturer in another project, the Gorgon natural gas development in Australia, which when operational will have the largest saline reservoir CO2 injection facility in the world. The company is leveraging its experience with CCS in developing new methods for capturing CO2, which can reduce costs and increase the application of carbon capture for society. ExxonMobil also is actively engaged, both internally and in partnership with renowned universities and institutions, in research on new break-through technologies for energy. ExxonMobil routinely conducts life cycle assessments (LCAs), which are useful to understand whether a technology can result in environmental improvements across a broad range of factors. For example, in 2011 we conducted a LCA in concert with Massachusetts Institute of Technology and Synthetic Genomics Inc. to assess the impact of algal biofuel production on GHG emissions, land use, and water use. The study demonstrated the potential that algae fuels can be produced with freshwater consumption equivalent to petroleum refining, and enable lower GHG emissions. A more recent LCA demonstrated that "well-to-wire" GHG emissions from shale gas are about half that of coal, and not significantly different than emissions of conventional gas. In addition, ExxonMobil is involved in researching emerging technologies that can help mitigate the risk of climate change. For example, the company has conducted research into combustion fundamentals with automotive partners in order to devise concepts to improve the efficiency and reduce emissions of internal combustion engines. ExxonMobil has also developed technology for an on-board hydrogen-powered fuel cell that converts other fuels into hydrogen directly under a vehicle's hood, thereby eliminating the need for separate facilities for producing and distributing hydrogen. This technology can be up to 80 percent more fuel efficient and emit 45 percent less CO2 than conventional internal combustion engines. The company is also a founding member of the Global Climate and Energy Project at Stanford University, a program that seeks to develop fundamental, game-changing scientific breakthroughs that could lower GHG emissions.

## Page: OG7. Methane from the natural gas value chain

OG7.1

**Please indicate the consolidation basis (financial control, operational control, equity share) used to prepare data to answer the questions in OG7**

| Segment | Consolidation basis |
|---|---|

OG7.1a

**Please provide clarification for cases in which different consolidation bases have been used**

OG7.2

**Does your organization have written operating procedures and/or policies covering the reduction of methane leakage and venting?**

OG7.3

**Please indicate the proportion of your organization's methane emissions inventory estimated using the following methodologies (+/- 5%)**

| Methodology | Proportion of total methane emissions estimated with methodology | What area of your operations does this answer relate to? |
|---|---|---|
| Direct detection and measurement | | |
| Engineering calculations | | |
| Source-specific emission factors (IPCC Tier 3) | | |
| IPCC Tier 1 and/or Tier 2 emission factors | | |

OG7.3a

**Do your operations include the production, gathering and processing stages?**

OG7.4

**OG7.4: Does your organization participate in voluntary methane emissions reduction programs?**

**Further Information**

CDP: [W][-,-][AQ][Pu]

# Exhibit 10

**From:** Powell, Guy A
**Sent:** Saturday, November 29, 2014 3:32 PM
**To:** Trelenberg, Pete W
**Subject:** Re: Some issues that may come up at our meeting Tuesday

Pete - about to get on a plane to Belize - here is my thoughts on the carbon price question: our carbon price assumptions are based on our view of the marginal cost of abatement in the future. Our price assumptions tend to be higher than stated policy - we assume additional policy beyond what is currently proposed. We test our upstream projects bases on the scope 1 emissions they will create. We do not make any assumptions on scope 3 emissions associated with producing additional hydrocarbons.

Sent from my iPhone

On Nov 28, 2014, at 5:22 PM, "Trelenberg, Pete W" <pete.w.trelenberg@exxonmobil.com> wrote:

> Haroon, Guy, Tahmid - note attached list of questions we will be asked to answer next Tuesday during a meeting with SRI's. Please provide input as follows (feel free to comment on any question):
>
> Technology and adaptation - Haroon, please comment specifically on adaptation
>
> Renewables - Tahmid, please provide comments on renewable cost curves, cost comparisons, update frequency, etc.
>
> Carbon Price - Guy, please provide you thoughts on this.
>
> Warming impact on GDP - Haroon, Guy, would it be correct to say that all scenarios/RCP's are fairly similar out through 2040? Would temperature rise be about the same? Would most models predict positive impacts of a modest temperature rise as would be seen in all scenarios at least through 2040? What did the Risky Business report say about climate impacts by mid-century?
>
> Thanks. I will need input over the weekend, as I fly to NYC Monday morning.
>
> Pete.
>
> Sent from my iPad
>
> Begin forwarded message:
>
>> **From:** "Cohen, Kenneth P" <kenneth.p.cohen@exxonmobil.com>
>> **Date:** November 26, 2014 at 3:09:55 PM PST
>> **To:** "Woodbury, Jeffrey J" <jeff.j.woodbury@exxonmobil.com>
>> **Cc:** "Tinsley, Brian D" <brian.d.tinsley@exxonmobil.com>, "Luettgen, Robert A" <robert.a.luettgen@exxonmobil.com>, "Trelenberg, Pete W" <pete.w.trelenberg@exxonmobil.com>, "McCarron, Suzanne M" <suzanne.m.mccarron@exxonmobil.com>
>> **Subject: Re: Some issues that may come up at our meeting Tuesday**
>>
>> Suggest Suzanne and I handle the legislative Q's: carbon tax and energy policy.
>>
>> Sent from my iPhone

On Nov 26, 2014, at 4:44 PM, Woodbury, Jeffrey J <jeff.j.woodbury@exxonmobil.com> wrote:

Please note questions below. We should have an aligned view on each of these. Thanks.

Regards, Jeff

Sent from my iPad

Begin forwarded message:

**From:** Donald Kirshbaum <donald.kirshbaum@gmail.com>
**Date:** November 26, 2014 at 1:19:22 PM CST
**To:** "Tinsley, Brian D" <brian.d.tinsley@exxonmobil.com>, "Luettgen, Robert A" <robert.a.luettgen@exxonmobil.com>, "Woodbury, Jeffrey J" <jeff.j.woodbury@exxonmobil.com>
**Cc:** "Smith, Timothy" <tsmith@bostontrust.com>
**Subject: Some issues that may come up at our meeting Tuesday**

**As I mentioned to Brian in an email earlier today, some of the investors who will be joining us on Tuesday had a call yesterday to talk about the agenda. We wanted to give you a heads up on some of the questions that may come up next week so you may be able to address them in your presentations. If we don't get to all of these questions, investors would be interested in having some follow up on these after in the coming weeks.**

**These of course don't cover everything, but will hopefully give you a sense of some of the issues that are on investors' minds.**

- **Stanford and MIT research projects: update on the status of these studies, what Exxon's expectations are and what is Exxon's funding commitment to them. Are there any similar project Exxon is supporting?**
- **Carbon Tax: What is Exxon's current position on a carbon tax, and is Exxon actively supporting any federal legislation regarding a carbon tax (some has been introduced).**

Case 3:20-cv-02995-K Document 1-2 Filed 08/06/19 Page 33 of 121 PageID 222

- **National energy policy: Given that Exxon believes that "all the economic sources of energy are needed to meet the word's energy needs" (Ken Cohen Perspectives November 6), how is Exxon supporting national (and international) energy policy that promotes the growth of clean energy.**

- **Technology and climate change adaptation: Mr. Tillerson has spoken about how technology has provided solutions to significant problems throughout history and how he sees this as an approach to climate change. What technology based solutions do you see for both reducing the impact of climate change, as well as humanity and the global economy adapting to it – and what is Exxon doing to help create these solutions?**

- What are Exxon's current thoughts on oil demand scenarios – both in the short term in the context of the current price of oil, and in the mid term and longer term to meet global energy needs in the context of accelerated growth in the availability of alternative energy solutions? How is this feeding into your capital expenditure planning?

- RENEWABLES: How does Exxon calculate cost curves for renewables and potentially competitive energy sources? Does it rely on third party sources? If so, which? Does it update this information?

- CARBON PRICE: How does Exxon develop the carbon prices it identifies? Are these tied to stated policy outcomes and if not, why not? How does it incorporate those prices into its process for selecting/ rejecting upstream projects?

- WARMING IMPACT ON GDP: How does Exxon evaluate the impact that 3.6C warming will have? Does it incorporate

**that analysis into its GDP/population growth projections?**

- **CAPEX CUT: If Exxon will not do high cost projects, will it so state publicly?**

# Exhibit 11

# 360 Property, Plant, and Equipment
## 10 Overall
### 35 Subsequent Measurement

**General Note**: The Subsequent Measurement Section provides guidance on an entity's subsequent measurement and subsequent recognition of an item. Situations that may result in subsequent changes to carrying amount include impairment, credit losses, fair value adjustments, depreciation and amortization, and so forth.

## General

**360-10-35-1** This Subsection addresses depreciation of property, plant, and equipment and the post acquisition accounting for an interest in the residual value of a leased asset.

**> Depreciation**

**360-10-35-2** This guidance addresses the concept of depreciation accounting and the various factors to consider in selecting the related periods and methods to be used in such accounting.

**360-10-35-3** Depreciation expense in financial statements for an asset shall be determined based on the asset's useful life.

**360-10-35-4** The cost of a productive facility is one of the costs of the services it renders during its useful economic life. Generally accepted accounting principles (GAAP) require that this cost be spread over the expected useful life of the facility in such a way as to allocate it as equitably as possible to the periods during which services are obtained from the use of the facility. This procedure is known as depreciation accounting, a system of accounting which aims to distribute the cost or other basic value of tangible capital assets, less salvage (if any), over the estimated useful life of the unit (which may be a group of assets) in a systematic and rational manner. It is a process of allocation, not of valuation.

**360-10-35-5** See paragraph 360-10-35-20 for a discussion of depreciation of a new cost basis after recognition of an **impairment** loss.

**360-10-35-6** See paragraph 360-10-35-43 for a discussion of cessation of depreciation on long-lived assets classified as held for sale.

**> > Declining Balance Method**

**360-10-35-7** The declining-balance method is an example of one of the methods that meet the requirements of being systematic and rational. If the expected productivity or revenue-earning power of the asset is relatively greater during the earlier years of its life, or maintenance charges tend to increase during later years, the declining-balance method may provide the most satisfactory allocation of cost. That conclusion also applies to other methods, including the sum-of-the-years'-digits method, that produce substantially similar results.

Pending Content:

**Transition Date:** *(P) December 16, 2017; (N) December 16, 2018* | **Transition Guidance:** **606-10-65-1**

The declining-balance method is an example of one of the methods that meet the requirements of being systematic and rational. If the expected productivity of the asset or ability of the asset to generate revenue is relatively greater during the earlier years of its life, or maintenance charges tend to increase during later years, the declining-balance method may provide the most satisfactory allocation of cost. That conclusion also applies to other methods, including the sum-of-the-years'-digits method, that produce substantially similar results.

### > > Loss or Damage Experience as a Factor in Estimating Depreciable Lives

**360-10-35-8** In practice, experience regarding loss or damage to depreciable assets is in some cases one of the factors considered in estimating the depreciable lives of a group of depreciable assets, along with such other factors as wear and tear, obsolescence, and maintenance and replacement policies.

### > > Unacceptable Depreciation Methods

**360-10-35-9** If the number of years specified by the Accelerated Cost Recovery System of the Internal Revenue Service (IRS) for recovery deductions for an asset does not fall within a reasonable range of the asset's useful life, the recovery deductions shall not be used as depreciation expense for financial reporting.

**360-10-35-10** Annuity methods of depreciation are not acceptable for entities in general.

### > > Accounting Changes

**360-10-35-11** See paragraphs 250-10-45-17 through 45-20 for guidance on the accounting and presentation of changes in methods of depreciation.

**360-10-35-12** [Paragraph not used]

### > Adjusting the Residual Value in Leased Assets by a Third Party

**360-10-35-13** The following paragraph provides guidance on how an entity acquiring an interest in the residual value of a leased asset shall account for that asset during the lease term.

**360-10-35-14** An entity acquiring an interest in the residual value of any leased asset, irrespective of the classification of the related lease by the lessor, shall not recognize increases to the asset's estimated value over the remaining term of the related lease, and the asset shall be reported at no more than its acquisition cost until sale or disposition. If it is subsequently determined that the fair value of the residual value of a leased asset has declined below the carrying amount of the acquired interest and that decline is other than temporary, the asset shall be written down to fair value, and the amount of the write-down shall be recognized as a loss. That fair value becomes the asset's new carrying amount, and the asset shall not be increased for any subsequent increase in its fair value before its sale or disposition.

## Impairment or Disposal of Long-Lived Assets

**360-10-35-15** There are unique requirements of accounting for the **impairment** or disposal of long-lived assets to be held and used or to be disposed of. Although this guidance deals with matters which may lead to the ultimate disposition of assets, it is included in this Subsection because it describes the measurement and classification of assets to be held and used and assets held for disposal before actual disposition and derecognition. See the Impairment or Disposal of Long-Lived Assets Subsection of Section 360–10–40 for a discussion of assets or asset groups for which disposition has taken place in an exchange or distribution to owners.

> **Long-Lived Assets Classified as Held and Used**

**360-10-35-16** This guidance addresses how long-lived assets or asset groups that are intended to be held and used in an entity's business shall be reviewed for impairment.

> > **Measurement of an Impairment Loss**

**360-10-35-17** An impairment loss shall be recognized only if the carrying amount of a long-lived asset (**asset group**) is not recoverable and exceeds its fair value. The carrying amount of a long-lived asset (asset group) is not recoverable if it exceeds the sum of the undiscounted cash flows expected to result from the use and eventual disposition of the asset (asset group). That assessment shall be based on the carrying amount of the asset (asset group) at the date it is tested for recoverability, whether in use (see paragraph 360-10-35-33) or under development (see paragraph 360-10-35-34). An impairment loss shall be measured as the amount by which the carrying amount of a long-lived asset (asset group) exceeds its fair value.

> > > **Assets Subject to Asset Retirement Obligations**

**360-10-35-18** In applying the provisions of this Subtopic, the carrying amount of the asset being tested for impairment shall include amounts of capitalized asset retirement costs. Estimated future cash flows related to the liability for an asset retirement obligation that has been recognized in the financial statements shall be excluded from both of the following:

a. The undiscounted cash flows used to test the asset for recoverability

b. The discounted cash flows used to measure the asset's fair value.

**360-10-35-19** If the fair value of the asset is based on a quoted market price and that price considers the costs that will be incurred in retiring that asset, the quoted market price shall be increased by the fair value of the asset retirement obligation for purposes of measuring impairment.

> > **Adjusted Carrying Amount Becomes New Cost Basis**

**360-10-35-20** If an impairment loss is recognized, the adjusted carrying amount of a long-lived asset shall be its new cost basis. For a depreciable long-lived asset, the new cost basis shall be depreciated (amortized) over the remaining useful life of that asset. Restoration of a previously recognized impairment loss is prohibited.

> > **When to Test a Long-Lived Asset for Recoverability**

**360-10-35-21** A long-lived asset (asset group) shall be tested for recoverability whenever events or changes in circumstances indicate that its carrying amount may not be recoverable. The following are examples of such events or changes in circumstances:

a. A significant decrease in the market price of a long-lived asset (asset group)

b. A significant adverse change in the extent or manner in which a long-lived asset (asset group) is being used or in its physical condition

c. A significant adverse change in legal factors or in the business climate that could affect the value of a long-lived asset (asset group), including an adverse action or assessment by a regulator

d. An accumulation of costs significantly in excess of the amount originally expected for the acquisition or construction of a long-lived asset (asset group)

e. A current-period operating or cash flow loss combined with a history of operating or cash flow losses or a projection or forecast that demonstrates continuing losses associated with the use of a

long-lived asset (asset group)

f. A current expectation that, more likely than not, a long-lived asset (asset group) will be sold or otherwise disposed of significantly before the end of its previously estimated useful life. The term *more likely than not* refers to a level of likelihood that is more than 50 percent.

**360-10-35-22** When a long-lived asset (asset group) is tested for recoverability, it also may be necessary to review depreciation estimates and method as required by Topic 250 or the amortization period as required by Topic 350. Paragraphs 250-10-45-17 through 45-20 and 250-10-50-4 address the accounting for changes in estimates, including changes in the method of depreciation, amortization, and depletion. Paragraphs 350-30-35-1 through 35-5 address the determination of the useful life of an intangible asset. Any revision to the remaining useful life of a long-lived asset resulting from that review also shall be considered in developing estimates of future cash flows used to test the asset (asset group) for recoverability (see paragraphs 360-10-35-31 through 35-32). However, any change in the accounting method for the asset resulting from that review shall be made only after applying this Subtopic.

### > > Grouping Long-Lived Assets Classified as Held and Used

**360-10-35-23** For purposes of recognition and measurement of an impairment loss, a long-lived asset or assets shall be grouped with other assets and liabilities at the lowest level for which identifiable cash flows are largely independent of the cash flows of other assets and liabilities. However, an impairment loss, if any, that results from applying this Subtopic shall reduce only the carrying amount of a long-lived asset or assets of the group in accordance with paragraph 360-10-35-28.

**360-10-35-24** In limited circumstances, a long-lived asset (for example, a corporate headquarters facility) may not have identifiable cash flows that are largely independent of the cash flows of other assets and liabilities and of other asset groups. In those circumstances, the asset group for that long-lived asset shall include all assets and liabilities of the entity.

**360-10-35-25** In limited circumstances, an asset group will include all assets and liabilities of the entity. For example, the cost of operating assets such as corporate headquarters or centralized research facilities may be funded by revenue-producing activities at lower levels of the entity. Accordingly, in limited circumstances, the lowest level of identifiable cash flows that are largely independent of other asset groups may be the entity level. See Example 4 (paragraph 360-10-55-35).

### > > > Effect of Goodwill when Grouping

**360-10-35-26** Goodwill shall be included in an asset group to be tested for impairment under this Subtopic only if the asset group is or includes a reporting unit. Goodwill shall not be included in a lower-level asset group that includes only part of a reporting unit. Estimates of future cash flows used to test that lower-level asset group for recoverability shall not be adjusted for the effect of excluding goodwill from the group. The term *reporting unit* is defined in Topic 350 as the same level as or one level below an **operating segment**. That Topic requires that goodwill be tested for impairment at the reporting unit level.

**360-10-35-27** Other than goodwill, the carrying amounts of any assets (such as accounts receivable and inventory) and liabilities (such as accounts payable, long-term debt, and asset retirement obligations) not covered by this Subtopic that are included in an asset group shall be adjusted in accordance with other applicable generally accepted accounting principles (GAAP) before testing the asset group for recoverability. Paragraph 350-20-35-31 requires that goodwill be tested for impairment only after the carrying amounts of the other assets of the reporting unit, including the long-lived assets covered by this Subtopic, have been tested for impairment under other applicable accounting guidance.

### > > Allocating Impairment Losses to an Asset Group

**360-10-35-28** An impairment loss for an asset group shall reduce only the carrying amounts of a long-lived asset or assets of the group. The loss shall be allocated to the long-lived assets of the group on a pro rata basis using the relative carrying amounts of those assets, except that the loss allocated to an

individual long-lived asset of the group shall not reduce the carrying amount of that asset below its fair value whenever that fair value is determinable without undue cost and effort. See Example 1 (paragraph 360-10-55-20) for an illustration of this guidance.

### > > Estimates of Future Cash Flows Used to Test a Long-Lived Asset for Recoverability

**360-10-35-29** Estimates of future cash flows used to test the recoverability of a long-lived asset (asset group) shall include only the future cash flows (cash inflows less associated cash outflows) that are directly associated with and that are expected to arise as a direct result of the use and eventual disposition of the asset (asset group). Those estimates shall exclude interest charges that will be recognized as an expense when incurred.

**360-10-35-30** Estimates of future cash flows used to test the recoverability of a long-lived asset (asset group) shall incorporate the entity's own assumptions about its use of the asset (asset group) and shall consider all available evidence. The assumptions used in developing those estimates shall be reasonable in relation to the assumptions used in developing other information used by the entity for comparable periods, such as internal budgets and projections, accruals related to incentive compensation plans, or information communicated to others. However, if alternative courses of action to recover the carrying amount of a long-lived asset (asset group) are under consideration or if a range is estimated for the amount of possible future cash flows associated with the likely course of action, the likelihood of those possible outcomes shall be considered. A probability-weighted approach may be useful in considering the likelihood of those possible outcomes. See Example 2 (paragraph 360-10-55-23) for an illustration of this guidance.

**360-10-35-31** Estimates of future cash flows used to test the recoverability of a long-lived asset (asset group) shall be made for the remaining useful life of the asset (asset group) to the entity. The remaining useful life of an asset group shall be based on the remaining useful life of the primary asset of the group. For purposes of this Subtopic, the primary asset is the principal long-lived tangible asset being depreciated or intangible asset being amortized that is the most significant component asset from which the asset group derives its cash-flow-generating capacity. The primary asset of an asset group therefore cannot be land or an intangible asset not being amortized.

**360-10-35-32** Factors that an entity generally shall consider in determining whether a long-lived asset is the primary asset of an asset group include the following:

a. Whether other assets of the group would have been acquired by the entity without the asset

b. The level of investment that would be required to replace the asset

c. The remaining useful life of the asset relative to other assets of the group. If the primary asset is not the asset of the group with the longest remaining useful life, estimates of future cash flows for the group shall assume the sale of the group at the end of the remaining useful life of the primary asset.

**360-10-35-33** Estimates of future cash flows used to test the recoverability of a long-lived asset (asset group) that is in use, including a long-lived asset (asset group) for which development is substantially complete, shall be based on the existing service potential of the asset (asset group) at the date it is tested. The service potential of a long-lived asset (asset group) encompasses its remaining useful life, cash-flow-generating capacity, and for tangible assets, physical output capacity. Those estimates shall include cash flows associated with future expenditures necessary to maintain the existing service potential of a long-lived asset (asset group), including those that replace the service potential of component parts of a long-lived asset (for example, the roof of a building) and component assets other than the primary asset of an asset group. Those estimates shall exclude cash flows associated with future capital expenditures that would increase the service potential of a long-lived asset (asset group).

**360-10-35-34** Estimates of future cash flows used to test the recoverability of a long-lived asset (asset group) that is under development shall be based on the expected service potential of the asset (group) when development is substantially complete. Those estimates shall include cash flows associated with all future expenditures necessary to develop a long-lived asset (asset group), including interest payments

that will be capitalized as part of the cost of the asset (asset group). Subtopic 835-20 requires the capitalization period to end when the asset is substantially complete and ready for its intended use.

**360-10-35-35** If a long-lived asset that is under development is part of an asset group that is in use, estimates of future cash flows used to test the recoverability of that group shall include the cash flows associated with future expenditures necessary to maintain the existing service potential of the group (see paragraph 360-10-35-33) as well as the cash flows associated with all future expenditures necessary to substantially complete the asset that is under development (see the preceding paragraph). See Example 3 (paragraph 360-10-55-33). See also paragraphs 360-10-55-7 through 55-18 for considerations of site restoration and environmental exit costs.

### > > Fair Value

**360-10-35-36** For long-lived assets (asset groups) that have uncertainties both in timing and amount, an expected present value technique will often be the appropriate technique with which to estimate fair value.

### > Long-Lived Assets Classified as Held for Sale

**360-10-35-37** This guidance addresses the accounting for expected disposal losses for long-lived assets and asset groups that are classified as held for sale but have not yet been sold. See paragraphs 360-10-45-9 through 45-11 for the initial criteria to be met for classification as held for sale.

### > > Measurement of Expected Disposal Loss or Gain

**360-10-35-38** Costs to sell are the incremental direct costs to transact a sale, that is, the costs that result directly from and are essential to a sale transaction and that would not have been incurred by the entity had the decision to sell not been made. Those costs include broker commissions, legal and title transfer fees, and closing costs that must be incurred before legal title can be transferred. Those costs exclude expected future losses associated with the operations of a long-lived asset (**disposal group**) while it is classified as held for sale. Expected future operating losses that marketplace participants would not similarly consider in their estimates of the fair value less cost to sell of a long-lived asset (disposal group) classified as held for sale shall not be indirectly recognized as part of an expected loss on the sale by reducing the carrying amount of the asset (disposal group) to an amount less than its current fair value less cost to sell. If the sale is expected to occur beyond one year as permitted in limited situations by paragraph 360-10-45-11, the cost to sell shall be discounted.

**360-10-35-39** The carrying amounts of any assets that are not covered by this Subtopic, including goodwill, that are included in a disposal group classified as held for sale shall be adjusted in accordance with other applicable GAAP prior to measuring the fair value less cost to sell of the disposal group. Paragraphs 350-20-40-1 through 40-7 provide guidance for allocating goodwill to a lower-level asset group to be disposed of that is part of a reporting unit and that constitutes a business. Goodwill is not included in a lower-level asset group to be disposed of that is part of a reporting unit if it does not constitute a business.

**360-10-35-40** A loss shall be recognized for any initial or subsequent write-down to fair value less cost to sell. A gain shall be recognized for any subsequent increase in fair value less cost to sell, but not in excess of the cumulative loss previously recognized (for a write-down to fair value less cost to sell). The loss or gain shall adjust only the carrying amount of a long-lived asset, whether classified as held for sale individually or as part of a disposal group.

**360-10-35-41** See paragraphs 310-40-35-11 and 310-40-40-10 for guidance related to determination of cost basis for foreclosed assets under Subtopic 310-40 and the measurement of cumulative losses previously recognized under the preceding paragraph.

**360-10-35-42** See paragraphs 830-30-45-13 through 45-15 for guidance regarding the application of Topic 830 to an investment being evaluated for impairment that will be disposed of.

> > **Accounting While Held for Sale**

**360-10-35-43** A long-lived asset (disposal group) classified as held for sale shall be measured at the lower of its carrying amount or fair value less cost to sell. If the asset (disposal group) is newly acquired, the carrying amount of the asset (disposal group) shall be established based on its fair value less cost to sell at the acquisition date. A long-lived asset shall not be depreciated (amortized) while it is classified as held for sale. Interest and other expenses attributable to the liabilities of a disposal group classified as held for sale shall continue to be accrued.

> > **Changes to a Plan of Sale**

**360-10-35-44** If circumstances arise that previously were considered unlikely and, as a result, an entity decides not to sell a long-lived asset (disposal group) previously classified as held for sale, the asset (disposal group) shall be reclassified as held and used. A long-lived asset that is reclassified shall be measured individually at the lower of the following:

a. Its carrying amount before the asset (disposal group) was classified as held for sale, adjusted for any depreciation (amortization) expense that would have been recognized had the asset (disposal group) been continuously classified as held and used

b. Its fair value at the date of the subsequent decision not to sell.

**360-10-35-45** If an entity removes an individual asset or liability from a disposal group previously classified as held for sale, the remaining assets and liabilities of the disposal group to be sold shall continue to be measured as a group only if the criteria in paragraph 360-10-45-9 are met. Otherwise, the remaining long-lived assets of the group shall be measured individually at the lower of their carrying amounts or fair values less cost to sell at that date.

> **Long-Lived Assets to Be Disposed of Other than by Sale**

**360-10-35-46** This guidance addresses the accounting for impairment of long-lived assets and asset groups that are intended to be disposed of by abandonment.

> > **Long-Lived Assets to Be Abandoned**

**360-10-35-47** For purposes of this Subtopic, a long-lived asset to be abandoned is disposed of when it ceases to be used. If an entity commits to a plan to abandon a long-lived asset before the end of its previously estimated useful life, depreciation estimates shall be revised in accordance with paragraphs 250-10-45-17 through 45-20 and 250-10-50-4 to reflect the use of the asset over its shortened useful life (see paragraph 360-10-35-22).

**360-10-35-48** Because the continued use of a long-lived asset demonstrates the presence of service potential, only in unusual situations would the fair value of a long-lived asset to be abandoned be zero while it is being used. When a long-lived asset ceases to be used, the carrying amount of the asset should equal its salvage value, if any. The salvage value of the asset shall not be reduced to an amount less than zero.

> > **Long-Lived Asset Temporarily Idled**

**360-10-35-49** A long-lived asset that has been temporarily idled shall not be accounted for as if abandoned.

# Exhibit 12

# PART I

## ITEM 1. BUSINESS

Exxon Mobil Corporation was incorporated in the State of New Jersey in 1882. Divisions and affiliated companies of ExxonMobil or market products in the United States and most other countries of the world. Their principal business is energy, involving explorat and production of, crude oil and natural gas, manufacture of petroleum products and transportation and sale of crude oil, natural petroleum products. ExxonMobil is a major manufacturer and marketer of commodity petrochemicals, including olefins, arc polyethylene and polypropylene plastics and a wide variety of specialty products. Affiliates of ExxonMobil conduct extensive r programs in support of these businesses.

Exxon Mobil Corporation has several divisions and hundreds of affiliates, many with names that include *ExxonMobil*, *Exxon*, *Esso* or *XTO*. For convenience and simplicity, in this report the terms *ExxonMobil, Exxon, Esso, Mobil* and *XTO*, as well as ter *Corporation*, *Company*, *our*, *we* and *its*, are sometimes used as abbreviated references to specific affiliates or groups of affiliat precise meaning depends on the context in question.

Throughout ExxonMobil's businesses, new and ongoing measures are taken to prevent and minimize the impact of our operations water and ground. These include a significant investment in refining infrastructure and technology to manufacture clean fuels, as projects to monitor and reduce nitrogen oxide, sulfur oxide and greenhouse gas emissions, and expenditures for asset ret obligations. Using definitions and guidelines established by the American Petroleum Institute, ExxonMobil's 2015 wo environmental expenditures for all such preventative and remediation steps, including ExxonMobil's share of equity co expenditures, were $5.6 billion, of which $3.8 billion were included in expenses with the remainder in capital expenditures. The to for such activities is expected to decrease to approximately $5 billion in 2016 and 2017, mainly reflecting lower project activity in C Capital expenditures are expected to account for approximately 30 percent of the total.

The energy and petrochemical industries are highly competitive. There is competition within the industries and also with other indus supplying the energy, fuel and chemical needs of both industrial and individual consumers. The Corporation competes with other f the sale or purchase of needed goods and services in many national and international markets and employs all methods of com which are lawful and appropriate for such purposes.

Operating data and industry segment information for the Corporation are contained in the Financial Section of this report un following: "Quarterly Information", "Note 18: Disclosures about Segments and Related Information" and "Operating Sum Information on oil and gas reserves is contained in the "Oil and Gas Reserves" part of the "Supplemental Information on Oil a Exploration and Production Activities" portion of the Financial Section of this report.

ExxonMobil has a long-standing commitment to the development of proprietary technology. We have a wide array of research pr designed to meet the needs identified in each of our business segments. Information on Company-sponsored research and devel spending is contained in "Note 3: Miscellaneous Financial Information" of the Financial Section of this report. ExxonMob approximately 11 thousand active patents worldwide at the end of 2015. For technology licensed to third parties, revenues approximately $158 million in 2015. Although technology is an important contributor to the overall operations and results of our Co the profitability of each business segment is not dependent on any individual patent, trade secret, trademark, license, franc concession.

The number of regular employees was 73.5 thousand, 75.3 thousand, and 75.0 thousand at years ended 2015, 2014 and 2013, respe Regular employees are defined as active executive, management, professional, technical and wage employees who work full time time for the Corporation and are covered by the Corporation's benefit plans and programs. Regular employees do not include emplo the company-operated retail sites (CORS). The number of CORS employees was 2.1 thousand, 8.4 thousand, and 9.8 thousand a ended 2015, 2014 and 2013, respectively. The decrease in CORS employees reflects the multi-year transition of the company-o retail network in portions of Europe to a more capital-efficient Branded Wholesaler model.

Information concerning the source and availability of raw materials used in the Corporation's business, the extent of seasonality business, the possibility of renegotiation of profits or termination of contracts at the election of governments and risks attendant to operations may be found in "Item 1A. Risk Factors" and "Item 2. Properties" in this report.

ExxonMobil maintains a website at exxonmobil.com. Our annual report on Form 10-K, quarterly reports on Form 10-Q, current rep Form 8-K and any amendments to those reports filed or furnished pursuant to Section 13(a) of the Securities Exchange Act of 1 made available through our website as soon as reasonably practical after we electronically file or furnish the reports to the Securit Exchange Commission. Also available on the Corporation's website are the Company's Corporate Governance Guidelines and C Ethics and Business Conduct, as well as the charters of the audit, compensation and nominating committees of the Board of Di Information on our website is not incorporated into this report.

gas supply requirements worldwide over the period 2015−2040 will be about $25 trillion (measured in 2014 dollars) or approx $1 trillion per year on average.

International accords and underlying regional and national regulations covering greenhouse gas emissions continue to evolve with ui timing and outcome, making it difficult to predict their business impact. For many years, the Corporation has taken into account ] established to reduce energy−related greenhouse gas emissions in its long-term *Outlook for Energy*, which is used as a foundat assessing the business environment and business strategies and investments. The climate accord reached at the recent Conference Parties (COP 21) in Paris set many new goals, and while many related policies are still emerging, the *Outlook for Energy* conti anticipate that such policies will increase the cost of carbon dioxide emissions over time. For purposes of the *Outlook for Ene* continue to assume that governments will enact policies that impose rising costs on energy−related $CO_2$ emissions, which we assu reach an implied cost in OECD nations of about $80 per tonne in 2040. China and other leading non−OECD nations are expected OECD policy initiatives. Nevertheless, as people and nations look for ways to reduce risks of global climate change, they will con need practical solutions that do not jeopardize the affordability or reliability of the energy they need. Thus, all practical and econo viable energy sources, both conventional and unconventional, will be needed to continue meeting global energy needs – because scale of worldwide energy demand.

The information provided in the Long−Term Business Outlook includes ExxonMobil's internal estimates and forecasts based upon data and analyses as well as publicly available information from external sources including the International Energy Agency.

## Upstream

ExxonMobil continues to maintain a diverse portfolio of exploration and development opportunities, which enables the Corporatic selective, maximizing shareholder value and mitigating political and technical risks. ExxonMobil's fundamental Upstream b strategies guide our global exploration, development, production, and gas and power marketing activities. These strategies capturing material and accretive opportunities to continually high-grade the resource portfolio, exercising a disciplined appro investing and cost management, developing and applying high-impact technologies, pursuing productivity and efficiency gains, g profitable oil and gas production, and capitalizing on growing natural gas and power markets. These strategies are underpinne relentless focus on operational excellence, commitment to innovative technologies, development of our employees, and investmen communities within which we operate.

As future development projects and drilling activities bring new production online, the Corporation expects a shift in the geograpl and in the type of opportunities from which volumes are produced. Oil equivalent production from North America is expected to i over the next several years based on current capital activity plans, contributing over a third of total production. Further, the propo our global production from resource types utilizing specialized technologies such as arctic, deepwater, and unconventional drilli production systems, as well as LNG, is also expected to grow, becoming a slight majority of production in the next few years. We anticipate that the expected change in the geographic mix of production volumes, and in the types of opportunities from which volun be produced, will have a material impact on the nature and the extent of the risks disclosed in Item 1A. Risk Factors, or result in a r change in our level of unit operating expenses.

The Corporation anticipates several projects will come online over the next few years providing additional production capacity. Ho actual volumes will vary from year to year due to the timing of individual project start-ups; operational outages; reservoir perfor performance of enhanced oil recovery projects; regulatory changes; the impact of fiscal and commercial terms; asset sales; weather price effects on production sharing contracts; changes in the amount and timing of capital investments that may vary depending on and gas price environment; and other factors described in Item 1A. Risk Factors.

The upstream industry environment has been challenged throughout 2015 with abundant crude oil supply causing crude oil pı decrease to levels not seen since 2004, while natural gas prices remained depressed. However, current market conditions are not nec indicative of future conditions. The markets for crude oil and natural gas have a history of significant price volatility. ExxonMobil b prices over the long term will continue to be driven by market supply and demand, with the demand side largely being a function o economic growth. On the supply side, prices may be significantly impacted by political events, the actions of OPEC and othe government resource owners, and other factors. To manage the risks associated with price, ExxonMobil evaluates annual plans investments across a wide range of price scenarios. The Corporation's assessment is that its operations will exhibit strong performan the long term. This is the outcome of disciplined investment, cost management, asset enhancement programs, and application of ac technologies.

## Downstream

ExxonMobil's Downstream is a large, diversified business with refining, logistics, and marketing complexes around the wor Corporation has a presence in mature markets in North America and Europe, as well as in the growing Asia Pacific region.

**Impact of Oil and Gas Reserves on Depreciation.** The calculation of unit-of-production depreciation is a critical accounting estim measures the depreciation of upstream assets. It is the ratio of actual volumes produced to total proved reserves or proved dev reserves (those proved reserves recoverable through existing wells with existing equipment and operating methods), applied to th cost. In the event that the unit-of-production method does not result in an equitable allocation of cost over the economic life of an up asset, an alternative such as the straight-line method is used. The volumes produced and asset cost are known and, while proved r have a high probability of recoverability they are based on estimates that are subject to some variability. While the revisi Corporation has made in the past are an indicator of variability, they have had a very small impact on the unit-of-production rates b they have been small compared to the large reserves base.

**Impact of Oil and Gas Reserves, Prices and Margins on Testing for Impairment.** The Corporation performs impairment asses whenever events or circumstances indicate that the carrying amounts of its long-lived assets (or group of assets) may not be reco through future operations or disposition. Assets are grouped at the lowest level for which there are identifiable cash flows that are independent of the cash flows of other groups of assets for this assessment.

Potential trigger events for impairment evaluation include:

- a significant decrease in the market price of a long-lived asset;
- a significant adverse change in the extent or manner in which an asset is being used or in its physical condition incl significant decrease in current and projected reserve volumes;
- a significant adverse change in legal factors or in the business climate that could affect the value, including an adverse ac assessment by a regulator;
- an accumulation of project costs significantly in excess of the amount originally expected;
- a current-period operating loss combined with a history and forecast of operating or cash flow losses; and
- a current expectation that, more likely than not, a long-lived asset will be sold or otherwise disposed of significantly before of its previously estimated useful life.

The Corporation performs asset valuation analyses on an ongoing basis as a part of its asset management program. These analy other profitability reviews assist the Corporation in assessing whether the carrying amounts of any of its assets may not be recoverab

In general, the Corporation does not view temporarily low prices or margins as a trigger event for conducting impairment tests. The r for crude oil, natural gas and petroleum products have a history of significant price volatility. Although prices will occasional significantly, industry prices over the long term will continue to be driven by market supply and demand. On the supply side, i production from mature fields is declining, but this is being offset by production from new discoveries and field developments. production policies also have an impact on world oil supplies. The demand side is largely a function of global economic grow relative growth/decline in supply versus demand will determine industry prices over the long term, and these cannot be acc predicted.

If there were a trigger event, the Corporation estimates the future undiscounted cash flows of the affected properties to jud recoverability of carrying amounts. Cash flows used in impairment evaluations are developed using estimates for future crude natural gas commodity prices, refining and chemical margins, and foreign currency exchange rates. Volumes are based on project and facility production profiles, throughput, or sales. These evaluations make use of the Corporation's price, margin, volume, a assumptions developed in the annual planning and budgeting process, and are consistent with the criteria management uses to e investment opportunities. Where unproved reserves exist, an appropriately risk-adjusted amount of these reserves may be included evaluation.

An asset group would be impaired if its undiscounted cash flows were less than the asset's carrying value. Impairments are measured amount by which the carrying value exceeds fair value. Cash flow estimates for impairment testing exclude the effects of de instruments.

In light of continued weakness in the upstream industry environment in late 2015, the Corporation undertook an effort to assess it long-lived assets most at risk for potential impairment. The results of this assessment confirm the absence of a trigger event and i that the future undiscounted cash flows associated with these assets substantially exceed the carrying value of the assets. The asse reflects crude and natural gas prices that are generally consistent with the long-term price forecasts published by third-party i experts. Critical to the long-term recoverability of certain assets is the assumption that either by supply and demand changes, or general inflation, prices will rise in the future. Should increases in long-term prices not materialize, certain of the Corporation's ass be at risk for impairment. Due to the inherent difficulty in predicting future commodity prices, and the relationship between industry and costs, it is not practicable to reasonably estimate a range of potential future impairments related to the Corporation's long-lived a

Significant unproved properties are assessed for impairment individually, and valuation allowances against the capitalized co recorded based on the estimated economic chance of success and the length of time that the Corporation expects to hold the

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

Level 2 inputs are inputs other than quoted prices included within Level 1 that are directly or indirectly observable for the asset or l Hierarchy Level 3 inputs are inputs that are not observable in the market.

**Inventories.** Crude oil, products and merchandise inventories are carried at the lower of current market value or cost (generally dete under the last-in, first-out method – LIFO). Inventory costs include expenditures and other charges (including depreciation) direc indirectly incurred in bringing the inventory to its existing condition and location. Selling expenses and general and admini expenses are reported as period costs and excluded from inventory cost. Inventories of materials and supplies are valued at cost or le

**Property, Plant and Equipment.** Depreciation, depletion and amortization, based on cost less estimated salvage value of the as primarily determined under either the unit-of-production method or the straight-line method, which is based on estimated asset serv taking obsolescence into consideration. Maintenance and repairs, including planned major maintenance, are expensed as incurred renewals and improvements are capitalized and the assets replaced are retired.

The Corporation uses the "successful efforts" method to account for its exploration and production activities. Under this method, c accumulated on a field-by-field basis. Costs incurred to purchase, lease, or otherwise acquire a property (whether unproved or prov capitalized when incurred. Exploratory well costs are carried as an asset when the well has found a sufficient quantity of reserves to its completion as a producing well and where the Corporation is making sufficient progress assessing the reserves and the econon operating viability of the project. Exploratory well costs not meeting these criteria are charged to expense. Other exploratory expen including geophysical costs and annual lease rentals, are expensed as incurred. Development costs, including costs of productive w development dry holes, are capitalized.

Acquisition costs of proved properties are amortized using a unit-of-production method, computed on the basis of total proved oil reserves. Capitalized exploratory drilling and development costs associated with productive depletable extractive properties are am using unit-of-production rates based on the amount of proved developed reserves of oil, gas and other minerals that are estimate recoverable from existing facilities using current operating methods. Under the unit-of-production method, oil and gas volur considered produced once they have been measured through meters at custody transfer or sales transaction points at the outlet valve lease or field storage tank. In the event that the unit-of-production method does not result in an equitable allocation of cost o economic life of an upstream asset, an alternative such as the straight-line method is used.

Production involves lifting the oil and gas to the surface and gathering, treating, field processing and field storage of the oil and g production function normally terminates at the outlet valve on the lease or field production storage tank. Production costs are those i to operate and maintain the Corporation's wells and related equipment and facilities and are expensed as incurred. They become pa cost of oil and gas produced. These costs, sometimes referred to as lifting costs, include such items as labor costs to operate the w related equipment; repair and maintenance costs on the wells and equipment; materials, supplies and energy costs required to ope wells and related equipment; and administrative expenses related to the production activity.

The Corporation performs impairment assessments whenever events or circumstances indicate that the carrying amounts of its lon assets (or group of assets) may not be recoverable through future operations or disposition. Assets are grouped at the lowest level fo there are identifiable cash flows that are largely independent of the cash flows of other groups of assets for this assessment.

Potential trigger events for impairment evaluation include:

- a significant decrease in the market price of a long-lived asset;
- a significant adverse change in the extent or manner in which an asset is being used or in its physical condition incl significant decrease in current and projected reserve volumes;
- a significant adverse change in legal factors or in the business climate that could affect the value, including an adverse a assessment by a regulator;
- an accumulation of project costs significantly in excess of the amount originally expected;
- a current-period operating loss combined with a history and forecast of operating or cash flow losses; and
- a current expectation that, more likely than not, a long-lived asset will be sold or otherwise disposed of significantly before of its previously estimated useful life.

The Corporation performs asset valuation analyses on an ongoing basis as a part of its asset management program. These analy other profitability reviews assist the Corporation in assessing whether the carrying amounts of any of its assets may not be recoverab

In general, the Corporation does not view temporarily low prices or margins as a trigger event for conducting impairment tests. The r for crude oil, natural gas and petroleum products, have a history of significant price volatility. Although prices will occasional significantly, industry prices over the long term will continue to be driven by market supply and demand.

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

On the supply side, industry production from mature fields is declining, but this is being offset by production from new discover field developments. OPEC production policies also have an impact on world oil supplies. The demand side is largely a function o economic growth. The relative growth/decline in supply versus demand will determine industry prices over the long term, and these be accurately predicted.

If there were a trigger event, the Corporation estimates the future undiscounted cash flows of the affected properties to ju recoverability of carrying amounts. Cash flows used in impairment evaluations are developed using estimates for future crude natural gas commodity prices, refining and chemical margins, and foreign currency exchange rates. Volumes are based on project and facility production profiles, throughput, or sales. These evaluations make use of the Corporation's price, margin, volume, a assumptions developed in the annual planning and budgeting process, and are consistent with the criteria management uses to e investment opportunities. Where unproved reserves exist, an appropriately risk-adjusted amount of these reserves may be include evaluation.

An asset group would be impaired if its undiscounted cash flows were less than the asset's carrying value. Impairments are measure amount by which the carrying value exceeds fair value. Cash flow estimates for impairment testing exclude the effects of de instruments.

Significant unproved properties are assessed for impairment individually, and valuation allowances against the capitalized c recorded based on the estimated economic chance of success and the length of time that the Corporation expects to hold the pro Properties that are not individually significant are aggregated by groups and amortized based on development risk and average period.

Gains on sales of proved and unproved properties are only recognized when there is neither uncertainty about the recovery applicable to any interest retained nor any substantial obligation for future performance by the Corporation.

Losses on properties sold are recognized when incurred or when the properties are held for sale and the fair value of the propertie than the carrying value.

Interest costs incurred to finance expenditures during the construction phase of multiyear projects are capitalized as part of the hi cost of acquiring the constructed assets. The project construction phase commences with the development of the detailed engi design and ends when the constructed assets are ready for their intended use. Capitalized interest costs are included in property, pl equipment and are depreciated over the service life of the related assets.

**Asset Retirement Obligations and Environmental Liabilities.** The Corporation incurs retirement obligations for certain assets. T values of these obligations are recorded as liabilities on a discounted basis, which is typically at the time the assets are installed. Th associated with these liabilities are capitalized as part of the related assets and depreciated. Over time, the liabilities are accreted change in their present value.

Liabilities for environmental costs are recorded when it is probable that obligations have been incurred and the amounts can be rea estimated. These liabilities are not reduced by possible recoveries from third parties and projected cash expenditures are not discount

**Foreign Currency Translation.** The Corporation selects the functional reporting currency for its international subsidiaries based currency of the primary economic environment in which each subsidiary operates.

Downstream and Chemical operations primarily use the local currency. However, the U.S. dollar is used in countries with a history inflation (primarily in Latin America) and Singapore, which predominantly sells into the U.S. dollar export market. Upstream op which are relatively self-contained and integrated within a particular country, such as Canada, the United Kingdom, Norw continental Europe, use the local currency. Some Upstream operations, primarily in Asia and Africa, use the U.S. dollar becau predominantly sell crude and natural gas production into U.S. dollar-denominated markets.

For all operations, gains or losses from remeasuring foreign currency transactions into the functional currency are included in incom

**Stock-Based Payments.** The Corporation awards stock-based compensation to employees in the form of restricted stock and re stock units. Compensation expense is measured by the price of the stock at the date of grant and is recognized in income over the r service period.

# Exhibit 13

**From:** Rosenthal, David S
**Sent:** Tuesday, March 25, 2014 6:57 PM
**To:** Luettgen, Robert A
**Subject:** RE: Ceres draft

Yes. Lets leave off the impairment footnote. That word gives the folks on the third floor heartburn.

David Rosenthal
Vice President, Investor Relations and Secretary
Exxon Mobil Corporation
Phone: 972-444-1538
Facs: 972-444- 1199

---

**From:** Luettgen, Robert A
**Sent:** Tuesday, March 25, 2014 7:54 AM
**To:** Rosenthal, David S
**Subject:** Ceres draft

I've adopted what I could from Pete's draft. I'd like to get your thoughts first before I send it out to the team for review.

Pete makes a good point in suggesting that the carbon asset risk discussion should precede the discussion on managing risks. I understand why you would like for the managing risks section to follow the statement of how important we view the risk of climate change, but I think we would be best served to dive into the carbon asset risk discussion (now that it has been amplified by Pete) earlier. I would just flip the order, if acceptable to you.

Pete placed the graph and discussion regarding the need to continue investing in hydrocarbons in the Planning Bases section of the document; but, I really think it fits better in the carbon asset discussion, as I've indicated in the attached. Let me know if you agree with this.

I'm afraid I couldn't use a lot of the material that Pete brought over (word-for-word) from Viederman, but I did backfill some of the points we had addressed in Viederman (e.g., technology, hydrogen fuel cells, etc.) where those concepts fit best in the Ceres document.

I'm not sure we've got the team sold yet on the need for a separate, self-standing document in the Ceres response (witness both Alan Jeffers and now Pete's whole-scale insertion of text from Viederman). I'll reiterate this in my note to the team and emphasize to them that while it's OK to bring over concepts from the Viederman piece, but we need to make sure that the Ceres letter reads independent, even if it shares many of the same looks and feel of the Viederman piece. The Viederman piece is intended to tell a story; the Ceres piece (while telling a story) is really focused on answering questions. They're different points of departure and deserving of separate treatment.

One last thing, while we address the issue of whether we anticipate having stranded assets, but we deleted the footnote that addressed the question of impairment. I know you asked to delete that, but I'm just confirming that this is your desire.

Robert A. Luettgen
Manager, Office of the Secretary
Exxon Mobil Corporation
5959 Las Colinas Blvd.
Rm 2616
Irving, Texas 75039

MySite Link

Phone: 972-444-1236
Fax: 972-444-1204
Cell: 281-224-9573

This communication may contain confidential information and is intended only for the addressee and may be legally privileged and exempt from disclosure under applicable laws. If you are not the intended addressee, or if this email is received in error, please notify me that you have received this message in error and then kindly delete this message without copying or saving it. Any use, dissemination or reproduction of this message by persons or entities other than the intended addressee(s) is unauthorized and is strictly prohibited.

Case 3:20-cv-02995-K Document 1-2 Filed 08/06/19 Page 52 of 121 PageID 241

# Exhibit 14

STATE OF NEW YORK
OFFICE OF THE ATTORNEY GENERAL

# SUBPOENA AD TESTIFICANDUM

## THE PEOPLE OF THE STATE OF NEW YORK

**GREETINGS**

**TO:**

Exxon Mobil Corporation
c/o Theodore V. Wells Jr.
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019-6064

**YOU ARE HEREBY COMMANDED**, pursuant General Business Law § 352, Executive Law § 63(12), and § 2302(a) of the New York Civil Practice Law and Rules, to appear and testify, through one or more designated persons having knowledge of the subjects set forth in the Schedule attached hereto, before Eric T. Schneiderman, the Attorney General of the State of New York, or a designated Assistant Attorney General, on ***the 10th day of April, 2017, at 9:30 a.m.***, or any agreed upon adjourned date or time, at 120 Broadway, New York, New York 10271, to testify in connection with an investigation concerning Exxon Mobil Corporation, and specifically in connection with the matters described in the attached Schedule, or any matter which the Attorney General deems pertinent thereto.

**TAKE NOTICE** that the Attorney General deems the testimony commanded by this Subpoena to be relevant and material to an investigation and inquiry undertaken in the public interest.

**TAKE FURTHER NOTICE** that Your disobedience of this Subpoena, by failing to attend and testify on the date, time and place stated above or on any agreed upon adjourned date or time, ***may subject You to prosecution for a misdemeanor or penalties and other lawful punishment*** under General Business Law § 352 and § 2308 of the New York Civil Practice Law, and/or other statutes.

**TAKE FURTHER NOTICE** that You should not disclose the existence of this Subpoena, its contents, or any subsequent communications with the Office of the Attorney General while this investigation is pending. In the event You believe that You are required to disclose the existence of this Subpoena or any information related thereto, You shall notify the individual listed below immediately and well in advance of Your disclosure of the same.

**WITNESS, The Honorable Eric T. Schneiderman,** Attorney General of the State of New York, this 24th day of March, 2017.

By: ____________________________

John Oleske
Senior Enforcement Counsel
120 Broadway, 26th Floor
New York, New York 10271
(212) 416-8222

## SCHEDULE

## TOPICS FOR TESTIMONY

1. Exxon Mobil Corporation's ("Exxon") process for identifying sources of potentially responsive documents, communications, and other information in response to the Office of the New York State Attorney General's ("OAG") November 4, 2015 subpoena to Exxon (the "Subpoena").

2. Exxon's preservation of, or failure to preserve, documents, communications, and other information in response to the Subpoena.

3. Exxon's collection of, or failure to collect, documents, communications, and other information in response to the Subpoena.

4. Exxon's production of, or failure to produce, documents, communications, and other information in response to the Subpoena.

5. Exxon's process for identifying, preserving, collecting, and producing documents, communications, and other information from Exxon's Management Committee members, Board of Directors members, and other high-level executives in response to the Subpoena.

6. The application of Exxon's preservation process to secondary e-mail accounts, and the non-application of that process to Rex Tillerson's secondary e-mail account after the Subpoena was issued.

# Exhibit 15

STATE OF NEW YORK
OFFICE OF THE ATTORNEY GENERAL

# SUBPOENA AD TESTIFICANDUM

**TO**: Exxon Mobil Corporation
c/o Michele Hirshman, Esq.
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019-6064

**YOU ARE HEREBY COMMANDED**, pursuant General Business Law § 352, Executive Law § 63(12), and § 2302(a) of the New York Civil Practice Law and Rules, to appear and testify, through one or more designated persons having knowledge of the subjects set forth in the Schedule attached hereto, before Eric T. Schneiderman, the Attorney General of the State of New York, or a designated Assistant Attorney General, on ***the 3rd day of May, 2017, at 9:30 a.m.***, or any agreed upon adjourned date or time, at 120 Broadway, New York, New York 10271, to testify in connection with an investigation concerning Exxon Mobil Corporation, and specifically in connection with the matters described in the attached Schedule, or any matter which the Attorney General deems pertinent thereto.

**PLEASE TAKE NOTICE** that the Attorney General deems the testimony commanded by this Subpoena to be relevant and material to an investigation and inquiry undertaken in the public interest.

**PLEASE TAKE FURTHER NOTICE** that Your disobedience of this Subpoena, by failing to attend and testify on the date, time and place stated above or on any agreed upon adjourned date or time, ***may subject You to prosecution for a misdemeanor or penalties and other lawful punishment*** under General Business Law § 352 and § 2308 of the New York Civil Practice Law, and/or other statutes.

**PLEASE TAKE FURTHER NOTICE** that You should not disclose the existence of this Subpoena, its contents, or any subsequent communications with the Office of the Attorney General while this investigation is pending. In the event You believe that You are required to disclose the existence of this Subpoena or any information related thereto, You shall notify the individual listed below immediately and well in advance of Your disclosure of the same.

Case 3:20-cv-02995-K Document 1-2 Filed 08/06/19 Page 58 of 121 PageID 247

**WITNESS, The Honorable Eric T. Schneiderman,** Attorney General of the State of New York, this 19th day of April, 2017.

By: ______________________________
John Oleske
Senior Enforcement Counsel
120 Broadway, 26th Floor
New York, New York 10271
(212) 416-8660

## SCHEDULE

## TOPICS FOR TESTIMONY

1. Exxon Mobil Corporation's ("Exxon") response to the Office of the New York State Attorney General's ("OAG") November 4, 2015 subpoena to Exxon (the "Subpoena"), including but not limited to:

   a. Date(s), person(s) instituting, and content of each preservation hold notice sent to each custodian;

   b. Date(s), person(s) conducting, and content of each custodial interview conducted;

   c. Date(s), person(s) conducting, and method of collecting potentially responsive or responsive documents, communications, and information for each custodian;

   d. Date(s), person(s) conducting, and method of reviewing potentially responsive or responsive documents, communications, and information for each custodian;

   e. Dates(s), person(s) conducting, and method of determination that potentially responsive or responsive documents, communications, and information were lost, for each custodian; and

   f. Dates(s), person(s) conducting, and method of recovery of potentially responsive or responsive documents, communications, and information that were lost for each custodian in 1(e).

2. Exxon's compliance with the Subpoena, including but not limited to the attestations required by Subpoena Instruction Nos. 3, 4, 10, 12, and 13 and including but not limited to the attestations required in the Affidavit Of Compliance Paragraph Nos. 5, 8 and 9.

3. Exxon's collection, preservation, review and production of Documents and Communications of reserves custodians responsive to the Subpoena, including but not limited to those of (a) William Strawbridge; (b) the Upstream Reserves Committee; (c) the EMPC Reserves Committee; (d) the EMDC Reserves Committee; and (e) the IOL Reserves Management Committee (RMC) for Time Period 1 of the Subpoena.

# Exhibit 16

- - - - - - - - - - - - - - - - - - - - -x

In the Matter of the Investigation of

EXXON MOBIL CORPORATION

- - - - - - - - - - - - - - - - - - - - -x

May 10, 2017

9:38 a.m.

EXAMINATION OF MICHELE HIRSHMAN, held at the Office of the Attorney General, 120 Broadway, New York, New York, before Jamie Ann Stanton, a Notary Public of the State of New York.

* * *

A P P E A R A N C E S:

STATE OF NEW YORK
OFFICE OF THE ATTORNEY GENERAL
ERIC T. SCHNEIDERMAN
120 Broadway
New York, New York 10271-0332

BY: JOHN OLESKE, ESQ.
MANDY DeROCHE, ESQ.

PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
Attorney for Exxon Mobil Corporation
1285 Avenue of the Americas
New York, New York 10019-6064
BY: DANIEL J. TOAL, ESQ.
NORA AHMED, ESQ.
JANE BOBET, ESQ.
Also present:
Ted Wells
* * *



M I C H E L E H I R S H M A N, having first been duly sworn by the Notary Public, was examined and testified as follows:

MR. TOAL: Before we get started, Ms. Hirshman is here to testify about the contents of her affirmation. We are not intending to and will not be waiving attorney/client privilege and work product protection, so we will try and get through this as best we can, but we will just have to take it one question at a time.

MR. OLESKE: Understood. Obviously, the Attorney General's Office is not waiving any objections it might have to assertions of privilege and the right to continue or reopen the examination to account for any testimony not taken as a result of such an assertion.

EXAMINATION BY
MR. OLESKE:



M. Hirshman

Q Please state your name for the record.
A Michele Hirshman.
Q Please state your address for the record.
A Paul, Weiss, Rifkind, Wharton & Garrison, LLP, 1285 Avenue of the Americas, New York, New York.
Q Ms. Hirshman, good morning.
A Good morning.
Q I am going to dispense with some of the preliminaries and just get to: You understand you are here to testify on behalf of ExxonMobil with our office's subpoena dated November 4, 2014, correct?
A I understand I am here to testify to the contents of my affirmation which concerns that subject matter.
Q And is there any reason that you are aware of why your testimony today would not be truthful or accurate?
A No.
Q And just some quick background:



M. Hirshman

You are currently employed by Paul, Weiss correct?
A I am a partner in the law firm of Paul, Weiss, yes.
Q And you have been a partner of Paul, Weiss in the last ten years, right?
A Correct.
Q And immediately preceding that, you were Deputy Attorney General for the State of New York for about eight years, correct?
A I was the First Deputy Attorney General for the State of New York for a little over eight years.
Q And then prior to that, you were in the Department of Justice, the Federal Department of Justice, for about 11 years, correct?
A That's correct.
MR. OLESKE: I would like to show you a document we will mark as Exhibit 1, if we can.
(Hirshman Exhibit 1 was marked for identification, as of this

M. Hirshman

date.)

Q Ms. Hirshman, can you please take a look at the document that you have been handed marked Exhibit 1, and just let me know when you are able to confirm whether or not this is the certification that you swore to on April 10th, 2017.

A (Reviewing exhibit.)

It is the document to which I affirmed on April 10, 2017.

Q And that is the same document that you referred to in your answer to my first question and that Mr. Toal to referred to in his colloquy before we began, correct?

A Correct. And there is also a supplemental affirmation as well.

MR. OLESKE: I will show you a document we will mark as Exhibit 2.

(Hirshman Exhibit 2 was marked for identification, as of this date.)

Q Ms. Hirshman, can you please look at the document that is been handed



M. Hirshman

you as Exhibit 2, and tell me whether or not you are able to confirm it is the supplement to your certification sworn to on May 3, 2017, that you were just referring to?

A (Reviewing exhibit.)

It is the supplemental affirmation, which I executed on May 3rd.

MR. OLESKE: I would like to show you a document that we will mark as Exhibit 3.

(Hirshman Exhibit 3 was marked for identification, as of this date.)

Q Ms. Hirshman, can you please review the document that is been handed you marked Exhibit 3, and when you are able to, please tell me if you recognize this document.

A (Reviewing exhibit.) I do.

Q What do you recognize this document to be?

MR. TOAL: John, before you go on, I think there is Exhibit A on



M. Hirshman

the back of this, and I'm not sure it actually belongs with this document.

MR. OLESKE: I see what you are saying. This is an extraneous part of a letter to which this document was attached; isn't it? This very last page, Exhibit A, letter from D. Toal.

MR. TOAL: This is not part of the affidavit of Connie Feinstein.

MR. OLESKE: Sure, we will let the record reflect that the last page on the back side of the paper of Exhibit 3 is extraneous to the rest of the document that we are talking about.

Q Is that your understanding, Ms. Hirshman?

A Well, what I can testify to is that with respect to pages -- the pages that are marked through page 13 of 13, in Exhibit 3, those pages of Hirshman Exhibit 3 were -- are the affidavit of Ms. Feinstein, which was attached as an



M. Hirshman

exhibit to my affirmation of April 10th.

Q And it was incorporated by reference into that affirmation, correct, of April 10th?

A I need to review the footnote. I think it -- it says in paragraph 45, that the affidavit, which is attached, describes the protocol used for the collection and review of documents belonging to the management custodians. So it was referred to in my affirmation and attached.

Q And Ms. Feinstein swore to that affirmation on March 30th of 2017; is that correct?

A I don't have personal knowledge of that. I see the affidavit and the document in front of me and I see, you know, Ms. Feinstein's signature as well as signatures of what appears to be a Texas Notary Public, indicating that date.

Q Sure, from your personal knowledge, though, you do know that

Page 10

M. Hirshman

Ms. Feinstein actually swore to this certification around that time, correct?

A I can tell you what I'm reading on the document.

Q Okay.

A I was not present for her swearing of that certification in front of the Notary.

MR. OLESKE: I am going to hand to the reporter what we will mark as Exhibit 4.

(Hirshman Exhibit 4 was marked for identification, as of this date.)

Q Ms. Hirshman, could you please just review the document that's been handed to you as Exhibit 4, and let me know when you are able to recognize that document.

A (Reviewing exhibit.) It appears to be the amended affidavit of Ms. Feinstein, executed on April 19th.

Q And this is a supplement or amendment to Exhibit 3, correct?

Page 11

M. Hirshman

A Correct.

MR. OLESKE: Why don't we take our break at this point?

[A recess was taken.]

MR. OLESKE: I am going to hand to the reporter to mark as Exhibit 5 a document.

(Hirshman Exhibit 5 was marked for identification, as of this date.)

THE WITNESS: I have the document in front of me.

Q Could you please review the document, and let me know when you are able to confirm whether or not you recognize this document.

A (Reviewing exhibit.) I do.

Q And what do you recognize this document to be?

A It appears to be the subpoena that was served on ExxonMobil around November 4, 2015.

Q And is this Exhibit 5 the subpoena that is referenced in your

Page 12

M. Hirshman

certification sworn to on April 10, 2017?

A In my certification to which I affirmed -- wait, could you repeat the question again?

Q Sure. Referring to Exhibit 1, at paragraph 2, is Exhibit 5 the subpoena referenced in paragraph 2 of Exhibit 1?

A Yes.

Q Was Paul, Weiss, your law firm, retained by ExxonMobil at or about the time of the issuance of this subpoena in order to represent it in connection with responding to the subpoena?

A Yes.

Q And were you and Mr. Wells designated as the lead counsel for Paul, Weiss in this matter?

A I would be hesitant to characterize any, you know, characterization, but Mr. Wells and I -- I believe Mr. Wells was contacted, and asked me to work on the matter with him.

Q And at or around the time that Paul, Weiss was retained for this

Page 13

M. Hirshman

purpose, did you receive a copy of the subpoena, Exhibit 5?

A Yes.

Q And did you review Exhibit 5 at that time?

A Yes.

Q Did you familiarize yourself with the contents of the document at that time?

A Generally, yes.

MR. OLESKE: I would like to mark this document as Exhibit 6, please.

(Hirshman Exhibit 6 was marked for identification, as of this date.)

Q Ms. Hirshman, could you please review the document that you have been handed marked Exhibit 6, and let me know when you have had a chance to determine whether you can confirm whether you recognize this document.

A Certainly.

(Reviewing exhibit.) I do.

Page 14

M. Hirshman
Q What do you recognize this document to be?
A It's correspondence that was sent to you and signed by me.
Q And what is the date of the correspondence?
A April 18th, 2016.
Q Was this correspondence sent in connection with your representation of Exxon in responding to the subpoena that was Exhibit 5?
A It was sent in connection with my representation of Exxon, and it covered some matters related to the subpoena as well as other matters.
Q If I could direct you to page 6 of that document.
A (Complying.)
Q And I would just ask you to, specifically, to yourself, read and just make sure you are familiar with the contents of that first full paragraph, beginning, "with respect to."
A Sure.

Page 15

M. Hirshman
Q And let me know when you are through with that paragraph.
A Great.
(Reviewing exhibit.)
Q Have you had a chance to review that paragraph, Ms. Hirshman?
A I have.
Q Did you write this paragraph?
A I am pretty sure I wrote significant parts of this paragraph, yes.
Q The paragraph states, in part, I am looking at the second line of the paragraph: ExxonMobil is well aware of its legal obligations to preserve documents in connection with its receipt of the subpoena.
You wrote that, correct?
A Yes.
Q And then you state: ExxonMobil's comprehensive effort to identify custodians with responsive documents plainly complies with applicable documents caselaw.
And you wrote that also,

Page 16

M. Hirshman
correct?
A Correct.
Q And you cite some caselaw and other authorities in the rest of the paragraph, correct?
A That is correct.
Q And you cite the First Department's holding in VOOM HD Holdings and also the Zubulake series of cases, correct?
A I cite the -- I cite that VOOM, Zubulake. I cite Zubulake's quotations on this subject.
Q And you also cite the Sedona Conference document in the eDiscovery field, correct?
A Yes, I did.
Q And if I could turn you to page 8.
A (Complying.)
Q Do you see that there is a heading, a bold number 8 and a heading, E-Discovery Contacts?
A Yes, I do.

Page 17

M. Hirshman
Q And that first paragraph right underneath that, it says: We have fully and accurately provided answers to all of your e-discovery inquiries and we therefore see no reason for your e-discovery specialists to speak with our counterparts at ExxonMobil.
You wrote that, correct?
A Yes.
Q And then you wrote: Messrs. Conlon and Wells and I collectively have been practicing law for over 100 years, and we each take great care in assuring that our representations to governmental bodies and opposing counsel are accurate.
You wrote that, correct?
A Yes, I did.
MR. OLESKE: Let's mark as Exhibit 7.
(Hirshman Exhibit 7 was marked for identification, as of this date.)
Q Ms. Hirshman, can you please

Page 18

M. Hirshman
review the document you have been handed marked Exhibit 7, and let me know when you are able to confirm whether or not you recognize it.
A (Reviewing exhibit.) Okay. I've read it.
Q Do you recognize this document?
A I do.
Q And what is this document?
A It's a correspondence from me to you, dated August 3rd, 2016.
Q I direct you to page 3 of this document.
A (Complying.)
Q On that page, do you see there is a bold heading that states: Preserved Documents and Custodians?
A Yes, I do.
Q And then going to the second line of the following paragraph, the letter reads: ExxonMobil is well aware of its preservation obligations, and that the duty to preserve extends only to those employees likely to have relevant

Page 19

M. Hirshman
information, i.e., what the caselaw defines as "key players," and not any person the Office decides to identify.
Did you write that?
A Yes.
Q When you referred to caselaw, and its definition of key players, you were referring to the Zubulake series of cases and following cases, correct?
MR. TOAL: Objection. Attorney/client privilege and work product protection.
MR. OLESKE: Just to clarify, I am asking what Ms. Hirshman was referring to -- when she says caselaw and key players, I'm asking whether she is, in fact, in this paragraph, referring to the same authorities that she cited in Exhibit 6.
MR. TOAL: I understand. Same objection. You are not entitled to Ms. Hirshman's mental impressions on legal issues.
MR. OLESKE: Let's mark

Page 20

M. Hirshman
Exhibit 8.
(Hirshman Exhibit 8 was marked for identification, as of this date.)
Q Ms. Hirshman, would you please review the document that's been handed to you as Exhibit 8, and let me know when you are able to confirm whether or not you recognize it.
A (Reviewing exhibit.)
MR. TOAL: Would you please read the question back, please?
[The requested portion of the record was read.]
A I can tell you what it purports to be, but I have never seen this document before.
Q So does this document purport to be an article from the New York Law Journal, dated December 6, 2016?
A That's what it looks like. I have not burdened everyone's time by reading the entirety of the document, which I never saw before.

Page 21

M. Hirshman
Q Okay, but you are confident --
A If you would like me to read it, I could spend time to read it.
Q I am just asking: You are confident from looking at the document that you have never seen the article?
A Correct.
Q You see that this article purports to have been authored by Mr. Toal and by a Mr. Christopher Boehning -- is that the correct pronunciation?
A It's name is Chris "Boehning."
Q Mr. Boehning is a partner at Paul, Weiss, correct?
A Both Mr. Toal and Mr. Boehning are my partners at Paul, Weiss.
Q And putting aside your familiarity or lack thereof with this particular article, you are aware that Mr. Toal and Mr. Boehning write an ongoing series of articles about complex litigation and e-discovery for the New York Law Journal, correct?

Page 22

M. Hirshman
A I'm actually not aware of that. I mean, I know that Mr. Boehning speaks on these issues occasionally, and I know Mr. Toal is very experienced in civil litigation and discovery issues.
Q Putting aside the issue of whether or not you specifically read the article, if I direct you to the front page of the article, do you see there is a bold heading in the middle of the page near the bottom, 'Rodman v. Safeway'?
A I see the heading Rodman v. Safeway.
Q And do you see a case citation immediately below that?
A I do.
Q Sitting here today, are you familiar at all with Rodman v. Safeway, that citation?
A I am not.
Q Putting aside your familiarity with Mr. Toal's potential authorship of article to the New York Law Journal, you are aware that Mr. Toal is an experienced

Page 23

M. Hirshman
e-discovery litigator, correct?
A I am aware, as I said, that Mr. Toal is experienced in civil litigation, including discovery and the processes associated with it.
Q And you, yourself, have been recognized with awards multiple times by publications and organizations for expertise in internal investigations, correct?
A I don't believe that's true.
Q Have you been honored with those sorts of awards with respect to representing clients complying with government investigations?
A I'm only aware of -- I can only think of one award I've been given as I sit here.
Q Why don't you just tell me what that is?
A It's from an organization, I don't remember the name now. It has -- Dick Dadey is the executive director, and it has to do with civic engagement that I

Page 24

M. Hirshman
have been honored.
Q Other than that, sitting here today, you don't know of any other instances where you have been honored for your work in civil litigation; is that correct?
A In civil litigation? No, I don't know any time that I have been honored or noted for work in civil litigation. I am recognized, I think, in chambers and other items.
Q If I could return you to Exhibit 1, please.
A (Complying.)
Q And if I could refer you to paragraph 1 of Exhibit 1. Paragraph 1 of Exhibit 1 states that you are a partner at the law firm of Paul, Weiss and either have personal information of the matter set forth in this document or state facts based on information and belief.
That was true when you swore to that, correct?
A It says I have personal

Page 25

M. Hirshman
knowledge of the matters or state facts based upon information and belief. And that was true and accurate at the time I affirmed.
Q And then the next sentence states: For the facts stated upon information and belief, I have made reasonable inquiries of individuals with knowledge to confirm the information.
You stated that, and that was true when you swore to it, correct?
A I stated that, and that was true at the time I made my affirmation, correct.
Q Who are the individuals that you spoke to with respect to facts stated upon information and belief?
A Sure.
MR. TOAL: And with respect to anyone at Paul, Weiss, you can just identify that you relied upon people at Paul, Weiss.
I am not going to allow you to inquire into the individual people

Page 26

M. Hirshman

at Paul, Weiss who she might have obtained knowledge from. I think that's protected by the attorney/client privilege and the work product protection.

MR. OLESKE: So just to be clear, for the remainder of this proceeding, you are going to be objecting on the basis of attorney/client privilege as to any identification of different roles played by different individuals at the law firm of Paul, Weiss; is that correct?

MR. TOAL: That's correct.

MR. OLESKE: And you are going to restrict Ms. Hirshman's answers to referring generically to Paul, Weiss?

MR. TOAL: That's correct.

MR. OLESKE: This is all subject -- everything will be subject to my earlier colloquy regarding our disagreement regarding the scope of

Page 27

M. Hirshman

the privilege.

Q So let's start with that. Did you make reasonable inquiries of individuals at Paul, Weiss?

A Yes.

Q Did you make reasonable inquiries of individuals who were employed by ExxonMobil Corporation?

A Over time, yes, which is -- but I guess to the extent I had conversations with people with ExxonMobil, that is the basis for my personal knowledge as well.

Q Well, I am putting aside contacts with ExxonMobil personnel from which you derived personal knowledge that may be part of this document.

I am asking you: What individuals at ExxonMobil Corporation did you make reasonable inquiries of in order to obtain facts stated on information and belief in this document?

A In this particular document, I did not need to speak to people for the completion of this affirmation.

Page 28

M. Hirshman

Q So the answer to the question is you spoke to no one at ExxonMobil Corporation regarding this document?

A For the completion of this particular document, that is correct.

Q And that includes Ms. Feinstein?

A I have never spoken to Ms. Feinstein.

Q Moving to paragraph 2. The document reads: I am Counsel to ExxonMobil Corporation in connection with this matter. As part of my responsibilities, I oversaw the production of documents in response to the subpoena duces tecum dated November 4, 2015.

You wrote this, and it was true when you swore to it; is that correct?

A Yes. I didn't swear to it. I affirmed and it is true.

Q Under the penalty of perjury, correct?

A Correct.

Page 29

M. Hirshman

Q When you state here that you oversaw the production of documents, does that include overseeing -- well, first, let me ask you: What do you mean by that, that you oversaw production of the documents? What does that mean?

A Sure. As part of my responsibilities, I oversaw the lawyers at the firm who were working with the client to identify, retrieve, review, determine responsiveness, of documents responsive to the subpoena.

Q So in addition to overseeing attorneys at Paul, Weiss, did you oversee the activities of the ExxonMobil Legal Department?

A I was familiar with the activities of the ExxonMobil Legal Department in connection with the effort to respond to the subpoena.

Q But I guess my question is: Does your oversight, did your oversight not include overseeing the actions of the ExxonMobil Legal Department in responding

Page 30

M. Hirshman
to the subpoena, or was that outside the purview of your oversight?
A My representation included consultation with ExxonMobil about the efforts to recover documents responsive to the subpoena.
Q Okay. I'm just asking a simple question, yes or no: Was ExxonMobil's Legal Department within the purview of your oversight of the company's response to the subpoena?
A I think in a general sense, yes.
Q And by virtue of the oversight in a general sense of the Legal Department, were you also responsible for overseeing the actions of the ExxonMobil Information Technology Department as it responded to the subpoena?
A I do not believe I was responsible for overseeing the legal technology department at ExxonMobil. I was familiar with the processes that they were employing, and I spoke to them in

Page 31

M. Hirshman
connection with representations to be made to your office.
Q Just to go back to something you just said when you were testifying, I believe you said that you do not believe you were responsible for overseeing the legal technology department.
Did you mean to say the Information Technology Department?
A I meant to say the Information Technology Department, yes.
Q And so you do not view your role of oversight as having included oversight of the ExxonMobil Information Technology Department; is that correct?
A That is correct.
Q Apart from people who worked on behalf of Paul, Weiss or people who worked on behalf of ExxonMobil Corporation, did your oversight include responsibility for overseeing any other individuals or entities?
A I would say, generally speaking, I had familiarity with the

Page 32

M. Hirshman
operations of the vendor who was part of the process.
Q Was there just one vendor who was part of the process?
A I am aware of one vendor as part of the process. There may have been others, but I am aware of one vendor.
Q And what was the name of that vendor?
A It's Kierstad.
Q How do you spell that?
A I believe it's K-I-E-R-S-T-A-D.
Q What sort of services did Kierstad provide in response to the subpoena?
A Kierstad is the vendor that hosts the -- I don't know that they host relativity, which is the platform on which documents are reviewed for determination of responsiveness, but Kierstad is the vendor that has the technology to run search terms through documents that are uploaded on to their platform which then are available on

Page 33

M. Hirshman
Relativity for review.
Q Do you have any other understanding of what Kierstad did in response to the subpoena other than what you just testified to?
A That is my general understanding of what Kierstad does.
Q Do you know whether or not other attorneys at Paul, Weiss would know more information about Kierstad's activities, including, but not limited to, the details about where the Relativity platform is located?
A Can you repeat the question again?
Q Sure. Do you know whether or not there are any other attorneys at Paul, Weiss who would have a greater understanding of Kierstad's activities, including, but not limited to, the specific information you are unaware of with respect to where the Relativity platform is hosted?
A Yes.

Page 34

M. Hirshman
Q But are you willing to identify who at Paul, Weiss has that information?
MR. TOAL: I would assert the same objection on attorney/client privilege and work product protection.
Q Do you know whether or not anyone at the ExxonMobil Legal Department has the same range of additional information or specifics with regard to Kierstad's activities?
A I expect so.
Q But you don't know that?
A I'm not certain.
Q Do you know whether or not anyone who works for ExxonMobil's Information Technology Department would have such information?
A That, I don't know.
Q Any other individuals or entities that we haven't discussed so far that you believe you were responsible for overseeing in connection with ExxonMobil's response to the subpoena?
A I don't believe so.

Page 35

M. Hirshman
Q If I can direct you to paragraph 3 of this document.
A (Complying.)
Q Paragraph 3 follows a bolded heading that says Subpoena, correct?
A Correct.
Q And the paragraph reads: ExxonMobil received the subpoena from the Environmental Protection Bureau of the New York Office of the Attorney General on November 4, 2015.
And then it continues: The subpoena sought documents relating to ExxonMobil's past climate change research and public statements concerning climate change.
You wrote this paragraph, correct?
A I am agreeing with the contents of this paragraph and this specific statement.
Q So you read this paragraph before you signed this document, correct?
A I read this, and I may have

Page 36

M. Hirshman
edited it.
Q That second sentence, where you state what the subpoena sought --
A Mm-hm.
Q -- the following language is not an exclusive list of the requests in the subpoena; is it?
A It is not exclusive.
Q I direct you to paragraph 4, please.
A (Complying.)
Q And immediately preceding paragraph 4, there is a bolded heading that says, Issuance of Legal Hold Notices, correct?
A Correct.
Q Paragraph 4 states that: ExxonMobil's Law Department uses the Atlas e-Discovery Process Management legal hold tool ("Atlas") to institute and send legal hold notices to individuals identified as reasonably likely to possess unique responsive documents pertinent to a pending, or a

Page 37

M. Hirshman
reasonably anticipated, investigation or litigation.
Did you write this paragraph?
A I don't know if I wrote it. It's certainly consistent in all respects of my understanding of Atlas.
Q And you read this paragraph --
A Absolutely.
Q -- before you signed the document, correct?
A Absolutely.
Q The contents of this paragraph, is this information that you testified to on information and belief?
A I have personal knowledge of this paragraph based on my conversations with people at ExxonMobil that I obtained in preparation for meetings with your office early in 2016 and perhaps before that.
Q Okay. So you obtained this information prior to the preparation of this document?
A I knew this information before.

Page 38

M. Hirshman
Q Sitting here, now, do you know any more specific information about the Atlas legal hold tool that is related in this paragraph 4?
A I know more -- some more information about -- some more detail about the information, but I'm not sure it's about the Atlas hold tool.
Q So sitting here today, are you unable to recall any additional specific information about the Atlas hold tool other than what's in this paragraph?
A The additional information that I am aware of with respect to holds, I just don't know whether it has to do with the hold tool or something else at Exxon.
Q So what is the additional information you have that you are not sure whether it relates to Atlas?
A I understand, based on the information relating to the Wayne Tracker matter, that there have been iterations of a program called Exchange at Exxon that provide different types of

Page 39

M. Hirshman
capabilities and that the company was transitioning to during this period. And I have no idea whether those are related to Atlas or separate.
Q And so you have no personal knowledge of how Atlas relates to this program you mentioned called Exchange; is that correct?
A Correct.
Q And the program that you mentioned called Exchange, do you know any other details about that program?
A No.
Q Do you know whether any other attorneys at Paul, Weiss would know more than you about the relationship between the Atlas legal hold tool and the program you know as Exchange?
A I don't know.
Q Do you know whether or not there are individuals at the Exxon Legal Department who would know more than you do about the relationship between the Atlas legal hold tool and the program you

Page 40

M. Hirshman
know as Exchange?
A I don't know if they're in the Legal Department.
Q Let me back up, then.
Do you know whether or not there are individuals employed by ExxonMobil Corporation who have more information than you do about the relationship between Atlas legal hold tool and the program you know as Exchange?
A I expect that there are.
Q But you don't know that for sure?
A I expect that there are, based on my understanding, yes.
Q Do you know what department of ExxonMobil Corporation those people work for?
A I would expect that they would be in Information Technology and in the Legal Department.
Q If I could direct you to paragraph 5?

Page 41

M. Hirshman
A Mm-hm.
Q Paragraph 5 states: At ExxonMobil, the automatic "file sweep" program is suspended for e-mail accounts linked to the Active Directory Account ("ADA") of any employee subject to a legal hold in the Atlas system.
Did you write that paragraph?
A I did not write that paragraph.
Q Did you read that paragraph before you signed the document?
A I absolutely did. And I read the Feinstein affidavit, and I had knowledge based on my prior conversations relating to the file sweep program.
Q Do you have any knowledge, sitting here today, about the automatic file sweep program utilized at ExxonMobil other than what's contained in this paragraph 5?
A I can explain it in my own words.
Q If you could, please?
A Yes. As I learned in the

Page 42

M. Hirshman
course of this matter, you know, in the beginning -- at the end of 2015 or the beginning of 2016, I understood that associated with Atlas was this program that would prevent -- would essentially disable the automatic sweep of e-mails if someone was placed on litigation hold.
Q Do you know any other details about the automatic file sweep program other than what you just testified to?
A That's my general understanding of how it operated, correct.
Q Do you know what, if any, computer application the file sweep program was associated with?
A Can you repeat that question again?
Q Yes. The paragraph refers to an automatic file sweep program.
My question is: Do you know which, if any, computer application the automatic file sweep program operates under?
A As I sit here, I can't name

Page 43

M. Hirshman
that. I don't recall whether such information is in the Feinstein affidavit or not.
Q Do you know, sitting here today, any details about the actual technical operation of the automatic file sweep program?
A Beyond my knowledge that the program prevents e-mails from being deleted if there's a litigation hold on a custodian, I don't know more about technical apparatus that will allow that to happen or not happen.
Q Just to clarify, is it your understanding that the automatic file sweep program is what prevents documents from being deleted?
A No. There's an automatic file sweep program. It is disabled when someone is put on litigation hold.
Q Right, okay.
So is it your understanding that there is some other computer application that disables the automatic

Page 44

M. Hirshman
file sweep program?
A I imagine so.
Q Do you know anything about that separate application, what the name of it is, or what computer software it uses?
A I do not know the name of the application, and I do not know what computer software it uses.
Q Do you know whether or not there are other attorneys at Paul, Weiss who would have more information about ExxonMobil's automatic file sweep program than what you have related in your affidavit and here today?
A I don't.
Q Do you know whether or not there are any individuals employed by ExxonMobil Corporation who would know more about Exxon's automatic file sweep program than what's in your affirmation and what you have related here today?
A I expect that there are.
Q As is similar to your prior answer, that you don't have any

Page 45

M. Hirshman
particular details; you just expect that somebody in the Legal or IT departments knows about this?
A I would expect that they do, yes.
Q But you have no specific individuals that you could point us to?
A I would be speculating about names.
Q Turning your attention to paragraph 6.
A (Complying.)
Q Paragraph 6 reads: On November 6, 2015, ExxonMobil issued legal hold notices through Atlas to ExxonMobil's Management Committee, scientists working on climate change issues, senior members of various departments, including Law; Public Government Affairs; Corporate Strategic Planning; safety Security Health and Environment ("SSH&E"); and others. Each employee was instructed to preserve information responsive to the Subpoena

M. Hirshman

(the "Legal Hold") and to confirm receipt of the legal hold notice.

Did you write this paragraph?

A I didn't write this paragraph, but I am fully familiar with all parts of it.

Q And you read this paragraph before you signed the document?

A Absolutely. You can -- my answer will be the same, I read each paragraph.

Q Then we can dispense with any questions about that in the future, thank you.

So do you have any knowledge of Exxon's process of issuing legal hold notices through Atlas other than what's related in this paragraph 6?

A Yes.

Q Can you please tell me what that is?

A At a general level, I understand, right, that the Atlas system, right, basically communicates to a



M. Hirshman

particular custodian the fact that that custodian is now on legal hold. And I think within the Atlas program, there's a provision for the person who receives that notice to acknowledge the receipt of that notice.

Q And so the process you just described, that's what you are referring to in the last sentence of paragraph 6, each employee was instructed to preserve information responsive to the subpoena, and to confirm receipt of the legal hold notice?

A Correct. And that happens through Atlas.

Q Okay. Do you know anything about Atlas's interaction with any other aspect of ExxonMobil's computer systems in connection with the legal hold notice process?

A Only what I've described about the suspension of the automatic file sweep.

Q Do you know whether or not



M. Hirshman

there are other attorneys at Paul, Weiss who would know more about ExxonMobil's issuance of legal hold notices through Atlas beyond what you have provided in paragraph 6 and testified to?

A I actually don't think so.

Q And do you know whether or not there are any persons employed by ExxonMobil who would have more information than you provided in your affidavit or in your testimony about its process for issuing legal hold notices through Atlas?

A I don't know.

Q If I could ask you to briefly review paragraphs 7 through 12, and just let me know when you have had a chance to read through paragraphs 7 through 12.

A Sure.

(Reviewing exhibit.) Okay. I have reviewed those paragraphs.

Q So paragraphs 7 through 12, is it fair to say that this relates the sequence of ExxonMobil adding additional



M. Hirshman

individuals to the legal hold in connection with response to this subpoena?

A Yes. And I had knowledge of that at the time.

Q And these processes that are described in paragraphs 7 through 12, these are or involve the same issuance of legal hold notices through Atlas that's described in paragraph 6, correct?

A I believe that would have been the case, but those paragraphs don't address that precise question.

Q Right. So paragraphs 7 through 12, did you write those yourself?

A I did not write those myself, but I had knowledge of them at the time that they occurred.

Q I guess the question is: Sitting here today, do you know whether or not, after the initial issuance of legal hold notices on November 6, 2015, that's related in paragraph 6, whether the following issuance of legal hold

M. Hirshman

notices in the subsequent paragraphs was done pursuant to the process involving the Atlas tool described in paragraph 6? Do you know that today?

A I don't specifically know that, but I have every expectation that it was because of my understanding about how the legal hold process at ExxonMobil was initiated here and thereafter followed.

Q Beyond what's described in paragraphs 4 through 12, did you personally do anything to regularly reiterate the need for these individuals to retain documents?

A Did I personally reiterate to the custodians the need?

Q To any individuals who were subject to the legal hold notices, did you regularly reiterate their obligations to any of them?

A No, I did not personally do that.

Q Do you know whether or not anyone at Paul, Weiss regularly



M. Hirshman

reiterated those obligations to any of those individuals?

A I do not believe that anyone at Paul, Weiss would have done so because there is an instruction in the initial legal hold to do so.

Q Do you know whether or not anyone employed by ExxonMobil Corporation regularly reiterated the obligations in the legal hold notices to the recipients of those notices?

A I do not know.

Q Did you, personally, do anything to monitor the compliance of the individuals identified in the legal hold notices with the obligations that were stated therein?

A I did not.

Q Do you know whether or not anyone, any attorneys at Paul, Weiss, did anything to monitor the compliance of the individuals who received legal hold notices and the obligations therein?

A I do not.



M. Hirshman

Q Do you know whether or not anyone employed by ExxonMobil Corporation did anything to monitor the compliance of the individuals who received the legal hold notices and the obligations therein?

A I believe as part of custodial interviews that ExxonMobil did, that instruction was reiterated as part of those interviews.

Q Other than ExxonMobil Corporation -- well, so would that be ExxonMobil Corporation monitoring compliance or would that be, then, reiterating the instructions?

A I believe it would have been ExxonMobil reiterating instructions in the context of a custodial interview.

Q If I could turn your attention to paragraph 16. I'm sorry, if I could just refer you to the prior page marked page 3 of 11 of this document. Preceding paragraph 13, there is a bold heading, Production of Documents, correct?

A Correct.



M. Hirshman

Q And if we continue to the next page, there are no further headings until or prior to paragraph 16, which is included in that same heading, correct?

A Correct.

Q Paragraph 16 states: In addition to the collection of hard copy documents, relevant electronic documents belonging to, or used by, each custodian were collected from multiple data sources.

Did you write that sentence?

A I did not write that sentence.

Q The next sentence says: The data sources collected therefore included not only e-mails and hard drives particular to each custodian, but also, where relevant, shared locations, including SharePoint MySites, SharePoint TeamSites, and I:/Drives.

Did you write that sentence?

A I did not write that sentence.

Q And then it says: ExxonMobil searched the shared locations and folders

Page 54

M. Hirshman
that the custodians themselves indicated that were reasonably likely to contain unique responsive documents.
Did you write that sentence?
A I may have edited that sentence.
Q You don't recall anything particular about that right now?
A I don't. I know it to be true.
Q If I could direct you to paragraph 18.
A (Complying.)
Q And immediately preceding paragraph 18, there is a bold heading reading, Document Review Protocol, correct?
A Correct.
Q And that continues under that heading for four paragraphs, 18, 19, 20, and 21, correct?
A Correct.
Q And then on the next page, there is another bold heading, Search Terms, correct?

Page 55

M. Hirshman
A Yes.
Q And three paragraphs following that in that heading, 22, 23, and 24, correct?
A That is correct.
Q Could you just please read through all seven of those paragraphs right now, so that you are familiar with the contents of what we are talking about specifically?
MR. TOAL: That's paragraphs 18 through 24?
MR. OLESKE: That's right.
A (Complying.) I have read those paragraphs.
Q Did you write paragraphs 18 through 24 yourself?
A Not by myself.
Q Do you recall any particulars about editing any of those paragraphs yourself?
A Because I have a lot of personal knowledge about this information, I don't recall whether I had

Page 56

M. Hirshman
to edit any of this.
Q Is it fair to say that these two sections of the document, the Document Review Protocol and the section entitled Search Terms, are your effort to fairly and accurately describe those two processes, the document review protocol and the application of search terms that was employed by ExxonMobil in response to the subpoena?
A I believe those paragraphs fairly describe that process, yes.
Q Now, these paragraphs do not apply to anything having to do with the documents of the Management Committee of ExxonMobil; do they?
A I think they do.
Q And is it your -- I have the same question about -- returning to paragraph 16.
Is it your understanding that paragraph 16 is an accurate description of the processes described therein as they relate to the Management Committee,

Page 57

M. Hirshman
as well as the rest of Exxon's production?
A I believe that aspects of paragraph 16 apply to the documents of the Management Committee, as do aspects of the remaining paragraphs, 18 through 21 and 22, it 23, 24, with, you know, a small variation with respect to Management Committee documents.
Q So it is your testimony that aspects of paragraphs 16 and 18 through 24 are accurate with respect to the collection of management custodian documents in response to the subpoena?
A I think probably all of them are.
Q Turning to paragraph 16.
A (Complying.) Mm -hm.
Q The last sentence reads:
ExxonMobil searched the shared locations and folders that the custodians themselves indicated were reasonably likely to contain unique responsive documents.

M. Hirshman

That sentence is not true as to management custodian documents; isn't that the case?

A I'm not sure whether that's not true or not.

Q If I could return your attention to your supplemental certification, which is Exhibit 2.

A (Complying.)

MR. OLESKE: Oh, I'm sorry, we have to introduce a new document, which is the May 3rd letter to which it was attached. So let's mark this as Exhibit 9.

(Hirshman Exhibit 9 was marked for identification, as of this date.)

Q Ms. Hirshman, could you please review what's been handed to you as Exhibit 9, and let me know when you are able to confirm whether or not you recognize it.

A Sure.

(Reviewing exhibit.) I do



M. Hirshman

recognize this document.

Q What is this document?

A It's a letter from Mr. Toal to you to which is attached various exhibits, including my supplemental affirmation.

Q And if I could ask you to turn to what's marked as page B-1 of this document. At the bottom center, it has page numbers and it's Exhibit B, B-1.

Do you see that?

A Okay, yes.

Q At the top it says: Exhibit B, Letter from D. Toal to J. Oleske, May 3, 2017, correct?

A Correct.

Q And this exhibit which continues on through the page marked B-5, this is a list of custodians at ExxonMobil Corporation or formerly at ExxonMobil Corporation who were custodians of documents produced to our office in response to the subpoena, correct?



M. Hirshman

A I believe so, yes.

Q And the second column of the chart in this exhibit lists the dates that these custodians were interviewed in connection with obtaining documents in response to the subpoena, correct?

A Correct.

Q And the third column identifies the affiliation of persons conducting those interviews, correct?

A Correct.

Q And every case that's listed here, the affiliation of persons conducting the interview is ExxonMobil Law Department, unless there was no interview conducted, in which the affiliation that is listed is "none," correct?

A Correct.

Q And is it the case that ExxonMobil Law Department conducted all of the interviews of document custodians in responding to this subpoena?

A That is my understanding, yes.



M. Hirshman

Q Do you have any understanding that attorneys from Paul, Weiss ever participated in any of those interviews?

A I do not believe that attorneys from Paul, Weiss participated in custodial interviews.

Q So according to this document, you are aware that there are numerous custodians identified who were not interviewed until March or April of 2017, correct?

A I have to review the document.

Q Before you do, without looking at the document, are you saying that you don't know whether or not there are custodians who were not interviewed with respect to subpoena compliance prior to March or April of this year?

A No. Your question was that there were numerous --

Q Yes.

A -- people who were not interviewed until March or April of this year, and I was not comfortable agreeing

Page 62

M. Hirshman
with your characterization of numerous without re-looking at the document.
Q Okay, I will ask a different question.
A Okay.
Q You are aware, without looking it at the document, that none of the Management Committee Custodians were interviewed prior to March or April 2017, correct?
A I am aware of that.
Q You are aware that none of the administrative assistants to any of those members of the Management Committee were interviewed prior to March or April of 2017, correct?
A I'd have to look at the document to ascertain that.
Q So without looking at the document, you think it's possible that some of the administrative assistants were interviewed prior to that?
A Based on my understanding of the process, I believe that

Page 63

M. Hirshman
administrative assistants were spoken to. I don't know whether they were interviewed earlier than that.
Q And there are some individuals who are custodians of documents who were never interviewed because they had left ExxonMobil Corporation, correct?
A That is my understanding.
Q And turning your attention to page B-4.
A (Complying.)
Q The fourth entry from the bottom, do you see, is for Mr. Rex Tillerson?
A I do see that.
Q And you recognize him as the former Chairman and CEO of ExxonMobil Corporation?
A I do.
Q And this document indicates that he was never interviewed, correct?
A That's what I -- that's what it does interview (sic) -- that's what it does indicate.

Page 64

M. Hirshman
Q And do you have any understanding that Mr. Tillerson was ever interviewed in connection with the subpoena --
MR. OLESKE: Strike that.
A I do not know.
Q Okay, you do not know.
A In connection with the subpoena.
Q Yes, in connection with the subpoena.
And Mr. Tillerson separated from the company, was it in December of 2016 or January of 2017; do you know which?
A I do not know which date.
Q But it was around sometime in those months; is that correct?
A I would expect that it would have been in and around that time period, yes.
Q And the subpoena had issued a year prior to that, in November of 2015, correct?

Page 65

M. Hirshman
A That's correct.
Q So Mr. Tillerson was, in fact, employed by ExxonMobil Corporation, but not interviewed in connection with the subpoena for about a year, correct?
A I believe what this indicated, he was not subject to a custodial interview relating to documents prior to the time he separated from the company, that's correct.
Q Right. And the same would go, for example, for any administrative assistant who had been with the company after the issuance of the subpoena, but who left before March or April 2017, correct?
A Again, I don't -- I don't know who is an administrative assistant or not on this list, so I can't speak to any particular person.
Q So you personally have -- you have no specific knowledge of who of these custodians are administrative assistants to the Management Committee

M. Hirshman
members?
A I'd have to look at the documents to see if I recognize any names.
Q So returning to paragraph 16 of your affirmation in Exhibit 1.
A (Complying.) Okay.
Q That last sentence of paragraph 16 where you say: ExxonMobil searched the shared locations and folders that the custodians themselves indicated were reasonably likely to contain unique responsive documents.
A Mm-hm.
Q That sentence is inaccurate with respect to at least Mr. Tillerson, correct, in that Exxon never interviewed Mr. Tillerson to find out where he would indicate documents would be?
A I think it is true -- it is accurate that ExxonMobil did not interview Mr. Tillerson. What I don't know is whether Mr. Tillerson had provided information so someone or that



M. Hirshman
someone knew the information already, you know, where locations and folders could be found to identify documents.
Q Okay, but those are two separate things, right? The first thing you said is whether Mr. Tillerson volunteered some information, but outside the context of an interview, correct, that's one possibility that you raise there?
A That is correct.
Q The other possibility you raise is that someone else knew where the documents were, and that's how they were located, correct?
A Correct.
Q But if it was that second thing, someone else knowing, that would not be consistent with the custodians, themselves, indicating where the documents are, correct?
A Correct.
Q Turning to paragraph 18.
A (Complying.)



M. Hirshman
Q You state here: On a rolling basis, hard copy documents and relevant sources of unfiltered electronic data, i.e. data to which search terms had not yet to be applied, identified during the document collection process were employed to ExxonMobil's third-party e-Discovery vendor.
Is that what this says?
A You inserted the word "not" in between "had" and "yet," but otherwise, that is what that paragraph says. I don't believe you intentionally inserted that.
Q Right. So with respect to all of the Management Committee Custodians, this paragraph is inaccurate in the sense that unfiltered electronic data was not provided to ExxonMobil's third-party e-Discovery vendor on a rolling basis; was it?
A Well, it wasn't entirely unfiltered in the same way that other custodial -- other custodians' electronic



M. Hirshman
data was provided.
Q Right. And, rather, the process that was followed was the separate process described in Ms. Feinstein's affidavit and in your firm's letters to the court of earlier this year, correct?
A Correct.
Q And paragraph 19 says: All hardcopy documents, and those electronic documents that hit on the search terms (discussed in further detail below in paragraphs 22-24), were uploaded to the e-Discovery vendor's document review platform.
That sentence is inaccurate with respect to the Management Committee Custodians, correct?
A I'm not certain of that.
Q Well, the search terms described in paragraphs 22 to 24 were, in fact, not applied to the electronic documents of the Management Committee Custodians prior to being uploaded to the

M. Hirshman

e-Discovery vendor's document review platform; isn't that the case? Isn't that what the Feinstein affidavit says?

A I have to look back at the Feinstein affidavit to answer that question.

Q Okay, then we can come back to that.

Paragraph 22 states: On December 15, 2015, ExxonMobil proposed a set of broad search terms designed to identify potentially responsive documents. The next day, the Attorney General proposed twelve modifications and three additional terms. On December 22, 2015, ExxonMobil confirmed its agreement to run the terms as modified by the Attorney General (the "Original Terms").

And then the paragraph continues: The Original Terms, which were used for the next year, included such commonplace phrases, and then it recites some phrases.

That final sentence is



M. Hirshman

inaccurate in that the Original Terms were not used for the next year to search for Management Committee documents; were they?

A Initially they were not, correct.

Q And then --

A I should clarify that, because I'd have to compare what I now understand to be the terms that were used initially on the Management Committee Custodians' e-mails with the specific words in this paragraph 22 to know whether those words were actually part of those searches, so -- and I -- I can do that at another time.

Q So sitting here today, without doing a comparison now, you don't already know whether or not the search terms that were used on the Management Committee documents were the same as the Original Terms listed in paragraph 22?

A Some of them were, and some of them weren't. What I understand is that



M. Hirshman

you couldn't use the boolean strings on the initial filtering of -- you know, the initial application of terms to the Management Committee documents.

Q I will come back to the details on that, but so is it in fact the case that you do know that the search terms that were applied to the Management Committee documents were at least, in some cases, not the original terms?

A Yes.

Q I direct your attention to paragraph 25.

A (Complying.)

Q In paragraph 25, it's preceded by a header in bold entitled, Custodians, correct?

A Correct.

Q Paragraph 25 states that: ExxonMobil has produced documents from custodians that are central to the Attorney General's investigation.

What is your understanding of which custodians are central to the



M. Hirshman

Attorney General's investigation?

A My understanding is that this investigation initiated with respect to questions of Exxon's historical treatment of climate change. And it has proceeded in different areas and the Attorney General's Office has identified priorities among custodians and the -- and ExxonMobil has produced documents from custodians responsive to the subpoena and what the Attorney General's office has identified as its priorities within the scope of the November 4th subpoena.

Q So my follow-up question is: When you say the word "central," here, does that mean anything more than what you just said, which is that these people had responsive documents to the subpoena?

A And they were most likely to be the people who had responsive documents to the subpoena.

Q And --

A They were the key custodians,

M. Hirshman

yes.

Q Okay. And was it Paul Weiss's role to determine who the key custodians were?

A I think it's Paul Weiss's role, along with the company, to review the subpoena. And as part of the effort to respond to the subpoena, to identify the individuals who were most likely to have documents responsive to the subpoena, to collect those documents, to review those documents, and to produce documents responsive to the subpoena.

Q So that was a responsibility both of Paul, Weiss and of the ExxonMobil Legal Department, in your understanding, correct?

A Well, I think it's the -- the responsibility of the company, and its attorneys play a significant role in assisting them in executing that responsibility.

Q And one of the ways in which key custodians are identified is through



M. Hirshman

the interviews that are conducted with potential custodians, correct?

A That is correct.

Q And, again, ExxonMobil Law Department conducted all of the interviews in this subpoena response, correct?

A Correct.

MR. TOAL: Can you read back that last question, please?

[The requested portion of the record was read.]

Q I will refer you to paragraph 26.

A (Complying.)

Q Paragraph reads: The custodians come from across the Company, and comprise a cross-section of individuals identified as most likely to have unique responsive documents and information sought by the Subpoena.

This is what you were just talking about; the central custodians are the ones most likely to have the unique



M. Hirshman

responsive documents, correct?

A I don't think it says the central custodians, but I think it -- that is an inference you could draw from it. This paragraph describes, you know, where the custodians were and what they can -- who they consist of, correct.

Q Paragraph 27, states that the custodians consist of, and then it lists different categories of individuals at ExxonMobil, correct?

A Correct.

Q And then the last two lines say that those categories include senior management across various business lines and ExxonMobil's Management Committee, correct?

A Correct.

Q Paragraph 28 states: ExxonMobil identified these custodians through comprehensive research, witness interviews, and document review, correct?

A Correct.

Q This paragraph is inaccurate



M. Hirshman

with respect to the Management Committee Custodians; isn't that correct?

A Well, I think we knew the names of the Management Committee Custodians because we knew their names. So there is true -- it is true that we did not have to do comprehensive research, witness interviews, and document review to identify the names of the Management Committee Custodians.

Q You didn't need to do that to identify the names of those individuals, right?

A Correct.

Q ExxonMobil did not conduct comprehensive research witness interviews and document review to identify where Management Committee custodian documents were located; did they?

A I disagree with that.

Q Did ExxonMobil conduct witness interviews to identify where ExxonMobil's Management Committee document custodians had their documents?

M. Hirshman
A I don't know the answer to that question.
MR. OLESKE: I am going to go into a new line of questioning at this point, and so I don't know whether or not you folks would prefer me to start with that and continue on for a half hour or hour or take an early lunch break now? I'll leave that to the convenience of Counsel and the witness.
Why don't we go off the record?
[A recess was taken.]
THE WITNESS: Before we get to the next phase, I just want to clarify a matter, because, Mr. Oleske, you are asking me specific questions, I am trying to answer those questions, but so that the record is clear, I think it's important when you read my entire affirmation, as well as Ms. Feinstein's affidavit, which is an exhibit to my affirmation, that the



M. Hirshman
record reflect that the process for production of the Management Committee documents was entirely the same as that for other custodians with the exception of what is laid out in Ms. Feinstein's affidavit and has been laid out to you and to your office in the past several months. So I think it's important that the record reflect that comprehensive facts.
MR. OLESKE: And I assure you that I will move on, later on, to questions about Ms. Feinstein's affidavit and the specific differences regarding the Management Committee documents, but thank you.
BY MR OLESKE:
Q For right now, I would like to turn your attention to paragraph 31 in Exhibit 1 of your affirmation.
Immediately preceding paragraph 31, there is a bold header reading: The Attorney General Sets the Production Priorities, correct?



M. Hirshman
A That is correct.
Q And then paragraph 31 states: By January 11, 2016, ExxonMobil had produced over 5,300 documents, totaling near 64,000 pages, from the four key custodians at ExxonMobil Research and Engineering who studied climate science, correct?
A That is correct.
Q Did you write this paragraph?
A I don't believe I wrote this paragraph, but it is completely consistent with my knowledge, and I confirmed the numbers.
Q So a little more than two months after the subpoena issued, ExxonMobil had produced 5,300 documents from custodians relating to the study of climate science, correct?
A It produced documents from those custodians, and that was their duties at ExxonMobil, correct.
Q And so prior to January 11, 2016, Exxon had been focused on producing



M. Hirshman
documents from custodians who studied climate science, correct?
A Prior to -- well, I would say ExxonMobil's obligation and its intent as expressed to the Attorney General's office early in the investigation was to produce the documents from persons who were, you know, involved in the study of climate science and we knew there were documents and we knew those were relevant and responsive to the subpoena.
Q I will move on.
Paragraph 32 states: The following month, the Attorney General informed ExxonMobil that his new "priority" was documents from custodians who contributed to the preparation of a 2014 report entitled "Energy and Carbon - Managing the Risks" -- and then there is a parenthetical -- ("Managing the Risks"), and those on ExxonMobil's greenhouse gas management team, ExxonMobil responded accordingly.
Did you write this paragraph?

M. Hirshman
A I don't believe I wrote this paragraph, but it is consistent with my knowledge of the investigation, and how it proceeded.
Q And then paragraph 33, states: After ExxonMobil produced over 24,000 documents (totaling over 110,000 pages) from Managing the Risks custodians, the Attorney General shifted his focus yet again.
Did you write that paragraph?
A I don't know, but, again, that is consistent with my knowledge of the matters in this investigation.
Q And then paragraph 34 states: In June 2016, the Attorney General indicated that his "immediate investigative priorities were focused specifically" on matters relating to ExxonMobil's "valuation, accounting, and reporting of its assets and liabilities" ("Valuation and Accounting Documents").
Did you write that paragraph?
A I didn't write it initially. I



M. Hirshman
confirmed -- I confirmed the quote marks, and I may have edited it.
Q And this paragraph relates back to paragraph 33, in that this paragraph 34 provides the specifics of the Attorney General shifting his focus yet again, described in paragraph 33, correct?
A Well, 33 describes the production of the documents relating to Managing the Risks custodians. And then 34 describes what the Attorney General said both publicly and in correspondence around that period of time about his priorities.
Q But just to be clear, the part of paragraph 33 that says, the Attorney General shifted his focus yet again, paragraph 34 describes that shift in focus, correct?
A That -- I think that that's correct, it specifies that, yes.
Q Okay.
A At least based on our understanding of what we understood the



M. Hirshman
Attorney's focus and shift in focus was.
MR. OLESKE: And so let me mark as Exhibit 10.
(Hirshman Exhibit 10 was marked for identification, as of this date.)
Q And Ms. Hirshman, can you please review the document that's been marked as Exhibit 10, and let me know when you are able to confirm whether or not you recognize the document.
A (Reviewing exhibit.) I have reviewed this.
Q Do you recognize this document?
A I do.
Q What do you recognize it to be?
A It's a letter from you to Ted and me.
Q And what is the date on the letter?
A June 24th, 2016.
Q Having now had the opportunity to review this letter, this letter is what you were referring to in paragraph



M. Hirshman
34, when you say, in June 2016, the Attorney General indicated, and then you say, immediate investigative priorities were focused specifically --
That quote is a quote from this letter; isn't it?
A I would have to look at that. I reviewed this letter generally for recognition; not to --
Q I refer you to page 2 of the letter, and ask you to look at the final paragraph on page 2.
And after you review that paragraph, let me know if that refreshes your recollection as to whether or not this letter is what you were referring to in paragraph 34 of Exhibit 1.
A (Reviewing exhibit.)
These quotes in paragraph 34 of my affirmation are a reference to these words in your letter of June 24th, which is Exhibit 10.
Q And so the events described in paragraph 31 through 34, this entire

M. Hirshman
sequence is what you, in your letters, and Paul, Weiss, in general, have referred to in this proceeding as the Attorney General's shifting priorities for Exxon's response to the subpoena, correct?
A These are among the items that constitute the reference to shifting priorities, correct. These are not the exclusive items, because there are public statements by the Attorney General in which he, himself, stated he was changing the focus.
Q You don't specify any of those in your affirmation; do you?
A I don't believe those were in my affirmation --
Q Do you recall --
A -- because they don't refer to document production.
Q Did you, sitting here, now, recall what specific time or place you are referring to the Attorney General making comments that he had shifted his



M. Hirshman
priorities?
A Yes. I recall two New York Times articles, I believe one in June and one in August of 2016. I believe the New York Times. There may be another media outlet, but yes, I do remember that specifically.
Q Between the events described in paragraphs 31 through 34, the letter that is Exhibit 10, and the public statements that you say you heard from the Attorney General, at this time, June of 2016, you believe that the Attorney General had shifted his priorities for response to the subpoena?
A I believe that the Attorney General was publicly remarking on an investigation and indicating that much.
Q But it wasn't just his remarks; it was this sequence of events in 31 through 34 that also described what you believed was a shift in priorities, correct?
A I see this and I see the words



M. Hirshman
and I see that they were from you and you said your immediate investigative priorities were focused on these issues.
Q Right, but I am not just referring to that letter, now, I'm also talking about in paragraph 31 and 32, you describe the production of climate science documents and then you say a month after January 11th, the following month, the Attorney General says he has a new priority about the Managing the Risks report, correct?
A I think that -- the priority in 32 relates to priority of production as opposed to priority of change of investigation. Because the Managing the Risks report is identified in, you know, obviously, in the original subpoena.
Q So you believe that the Managing the Risks, this is not a shift in priorities, described in paragraph 32?
A The title of this section is the Attorney General Sets the Production Priorities.



M. Hirshman
Q Right, but I guess what I am referring to is paragraph 33, which refers to the June shift that you have described says, shifted his focus yet again.
And so when you say "yet again," is the prior instance you were referring to the shift from climate science in January or up to January of 2016 to Managing the Risks the following month?
A I think that's a fair focus.
Q So if I could refer you to Exhibit 5, the subpoena.
A (Complying.)
Q And if I could turn your attention to page 8 of that document.
A (Complying.)
Q Could you please just review for me to yourself items 3 and 4 on page 8, and let me know when you have a chance to read through those items.
A (Reviewing exhibit.) I have read them.

M. Hirshman

Q Item 3 is one of the Documents to Be Produced categories in the subpoena, correct?

A Yes.

Q It's the header at the top of the page? Okay.

And item 3 requests: All Documents and Communications, within Time Period 2, Concerning the integration of Climate Change-related issues.

And then it lists a series of items, (a) through (g), and then says: Into Your business decisions, including but not limited to, financial projections and analyses, operations projections and analyses and strategic planning performed by you.

You read this request at the time you received the subpoena, correct?

A Correct.

Q And item 4 calls for: All Documents and Communications within Time Period 1, Concerning whether and how You disclosed the impacts of Climate Change



M. Hirshman

(including but not limited to regulatory risks and opportunities, physical risks and opportunities, Greenhouse Gas emissions and management, indirect risks and opportunities, International Energy Agency scenarios for energy consumption, and other carbon scenarios) in Your filings with the U.S. Securities and Exchange Commission and in Your public-facing and investor-facing reports including but not limited to Your Outlook For Energy reports, Your Energy Trends, Greenhouse Gas Emissions, and Alternative Energy reports, and Your Energy and Carbon - Managing the Risks Report.

You read this paragraph when you received the subpoena, correct?

A Correct.

Q And the end of this item number 4 which lists the Energy and Carbon - Managing the Risks Report, that was what you were just referring to in your previous testimony when you said that the Managing the Risks report was



M. Hirshman

actually mentioned in the subpoena, correct?

A Correct.

MR. OLESKE: I am going to mark as Exhibit 11.

(Hirshman Exhibit 11 was marked for identification, as of this date.)

Q Ms. Hirshman, could you please review the document that is been marked as Exhibit 11, and let me know when you are able to confirm whether or not you recognize this document.

A (Reviewing exhibit.) I recognize this document.

Q What is this document?

A It's a series of e-mails between Monica Wagner and others and Paul, Weiss and Pat Conlon is also on these documents, as well.

Q Just to direct your attention to the second physical page of this exhibit, do you recognize that there is an e-mail from Monica Wagner to



M. Hirshman

Mr. Wells, yourself and others dated December 14, 2015?

A Yes.

Q And if I direct your attention to the next physical page, the first full paragraph that begins "finally." It states: Finally, we would like to request that as the next priority item, documents and communications of the authors and contributors to the 2014 Report entitled, Energy and Carbon - Managing the Risks (see Subpoena Request No. 4) be produced, including but not limited to those of Peter Trelenbeg and Robert Luettgen.

Do you see that?

A I do see that.

Q So paragraph 32 your affirmation is false; isn't it?

A No.

Q Please refer to paragraph 32 of your affirmation.

A (Complying.)

Q Paragraph 31, first of all,

Page 94

M. Hirshman

says: By January 11, 2016, and then recalls events that had taken place up to that time. And paragraph 32 says: The following month, the Attorney General informed ExxonMobil of a new priority.
In fact, the Attorney General had notified you of that priority a month prior to January 11, 2016, correct?
A May I answer the question --
Q Yes.
A -- so that I can give a complete answer?
At the time I considered this e-mail to be a suggestion and a direction, although I don't believe that the Attorney General has the power to direct, but to be a suggestion and -- to us that essentially once you produce the science custodians, then this is what we want you to turn to next. And we were producing the science custodians. There was never any question in my mind that we needed to -- that the Attorney General's office would want to focus on this issue.

Page 95

M. Hirshman

It was a matter of this is a very broad subpoena, there were many documents responsive to the subpoena. We were acting expeditiously to produce as many documents as possible.
Q Ms. Hirshman, you haven't answered my question.
A I did answer your question. The statement is not false.
Q Paragraph 32 says that the Attorney General informed ExxonMobil that his new priority was documents from custodians who contributed to the Managing the Risks report.
Those events actually occurred in December of 2015, not in February of 2016, correct?
A I believe there's correspondence in February of -- in February of 2016 that talks about Managing the Risks and greenhouse gas issue management teams from your -- from your office.
Q Okay, but ExxonMobil was not

Page 96

M. Hirshman

informed of the priority of producing Managing the Risks of custodians for the first time in February 2016; they were notified of that in December of 2015, correct?
A That's not what -- right. And my affirmation does not say that in February 2016, ExxonMobil was notified for the first time that this was a priority for the office.
Q And it is your belief, sitting here today, that this is an accurate and non-misleading description of these series of events?
A Yes, I do.
Q Paragraph 33 mentions production of documents relating to the Managing the Risks custodians, correct?
A Yes, it does.
Q And it goes on to describe, in paragraph 34, the shift we talked about in June 2016. So putting those timelines together, that means that as of June 2016, Exxon had produced over 24,000

Page 97

M. Hirshman

documents relating to the Managing the Risks custodians, correct?
A Correct. That is my understanding.
Q But, in fact, ExxonMobil had not completed production of documents relating to the Managing the Risks custodians in June 2016, had they?
A I would expect that to be correct.
Q That they had not?
A That we had not completed production.
Q Okay.
A That we had produced some documents, but that there might be additional documents to be produced.
Q And it is, in fact, true that from the time of Ms. Wagner's December 14, 2015, e-mail, asking Exxon to prioritize next the production of Managing the Risks documents, it took ExxonMobil more than 9 months to complete production of documents relating to that

Page 98

M. Hirshman

report, correct?

A I'm not certain of that. I don't know when all of the documents for Managing the Risks custodians were produced. And I don't know when -- I have a recollection that your office identified people as associated with Managing the Risks, and there had to be review done to determine whether your office's identifications, in fact, you know, bore out as individuals possessing documents, so I don't know whether 9 months is accurate or not.

Q Do you have any independent basis to know how long it took ExxonMobil, from when it started producing documents, from Managing the Risks, to complete that production?

A What does "independent basis" mean?

Q Do you have any knowledge, sitting here today --

A I'd have to go back and look at the various letters and the custodians

Page 99

M. Hirshman

identified and match those up.

Q So without looking at, referring to other documents to refresh your recollection, you don't have a recollection you can testify to today?

A With respect to -- no, I do not. There are many millions of pages of documents produced here.

Q You are familiar with the Managing the Risks Report, correct?

A Yes.

Q And you are aware that the Managing the Risks Report relates, at least in part, to the integration of climate change, regulation risk into Exxon's business decisions, correct?

A I'd have to review it to make certain that your words accurately characterize the report, but I understand generally the genesis of the Managing the Risks Report.

Q Why don't you tell me what your understanding of the Managing the Risks Report is about.

Page 100

M. Hirshman

A My recollection is that there were some shareholders who were interested in how ExxonMobil dealt with issues relating to CO2 emissions and that this report was prepared, in part, to address some of those issues.

Q Do you know any of the specifics as to what the issues relating to carbon emissions were that were the genesis of the report?

MR. TOAL: I am just going to instruct the witness to exclude from your answer anything that's covered by the attorney/client privilege.

THE WITNESS: Yeah, I can't answer.

A I don't believe I have any -- I don't believe I have knowledge separate and apart from privileged conversations that I could draw on today without me reading the report.

Q From your review of Managing the Risks, do you know whether or not the Managing the Risks Report incorporates a

Page 101

M. Hirshman

discussion of ExxonMobil's use of a proxy cost of carbon?

A I don't. I don't remember the specifics of the words of the report.

Q Do you know whether or not the Managing the Risks report includes any discussion of the potential for Exxon's assets to become stranded as a result of climate change regulation?

A No, I can't tell you -- I can't, as I sit here, remember the contents of the document, standing alone.

Q With respect to the subject area I just asked you about; is that correct?

A I think that would be true of almost every subject area.

Q Well, I will ask just to be sure.

Do you know whether or not the Managing the Risks Report includes any discussion of processes that ExxonMobil uses to ensure that it is evaluating the risk of potential future climate change

M. Hirshman
regulation?
A As I sit here, you know, I do -- as I sit here, I cannot report to you the specific contents of the report.
Q I will ask one more question about it.
A Sure.
Q Do you know whether or not the Managing the Risks Report addresses Exxon's evaluation of the likelihood of a future low carbon scenario?
A Without reference to privileged information, I can't speak to that.
Q So turning to paragraph 34, again, where --
A This is in Exhibit 1?
Q Yes, this is in Exhibit 1, I am sorry.
So paragraph 34 of your affirmation, Exhibit 1, this is where you quote the June 24th letter, which is Exhibit 10.
Do you have them both in front of you?



M. Hirshman
A Yes.
Q Okay. So you quote from the letter in paragraph 34 from page 2 of the letter, saying, the portion of the letter on page 2 that says: Our immediate investigative priorities are focused specifically, and then you end your quote from the letter, the first portion of your quote from the letter of paragraph 34 there, correct?
A After the word "liabilities."
Q Well, you --
A Yes.
Q The quotation marks in your paragraph begin before "immediate," correct?
A Correct.
Q And they end after the word "specifically," correct?
A Correct.
Q And then you have your own language saying, on matters relating to ExxonMobil's, and then you begin the quotes again, valuation, accounting and



M. Hirshman
reporting of its assets and liabilities.
A Yes.
Q And you end the quote there, correct?
A Yes. And the words "on matters" and "ExxonMobil's" are also in your letter, but you are absolutely correct as to where the quotes begin and end, both in my affirmation.
Q And you refer to these documents collectively in your parenthetical as valuation and accounting documents, correct?
A Correct.
Q The letter actually goes on to ask for documents relating to -- and this is the end of page 2 -- the impact of climate change and related government action on such valuation, accounting and reporting, correct?
A The letter does say that, correct.
Q But you don't include that in your summary in paragraph 34; do you?



M. Hirshman
A It is not included there.
Q And then that paragraph continues and ends with the sentence: For your convenience, we have outlined exemplar categories of responsive documents below.
Correct?
A That is what the letter states, yes.
Q I am going to ask you to read to yourself the numbered 1 through 6 that immediately follows that paragraph, and please let me know when you have had a chance to read it.
A Okay.
(Reviewing exhibit.) I've completed reading numbers 1 through 6 from page 3 of Exhibit 10.
Q Having read numbers 1 through 6, does that exercise refresh your recollection in any respect as to the contents of the Managing the Risks Report?
A No.

M. Hirshman

Q And so sitting here today, based on your prior testimony, you have no way of knowing whether or not the categories outlined in numbers 1 through 6 relate to the subject matter of the Managing the Risks Report; do you?

A Well, with respect to number 5, it states: Such as in the 2014 Managing the Risks Report. So I expect you would have not said that if you did not know that that to be the content in the Managing the Risks Report.

Q Right, but sitting here today, apart from that being included in number 5, you have no independent way to know whether or not that's true, whether or not the subject matter of number 5 is, in fact, the subject matter of the Managing the Risks Report, correct?

A Generally expect that governmental officials will not write things that are false.

Q Sure, sure. I am just trying to differentiate between knowledge that



M. Hirshman

you gained as a result of relying on that expectation in this list and knowledge that you had independently before you saw this again today. And what I am trying to get at is that including number 5, but as to all of numbers 1 through 6, you have no basis, apart from what you read here today, to know whether or not these are the same subject matter as what's in Managing the Risks, correct?

A I don't have a recollection of the specific content of Managing the Risks, correct.

Q Having read numbers 1 through 6 again, do you know whether or not these categories of documents are responsive to items number 3 and 4 on page 8 of the subpoena, which is Exhibit 5?

MR. TOAL: Objection. Attorney/client privilege. I think that calls for a legal interpretation of these categories and the language in the subpoena.

MR. OLESKE: I think this is



M. Hirshman

probably going to be the time where I prefer to take a lunch break, if we can. I am about to move on to new subject matter.

THE WITNESS: I should note 1 item, though. I don't believe paragraph number 4 on page 3 relates to the managing the content of -- to the Managing the Risks Report or its words because it references statements made in 2016, and the Managing the Risks Report was prepared several years earlier.

Q Right, specifically to that point, though, let's just get into the record, number 4 asks for documents relating to Rex Tillerson's statements at ExxonMobil's 2016 shareholder meeting that most of ExxonMobil's projects are either too short term or too large for the cost of carbon to affect its decisionmaking.

You are saying you don't believe that relates to Managing the



M. Hirshman

Risks because it's describing an event in 2016, correct?

A To the extent that what you are trying to get me to -- what you are trying to ask me is whether this refreshes my recollection of the content of the Managing the Risks Report. And none of it does generally. The topics that are listed here, I would expect, have some relevance to the report, but number 4, I think I could say pretty clearly doesn't relate to the content of the report, although the subject matter may be the same.

MR. OLESKE: Thank you. Why don't we take a break for lunch, if that works for everybody else? And it's 12:37. Like I said, I think we are moving fairly briskly, so I think we could take a full hour.

[Whereupon, a luncheon recess was taken.]

M. Hirshman
[Whereupon, after a luncheon recess was taken, the following was had:]

A F T E R N O O N S E S S I O N

BY MR OLESKE:
Q Ms. Hirshman, I would like to direct you now to Exhibit 1, your affirmation at paragraph 44.
A (Complying.)
Q And immediately preceding paragraph 44, there is a bolded heading that reads: ExxonMobil Addresses Additional Concerns Raised By the Attorney General, correct?
A Correct.
Q And then paragraph 44 relates that the Attorney General inquired about the volume of data for Management Committee custodians, correct?
A Correct.
Q And then moving to paragraph 45, this is where you reference,



M. Hirshman
incorporate, and attach Ms. Feinstein's affidavit, correct?
A I reference it and attach it.
Q When you say here that the affidavit dated March 30, 2017, describes the protocol, does that mean to incorporate into your affidavit a representation on your part, at least, on information and belief that her affidavit accurately describes the protocol?
A No. I have reviewed her affidavit. She swore to it. And I have every expectation that her sworn affidavit is truthful.
Q Did you --
A And, therefore, that is why I was happy to submit it along with my affirmation.
Q Paragraph 46, just says that in response to issues raised by the Attorney General, Exxon conducted additional searches of the Management Committee Custodians, correct?
A Correct.



M. Hirshman
Q So --
A And -- and that their information about that is reflected in her affidavit.
Q It doesn't say that in paragraph 46; that's what you are telling us?
A I'm telling you that and I'm describing it, yes.
Q And you believe that her affidavit accurately reflects the facts related in paragraph 46?
A I have -- yes, to that question, yes. And her affidavit is Exhibit 3.
Q So the process for preserving, collecting, reviewing and producing documents from the Management Committee Custodians that is described in Ms. Feinstein's affidavit does differ in some respects from the process that you described earlier in your affidavit, in paragraphs 16 and 18 through 24, correct?
A I believe it differs in only



M. Hirshman
one respect.
Q What's the one respect in which you believe it differs?
A That with respect to electronic data from the management custodians, there were search terms applied to extract that electronic data, which was then transferred to the vendor and put on the review platform. With respect to other custodians, the entirety of their electronic data was -- e-mail data, at least, was taken and unfiltered placed on the vendor's platform where search terms were then -- where, then, the agreed-upon search terms were then applied. The agreed-upon search terms were also applied at the vendor to the management custodian's data.
Q Okay.
A That's what my understanding is of the difference.
Q You are aware that unlike the other custodians, ExxonMobil's Legal Department did not interview the

Page 114

M. Hirshman

Management Committee Custodians prior to attempting to collect their documents in the first instance; you are aware of that, right?

A I don't know if I'm aware of that. I would have to refresh my recollection with respect to that.

Q Are you aware that Ms. Feinstein testified that with respect to documents other than e-mails, ExxonMobil's Legal Department issued some kind of instructions to the custodians' administrative assistants as to how to locate such non-e-mail documents?

MR. TOAL: I am going to direct the witness to exclude from her answer any information she learned from Counsel. And since she wasn't present for that examination, I don't see how she could possibly know that otherwise.

MR. OLESKE: I will rephrase my question.

Q In your role as, in overseeing

Page 115

M. Hirshman

ExxonMobil's compliance with this subpoena, are you aware of whether or not Ms. Feinstein has provided testimony regarding the specific process by which administrative assistants were directed to obtain documents from Management Committee Custodians?

MR. TOAL: I am going to make the same objection based on attorney/client privilege. If you can reframe the question to avoid focusing on what she learned from --

MR. OLESKE: I will.

MR. TOAL: -- Counsel.

MR. OLESKE: I will.

Q Sitting here, now, regardless of the source of information, are you aware whether or not Exxon's Legal Department issued instructions to administrative assistants of Management Committee Custodians with respect to how to collect non-e-mail documents from those custodians?

A I expect that they would have,

Page 116

M. Hirshman

because I know that they -- and I know this from personal knowledge, early in the investigation, that the Legal Department spoke with those assistants in order to collect management custodian -- Management Committee Custodians' documents.

Q There are no interviews with the administrative assistants listed in the documents that Paul, Weiss has provided prior to March of this year.

Are you aware that notwithstanding that disclosure from Paul, Weiss, that ExxonMobil actually did interview those administrative assistants at some time prior to March or April of this year?

A No. I'm aware that they talked to them as part of the process of obtaining the data.

Q Are you --

A And I know -- and I know that historically and based on my personal knowledge, going back to the early part

Page 117

M. Hirshman

of the investigation.

Q Do you have any knowledge as to what the instructions were from ExxonMobil's Legal Department to the administrative assistants with respect to how they should collect documents from Management Committee Custodians other than e-mails?

MR. TOAL: Objection. Attorney/client privilege.

Q Are you aware that Ms. Feinstein has provided information that the e-mails of Management Committee Custodians were initially collected by someone named Bob Lauck?

MR. TOAL: Objection. Attorney/client privilege.

Q Separate from anything Ms. Feinstein may have said, are you aware of whether or not ExxonMobil had someone named Bob Lauck conduct a search for e-mails of Management Committee Custodians as part of the process described in Ms. Feinstein's affidavit?

M. Hirshman

A Apart from communications -- wait, did you say in Ms. Feinstein's affidavit? Why don't you ask me the question again?

Q Are you aware of whether or not ExxonMobil directed someone named Bob Lauck to conduct a search for e-mails of Management Committee Custodians as part of the process described in Ms. Feinstein's affidavit?

A I don't think so.

Q Do you know who Bob Lauck is?

A I recognize the name, but I can't tell you what his title is.

Q Apart from not knowing his title, do you know if he works for ExxonMobil Corporation?

A I would expect that if his name came up in the course of this, he has some affiliation with ExxonMobil Corporation.

Q Okay, but apart from that, you have no independent knowledge of that?

A No.



M. Hirshman

Q And you have no independent knowledge of what someone named Bob Lauck's role in this whole subpoena compliance would have been; is that correct?

A Apart from privileged communications, no.

Q So is it fair to say that you never had any direct contact yourself with someone named Bob Lauck?

A That is correct.

Q Previously you mentioned that you did have --

A As far as I know.

Q Okay.

A Right? I don't know if he was on a call that I was on also, but I don't know.

Q Previously in your testimony, you mentioned that you did have personal communications with unspecified persons who worked for ExxonMobil's Information Technology Department.

Do you recall the names of any



M. Hirshman

of those people?

A I don't recall their names, but they were both non-lawyers and lawyers.

Q Are you saying that there were lawyers within the IT department that you had contact with?

A I don't know whether they're in the IT department or whether they're in the Legal Department, but I know there's a lawyer who is associated with IT issues.

Q Is that Mr. Bolia?

A No.

Q But you don't recall the name of the lawyer you are talking about?

A I think the lawyer's name is Robert Levy.

Q And do you recall the names of any of the non-lawyers who you spoke to at ExxonMobil Information Technology?

A I don't. It was early on in the investigation.

Q Previously you described that the difference you are aware of being how



M. Hirshman

the search terms were applied to the Management Committee Custodians' documents, correct?

A I don't think that's a correct recitation of what I said.

Q Okay. Well, why don't you tell me, specifically, with respect to how e-mails were collected from Management Committee Custodians, what is your understanding of how that process differed from the collection of e-mails from other custodians?

A As I said, there were e-mails and those e-mails have been provided to you in exhibits to various documents. There were e-mail terms that were initially applied to the Management Committee Custodians' documents as well as Mr. Welberry's, in order to obtain potentially responsive documents and avoid the uploading onto the vendor system of other confidential materials, that is, so that the entirety of their e-mail box was not uploaded, unfiltered

M. Hirshman

onto the vendor's review platform.
Q Okay.
A That's what I understand the distinction to be between Management Committee Custodians and Mr. Welberry and other custodians.
Q Who is Mr. Welberry?
A He is -- I believe he's in the Corporate Secretary's office.
Q How do you spell his name?
A I think it's W-E-L-B-E-R-R-Y.
Q So you are aware that there is a difference in that the Management Committee Custodians's e-mail files were not simply uploaded unfiltered to the vendor, correct, that didn't happen for them in the first three searches that ExxonMobil conducted, correct?
A Well, that didn't happen in the first search. And I believe in the intermediate, second, and third searches, there were other ways of extracting data. And it was not until a fourth search, as described in Ms. Feinstein's affidavit,



M. Hirshman

that their data was uploaded.
Q It was only in the fourth search that the data was uploaded unfiltered; the entire e-mail contents were uploaded unfiltered only in the fourth search, correct?
A I believe that's correct.
Q So do you know whether or not the administrative assistants were told to identify certain folders or locations of e-mail for the search term process that you described to be applied to?
A Locations of e-mail?
Q Yes.
A I mean, people have e-mail accounts.
Q Sure. But for example, you are aware -- do you know what e-mail program ExxonMobil was using at the time of the document collection?
A I believe I've read it in a document, but I don't know.
Q Sitting here now, you -- okay --



M. Hirshman

A It's either Lotus Notes, something like that. You know, Lotus Notes, Outlook, something. I can't tell you without going back and looking at a document.
Q So sitting here today, you are not familiar with whether or not the e-mail program that Exxon had in active use at the time of the events described in Ms. Feinstein's affidavit was Lotus Notes or Outlook or something else?
A That is correct.
Q Are you familiar with Outlook?
A I have general familiarity, but I am not -- I am not and I continue to be not technologically proficient. I use e-mail regularly.
Q Right. Are you familiar with the search function -- or do you use Outlook, yourself?
A I believe I use Outlook.
Q Are you familiar with the search function in Outlook that allows you to type a word into a box at the top



M. Hirshman

left of the screen and hit "enter" and a list of results will show up below that, indicating which e-mails match that term? Are you familiar with that tool?
A I'm familiar with that. I don't use that tool. I only use the search function to search by the name of the sender or recipient.
Q So you never use it to search for text; is that correct?
A I don't. I know. It's funny, but it's true.
Q Are you aware that in this instance, what happened was that someone from ExxonMobil typed individual words into the Management Committee Custodians' Outlook search function and got a list of results that way?
A Is the question am I aware?
Q Yes.
A No, I'm not aware.
Q Is there anyone else at Paul, Weiss who would have greater familiarity with the specifics of how ExxonMobil

M. Hirshman

searched for e-mails in the first three searches described in Ms. Feinstein's affidavit?

A I don't think so.

Q Do you know if there is anyone at the ExxonMobil Legal Department who would have greater or more specific information in that respect?

A I don't know -- I know Dan Bolia is involved in this process. I don't know whether he would have more specific information on that particular question.

Q And the same question with respect to whether you know whether anyone at ExxonMobil's Information Technology Department would have more specific information about that subject matter?

A I -- I don't know.

Q Sitting here today now, are you personally aware of any vulnerabilities or flaws in using the search function in Outlook to locate documents?



M. Hirshman

A Specifically, no.

Q Do you know whether or not anyone else at Paul, Weiss would have a greater knowledge of any vulnerabilities or flaws in using Microsoft Outlook's search function to identify e-mails?

A I have no idea.

Q Same question with respect to ExxonMobil's Legal Department?

A I don't know specifically with respect to that specific question.

Q And same question with respect to ExxonMobil's Information Technology Department?

A Correct.

Q And do you --

A But I want to be clear, I understood early on that search terms were going to be applied to the Management Committee Custodians' data and that the data would not be uploaded in an unfiltered fashion on the vendor's review platform. I want to make that crystal clear.



M. Hirshman

Q Okay, you testified in that respect. I want to clarify: When did you become aware of that? You just testified that it was early on?

A Early. Yeah, I would say between November and January.

Q So you knew at that time --

A November of 2015 and January 2016, yes.

Q So you knew at that time that Exxon was not going to upload the unfiltered data and instead was going to use a different protocol?

A I understood precisely -- I understood that the protocol would involve, because of the sensitivity of the data of the management custodians' e-mail accounts, that their -- that, you know, very broad terms that should capture much information were going to be applied so that what came off of the management custodians' e-mail accounts would then be uploaded, but, you know, data that, you know, was not even within



M. Hirshman

the realm of targeting would not be uploaded.

Q Okay.

A I definitely knew that, and I knew that early on in the investigation.

Q But you didn't know the ways in which the search term application that was going to be made to the Management Committee Custodians' documents differed from the search term application that was made to the rest of the documents; did you?

A I am not certain when I learned about that boolean -- the boolean string issue, you know, actually existed. I don't -- I'm not sure about that.

Q Okay.

A And I could have learned -- I could have appreciated early on that that existed. And as I sit here today, I can't tell you, you know, whether I remembered it -- whether I knew it at the time and, you know, then having read this, my recollection, you know, was

Page 130

M. Hirshman

refreshed -- I can't tell you that. But I am very confident I understood that there were search terms being applied. And I knew -- I can tell you this: I understood that at a point in time before we had agreed-upon search terms. I understood that.

Q Okay.

A Because we were focused on getting -- because the holds went out to the Management Committee totally done by ExxonMobil, you know, very, very soon.

Q So you -- at some point, and you are not exactly sure when -- became aware that one of the differences between the two different kinds of search term applications was that the process for the Management Committee Custodians was unable to use boolean search connectors, correct?

A The initial process. The initial. Taking the data off of the person's custodial accounts.

Q Right.

Page 131

M. Hirshman

A But I believe the boolean search terms were applied there afterwards, when you are at the vendor.

Q You believe the search terms were applied again at the vendor after these --

A Yes.

Q During the course of the first three searches?

A Yes.

Q Do you know whether or not putting a single word search term into the Outlook search function will return e-mails where only the attachment contains the searched for word as opposed to the e-mail itself?

A I don't know the answer to that question.

Q Have you heard of something called EMURALD, spelled E-M-U-R-A-L-D?

A Yes.

Q What is your understanding of what EMURALD is?

A At this minute, I don't have

Page 132

M. Hirshman

one.

Q You just --

A I know that as part of my preparation for here, I have, you know, seen something about EMURALD, but I don't know what it is.

Q Regardless of any specifics regarding EMURALD, are you aware that ExxonMobil had an internal computer system application that assigned the Wayne Tracker e-mail and a secondary e-mail for Mr. Woods not to them, but to an Information Technology employee named Ramona Helble?

A I know that there is such a process. And I know that that was -- at least one of them was assigned to Ramona Helble. I don't know as I sit here that both of them were assigned to Ramona Helble. I would have to review the affidavit.

Q Do you believe that the affidavit discusses these identities being assigned to Ramona Helble?

Page 133

M. Hirshman

A I'd have to review it.

Q Is it your understanding that when Exxon conducted the first three searches described in Ms. Feinstein's affidavit, that the Wayne Tracker e-mail account was searched as well at those times?

A Yes.

Q But you are aware that for some kind of technical reason, the automatic sweep of the Wayne Tracker e-mails was not suspended at any time prior to 2017, correct?

A I am aware of that.

Q Are you aware of any of the details of how that happened?

A I don't have firsthand knowledge. I do have the knowledge based on Ms. Feinstein's affidavit.

Q Do you know anyone other than Ms. Feinstein who would be able to provide details about that technical issue that Ms. Feinstein was unable to provide to us?

M. Hirshman

MR. TOAL: I object on attorney/client privilege, because she is giving a source of information about what information Ms. Feinstein provided to you other than communications with Counsel.

MR. OLESKE: I will rephrase my question.

MR. TOAL: I don't know if it will matter if you rephrase your question, because it is still inevitably going to call for information that she could only have learned from conversations with Counsel.

MR. OLESKE: I am going to rephrase the question. You can object again if you would like.

Q Do you know anyone other than Ms. Feinstein at Paul, Weiss or at ExxonMobil who has knowledge about the technical details of the failure to suspend the automatic sweep on the Tracker account?



M. Hirshman

A I don't think so. I mean, I think my knowledge is really -- it comes from the Connie Feinstein affidavit.

Q Prior to --

A But I want to be clear, again, because you didn't ask me this. You know, I know that Wayne Tracker e-mails were produced early on in this investigation. And I want to be crystal clear that I know that, and I know that from personal knowledge.

Q And you know from personal knowledge that Tracker e-mails were produced, you said, early on in this investigation --

A Correct.

Q What do you mean by early on?

A In the first part of 2016.

Q Were you aware of that at the time?

A Yes, I was. Because I knew about them and I read them and I said, well, this will be an interesting test of whether the Attorney General's office is



M. Hirshman

reading the documents, because there are documents from that e-mail account and they say Rex Tillerson on them.

Q So you are volunteering that in the first part of 2016, you were aware that Mr. Tillerson had an alternate e-mail account named Wayne Tracker, correct?

A I don't know if I'm aware of that -- that it was called Wayne Tracker, but I have a vague recollection that it was.

Q Well --

A And I -- and I am certain that those e-mails said the name "Rex" on them.

Q And so your testimony is at the time that you became aware of this in the beginning of 2016, you thought it would be an interesting test to see if the Attorney General could divine --

A No.

Q -- that Mr. Tillerson had an alternate e-mail address from the



M. Hirshman

production of this document?

A It is not a test. It is a very fair question for you to ask me that because of what I just said. And I didn't think it was a test. I thought it was evidence of the -- of the production that -- and that the production was appropriately focused on the right custodians, that those e-mails were being produced because Rex Tillerson was a custodian.

Q But those documents that you are talking about were not produced from Mr. Tillerson's custody; were they?

A They were produced by ExxonMobil, correct.

Q No. I am saying they were not produced as custodial files of Mr. Tillerson; were they?

A I don't know how they were produced. They were produced by ExxonMobil and they were -- I don't know what the metadata showed, but I know they were produced.

Page 138

M. Hirshman
Q Are you unaware that ExxonMobil produced no documents from the custody of Mr. Tillerson prior to at least December 2016?
A I'm not aware of that one way or the other.
Q And so you are not aware that the documents you are referring to that were produced in the first half of 2016 were produced from the custody of non-Management Committee Custodians who incidentally had communicated with Mr. Tillerson and the Tracker account?
A Oh, I see what you are saying. I see what you are saying. I guess that's possible.
Q And you are aware that --
A I see what you are saying.
Q From the affidavit you submitted and the other representations that Paul, Weiss has made to the court, you are aware that ExxonMobil has, at this point, produced over 2.8 million pages of documents, correct?

Page 139

M. Hirshman
A Correct.
Q And you are aware that by the time the document that you are referring to was produced, the e-mail that identified or had a Wayne Tracker e-mail address on it, you are aware that by that time, ExxonMobil had produced over a million pages of documents, correct?
A No, I don't think so.
Q Okay.
A I think that -- you are correct to point out that the document that I may be thinking about may have come from a different custodian's files.
Q That's not my question.
A No, no, no. But -- but to be clear, and I believe that that was at a time before ExxonMobil had produced over a million pages of documents.
Q Regardless of the specifics, by that time, ExxonMobil had certainly produced hundreds of thousands of pages of documents; hadn't it?
A I don't know if that's correct.

Page 140

M. Hirshman
Q And so at the time that document was produced and you knew that there was an alternate e-mail address for Mr. Tillerson under the label Wayne Tracker, rather than telling the Attorney General's office that Mr. Tillerson had a secondary e-mail address under the alius Wayne Tracker, it would be an interesting test to see if we detected it on our own?
A That is not my testimony.
Q Why don't you please clarify it?
A Nor is it accurate to say that there was an alius. It was another e-mail account that was used by Mr. Tillerson.
Q Okay.
A And I understood that there was an e-mail between Mr. Tillerson and someone else with a Wayne Tracker e-mail address. And I would say this: Whether or not it was an interesting test in my own mind, I do not believe that ExxonMobil was under any obligation to

Page 141

M. Hirshman
notify your office of that because ExxonMobil's obligation, in my view, is to produce documents responsive to the subpoena.
Q Understood. So you are aware, sitting here now --
A And had I believed ExxonMobil had an obligation to do so, I would have advised them.
Q Sitting here now, you are aware that by the time the Wayne Tracker e-mails were searched by ExxonMobil the first time, that the automatic file sweep program had already destroyed approximately three months' worth of e-mails from that account, correct?
A I believe that that is correct, yes.
Q And you are aware, sitting here, now, that over the course of the remainder of 2016, another approximately nine months' worth of Wayne Tracker e-mails were destroyed by the automatic file sweep program?

M. Hirshman
A Correct. Correct. I believe that's correct. It's in the affidavit, and it specifies the dates.
Q Right.
A I'm taking you at your word, that those are correct numbers.
Q First, let's start with your personal knowledge.
At the time that you became aware that there was a secondary e-mail address for Mr. Tillerson, did you take any steps to ensure that the Wayne Tracker e-mails were effectively subject to a preservation hold?
A I do not believe I took any steps to that effect.
Q Do you know whether or not anyone at Paul, Weiss took any such steps at any time prior to 2017?
A I do not believe that anyone did.
Q Do you know whether or not anyone at the ExxonMobil Legal Department took any such steps?



M. Hirshman
A I believe there was an expectation that that account was on hold.
Q But my question is: Do you know whether or not --
A I do not know what steps were taken.
Q So it's not the case that Paul, Weiss found out about the Wayne Tracker account in 2017, when we sent a letter to your office, and that then you investigated the matter and determined the issue about the e-mails being destroyed; you already knew about the Wayne Tracker e-mail address the previous year?
A I knew about the existence of a Wayne Tracker e-mail address, that is correct, and I knew that there were documents that been produced that reflected the Wayne Tracker e-mail address and that it was clear from those e-mails that the address -- that -- that they were sent to someone named Rex.



M. Hirshman
Q Do you know if they were sent from --
A Maybe they may have been sent or from. I don't remember specifically. I just know the name "Rex" is on those e-mails, and that they were subjects that would have been discussed with Mr. Tillerson.
Q So during this period of time in the first half of 2016, were you aware that the administrative assistants to the Management Committee were not subject to a preservation hold?
A I think it's -- I don't believe I was aware that they were not. I would not have expected them to be, and I know we sent you the names of persons repeatedly who were on litigation hold. And I don't recall that any of their titles reflected them as being assistants. So I think that those different facts would suggest that I was aware that assistants were not on hold, correct.



M. Hirshman
Q What's the basis for your statement that you would not have expected the administrative assistants to be on hold?
A Because, generally, unique responsive documents are generally not in the custodial accounts of assistants. And --
Q When you say "generally," do you mean in corporations, generally?
A Generally, in my experience, I have not found the unique responsive documents to be there, and I have not -- I don't recall ever directing anyone to put a hold on an assistant's e-mail account, and I don't recall being -- well, I -- let me change that.
You, in your letters, asked at certain points in time for assistants to be placed on hold. That's the only time in my career that I recall being directed to do that. And I don't recall generally requesting that when I was on the other side.

M. Hirshman

Q What do you mean by when you were on the other side?

A When I worked for the government for over 20 years.

Q And so the Zubulake series of cases and following authorities that you cited in various correspondence we reviewed earlier, are you aware of whether or not administrative assistants have been considered key players in those authorities?

A I am not, specifically, one way or the other.

Q Did you take any steps to determine whether or not ExxonMobil's particular situation and the particular situation of administrative assistants to the Management Committee at ExxonMobil might differ from your general understanding of what's in the custodial files of administrative assistants in corporations generally?

A I did not take -- it's not just corporations; it's other organizations as



M. Hirshman

well that that perspective derives from. I did not take any specific steps, and given the, you know, extensive number of custodians who were placed on hold in this matter.

Q Do you know whether or not anyone else at Paul, Weiss took any such steps?

A I don't know whether, after your requests, and more recently, people did or not.

Q Let's say prior to any requests that my office may have made in 2017, are you aware of anyone at Paul, Weiss who would have made any such inquiries?

A No.

Q Are you aware that, in fact, at ExxonMobil, the administrative assistants have a high degree of knowledge and involvement in the communications of their principals on the Management Committee?

A I'm not aware one way or another. Nor do I think that that



M. Hirshman

addresses the question of whether they have unique responsive documents.

Q What do you think addresses the question of whether or not they have unique responsive documents?

A Whether there is any indication that they have unique responsive documents.

Q And how would one find that out?

A I think there are many people who work at the company who made determinations based on custodial interviews, based on their knowledge of the organization, based on extensive custodial interviews, who would provide them with that information.

Q But the information you provided us is that none of those administrative assistants were, in fact, interviewed prior to 2017, correct?

A I believe that's correct.

Q Okay.

A Those aren't the only people



M. Hirshman

who would have knowledge as to whether those -- whether those administrative assistants would have unique responsive documents.

Q Are you aware of whether or not Paul, Weiss or ExxonMobil interviewed anybody else to determine whether or not the administrative assistants would have unique responsive documents?

A I don't have specific knowledge of that.

Q Can you tell me any other ways in which Paul, Weiss, any other basis for Paul Weiss's determination that administrative assistants were unlikely to have unique responsive documents?

A I didn't say that was Paul Weiss's determination. I said that's my view. And I said that it's my view, and I don't know of anyone else at Paul, Weiss who would have made a determination.

Q So you are aware that during the entire time of the subpoena

M. Hirshman

compliance, from its issuance until November 4, 2015, until when these administrative assistants were placed on hold sometime in March or April of 2017, that ExxonMobil's automatic file sweep program was still actively sweeping their files? Are you aware of that?

A If they were not on hold, I believe that that would be correct.

Q And so as a result, given that the subpoena had been outstanding for approximately 12 to 14 months before those custodians were placed on hold, that 12 to 14 months of their e-mails have been deleted from Exxon's e-mail system, correct?

A I don't know that it's 12 to 14 months, because there's a -- the way the file sweep program works -- and this is based on very general understanding, right -- there's -- there's timeframe -- there's a time lag. So I don't know whether it's 12 to 14 months, but I do not disagree that e-mails from persons



M. Hirshman

not on litigation hold during a relevant period would have been deleted.

MR. OLESKE: I am going to ask that we mark as Exhibit 12.

(Hirshman Exhibit 12 was marked for identification, as of this date.)

Q And Ms. Hirshman, could you please review what's been marked as Exhibit 12, and let me know when you are able to confirm whether or not you recognize it.

A Sure. (Reviewing exhibit.)

Q Ms. Hirshman, have you had a chance to review Exhibit 12?

A Yes, I have.

Q Do you recognize Exhibit 12?

A I do.

Q What is Exhibit 12?

A It's a series of e-mails between myself and Lem Srolovic and Monica Wagner and your office.

Q So first, if I could direct you to the part of the e-mail thread that is



M. Hirshman

on physical page 2 of this document, it's in the middle of the page. It says from Lemuel Srolovic to you, Thursday, November 19, 2015.

Do you see where I am looking at?

A Yes.

Q And the e-mail below is addressed to you, Mr. Wells, and Mr. Conlon, correct?

A You mean the addressees on this e-mail that you are describing?

Q Yes. Well, the salutation is to you --

A Correct.

Q -- Mr. Wells, and Mr. Conlon?

A Correct.

Q And the second full paragraph, it states: We would also like to confirm the steps that Exxon has taken to preserve documents and information potentially responsive to the subpoena. Michelle indicated at our first meeting that Exxon had instituted a litigation



M. Hirshman

hold but we are not clear whether that was imposed on all custodians of potentially responsive documents and information or a smaller group of custodians. Please let us know the full extent of the hold that has been imposed.

Did I recite that accurately?

A Correct.

Q And do you recall receiving this e-mail --

A Yes.

Q -- at the time?

And then turning back to page 1 of the document.

A (Complying.)

Q The e-mail above that in the thread is an e-mail from -- a response e-mail from you to Mr. Srolovic, copying Mr. Wells and Mr. Conlon on Friday, November 20, 2015, correct?

A Mm-hm.

Q And in that e-mail here reads, in part: In response to your request regarding the legal hold, ExxonMobil's

Page 154

M. Hirshman
Law Department issued a legal hold to all employees whom it currently knows to have potentially responsive documents. ExxonMobil's search for custodians is ongoing and it continues to add employees to the legal hold as they are identified. There are currently approximately 100 employees on hold.
Did you write that?
A I did.
Q Was it accurate at the time?
A I believed it to be accurate at the time, correct.
Q Do you have any reason to believe now that it, in hindsight, was not accurate?
A Nope.
Q Looking at the e-mail above that in the thread, that indicates it is from Mr. Srolovic to you, Mr. Wells, Mr. Conlon. And it says: Michele, We appreciate the preservation efforts Exxon has taken thus far, but we are concerned that a hold on the documents of

Page 155

M. Hirshman
approximately 100 employees is not sufficient to preserve relevant or potentially relevant documents.
Do you see that?
A I do see that.
Q Do you remember receiving this?
A Yes, I do.
Q Down in the next paragraph, it says: If this has not already been done, we request that an immediate hold be distributed to those entire department/divisions (including management), and not employees on an individual basis.
Do you remember receiving that?
A I do.
MR. OLESKE: I am going to mark as Exhibit 13.
(Hirshman Exhibit 13 was marked for identification, as of this date.)
THE WITNESS: Would you like me to read Exhibit 13?
Q Yes, please, if you could

Page 156

M. Hirshman
review Exhibit 13, and let me know when you are able to confirm whether or not you recognize it.
A (Reviewing exhibit.) I do.
Q What do you recognize this document to be?
A So it looks to me like Exhibit 13 just has an additional e-mail at the top to the chain of e-mails that's contained in Exhibit 12. It looks -- I think this is correct. And it looks like it's my response to Mr. Srolovic's e-mail of Friday, November 20th.
Q And your response is dated Tuesday, November 24th, correct?
A Correct.
Q And in this response, it reads, here: Lem, I'm writing in response to your e-mail from late Friday afternoon (below) regarding ExxonMobil's preservation efforts. Since receiving the subpoena, ExxonMobil has acted reasonably and responsibly to identify and notify custodians likely to have

Page 157

M. Hirshman
relevant information and to place them on litigation hold. That comprehensive effort is ongoing, and your request for preservation efforts in addition to what has been done and the ongoing process that is currently underway is unsupported by the controlling caselaw.
Did you write that?
A Yes, I did.
Q And in the following paragraph, you reference the VOOM HD case and its reference, in turn, to the Zubulake series of cases, correct?
A Correct.
Q And then the next paragraph after that, you state: ExxonMobil's good faith and expeditious preservation efforts aimed at employees likely to have relevant information clearly meet the standards of reasonableness and proportionality laid out in the controlling authority.
You wrote that?
A I did.

Page 158

M. Hirshman
Q And you believed this all to be true at the time that you wrote it?
A Yes.
Q In hindsight, do you believe there is anything inaccurate about this?
A Nope.
Q Just a couple of other questions.
With respect to -- let me direct you back to paragraph 6 of Exhibit 1.
A (Complying.)
Q And this paragraph, again, discusses the legal hold notice process at ExxonMobil, correct?
A Mm-hm.
Q There is a footnote at the end of that paragraph, footnote 3, correct?
A Mm-hm.
Q And footnote 3 says: Individuals who had separated from ExxonMobil prior to the receipt of the Subpoena, and whose documents were not otherwise separately retained at the time

Page 159

M. Hirshman
of separation, were not placed on Legal Hold.
A Mm-hm.
Q Did you write this?
A No, I did not write this.
Q Do you have an understanding of what happens to the documents belonging to ExxonMobil employees when they leave the company's employ?
A My understanding is if they are not -- if they are not otherwise on a legal hold at that time, those documents are not retained.
Q Are you familiar with a process whereby those documents are transferred to the custody of still-current employees who have a similar or overlapping responsibilities?
A I have heard of that. That where employees -- regardless of whether they are on legal hold, if they have some documents that would be relevant to the work of employees, either who are assuming their functions or have

Page 160

M. Hirshman
functions related to theirs, that some of their -- that some of their -- I don't know what -- which of their documents, but some of their documents are transferred to other people. I've heard that.
Q So as to that process that you have heard about, do you know any specifics about any steps taken by Paul, Weiss or anyone at ExxonMobil Corporation to trace documents from custodians who had left the company's employ, that would have been relevant or responsive to the subpoena, to other individuals' custody through the process you just described?
A I'm not aware of specific steps to trace --
Q Okay.
A -- that information.
Q But in the case of individuals who separated, and whose documents were not so-transferred to someone else, if they were separately retained, your understanding is that they would be

Page 161

M. Hirshman
placed on legal hold, correct?
A Can you repeat that question?
Q Sure. Sure. Well, just to go back to the wording of your footnote 3. You said individuals who had separated from ExxonMobil and whose documents were not otherwise retained were not placed on legal hold.
I guess the question is: Does that demonstrate the inverse, which is for custodians who had left, but whose documents were otherwise separately retained, were they placed on legal hold?
A I don't know the answer to that question.
Q Do you know who Donald Humphries is?
A I've heard the name.
Q So you are not aware whether or not he served on ExxonMobil's Management Committee during the time of the subpoena?
A I think I have heard his name in connection with a -- with a discussion



Veritext Legal Solutions
212-267-6868 www.veritext.com 516-608-2400

Page 162

M. Hirshman
that he was on the Management Committee --
Q Okay.
A -- at some point in time.
Q Did you take any steps to determine whether any of the custodians at issue in Exxon's subpoena response here had been on a legal hold for another matter, and whether or not that separate legal hold could aid ExxonMobil in collecting or recovering documents from custodians relevant to this subpoena response?
A The question, did I take any steps?
Q Yes. Have you at any time investigated whether or not any of these custodians were on a different legal hold, and, if they were, whether or not that could be utilized to help collect or recover relevant custodians' documents?
A I'm -- what I'm trying to remember is in the process of the efforts to recover information from the Tracker

Page 163

M. Hirshman
account, that that was one of the steps that was deployed or not, that is, you try to go to accounts of other people who are on hold who might not be on hold on this but they might have e-mails to the Tracker account. I just don't know whether that is a step or not that is described in the affidavit. I would have to look at the affidavits.
Q Is it fair to say you know that you, personally, didn't do anything like that?
A I am very confident I personally did not do anything like that.
Q And is it fair to say that sitting here now, you are not sure whether or not anyone else at Paul, Weiss or at ExxonMobil did anything like that?
A Sitting here at the moment, I don't know. I would have to look at Ms. Feinstein's affidavit to see if it's laid out there.
Q Other than Ms. Feinstein, can you point us to any other individual who

Page 164

M. Hirshman
might have more knowledge about that than you?
A No.
Q As an initial matter, prior to the issue of the loss of the Wayne Tracker e-mails coming up, do you know whether or not ExxonMobil took any steps to preserve any backup resources for electronic data with respect to responding to this subpoena?
A I think that the preservation efforts, you know, have been laid out. And I don't know specifically what other backup systems exist otherwise.
Q Other than Ms. Feinstein, can you point us to anyone who would know more about backup systems at ExxonMobil than you?
A I can't speak -- I am confident there are many people who would know more about backup systems than me, but the only person I would point to is Ms. Feinstein, because that's the source of my knowledge about those issues.

Page 165

M. Hirshman
Q You've never spoken to her; your source of knowledge is reading the affidavit?
A When I am pointing to the documents in front of me, I mean her affidavit.
MR. OLESKE: Let's mark this as Exhibit 14.
(Hirshman Exhibit 14 was marked for identification, as of this date.)
Q Ms. Hirshman, can you please review what has been marked as Exhibit 14, and let me know when you are able to confirm whether you recognize it.
A (Reviewing exhibit.) I recognize it as a letter on Paul, Weiss letterhead from Dan Toal to you.
Q And it's dated --
A With a date of April 4th.
Q 2017?
A Correct.
Q The second full paragraph in the letter says: First, we are providing

M. Hirshman

to you under separate cover a production letter enclosing ExxonMobil's Management and Protection of Information (MPI) Guidelines and copies of ExxonMobil's Business Continuity Plans ("BCPs") and Disaster Recovery Plans ("DCPs"). We redacted certain nonresponsive information from the BCPs and DCPs that is highly confidential because of its implications for ExxonMobil's cybersecurity.

Did I recite that correctly?

A Yes.

Q Were you aware, on April 4, 2017, that your firm was providing these documents and making these representations to our office?

A I don't believe I was.

Q Were you aware of that before you saw this letter today?

A I know that there -- I've seen in correspondence reference to that, but I was not -- and so I -- I've seen an indication that some documents like this



M. Hirshman

have been provided to you recently, but that's what I know.

MR. OLESKE: I am going to ask to mark 2 documents as 15 and then 16.

(Hirshman Exhibits 15 and 16 identification, as of this date.)

THE WITNESS: Would you like me to read these documents?

Q Let's start with Exhibit 15, and I am going to ask you some questions straight off. The document that you have been handed that is marked Exhibit 15, on the first page, it has a designation, MSG-D-5118 near the top of the page, correct?

A Yes, I see those letters and number.

Q And then underneath that, it says, Exchange Server Design, correct?

A I see that.

Q And this document is Bates stamped EMC 002747908, correct?

A I see that as well.



M. Hirshman

Q I will ask you to turn to page 7 of 17, as denoted at the top right of the document where the page numbers are.

A (Complying.) Okay.

Q The document reads: Internal Storage Mailbox servers, (Type A4) will be limited to 300 Users and only deployed at locations that do not have sufficient network connectivity to support the Site's Users at a Regional Hub location, or due to a special need, i.e., Management Committee Server.

Do you know what an Internal Storage Mailbox server (Type A4) is?

A No.

Q Do you know what the Management Committee Server is?

A No.

Q If I could ask you to turn to page 16 of 17.

A (Complying.)

Q Do you see that there is a header, maybe a quarter of the way down the page, Exchange 2007 Backup?



M. Hirshman

A Yes, I do see that.

Q And the document says: Only Exchange 2007 Mailbox servers will have backup. Exchange Hub and CAS servers only store transient data that does not need to be maintained. Recovery of these server roles can be performed by re-installing the OS, joining to the domain as the same server name and then re-installing Exchange with the Mode recoverserver switch. This will reinstall the original Exchange server role on the server, and also include all the stored Active Directory information for the server.

Did I recite that accurately?

A Except for the slash line before "mode" and the colon between "mode" and "recoverserver."

Q Do you have any understanding of the information contained in this paragraph?

A No.

Q And do you see below that there

Page 170

M. Hirshman
is a line that says: Mailbox servers will have a full backup performed.
And then there is a redaction, correct?
A I see that yes.
Q And then it says: Transaction log backups will be performed.
And then there is a redaction, correct?
A I see that also.
Q And it says: Exchange Mailbox Servers with SAN storage will use --
And then there is a redaction, correct?
A I see that as well.
Q And then it says: Exchange Mailbox Servers using Internal Storage will be --
And then there is a redaction, correct?
A I see that as well.
Q Is it your understanding that these redactions were made because this is nonresponsive information that is

Page 171

M. Hirshman
highly confidential because of its implications for ExxonMobil's cybersecurity?
A I have no understanding one way or the other. I see that in the letter, and I expect that it is accurate.
Q Well, in your role of supervising ExxonMobil's subpoena compliance, was it Paul Weiss's responsibility or the ExxonMobil Legal Department's responsibility to determine whether or not specific material was nonresponsive and therefore should be redacted in documents such as this?
A In a document that where the redaction is based on the confidential nature and the proprietary nature of the information, I would expect that that is something that was a decision made by the parties together, by Paul, Weiss and the company.
Q And you mentioned material that's highly confidential, but the letter says that in addition to being

Page 172

M. Hirshman
highly confidential, the redacted material is nonresponsive, correct?
A Correct.
Q And so with that --
A Paul, Weiss would make that determination.
Q Do you know --
A Informed by information from the company.
Q Do you know who at Paul, Weiss made the determination in the case of this document, that the redacted material here was nonresponsive?
A I do not.
Q I am going to turn you to Exhibit 16. The front of this document reads: Foundation Infrastructure, Windows Server & Storage Solutions, Business Continuity Plan.
Did I read that accurately?
A Yes, you did.
Q And if I could turn you page 37 of 46. The page numbers in this case are in the bottom center of the document.

Page 173

M. Hirshman
A (Complying.) Okay, I've turned to that page.
Q At the top center of the page it says Windows Server & Storage Solutions?
A Yes.
Q And then underneath that, it says: 8.3, Key Vendors and Suppliers, correct?
A Correct.
Q And below that it says: Please find below list of current vendors and suppliers for WSSS, correct?
A Correct.
Q And then if you will look at the next -- that page, and then the next 3 pages, there is a table of information, all of the information from which has been redacted, correct?
A I see that it has been redacted.
Q I have the same question as to these redactions. Is your answer the same as to who determined that this

M. Hirshman

material was nonresponsive?

A I don't know whether the determination of this material was based on nonresponsiveness or security-related issues. From the face of the document, I can understand why the redaction would be based on security issues.

Q I just want to go back --

A But I didn't make the determination, and I don't know who made the determination.

Q Okay, don't know.

Apart from what might be behind these redactions --

A Well, I think we know what's probably behind these redactions. The names of vendors who provide Security and Business Continuity services.

Q Well, my specific question is: As to that document, do you know whether or not any of those vendors perform data backup services for ExxonMobil?

A I do not know.

Q Do you know whether or not



M. Hirshman

ExxonMobil has any vendors at all that -- putting this document aside -- that maintain data or provide data backup services for ExxonMobil?

A I do not know.

Q Have you made any attempt to determine whether or not ExxonMobil has third-party vendors who provide data backup services?

A I, personally, have not done so.

Q Do you know whether or not anyone at Paul, Weiss or ExxonMobil has tried to determine whether or not the company has vendors that provide data backup services in connection with the response to this subpoena?

A Again, I would have to refer to the Feinstein affidavit.

Q Apart from referring to the Feinstein affidavit, are you able to identify any other individuals who would have more information than you about whether or not ExxonMobil has third-party



M. Hirshman

vendors who provide data backup services?

A I can't tell you specific names.

Q Do you know --

A I mean, I don't know the specific names. Not that I can't tell you.

Q Do you know, with respect to any of the time period since the issuance of the subpoena, whether ExxonMobil has had any of its data backed up to a Cloud Networking System?

A I do not know.

Q Do you know whether or not ExxonMobil has, during the time since the issuance of the subpoena, had a practice of backing up its data to any third-party location not at an ExxonMobil corporate location?

A I believe -- I'm just trying to remember something. I believe I have heard kind of information about sites that aren't at a corporate headquarters location in Texas, but I don't --



M. Hirshman

that's -- it's a very vague recollection.

Q And that vague recollection, does that include whether or not those non-headquarters locations are still ExxonMobil properties or a third-party's properties?

A That, I don't know.

Q And do you know whether or not anyone else at Paul, Weiss or at ExxonMobil Corporation has made any effort to determine whether any of ExxonMobil's data was backed up to a cloud system in connection with responding to the subpoena?

A I don't know.

Q Do you know whether or not anyone at Paul, Weiss or ExxonMobil has made any efforts to determine whether or not any of ExxonMobil's data was backed up to any other third-party location in connection with responding to this subpoena?

A Again, I have to look at the segment of the Feinstein affidavit.

M. Hirshman

Q Other than the Feinstein affidavit, are you able to point us to any individuals who would know more than you do about whether or not ExxonMobil has attempted to locate third-party sources of its data in response to this subpoena?

A Can you say that question again? Can you read it back, I'm sorry.

Q Sure. Other than the Feinstein affidavit, are you able to point us to any individuals who would know more than you do about the subject matter of my previous questions, specifically, locating ExxonMobil data in a Cloud Networking System or in any other third-party-maintained location?

A I don't know what the specific knowledge of specific individuals would be, but there's obviously people at Paul, Weiss and ExxonMobil who are working on this matter in addition to me.

MR. OLESKE: Let's mark this as Exhibit 17.



M. Hirshman

(Hirshman Exhibit 17 was marked for identification, as of this date.)

Q Ms. Hirshman, could you please review what has been marked as Exhibit 17, and let me know when you are able to confirm whether or not you recognize it.

A I will do that.

(Reviewing exhibit.) I do recognize this document.

Q What do you recognize it to be?

A It's a letter dated April 24th, 2017, to you and it's slash signed by Dan Toal.

Q This letter addresses some technical issues that arose after you submitted your affirmation that is Exhibit 1, correct?

A That is correct.

Q Without getting into the details of those technical issues, I want to draw your attention to the second page. The first full paragraph, which



M. Hirshman

begins: ExxonMobil took immediate remedial action.

Do you see the paragraph I am talking about?

A Yes, I do.

Q It lists a series of four steps ExxonMobil took with respect to the technical issue that I mentioned, correct?

A Correct.

Q And the fourth of those is, near the bottom of that paragraph: Fourth, in abundance of caution, on April 14, 2017, ExxonMobil's outside counsel engaged Deloitte Transactions and Business Analytics, LLP ("Deloitte ") to validate the remediation efforts conducted by the vendor at the direction of ExxonMobil (the "Validation Exercise").

Did I recite that correctly?

A Yes.

Q And did part of your responsibilities for overseeing



M. Hirshman

ExxonMobil's subpoena compliance involve overseeing Deloitte in performing the function described in this letter?

A I did not personally oversee Deloitte.

Q Who did?

MR. TOAL: I am going to object on attorney/client privilege grounds. I think you are not entitled to know how Paul Weiss's staffing this matter.

Q Did somebody at Paul, Weiss other than you have responsibility for overseeing Deloitte?

A Yes.

Q Do you know whether or not Deloitte had any other functions with respect to ExxonMobil's subpoena compliance?

A In this matter?

Q Yes.

A I am not aware of Deloitte having other responsibilities.

Q Are you aware that at some

M. Hirshman

point after the potential destruction of the Wayne Tracker e-mails came to light, that ExxonMobil made efforts to determine whether or not information could be recovered from mobile devices assigned to or belonging to members of the Management Committee?

A I have a recollection of hearing that.

Q You didn't have any personal involvement in that, though?

A No.

Q Do you know whether or not Deloitte had any involvement in that process?

A I don't recall hearing that.

Q Do you know whether or not the person named Bob Lauck at ExxonMobil, do you have any knowledge as to whether or not his son was involved in the retention of Deloitte for subpoena compliance in this matter?

A I have no knowledge one way or another.



M. Hirshman

Q Do you know whether or not Deloitte was involved in any respect with the attempted recovery of any lost or destroyed e-mails from potential backup sources?

A I don't know.

Q Do you know whether or not anyone else at Paul, Weiss might have more information about that than you?

A No.

Q Do you know whether or not anyone else at ExxonMobil would have more information about that than you?

A No.

MR. OLESKE: Let's mark this as Exhibit 18.

(Hirshman Exhibit 18 was marked for identification, as of this date.)

Q Ms. Hirshman, before we address this document, let me ask: In your role in overseeing ExxonMobil's subpoena compliance in this matter, did your responsibilities include overseeing the



M. Hirshman

activities of Sidley Austin LLP?

A I would not say that my role included overseeing any activities of Sidley.

Q If I could address you to the document that's been marked Exhibit 18, do you see that at the top left, it has a notation saying "pwc"?

A Yes.

Q And at the bottom right, the document begins with a Bates stamp PNYAG0126718; is that correct?

A That is correct.

Q If you could turn to page 3 of 6, as denoted at the bottom right, where the page numbers are.

A (Complying.) Okay.

Q The document in the first full paragraph after the list of numbers at the top of the page says that: The internal effort is being overseen by General Counsel. PwC's primary contact is Randall Ebner, Assistant General Counsel.



M. Hirshman

Did I recite that correctly?

A Yes.

Q And then after a bold parenthetical, it continues: Management of the Corporation have hired the law firm Paul, Weiss for external representation with attorney Ted Wells serving as lead external counsel on this matter. ExxonMobil has hired Sidley Austin LLP to assist them with identifying documents internally that are responsive to the various requests.

Did I recite that correctly?

A You did.

Q Is it your understanding that ExxonMobil hired Sidley Austin LLP to help identify documents internally that were responsive to the subpoenas requests?

A I don't know, because I haven't read this document, so I don't know what "various requests" refers to.

Q Why don't you refer back to the first page?

Page 186

M. Hirshman
A You want me to read the document now?
Q Well, I am going to ask you to look at the first page of the document and read that first page and then tell me whether or not reading that first page enables you to tell me about the information I was just asking about.
A Sure.
(Reviewing exhibit.)
THE WITNESS: I am going to have to get that phone. Can we go off the record, please?
[Discussion held off the record.]
BY MR. OLESKE:
Q For the sake of completeness, Ms. Hirshman, why don't you just continue to read, to make sure that we don't waste time, the rest of the letter through that section on page 3 that we previously discussed.
A Sure.
Q Thank you.

Page 187

M. Hirshman
A (Reviewing exhibit.) Okay, I have read up to the sentence you described.
Q So now having read the first portion of this document up to the section that we previously discussed, this document, on its face, is a memo from someone named Richard Auter, dated sometime in October 2016, Subject: Climate Change Investigations, correct?
A It appears to be a draft insofar as it's missing various information and asks questions within the draft --
Q Sure.
A -- about information.
Q Notwithstanding its prospective status as a draft, though this document does discuss ExxonMobil being served with the New York Attorney General subpoena, November 4, 2015, correct?
A Correct.
Q And pages 2 and 3, through the bottom of page 2 and the top of page 3

Page 188

M. Hirshman
through the section that we previously discussed, is about ExxonMobil's response to the New York Attorney General's subpoena, correct?
A You mean at the very bottom of page 2?
Q Yes, where it says ExxonMobil Response, from there following until the section that we previously discussed on page 3, that relates to ExxonMobil's response to our office's subpoena, correct?
A That's what it appears to describe.
Q And so back to what we were discussing before, the section that says: ExxonMobil has hired Sidley Austin LLP to assist them with identifying documents internally that are responsive to the various requests.
You stated earlier that you did not oversee Sidley Austin LLP. Are you aware of what role Sidley Austin LLP had in assisting Exxon with identifying

Page 189

M. Hirshman
documents internally that are responsive to the various requests?
A I am not aware of what role Sidley had with respect to identifying documents internally that are responsive to the various requests.
MR. OLESKE: 19.
A I guess I am also not aware whether Sidley had a role in identifying documents internally that are responsive to the various requests.
MR. OLESKE: So this is Exhibit 19 that we are going to look at after it's marked.
(Hirshman Exhibit 19 was marked for identification, as of this date.)
THE WITNESS: Should I read this document?
Q Why don't we just start with me asking a couple of questions about it.
The document you have just been handed marked as Exhibit 19, the first page has a large black oblong shape, and

M. Hirshman

in the middle of it, it says: Document Placeholder in white, correct?

A That's -- that looks to be an accurate description.

Q And then underneath that, in black, it says: Document Produced in Native, correct?

A That's what it says.

Q In the bottom right, there is a Bates number PNYAG0038905, correct?

A Correct.

Q Turning to page 2 or the second physical page of this document, when you have a chance.

A (Complying.)

Q This document has a logo "pwc" at the top left, correct?

A Correct.

Q And then it has a to field saying: To: PwC Assurance - ExxonMobil Audit File, correct?

A Correct.

Q And then it says: From: Alan Page / Kyle Liner, correct?



M. Hirshman

A Correct.

Q And it's dated February 12, 2016?

A Correct.

Q And the regarding line is: New York Attorney General and SEC investigation.

Correct?

A Correct.

Q Going down, there is a header immediately following that says: I. Summary of Issue, correct?

A Yes.

Q And then it says: On November 4, 2015, ExxonMobil received a subpoena from New York Attorney General, correct?

A Correct.

Q And then going down there is a header, II. Company Response to Allegations, correct?

A Right. Well, there's, you know --

Q There's text in between there?



M. Hirshman

A There's text in between. And then number two, in a Roman numeral, it says: Company Response to Allegations.

Q Right. And then, thereafter, it says: Alan Page (PwC GEP) and Kyle Liner (PwC Corporate Partner) met with David Rosenthal (ExxonMobil Controller) and Randy Ebner (ExxonMobil Assistant General Counsel) on November 10, 2015 to discuss the public news articles related to this matter and the content of the subpoena. As part of this meeting, the Corporation communicated they were:

And then there is a series of bullet points beginning on the next page, correct?

A I haven't turned to the page because you didn't tell me -- you told me I couldn't read the document. You are going to go through it.

Q I'm sorry.

A So now I will turn to page 2?

Q Yes. The next page follows with a series of four bullet points,



M. Hirshman

correct?

A Correct.

Q And the first bullet point is: Intending to comply with the subpoena, correct?

A Correct.

Q The next bullet: Commencing an internal process to identify items requested in the subpoena, correct?

A Correct.

Q Next bullet point reads: Hiring Ted Wells from Paul, Weiss as lead external counsel to interact with the NYAG's office on the extent of information requested and to evaluate items identified by ExxonMobil, correct?

A Correct.

Q And then it says, in the last bullet point: Hiring Sidley Austin LLP from Austin to support the internal investigation, correct?

A That's what it says.

Q Are you aware of what role, if any, Sidley Austin LLP had in "supporting

M. Hirshman

the internal investigation"?

A No. I am also not aware of what the term, "the internal investigation," means in this context.

Q Understood.

MR. OLESKE: Let's mark this as Exhibit 20.

(Hirshman Exhibit 20 was marked for identification, as of this date.)

Q Ms. Hirshman, the document you have been handed marked Exhibit 20 has a Bates number on the first page of PNYAG006161, correct?

A Correct.

Q If I could ask you to turn to the second physical page of the document, there is a logo at the top left that says "pwc," correct?

A Yes.

Q And then the next word is "Memo," correct?

A Okay. So it's an un-marked page. So it's the second physical page,



M. Hirshman

correct.

Q It's the second physical page.

A Right, but not the page marked 2 of 5.

Correct.

Q After that, it says that it's: To: Files / Dallas, and Richard Auter, A-U-T-E-R, correct?

A That's what it says, yes.

Q And it's dated April 29, 2016, correct?

A Correct.

Q The subject matter is: Q1 Update on Pending Investigations, correct?

A Yes.

Q Could you please refer to the third physical page that is marked page 2 of 5 on the lower right-hand corner.

A (Complying.)

Q Do you see that there is a header on that page in bold, New York Attorney General - Climate Change Disclosure?



M. Hirshman

A I do see that.

Q Could you just take the time to read the text that is underneath that header and precedes whatever header comes next in the document?

A Sure.

(Reviewing exhibit.) I've reviewed that section of Exhibit 20.

Q Excuse me, I'm sorry?

A I have reviewed that section of Exhibit 20.

Q Thank you.

That section includes a set of four bullet points, correct?

A Correct.

Q And, again, the final bullet point in this section is: Hiring Sidley Austin LLP from Austin to support the internal investigation, correct?

A That is correct. That bullet point is identical from both documents, Exhibit 19 and Exhibit 20.

Q And if I ask you what you understand as of the date of this



M. Hirshman

document, April 29, 2016, what you understood as of that time, April 29, 2016, what the role of Sidley Austin in supporting the internal investigation, would that be the same as your answer with respect to the last document?

A My answer with the respect to the last document was based on my knowledge as of today.

Q Okay.

A And so it is the same.

Q Okay. Putting aside the references to supporting internal investigation or assisting in locating documents, sitting here today, are you aware of whether or not Sidley Austin LLP has played any role in ExxonMobil's response and compliance with our office's subpoena?

A I am aware that Sidley Austin has been retained by ExxonMobil in connection with matters related to climate change and our investigation.

Q Putting aside matters regarding

M. Hirshman

climate change that are not connected to this investigation, what is or has ever been Sidley Austin LLP's role in ExxonMobil's compliance with this subpoena?

MR. TOAL: So I am going to object on attorney/client privilege grounds.

Is your question whether Sidley has played a role in review of documents in this matter?

MR. OLESKE: I am asking whether or not -- Ms. Hirshman has testified as to the role of Paul, Weiss and its attorneys, has testified to the role of ExxonMobil's Legal Department, other employees of ExxonMobil, other third parties. She has testified to the extent as to which she has either overseen them or not overseen them in those roles.

I am asking what role, if any, at any time, Ms. Hirshman knows Sidley Austin LLP played in



M. Hirshman

ExxonMobil's compliance with this subpoena.

MR. TOAL: Give me a minute.

MR. OLESKE: We are going to go off the record for this?

MR. TOAL: Yes.

THE WITNESS: Can I go to the ladies' room?

MR. OLESKE: Yes. There is a pending question, so obviously you shouldn't consult with your counsel.

[A recess was taken.]

BY MR OLESKE:

Q Ms. Hirshman, my question is: With respect to ExxonMobil's compliance with the subpoena at issue here, what role, if any, at any time, did Sidley Austin LLP have with respect to ExxonMobil's compliance with the subpoena?

MR. TOAL: Objection. Attorney/client privilege.

Q Did Paul, Weiss retain Sidley Austin LLP in connection with compliance



M. Hirshman

with this subpoena?

MR. TOAL: You can answer yes or no.

A No.

Q Do you know if ExxonMobil retained Sidley Austin LLP in connection with compliance with this subpoena?

MR. TOAL: Objection of attorney/client privilege.

MR. OLESKE: Let's mark as Exhibit 21.

(Hirshman Exhibit 21 was marked for identification, as of this date.)

Q Ms. Hirshman, directing your attention to the document you have been handed marked Exhibit 21, you can see there is a Bates number at the bottom right-hand corner PNYAG01165508?

A Correct.

Q Turning to the second physical page of the document which is marked at the bottom page 1 of 11; do you see that page?



M. Hirshman

A I do.

Q At the top of the page there is a "pwc" logo, correct?

A Correct.

Q And there is a word "Memo" underneath that, correct?

A Correct.

Q And it has a "to" field, saying ExxonMobil Upstream, Downstream and Chemical 2016 Audit File, correct?

A Correct.

Q And then it has a "From: / Location," and it says: PwC Houston Engagement Team, correct?

A Yes.

Q And it's dated June of 2016, correct?

A Correct.

Q And the subject is Auditing Litigation Matters, correct?

A Yes.

Q And then there is a heading that says Purpose; do I have that right?

A Yes.

M. Hirshman

Q And then it says: This memorandum summarizes PwC's audit approach to litigation matters on the ExxonMobil ("ExxonMobil", or the "Corporation") audit engagement.

Did I read that correctly?

A Yes.

Q Just if I could ask you to skip ahead to what is marked at the bottom center as page 8 of 11.

A (Complying.)

Q Do you see that there is a header, maybe a fifth of the way from the top of the page that says in bold, Representation Letters - Content and Rationale?

A Yes.

Q Could you please read that full paragraph that follows, just that full paragraph that follows that header, please, and let me know when you have had a chance to read through that paragraph.

A (Reviewing exhibit.) I've read it.



M. Hirshman

Q The first sentence says: ExxonMobil Law is led by Jack Balagia, Vice President and General Counsel, who is in turn supported by several Assistant General Counsels, including the Assistant General Counsel for Litigation.

Did I read that correctly?

A Yes, you did.

Q And the information related in that sentence was accurate with respect to your involvement with ExxonMobil, at least, until Mr. Balagia left the employ of ExxonMobil, correct?

A Yes.

Q When did Mr. Balagia leave ExxonMobil?

A I think November 2016? Maybe earlier, but around that time, I think, the second half of 2016.

Q Do you know whether any of the documents of Mr. Balagia or any other members of the ExxonMobil Law Department have ever been put on a preservation hold with respect to ExxonMobil's compliance



M. Hirshman

with the subpoena in this matter?

A I have to look at the list of holds.

Q The next sentence says: ExxonMobil Law, which rivals many law firms in size and experience, employs over 500 lawyers worldwide and is represented at the affiliate, functional and corporate levels.

Is that description of ExxonMobil's Law Department consistent with your experience with ExxonMobil's Law Department during the time of your work overseeing its compliance with the subpoena here?

A I'd say consistent -- generally consistent. I don't know the specific number of lawyers in the department, you know, in the Law Department, but it wouldn't surprise me.

Q The next sentence says: ExxonMobil Law does not typically outsource the task of managing litigation.



M. Hirshman

Does that accord with your general understanding of ExxonMobil law's practices with respect to the management of litigation?

A Yes. Although this is an investigation, and I have never represented the company in connection with litigation, but my experience here is consistent with that.

Q If I could return your attention to Exhibit 12.

A (Complying.)

Q Before we look at specific portions of this document, do you recall earlier in your testimony, we were discussing the timing of the Attorney General's informing ExxonMobil of the production of Managing the Risks-related documents as a priority.

Do you remember that general discussion?

A Yes.

Q And do you recall that I showed you a document that appeared to identify

M. Hirshman

and inform ExxonMobil of that priority in December of 2015? Do you remember that?

A Well, it's among the exhibits that you have marked, so -- but I don't know which exhibit it is that you've marked.

Q Putting that aside, do you recall that?

A I do.

Q And do you recall at the time that you responded that you believed your reference in paragraph 32 of Exhibit 1, your affirmation that information coming out in February of 2016 --

THE WITNESS: I'm sorry, can you please ask the people who are adjacent to these rooms to lower the volume a little bit so I can focus on the questions? Thank you.

[Discussion held off the record.]

Q Do you recall testifying with respect to paragraph 32 of Exhibit 1, your affirmation, that you may have been



M. Hirshman

referring to correspondence you said you thought you might remember from February, that refer to Managing the Risks and the greenhouse gas issue management team as new priorities separate from the December correspondence that we looked at?

A Mm-hm. I do, yes.

Q So if I could direct you to what is marked on the bottom of page 3, in the bottom center of the page, there is page numbering. You see page 3 at the very bottom?

A Is this on Exhibit 12?

Q Yes, this is on Exhibit 12. And do you see at the very bottom, there, there is the beginning of an e-mail from Lemuel Srolovic to Mr. Wells, yourself --

A Yes.

Q -- and yourself?

A Yes.

Q And then it begins on page 3, Ted and Michele, and then it goes to the next page, page 4.

Could you please read the



M. Hirshman

remainder of that e-mail to yourself and let me know when you have had a chance to look at that.

A (Reviewing exhibit.) I have read it.

Q So looking at the middle of page 4, do you see that there is a section of e-mail that begins: Documents to be produced on or before January 11, 2016?

A I do.

Q And do you see that there is a second bullet point underneath that that says: Responsive non-e-mail documents and communications in the custody of the employees in the corporate-wide global climate change and GHG issue management team?

Do you see that?

A I do.

Q And then do you see two bullets below that, there is a bullet that says: Non-e-mail documents and communications, including drafts, concerning the Energy



M. Hirshman

Trends, Greenhouse Gas Emissions and Alternative Energy and Energy and Carbon - Managing the Risks reports that are in the custody of the primary authors of those reports.

Do you see that?

A I do.

Q Do you recall receiving this on or about November 13, 2015?

A I do.

Q So, in fact, the Attorney General alerted or informed ExxonMobil that GHG issue management team and Managing the Risks Reports were a priority for production even earlier than the December document that we earlier looked at, in fact, as early as November 13, nine days after the issuance of the subpoena, correct?

A I think the Attorney General listed a number of items in which those were included that it wanted to produce. And these items turned out to be very voluminous.

M. Hirshman
MR. OLESKE: If we could, let's just take five minutes, and we'll come back and I think we will be just about ready to wrap up.
[A recess was taken.]
MR. OLESKE: With the proviso on the record that, this is always the case, our view is that the hearing is held open potentially regardless, but in particular given the attorney/client privilege issues and assertions that were raised, the office explicitly reserves all of its rights to continue this examination at a later date to obtain whatever testimony to which the office may be legally entitled. With that said, I am prepared to go off the record at this time. Do you guys have anything for the record?
MR. TOAL: No. Ted, anything for the record? No.
MR. OLESKE: Okay.
(Time noted: 4:00 p.m.)



I N D E X


| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| M. Hirshman | Mr. Oleske | 4 |




E X H I B I T S


| HIRSHMAN | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Certificate of Compliance | 5 |
| Exhibit 2 | Supplemental Affirmation Of Michele Hirshman | 6 |
| Exhibit 3 | Affidavit of Connie Lynn Feinstein | 7 |
| Exhibit 4 | Amended Affidavit of Connie Lynn Feinstein | 10 |
| Exhibit 5 | Subpoena for Production of documents to Jack Balagia, Jr. | 11 |
| Exhibit 6 | April 18, 2016 letter to J. Oleske | 13 |
| Exhibit 7 | August 3, 2016 letter to J. Oleske | 17 |
| Exhibit 8 | NY Law Journal Vol 256 - No. 108, Tuesday, 12/6/2016 | 20 |
| Exhibit 9 | May 3, 2017 letter to J. Oleske | 58 |
| Exhibit 10 | June 24, 2016 letter to Wells and Hirshman | 84 |
| Exhibit 11 | December 16, 2015 e-mail from Monica Wagner to Sean Jansen | 92 |
| Exhibit 12 | November 20, 2015 e-mail from Lemuel Srolovic to Michele Hirshman | 151 |
| Exhibit 13 | November 25, 2015 e-mail from Michele Hirshman to Lemuel Srolovic | 155 |
| Exhibit 14 | April 4, 2017 letter to J. Oleske from D. Toal | 165 |




E X H I B I T S
(CONTINUED)


| HIRSHMAN | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 15 | EMC 002747908-002747924 | 167 |
| Exhibit 16 | EMC 002747862-002747907 | 167 |
| Exhibit 17 | April 24, 2017 letter to J. Oleske from D. Toal | 178 |
| Exhibit 18 | PNYAG 0126718-0126724 | 183 |
| Exhibit 19 | PNYAG 0038905 and PwC documents dated 2/12/16, four pages | 189 |
| Exhibit 20 | PNYAG 0006161 and PwC documents dated 4/29/16, five pages | 194 |
| Exhibit 21 | PNYAG 0116508 and PwC documents dated June 2016, eleven pages | 200 |


(Reporter retained exhibits.)

CERTIFICATION

I, JAMIE ANN STANTON, a Notary Public for and within the State of New York, do hereby certify:

That the within transcript is a true and accurate record of the proceedings.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 11th day of May, 2017.



JAMIE ANN STANTON

* * *

**&**

**&** 2:14 4:7 172:19 173:5

**0**

**0006161** 213:11
**002747862-002...** 213:6
**002747908** 167:24
**002747908-002...** 213:5
**0038905** 213:9
**0116508** 213:13
**0126718-0126724** 213:8

**1**

**1** 5:23,24 6:5 12:6 12:8 24:14,17,17 24:17,18 59:9,11 66:7 79:21 85:18 90:24 102:17,18 102:21 105:12,18 105:20 106:5 107:7,15 108:6 110:10 153:14 158:12 179:20 200:24 206:13,24 212:4
**10** 1:7 6:11 12:2 84:4,5,10 85:23 87:11 102:23 105:19 192:10 212:8,17
**100** 17:14 154:8 155:2
**10019-6064** 2:17
**10271-0332** 2:8
**108** 212:15
**10th** 6:8 9:2,5
**11** 5:19 52:22 80:4 80:24 92:6,7,12 94:2,9 200:24 202:11 208:10 212:10,19
**110,000** 82:8
**11th** 88:10 214:16
**12** 48:17,19,23 49:8,16 50:12 150:13,15,18,24 151:5,6,11,16,18 151:20 156:11 191:3 205:12 207:14,15 212:20
**12/6/2016** 212:15
**120** 1:12 2:7
**1285** 2:16 4:8
**12:37** 109:19
**13** 8:22,22 52:23 155:19,20,24 156:2,9 209:10,19 212:12,22
**14** 93:3 97:21 150:13,15,19,24 165:9,10,15 180:15 212:24
**15** 70:11 167:5,7 167:11,14 213:5
**151** 212:21
**155** 212:23
**16** 52:20 53:4,7 56:21,23 57:5,12 57:18 66:6,10 112:24 167:6,7 168:21 172:17 212:19 213:6
**165** 212:25
**167** 213:5,6
**17** 168:3,21 178:25 179:2,7 212:13 213:7
**178** 213:7
**18** 54:12,15,20 55:13,17 57:7,12 67:24 112:24 183:17,18 184:7 212:11 213:8
**183** 213:8
**189** 213:10
**18th** 14:8
**19** 54:20 69:10 152:5 189:8,14,16 189:24 196:23 213:9
**194** 213:12
**19th** 10:23

**2**

**2** 6:20,21 7:2 12:7 12:8 28:11 58:9 85:11,13 90:10 103:4,6 104:18 152:2 167:5 187:24,25 188:7 190:13 192:23 195:5,19 212:5
**2.8** 138:24
**2/12/16** 213:10
**20** 54:20 146:5 153:21 194:8,9,13 196:9,12,23 212:15,20 213:11
**200** 213:14
**2007** 168:25 169:4
**2014** 4:16 81:19 93:11 106:9
**2015** 11:23 28:18 35:12 42:3 45:15 49:23 64:24 70:11 70:17 93:3 95:17 96:5 97:21 128:9 150:3 152:5 153:21 187:22 191:16 192:10 206:3 209:10 212:19,20,22
**2016** 14:8 18:12 20:21 37:20 42:4 64:15 80:4,25 82:17 84:22 85:2 87:5,13 89:11 94:2,9 95:18,21 96:4,9,23,25 97:9 108:12,19 109:3 128:10 135:19 136:6,20 138:5,10 141:22 144:11 187:10 191:4 195:11 197:2,4 201:11,17 203:18 203:20 206:15 208:11 212:11,13 212:17 213:14
**2017** 1:7 6:8,11 7:5 9:15 12:2 59:16 61:11 62:10 62:17 64:15 65:16 111:6 133:13 142:20 143:11 147:14 148:22 150:5 165:22 166:16 179:15 180:15 212:16,24 213:7 214:17
**20th** 156:14
**21** 54:21 57:8 200:12,13,18 213:13
**22** 55:4 57:8 69:22 70:10,16 71:14,23
**22-24** 69:14
**23** 55:4 57:8
**24** 55:4,13,18 57:8 57:13 69:22 112:24 212:17

213:7
**24,000** 82:7 96:25
**24th** 84:22 85:22 102:22 156:16 179:14
**25** 72:14,16,20 212:22
**256** 212:14
**26** 75:15
**27** 76:9
**28** 76:20
**29** 195:11 197:2,3

**3**

**3** 7:5,12,13,18 8:15 8:23,24 10:25 18:13 35:3,5 52:22 59:15 89:21 90:2,8 105:19 107:18 108:8 112:16 158:19,21 161:5 173:18 184:15 186:22 187:24,25 188:11 207:10,12,22 212:6,13,16
**30** 111:6
**300** 168:8
**30th** 9:15
**31** 79:20,23 80:3 85:25 87:10,21 88:7 93:25
**32** 81:14 88:7,15 88:22 93:19,22 94:4 95:11 206:13 206:24
**33** 82:6 83:5,8,9,17 89:3 96:17
**34** 82:16 83:6,12 83:19 85:2,18,20 85:25 87:10,22 96:22 102:15,20 103:4,11 104:25
**37** 172:23
**3rd** 7:9 18:12 58:13

**4**

**4** 4:16 10:12,13,18 11:23 28:18 35:12 36:10,14,18 38:5 50:12 63:11 89:21 90:22 91:21 93:14 107:18 108:8,17 109:12 150:3 166:15 187:22 191:16 207:24 208:8 211:5 212:8 212:24
**4/29/16** 213:12
**44** 110:11,14,19
**45** 9:7 110:25
**46** 111:20 112:7,13 172:24
**4:00** 210:25
**4th** 73:14 165:21

**5**

**5** 11:8,9,24 12:7 13:3,5 14:12 40:25 41:3,21 59:19 89:15 106:8 106:16,18 107:6 107:19 195:5,20 212:4,9
**5,300** 80:5,18
**500** 204:8
**5118** 167:16
**58** 212:16

**6**

**6** 13:13,15,20 14:17 19:20 20:21 45:12,14,15 46:19 47:10 48:6 49:11 49:23,24 50:4 105:12,18,21 106:6 107:7,15 158:11 184:16 212:5,11
**64,000** 80:6

**7**

**7** 17:21,22 18:3 48:17,19,23 49:8 49:15 168:3 212:7 212:13

**8**

**8** 16:20,23 20:2,3,8 89:18,22 107:18 202:11 212:14
**8.3** 173:9
**84** 212:18

**9**

**9** 58:15,16,21 97:24 98:14 212:16
**92** 212:19
**9:38** 1:8

**a**

**a.m.** 1:8
**a4** 168:7,15
**able** 6:6 7:3,19 10:19 11:16 18:4 20:9 58:22 84:11 92:13 133:22 151:12 156:3 165:16 175:22 178:3,12 179:8
**absolutely** 37:9,12 41:13 46:10 104:8
**abundance** 180:14
**accord** 205:2
**account** 3:21 41:6 133:7 134:25 136:3,8 138:14 140:16 141:17 143:3,11 145:17 163:2,7
**accounting** 82:21 82:23 103:25 104:13,20
**accounts** 41:5 123:17 128:19,23 130:24 145:8 163:4
**accurate** 4:23 17:17 25:4 56:23 57:13 66:22 96:13 98:14 140:14 154:12,13,17 171:7 190:5 203:11 214:8
**accurately** 17:4 56:7 99:19 111:11 112:12 153:8 169:17 172:21
**acknowledge** 47:6
**acted** 156:23
**acting** 95:5
**action** 104:20 180:3 214:12
**actions** 29:24 30:18
**active** 41:6 124:9 169:15
**actively** 150:7
**activities** 29:16,19 33:12,20 34:11 184:2,4
**actual** 43:6
**ada** 41:7
**add** 154:6
**adding** 48:25
**addition** 29:14 53:8 157:5 171:25

178:23
**additional** 34:9 38:11,14,18 48:25 70:16 97:18 110:16 111:22 156:9
**address** 4:5 49:14 100:7 136:25 139:7 140:4,8,22 142:12 143:16,19 143:23,24 183:21 184:6
**addressed** 152:10
**addressees** 152:12
**addresses** 102:10 110:15 148:2,4 179:17
**adjacent** 206:18
**administrative** 62:14,22 63:2 65:13,19,24 114:14 115:6,21 116:10,16 117:6 123:10 144:12 145:4 146:10,18 146:22 147:19 148:21 149:3,9,16 150:4
**advised** 141:10
**affairs** 45:21
**affect** 108:22
**affidavit** 8:11,24 9:8,18 10:22 41:14 43:3 44:15 48:12 69:6 70:4,6 78:24 79:7,15 111:3,6,8,10,13,15 112:5,12,15,21,23 117:25 118:4,11 122:25 124:11 126:4 132:22,24 133:6,20 135:4 138:20 142:3 163:9,22 165:4,7 175:20,22 177:25 178:3,12 212:6,8
**affidavits** 163:10
**affiliate** 204:9
**affiliation** 60:10 60:14,18 118:21
**affirmation** 3:9 4:19 6:18 7:9 9:2 9:4,12,15 25:14 27:25 44:21 59:7 66:7 78:23,25 79:21 85:21 86:16 86:18 93:20,23 96:8 102:21 104:10 110:11 111:19 179:19 206:14,25 212:5
**affirmed** 6:11 12:4 25:5 28:22
**afternoon** 156:20
**agency** 91:7
**agreed** 113:15,17 130:7
**agreeing** 35:20 61:25
**agreement** 70:17
**ahead** 202:10
**ahmed** 2:19
**aid** 162:11
**aimed** 157:19
**alan** 190:24 192:6
**alerted** 209:13
**alius** 140:8,15
**allegations** 191:22 192:4
**allow** 25:24 43:13
**allows** 124:24
**alternate** 136:7,25 140:4
**alternative** 91:14 209:3
**amended** 10:22 212:8
**amendment** 10:25
**americas** 2:16 4:9
**analyses** 90:16,17
**analytics** 180:17
**ann** 1:13 214:4,22
**answer** 6:13 28:2 44:25 46:11 70:6 78:2,20 94:10,13 95:9 100:14,17 114:18 131:18 161:15 173:24 197:6,8 200:3
**answered** 95:8
**answers** 17:4 26:19
**anticipated** 37:2
**anybody** 149:8
**apart** 31:18 100:20 106:15 107:8 118:2,16,23 119:7 174:14 175:21
**apparatus** 43:13
**appeared** 205:25
**appears** 9:21 10:22 11:21 187:12 188:14
**applicable** 15:24
**application** 42:15 42:22 43:25 44:5 44:8 56:9 72:4 129:8,11 132:11
**applications** 130:18
**applied** 68:6 69:23 72:9 113:7,16,18 121:2,18 123:13 127:20 128:22 130:4 131:3,6
**apply** 56:15 57:5
**appreciate** 154:23
**appreciated** 129:20
**approach** 202:4
**appropriately** 137:9
**approximately** 141:16,22 150:13 154:8 155:2
**april** 6:8,11 9:2,5 10:23 12:2 14:8 61:11,19,24 62:10 62:16 65:16 116:17 150:5 165:21 166:15 179:14 180:15 195:11 197:2,3 212:11,24 213:7
**area** 101:15,18
**areas** 73:7
**arose** 179:18
**article** 20:20 21:7 21:9,21 22:9,10,24
**articles** 21:23 87:4 192:11
**ascertain** 62:19
**aside** 21:19 22:7 22:22 27:14 175:3 197:13,25 206:8
**asked** 12:23 101:15 145:19
**asking** 19:15,17 21:5 27:18 30:8 78:19 97:21 186:9 189:22 198:13,23

**asks** 108:17 187:14
**aspect** 47:19
**aspects** 57:4,6,12
**assert** 34:4
**assertion** 3:23
**assertions** 3:19 210:13
**assets** 82:22 101:9 104:2
**assigned** 132:11 132:18,20,25 182:6
**assist** 185:11 188:19
**assistant** 65:14,19 184:24 192:9 203:5,6
**assistant's** 145:16
**assistants** 62:14 62:22 63:2 65:25 114:14 115:6,21 116:5,10,16 117:6 123:10 144:12,22 144:24 145:4,8,20 146:10,18,22 147:19 148:21 149:4,9,16 150:4
**assisting** 74:22 188:25 197:15
**associated** 23:6 42:5,16 98:8 120:11
**assuming** 159:25
**assurance** 190:21
**assure** 79:12
**assuring** 17:15
**atlas** 36:20,21 37:7 38:4,9,12,20 39:5 39:7,18,25 40:10 41:8 42:5 45:16 46:18,24 47:4,16 48:5,14 49:10 50:4
**atlas's** 47:18
**attach** 111:2,4
**attached** 8:7,25 9:8,13 58:14 59:5
**attachment** 131:15
**attempt** 175:7
**attempted** 178:6 183:4
**attempting** 114:3
**attention** 45:11 52:19 58:8 63:10 72:13 79:20 89:18 92:22 93:5 179:24 200:17 205:12
**attorney** 1:12 2:5 2:15 3:11,17 5:10 5:13 19:12 26:5 26:11 34:5 35:11 70:14,19 72:23 73:2,7,12 79:24 81:6,15 82:10,17 83:6,12,17 85:3 86:5,12,24 87:12 87:14,17 88:11,24 94:5,7,17,24 95:12 100:15 107:21 110:17,20 111:21 115:11 117:11,18 134:3 135:25 136:22 140:6 181:9 185:8 187:21 188:4 191:7,17 195:24 198:8 199:23 200:10 205:17 209:12,21 210:12
**attorney's** 84:2
**attorneys** 29:15 33:10,18 39:16 44:11 48:2 51:21 61:3,5 74:21 198:16
**audit** 190:22 201:11 202:3,6
**auditing** 201:20
**august** 18:12 87:5 212:13
**austin** 184:2 185:11,17 188:18 188:23,24 193:20 193:21,25 196:19 196:19 197:4,17 197:21 198:4,25 199:19,25 200:7
**auter** 187:9 195:8
**authored** 21:10
**authorities** 16:5 19:19 146:7,12
**authority** 157:23
**authors** 93:11 209:5
**authorship** 22:23
**automatic** 41:4,18 42:7,10,20,23 43:7 43:16,19,25 44:13 44:20 47:23 133:11 134:24 141:14,24 150:6
**available** 32:25
**avenue** 2:16 4:8
**avoid** 115:12 121:22
**award** 23:18
**awards** 23:8,14
**aware** 4:22 15:14 18:22 21:21 22:2 22:25 23:3,17 32:6,8 38:15 61:9 62:7,12,13 99:13 113:23 114:4,6,9 115:3,19 116:13 116:19 117:12,21 118:6 120:25 122:13 123:19 125:14,20,22 126:23 128:4 130:16 132:9 133:10,15,16 135:20 136:6,10 136:19 138:6,8,18 138:23 139:3,7 141:6,11,20 142:11 144:11,16 144:24 146:9 147:15,18,24 149:6,24 150:8 160:17 161:20 166:15,20 181:23 181:25 188:24 189:4,9 193:24 194:3 197:17,21

**b**

**b** 59:9,11,11,14,19 63:11 122:12 212:2 213:2
**back** 8:2,14 20:13 31:4 40:5 70:5,8 72:6 75:10 83:4 98:24 116:25 124:5 153:14 158:11 161:5 174:9 178:10 185:24 188:16 210:4
**backed** 176:12 177:13,20
**background** 4:25

**backing** 176:18
**backup** 164:9,15 164:18,22 168:25 169:5 170:3 174:23 175:4,10 175:17 176:2 183:5
**backups** 170:8
**balagia** 203:3,13 203:16,22 212:10
**based** 24:22 25:3 37:17 38:21 40:16 41:15 62:24 83:24 106:3 115:10 116:24 133:19 148:14,15,16 150:21 171:17 174:4,8 197:9
**basically** 46:25
**basis** 26:10 27:13 68:3,21 98:16,20 107:8 145:2 149:14 155:15
**bates** 167:23 184:12 190:11 194:14 200:19
**bcps** 166:6,9
**began** 6:16
**beginning** 14:24 42:3,4 136:20 192:16 207:17
**begins** 93:7 180:2 184:12 207:22 208:9
**behalf** 4:15 31:19 31:20
**belief** 24:22 25:3,8 25:18 27:22 37:15 96:12 111:10
**believe** 12:22 23:12 30:21 31:6 31:6 32:13 34:22 34:25 49:12 51:4 52:7,16 56:12 57:4 60:2 61:5 62:25 65:7 68:14 80:12 82:2 86:17 87:4,5,14,17 88:20 94:16 95:19 100:18,19 108:7 108:25 112:11,25 113:4 122:9,21 123:8,22 124:22 131:2,5 132:23 139:18 140:24 141:18 142:2,16 142:21 143:2 144:15 148:23 150:10 154:16 158:5 166:19 176:21,22
**believed** 87:23 141:8 154:13 158:2 206:12
**belonging** 9:11 53:10 159:8 182:7
**belongs** 8:3
**best** 3:13
**beyond** 43:9 48:5 50:11
**bit** 206:19
**black** 189:25 190:7
**blood** 214:12
**bob** 117:16,22 118:7,13 119:3,11 182:19
**bobet** 2:20
**bodies** 17:16
**boehning** 21:12,14 21:15,17,22 22:3
**bold** 16:23 18:17 22:11 52:23 54:15 54:24 72:17 79:23 185:4 195:23 202:15
**bolded** 35:5 36:14 110:14
**bolia** 120:13 126:11
**boolean** 72:2 129:15,15 130:20 131:2
**bore** 98:12
**bottom** 22:12 59:10 63:14 172:25 180:13 184:11,16 187:25 188:6 190:10 200:19,24 202:10 207:10,11,13,16
**box** 121:25 124:25
**break** 11:4 78:10 108:3 109:17
**briefly** 48:16
**briskly** 109:20
**broad** 70:12 95:2 128:20
**broadway** 1:12 2:7
**bullet** 192:16,25 193:4,8,12,20 196:15,17,21 208:14,23
**bullets** 208:22
**burdened** 20:23
**bureau** 35:10
**business** 76:16 90:14 99:17 166:6 172:20 174:19 180:17

**c**

**c** 2:2 3:2
**call** 119:18 134:13
**called** 38:24 39:8 39:12 131:21 136:11
**calls** 90:22 107:22
**capabilities** 39:2
**capture** 128:21
**carbon** 81:19 91:8 91:16,22 93:12 100:10 101:3 102:12 108:22 209:3
**care** 17:15
**career** 145:22
**cas** 169:5
**case** 22:15 49:13 58:4 60:13,21 70:3 72:7 143:9 157:12 160:21 172:12,24 210:9
**caselaw** 15:24 16:4 19:2,7,16 157:8
**cases** 16:10 19:10 19:10 72:11 146:7 157:14
**categories** 76:11 76:15 90:3 105:6 106:5 107:17,23
**caution** 180:14
**center** 59:10 172:25 173:4 202:11 207:11
**central** 72:22,25 73:17 75:24 76:4
**ceo** 63:18
**certain** 34:14 69:20 98:3 99:19 123:11 129:14

136:15 145:20 166:8
**certainly** 13:24 37:6 139:22
**certificate** 212:4
**certification** 6:7 7:4 10:3,8 12:2,3 58:9 214:2
**certify** 214:6,10
**chain** 156:10
**chairman** 63:18
**chambers** 24:12
**chance** 13:21 15:6 48:18 89:22 105:15 151:16 190:15 202:23 208:3
**change** 35:15,17 45:18 73:6 88:16 90:11,25 99:16 101:10,25 104:19 145:18 187:11 195:24 197:24 198:2 208:18
**changing** 86:13
**characterization** 12:21 62:2
**characterize** 12:20 99:20
**chart** 60:4
**chemical** 201:11
**chris** 21:14
**christopher** 21:11
**citation** 22:15,20
**cite** 16:4,8,12,12 16:13,15
**cited** 19:20 146:8
**civic** 23:25
**civil** 22:5 23:4 24:6,8,10
**clarify** 19:14 43:15 71:9 78:18 128:3 140:12
**clear** 26:8 78:21 83:16 127:18,25 135:6,11 139:18 143:23 153:2
**clearly** 109:13 157:20
**client** 3:11 19:12 26:5,11 29:11 34:5 100:15 107:21 115:11 117:11,18 134:3 181:9 198:8 199:23 200:10 210:12
**clients** 23:15
**climate** 35:15,16 45:18 73:6 80:8 80:20 81:3,10 88:8 89:9 90:11 90:25 99:16 101:10,25 104:19 187:11 195:24 197:24 198:2 208:18
**cloud** 176:12 177:14 178:16
**co2** 100:5
**collect** 74:12 114:3 115:23 116:6 117:7 162:21
**collected** 53:11,16 117:15 121:9
**collecting** 112:18 162:12
**collection** 9:10 53:8 57:14 68:7 121:12 123:21
**collectively** 17:13 104:12
**colloquy** 6:15 26:24
**colon** 169:19
**column** 60:3,9
**come** 70:8 72:6 75:18 139:14 210:4
**comes** 135:3 196:5
**comfortable** 61:25
**coming** 164:7 206:14
**commencing** 193:8
**comments** 86:25
**commission** 91:10
**committee** 45:17 56:16,25 57:6,10 62:9,15 65:25 68:17 69:18,24 71:4,12,21 72:5,10 76:17 77:2,5,11,19 77:24 79:3,16 110:22 111:23 112:19 114:2 115:8,22 116:7 117:8,14,23 118:9 121:3,10,19 122:6 122:15 125:17 127:21 129:10 130:12,19 138:12 144:13 146:19 147:23 161:22 162:3 168:13,18 182:8
**commonplace** 70:23
**communicated** 138:13 192:14
**communicates** 46:25
**communications** 90:9,23 93:10 118:2 119:8,22 134:7 147:21 208:16,24
**company** 39:2 64:14 65:10,14 74:7,20 75:18 148:13 171:22 172:10 175:16 191:21 192:4 205:8
**company's** 30:11 159:10 160:13
**compare** 71:10
**comparison** 71:19
**complete** 94:13 97:24 98:19
**completed** 97:7,13 105:18
**completely** 80:13
**completeness** 186:18
**completion** 27:25 28:5
**complex** 21:23
**compliance** 51:15 51:22 52:4,14 61:18 115:2 119:5 150:2 171:10 181:2,20 182:22 183:24 197:19 198:5 199:2,16,20 199:25 200:8 203:25 204:15 212:4
**complies** 15:23
**comply** 193:5