# EXHIBIT A
# Part 5

Case 3:16-cv-03111-K Document 36-1 Filed 07/26/17 Page 330 of 553 PageID 737



talking about?

MS. SHETH: So what we're talking about, the categories are outlined of bottom of page 1. We're talking about the documents that will discuss the impact of climate change and climate change reservation on reserves, on the reserve replacement ratio, and the likelihood that the reserves will be impaired or stranded, the rate at which reserves will be utilized and the likelihood of low carbon emission scenarios.

THE COURT: You just outlined a half a dozen potential search terms that you can give to Exxon and which I would ask Exxon to utilize.

That's the point of what I'm trying to get across, here, which is if you have search terms that you want to add and they're reasonable, based on everything that you have done for the last year the Court would order them produced. And frankly, I think Exxon would agree to add them at a meet and confer without the Court's intervention.

MS. SHETH: Okay, we've tried that in the past and we'll try that again, Your Honor.

We will try again and we will do it expeditiously because we do want these documents by the end of January.

THE COURT: Well it seems to me we have a record here. You just articulated a half a dozen search terms which may or may not be search terms that Exxon has

previously utilized.

I'm satisfied, based on what you presented to the Court, that those terms are reasonable for Exxon to add to search terms that its using and you should just send Exxon an e-mail or a letter listing those half a dozen search terms and it would be the order of the Court that those should be added to the search that's being made of the 56 custodians that have previously been agreed upon. And if there are additional custodians that you've identified based on the review of the 1.4 million pages of documents that Exxon has produced those will be added, as well. And it seems to me that Exxon has the resources to add those additional custodians and add those additional search terms without affecting the January 31st deadline.

Now, with respect to this business of having privileged logs produced every two weeks, that's just unreasonable.

MS. SHETH: Thank you, Your Honor, we will do that. We will expeditiously provide them with a supplemental list of custodians and supplemental list of search terms.

And if I could address just one other point, Your Honor.

THE COURT: Let me just make sure that Exxon is agreeable to this.

MR. TOAL: So, I would just say a few things. I

think we have a set of search terms that it was agreed upon and it was negotiated.

THE COURT: I understand.

MR. TOAL: So I think those are reasonable terms to accomplish the task of trying to come --

THE COURT: The New York Attorney General has indicated there are these additional search terms that the New York Attorney General deems to be relevant based on its evolving review of the documents and it doesn't seem to me to be extraordinarily onerous to add the four or five additional specific search terms that counsel has articulated, and if there are a couple of, three or four custodians that the New York Attorney General has identified, it doesn't seem to me to be onerous for you to add those.

The burden of your letter to the Court was that the New York Attorney General wasn't telling you what it was they wanted you to search or whose files they wanted you to search. Now we've convened here with a large audience, the New York Attorney General has identified a handful of additional search terms and is proposing to add a handful of additional custodians. I would have thought that could have been agreed upon at a meet and confer but it wasn't, so --

MR. TOAL: So Your Honor, I would say a few things. If we're talking about a handful of search terms and they're

not their terms that are likely to capture documents that the existing search terms wouldn't have caught and they're reasonable and responsive to the subpoena, that obviously is something we've been willing to talk about from the beginning. If we're talking about a few additional custodians and there's a reasonable likelihood to believe they have responsive documents, that is something we can talk about if there is reasonable documents in that the existing custodians wouldn't have produced that we can talk about.

The January 31st deadline was predicated on the custodians that were specifically identified in the search terms that were specifically identified and if we do have to go back and collect data from additional custodians, load that data, run search terms, that will take additional time and we don't know how much additional time until we know how many of those documents hit on the search terms. So that's the only proviso that I would add, Your Honor, is that we really can't predict what the volume is going to be, how many documents will hit on the search terms. Once we know that we can make reliable predictions about how long it will take us to review those documents.

MR. WELLS: Your Honor, if I could just add, in terms of what I'll call a big picture answer we'll get done what you just said. If we're talking about a handful of new

search terms, whatever they are, we'll run them, okay.

With respect to the handful of custodians, we will take care of that and do our best to meet the end of the month deadline, if possible.

The search terms are different from the custodians. What's different is that with the existing custodians they're now in the data base. So they give us handful of new search terms we can run it, okay. The custodians, if they're new names, what has to happen is more time-consuming in the sense we've got to go out to that person's office.

THE COURT: You have to upload the document. I've been there done this, so I understand exactly what we're talking about. And it's my belief that if the parties both behave reasonably and responsibly, adding a handful of additional search terms and a handful of additional custodians shouldn't be an insuperable barrier to production of all of the documents by January 31st.

MR. WELLS: I agree, Your Honor.

MS. SHETH: Thank you, Your Honor.

One last point, and this goes to Mr. Wells's point about the custodians. I just want to be clear about the shared drives, and I know Your Honor is well familiar with shared drives. I like to think of them as an electronic filing cabinet where, you know, the entire filing cabinet a particular department or group of individuals at the company

has access to that cabinet. They can pull it out and within the cabinets are folders and they're organized by either topic or sometimes by person.

Now, Exxon is telling the Court it has searched those shared drives, but I think what Exxon has done, based on my understanding of the correspondence, is that they have searched the folders within this cabinet that relate to the 56 custodians. What they haven't searched are the topical folders. And I have a nice document from Exxon's own production, which if I may hand it up, will show what I'm talking about, here.

So, we were lucky in that we coincidentally found this in Exxon's production, it's on a topic that really is not relevant to this investigation but Exxon happened to produce this document which pertains to something relating to water resource management. But what this document shows is this, a screen shot of the shared drive system or one of the shared drive systems in place at Exxon. And if you look at the right --sorry, the left hand corner, it says Document Resource Library, and at the bottom, you see a bunch of documents; some look like word documents, some appear to be power point documents. But these are documents that are within this folder called Water Resources.

Now, we had asked Exxon repeatedly, can you please search these shared drives. And if you look at page 3 of

Case 3:16-cv-03111-K Document 36-1 Filed 07/26/17 Page 336 of 553 PageID 763



our dec we've even identified the specific shared drives that we've identified based on their document production. We said, rather than look for the folder of custodians, please look for the topical folder. For example, look at the folder that pertains to greenhouse gases, look at the folder that pertains to oil and gas project approvals which does have documents concerning the application of the proxy cost and they have refused to do that. So I would ask Your Honor that in addition to us identifying additional supplemental custodians and search terms, that Exxon also search these shared drives and the specific topical folder in the shared drives.

And the one other area is data bases. We have not seen any documents in their production that come from data bases and we know based on a review of the documents there are data bases for example the flex data base which contains emissions and environmental data, so we would ask that they also search those the January 31st deadline.

THE COURT: Well, let me ask a very practical question. Is it contemplated that there are going to be depositions in this proceeding?

MS. SHETH: Yes, Your Honor, I think that that's a fair assumption.

THE COURT: What I think is that the search terms that you give to Exxon, supplemental search terms will

capture what you're looking for.

MS. SHETH: Only if they run them in the shared drives. If they're just running them on custodians we may not get these shared drive documents. That's my understanding of how it works.

THE COURT: You've represented they have run the search terms on shared drives, that's what they have represented.

MS. SHETH: I would ask for a clarification from counsel. Are they running the search terms on the topical shared drive folder?

MR. TOAL: We have asked custodians, we've interviewed custodians, we've asked them where they store documents, we asked them if they store documents on shared drives. They indicated they stored documents on the shared drives that are reasonably likely to be responsive to the subpoena. We searched the shared drive.

THE COURT: Okay, it seems to me that, you know, it's unreasonable for Exxon to deliver to the New York Attorney General's Office every document that Exxon has in its possession and it seems to me that when you commence the deposition process it will become very apparent if there are any gaps in the document production, and you're just throwing darts against the wall, here.

If you give them, as part of the supplemental

search terms, some of the terms that are, that appear on page 3 and they run those through the shared drives, which they have represented that they're doing, you're going to get pretty close to the universe of what you need and what you want.

MS. SHETH: I agree with Your Honor, if that's what they're doing, if they're willing to run our search terms on the shared drives then, yes, you're absolutely right, we will get what we're asking go for and looking for. I don't interpret what Mr. Toal said to be doing that. I think what he's saying is we're only going to look in a particular shared drive because the custodians said I put my documents in the shared drive.

So what that means is, let's say we have the search shared climate change, if I am one of their custodians I mention that drive, they're not running searches in that drive but meanwhile, based on the folder name we know there are documents in a shared drive, that's the climate change implementation shared drive. So we're asking to search that drive using the search terms, and if they're willing to do that, that's perfect.

MR. TOAL: So we're aware of our obligation to search for documents in places that they're reasonably likely to be found. I can't address all the specific shared drives now because they were raised for the first time right

now. This is really what should have happened during the meet and confer. The A.G. was not willing to engage on these topics so I can only talk generally.

We are aware of our obligation to search for documents where they're reasonably likely to be found and we'll continue to do that.

MS. SHETH: And I would submit that the documents relating to climate change are reasonably likely to be found in the shared drives with these names.

THE COURT: Counsel is attempting to be responsive to your concerns and I think we've accomplished all we can accomplish this morning. If it turns out that you believe that there isn't good faith compliance with what we've agreed upon and discussed this morning then you come back here and we'll drill down deeper than we've drilled today, but it seems to me that they have agreed to produce by January 31st, documents captured by additional search terms. They have agreed to produce by January 31st documents from additional custodians and they have agreed, to the extent the search terms are reasonably likely to produce documents from shared drives, they will produce them. That's by order of the Court.

And if there is any further issues you will initiate additional conferences in early January.

MS. SHETH: Thank you, Your Honor, we really

appreciate your time and your patience and we will do that, we'll work expeditiously starting as soon as Monday or even this afternoon to get that done. And I would ask Your Honor that if we could keep the December 15th pre-existing conference on the calendar so that if we do have disputes about what's a reasonable handful of custodians and search terms that we may revisit that issue with Your Honor.

MR. WELLS: I was going to ask just the opposite, Your Honor. The December 15th date was set with respect to the climate. We reached a stipulation, we don't have any dispute, we have a schedule and that's all in place, so that was the purpose of the December 15th date.

THE COURT: I understand and I agree.

MR. WELLS: And so, since -- so I would ask that we not be --not have to hold this date. People have to fly here from Texas and make plans and there's no reason, as Your Honor has indicated it looks like if there's a problem they can write a letter and you call us in on short notice and we appear and that's worked out so far fine with everybody, so I would ask that we adjourn the December 15th date and if we have to get back here whenever, we will.

THE COURT: I agree with that. The December 15th date relating to the PWC issues, and I signed the stipulation yesterday memorializing your agreement as respects the PWC documents, so there's no reason to come

back here on December 15th, but, if things go awry in connection with what we've discussed this morning you'll apprise me by letter and if you have to come back next week or the week after we'll do that. But it seems to me that there's been a meeting of the minds, here, and let's hope that things move smoothly and cooperatively.

MS. SHETH: Thank you, Your Honor.

I think there is one issue that's still pending and that pertains to the redactions of --the redactions for responsiveness. So we had asked in our letter --well, we submitted in our letter that those redactions are improper. Exxon is only permitted to redact on the basis of privilege or work product and instead we have received documents that are responsive but have been redacted oftentimes in the entirety. So we've got multiple documents where the entire document, but for one line, has been redacted for responsiveness reasons. So we would respectfully ask those documents be produced immediately.

THE COURT: I'm not prepared to order that at this point in time. That's something that would have to be fully briefed by both parties. And if you want to submit within ten days simultaneous briefs on that issue, I will address it.

MS. SHETH: Thank you, Your Honor.

MR. TOAL: Your Honor, I would say on the redaction

point, we have agreed to go back and re-review all of our redactions for responsiveness and limit our redactions to issues regarding sensitive and private information which even the A.G. says is an appropriate reaction.

THE COURT: That's among the reasons why I'm not prepared to order anything today.

MR. TOAL: Thank you, Your Honor.

THE COURT: Okay. Thank you. You will order the transcript.

C E R T I F I C A T E

It is hereby certified that the foregoing is a true and accurate transcript of the proceedings.

---------------------------------

ANGELA BONELLO

SENIOR COURT REPORTER

SUPREME COURT-NEW YORK COUNTY

# Exhibit 21

In the Matter of the Subpoena Issued by The Attorney General of the State of New York, Dated November 4, 2015, to Exxon Mobil Corporation

**SUPPLEMENTAL AFFIRMATION OF MICHELE HIRSHMAN**

I, Michele Hirshman, an attorney admitted to the practice of law before the courts of the State of New York, and not a party to the above entitled cause, affirm the following to be true under penalties of perjury pursuant to N.Y. C.P.L.R. 2106:

1. I am a partner in the law firm of Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul, Weiss"), and either have personal knowledge of the matters set forth herein, or state facts based upon information and belief. For the facts stated upon information and belief, I have made reasonable inquiries of individuals with knowledge to confirm the information. If called as a witness, I could and would competently testify to the contents herein.

2. I am counsel to Exxon Mobil Corporation ("ExxonMobil" or "the Company") in connection with this matter. As part of my responsibilities, I oversaw the production of documents in response to the subpoena *duces tecum* dated November 4, 2015 ("the Subpoena").

***Hirshman Affirmation***

3. On April 10, 2017, I executed an affirmation describing ExxonMobil's compliance with the Subpoena (the "Hirshman Affirmation").

***Identification of Document Processing Error and Disclosure***

4. The next morning, on April 11, 2017, ExxonMobil's e-discovery vendor (the "Vendor") provided to Paul, Weiss and ExxonMobil a search term hit report (the "Hit Report") concerning the then-upcoming April 30, 2017 production.[1] That report did not list four of the 25 search terms (the "Complete Set of Search Terms")[2] that ExxonMobil had instructed the Vendor to apply to the data set described in the Hit Report. Absent from the Hit Report were the four supplemental search strings (the "Supplemental Search Terms") that, on January 17, 2017, ExxonMobil had agreed to add to the then-current list of 21 search terms.[3]

5. Unable to reconcile the Hit Report with the Complete Set of Search Terms, Paul, Weiss exchanged multiple emails with, and spoke by phone to, the Vendor.

6. By day's end, Paul, Weiss and ExxonMobil had learned that, on or around March 15, 2017, the Vendor had stopped running the Supplemental Search Terms against any data received in connection with the Subpoena. The Vendor explained by phone that, on March 15, 2017, in preparation for leaving the Vendor's employ, the former project manager responsible for processing all data related to the Subpoena transitioned his responsibilities to a new project manager. The Vendor clarified that, when this transition occurred, the former project manager failed to notify his replacement that the search terms in use included the Supplemental Search Terms.

---

1 *See* Hirshman Affirmation, ¶ 48.

2 *See* Exhibit C to Hirshman Affirmation (listing the Complete Set of Search Terms that the Vendor was instructed to apply); *see also* Hirshman Affirmation ¶¶ 22–24 ("Search Terms").

3 *See* Hirshman Affirmation, ¶ 24.

7. On April 11, 2017, the Vendor confirmed that the Supplemental Search Terms had not been applied to the unfiltered data of the Management Committee Custodians[4] (the "Employee Transition Error").

8. The following day, on April 12, 2017, at the direction of ExxonMobil, Paul, Weiss disclosed to the Attorney General the Employee Transition Error. Paul, Weiss informed the Attorney General that it was continuing to gather and analyze all facts relevant to the error (the "Assessment").

***Identification of Two Additional Document Processing Errors***

9. During the course of the Assessment, Paul, Weiss and ExxonMobil learned that, in addition to the Employee Transition Error, the Vendor had also failed to properly apply the Supplemental Search Terms to two other sets of data.

10. Both of these additional oversights occurred in mid-January 2017. Each was the result of human error.

11. On April 13, 2017, Paul, Weiss and ExxonMobil learned that, in mid-January 2017, the Vendor had failed to manually transfer from a proprietary systems tool to Relativity (*i.e.*, the document review platform) a subset of documents hitting on the Supplemental Search Terms. Because these documents were never uploaded to Relativity, they were not reviewed by Paul, Weiss (the "Relativity Upload Error").

---

4 The "Management Committee Custodians" as defined herein include (i) those six members who served on the Management Committee on the date that the Attorney General issued the Subpoena, *i.e.*, Rex W. Tillerson, Darren W. Woods, Mark W. Albers, Jack P. Williams, Andrew P. Swiger, and Michael J. Dolan, and (ii) Jeffrey Woodbury, Secretary of ExxonMobil and Vice President of Investor Relations, whose documents, due to their highly confidential and sensitive nature, were treated in the same way as those belonging to the six members of the Management Committee. *See* Amended Affidavit of Connie Lynn Feinstein (April 19, 2017), ¶¶ 12–39 (describing the document search, collection, and review protocols applied to the six members of the Management Committee). The Vendor processed the unfiltered data of the Management Committee Custodians after March 15, 2017.

12. On April 14, 2017, Paul, Weiss and ExxonMobil learned that, also in mid-January 2017, the Vendor had segregated, in error, a distinct subset of documents to an ancillary Relativity platform. That ancillary platform, referred to as "Administrative Staging," is controlled by, and only visible to, the Vendor. Because documents in Administrative Staging that hit on the Supplemental Search Terms were hidden from view, they also were not reviewed by Paul, Weiss (the "Administrative Staging Error").

***Remediation Efforts***

13. ExxonMobil took immediate remedial action as soon as it learned of the three above described document processing errors.

14. *First*, ExxonMobil and Paul, Weiss instructed the Vendor to re-apply the Complete Set of Search Terms (which includes the Supplemental Search Terms) to all unfiltered data belonging to the 125 custodians from whom, and 11 shared locations from which, ExxonMobil had to date produced documents (the "Remedial Search").

15. *Second*, ExxonMobil and Paul, Weiss directed the Vendor to upload to Relativity, and render visible for review, all non-duplicative documents identified as a result of the Remedial Search.

16. *Third*, ExxonMobil directed Paul, Weiss to (a) manually review all documents identified by the Remedial Search, and (b) prepare for production all responsive, non-privileged documents resulting from this review.

***Validation Exercise***

17. In an abundance of caution, on April 14, 2017, Paul, Weiss engaged Deloitte Transactions and Business Analytics LLP ("Deloitte") to validate the remediation efforts conducted by the Vendor at the direction of ExxonMobil (the "Validation Exercise").

18. On April 21, 2017, Deloitte concluded the Validation Exercise. It confirmed that the Vendor had uploaded to Relativity, and rendered visible for review, all non-duplicative documents identified as a result of the Remedial Search.

***Additional Disclosures***

19. On April 24, 2017, at the direction of ExxonMobil, Paul, Weiss disclosed to the Attorney General (i) the Relativity Upload and Administrative Staging Errors; (ii) the Company's remediation efforts concerning the three document processing errors identified to date; and (iii) the inception and outcome of the Validation Exercise.

***Document Production***

20. On April 30, 2017, ExxonMobil produced to the Attorney General all responsive, non-privileged documents reviewed as part of the Remedial Search. That production also included responsive, non-privileged documents from 17 additional custodians, whose files ExxonMobil had agreed, on March 31, 2017, to search and review as an accommodation to the Attorney General.

21. By April 30, 2017, ExxonMobil had produced to the Attorney General all responsive, non-privileged documents that, as of April 24, 2017, it had agreed to produce or was required to produce.

22. To date, and in accordance with the Attorney General's investigative priorities, ExxonMobil has collected and produced over 430,000 documents (totaling nearly 2.8 million pages) from (a) 142 custodians, and (b) 11 shared locations untethered to specific custodians.

23. On May 15, 2017, ExxonMobil will produce to the Attorney General (i) a privilege log pertaining to documents withheld from the April 30, 2017 production, and (ii) responsive, non-privileged electronically stored information from the custodial files of Amy Climo, whose documents ExxonMobil agreed to produce on April 27, 2017 as an accommodation to the Attorney General.

24. If, after May 15, 2017, ExxonMobil learns of additional responsive, non-privileged documents in its custody and control belonging to any of the 142 custodians and/or the 11 shared locations referenced above in ¶ 22, they will be produced promptly to the Attorney General.

I affirm that the foregoing statements made by me are true.

Dated: May 3, 2017
New York, New York

Michele Hirshman

Case 3:20-cv-02995-K Document 1-5 Filed 08/06/19 Page 22 of 147 PageID 444

# Exhibit 22

**From:** Williams, Jack P
**Sent:** Monday, November 23, 2015 5:36 PM
**To:** Kruger, Rich M; Woods, Darren W
**Subject:** RE: Alberta GHG policy announcement

Thanks Rich.

Jack Williams
Exxon Mobil Corporation
5959 Las Colinas Blvd. Rm 9
Irving, TX 75039
Ph: 972-444-1919

---

**From:** Kruger, Rich M
**Sent:** Monday, November 23, 2015 8:53 AM
**To:** Williams, Jack P; Woods, Darren W
**Subject:** Alberta GHG policy announcement

Gentlemen,

Alberta's new Premier Rachel Notley and Environment Minister Shannon Phillips announced the next steps on Alberta's GHG policy on Sunday, November 22. The announcement draws on the work of the climate change policy panel Premier Notley appointed upon election six months ago. The Premier will travel today to a meeting with Canada's new Prime Minister Trudeau and all of Canada's other premiers to discuss GHG policy in the run-up to the Paris CoP. Notley and Phillips will both be at CoP with the stated objective of "improving Alberta's reputation."

The announced framework will accelerate Alberta's transition from a coal dominated power sector to natural gas and renewables-heavy electricity production. The Premier also stressed that Alberta will focus more than it has on energy conservation and renewables in general. In addition to coal, the focus of the public announcement was on what sounds like a complex, more demanding regime for GHGs from oil sands production when compared to the existing, intensity based regime under the "Specified Gas Emitters Regulation" (SGER) policy for major emitters. The details of the new framework will take time to assess, but among the major highlights appear to be an industry-wide cap on oil sands GHGs at a level above current production and a broader (perhaps economy wide) tax on carbon that would no longer be intensity based and which would capture all tons at a $30 level staring in 2018. This contrasts with an effective $5-6 price per ton price associated with the planned $30 per ton intensity-based policy already in place via SGER.

The Premier described the carbon tax as revenue neutral and then enumerated a long list of ways, including in part technology development, on which the additional funds would be spent. The policy does contemplate some form of offsets to address competitiveness which we need to better understand. Several oil sands producers (specifically CNRL, Cenovus, Shell and Suncor) and various ENGOs were present and on stage with the Premier and endorsed the policy announcement.

We are turning our immediate focus to a detailed examination of the announcement and its impact on our existing operations and possible future projects in Alberta.

If contacted by the media we plan a short, simple response something like the following:

--We believe any GHG policy for Alberta should be designed to protect the competitiveness of the province's oil and gas industry.
--We are studying the announcements from the government to assess their impact on our existing operations and possible future projects.

Rich

Case 3:16-cv-03111-K Document 36-1 Filed 07/26/17 Page 352 of 553 PageID 779

# Exhibit 23

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
2001 K STREET, NW
WASHINGTON, DC 20006-1047
TELEPHONE (202) 223-7300

WRITER'S DIRECT DIAL NUMBER
(202) 223-7446

WRITER'S DIRECT FACSIMILE
(202) 315-3802

WRITER'S DIRECT E-MAIL ADDRESS
sjansen@paulweiss.com

1285 AVENUE OF THE AMERICAS
NEW YORK, NY 10019-6064
TELEPHONE (212) 373-3000

UNIT 3601, OFFICE TOWER A
BEIJING FORTUNE PLAZA
NO. 7 DONGSANHUAN ZHONGLU
CHAOYANG DISTRICT
BEIJING 100020
PEOPLE'S REPUBLIC OF CHINA
TELEPHONE (86-10) 5828-6300

12TH FLOOR, HONG KONG CLUB BUILDING
3A CHATER ROAD, CENTRAL
HONG KONG
TELEPHONE (852) 2846-0300

ALDER CASTLE
10 NOBLE STREET
LONDON EC2V 7JU, U.K.
TELEPHONE (44 20) 7367 1600

FUKOKU SEIMEI BUILDING
2-2 UCHISAIWAICHO 2-CHOME
CHIYODA-KU, TOKYO 100-0011, JAPAN
TELEPHONE (81-3) 3597-8101

TORONTO-DOMINION CENTRE
77 KING STREET WEST, SUITE 3100
P.O. BOX 226
TORONTO, ONTARIO M5K 1J3
TELEPHONE (416) 504-0520

500 DELAWARE AVENUE, SUITE 200
POST OFFICE BOX 32
WILMINGTON, DE 19899-0032
TELEPHONE (302) 655-4410

December 22, 2015

***Via E-Mail***

Monica Wagner, Esq.
Deputy Chief
Environmental Protection Bureau
Office of the Attorney General
State of New York
120 Broadway, 26th Floor
New York, NY 10271

*Re: New York State Attorney General Subpoena Directed to Exxon Mobil Corporation*

Dear Ms. Wagner:

We represent Exxon Mobil Corporation ("ExxonMobil") in connection with the above-referenced matter. In response to your subpoena dated November 4, 2015 (the "Subpoena"), we are enclosing materials bearing Bates numbers EMC 000000005 – EMC 000000022. Pursuant to our December 10, 2015 discussions, the enclosed materials include organizational charts for certain individuals who are on litigation hold.

We are also enclosing as Appendix A a list of the names, titles, and business units for individuals who are on litigation hold in the United States. In addition to the names included on Appendix A, sixty-six individuals who are employed by global ExxonMobil affiliates are also on hold. These sixty-six individuals are located in the following countries: Australia, China, Belgium, Canada, Qatar, Russia, Singapore, and the United Kingdom.

Moreover, in your December 16, 2015 correspondence, you suggested several modifications to the search terms that ExxonMobil is using to identify potentially relevant electronic data. ExxonMobil confirms that we have incorporated all of your suggested modifications.

During our November 18 discussions, you and your colleagues represented that the New York Attorney General ("NYAG") would maintain the confidentiality of ExxonMobil's information produced in response to the Subpoena. Because this

submission contains confidential information which, if disclosed, would cause substantial injury to the competitive position of ExxonMobil, ExxonMobil requests that the NYAG accord confidential treatment under New York's Freedom of Information Law ("FOIL") to this letter, the files and the data accompanying this letter, and all information derived therefrom (the "Confidential Information") pursuant to New York Public Officers Law § 87(2). Accordingly, we have stamped the enclosed files "Confidential / FOIL Treatment Requested by Exxon Mobil Corporation Pursuant to Pub. Officers Law Section 87(2)." We respectfully request that you take all appropriate measures to ensure that the Confidential Information (i) will not be publicly released, disseminated or publicized, (ii) will only be shared with NYAG staff on a need-to-know basis, and (iii) will be maintained in a secure facility.

If you have any questions about the production, please do not hesitate to call me.

Very truly yours,

Sean D. Jansen

Enclosures

cc: Patrick J. Conlon, Esq.
cc: Michele Hirshman, Esq.
cc: Theodore V. Wells, Jr., Esq.

Case 3:16-cv-03111-K Document 36-1 Filed 05/06/17 Page 355 of 553 PageID 782

**Appendix A**
**Letter from S. Jansen to M. Wagner**
**December 22, 2015**

| Name | Job Title | Business Unit |
|---|---|---|
| Aguiar, Matthew J. | Sr. Vice President | ExxonMobil Chemical Company |
| Albers, Mark W. | Sr. Vice President | Exxon Mobil Corporation |
| Allman, Gemma T. | Manager | Public and Government Affairs, Downstream |
| Ames, Thomas L. | Research Analyst | Corporate Strategic Planning, Economics & Energy |
| Bachman, Ammie N. | Associate Toxicologist | EMRE, Biomedical Sciences -Toxicology |
| Bailes, Robert W. | Downstream & Chemical SSH&E Manager | Safety, Security, Health and Environment |
| Balagia, S. Jack | Vice President, General Counsel | Exxon Mobil Corporation |
| Banaszak, Sara J. | Manager | Public and Government Affairs, Upstream, Gas & Power Marketing |
| Bell, Annora B. | Counsel | Law |
| Bergman, Cynthia L. | U.S. Government Relations Manager | Public and Government Affairs, U.S. Government Relations |
| Bishop, Nathan R. | Public & Government Affairs Manager, Fuels & Lubes | Public and Government Affairs, Downstream, Fuels & Lubes |
| Blevins, Susan K. | Climate Policy Planning Sr. Advisor | ExxonMobil Refining and Supply Company, Strategy and Planning-Global Regulatory Affairs |
| Boyer, Robert F. | Claims Supervisor | Treasurers, Risk Management-Claims |
| Bradbury, Sidney M. | Financial Advisor | Controller's, Corporate-Financial Reporting |
| Buchholtz, Walt F. | Manager | Public and Government Affairs, Chemicals |
| Byrne, Richard E. | General Counsel | Law, Downstream |
| Carpenter, Bill C. | Program Manager | Public and Government Affairs, Budget and Controls Management |
| Carron, Christopher M. | Counsel | Law |
| Carter, Susan E. | Sr. Advisor | Public and Government Affairs, Executive Branch Issues Management Coordination |
| Chapman, Neil A. | President | ExxonMobil Chemical Company |
| Chaves, Milton | Sr. Advisor | Public and Government Affairs, Federal Government Relations |
| Christensen, Karen P. | Environmental Associate | EMRE, Biomedical Sciences and Environmental Sciences |
| Chuchro, Alicia J. | Environmental Engineer | U.S. Production |
| Clark, Alan L. | Manager | Gas & Power Marketing |
| Clark, Kimberly A. | Employee Communications Manager | Public and Government Affairs, Communications |



**Confidential / FOIL Treatment Requested by Exxon Mobil Corporation Pursuant to Pub. Officers Law Section 87(2)**

**Appendix A**
**Letter from S. Jansen to M. Wagner**
**December 22, 2015**

| Name | Job Title | Business Unit |
|---|---|---|
| Climo, Amy E. | Environmental Advisor | Safety, Security, Health and Environment, Environment & Regulatory |
| Cohen, Kenneth P. | Vice President; Chairman | Public and Government Affairs; ExxonMobil Foundation |
| Collins, Douglas | Chief Attorney | Law, Downstream |
| Colton, William M. | Vice President | Corporate Strategic Planning, Management & Staff |
| Connell, Dylan B. | Media Analyst | Public and Government Affairs, Media Relations, Center of Expertise |
| Cooney, Philip | USA Operations Manager | Public and Government Affairs, U.S. Public and Government Affairs Operations |
| Copeskey, Jeff F. | Advisor | Public and Government Affairs, Government Relations & Business Support, State Government Relations |
| Copley, Bruce G. | Sr. Scientific Associate | EMRE, Biomedical Sciences -Occupational & Public Health |
| Cousins, Mike | Executive Vice President | ExxonMobil Exploration Company, Exploration Regions |
| Creegan, Kathleen M. | Chemist | EMRE, Research & Development Support Services |
| Dalcol, Devan J. | Integrated Advocacy Advisor | Public and Government Affairs, Integrated Advocacy |
| Dashwood, John R. | Vice President, Upstream Commercial Resources | Gas & Power Marketing |
| Devlin, Dennis J. | Sr. Environmental Health Advisor | Corporate Strategic Planning, Environmental Policy & Planning |
| Dingmore, Lindsey | Vice President | XTO Energy, Public and Government Affairs |
| Dolan, Michael J. | Sr. Vice President | Exxon Mobil Corporation |
| DuCharme, Linda D. | Vice President | Gas & Power Marketing, Americas, Asia Pacific, Africa & New Markets |
| Easley, Daniel C. | House Sr. Advisor | Public and Government Affairs |
| Ebner, Randall M. | Assistant General Counsel | Law, Corporate |
| Eikenberry, Jeremy | Program Officer | Public and Government Affairs, Corporate Citizenship |
| Faldi, Alessandro | Distinguished Research Associate | EMRE, Research & Development - Corporate Strategic Research |
| Fariello, Theresa M. | Vice President | Public and Government Affairs |
| Feeley, Jennifer S. | Corporate Program Portfolio Manager | EMRE, Research & Development - Corporate Strategic Research |
| Fick, C. Milton | Counsel | Law, Upstream |
| Furman, Kevin C. | Associate Developer | Gas & Power Marketing Corporate Power Projects |
| Gardner, Robert E. | Manager | Corporate Strategic Planning, Economics & Energy |



**Confidential / FOIL Treatment Requested by Exxon Mobil Corporation Pursuant to Pub. Officers Law Section 87(2)**

**Appendix A
Letter from S. Jansen to M. Wagner
December 22, 2015**

| Name | Job Title | Business Unit |
|---|---|---|
| Glennon, John P. | Manager | ExxonMobil Refining and Supply Company, Strategy & Planning-Global Regulatory Affairs |
| Gobush, Matthew N. | Integrated Advocacy Sr. Advisor | Public and Government Affairs, Integrated Advocacy |
| Goins, Neal R. | Vice President | Public and Government Affairs, Government Relations & Business Support -International Government Relations |
| Goudge, Laura M. | Corporate Communications Advisor | Public and Government Affairs, Communications, Center of Expertise |
| Graber, Mary Y. | Air Group Head | EMRE, Engineering, Specialized Engineering Division, Environmental Technology |
| Greenlee, Stephen M. | President | ExxonMobil Exploration Company |
| Gunn, John P. | Manager | Gas & Power Marketing, Upstream Fiscal & Regulatory Affairs |
| Gunnlaugsson, Tracey C. | Manager | ExxonMobil Refining & Supply Company, Supply & Transportation Global Logistics Optimization-Americas Product |
| Gunter, John W. | Global Energy and Oil Loss Advisor | ExxonMobil Refining & Supply Company, Global HQ - Refining & Supply-Operations Support & Best Practices |
| Hafker, William R. | Environmental Global Technology Sponsor | EMRE, Engineering, Specialized Engineering Division, Environmental Technology |
| Hamilton, Jed M. | Sr. Artic Consultant | ExxonMobil Upstream Research Company, Engineering Offshore & Environment |
| Hazel, Carol C. | Chemicals Issues Advisor | Public and Government Affairs, Issues Management , Center of Expertise |
| Heckman, D. Christopher | General Counsel, ExxonMobil Risk Management Inc., Petroleum Casualty Company | Exxon Mobil Corporation, Compliance & Corporate |
| Herrin, Tammy S. | Tax Counsel | Exxon Mobil Corporation |
| Holbrook, William F. | Corporate Media Sr. Advisor | Public and Government Affairs, Corporate Public Affairs |
| Holguin, Margo | Board Secretariat | Office of the Secretary |
| Howison, Susan S. | Paralegal | Law |
| Hubbard, Andy J. | Global Regulatory Advisor | Upstream Fiscal & Regulatory Affairs |
| Huffaker, Charlotte B. | Executive Communications Advisor | Public and Government Affairs, Communications, Center of Expertise |
| Hulbert, Kristen R. | Counsel | Law |
| Jackson, Lorie D. | State Government Relations Advisor | Public and Government Affairs, Government Relations & Business Support -U.S. Government Relations |



**Confidential / FOIL Treatment Requested by Exxon Mobil Corporation Pursuant to Pub. Officers Law Section 87(2)**

**Appendix A**
**Letter from S. Jansen to M. Wagner**
**December 22, 2015**

| Name | Job Title | Business Unit |
|---|---|---|
| Jeffers, Alan T. | Media Relations Manager | Exxon Mobil Corporation, Corporate Public Affairs |
| Johnson, Kenneth C. | Counsel | Law, Litigation |
| Johnson, Robert W. | Assistant General Counsel | Exxon Mobil Corporation, Management Support Services |
| Jones, Edward | Energy Advisor | Corporate Strategic Planning, Economics & Energy |
| Keil, Richard D. | Sr. Advisor | Public and Government Affairs, Integrated Advocacy |
| Kerby, Michael C. | Manager | EMRE Research & Development, Corporate Strategic Research |
| Kerr, Lauren A. | Manager | Public and Government Affairs, Media Relations Operations, Center of Expertise |
| Kestle, Stephen J. | Manager | Controller's, Corporate-Financial Reporting |
| Kheshgi, Haroon S. | Global Climate Change Science Program Lead | EMRE Research & Development, Corporate Strategic Research |
| Klein, Travis | Gulf Coast Growth Venture Air Engineer | Central SHE (Safety, Health & Environment) |
| Klekar, Chad C. | Planning Advisor | Corporate Strategic Planning |
| Knapp, Andrew C. | Manager | Public and Government Affairs, Functional Issues Management, Center of Expertise |
| Knight, Matt | Manager | Gas & Power Marketing, Corporate Power Projects |
| Krishna, Paul P. | Environmental Programs Manager | XTO Energy, Environmental Health & Safety |
| Lachenmyer, Lynne M. | Vice President | Safety, Security, Health and Environment |
| Landuyt, William | Research Associate | EMRE Research & Development, Corporate Strategic Research |
| Levey, Seth | Integrated Advocacy Advisor | Public and Government Affairs, Integrated Advocacy |
| Lewis, R. Jeffrey | Section Head, Epidemiology & Health Surveillance | EMRE, Biomedical Sciences - Occupational & Public Health |
| Ligh, David | State Government Relations Advisor | Public and Government Affairs, Government Relations & Business Support-U.S. Government Relations |
| Linker, Jennifer D. | Downstream Issues Advisor | Public and Government Affairs, Issues Management, Center of Expertise |
| Linville, Kristine K. | Attorney | Law, Legal Services |
| Logan, Laura E | Regional Communications Manager | Public and Government Affairs, Communications, Center of Expertise |
| Luettgen, Robert A. | Manager | Office of the Secretary |
| Lyons, Glen C. | Regulatory Advisor | Upstream Fiscal & Regulatory Affairs |
| Matturro, Michael G. | Lab Director | EMRE Research & Development, Corporate Strategic Research |



**Confidential / FOIL Treatment Requested by Exxon Mobil Corporation Pursuant to Pub. Officers Law Section 87(2)**

**Appendix A**
**Letter from S. Jansen to M. Wagner**
**December 22, 2015**

| Name | Job Title | Business Unit |
|---|---|---|
| Matusic, Karen P. | Sr. Director, Federal Relations; Executive Director | Public and Government Affairs, Corporate Citizenship, Center of Expertise; ExxonMobil Foundation |
| McCarron, Suzanne M. | General Manager; President | Public and Government Affairs, Government Relations & Public Affairs Business Support; ExxonMobil Foundation |
| McCoy, Keith W. | House Sr. Advisor | Public and Government Affairs |
| McGowan, Marie C. | Chief Attorney | Law, Legal Services |
| Mignone, Bryan K. | Research Associate | EMRE Research & Development, Corporate Strategic Research, Emerging Energy Sciences Section |
| Mills, Darlene C. | Office Manager | Public and Government Affairs |
| Mire, Richard A. | Manager | Safety, Security, Health and Environment - Environment, Regulatory and Socioeconomics |
| Mitchell, Jeanne O. | Senate Sr. Advisor | Public and Government Affairs |
| Mizan, Tahmid I. | Sr. Technology Advisor | Corporate Strategic Planning |
| Monahan, Tom | Staff Regulatory Specialist | XTO Energy, Environmental, Health & Safety Project Management |
| Mueller, Daniel | Legislative and Regulatory Manager | Fuels Marketing Retail Americas - Retail Support |
| Murphy, Kevin | Global Issues Manager | Public and Government Affairs, Issues Management, Center of Expertise |
| Nelson, Neely S. | EMRE/URC Manager | Public and Government Affairs, Operations Management |
| Nolan, Robert M. | Federal Government Relations Sr. Advisor | Public and Government Affairs |
| Norman, John P. | Associate Toxicologist | EMRE, Biomedical Sciences - Toxicology |
| O'Brien, David P. | Sr. Consultant, Power Projects | Gas & Power Marketing, Upstream Commercial Resources |
| Omey, Samantha A. | State Government Relations Advisor | Public and Government Affairs, Government Relations & Business Support-U.S. Government Relations |
| Onderdonk, Todd W. | Sr. Energy Advisor | Corporate Strategic Planning, Economics & Energy |
| Ortwein, Sara N. | President | ExxonMobil Upstream Research Company |
| Parker, Randy E. | Regulatory Advisor | Upstream Fiscal & Regulatory Affairs |
| Parsons, James E. | Corporate Securities & Finance Coordinator | Law, Corporate |
| Plumeri, John A. | Manager | EMRE, Biomedical Science |
| Popovech, Marusia A. | Advanced Toxicologist | EMRE, Biomedical Sciences - Toxicology |
| Powell, Guy A. | Corporate Greenhouse Gas Manager | Corporate Strategic Planning, Environmental Policy & Planning |



**Confidential / FOIL Treatment Requested by Exxon Mobil Corporation Pursuant to Pub. Officers Law Section 87(2)**

**Appendix A**
**Letter from S. Jansen to M. Wagner**
**December 22, 2015**

| Name | Job Title | Business Unit |
|---|---|---|
| Prince, Roger C. | Sr. Scientific Associate | EMRE, Biomedical Sciences - Environmental Sciences |
| Quinn, John | State Government Affairs Advisor | Public and Government Affairs, Government Relations & Business Support, U.S. Government Relations |
| Rau, Charlie T. | Global Environmental and Sustainability Advisor | Safety, Security, Health, and Environment - Environment & Regulatory |
| Redman, Aaron D. | Sr. Environmental Scientist | EMRE, Biomedical Sciences - Environmental Sciences |
| Rippe, Robert D. | Sr. Counsel | Law, Corporate |
| Roberts-Judd, Alexandra J. | Manager | Public and Government Affairs, Exploration & Upstream Ventures |
| Robinson, Matthew S. | Executive Communications Manager | Public and Government Affairs, Communications, Center of Expertise |
| Rodgers, Abigail L. | Corporate Brand Manager | Public and Government Affairs, Corporate Brand CIT&CO |
| Roman, Michael J. | Federal Government Relations Sr. Advisor | Public and Government Affairs |
| Rosenthal, David S. | Vice President and Controller's | Controller's |
| Rzakulieva, Leyla R. | ExxonMobil Production Company Manager and Upstream Lead | Public and Government Affairs, Upstream |
| Sakamoto, Craig T. | Staff Regulatory Strategist | ExxonMobil Oil Corporation, Marketing & Refining U.S. General Ledger - Downstream Embedded Safety, Health & Environmental, Refining - North America |
| Sandefur, Kristin T. | Dallas IMS Supervisor | Global Services Company, Global Real Estate & Facilities, Facilities America, Irving |
| Schuessler, Daniel L. | Sr. Advisor | ExxonMobil Chemical Company, Business Services, Planning & Business Development |
| Schulz, Christopher | Executive Communications Advisor | Public and Government Affairs, Corporate Brand CIT&CO, Center of Expertise |
| Schulz, James | Issue Advocacy Manager | Public and Government Affairs, Integrated Advocacy |
| Scinta, Nicholas | Issues Advisor | Public and Government Affairs, Issues Management, Center of Expertise |
| Scott, Sherry L. | Counsel | Law, Legal Services |
| Shenefelt, Patricia F. | Corporate Issues Sr. Advisor | Public and Government Affairs, Issues Management, Center of Expertise |
| Shores, Mark M. | Planning Manager | Corporate Strategic Planning |
| Silvestri, Scott J. | Corporate Media Sr. Advisor | Public and Government Affairs, Corporate Public Affairs |



**Confidential / FOIL Treatment Requested by Exxon Mobil Corporation Pursuant to Pub. Officers Law Section 87(2)**

**Appendix A**
**Letter from S. Jansen to M. Wagner**
**December 22, 2015**

| Name | Job Title | Business Unit |
|---|---|---|
| Smith, Joseph P. | Sr. Research Associate | ExxonMobil Upstream Research Company, Engineering Offshore & Environment |
| Snow, Angela K. | Advertising and Corporate Projects Manager | Public and Government Affairs, Corporate Brand CIT& CO, Center of Expertise |
| Sokul, Stanley S. | XTO Issues Management and Advocacy Advisor | XTO Energy, Government & Regulatory Affairs |
| Spellings, Jaime | Vice President, General Tax Counsel | Tax, General Management |
| Stern, David L. | Policy Planning Executive | ExxonMobil Refining & Supply Company, Strategy & Planning Global Regulatory Affairs |
| Stuckwisch, Kurt D. | Manager | ExxonMobil Development Company, Public and Government Affairs, Upstream |
| Swarup, Vijay | Vice President | EMRE, Research Development |
| Swiger, Andrew P. | Sr. Vice President | EMRE, Research & Development, Management |
| Tanaka, Paul L. | Energy & Technology Advisor | Corporate Strategic Planning, Economics & Energy |
| Theurer, Derek J. | Federal Government Relations Sr. Advisor | Public and Government Affairs |
| Tillerson, Rex W. | Chairman and CEO | Exxon Mobil Corporation |
| Timmons, Sharon M. | Paralegal | Law, Legal Services |
| Tinsley, Brian D. | Manager | Office of the Secretary, Shareholder Relations |
| Trelenberg, Pete W. | Manager | Corporate Strategic Planning, Environmental Policy & Planning |
| Turner, James Ward | Sr. Technical Professional, Sr. Structural and Civil Consultant | Development Co., Engineering Function, Marine & Arctic; Marine Civil & Materials / Civil Structural & Arctic |
| Usadi, Adam | Section Head | EMRE Research & Development, Corporate Strategic Research |
| Van Pelt, Doug J. | Regulatory Manager, Environmental, Regulatory, and Socioeconomic Group | Central Safety, Security, Health, and Environment - Environment & Regulatory |
| Vendel, Jason D. | Counsel | Law, Downstream |
| Walton, Gantt H. | Operations Manager | Public and Government Affairs, Operations Management |
| Welberry, Christopher R. | Corporate Communications Manager | Public and Government Affairs, Communications, Center of Expertise |
| Wheeler, Derek B. | Compliance and Logistics Optimizer | ExxonMobil Refining & Supply Company, Supply & Transportation Global Logistics Optimization-Americas Product |



**Confidential / FOIL Treatment Requested by Exxon Mobil Corporation Pursuant to Pub. Officers Law Section 87(2)**

**Appendix A**
**Letter from S. Jansen to M. Wagner**
**December 22, 2015**

| Name | Job Title | Business Unit |
|---|---|---|
| Williams, Jack P. | Sr. Vice President | Exxon Mobil Corporation |
| Williams, Tyler C. | Associate Analyst | Gas & Power Marketing, Business & Market Analysis Americas / Asia Pacific / Africa Gas Marketing (New Markets) |
| Wirsing, Penny | Environmental Section Supervisor | ExxonMobil Oil Corp., Marketing & Refining U.S. General Ledger - Downstream Embedded Safety, Health & Environmental, Refining - North America |
| Wojnar, Theodore J. | President | EMRE |
| Woodbury, Jeffrey J. | Vice President | Investor Relations & Office of the Secretary |
| Woods, Darren W. | Sr. Vice President | Exxon Mobil Corporation |
| Yeh, Grace C. | Counsel | Law, Downstream |
| Young, Robert B. | Regional Operations Manager | Public and Government Affairs, Regional Operations |
| Zamora, Michael P. | Global Logistics Optimization Manager | ExxonMobil Refining & Supply Company, Supply & Transportation Global Logistics Optimization |



**Confidential / FOIL Treatment Requested by Exxon Mobil Corporation Pursuant to Pub. Officers Law Section 87(2)**

# Exhibit 24

Case 3:16-cv-03111-K Document 36-1 Filed 07/26/17 Page 364 of 553 PageID 791

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

1285 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10019-6064

TELEPHONE (212) 373-3000

LLOYD K. GARRISON (1946-1991)
RANDOLPH E. PAUL (1946-1956)
SIMON H. RIFKIND (1950-1995)
LOUIS S. WEISS (1927-1950)
JOHN F. WHARTON (1927-1977)

UNIT 3601, OFFICE TOWER A, BEIJING FORTUNE PLAZA
NO. 7 DONGSANHUAN ZHONGLU
CHAOYANG DISTRICT
BEIJING 100020
PEOPLE'S REPUBLIC OF CHINA
TELEPHONE (86-10) 5828-6300

12TH FLOOR, HONG KONG CLUB BUILDING
3A CHATER ROAD, CENTRAL
HONG KONG
TELEPHONE (852) 2846-0300

ALDER CASTLE
10 NOBLE STREET
LONDON EC2V 7JU, U.K.
TELEPHONE (44 20) 7367 1600

FUKOKU SEIMEI BUILDING
2-2 UCHISAIWAICHO 2-CHOME
CHIYODA-KU, TOKYO 100-0011, JAPAN
TELEPHONE (81-3) 3597-8101

TORONTO-DOMINION CENTRE
77 KING STREET WEST, SUITE 3100
P.O. BOX 226
TORONTO, ONTARIO M5K 1J3
TELEPHONE (416) 504-0520

2001 K STREET, NW
WASHINGTON, DC 20006-1047
TELEPHONE (202) 223-7300

500 DELAWARE AVENUE, SUITE 200
POST OFFICE BOX 32
WILMINGTON, DE 19899-0032
TELEPHONE (302) 655-4410

MATTHEW W. ABBOTT
EDWARD T. ACKERMAN
JACOB A. ADLERSTEIN
ALLAN J. ARFFA
ROBERT A. ATKINS
DAVID J. BALL
SCOTT A. BARSHAY
JOHN F. BAUGHMAN
LYNN B. BAYARD
CRAIG A. BENSON
MITCHELL L. BERG
MARK S. BERGMAN
DAVID M. BERNICK
JOSEPH J. BIAL
BRUCE BIRENBOIM
H. CHRISTOPHER BOEHNING
ANGELO BONVINO
JAMES L. BROCHIN
DAVID W. BROWN
SUSANNA M. BUERGEL
PATRICK S. CAMPBELL*
JESSICA S. CAREY
JEANETTE K. CHAN
GEOFFREY R. CHEPIGA
ELLEN N. CHING
WILLIAM A. CLAREMAN
LEWIS R. CLAYTON
JAY COHEN
KELLEY A. CORNISH
CHRISTOPHER J. CUMMINGS
CHARLES E. DAVIDOW
THOMAS V. DE LA BASTIDE III
ARIEL J. DECKELBAUM
ALICE BELISLE EATON
ANDREW J. EHRLICH
GREGORY A. EZRING
LESLIE GORDON FAGEN
ROSS A. FIELDSTON
ANDREW C. FINCH
BRAD J. FINKELSTEIN
BRIAN P. FINNEGAN
ROBERTO FINZI
PETER E. FISCH
ROBERT C. FLEDER
MARTIN FLUMENBAUM
ANDREW J. FOLEY
ANDREW J. FORMAN*
HARRIS B. FREIDUS
MANUEL S. FREY
ANDREW L. GAINES
KENNETH A. GALLO
MICHAEL E. GERTZMAN
ADAM M. GIVERTZ
SALVATORE GOGLIORMELLA
ROBERT D. GOLDBAUM
NEIL GOLDMAN
ROBERTO J. GONZALEZ*
CATHERINE L. GOODALL
ERIC GOODISON
CHARLES H. GOOGE, JR.
ANDREW G. GORDON
UDI GROFMAN
NICHOLAS GROOMBRIDGE
BRUCE A. GUTENPLAN
ALAN S. HALPERIN
JUSTIN G. HAMILL
CLAUDIA HAMMERMAN
BRIAN S. HERMANN
MICHELE HIRSHMAN
MICHAEL S. HONG
DAVID S. HUNTINGTON
AMRAN HUSSEIN
LORETTA A. IPPOLITO
JAREN JANGHORBANI
BRIAN M. JANSON
MEREDITH J. KANE
JONATHAN S. KANTER
ROBERTA A. KAPLAN
BRAD S. KARP
PATRICK N. KARSNITZ
JOHN C. KENNEDY
BRIAN KIM
DAVID M. KLEIN
ALAN W. KORNBERG
DANIEL J. KRAMER
DAVID K. LAKHDHIR
STEPHEN P. LAMB*
JOHN E. LANGE
GREGORY F. LAUFER
BRIAN C. LAVIN
DANIEL J. LEFFELL
XIAOYU GREG LIU
JEFFREY D. MARELL
MARCO V. MASOTTI
EDWIN S. MAYNARD
DAVID W. MAYO
ELIZABETH R. McCOLM
MARK F. MENDELSOHN
CLAUDINE MEREDITH-GOUJON
WILLIAM B. MICHAEL
JUDIE NG SHORTELL*
CATHERINE NYARADY
JANE B. O'BRIEN
ALEX YOUNG K. OH
BRAD R. OKUN
KELLEY D. PARKER
VALERIE E. RADWANER
CARL L. REISNER
LORIN L. REISNER
WALTER G. RICCIARDI
WALTER RIEMAN
RICHARD A. ROSEN
ANDREW N. ROSENBERG
JACQUELINE P. RUBIN
CHARLES F. "RICK" RULE*
RAPHAEL M. RUSSO
ELIZABETH M. SACKSTEDER
JEFFREY D. SAFERSTEIN
JEFFREY B. SAMUELS
DALE M. SARRO
TERRY E. SCHIMEK
KENNETH M. SCHNEIDER
ROBERT B. SCHUMER
JOHN M. SCOTT
STEPHEN J. SHIMSHAK
DAVID R. SICULAR
MOSES SILVERMAN
STEVEN SIMKIN
JOSEPH J. SIMONS
AUDRA J. SOLOWAY
SCOTT M. SONTAG
TARUN M. STEWART
ERIC ALAN STONE
AIDAN SYNNOTT
RICHARD C. TARLOWE
MONICA K. THURMOND
DANIEL J. TOAL
LIZA M. VELAZQUEZ
LAWRENCE G. WEE
THEODORE V. WELLS, JR.
STEVEN J. WILLIAMS
LAWRENCE I. WITDORCHIC
MARK B. WLAZLO
JULIA MASON WOOD
JENNIFER H. WU
BETTY YAP*
JORDAN E. YARETT
KAYE N. YOSHINO
TONG YU
TRACEY A. ZACCONE
TAURIE M. ZEITZER
T. ROBERT ZOCHOWSKI, JR.

*NOT ADMITTED TO THE NEW YORK BAR

WRITER'S DIRECT DIAL NUMBER

212-373-3869

WRITER'S DIRECT FACSIMILE

212-492-0868

WRITER'S DIRECT E-MAIL ADDRESS

dtoal@paulweiss.com

April 19, 2017

***Via Email***

John Oleske, Esq.
Senior Enforcement Counsel
Office of the Attorney General
State of New York
120 Broadway, 26th Floor
New York, NY 10271

*Re: In the Matter of the Application of the People of the State of New York, by Eric T. Schneiderman, Index No. 451962/2016.*

Dear John:

We write in response to your letter, dated April 13, 2017, which demands information that deviates from the instructions provided by Justice Ostrager at the March 22, 2017 discovery conference (the "Discovery Conference"). We disagree with your claim that the Affidavit of Connie Lynn Feinstein (the "Feinstein Affidavit") and the Affirmation of Michele Hirshman (the "Hirshman Affirmation") "lack the key information" required. To the contrary, the substance of each submission corresponds to the Court's express guidelines.

***Feinstein Affidavit***

In accordance with the Court's March 22 directive, the Feinstein Affidavit confirms the representations of ExxonMobil's counsel regarding the collection of documents and electronic data from the Management Committee custodians. (*See* Mar. 22, 2017 Tr. at 17:14–26.) It also explains the issue relating to the Wayne Tracker email account, and the steps taken by ExxonMobil to address the issue. (*See id.*) At the Discovery Conference, Justice Ostrager ordered ExxonMobil to provide one or more affidavits "attesting to" the information "represented by counsel" in ExxonMobil's letter of March 21, 2017. (*Id.* at 17:18–19, 17:25–26.) The Feinstein Affidavit does precisely that. And, indeed, it is entirely appropriate for

ExxonMobil to designate Ms. Feinstein to testify on its behalf not only as to information known to her first hand, but also as to information known to others at ExxonMobil.[1] Nevertheless, as you requested and in an effort to streamline her deposition, we enclose as Exhibit A the list of individuals with whom Ms. Feinstein conferred regarding the facts contained in her Affidavit.

As a further accommodation to the Attorney General, ExxonMobil will produce Ms. Feinstein for a deposition on April 26, 2017, at the New York offices of ExxonMobil's counsel, Paul, Weiss, Rikfind, Wharton & Garrison LLP.[2]

***Hirshman Affirmation***

Your letter also requests a new "Certification of Compliance." This is unreasonable and contrary to the Court's March 22 order. *First*, contrary to the suggestion in your letter, at no point during the Discovery Conference, or at any other time, did the Court endorse or otherwise require ExxonMobil to comply with any of the supposed Instructions contained in the Attorney General's subpoena. *Second*, subpoena Instruction No. 10 ("Your Production Instructions to be Produced") is plainly improper because both written and oral instructions prepared by counsel concerning the steps taken to respond to a subpoena are protected by the work product doctrine and attorney-client privilege. ExxonMobil therefore rejects any purported obligation to produce such instructions. *Third*, without providing any specifics, you claim that ExxonMobil failed to produce documents responsive to some, but not all, subpoena requests. Not so. ExxonMobil has produced documents responsive to each of the Attorney General's subpoena requests. As a result, even setting aside issues about the propriety of subpoena Instruction 4 ("No Documents Responsive to Subpoena Requests"), the Hirshman Affirmation need not address it. *Fourth*, the suggestion in your letter that the Hirshman Affirmation fails to conform to subpoena Instruction No. 3 ("Documents No Longer in Your Possession") is without merit. The Feinstein Affidavit, attached to the Hirshman Affirmation, was provided to you for this very reason. No more is required. *Fifth*, as indicated in her Affirmation, Ms. Hirshman oversaw the production of documents in response to the subpoena. ExxonMobil has thus complied in good faith with subpoena Instruction No. 12 ("Affidavit of Compliance").[3]

* * *

---

[1] The Rules of the Commercial Division of the Supreme Court expressly permit ExxonMobil to designate an individual to testify on the Company's behalf. Rule 11-f—enacted in 2015—permits a company to designate an individual to testify on the company's behalf in response to a subpoena directed to the company. 22 N.Y.C.R.R. § 202.70, Rule 11-f(a), (c), (f). The deponent may testify "about information known or reasonably available *to the entity*," not just to information known first-hand. *Id.* at Rule 11-f(f) (emphasis added).

[2] ExxonMobil reserves its rights to contest the content and location of any additional depositions of ExxonMobil employees pertaining to the subject matter of the Feinstein Affidavit.

[3] It is unclear what your office means when it states in Exhibit A to your April 13 letter that "Exhibit Listing Litigation Hold Persons Incomplete (Mar. 28, 2017 Tr. 33-34.)." Attached as Exhibit B to the Hirshman Affirmation is a list of 638 employees placed on litigation hold.

Finally, as indicated in Ms. Ahmed's April 12, 2017 email, the Feinstein Affidavit and Hirshman Affirmation will be supplemented, as necessary. We are still in the process of gathering, analyzing, and verifying all relevant facts regarding application of the supplemental search terms to all data, including the Management Committee data, provided to ExxonMobil's e-discovery vendor. We plan to provide an amended version of the Feinstein Affidavit by Friday, April 21, 2017. Unfortunately, Ms. Hirshman has been addressing two pressing personal issues, and it will take additional time to supplement her Affirmation. She is prepared to describe these issues to your office if necessary.

Sincerely,

*<u>/s/ Daniel J. Toal</u>*
Daniel J. Toal

cc: Manisha Sheth, Esq.; Katherine Milgram, Esq.; Mandy DeRoche, Esq.; Patrick Conlon, Esq.; Theodore V. Wells, Jr., Esq.; Michele Hirshman, Esq.

**Exhibit A**
**Letter from D. Toal to J. Oleske**
**April 19, 2017**

| Paragraph | Source |
|---|---|
| **1** | Personal Knowledge |
| **2** | Donnie Wilburn<br>Personal Knowledge |
| **3** | Personal Knowledge |
| **4** | Jeff Demuynck<br>Karen Cunningham<br>Personal Knowledge<br>Robert Levy |
| **5** | Karen Cunningham<br>Personal Knowledge<br>Robert Levy |
| **6** | Paul, Weiss<br>Robert Levy |
| **7** | Paul, Weiss<br>Personal Knowledge |
| **8** | Jeff Demuynck<br>Personal Knowledge<br>Robert Levy |
| **9** | Jeff Demuynck<br>Personal Knowledge<br>Robert Levy |
| **10** | Personal Knowledge<br>Robert Levy |
| **11** | Personal Knowledge<br>Robert Levy |
| **12** | Dan Bolia |
| **13** | Bob Lauck<br>Dan Bolia |
| **14** | Dan Bolia<br>Paul, Weiss<br>Personal Knowledge |

**Exhibit A**
**Letter from D. Toal to J. Oleske**
**April 19, 2017**

| Paragraph | Source |
|---|---|
| **15** | Bob Lauck<br>Dan Bolia<br>Personal Knowledge |
| **16** | Bob Lauck<br>Dan Bolia<br>John Rudisill |
| **17** | Personal Knowledge |
| **18** | Bob Lauck<br>Dan Bolia |
| **19** | Bob Lauck<br>Dan Bolia<br>Personal Knowledge |
| **20** | Dan Bolia<br>Paul, Weiss |
| **21** | Dan Bolia<br>Paul, Weiss |
| **22** | Dan Bolia<br>Paul, Weiss |
| **23** | Dan Bolia<br>Paul, Weiss |
| **24** | Bob Lauck<br>Dan Bolia |
| **25** | Bob Lauck<br>Dan Bolia |
| **26** | Dan Bolia<br>Personal Knowledge |
| **27** | Dan Bolia<br>Paul, Weiss |
| **28** | Dan Bolia<br>Paul, Weiss |
| **29** | Dan Bolia<br>Paul, Weiss |

**Exhibit A**
**Letter from D. Toal to J. Oleske**
**April 19, 2017**

| Paragraph | Source |
|---|---|
| **30** | Dan Bolia<br>Paul, Weiss |
| **31** | Dan Bolia<br>Paul, Weiss |
| **32** | Bob Lauck<br>Dan Bolia<br>Doug Neagli |
| **33** | Bob Lauck<br>Dan Bolia<br>Doug Neagli<br>Personal Knowledge |
| **34** | Dan Bolia<br>Personal Knowledge |
| **35** | Dan Bolia<br>Paul, Weiss |
| **36** | Archana Patel<br>Dan Bolia<br>Personal Knowledge |
| **37** | Dan Bolia<br>Paul, Weiss |
| **38** | Dan Bolia<br>Paul, Weiss |
| **39** | Dan Bolia<br>Paul, Weiss |
| **40** | Cynthia Leong<br>Personal Knowledge<br>Ronald (“J.R.”) Brown |
| **41** | Bob Lauck<br>Cynthia Leong<br>Eric Wells<br>Ramona Helble |
| **42** | Personal Knowledge<br>Robert Levy |

**Exhibit A**
**Letter from D. Toal to J. Oleske**
**April 19, 2017**

| Paragraph | Source |
|---|---|
| **43** | Bob Lauck<br>Eric Wells<br>Personal Knowledge<br>Ramona Helble<br>Ronald ("J.R.") Brown |
| **44** | Bob Lauck<br>Eric Wells<br>Personal Knowledge<br>Ramona Helble<br>Ronald ("J.R.") Brown |
| **45** | Eric Wells<br>Personal Knowledge |
| **46** | Kathryn Evans<br>Personal Knowledge |
| **47** | Cynthia Leong |
| **48** | Cynthia Leong<br>Personal Knowledge |
| **49** | Cynthia Leong<br>John Rudisill<br>Personal Knowledge<br>Ronald ("J.R.") Brown |
| **50** | Cynthia Leong<br>Eric Wells<br>Kathryn Evans |
| **51** | Personal Knowledge<br>Ye-Ching Lee |
| **52** | Jeff Demuynck<br>Personal Knowledge<br>Robert Levy |
| **53** | Dan Bolia<br>Cynthia Leong<br>Robert Levy |

**Exhibit A**
**Letter from D. Toal to J. Oleske**
**April 19, 2017**

| Paragraph | Source |
|---|---|
| **54** | Jackie Barrs<br>Jeff Demuynck<br>Michael Luc<br>Robert Levy<br>Ronald ("J.R.") Brown |
| **55** | Ronald ("J.R.") Brown |
| **56** | Bob Lauck<br>Cynthia Leong<br>John Rudisill<br>Ronald ("J.R.") Brown |
| **57** | Bob Lauck<br>Cynthia Leong<br>John Rudisill<br>Ronald ("J.R.") Brown |
| **58** | Eric Wells<br>Ramona Helble<br>Ronald ("J.R.") Brown |
| **59** | Archana Patel<br>Bob Lauck<br>Cody Creel<br>Cynthia Leong<br>Dan Bolia<br>Donnie Wilburn<br>Doug Neagli<br>Ian Hjolm<br>Jamie Manning<br>Jeffrey Woolsey<br>John Cooney<br>John Rudisill<br>Mac Oparakum<br>Mary McHenry<br>Paul Ivy<br>Personal Knowledge<br>Ryan Seager<br>Shirley Hughes |
| **60** | Cynthia Leong<br>Personal Knowledge |

# Exhibit 25

- - - - - - - - - - - - - - - - - - - - -x
In the Matter of the Investigation of

EXXON MOBIL CORPORATION

- - - - - - - - - - - - - - - - - - - - -x

April 26, 2017
10:00 a.m.

EXAMINATION OF CONNIE FEINSTEIN, held at the Office of the Attorney General, 120 Broadway, New York, New York, before Jamie Ann Stanton, a Notary Public of the State of New York.

* * *

2

A P P E A R A N C E S:

STATE OF NEW YORK
OFFICE OF THE ATTORNEY GENERAL
ERIC T. SCHNEIDERMAN
120 Broadway
New York, New York 10271-0332

BY: MANDY DeROCHE, ESQ.
JOHN OLESKE, ESQ.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
Attorney for Exxon Mobil Corporation
1285 Avenue of the Americas
New York, New York 10019-6064
BY: DANIEL J. TOAL, ESQ.
NORA AHMED, ESQ.
JANE BOBET, ESQ.

* * *

3

C. Feinstein

C O N N I E F E I N S T E I N, having first been duly sworn by the Notary Public, was examined and testified as follows:

EXAMINATION BY
MS. DeROCHE:

Q Ms. Feinstein. My name is Mandy DeRoche. I am an attorney with the Office of the Attorney General, and I am here representing the State of New York. This is an examination under New York State Executive Law 6312 and General Business Law 352. This is an investigation examination; it is not a deposition.

A Okay.

Q It's different from a deposition in that you have no right to have Counsel present here today, but, as a courtesy, our office is permitting Counsel to be here.

A Okay.

Q It is different in that Counsel has no right to object as to the form of

4

C. Feinstein

the question or the scope of the question, but we will permit Counsel to interpose objections as to attorney/client privilege issues and to be constitutional issues.

A Okay.

Q Do you have any questions?

A No.

Q The testimony you give here today is under oath and accordingly has the same force and affect as in a court of law. This means you have to tell the truth or you can be prosecuted for perjury.

Do you understand?

A Yes, I do.

Q I will be asking you questions today and the court reporter will be taking your answers down. Please do not nod or shade your head or otherwise make non verbal gestures in response to my questions. You must answer no, yes, or otherwise verbally in a manner that can be taken down by the court reporter.

5

C. Feinstein

Do you understand?

A Yes.

Q Because the court reporter can only take down one of us at a time, please wait until I have finished asking the question to begin your answer so we don't talk over each other, and have a clear record.

Do you understand?

A Yes.

Q Once a question is pending, you must answer the question, except if you have a question about attorney/client privilege, at which time you may speak to your attorneys, for that purpose, and that purpose only, before answering.

Do you understand?

A Yes.

Q If you don't understand a question I ask, you may ask me to rephrase the question. I will try to do so. If you answer a question, I will assume you have heard and understood it.

Do you understand?

6

C. Feinstein
A Yes.
Q If at any time you need a break, please let us know. We will try to accommodate it as long as there no question pending. So after an answer, we can take a break.
Do you understand?
A Yes.
Q Are you presently under the influence of any drugs or alcohol that might affect your ability to answer questions truthfully or affect your memory?
A No, I'm not.
Q Are you presently under the influence of any medication or any medical condition that might affect your ability to answer the questions truthfully or that affect your memory?
A No, I am not.
Q Can you please state your name and home address for the record?
A My name is Connie Feinstein and my home address is 2003 Allan Parkway,

7

C. Feinstein
Houston, Texas 77019.
Q Have you gone by any other name?
A Yes. Connie Devine.
Q And when did your name change?
A June 23rd of last year, 2016. I got married.
Q Congratulations.
A Thank you.
Q Have you gone by any other name besides Devine?
A Yes. My maiden name is Connie Hamilton.
Q And when did your name change?
A Let's see, so I got married -- let's see. I got married -- Devine was in 1984.
Q Have you ever testified, been deposed or examined before?
A I have been deposed before.
Q In what matter?
A The Mayflower Pipeline incident.
Q What year was that?

8

C. Feinstein
A That would have been 2016. I believe that was 2016. 2015 or 2016. I would have to look at the exact date.
Q And you testified on behalf of ExxonMobil Corporation?
A I was deposed in an ExxonMobil matter.
Q Have you been a plaintiff or a defendant in any action as an individual?
A I have not been a plaintiff or a defendant in any action as an individual.
Q Have you otherwise been involved in any litigation in an individual capacity?
A My parents, when my parents died, I was the administrator of their estate, and so we had to give some -- we had some -- I don't know if they were actual depositions or there were a number of meetings with attorneys and I had to be the administrator of the estate.
Q Anything else?
A Other than divorce.

9

C. Feinstein
Q Have you ever been convicted of a crime?
A No, I have not.
Q In your affidavit, you stated that you were the Security and Consulting Manager in Information Technology Risk Management for ExxonMobil Corporation; is that correct?
A That's correct.
Q Is Information Technology Risk Management a part of the -- the acronym is EMIT -- ExxonMobil Information Technology?
A Sorry?
Q Is Risk Management a subdivision or an affiliate of EMIT, ExxonMobil Corporation Information Technology?
A It's a department within the ExxonMobil IT department. So it's a group.
Q Thank you.
What other subdivisions are there besides Risk Management?

C. Feinstein
A There are a large number of subdivisions. I'm not sure if I can recite all of them off the top of my head, but -- so the ExxonMobil IT department has -- they have a number of subdivisions which would include groups like the infrastructure organizations, the applications organization, the strategy group, let's see, the -- I'm not doing a very good job of reciting these off the top of my head.
Q That's okay.
A But there are a number of them, and I would have to look them all up on a chart to tell you exactly what all of them are.
Q What are your job duties as security and consulting manager?
A My job duties include providing guidance to our IT organization on the appropriate level of controls that are required to make sure that we manage compliance to secure our applications, our network, monitor our compliance



C. Feinstein
programs for our internal audits, ensure that we conduct internal assessments appropriately. We provide support for our risk advisors who also work in the IT Risk Management area so that they can help respond to audit inquiries, audit comments. Part of my responsibilities include the e-Discovery support services where I provide support to the ExxonMobil Law Department. We provide documentation and support for Dom Rep process. We provide support for internal investigations that are carried on within ExxonMobil. And those are the highlights. There are a few other things, but those are the general highlights.
Q Who do you report to?
A I report to Don Wilburn.
Q And who reports to you?
A I have 15 direct reports. I have two supervisors that report to me and then I have two people who are direct reports and the other folks report to my



C. Feinstein
supervisors.
Q What are the names of your supervisors?
A Jamie Manning, is one, and Tanya Hitler is the other.
Q Can you tell me your job history from your current position and going back to when you first began at ExxonMobil?
A I can do my best. It's easier if I start first and then work forward.
Q Yes.
A So I hired originally in 1981, I hired into the HR department as an HR assistant. And at that time I was in professional recruiting at the -- I was first assigned to the Bay Town Refinery. And I did input on wage applicants and then later on professional recruits that we were bringing through. I went to an assignment in the controllers organization for a brief period, for about a year, I think, in gas accounting. I then came back to an assignment that we



C. Feinstein
were building an employee relations information system and then I worked on that project for some time. That was during the period of time that I got married. During that time, I decided to leave the company. My ex-husband worked for the company and I had a child. They didn't have a part-time policy, so I left. Then I worked contract off and on. I came back full time in, I believe it was, 2001. I came back as a Security Controls Advisor.
Q Security and Controls Advisor?
A Security and Controls Advisor.
Q Is that in HR or was that in IT?
A No, that was in IT. I'm sorry, I should clarify. During the time that I was working on the HR information system and when I was working contract, I later was moved over to the IT department and so because of -- I had -- I had started working in the IT area. So I had moved over to the IT department. And when I

14

C. Feinstein

came back, I came back to the IT department. And I was working as a Security and Controls Advisor, providing support for the refining organizations in downstream.
Q How long did you do that for?
A That was a couple of years. I don't know the exact amount of time. And then I went to an assignment where I was working on infrastructure as we were opening -- we were doing some work on the intranet security. And then I went to a different assignment in E-business doing strategy and planning. And then after that I went to the SAP area in the applications organization where I did SAP security. I was a supervisor for SAP security. And then I went to -- I became the Security and Controls Manager for the business line applications organization. And then we had a couple of reorganizations. I went into -- I stayed in the same job. I changed organizations. I eventually went into a

15

C. Feinstein

role where I was a Strategy Advisor for the IT Risk Management organization. And then I moved into this role, where I'm the Security and Consulting Manager for IT Risk Management.
Q How long have you been in your current role?
A I have been in this current role -- I have been in this current role since, I believe, January 2014.
Q I would like to show you a document. I would like to explain it first and then introduce it. In this investigation, documents have been produced both from ExxonMobil and from its auditor, Pricewaterhousecoopers. This is a document that's been produced by Pricewaterhousecoopers.
MS. DeROCHE: I would like to mark it as Feinstein examination Exhibit 1. I will give this to the court reporter to mark.
(Feinstein Exhibit 1 was marked for identification, as of this

16

C. Feinstein

date.)
Q Ms. Feinstein, do you recognize this document?
A I do.
Q And what is this document?
A It's an organization chart.
Q It's dated May 1, 2014.
Is the organizational chart as of today similar to the one that's presented here?
A I would say that it's -- it's similar, yes.
Q And I understand from your prior testimony that, and correct me if I'm wrong, that you report in to the box on the far right bottom, where it says IT Risk Management, Manager, D.W. Wilburn, is that correct?
A That's correct, Donnie Wilburn, that's correct.
Q Were any of the roles or people on this organizational chart involved in responding to the subpoena issued by our office on November 4, 2015, to your

17

C. Feinstein

knowledge?
A I'm sorry, which -- can you repeat the question?
Q Sure. Were any of the individuals or titles on this organizational chart involved in responding to the subpoena issued by our office on November 4, 2015?
A I don't know the answer to that. That's the original subpoena. I don't know the answer to that.
Q Moving on from the exhibit, did you prepare for your testimony today?
A Yes, I did.
Q How did you do so?
A By reviewing -- by reviewing the affidavit that I had prepared and asking questions of people that had knowledge about some of the things that I didn't have firsthand knowledge about. I -- interviewing some people and refreshing my memory about some things, about exactly what happened and when. And then working with our attorneys on --



Veritext Legal Solutions
212 267-6868 www.veritext.com 516 608-2400

18

C. Feinstein
on the preparation, understanding what would be happening.
Q You mentioned that you reviewed your affidavit, and that you asked questions of people.
Did you ask questions of people after you had submitted the affidavit?
A I asked questions of people before I submitted the affidavit in preparation -- in preparing the affidavit.
I'm trying to -- I'm not sure I understand your question exactly.
Q My initial question was how you prepared for testimony today, and you had responded that you had met with people or interviewed people and asked questions. I am wondering when that happened; if it was at one time, more than one time, when it happened?
A Oh, it was more than one time.
Q Okay. So for the people that you spoke to to prepare your affidavit, did you speak to them after your

19

C. Feinstein
affidavit was submitted, but before today's testimony?
A There may be some -- I may have -- I may have spoken to those people. I speak to a number of those people on an ongoing basis as part of my everyday job. So I may have spoken to some of them as just a part of my regular, ongoing job. And I may have gone back and clarified some questions as I was going through the affidavit to be sure that I had some more details down.
Q Did you review documents to prepare for your testimony today?
A I did review some documents.
Q Which documents?
MR. TOAL: Objection. That's attorney/client privilege and work product.
Q When you met with Counsel to prepare for your testimony, who was present?
A When I met with Counsel to prepare -- I'm sorry, so when I met with

20

C. Feinstein
Counsel to prepare for my testimony, who was present? It would be myself and the lawyer or lawyers that I was talking to.
Q Which lawyers?
A I talked with Robert Levy in our Law Department at ExxonMobil. I talked with Dan Bolia. I talked with Mr. Toal and Ms. Ahmed. And I think that's all. I can't recall if I talked with anyone else.
Q Did you speak with Mr. Levy and Mr. Bolia to prepare for your testimony?
A Did I speak to Mr. Levy and Mr. Bolia to prepare for my testimony? I spoke with them -- I spoke with them, yes, in preparation -- I spoke with them in order to prepare the affidavit, as I was working through that. And I spoke with them after I had prepared the affidavit.
MS. DeROCHE: I would like to introduce the next document as Exhibit 2.
(Feinstein Exhibit 2 was

21

C. Feinstein
marked for identification, as of this date.)
Q What I have marked as Exhibit 2, do you recognize the document, Ms. Feinstein?
A Yes, I do recognize it.
Q What is it?
A It's the subpoena.
Q This is the subpoena for your testimony dated March 24, 2017; is that correct?
A I'm not certain of the date.
Q If you look to the top of page two?
A Oh, there. 24th of March, yes, okay.
Q When did you receive this document?
A When I did receive this document? I do not know the exact date that I received it.
Q Was it close to the 24th?
A I would say that it was close to the 24th.



Veritext Legal Solutions
212 267-6868 www.veritext.com 516 608-2400

Case 3:20-cv-02995-K Document 1-5 Filed 08/06/19 Page 51 of 147 PageID 473



C. Feinstein
Q What did you do when you first received it?
A What did I do when I first received it? I spoke with Robert -- I spoke -- actually, I spoke with my boss, Donnie Wilburn. And I spoke with Robert Levy in the Law Department.
Q Did either of those gentlemen give you the subpoena?
A I believe that Mr. Levy gave it to me.
Q If you could turn to page three.
A (Complying.)
Q The topics for testimony schedule. I would like to go through each of these topics in turn.
Are you able to testify truthfully to topic one?
A Yes.
Q Are you able to truthfully testify to topic two?
A Yes.
Q Are you able to testify



C. Feinstein
truthfully to topic three?
A Yes.
Q Are you able to testify truthfully to topic four?
A Yes.
Q To topic five?
A Yes.
Q And to topic six?
A Yes.
MS. DeROCHE: I would like to introduce the next exhibit, Exhibit 3.
(Feinstein Exhibit 3 was marked for identification, as of this date.)
Q Do you recognize this document?
A Yes, I do.
Q What is it?
A It's Exxon Mobil's Record Management Guidelines.
Q What is the date of this document?
A This is October of 2015.
Q How do you use this document in your duties?



C. Feinstein
A I use the document two ways in my duties: One is that I provide guidance, help provide guidance, my team helps provide guidance to the organization on how to comply with these guidelines, and then I also have to comply with these guidelines and ensure that my team complies with these guidelines.
Q How often do you work with this document?
A The document, itself, I don't work with frequently. It doesn't change that frequently. But ensuring compliance with it is something that's ongoing.
Q Could you turn to page 13?
A (Complying.)
Q There is a heading there that says: ExxonMobil Information Technology (EMIT.)
Could you read that, and tell me if that is an accurate description?
A (Reading.) ExxonMobil Information Technology (EMIT). Set



C. Feinstein
strategy for electronic record solutions in collaboration with IMS CoE, departments and business units. Serve as custodian of --
MR. TOAL: Did you want her to read it out loud?
Q You don't need to read it out loud?
A Can you repeat your question?
Q Does it accurately describe EMIT's role in Records Management?
A Yes, it does.
Q Are you involved in the revisions to this document over time?
A I could have been in the past. I don't recall that I specifically have been recently.
Q What is IMS CoE?
A The IMS CoE is the group in the graph, the Information Management Services Center of Expertise.
Q How does it relate to EMIT?
A It's a different -- it's a different organization in ExxonMobil.



Veritext Legal Solutions
212 267-6868 www.veritext.com 516 608-2400

26

C. Feinstein
Q What are its roles and responsibilities, if you know?
A I don't -- I don't know specifically.
Q And do you collaborate with IMS CoE at all?
A We probably have in the past as part of whenever we need to, to work out some issue. I don't collaborate with them on a regular ongoing basis.
Q Could you turn to page 16?
A (Complying.)
Q And, specifically, section 4.1.
A (Complying.)
Q Are you familiar with business continuity plans and disaster recovery plans at ExxonMobil?
A I am.
Q Were the business continuity plans or disaster recovery plans consulted in relation to collecting and/or recovering records in response to the investigation by our office?
A No. Not to my knowledge.

27

C. Feinstein
Q Do you know if there is a specific business continuity plan or disaster recovery plan for the management committee?
A I do not know about the management committee.
Q Are they considered a separate business unit or department from other departments or business units at ExxonMobil?
A I don't know the answer to that.
Q Do you know who would know the answer to that?
A I -- I don't know.
Q In section 4.3, the last sentence in the first paragraph, it reads: For electronic records, the standard recovery process will involve restoration from a point in time as identified by the business unit.
Was this section and/or sentence consulted when ExxonMobil was collecting and/or trying to recover

28

C. Feinstein
records in response to the investigation by our office?
A No.
Q How did it differ?
A Disaster recovery is for recovering when you have an application outage or you have a failure, and so you are trying to restore capability.
In this case, what we were looking for were -- we were using backups, but we were looking for information that might have been deleted and swept through an automated file sweeper.
Q And what policy, procedure or guidance governs recovery in that instance?
A In that instance, it would be -- it would be procedures.
Q What kind of procedures?
A So there would be the e-mail backup procedures, the e-mail procedures for how the data is maintained on an ongoing basis, and then the backup

29

C. Feinstein
procedures for the e-mail system.
Q Are there specific document titles that you can recall that govern e-mail procedures and e-mail backup?
A I don't recall the specific document names.
Q Could you turn to page 35 of this document, section 10.1?
A (Complying.)
Q Are you familiar with Basic Records Retention Schedules?
A Yes, I am.
Q Are you familiar with Supplemental Records Retention Schedules?
A Yes, I am.
Q And was there a Supplemental Records Retention Schedule for the Management Committee?
A I do not know the answer to that.
Q Who might know?
A I'm not sure who would know the answer to that.
MS. DeROCHE: I would like to



Veritext Legal Solutions
212 267-6868 www.veritext.com 516 608-2400

C. Feinstein
introduce the next exhibit, Exhibit 4, I believe.
(Feinstein Exhibit 4 was marked for identification, as of this date.)
Q If you could turn to page three, I believe, of the exhibit.
A (Complying.)
Q Do you recognize that?
A Yes, I do.
Q What is that?
A It's a SharePoint site.
Q And what is the title of the SharePoint site?
A GREF Information Management Services.
Q What does G-R-E-F stand for?
A That is the Global Real Estate Facilities organization.
Q And is this where all Records Management Guidelines reside?
A Yes.
Q It doesn't reside with EMIT?
A GREF owns and maintains the



C. Feinstein
Records Management Guidelines and Global Security owns the management protection information policy.
Q If we go to the first photo on the top left that says, Records Management Guidelines, how many Records Management Guidelines exist?
A The Records Management Guidelines would be this document.
Q There is just one?
A There is just one, to my knowledge.
Q The photo, top right, basic records retention schedule, is there more than one?
A To my knowledge, there's only one.
Q And then bottom right photograph, Supplemental Records Retention Schedule, is there one supplemental or are there many?
A I don't recall that there are one or many, but it's only one document or those can be separate documents.



C. Feinstein
Q I believe these photos are icons that you can click into when you were on the SharePoint site?
A That's correct.
Q Does it take you to an index or a list of documents?
A As I recall, it takes you directly to these documents. I don't recall that it takes you to an index.
Q The top row middle, it says forms and checklists, what kind of forms and checklists reside here?
A I don't recall what all the forms are. I believe there is a form, the destruction notice. But I don't know what the other forms that are in the checklist are.
Q And the middle photo, BRRS mapping document, what is that?
A I'm not sure what that is.
Q Below it, BRRS Reference Card, what is that?
A That's a shorter reference card that helps people summarize some of the



C. Feinstein
information in the larger, the longer BRRS.
Q Are there different cards for different business units?
A I'm not sure.
Q What is an RMG Reference Card?
A It's a reference card that's a summary of this document.
Q What is a Retention Keyword Search, RKS?
A So that's a search facility to help you find information within, I believe it searches only the BRRS. I don't think it actually searches the RMG. I think it just searches the BRRS.
Q And is this the full set of policies or guidelines with respect to Records Management?
A To my knowledge, it is.
Q Is there a separate repository in EMIT?
A Separate repository? I'm not sure I understand the question.
Q Is there a similar type of

C. Feinstein

collection, SharePoint site, like this, in EMIT?

A Not to my knowledge. We use -- we comply by these guidelines.

Q If we can turn back to the prior exhibit, which, I believe, is Exhibit 4. If you could turn to page 23, Section 8.1?

MR. TOAL: The Records Management Guidelines?

MS. DeROCHE: Yes, thank you.

A Which one?

Q Records Management Guidelines.

MR. TOAL: Which page?

MS. DeROCHE: 23.

MR. TOAL: I have that as Exhibit 3. What does that sticker say?

MS. DeROCHE: I think you are right.

A What page did you say?

Q 23, Section 8.1.

A Okay.

Q If you could read the first



C. Feinstein

paragraph to yourself.

A Okay.

Q And let me know when you are finished.

A Okay.

Q How do your job duties involve this section of the Records Management Guidelines section?

A My job duties would apply in two ways: So my job duties would apply in giving guidance to our EMIT folks, our risk advisors or our employees who may have questions about what they need to do to ensure compliance. And then on a personal level, I also have to make sure that I comply with it. And then I have some responsibility for the coordination of some of the IT processes that are used for the litigation hold processes, where we use tools to disable file sweepers, the file sweeper tool.

Q Are you involved in the retention of records?

A I am involved in the retention



C. Feinstein

of the records that I or my team use.

Q Do you send out litigation hold notices?

A I do not.

Q Do you work with folks that do?

A The Law Department sends the litigation hold notices.

Q For persons subject to a litigation hold, do they call you for questions, with their questions?

A No, they do not.

Q Who do they call?

A They would call the Law Department.

Q Are you responsible for ensuring that the retention of records is robust?

A I am not sure what you mean by that.

Q The last sentence in the first paragraph says that: The retention of records includes both not destroying records as well as taking appropriate steps to prevent records from automatic



C. Feinstein

deletion.

Are you involved in complying with that sentence?

A Yes, I am involved in complying with that sentence.

Q Are you involved in ensuring that records are not destroyed?

A I am involved in ensuring that records that I or my team use are not destroyed. And then I play a coordination role in making sure that the tools that we use to disable the automated file sweeper are working appropriately.

Q The file sweeper that we have been discussing, is that a synonym for automatic deletion in this sentence?

A I am talking about the e-mail automated file sweeper.

Q Do you have responsibilities over the e-mail automated file sweeper for all custodians at ExxonMobil?

A I play a coordination role in ensuring that the tools that work

C. Feinstein
together to ensure that the automated file sweepers are disabled for folks who are on litigation hold are working appropriately.
Q Who do you coordinate with?
A I coordinate with the owners of those tools or the organizations responsible for supporting those tools and the Law Department.
Q Who are the owners of the tools?
A I don't know the -- I guess there are several tools involved. And so it would depend on which tool that we're talking about.
Q So is the e-mail automated file sweeper more than one tool?
A The e-mail automated file sweeper is a separate tool from the e-mail system. It is a tool by itself.
Q And who is the owner of that tool?
A I believe -- so the Collaboration Services, E-Mail



C. Feinstein
Collaboration Services would own that tool. I don't know the specific individual who owns it.
Q The name of the position is E-Mail Collaboration Services?
A Services.
Q And you had mentioned that you coordinate with people who support that tool.
Who are the folks that support that tool?
A Cynthia Leong, L-E-O-N-G, is my primary contact on that.
Q And what is her business unit or job title, if you know?
A She is an e-mail -- she's -- bear with me one second, I will tell you exactly. She is the Operations Tools Security and Controls Manager For Collaboration Solutions.
Q What document are you consult right now?
A This one.
Q Could you tell us what that



C. Feinstein
document is?
A This is dated April 24th. This is a letter from Mr. Toal to John Oleske in which some of the names and titles of the people are listed.
Q Thank you.
Could you turn to page 19 of the Records Management Guideline, section 6.3?
A (Complying.)
Q This section is entitled: Destruction Notification Process.
Could you explain how your job duties interact with Destruction Notification Processes?
A Well, if we were to have records that were due to be destroyed, then I would -- my team answers questions and give guidance if folks have records that are due to be destroyed and they need to complete a Destruction Notification Form, we give guidance on that. And then if we have records within our other than organization that need to



C. Feinstein
be destroyed, then we would fill out.
Q Did you receive any questions in response to the investigation subpoena issued by our office as to compliance with this section?
A I'm sorry, can you state that one more time?
Q Yes, sorry.
A Thank you.
Q In the course of responding to this office's investigation, did you receive any questions about the destruction or the form that needs to be completed under this section?
A So you are asking did I receive any questions from your office about this form?
Q No, I'm sorry.
I understood your previous testimony to say that one of your roles was to answer questions about destruction and the form to be completed upon destruction.
Did you receive any questions?

42

C. Feinstein
A No.
Q Do you collect the Destruction Notification Forms?
A No, I do not.
Q Who does?
A The department -- the appropriate department records contact.
Q When you say "department," could you elaborate?
A Well, we have -- we are organized into a number of different departments and each department has some type of Records Management contact identified.
Q Do you know who the Records Management contact is for the management custodian, Management Committee custodians?
A No, I do not.
MS. DeROCHE: I would like to introduce the next exhibit, which, I believe, is Exhibit 5.
(Feinstein Exhibit 5 was marked for identification, as of this

43

C. Feinstein
date.)
Q Do you recognize this document?
A I do.
Q What is it?
A It is the disaster recovery procedure for restoring Active Directory.
Q Is this policy related to the file, automated file sweep that we had been talking about?
A No, not really.
Let me make sure I understood your question. You are asking me if the ability to restore Active Directory is related to the use of the automated file sweep tool?
Q Yes.
A Not really, not generally.
Q Was this policy referred to when trying to recover documents in response to the subpoena?
A I don't know if the document was referred to or not.
Q Were Active Directories reviewed and searched?

44

C. Feinstein
A Were Active Directories reviewed and searched? I'm not sure I understand your question. So were Active Directories reviewed and searched?
Q In response to the subpoena for relevant documents.
A Well, documents wouldn't be stored in Active Directory.
Q Okay.
A Active Directory information was reviewed.
Q What information was reviewed?
A To determine on the Wayne Tracker account the setup of that and how that was set up and as part of the troubleshooting and root cause analysis to figure out what happened there.
Q On page two of this document, under Network Disasters, it mentions Windows Server 2003/2008/2012R2.
A Mm-hm.
Q Which server was hosting the Active Directory accounts of Mr. Tillerson, both of his e-mail

45

C. Feinstein
addresses?
A I don't know the answer to that, specifically.
Q Who would know?
A The e-mail -- the e-mail Collaboration Solutions Group or the Identity and Access Management Group.
MS. DeROCHE: I would like to introduce the next exhibit, Exhibit 6.
(Feinstein Exhibit 6 was marked for identification, as of this date.)
Q Do you recognize this document?
A I do.
Q What is it?
A It's the Backup and Recovery Guide for Active Directory.
Q If you could turn to page two at the bottom, terms of reference, there is a subsection there entitled edb.log.
Can you describe the log files that are described here?
A No, I am not familiar with these, with the edb logs.

C. Feinstein
Q Who might be?
A That would be someone in the Active Directory group who supports this.
Q Do you know if edb log files were reviewed to collect documents in response to the subpoena?
A I do not know.
Q Can you turn to page six?
A (Complying.)
Q The section at the bottom entitled: What Constitutes a Good Backup?
A (Complying.)
Q On page seven, there are two subheadings, one is Contents and one is Age.
Are you familiar with the contents of the backups at ExxonMobil?
A I'm not familiar with the contents of the backups.
Q Who might be?
A The group that does that.
Q What is the group that does that?



C. Feinstein
A The Backup and Recovery Group.
Q Are you familiar with the age of the backups?
A Am I familiar with the age of the backups?
Q The subsection there, about ages --
MR. TOAL: Just to be clear, you are asking about backups for the Active Directory?
MS. DeROCHE: I am.
MR. TOAL: Okay.
A I read the description. I understand conceptually what it means, but I am not familiar with the process.
Q Is it's not part of your daily job duties?
A No.
MS. DeROCHE: If we can go off the record. Do you mind if we take a five-minute break?
MR. TOAL: Sure.
[A recess was taken from 10:48 a.m. to 10:58 a.m.]



C. Feinstein
THE WITNESS: You asked me about any other names. I was married when I was nineteen, so I went by Connie Towers for a number of years.
MS. DeROCHE: I would like to introduce the next exhibit, Exhibit 7.
(Feinstein Exhibit 7 was marked for identification, as of this date.)
Q Do you recognize this document?
A I do.
Q What is it?
A It's the DDR Recovery Procedures.
Q What does "DDR" stand for?
A I don't recall what "DDR" stands for.
Q Is this document one of the procedures you referenced earlier when you mentioned that backup and recovery procedures were referenced in order to collect and recover documents in response to the subpoena in this case?
A No.



C. Feinstein
Q Which recovery, if you remember, or procedures were applicable?
A The recovery -- so let me make sure that I'm clear. When you asked me did I review any -- any documents earlier -- let me make sure that I'm clear on what you are asking. Can you ask it one more time?
Q Sure. You had mentioned earlier that there were recovery procedures or backup procedures that were consulted or utilized in order to collect or recover documents in response to our office's subpoena.
A That's correct.
Q And this is not one of them?
A So I am not sure exactly which recovery procedures the people who were doing the backup restore used. I don't know if this was one of them or not. This is not one that I looked at in -- I'm familiar with what the document is, but this is not one that I would have referenced in my backup. I don't know --

C. Feinstein
the people that were doing the restores as part of the efforts that we went through, I'm not sure exactly which procedures they followed.
Q Okay.
A I don't know if they followed written or verbal or if it's part of their every day job, so I don't know specifically what they did.
Q Do you recall which procedures you consulted?
A I didn't do any, so I didn't consult procedures and backups. I didn't do backups.
Q If you turn to page two of this document, at the bottom, do you know if, in response to the subpoena -- I am looking at the image at the bottom -- if any offsite storage sites were searched?
A I don't know.
Q Do you know where the offsite storage sites are?
A We generally replicate between Dallas and Houston locations that are our



C. Feinstein
own locations, we have two data centers that we generally replicate back and forth between. If there are other offsite centers, I don't know what those are.
Q You said that you have your own locations?
A Right. So we generally use either our Dallas or Houston data centers, and we replicate back and forth between them.
Q So those are Exxon-owned or controlled offsite storage sites?
A They are ExxonMobil-controlled sites, we have data centers. We have the ability to replicate between our own centers as part our disaster recovery capability.
Q And did I understand you to say that there may be other offsite storage sites that are not Exxon owned?
A I don't know. If there are, I don't know what those are. I wouldn't know if there's more or not.



C. Feinstein
Q These offsite storage sites, are they, in addition to being a location in Dallas or Houston, are there any cloud locations?
A I am not aware of any cloud locations. I don't know if there are any or not.
Q And do you know if any vendors of ExxonMobil have their own offsite storage sites for ExxonMobil documents and communications?
A Ask me the question one more time, please?
Q Do you know of any vendors on behalf of ExxonMobil have offsite storage sites for ExxonMobil documents and communications?
A Certainly, we have vendors who store data, ExxonMobil data on our behalf.
Q Are they located at these Dallas and Houston locations that you mentioned before, or those are separate locations?



C. Feinstein
A We have, as an example, we have HR service providers who would have HR-type data and they provide services to us. So if it's a third-party contract like that, they would store some of that data at their sites. And then we use vendor software, where we use that software and we store that data internally.
Q As an example, I am trying to think of one for vendor software, SharePoint is, I believe, a Microsoft product.
A SharePoint is a Microsoft product.
Q Where does SharePoint data get backed up?
A SharePoint data gets backed up on the corporate network internally.
Q This example, on the bottom of page two, is that on the right side where it says backup site?
A I'm sorry, you are saying in which picture?

54

C. Feinstein
Q On the bottom of page two?
A I can't specifically speak to it. I don't have enough detailed knowledge to know exactly how they do this.
Q And would Microsoft also back up as a vendor of that software?
A I would not think so.
Q What is an IP-based backup?
A I'm not sure.
Q Is it true that you don't know which vendors, if any, assist ExxonMobil with its backups?
A I do not know which vendors, if any, assist ExxonMobil with their backups.
MS. DeROCHE: I would like to introduce the next exhibit, which would be Exhibit 8.
(Feinstein Exhibit 8 was marked for identification, as of this date.)
Q Do you recognize this document?
A I've seen this before, yes.

55

C. Feinstein
Q What is it?
A It's the Exchange Server Design for the e-mail servers.
Q This document controls or governs the servers for both documents and communications at ExxonMobil; is that correct?
A Ask me one more time?
Q Does this document govern the servers on which documents and communications at ExxonMobil reside?
A The e-mail.
Q Just the e-mail?
A What do you mean by "communications"?
Q I mean electronic communications like e-mail.
A So -- so it certainly governs the e-mail communications. I'm trying to think of what -- I don't know that it governs SharePoint. I don't know that it governs the Link telephone system, but it does govern the e-mail.
Q On the bottom of page two under

56

C. Feinstein
the heading Exchange 2000 Server Mailbox Server Role-Physical Server, the first line reads that Exchange 2007 Server Mailbox Servers can be classified in two storage types: SAN storage and internal storage.
Can you describe these two storage types?
A No. I can give you a very high level understanding, but basically, that the SAN would be the additional storage and the internal storage would be the -- the -- the -- SAN storage is typically where you connect to additional storage capability and the internal storage is where you are using the storage that you are working with most frequently and that's the extent of my knowledge.
Q Do you know if SAN storage is offsite?
A I don't know.
Q Do you know if different policies or protocols apply to the different storage types?

57

C. Feinstein
A No, I do not know.
Q You could turn to page seven, please.
A (Complying.)
Q The paragraph at the top, if you could read that.
A (Reviewing exhibit.)
Q It mentions an internal storage mailbox server called the Management Committee Server.
A Mm-hm.
Q Are you familiar with that?
A Not really. I vaguely know that there is a Management Committee server, but that's really the extent of my knowledge.
Q Is there only one Management Committee server?
A I don't know.
Q Do you know where the Management Committee server resides?
A I do not know.
Q The clause right before the Management Committee server reads that:

Case 3:20-cv-02995-K Document 1-5 Filed 08/06/19 Page 60 of 147 PageID 482



C. Feinstein
If there is a special need.
Do you understand what the context is for special need with respect to the Management Committee server?
A I would presume that security -- I don't know that for certain, but I would presume that's security.
Q Other than the identity of the employees on their accounts that is stored on the Management Committee server, is it different in any other way from any other storage?
A I don't know.
Q What is the Legal Discovery Server?
A The Legal Discovery Server is one where we put documents that we're collecting.
Q After they have been collected?
A After they have been collected. I believe that's right in this context. That's what we typically refer to it as. Let me just read this one more time.



C. Feinstein
I believe that's the same server that we're referring to. I would have to validate that to be absolutely certain, that looks like one that we put documents on.
Q Who would have personal knowledge of that?
A I believe that Cynthia Leong would be able to answer that.
Q If you could turn to page 16.
A (Complying.)
Q The section called Exchange 2007 Backup.
A Mm-hm.
Q It reads, the first sentence: Only Exchange 2007 mailbox servers will have backup.
Do you know how frequently they are backed up?
A They are backed up daily, on a daily backup. They are backed up weekly, on a full backup.
Q Underneath the first paragraph, there are four lines about different



C. Feinstein
types of backups. The first one reads: Mailbox servers will have a full backup performed.
Is that, when you answered the prior question about daily and weekly, is that also applicable to mailbox servers?
A That's what I am answering for. So mailbox servers have a full backup performed weekly.
Q And who performs that?
A The Operations Support Team that supports the servers.
Q Do you know how long the full backups are stored?
A My understanding is they are stored five weeks.
Q What is your understanding based on?
A Discussions that I had with the e-mail services group, Cynthia Leong.
Q What are transactions logs?
A In this case, I'm not sure what the transaction logs would be. Generally, transaction logs are logs that



C. Feinstein
tell you what traffic has gone back and forth. I'm not sure in this case what this is referring to.
Q When you say traffic that has gone back and forth, can you explain?
A Well, it can vary depending on the system and what kind of transactions you are processing or what type of transaction data its monitoring. So I don't know in this case what type of transaction -- it's not necessarily -- it doesn't necessarily mean the types of e-mails. It may mean whatever types of -- whatever types of transaction codes have been identified in Exchange as to be monitored by the architecture of that system. So I don't know what that is.
Q Would a transaction log show automatic deletion or deletion of files?
A I do not know what these show.
Q Who would know?
A Cynthia Leong.
Q Do you know how frequently transaction logs are backed up?

Case 3:16-cv-03111-K Document 36-1 Filed 07/26/17 Page 389 of 553 PageID 816

62

C. Feinstein
A No, I do not know when the transaction logs are...
Q Do you know who would?
A I would -- I would think that Cynthia would be knowledgable of that.
Q Are different mailbox servers backed up differently depending on the type of content?
A Not to my knowledge. I don't know specifically, but as far as I understand, they are all backed up the same.
Q Who might know direct knowledge of that?
A Cynthia. Cynthia Leong.
MS. DeROCHE: The next exhibit, Exhibit 9, I would like to introduce.
(Feinstein Exhibit 9 was marked for identification, as of this date.)
Q Do you recognize this document?
A Yes, I do.
Q What is it?

63

C. Feinstein
A It is the subpoena that was issued in December 2015.
Q When did you first see it?
A I think I first saw it in March or April.
Q Of what year?
A Of 2017.
Q In what context did you see it?
A I saw it after I had been made aware that this subpoena for me.
Q I'm sorry?
A So when I was aware that I needed to come and talk to you guys, then I was aware -- I had heard about the subpoena before, but I hadn't seen it until then, to my knowledge.
Q When did you first hear about the subpoena?
A About this one? I heard generally in 2016. I couldn't tell you exactly when.
Q When did you first have to do something within your job duties with respect to the subpoena?

64

C. Feinstein
A With respect to the subpoena. So I specifically didn't have to do anything in 2015 or 2016. My team had to extract data for some of the custodians, and I would have to determine whether that started in December of 2015 or it started in 2016.
Q Can you explain what you meant by your team had to extract data?
A I have a team that provides support to litigation services. And what we do is we -- they identify for us custodians --
Q Who is "they"?
A Litigation services, the Law Department, identifies for us a list of custodians that they want to have data extracted for, and then what type of data needs to be extracted. And then my team does the extraction without filtering and provides it back to the Law Department.
So I became aware of a need to make sure that we had adequate staffing because we're a small team. I had to

65

C. Feinstein
make sure that we had resources to meet the deadlines.
Q What instructions were you given by the litigation team?
MR. TOAL: Objection.
I am going to direct the witness to exclude from your answer any instructions you were given by Counsel.
THE WITNESS: Okay.
A I'm not sure -- that's pretty broad. Can you tell me what you are asking about?
Q Let me step back.
Were you given instructions for the collection of custodians and data?
A We are routinely given, as part of the process, we are routinely given the names of the custodians and then the objects to collect from.
Q Is that done in writing or orally?
A It's done through our ticketing system.

66

C. Feinstein
Q What is the ticketing system called?
A ITSM.
Q What does it stand for?
A I think it's IT Service Management.
Q So would the first time that you were given instructions with respect to the subpoena come through the ITSM ticketing?
A I believe that Shirley Hughes gave me a heads up that we had some collections coming and that we needed to make sure we had adequate staffing. So we talked about the staffing, but those were not instructions about what to collect or whatnot to collect.
Q Who is Shirley Hughes?
A Shirley Hughes was the litigation services manager or supervisor.
Q And then when would instructions come; after the ticketing?
A No. The -- so the -- it's part

67

C. Feinstein
of the documented process. It's part of the process that we follow. So the litigation services enters tickets with the names of the custodians and the records to collect for them and then my team processes that. So those are the instructions. I'm not sure if I am being clear, but those are the instructions.
Q Where does the litigation hold notice factor into this timeframe of notification of custodians and which data to collect?
A The litigation hold notices go out long before collection occurs. So litigation hold notices go out at the time that there is understanding that there might be potential litigation or something has been filed. So the litigation hold notices go out first.
Q Are you involved in that?
A No, not really.
Q Do you receive a copy?
A I do not.
Q Do you know which custodians

68

C. Feinstein
were put on hold, when?
A No, I typically do not. Not as part of the ongoing process. I could look it up if I needed to research it, but typically, we don't.
Q You had mentioned that you collected data from the custodians without extraction.
What does that mean?
A Without filtering.
Q "Without filtering," what does that mean?
A In our typical process, what we do or our prevalent process, what we do is the litigation services sends us through the ticketing system a list of custodians and they tell us what objects to collect from. So they say e-mail for this time period, C:/Drive for this time period, whatever. And so we just collect all of that. We don't apply search terms or anything. We just collect it and we put it on -- we provide it back to the Law Department so that they can then

69

C. Feinstein
provide it to their third-party vendor.
Q Did you collect for all custodians that were responsive to the subpoena or only some?
A So I don't know whether all the custodians have had records collected yet or not. I think that work is still ongoing, so I can't -- I can't say that it's all been done, because I don't know that to be true.
On the Management Committee searches, on the Management Committee collections, those were done a different way. Those were done using a different process initially.
Q When did you first get involved with the collection of Management Committee custodians' data?
A That would have been in the March/April timeframe.
Q Of what year?
A 2017.
Q When we were just discussing the first work you did under the subpoena

70

C. Feinstein
of collecting custodians, I believe you said that was either in late 2015 or 2016?
A That's right. But that didn't include the Management Committee custodians. That was the -- those were the custodians who are nonmanagement committee members that came through the --
Q Did another team handle the collection of Management Committee custodians at that time?
A Yes.
Q What team was that?
A We -- there is an area ops team or a local contact -- a local EMIT contact in Dallas.
Q Who is that?
A Bob Lauck, L-A-U-C-K.
Q Did you work with Mr. Lauck at all when you were doing the collection of custodians in late 2015 or early 2016?
A No. Mr. Lauck was not involved in the part of the collection that is my

71

C. Feinstein
team did.
MS. DeROCHE: Can we just go off the record for a moment?
[Discussion held off the record.]
Q When you first became involved with the Management Committee custodians' data, when was that?
A That would have been March or April of 2017.
Q And how did that occur?
A That occurred when I was working with the Law Department as we were trying to understand about the Wayne Tracker account and understand what had happened there, what the recall of that issue was. So at that point, I began to understand from the Law Department how the initial Management Committee searches had been conducted.
Q In the course of gaining understanding about the collection and production of documents before your involvement, did you review the

72

C. Feinstein
production of documents to date for the management custodians?
A I'm not sure what you mean by "review the production."
MS. DeROCHE: Let me introduce the next exhibit.
(Feinstein Exhibit 10 was marked for identification, as of this date.)
Q Do you recognize this document?
A Just let me read it. I have seen this before, yes.
Q What is it?
A It is an e-mail or -- I'm sorry, a letter. It is a letter to Mr. Oleske where it outlines documents that are being produced and the Bates numbers on those.
Q Can you turn to page five, underneath the table?
A (Complying.)
Q The sentence right below it and read it out loud?
A (Reading.) Exhibit A contains

73

C. Feinstein
a list of the data sources searched for each custodian listed above.
Q And if you could turn to that Exhibit A, which is two pages later.
A (Complying.)
Q Did you review this Exhibit A to familiarize yourself with the prior searches that had been conducted for the Management Committee custodians?
A I believe that I did.
Q What else did you do to familiarize yourself with what had been done before your involvement in March or April of this year?
A Familiarize myself with what had been done before March or April of this year? I talked to Bob Lauck who conducted the searches. I talked to Dan Bolia in the Law Department. I talked to Doug Neagli in the Law Department.
Q Who was that last name?
A Neagli, N-E-A-G-L-I. I don't know his role exactly. I believe he is in the Law Department, but who

74

C. Feinstein

participated in -- in some of the searches. I talked with Robert Levy in the Law Department. I looked back at some of the tickets to see what had been done, what work had been done -- can you restate your question, to make sure I am answering it?

Q You are answering it.

A Oh, okay.

Q What did you review and what did you do to familiarize yourself with the searches that had been done prior to your involvement?

A I'm trying to think if there is anything else that I did. That's all that I can recall right now.

Q Did you look at the actual documents collected?

A No, I did not.

Q Did you look at the methodology under which they had been collected?

A I looked at the search terms to get an understanding of how they did the searches. I looked at some

75

C. Feinstein

correspondence that had gone back and forth about it. I talked with Bob about how they had done the searches. And I looked at some of the instructions that had been given on how they did the searches.

Q Did you review the locations where the search terms had been applied?

MR. TOAL: I couldn't hear the end of that question.

MS. DeROCHE: Sorry.

Q Did you look at the data sources or locations where the search terms were applied?

A Make sure I'm understanding the question, did I look at like the laptops and the C:/Drives and where they applied?

Q Yes. But also if you didn't look at the physical hardware, what did you look at?

A No, I did not look at the -- I did not look at the physical hardware. I did not look at the drives where they had done the collections. So I relied on the

76

C. Feinstein

information coming from Mr. Lauck and then from Mr. Bolia about what had been collected and produced.

Q Was that in the tickets?

A No, that's not in the tickets.

Q Where does that data reside, the methodology?

A Oh, the methodology. There was an e-mail that I reviewed where the instructions were given to the admins as part of the searches on how to do that. So that was done in an e-mail and I had a copy of that. So the e-mail is where I know that that came from. And the other came from the telephone conversations that I had with Mr. Lauck and then face-to-face conversations with Dan Bolia.

Q In the e-mail, did it list the data sources where the search terms were applied?

MR. TOAL: Object. Attorney/client privilege. I believe the e-mail she is referencing came

77

C. Feinstein

from Counsel so...

Q You had mentioned admins had conducted the search.

What did you mean by that?

A Not admins who conducted the search. So what I meant was that there were -- in the first search -- so there were instructions given to the admins about how to identify where there were potentially responsive documents.

Q Whose admins?

A The Management Committee admins.

Q And they were given instructions on how to identify responsive documents when, if you remember?

A I -- I don't. Let's see, they would have been -- the first search would have been in January of 2016. So it would have been in January of 2016 that the instructions were given. So on that, the Law Department worked with the admins to identify where these potential



Veritext Legal Solutions
212 267-6868 www.veritext.com 516 608-2400

C. Feinstein

documents were. And then how to move those into a folder where they could be searched.

Q Could you tell me about your personal involvement in the recovery efforts undertaken March or April of 2017 with respect to the Management Committee custodians?

A The recovery efforts, the Management Committee custodians? Are you speaking specifically about the Wayne Tracker?

Q Right now, more generally, management custodian, Management Committee custodians. Did you only focus on Wayne Tracker recovery or did you look at recovery for more than just that account?

A So in the March timeframe, we were very focused on the recovery for the -- well, there were two pieces. One I wouldn't call recovery, but there was one piece where we were looking at -- the Law Department had decided to upload all



C. Feinstein

of the data to the third-party vendor server. And so I was engaged somewhat on the security of that and ensuring that we took perfect steps in security on that. And then on the Wayne Tracker, where we realized that the automated file sweeper had not been disabled for a period of time as it should have been, then we were engaged in looking at backups and trying to do recovery for that period.

Q So with the Management Committee custodians data, going to a third-party data server, what was your involvement?

A My involvement was identifying someone to go over and review the security on the server, to make sure that we had locked that data down as tightly as we could and to make sure that we had all the necessary controls in place, that we were going to get them in place as quickly as we could.

Q Was the server at the third-party vendor's location or at



C. Feinstein

Exxon's location or cloud-based?

A For that search, it was at the third-party vendor's location.

Q Physical location?

A Physical location.

Q There was no cloud?

A There was no cloud, to my knowledge.

Q After you had ascertained the security of the server, were you involved at all in the Management Committee custodians data?

A So my team collected the data to provide to the Management Committee -- to put on the server.

Q What did your team collect the data from?

A The data would have been collected from the Management Committee sources, so e-mail, C:/Drives.

Q Are you talking about the records that had been collected previously, or was this a different collection effort?



C. Feinstein

A So I am talking about the fourth collection.

Q Okay. I will get back to that in a moment.

A Okay.

Q Could you tell me, generally, about the recovery efforts that you were involved with, with the Wayne Tracker e-mail account?

A So could I tell you about the recovery effort for the Wayne Tracker account? So I think that's fairly broad. Can you tell me what -- sorry, it was a big effort.

Q Let me get back to that.

A Okay.

Q I would like to focus a little bit on the technology end of it, rather than the custodians.

A Okay.

Q When the recovery efforts were conducted, both for the Management Committee -- I am just going to include the Wayne Tracker e-mail account for all

82

C. Feinstein
the Management Committee custodians --
A Okay, right.
Q -- was an effort undertaken to review all backup tapes?
A I'm sorry, can you say that one more time?
Q Was an effort undertaken to try to assess and recover all backup tapes that might have existed?
A For the Wayne Tracker?
Q For all Management Committee custodians and accounts.
A So as part of the effort to restore the data on the Wayne Tracker, one of the things that was done is that the -- there was not a period when the Management Committee custodians had their file sweeper disabled. So there was a review -- so there was an attempt to recover the Wayne Tracker account. But then there was also an extra step taken to go through, because -- because when the e-mails are sent or received, if he was sending or receiving anything to the

83

C. Feinstein
Management Committee members, then those e-mails would have existed in their e-mail, as well. So their e-mail was reviewed, as well.
Q Who reviewed the backup tapes?
A We had -- who reviewed the backup tapes. So the backup data, we had e-mail services working to -- to do restores and then to restore the data and then whatever could be restored, then searched and Bob Lauck was conducting the searches.
Q Who collected before they were restored?
A Who collected before they were restored? I'm not sure I understand your question.
Q Who inventoried where all the backup materials might have existed?
A Who inventoried for all the backup materials? Are you -- are you -- I'm not sure I am understanding. Are you asking about who inventoried where the Management Committee might have had

84

C. Feinstein
responsive documents, or are you asking about which servers?
Q I am asking about the servers.
A Okay. So we had a team of folks involved in doing that. There were a number of people involved, and I'm not sure I could tell you specifically which individual identified those servers. Cynthia Leong could probably provide more information, but we had a number of people involved who were working to identify servers, potentially, that might have data that we could go to and get back that information.
Q Were you involved in any of the forensic imaging that was conducted in any of the Management Committee custodians records?
A I was not directly involved. I was aware that the process was going on. I was -- I listened to some of the discussions, understood some of the -- the work that was going on, but I was not directly involved in it.

85

C. Feinstein
Q Who was directly involved?
A On the imaging, you are asking about, let me make sure I am clear about what piece you are asking about, to make sure I give the right answer.
Q I can help clarify.
A Okay.
Q Some of the documents that were produced to our office came from a location called Logical Imaging. I am wondering who was involved in the Logical Imaging?
A If we are talking about the Logical Imaging related to e-mail, then it would have been the E-Mail Services Group, would have been -- let me see. Your question -- tell me your question one more time. It was about who was involved?
Q Who was involved in the forensic imaging?
A In the forensic imaging. So in the forensic imaging, we had Deloitte engaged to help us with some of that.



Veritext Legal Solutions
212 267-6868 www.veritext.com 516 608-2400

Case 3:16-cv-03111-K Document 36-1 Filed 07/26/17 Page 395 of 553 PageID 822

86

C. Feinstein
Q When was Deloitte engaged?
A They were engaged -- I don't know specifically -- I think it was in the March timeframe, but I don't know the specific date.
Q Did Deloitte conduct the imaging, or did ExxonMobil conduct the imaging?
A I did not know specifically who did what as far as the operations. I know they provided a lot of guidance to this. I don't know whose hands were on the keyboard.
Q Okay.
A And then we also did some imaging of the iOS devices. So I am not sure which one you are referring to there.
Q Okay, thank you.
MS. DeROCHE: I would like to introduce an exhibit, Exhibit 11.
(Feinstein Exhibit 11 was marked for identification, as of this date.)

87

C. Feinstein
Q You had referenced this document earlier. We are introducing it as an exhibit now.
Could you tell me what this document is?
A This is a letter from Mr. Toal to Mr. Oleske. It gives the job titles and business units of the people who were involved in the recovery effort or understanding of what happened with the Management Committee searches.
Q You mentioned that E-Mail Services Group a number of times.
A Mm-hm.
Q Who on this list is on the E-Mail Services Group?
A Okay. I will tell you to the best of my ability. Cynthia Leong. Kathryn Evans.
Q Can you say the last name again?
A Kathryn Evans. I believe Ye-Chin Lee is. I'm not sure exactly. It's Messaging Service Design Lead, so I

88

C. Feinstein
think Ye-Ching is -- messaging, that's e-mail messaging.
Q Okay.
A And that's all that I see.
Q Do you know if any of the hard drives for the Management Committee custodians were mirrored?
A I do not know if they were mirrored.
Q Who might have done that, if they were?
A If they were, Bob Lauck would have done it.
Q Do you know if any mailbox auditing was done?
A No, I don't know -- mailbox auditing, can you tell me more what you mean by that?
Q I understand it's a mechanism for tracking events in a mailbox server.
A I -- I don't know. I don't know for sure.
Q Was the E-Mail Services Group, any individuals who you identified,

89

C. Feinstein
involved in all of the recovery efforts for the Management Committee custodians or just parts?
A They were involved in all of the recovery efforts where we were going through these efforts to find any backup tapes, to find any -- or backups, to find any backup information, to go back and restore that information where the automated file sweeper had been enabled, so they were involved in that.
MS. DeROCHE: I would like to go off the record, if we could take a short break?
[A recess was taken from 11:53 a.m. to 12:02 p.m.]
MS. DeROCHE: If it's okay with everyone, we would like to ask a couple more questions, and then take a lunch break.
MR. TOAL: Okay.
BY MS. DeROCHE:
Q So can you tell me what steps you took in the recovery of Wayne Tracker

C. Feinstein
e-mails?
A What steps I personally took? So I participated in -- I participated in an effort to determine the root cause. So I worked with a number of people who had specific expertise or knowledge in the different areas of the systems that linked together to make the automated file sweeper work or not work.
So I worked with my boss, I worked with different subject matter experts who had an understanding of it to -- and with the Law Department, with Robert Levy, to understand what had happened, what it looked like was impacted, how could that have happened, how was -- where was the Wayne Tracker ID set up, and then what was the root cause of this, what we could do to go back and what could we get out of the existing system, what could we do to recover things from the backups, what could we do to get things from the dumpster in the e-mail system, what could we do as far as



C. Feinstein
data carving. And so I played the role of contributing some knowledge about the process and then doing the coordination and working to make sure that we kept things on track and that we could fully understand how far back we could get. So some knowledge and some coordination.
Q Who worked on identifying the root cause, meaning, what accounts were impacted and when?
A What accounts were impacted and when?
MS. DeROCHE: Strike that.
THE WITNESS: Okay.
Q Do you know who was responsible in EMIT for setting up the secondary e-mail account?
A Mr. Tillerson's Wayne Tracker account. That account was set up in 2007, and I understand Erick Wells was knowledgable about that. So I don't know who made the initial request, but I know that Erick Wells was the contact who was knowledgable about when that account was



C. Feinstein
set up and why.
Q Who was the person with the personal knowledge about what devices or software that account showed up in, and to be practical about it, in Outlook, you know, if you see two different e-mail addresses populate or if you have got a BlackBerry with one e-mail address on one or the other or two addresses in one, who set that up for Mr. Tillerson?
A Let me make sure I understand. So when the Wayne Tracker account was set up initially, it was set up in Lotus notes. So Erick Wells would have been knowledgable about how that was set up. And then it got transitioned over to Exchange, Microsoft Exchange, 2007, in late 2011, early 2012.
As far as how that displayed? I'm not sure I understand the question. How it was set up in Lotus Notes originally would have been Erick Wells.
Q Okay.
A And then I don't know when



C. Feinstein
Erick changed roles. And then when we did the transition -- to Microsoft Exchange 2007 -- what was your question?
Q Who would have set up the two e-mail accounts on his devices or in his software?
A Well, the account was initially set up -- the account was initially set up in Lotus Notes in 2007. Erick Wells was knowledgable about that.
As it transitioned over, as we migrated, we shut down Lotus Notes and migrated over Microsoft Exchange 2007. The account would have migrated and been set up as a new account.
Q And who would do that?
A I'm not sure who would -- e-mail services would have done the migration. I don't know specifically who would have helped him, if anyone would have helped him with that migration.
Q You had mentioned that there were subject matter experts that worked with you on the recovery of the Wayne

C. Feinstein

Tracker e-mail.
Who are those subject matter experts? What were their expertise?
A So there were a number of people who were involved in that. It was a -- it was a pretty massive effort. I can tell you who -- I can give you a list of most of the people. There were a large number of people.
So on the recovery efforts, obviously, Cynthia Leong was involved.
Q What was her expertise?
A Her expertise is e-mail, Microsoft Exchange.
Q Would she have been involved in the recovery efforts on the Exchange server?
A Yes.
Q And the Exchange server backups?
A Yes. She was very much involved in that, the recovery for the Wayne Tracker account where the automated file sweep was not disabled.



C. Feinstein

And you are focused just on recovery, right?
Q Yes.
A Paul Ivy, I believe.
Q Who was?
A Paul Ivy was a storage operation supervisor and he has some responsibility for backup.
Q Do you know what he did with respect to the backups in this matter?
A I don't know specifically all he did. This was a very large effort and very extensive, so I can't tell you what exactly all he did.
Bob Lauck would have been involved in helping to conduct additional searches.
Q Where?
A Bob Lauck.
Q I'm sorry, searches where?
A Of the hardware or looking for additional LST or PST files.
Q What kind of hardware?
A Whatever hardware Mr. Tillerson



C. Feinstein

may have had.
Q That includes desktop, remote or personal devices?
A So that would include his -- that would have included his laptop, that would have included his C:/Drive, his H:/Drive, whatever drives that he was looking for. Mr. Lauck was not involved -- I don't think he was involved in searching his iOS devices. I think that was done separately, but I have to verify whether he was involved in that or not.
Q Okay.
A Let's see, still talking about backup?
Q Mm-hm.
A John Rudisill.
Q What was his involvement?
A He is in Customer Infrastructure E-Mail Technical Support, so he has technical knowledge about the server support and backup processes.
Q The Exchange e-mail server?



C. Feinstein

A The Exchange e-mail server.
Q What do you understand the steps he took?
A I can't tell you specifically what steps each person took.
Q Okay.
A There were many, many steps that were taken over a number of days and so I can't tell you exactly how all of the different steps broke down.
Q Maybe we should take it in terms of steps, if you were involved in coordinating and providing content, expertise.
Do you want to take me through the step-by-step?
A Okay, for the Wayne Tracker account?
Q Mm-hm.
A Okay. Give me one second, let me go back to --
Q We will have some questions about the affidavit specifically after lunch.

98

C. Feinstein
A Okay.
Q If this refreshes your recollection, in order to describe the steps, great.
A I will tell you everything I can about the steps. As I said, it was a large effort, and so -- okay. So the first step was to identify what could be recovered from within Microsoft Exchange. And some that, including identifying any places on the existing Exchange servers where the data might be available. And then going through the backups, as many backups as could be found, or the servers on which the Wayne Tracker account may have had information. And then looking at those backups.
There were steps taken to search any of the laptops that Mr. Tillerson might have used. There was a search made of the IOS devices, his iPad and his -- his iPhone. Then there was searching of all of the e-mails of all the other Management Committee

99

C. Feinstein
Custodians who might have received e-mails from Mr. Tillerson using the Wayne Tracker ID. There was -- brought Deloitte in to see if there was any more data carving or forensics work that could be done to restore something else that had not yet been identified.
Q The laptops you mentioned, were those backed up?
A So laptops have a C:/Drive which periodically gets backed up to an H:/Drive, if they are put in a certain folder, and then the H:/Drive gets backed up. So the laptops were searched. I don't know specifically, out of the data that Mr. Tillerson had, exactly how much was -- some people don't use their C:/Drive very much, some people do. I don't know -- I know that the drives were searched, and I know that the backups were searched.
Q The IOS devices, are they backed up?
A The IOS devices, so the IOS

100

C. Feinstein
devices, if they are downloading e-mail, then the e-mail is coming from the e-mail server, so that's what gets backed up. The IOS devices were -- they -- the -- whatever they are connecting to, if it's connecting to the network, it's part of that other backup, right, it's not a backup of the IOS device, itself.
So the IOS devices were searched thoroughly. And if there is any other backup of the IOS devices, I am not aware of it.
Q You mentioned looking at e-mails of the other Management Committee Custodians.
A Correct.
Q Did you look at the admins for those Management Committee members?
A I don't believe that the admins' e-mail was looked at for that. I would have to confirm that, but I don't believe it was.
Q You had mentioned earlier in your testimony that admins were asked to

101

C. Feinstein
conduct some of the searches for the management custodians 2016?
A So what they were asked to do was to work to identify the locations of documents, and then to put those in a folder --
Q And --
A -- where they can be searched.
Q -- did you work with the admins to do that?
A I did not.
Q Who did?
A That would be Bob Lauck.
Q Do you know if, at the time the admins collected these documents, they were placed on litigation hold?
A I do not know for certain, but I do not believe they were placed on litigation hold.
Q Do you know of any efforts that had been made to recover e-mails and documents of the admins in the relevant time period?
A I do not know. I have no idea.

C. Feinstein
Q The --
A Actually, actually, let me check -- let me check something. I believe they may be listed as some of the custodians. Here's an attachment that has some of the custodians, and I think I did see that one of the names was in there, but I am not absolutely certain about it, so I can't tell you definitively. I think I may have seen it in the list of names, but I don't know the admins' names off the top of my head, so I'm not sure.
Q We will go through that later.
The steps we just described about recovering the Wayne Tracker e-mails, the Exchange server, the laptops, IOS devices, the e-mails of other Management Committee members and the forensics by Deloitte, were those similar steps taken to recover other Management Committee Custodians records?
A No. Other Management Committee members didn't have their file sweeper



C. Feinstein
disabled, so there wasn't a need to do recovery on theirs.
MS. DeROCHE: We are ready to take our lunch break.
[A luncheon recess was taken fro 12:20 p.m. to 1:21 p.m.]



C. Feinstein
[Whereupon, after a luncheon recess was taken, the following was had:]

A F T E R N O O N S E S S I O N

BY MS. DeROCHE:
Q Thanks for coming back.
I would like to go back to Exhibit 10, which is the December 31, 2016, production letter.
A Okay. I have that.
Q Do I have this right? It's that you had no involvement in the collection of potentially responsive documents for this production in December 31, 2016?
A For this production on December -- which one are you talking about?
Q For this production cover letter, December 31, 2016.
A That I had -- I'm not sure I understand. That I had no?



C. Feinstein
Q Did I understand your prior testimony that you had no involvement in the collection of potentially responsive documents for the Management Committee Custodians that were produced on this day?
A December -- produced on -- you are not talking about collected. You are talking about -- I'm trying to figure out which search you are talking about. The Management Committee searches, I didn't do any of those. So the Management Committee searches, Bob Lauck did those.
Now, let me go back and look at -- let me go back and look at which one you are talking about specifically.
Q That's all right. You understood my question correctly, which is the collection before your involvement in March or April of this year for the Management Committee?
A Right.
Q And do I understand that there were no interviews of Management

106

C. Feinstein
Committee custodians in 2015 or 2016 to collect their documents?
A So the Management Committee Custodians were interviewed during the third search, so let me look at the date on that. That would have been in -- let me look at the date to make sure I am right. So they would not have been interviewed in 2015 or 2016. The Management Committee members would have been interviewed in 2017.
Q And were you involved in those interviews?
A No, I was not.
Q Who was?
A It would be the Law Department.
Q Do you know if Mr. Lauck was involved in the interviews?
A I do not know. I don't know if he would be -- I wouldn't think, but I don't know.
Q For the collection that we talked about earlier today about the admins collecting documents, how did they

107

C. Feinstein
review for potentially responsive documents?
A How did the Management Committee admins review? They got a set of instructions where they worked with the Law Department and I wasn't in on those discussions, but they worked with the Law Department to identify -- the Management Committee admins tend to be quite knowledgable about how their bosses worked. So they worked with the Law Department to identify where the potentially responsive documents would be located based on their knowledge of what their Management Committee did. And so based on their knowledge of his working habits and some of those people have delegated access to the e-mails and that sort of thing.
Q Do I understand this correctly, that it was Law Department directed, but that Mr. Lauck was involved?
A That's correct.
Q And that you were not

108

C. Feinstein
personally involved?
A I was not personally involved in those searches, that is correct.
Q The ticketing multiple tickets that you testified to in the middle of 2016 that your team had worked on for collecting custodians and relevant data sources for those custodians, is it right that there were no management custodians on that ticket?
A As far as I know, there would not have been -- I have to go back and look to be absolutely certain there was none on there, but the Management Committee Custodians were handled differently because of the sensitivity of the data that they had. So the searches that we were doing for the other custodians, using our access data tool would have been different and was -- the point of that was that it was not the Management Committee.
Q Was this the first time that the Management Committee Custodians had

109

C. Feinstein
been collected in a separate manner than other relevant custodians to a potential litigation or investigation?
A I believe that it's been done before. My team doesn't normally support that, but I understand it's been done before, I just don't have the details on it.
Q What is the basis for your belief?
A Information that I gathered from the -- from the Law Department. I think I asked the question.
MS. DeROCHE: I would like to introduce an exhibit, Exhibit 12.
(Feinstein Exhibit 12 was marked for identification, as of this date.)
Q Do you recognize this document?
A No, I don't. I know it's a litigation hold notice, but not this specific document.
Q Were you, if you recall, involved in the litigation hold or data



Veritext Legal Solutions
212 267-6868 www.veritext.com 516 608-2400

110

C. Feinstein
preservation or data collection for documents responsive to the Kivalina and Comer lawsuits?
A No. This looks like it was from 2010. And so I'm not familiar with this suit at all.
Q Did a similar notice like this go out when the subpoena was issued? Obviously, the names will have changed and the description will have changed, but this sort of e-mail to all --
A You are talking about the December 2015?
Q Yes, November 2015.
A November 4th? Yes, so when the November 4th subpoena went out, there were litigation hold notices sent after that went out.
Q And did the litigation hold notice that went out after the OAG subpoena was issued in November of 2015, did that notice include the Management Committee Custodians?
A It did include the Management

111

C. Feinstein
Committee Custodians.
Q And so when the ticketing was created for your department to start the collection, at some point somebody went through and took out particular custodians from that hold notice for a different workflow in terms of collection?
A Oh, okay. So -- so when litigation hold notices are sent, they're sent out of Atlas. So subjects are identified, but we may not collect from all of those at one time.
Q Right.
A So it's not a matter of everybody in Atlas generates one single ticket to do all of them at one time. So yes, someone in the Law Department would tell us out of everybody who is on litigation hold which ones to collect at what point in time.
Q And who told you, in response to this subpoena, in 2016, who to collect from and at what point in time?

112

C. Feinstein
A In 2016, through the normal workflow, what would have happened is that Litigation Services, or the Law Department, through Litigation Services, would have decided what custodians need to be collected from at what point in time and then what needed to be collected. And then they would send that through a ticketing to my team and then my team would -- and then they would tell them what, generally, we understand, collect information about what deadline do you need these collections by. And so then they would have done that collection based upon what custodian information was been provided to them by Litigation Services.
Q If we could turn to Exhibit 10, the December 1, 2016 cover letter, and moving to Exhibit A.
A (Complying.)
Q If you could look at the first row, row one, Albers, Mark.
A Did you say ten? Am I on the

113

C. Feinstein
wrong one?
Q It's the December 31, 2016, cover letter. Exhibit A, the first row, Albers, Mark, data sources are e-mail, H:/Drive and paper.
A I must be on the wrong page. Which page are you on?
Q Here. I believe your testimony earlier today was that when you got involved in March of 2017, that you reviewed what had been collected from the Management Committee Custodians.
A So when I got involved, that's where I began to learn what had been collected from the Management Committee Custodians. So somewhere during that time I saw some of the documentation about what had been collected. Now, I had never reviewed the documents, themselves, and so I don't have an understanding of exactly what was produced, I just know that the searches were conducted, what the search terms were, that sort of thing.



Veritext Legal Solutions
212 267-6868 www.veritext.com 516 608-2400

114

C. Feinstein
Q For Mr. Albers here, e-mail, H:/Drive and paper, who conducted the search in these data sources?
A So let me make sure that I am clear about the timeline on this. So this would have been December 31st. I believe this would have been search number one, if I'm not mistaken. Let me just double check and make sure that I have got this. This would have been from search number one. I'm sorry, could you repeat your question?
Q How was it searched and by whom?
A So the Management Committee information on this search would have been -- this would have been -- this would have been an e-mail search. This would have been -- I'm sorry, let me back up.
So what would have happened here is that the Law Department worked with the admins to determine where the sources of this data was and they

115

C. Feinstein
manually identified the e-mail locations, the other electronic sources and the hard copy documentation. And then on this one, there was a search -- so they identified the documents and they put them in a folder. And then the search was conducted by Bob Lauck and it was using the simplified terms that were intended to be an approximation of the more complex terms that couldn't be done using the native Microsoft Exchange technology.
Q How did the admins manually ID sources for Mr. Lauck to run simplified searches upon?
A Based on their knowledge of where the documents would be.
Q So did they run any search terms?
A Not to my knowledge. I would have to double check that, but I think they collected documents, put them in the folder and Mr. Lauck ran research terms. I have to be certain about that.

116

C. Feinstein
Q For any e-mail, in-box or sent items, how were those collected? Was everything from the in-box moved over for a search, or was everything from the sent items moved over for Mr. Lauck's search?
A I would have to look back at the specific instructions to them on how they were told to do that. I don't know --
Q Who would know that best?
A Bob Lauck would have those instructions or the Law Department.
Q What about the H:/Drive? How would the admin collect documents for searches to be applied?
A It would be the same methodology as we see, identify the documents, put them in the folder.
Q What about paper?
A Paper, I don't know how they did the paper collections.
Q And who might know that?
A The Law Department.
Q If you could move to, I guess

117

C. Feinstein
it's Exhibit A, page A-3, row 26.
A I'm sorry, where am I? This is on Exhibit 10?
Q Yes.
A And where am I?
Q It's Exhibit A, page A-3, row 26, Dolan, Michael. The data sources that were searched that are listed here are e-mail, H:/Drive, C:/Drive, MySites and paper.
A Mm-hm -- I'm sorry, I should be saying yes.
Q Were these collected in the same manner that you just described for Mr. Albers?
A Yes, those had been collected in the same manner.
Q There are two additional sources here; a C:/Drive and a MySites.
Can you tell me what the C:/Drive is?
A So the C:/Drive is the hard drive.
Q Do you know why the hard drive

118

C. Feinstein
might not have been searched for Mr. Albers?
A He might not have used his hard drive. Sometimes a lot of folks don't like to use their C:/Drive. They store everything on their H:/Drive.
Q Do you know if it was searched?
A I do not know if it was searched.
Q And who would know that best?
A Bob Lauck. Bob Lauck, the Law Department, or the admin, the Management Committee admin.
Q Do you know who the admin was --
A I do not.
Q -- who conducted the search for Mr. Dolan?
A I do not know who Mr. Dolan's admin is.
Q Do you know who the admin is that conducted the search, that may or may not be the same person?
A I don't know who the admins, by

119

C. Feinstein
name, that were involved in identifying the sources of the data.
Q Is that true for each of the Management Committee --
A Yes, I don't know who that is.
Q Another location for Mr. Dolan is MySites.
What is MySites?
A Each of our employees has a SharePoint site that we deem as their MySites that they can choose to use or not use and they can choose to store documents on it or not store documents on it.
Q Did the Management Committee have a team site on SharePoint?
A I do not recall specifically whether they had a team site or not.
Q Do you know who would know that?
A I would think that Bob Lauck would know that.
Q Do you know, during your efforts in March or April of this year,

120

C. Feinstein
for recovery efforts, if there was a team site that was searched?
A For the recovery efforts. The recovery efforts were focused on the Wayne Tracker ID. And so the Wayne Tracker ID, there would -- the short answer is no, there wouldn't have been a recovery effort for a team site.
Q If Mr. Tillerson used that team site, would it have been searched?
A If Mr. Tillerson had used a team site and, yes, it would have been searched.
Q Turning back to Exhibit 10, Exhibit A. It's page A-8, row 85, Swiger, Andrew.
Do you know how his e-mail, H:/Drive and paper documents were searched?
A They would have been searched in the same manner as the other Management Committee members.
Q Same page, further down, row 89, Mr. Tillerson, do you know if his

121

C. Feinstein
e-mail, H:/Drive and paper documents were searched?
A It would have been in the same manner as the other Management Committee members.
Q And on page A-9, row 97, Mr. Williams, his e-mail, H:/Drive and paper, were they searched in the same manner as the other custodians?
A They would have been searched in the same manner as the other custodians.
Q Row 99, Woods, Darren.
A They would have been searched in the same manner.
MS. DeROCHE: If we can turn to the next exhibit, number 13.
(Feinstein Exhibit 13 was marked for identification, as of this date.)
Q Do you recognize this document?
A Yes, I have seen it before.
Q What is it?
A This is a letter from Nora



Veritext Legal Solutions
212 267-6868 www.veritext.com 516 608-2400

122

C. Feinstein
Ahmed to John Oleske, outlining the production of some documents from the Management Committee members.
Q And the document is dated March 21, 2017?
A That's correct.
Q Were you involved in the collection of documents that were produced on this date?
A No, I would not have been involved. I am trying to make sure that I am certain about which one this is.
Q We can go through it.
A Give me one second to make sure the dates are lined up. So this is -- is this from the fourth search? This is from -- this is from the fourth search. I believe that this is from the fourth search.
Q If you could turn to page two of the exhibit underneath the table of Bates ranges for each custodian.
Can you read the sentence right below the table?

123

C. Feinstein
A I'm sorry. Oh, over here. Okay. (Reading.) Exhibit A contains a list of the data sources searched for each custodian listed above.
Q And if you could turn to Exhibit A, first row, Mr. Albers is in the first row, and the data sources listed here are a little bit different than the December 31st data sources.
A Okay.
Q We have the addition of the C:/Drive. So who conducted the search of the C:/Drive for this production?
A So on this fourth search, which is what I believe this to be from, so on the fourth search, all of the data was collected from the various sources and it was uploaded to the Law Department's third-party vendor and the vendor conducted the searches.
Q Who collected the documents from Mr. Albers?
A I would have to double check on this. I'm not sure on this one whether

124

C. Feinstein
or not -- whether or not we collected this using access data where we collected all of them or they actually did just a -- loading all of them. I think we did this through the access data tool, but I need to verify to be sure. This was using unfiltered data, so the search terms applied by the IT department.
Q Was all the contents of this Albers C:/Drive collected?
A Yes. All the contents of the C:/Drive would have been collected because this was unfiltered data.
Q And who collected it?
A That's what I'm not certain about. I need to verify whether it was --
Q Was it someone at ExxonMobil?
A It was someone at ExxonMobil.
Q Was it someone at EMIT?
A It would have been someone at EMIT. I'm just -- I'm questioning myself about whether it -- whether Bob Lauck did that collection, or we did it through the

125

C. Feinstein
Access Data Tool. I need to check that.
Q What is the Access Data Tool?
A The Access Data Tool is the one that we use to do collections, unfiltered collections.
Q And the Access Data Tool was not used for the collection of the documents produced in December of 2016?
A That is correct.
Q Who administered -- what group, if not the person, administered the Access Data Tool?
A That's my tool -- that's my team. Jamie Manning is my supervisor of it, her team administers the Access Data Tool.
Q Another new data source from this will letter is the I/:Drive.
What is the I:/Drive?
A I/:Drives are used for land folders, like shared land locations or other folders.
Q Are there multiple folders on an I:/Drive?

126

C. Feinstein
A There could be multiple folders on an I:/Drive.
Q And is the I:/Drive shared with other custodians or the folders or both?
A The I:/Drive would be shared -- could potentially be shared with other custodians. I don't know exactly how this one was set up, who has access to it, but the I:/Drive could be shared. The intent of that is to be a shared drive.
Q And is there a Management Committee I:/Drive?
A I do not know how their I/:Drives are set up, exactly.
Q Who would know that?
A Probably Bob Lauck would know how it was set up on share drives.
Q The next entry here is Lotus Notes Archives. This is a new data source.
What is Lotus Notes Archives?
A We shut down our Lotus Notes system or we -- we used to use Lotus

127

C. Feinstein
Notes for our e-mail system. And then, beginning in two thousand -- late 2011, 2012, we started migrating from Lotus Notes to Microsoft Exchange for our e-mail system. So there are some old archived files out there for all those databases.
Q Did the admins not have access to Lotus Notes Archives when they were collecting documents?
A I do not know whether they had access or not.
Q Who collected the Lotus Notes Archives in this instance?
A It would be the same person who did these other collections. I just -- I'm not sure whether that was Bob Lauck, or whether that was my team processing through access data.
Q Is that also true of the I:/Drive?
A Yes.
Q Would the admins have had access to the C:/Drives and the I/:Drives

128

C. Feinstein
by Mr. Albers?
A I believe that they would have. I'm not absolutely certain, but I believe that the admins likely would have that access. I'm not sure.
Q And the new sources here, the C:/Drive, the I:/Drive and the Lotus Notes Archives, were the contents of those data sources on preservation hold as of the date of our subpoena, November in 2015?
A Let me think about that. So your subpoena went back as far as -- so I'm not absolutely certain. I'm trying to reason my way through that. I am not absolutely certain. I'm not sure what the date of these are, and so I don't know that for sure.
Q Who would know or who might have checked that, that the preservation hold was intact on new data sources collected from in 2017?
A Preservation hold, the preservation hold -- I'm trying to think

129

C. Feinstein
if I understand your question. The preservation hold is assigned to a person. And so that would mean to all of their sources. So if Mr. Albers was on litigation hold and depending on when he received it, what -- it depends on what the time period is for that hold and then it depends on whether there was data available that had not already been removed in accordance with the RMG policy.
So let me go back and -- ask your question one more time and see if I understand.
Q My question is whether the new data sources in this exhibit, the contents were preserved throughout the period since our subpoena was issued?
A How would we -- you are asking how would we validate that?
Q Mm-hm.
A The way that we would validate it would be -- so when Mr. Albers received the litigation hold notice, it

C. Feinstein

would tell him -- we use a preserve-in-place strategy. So when he receives a litigation hold notice, it would tell him not to delete any records. It was not an automated delete on a Lotus Notes Archive. Lotus Notes did not have the automated delete program. So there was nothing to disable on that.

I don't know what was in this Lotus Notes archive. I presume it's his old e-mail archive, and I don't know exactly where it was stored. So it's a little hard for me to give you details on how they would have validated that.

Q I think you said Mr. Lauck would have the most data about this?

A I think he would have the most data about that.

Q And you had mentioned that data would have been removed at some point in accordance with the RMGs.

When was the data removed from Mr. Albers' responsive documents in this investigation?



C. Feinstein

A So if you are -- it's a complicated question. Give my best answer. So it would depend on the type of data. It would depend on whether Mr. Albers was already on litigation hold in some other matter. If he was not on litigation hold in some other matter, then his e-mail would have the automated file sweeper in place and the automated file sweeper would retain the data for 13 months. If he were on litigation hold in an earlier case, then it might go back further than that. And the same is true of all of these, this is our standard process. So I would have to look at each one to know were they on a prior litigation hold, if so, how far back did that go. At the time they received the litigation hold notice, would have been -- that notice would have gone out on November 6th, so at that point the file sweeper would have become disabled.

Q And did anyone that you are aware of check on each of these steps



C. Feinstein

that you said that you might yourself check, to see if any documents -- if the hold was intact for the new sources?

A We have checked -- we have checked since -- certainly I am aware we have checked since then once we knew that there was an issue about the Wayne Tracker account. Checks that were done prior to that, I don't know about the checks.

Q When you say "checks," who are you speaking about?

A As part of the root cause analysis we were doing to try to understand what was happening with the Wayne Tracker account was to see did anybody else have an issue and that would have been on the Management Committee. One of these names, I don't recognize as the Management Committee.

Q We will get there.

Someone at EMIT was checking this in March or April of this year?

A Yes. So we were checking this



C. Feinstein

as part of the root cause analysis.

Q And you had mentioned that Mr. Albers, when he received the litigation hold, would have been directed not to delete things.

Is there anything preventing him technologically from deleting anything?

A He could do it. In some cases, it would go to a recycle bin, where we could find it for a period of time, but we don't have a hard stop that would prevent everybody on litigation hold from deleting any documents whatsoever.

Q And it's true that no litigation hold notice went to the admins in this case?

A I don't know if they were -- if they received a copy of a Management Committee member hold notice or not. I know that they were aware that this litigation hold was in place, simply because of the work that they did with the Law Department in identifying the

C. Feinstein
sources. So they would have been aware of it. They did not receive one, to my knowledge, specifically aimed at them that --
Q But they have control over these data sources for the person for whom they work?
A My understanding is that they do have a lot of control and knowledge about these sources.
Q And you had also mentioned that if one of these custodians had been on litigation hold for some other matter at the time of the subpoena, do you know which of these custodians were on that hold?
A I don't know that.
Q And who might know that?
A The Law Department would know that.
Q Moving on to row two, Mr. Dolan, the new data sources as of March 21st, as compared to the December 31st production, are the



C. Feinstein
I:/Drive and Lotus Notes Archives?
Would this be the same I:/Drive location as Mr. Albers?
A Yes, I would presume that's the same I:/Drive location.
Q And when you say --
A I didn't validate that, but I would presume it's the same one.
Q Did anyone validate that, or who would know if it is?
A Whether it was the same one or not?
Q Mm-hm.
A Bob Lauck would know whether it's the same one. I don't know if anyone validated whether or not. They were just collected.
Q Is it the same answer that either Bob Lauck or someone who uses the Access Data Tool on your team would have collected documents from the I:/Drive?
A Yes.
Q And is it also --
A Or collected or coordinate the



C. Feinstein
collection.
Q Is that also true for the Lotus Notes Archives of Mr. Dolan?
A The Lotus Notes Archives, I would have to double check on how that one -- I'm not -- I'm not sure the details on how that's collected.
Q Who would know?
A Who would know about Lotus Notes Archives? I think that would probably be -- that would either be Bob Lauck or -- Bob Lauck or Cynthia Leong might know -- well, let me think. Cynthia -- Bob Lauck or probably the Law Department. I would have to double check on that one.
Q The next row is for Mr. Robert Luettgen.
Do you know why Mr. Luettgen is a source for Management Committee documents?
A No, actually, I don't. I don't know who he is.
Q Do you know who collected for



C. Feinstein
Mr. Luettgen's e-mail, H:/Drive, C:/Drive, I:/Drive and paper files?
A No, I don't. I don't know what his role is.
Q For Mr. Swiger, the fourth name on this list, there is a new data source of the C:/Drive and I:/Drive.
A Right.
Q Is it also the case that Mr. Lauck or a person on your team who conducted the Access Data Tool would have collected from those new data sources?
A That's correct.
Q Did Mr. Swiger have a Lotus Notes archive?
A I do not know. Apparently not or it would have been listed as the data source, but I do not know whether he had one or not.
Q And was it the same answer about who would have known the --
A Right.
Q -- Lotus Notes Archives for Mr. Albers and Dolan?

C. Feinstein
A That's correct.
Q The next name on the list is Mr. Tillerson. The new data sources in this letter are from the C:/Drive and I:/Drive.
A Right.
Q Is it similar or same answers as for Mr. Albers, Dolan and Swiger?
A Right.
Q And then the next name on this list is Mr. Williams.
A Yes.
Q The new data sources on here are the C:/Drive, the I:/Drive, his iPad and iPhone.
A Correct.
Q Who conducted the searches for the C:/Drive and I:/Drive?
A That would have been the same as the other.
Q And who conducted the searches for the iPad and iPhone?
A The iPad and iPhone, it would have either been Deloitte or my team that



C. Feinstein
did it.
Q And were you involved?
A I was not involved.
Q Who on your team might have done it?
A Could have been Archana Patel or Jamie Manning.
Q Were document that were collected from the iPad or iPhone for the production of March 21st preserved from the date of the subpoena, November 4, 2015, to its production?
A They -- they, they would have been preserved for Jack Williams.
Q How so?
A Well, again, going back to the litigation hold notice, it says not to delete anything.
Q For the names above Mr. Williams for the Management Committee, Albers, Dolan, Swiger and Tillerson, there is no iPad or iPhone listed here.
Do you know why?



C. Feinstein
A I do not know why. I know Mr. Tillerson had an iPad or an iPhone that we looked at, but I do not know about these others.
Q And who might know that?
A Bob Lauck would know that.
Q If you could turn to the next page, number seven, Jeffrey Woodbury?
A Yes.
Q Do you know why his documents were searched for Management Committee?
A I do know that Mr. Woodbury's been in the Office of Investor Relations and so he has a role -- and that may not be specifically why he is there, but he plays a -- he has a high level management role in the corporation where he has a lot of sensitive documents and materials, so I presume that he was treated the same way as the other Management Committee members or as the Management Committee members.
Q Who would be able to confirm your presumption?



C. Feinstein
A About the reason why he is on here? The Law Department.
Q And Mr. Woodbury's documents have been produced previously to this.
Do you know why there were additional documents that were responsive to the subpoena produced on March 21st?
A No, I don't.
Q Who would know that?
A The Law Department.
Q Does Mr. Lauck have any role with Mr. Woodbury's data sources?
A I don't know if he collects services to Mr. Woodbury or not.
Q The last row, number eight, for Mr. Woods, the new data source on this list as compared to the December 31 is the I:/Drive.
Is it also true that the I:/Drive was searched either by Mr. Lauck or someone using the Access Data Tool?
A Right.
Q Do you know why Mr. Woods' iOS devices are not listed here?



Veritext Legal Solutions
212 267-6868 www.veritext.com 516 608-2400

Case 3:16-cv-03111-K Document 36-1 Filed 07/26/17 Page 409 of 553 PageID 836

142

C. Feinstein
A I do not know.
Q And is it also true that either Deloitte or Mr. Patel or someone else on your team might know the answer to that?
A Ms. Patel.
Q Ms. Patel, thank you.
A Ms. Patel and Mr. -- well, the Law Department might know -- I'm sorry. Let me -- rephrase your question, again, if you don't mind?
Q Thanks.
A What was your question again? I'm sorry.
Q Who would know why the iOS devices of Mr. Woods were not searched or produced at this time?
A That would be the Law Department. Whether he had iOS devices, Mr. Lauck could tell us. If he had them and it was not produced, that would be the Law Department.
Q Before we took our lunch break, we had talked about the steps that had been taken to recover the Wayne Tracker

143

C. Feinstein
e-mails and documents.
A Yes.
Q There are several steps. I would like to just go back through them quickly about the backups for each of them and who conducted the search of the backups.
A Okay.
Q We had mentioned a backup for the Exchange server, the e-mail server.
A Right.
Q Who conducted the search for the backups?
A So that would have been Cynthia Leong and/or John Rudisill.
Q Were you involved?
A I was -- I was not -- I did not conduct the searches. I was involved in the coordination effort, but I was not involved in conducting the searches.
Q Did you supervise or quality control the searches?
A I provided information when asked. I don't have the deep Exchange

144

C. Feinstein
technical knowledge that they do, so.
Q What questions were asked?
A What questions were asked?
Q About searching the backup of the Exchange server for e-mails.
A There were many, many questions asked.
Q Okay.
A One of the key questions was what is available, what servers could we locate data on, what -- basically, have we exhausted every possibility. I am shortcutting here. There were many, many questions that were asked.
Q Okay.
A We were working very diligently to try and get anything that we could to close that gap. And so there were many, many questions asked to just determine if we had exhausted every possibility and looked in every location that we could to try to find this data.
Q The backups and the servers for the Exchange server for the e-mails for

145

C. Feinstein
Wayne Tracker, they were on an ExxonMobil infrastructure, not on a third-party infrastructure?
A That's correct, ExxonMobil infrastructure.
Q The laptops that were searched, the backups for those, who conducted the search of the backups of the laptops?
A That would have been Bob Lauck.
Q Where do the servers and backups for the laptops reside?
A On the ExxonMobil infrastructure.
Q And not a third-party?
A Not a third-party.
Q For the iOS devices of the Management Committee Custodians, who searched the backups and servers for those devices?
A There's not a server for that device.
Q Okay.
A So for the iOS devices, we had help from Deloitte. And then we did --

146

C. Feinstein
and then internally, we had my team search as well.
Q Who on your team?
A Archana Patel and Jamie Manning.
Q And the backups --
A I'm sorry, I may have been answering the question just then.
Deloitte helped us with the backups on those. I think that's actually what your question was, right?
Q Mm-hm.
A Okay. My team helped to recover the data, but they were not the ones searching for backups. That would have been Deloitte and our mobility team.
Q Your team was looking at the devices, themselves?
A We were looking at the devices themselves to help get copies of the documents from the Wayne Tracker account.
Q And the iOS device backup, was that on ExxonMobil infrastructure or on a third-party infrastructure?

147

C. Feinstein
A I would have to double check that. I believe that's only on ExxonMobil infrastructure, but I would have to double check that to be sure.
Q Who would you double check with?
A I would double check that with -- Ian Hjorth, I believe -- bear with me one second. I will look his name up to be sure. It's our mobility technical person.
So I would check that with -- yes, Ian Hjorth, I-A-N, H-J-O-R-T-H.
Q The Management Committee server that we discussed this morning, where is that backed up?
A I am not sure where it's backed up. It's on the corporate network, and I don't know if they have any kind of different backup than would be on the corporate network.
Q Who would know that?
A Backup on that, it would be Paul Ivy would likely know that or Bob

148

C. Feinstein
Lauck.
Q When a litigation hold is issued to everyone on the Management Committee, do the contents of that server get preserved independently?
A I would not think so. I don't know for sure, but I would not think so. The litigation hold notices are sent to individuals, and so I am not aware of a process where they would say preserve the entire server. I wouldn't rule it out. It may be possible, but I don't think that's typical.
Q And who would know for sure?
A Probably Robert Levy in the Law Department.
Q Is there one person in EMIT that is responsible for the Management Committee server?
A There very well could be. I'm not sure who it is. It would be somebody in Infrastructure, in Server Ops. Bob Lauck, again, would know that.
MS. DeROCHE: If we can just

149

C. Feinstein
go off the record for a few minutes?
[A recess was taken from 2:10 p.m. to 2:11 p.m.]
BY MS. DeROCHE:
Q The e-mail servers backup tapes --
A The e-mail servers backups, mm-hm.
Q -- would Mr. Lauck have been involved in the Management Committee Custodians' e-mail servers and backups?
A No. No. Not to my knowledge. I can't think of why it would be.
Q When Deloitte was engaged for forensic recovery, what did you understand their engagement to entail?
A I didn't -- I was not party to that initial conversation with them to outline what their scope of work was. My understanding, coming into it, was that they were there to help us do forensic work to understand if there was any stone we were leaving unturned in looking for the -- the period of time when the Wayne



Veritext Legal Solutions
212 267-6868 www.veritext.com 516 608-2400

C. Feinstein

Tracker e-mail was -- was enabled and it should have been disabled, to make sure that as far as backups, that we could -- we had considered, you know, forensics in looking for everything that we could as far as backups or other available data. And then to help us with the collections on iOS devices.

Q How did you personally interact with Deloitte, if at all?

A I interacted on calls with them where, as I said, we were -- there were a number of people engaged in troubleshooting and trying to figure out, how did this occur, what could we do about it, where might we be able to find data to back up. So I was engaged in the conversations with them along with a number of other people on these calls in trying to understand, had we looked at all the different places, providing information to them about, well, how does this work and how does that work and where is -- where is this information.



C. Feinstein

And then I worked with -- with -- not directly with them, but as we started to do some of the iOS collection ourselves, they provided some expertise and guidance on how to do that. Not directly through me, but through another EMIT person on our team on how to set that up and make sure that we did it correctly.

Q Other than the iOS devices, what forensic work did they recommend?

A They tried data carving and they provided some expertise and knowledge about just going back and looking at the backup tapes and logs and seeing if there was anything else that we can do.

Q What did they suggest, with respect to the logs?

A I don't recall -- I don't know if I was there when they gave the specific suggestions on the logs. Or if I was, it was probably more technical than I knew about the Exchange logs. So I -- I don't know that I could tell you



C. Feinstein

specifically what they said.

Q Who would know that?

A Cynthia Leong would know that, the Exchange logs.

MS. DeROCHE: If we can go off the record and take a five-minute break, please?

[A recess was taken from 2:15 p.m. to 2:30 p.m.]

THE WITNESS: Can I just clarify?

BY MS. DeROCHE:

Q Sure.

A On that first search, I think what I had said may have been confusing. I'm not sure it was confusing or not, but I want to make sure I was clear about it.

So on the first search, the Management Committee search, which was back in January of 2016, the way that search was done -- so there were -- there was the e-mail piece of it, and that's where the simplified search terms were applied, in the e-mail. And that's Bob



C. Feinstein

Lauck that did that. And then there were -- the admins had identified the potential locations for the non-e-mail documents and the hard copy and that sort of thing, so the non-e-mail stuff was put into a folder. I wasn't sure if I was clear earlier about the simplified search terms being applied

Q Let's take that in reverse order.

The non-e-mail documents that were collected by the admins, they didn't pull all the contents from a particular drive or location over; they pulled certain documents out?

A Yes.

Q Did they take it on a document-by-document basis or on a folder-by-folder basis or you are not sure?

A So Bob would have -- Bob would have done it. So they would have identified where the documents were located, and then Bob would have worked

C. Feinstein
with them to put them into a folder. And I don't know if they did that -- they had specific instructions on how to do it, but I don't recall if that was document by document or folder by folder, exactly how they did that.
Q And the e-mails who you just said were searched by Mr. Lauck using simplified search terms --
A Right.
Q -- how did he collect the e-mails? He collected all the e-mails, or he --
A He collected -- so he used their e-mail accounts, and then used simplified search terms that were in that exhibit that were intended to be in approximation of those more complicated ones. So he then did that and then the ones -- ones that came of his hits were put into a folder, and he provided it to Bob Lauck.
Q He went to the particular custodian's Outlook?



C. Feinstein
A Right.
Q On their desktop?
A Right.
Q And went into their e-mail boxes?
A Into their e-mail boxes, into the search terms in Outlook.
Q And he did it across all contents and all folders?
A Yes. I believe the instructions were all contents and all folders. I would have to double check that, but I think that's what the instruction said.
Q And when Mr. Lauck went into Mr. Tillerson's Outlook, would he have seen both e-mail accounts populated?
A Both the Wayne Tracker and rexwtillerson@ExxonMobil, and the Wayne Tracker account, those would have been two separate e-mail accounts, and I understand he did search for both.
Q In January 2016?
A In January 2016.



C. Feinstein
Q What is your understanding based on?
A What he told me.
Q The I:/Drive that we had spoken about, that the management custodians had access to, if other people had access to those I/:Drives that were not on litigation hold, could they have deleted from them, from the I:/Drive for example, the assistants of the Management Committee custodians?
A It would depend on what type of access they had.
Q In theory, if you have access to an I:/Drive, you can delete from it?
A It depends on whether you have read only access or read-write access.
Q Who would know that with respect to the Management Committee custodians?
A I believe that Bob Lauck could look up the permissions on the I:/Drive.
Q And do you understand the admins for the management custodians to



C. Feinstein
have read only access to their --
A I do not know what type of access they had to the shared drive.
Q With respect to the iOS devices that we have been speaking about, were there any steps taken to determine if any content had separately been backed up to the Cloud, the Apple Cloud, independent of the Exxon backups process, such as the e-mails or the calendar items that might have been on those devices?
A Any steps -- so -- on the iOS devices, were there any steps taken to determine if someone backed up their -- their iOS devices to the Cloud?
Q If there was any backup to any Cloud.
A I don't believe that it gets backed up to the Cloud. I'd have to double check that. I don't recall off the top of my head, but I know that was checked, if it was a possibility, and all the backups were checked.
Q Who checked them?

C. Feinstein
A So -- so let's see, who would have checked on that. On the iOS devices, that would have likely been -- we had some help from Deloitte on that. And I would have to ask our -- I would have to ask our Mobility Engineer person.
Q Who is the Mobility Engineer?
A That's Ian Hjorth, if I'm not mistaken. Let me double check his name. Ian Hjorth.
Q Were any steps taken to determine from the logs if documents were not able to be recovered, if any metadata could be recovered through those logs?
A For the Wayne Tracker account?
Q For the Wayne Tracker deleted -- things that had been deleted while the file sweep had not been disabled.
A I do know that there was an attempt to look at the metadata to determine if there was anything of value that would help there. I don't know exactly what the results of that, how



C. Feinstein
helpful it was in -- in the ability to go back. We were able to -- to go back and restore some additional data, but I don't know -- and I know the metadata was looked at, but I don't know how effective or helpful it was.
Q And do you know who conducted that analysis?
A On the e-mail, it would have been probably John Rudisill or Cynthia Leong could tell us who did it.
Q And this is with respect to the logs?
A You are talking about e-mail?
Q E-mail logs?
A E-mail logs, right, it would have been John Rudisill or Cynthia Leong.
Q What about logs of the electronic documents, either on the E/:drives or where else?
A The Wayne Tracker account was about the e-mail. It was the automated file sweep on the e-mail was disabled.
Q So no logs were looked at for



C. Feinstein
electronic documents?
A Right. There was no need to do that.
MS. DeROCHE: I am going to introduce three new documents at once. They are related. It's the March 31, 2017, affidavit of Ms. Feinstein. And then the next exhibit is the revised exhibit of Ms. Feinstein, dated April 21, 2017. And then the third is a letter from Paul Weiss, dated April 19th.
(Feinstein Exhibits 14-16 were marked for identification, as of this date.)
Q Do you recognize Exhibit 14?
A Yes, I do.
Q What is it?
A That's the affidavit that I prepared and signed.
Q And did you sign that statement under oath?
A I presume. I'm not sure. I don't know what that means.



C. Feinstein
Q Did you draft the affidavit?
A I provided the information to draft it. I didn't type it.
Q Do you know who drafted it?
A No, I really don't. Someone in the Law Department.
Q And Exhibit 15, do you recognize the document?
A Yes. That's the amended affidavit.
Q Did you draft the revisions in this affidavit?
A I did not draft the -- I didn't type any of this. I provided information on both of them, but I didn't draft either one of them.
Q And Exhibit 16, do you recognize the document?
A Yes, I do recognize this.
Q What is it?
A This is a letter from Paul Weiss to Mr. Oleske, where there was a request for information about who all that I talked to in preparing the

162

C. Feinstein
affidavit and trying to get the information.
Q And is that information in Exhibit A?
A That information is in Exhibit A.
Q Did you draft Exhibit A?
A I didn't draft it. I provided the information for it.
Q If you could turn to the revised affidavit, paragraph three.
A Paragraph three, okay.
Q The last sentence about the identity and access management.
What is identity and access management?
A So one of the key things that we have to manage is who has access to our corporate network or to our assets, to our electronic information or applications, etcetera, etcetera. And because we are a large company, it's a field where we have to really be -- have some expertise in understanding how to

163

C. Feinstein
maintain identity of people. So how to identify and authenticate people to the assets that they might need access to.
Q In paragraph four, you describe the rollout of the Atlas e-Discovery Process Legal Hold Tool in November 2008.
A Right.
Q Was Atlas used for the hold in this subpoena?
A Yes. Atlas was used for the litigation hold notices in this matter.
Q What happens at the end of a hold?
A At some point after the Law Department determines that the custodians are no longer subject to the hold, the matter is resolved or whatever -- I don't know what goes into that decision, but the folks that are on litigation hold at some point receive a notice that says you are no longer on litigation hold, and they are notified that they can revert back to their normal processes.
Q Do you have personal knowledge

164

C. Feinstein
of this paragraph?
A About the -- about November 2008 rolled out the e-Discovery? Yes, I do.
Q How so?
A So I've talked with Jackie Barr who was a person, the project manager who was rolling it out at that time. I was aware that this was going on. I know some of the folks who were involved in supporting at the time. I talked to Karen Cunningham in the Law Department. But I also, being in the Security and Controls area, was aware that this process was going on in 2008.
Q Who is Jeff Demuynck?
A Jeff Demuynck is a -- he is an IT Support Analyst in the Exxon organization. I also talked to him. Jeff was also a source of knowledge about the processes in general, about Atlas. He supports Atlas as part of his role, as far as some other e-Discovery tools.
Q If you could turn to paragraph

165

C. Feinstein
seven.
A Yes.
Q Do you have personal knowledge of the contents of this paragraph?
A Yes, I did know who Management Committee members were.
Q So this speaks to the time period of when the subpoena was issued?
A Yes.
Q The time period of the subpoena goes back further than the date of when it was issued.
Did you understand other people to be on the Management Committee during the relevant time period of the subpoena?
A I understood that there could be more people. I understood that at the time the subpoena was issued, this is who was there, but I did understand that it went back further, and so historically, it could have included more folks.
Q I might be repeating a question from before, but were any of these custodians on hold for other litigations

C. Feinstein
or investigations before November 2015?
A I don't know.
Q And would anyone in EMIT know that?
A I don't know whether anyone in EMIT would know it. The Law Department would know it, but I don't know whether anyone at EMIT would know it. There may be someone who would, but I don't know.
Q In paragraph nine, you write that Management Committee custodians had confirmed receipt of the legal hold notice.
A Yes.
Q How was that done?
A So they respond -- there's a place in the notice for them to respond that they received the notice, and then that information gets tracked in Atlas. So I looked in Atlas to verify that.
Q Paragraph 12, do you have personal knowledge of the contents of this paragraph?
A I have personal knowledge. I



C. Feinstein
did not have personal knowledge at the time, but through the inquiries that I made and numerous discussions, I have some personal knowledge of that.
Q Since the affidavit was submitted?
A No. Before the affidavit was submitted.
Q Did you draft this paragraph?
A I did not. I didn't type any of this. I gave a lot of information on it. I gave the information, but I didn't type any of it.
Q The search protocol that is described in this paragraph, who developed that?
A The search protocol, I understand, was developed by the Law Department.
Q And I understand from your prior testimony that you did not have any involvement in that; is that correct?
A Not in the search protocol, no.
Q Was a third-party electronic



C. Feinstein
discovery vendor used in the development of the search protocol?
A Was a third-party electronic vendor used? Not to my knowledge. I believe the Law Department may have consulted with outside counsel, but I don't think -- I don't know that. So I don't believe they used a third-party.
Q The electronic discovery vendor in paragraph 12 is only related to the upload of documents?
A Yeah, that's related to the upload.
Q And who is that third-party e-Discovery vendor?
A That would be Kirsten. Let me make sure I am reading it right to make sure I am answering your question correctly.
Right. That's talking about not loading -- not moving the files over to the e-Discovery vendor, Kirsten.
Q In paragraphs 13 and 14, I understand it was conducted by Mr. Lauck



C. Feinstein
and the Law Department.
Whose responsibility was it to supervise or quality control the protocols and processes described here?
A That would be the Law Department.
Q Do you know who in the Law Department?
A I would presume that it's Dan Bolia.
Q Was Mr. Bolia at Exxon in January 2016?
A As far as I know, yes, he would have been, in January 2016.
Q In paragraphs 15 and 16, discussing simplified versions of the complex search terms, do you know who determined the simplified search terms?
A I understand the Law Department did that.
Q Do you know who in the Law Department?
A I don't know specifically who.
Q Paragraph 18 describes in



Veritext Legal Solutions
212 267-6868 www.veritext.com 516 608-2400

C. Feinstein
January 2016 where potentially responsive e-mails and non-e-mail electronic documents were stored.
Who decided to do it this way?
A The Law Department would have made the decision about how to do this.
Q And is a personal drive of each management committee custodian of their LAN drives, either their H:/Drive or their C:/Drive?
A I would interpret that to be either their C:/Drive or their H:/Drive.
Q Do the admins who collected some of these materials and Mr. Lauck who collected some of these materials have access to the Management Committee custodians' C or H:/Drives?
A So Mr. Lauck did the collections. So do -- do they have access to the C:/Drives and H:/Drives? Yes, they would have access to those. Or they were granted access for this. They would have had access to -- to put these in the folder. I don't know how broad



C. Feinstein
their access is.
Q You are not sure?
A I am not sure exactly what their access is, but they would have had access to do this.
Q Was it possible for the Management Committee custodians or their assistants to view the documents in this personal drive?
A Was it possible for them to view the documents in the personal drive, the documents that had been collected? I presume it would be. I don't know for sure, but I presume it would be.
Q How long did the documents collected reside on this personal drive?
A I don't know.
Q Who would know that?
A Bob Lauck would know that.
Q In paragraph 19, it says that these folders from the personal drives of each Management Committee custodian were collected by EMIT.
Who in EMIT collected them?



C. Feinstein
A That would be Bob Lauck.
Q When did he do that?
A I don't know the exact date that he did that.
Q Was it in January 2016?
A I don't know if he did that in January, or if he did that later.
Q And then the next clause describes it being uploaded to the platform of Exxon Mobil's e-Discovery vendor.
Who uploads the data?
A So the data gets uploaded -- in this case, I -- I believe that it got uploaded to a law server first and then to an e-Discovery, but I need to double check that to be sure. I don't know if they did a direct load of this over to the e-Discovery vendor, or if they went through -- normally, we send things over to -- back to the Law Department and they do the upload. In this case, I'm not sure whether they did that directly, or if they went through the law server



C. Feinstein
first.
Q This is the Kirsten platform?
A Right.
Q The last clause, it says that the folders or the contents were made available for manual review.
What does "made available" mean?
A Provided to them. Sent to them. I presume, from Kirsten, right, made available through that to Exxon Mobil's outside counsel.
Q Did the Law Department have access to these documents?
A That's what I'm not certain about, is whether it went to the Law Department server first or whether it went straight to Kirsten.
Q Did the Law Department have access to the Kirsten database?
A I don't know.
Q The platform?
A I don't know if they did or not.

174

C. Feinstein
Q Do you know who did the review of these documents, the Law Department or outside counsel?
A I don't know.
Q In paragraph 21, your affidavit describes a second search conducted in December 2016.
A Right.
Q For the term of proxy cost.
A Right.
Q Across all custodians for whom it had produced documents to date.
Was proxy cost run against the Management Committee custodians then?
A Yes, it was.
Q How do you know that?
A Because I asked Bob Lauck about that.
Q Did Mr. Lauck run that search?
A Yes, Mr. Lauck ran that search.
Q And did he run it on the data that he had collected from the personal drive and saved on the personal drives?
A He ran it in Outlook.

175

C. Feinstein
Q In December 2016?
A He ran it -- he ran it in Outlook in December -- would have been January 2016, actually, I think.
Q And did he run it on Lotus Notes contents?
A I don't know if he ran it on Lotus Notes. I think he just ran it -- no. I know that he ran it on Outlook.
Q Did he run it in electronic documents that were not e-mail?
A No. He ran it on Outlook.
Q Did he search the paper documents of the management custodians?
A No. This was an Outlook search. Broader terms, proxy cost, plus the other broader terms.
Q Were the accounts of Mr. Tillerson, both Wayne Tracker and Tillerson, preserved from November 2015 until this search in December 2016?
A So Mr. Tillerson's account had the file sweeper disabled. The Wayne Tracker account did not have the file

176

C. Feinstein
sweeper disabled.
Q I will come back to that.
A Okay.
Q Paragraph 22: Out of an abundance of caution, ExxonMobil crafted additional search terms to run across the e-mail files of Management Committee custodians.
Who at ExxonMobil crafted additional search terms?
A That would have been the Law Department.
Q Do you know what they were?
A I do know what they were. They are listed in the next paragraph.
Q Paragraph 24, ExxonMobil conducted a second Microsoft Outlook search using these terms.
Who conducted this search?
A That was Bob Lauck.
Q Under whose direction?
A It would have been the direction of the Law Department.
Q Paragraph 25, potentially

177

C. Feinstein
responsive e-mails identified through the use of these terms were stored in a folder and the personal drive of each management custodian.
Is this the same personal drive discussed in paragraph 18, or is it an additional personal drive?
A No. It's the same. That would be the same personal drive.
Q So in December of 2016, the documents and communications collected in January of 2016 were still residing on the personal drive of those management custodians?
A I don't know if they were still there, or if they had been provided to the Law Department. And so I don't know if they were in a separate folder, but we have a limited number of personal drives.
Q In paragraphs 28 and 29, under the heading "Third Search," describes running additional search strings.
A Right.
Q When was this conducted?



Veritext Legal Solutions
212 267-6868 www.veritext.com 516 608-2400

178

C. Feinstein
A This would have been in -- this would have been in March of 2017. I believe March. I think March.
Q Were you involved?
A No, I was not involved in this, in this search.
Q Who in EMIT was involved?
A Bob Lauck was involved from EMIT.
Q Was he running these search terms across all custodians?
A He was running these across the Management Committee custodians.
Q And who would run them against all custodians?
A On all custodians -- on all custodians, the non-Management Committee -- let me back up just a minute.
This was about the Management Committee. So Bob Lauck runs things against the Management Committee.
Q In paragraph 28 it says that the search terms were run against all

179

C. Feinstein
custodians?
A From whom may have produced documents to date.
Q Mm-hm.
A So on the nonmanagement committee custodians, those are done through Access Data. Now, from the Access Data, I'm not familiar with what was run with regard to these additional search terms on a nonmanagement committee. I would have to look that up in Access Data.
Q You know that Access Data Tool members were involved, but just not which individuals?
A I am not sure. That's what I am not sure about. I know the Management Committee searches were -- the Management Committee searches on this. So I am not sure what other custodians these were run against besides the Management Committee. The Management Committee, I know, because I checked that and got permission.
Q But your team would have run

180

C. Feinstein
against the nonmanagement committee custodians?
A If this is run against any nonmanagement committee custodians, those would have been done by my team.
Q So you are not sure it was done against --
A I'm trying to recall on this. So -- give me one second. Let me try and straighten my head. So I know for sure that we ran it on all of the Management Committee members or the persons that have been identified as being treated like Management Committee. And then those were done by Bob Lauck using the broader terms. I'm not certain. I have to refresh my memory on whether or not there were other custodians. I just am drawing a blank. I don't want to tell you the wrong thing.
Q In paragraph 31, it describes ExxonMobil crafting additional broad simplified search terms.
A Right.

181

C. Feinstein
Q Who would have crafted those?
A The Law Department.
Q Would anyone in EMIT have assisted?
A I don't think anyone in EMIT would have assisted on that.
Q In paragraph 32 --
A We may have had to talk to someone at some point in time, obviously, a Microsoft Exchange expert to understand what Microsoft Exchange could or could not do, but to my knowledge, this was being done by the Law Department only at that time.
Q In paragraph 32, the additional simplified search terms and the previously crafted search terms were conducted.
Who ran those searches?
A So Bob Lauck ran these.
Q Where did he run them?
A Where did he run them? He ran them in their e-mail.
Q Who ran the searches in the



Veritext Legal Solutions
212 267-6868 www.veritext.com 516 608-2400

C. Feinstein
hard drives and shared drives?
A That would have been Bob.
Q Do you know what relevant hard drives or shared drives were run?
A I don't know specifically which -- which drives for each person.
Q Paragraph 33, potentially responsive electronic documents identified through the use of these terms were stored in various folders.
Which various folders and where?
A Those would have been folders that had been designated to hold the different types of items and I don't know exactly where. I believe it's on their personal drives, but I'm not sure exactly where.
Q Who would know?
A Bob Lauck.
Q This paragraph references electronic documents, does that include e-mails, as well, or are they saved elsewhere?



C. Feinstein
A That would include e-mails.
Q How do you know?
A Just from my conversations with Bob Lauck. And Dan Bolia. I talked to Dan Bolia and Bob Lauck about this.
Q For paragraph 36, under the heading "Fourth Search," when was the fourth search conducted?
A The fourth search was done in March of 2017.
Q Do you know what date?
A I don't know specifically what date.
Q What do you mean by "unfiltered data" here?
A So that's all the data that -- all the data. Everything in the e-mail box or everything on the C:/Drive, everything on H:/Drive.
Q That had been previously collected by the admins?
A No. This would be everything.
Q Every e-mail?
A So this would be every e-mail.



C. Feinstein
This would be all of the e-mail, all of the C:/Drive, all the --
Q That did not hit on a search term, this is just raw data?
A This is unfiltered, so it would be all of the data.
Q For what time period?
A For the time period that was subject to the subpoena that was available.
Q At this time, did anyone go back to look at the Management Committee custodians who were on the Management Committee during the time period of the subpoena?
A I don't know the answer to that.
Q Who might know?
A The Law Department.
Q How is the unfiltered data, all data, collected?
A This is the one where I have to check whether it came through our Access Data system or whether Bob did it and



C. Feinstein
just put the files up. I think it came through Access Data system, but I have to verify that.
Although I should be clear. On e-Discovery, we have -- I mean, on -- we use e-Discovery center for some of the e-mail collections in addition to the Access Data Tool, so there's actually two tools, not just the Access Data Tool. It's the same process.
Q Who would you check with on your team for both of those tools?
A I would check with Archana Patel.
Q In paragraph 37, whose decision was it to have the e-Discovery vendor apply the search terms?
A Whose decision? Well, they work at the direction of the Law Department.
Q This unfiltered data in the fourth search, did it include any of the assistants to the Management Committee?
A I don't believe that it did. I

C. Feinstein
can't confirm that for sure, but I don't believe that it did. I have to go back and look at the list, but I believe this was the custodians -- the Management Committee member's data.
Q Paragraph 37 has a revision --
A Yes.
Q -- from your original affidavit.
A Yes, it does.
Q Did you make that revision?
A I didn't type it. I -- I discussed it and helped provide the wording, but I didn't type it.
Q Same question for paragraph 38, which was revised.
A Right.
Q What was your involvement in the revision of this paragraph?
A Again, it was providing the information, discussing it, but not actually doing the typing.
Q Were you involved with the vendor running the search terms?



C. Feinstein
A No, I was not. Which was one of the reasons for the change, was the recognition that I couldn't say that specifically since I hadn't talked to the vendor to collect that.
Q In paragraph 38, in the revision, a change was made that the results of the application of the complete search terms were available for manual review.
What does available "for manual review" mean?
A It means provided, to look at, to go through, and manually determine what's responsive or not.
Q And how is that different from it just being uploaded for review?
A Well, the uploading part is, generally what we are talking about, we are talking about when it's being uploaded to the third-party vendor's platform. And then where it's available for manual review is typically where the Law Department or outside counsel is



C. Feinstein
taking those documents and looking at them.
Q Paragraph 39 is a similar revision. The word "search" is changed to "manual review."
What is the significance of that change?
A Oh, just to be more clear, so the documents resulting from the manual review, so after -- after they were uploaded, the third-party vendor, then they were manually reviewed by either the Law Department or outside counsel.
MS. DeROCHE: Do you mind if we take a five-minute break?
MR. TOAL: Sure.
[A recess was taken from 3:18 p.m. to 3:27 p.m.]
THE WITNESS: I have clarification, if you don't mind. You were asking me a question about searches and I answered you about collection so that's why I was getting really confused.



C. Feinstein
So on that third search, you were asking me about the searches for the nonmanagement committee members, and I think I answered you about collection, because I just had a brain freeze there.
Q What is the difference between search and collection?
A So collection is where we get the data and provide it. And then search is where -- so -- so a search would be for the -- I mean, a collection would be for the unfiltered data, typically, when we're talking about the nonmanagement committee members. So that would be the unfiltered data. And then what happens for the majority of our processes is we collect the unfiltered data, and we provide it to the Law Department. They provide it to the third-party vendor, and the third-party vendor applies the search terms. So for the nonmanagement committee members, that's the way the searches were done all the way through,

190

C. Feinstein
except there's a couple of exceptions like Jack Woodbury, we talked about. But you were asking me about collection a moment ago, and I was struggling to answer, but you were actually asking about searches.
Q Let's turn back to paragraph 28, then, which is where the all custodians language is.
ExxonMobil agreed to run the additional search strings against the unfiltered data of all custodians.
A Right.
Q Who conducted those searches?
A So the searches were done in two different ways, okay. So for the nonmanagement committee members, I'm not sure where Jeff Woodbury fell in all this, but for nonmanagement committee members, the data is collected unfiltered and then it's sent over to the Law Department, they send it to the third-party vendor and the third-party vendor applies the search and there they

191

C. Feinstein
have the capability to do the complex boolean searches and proximity locators.
Q So in paragraph 28, these search strings that run against all custodians for the nonmanagement committee custodians, that search was conducted by a third-party vendor?
A Say it one more time? Let me double check it. Can you say it one more time?
Q Paragraph 28, the search strings that were run, for the custodians that were nonmanagement committee custodians, those searches were run by the vendor?
A Those searches were run by the third-party vendor.
Q From the data that you had collected, from those custodians --
A The unfiltered data.
Q Unfiltered data that you collected previously?
A Correct.
Q Turning to paragraph 40 of your

192

C. Feinstein
revised affidavit.
A Yes.
Q 40 reads: As a standing practice, ExxonMobil employees are assigned only one e-mail account on the ExxonMobil platform.
A Correct.
Q What does it mean, "as a standing practice"?
A So it means, as a standing practice, we -- I don't know whether it's technically possible to do it differently in Active Directory or not, but as a standing practice, the way that we have implemented our network identity and access management solutions is that we only give our employees one e-mail account to use at a time for their ongoing communications. So --
Q Whose standing practice is it?
A It's -- it's the EMIT standing practice.
Q And is that documented somewhere?

193

C. Feinstein
A I'm sure that it is. I could not point you to the specific documentation, but I am sure that it is.
Q In the Active Directory manuals that we reviewed this morning, do you recall it being in those?
A No. Those are backup and disaster recovery guides.
Q Who is Mr. Ronald J.R. Brown?
A J.R. Brown is one of our folks who is very knowledgable in this area and provides support in this area. So he helps to determine how we manage in this area.
Q Does he know about the standing practice?
A Yes, he does.
Q What personal knowledge do you have about the contents of this paragraph?
A I have some personal knowledge of this because I have been involved in identity and access management in the past. I participated in a project on



Veritext Legal Solutions
212 267-6868 www.veritext.com 516 608-2400

C. Feinstein
access management and it's one of our key controls in corporation's managing access, so I have some personal knowledge of how this works.
Q In paragraph 41, it describes an exception being made to this standing practice for Mr. Tillerson?
A Right.
Q Who decided to make the exception?
A Erick Wells is the person that I talked with about how this was set up and when and why. I don't know if he was the chief decisionmaker, but he is the source of knowledge about it. Erick Wells and Kathryn Evans.
Q Who is Kathryn Evans?
A Kathryn Evans, she is the manager of the e-mail -- let me look up her exact title. So Kathryn is Customer Infrastructure, Collaboration Solutions E-Mail Engineering and Technical Support Supervisor. And then J.R. Brown is Identity and Access Management Process



C. Feinstein
Advisor.
Oh, you asked me about Erick Wells?
Q No, that's good.
A Sorry.
Q You had said that Wells was knowledgable about this exception?
A Yes.
Q But you weren't sure if he had made the decision.
Was he the person who might have created, physically created this second e-mail?
A He may have. In the role that he was in at that time, he may have been the person who created it.
Q And who would have considered the implications of making this exception?
A Who -- I'm sorry, I'm not sure what you mean by that.
Q Who did he run it by? Who would have considered the implications of making an exception to a standing



C. Feinstein
practice or rule?
A I don't know who would -- now, when this was set up, it was in Lotus Notes. And that was a different setup.
Q Is it technically impossible for a second e-mail address to be connected to a single ADA account?
A I don't know if it's technically possible or not.
Q Who would know that?
A We need an Active Directory expert. Let's see.
Q Is that not Mr. Wells?
A No. Mr. Wells was in a different role. I think Kathryn Evans would know that.
Q For -- are there --
A Possibly John Rudisill.
Q Thanks.
Are there people at Exxon who change positions through different entities and change e-mail addresses?
A Yes, they do.
Q And what happens with their



C. Feinstein
former and then latter e-mail addresses?
A So the information gets transferred over to their new e-mail account.
Q So no one at Exxon could have, for example, two e-mail addresses at one time, @SO and @XTO and @ExxonMobil or any variation of that?
A They can exist temporarily. As a standing practice, we don't let people have two like that for ongoing. Now, when they are transitioning between domains, if they had moved from -- not every time they move between domains do we have to do it, but there are certain instances when they're moving from one domain to another that we have to create a new e-mail address. And in that case -- so temporarily, while the new e-mail address is being created, the other one may exist, but they don't use both at the same time. Same thing happens with XTO. We have folks that go to XTO and they come back. So they may



Veritext Legal Solutions
212 267-6868 www.veritext.com 516 608-2400

198

C. Feinstein
have two e-mail addresses, but one is not used. There is only one that is active at a time.
Q Can only one of those be associated with its Active Directory account, or could they both be?
A So as a standing practice, we only -- we have a different Active Directory account for each e-mail address. Now, the way that that's working is one is -- one is considered active, and then the other becomes inactive. I don't know if that's set up on the same -- so actually, transitioning between domains, you are actually training the LAN account. You are actually changing their e-mail address, their LAN account and their e-mail address both at the same time. So we would still be doing a one-to-one on that.
Q So it's possible to have an inactive ADA account?
A You can have an inactive Active

199

C. Feinstein
Directory account.
Q Was the Wayne Tracker e-mail address ever designated as an inactive ADA account?
A After Mr. Tillerson retired.
Q For folks who migrate from domains within the ExxonMobil organization and are put on litigation hold, does the system go back -- is it able to identify the prior inactive former e-mail addresses?
A I would have to verify this, but -- but yes, we should be able to. We use -- Active Directory is not the only identity tool that we use. We have another tool that we use here to add some supplementary information, supplemental information. And we have a unique identifier for each identity at ExxonMobil, who is who.
Q You have a unique identifier for each human?
A Each human.
Q And it associates with all its

200

C. Feinstein
prior e-mail addresses?
A It associates -- I believe it does. I have to check with J.R. on all the prior e-mail addresses. But the --
Q What is that tool called?
A EMURALD, E-M-U-R-A-L-D.
Q What does "R-A-L-D" stand for?
A Something like ExxonMobil User something.
Q When Mr. Tillerson was put on hold, did EMURALD identify Wayne Tracker as one of his affiliated accounts?
A No. It wasn't tied to Mr. Tillerson's AD account.
Q So who would have had to tie that upon its creation; Mr. Wells?
A Let me back up here. At the time that Mr. Tillerson's ID was created, it was created in Lotus Notes. It is not necessary to tie Lotus Notes to an Active Directory account. So the tie to Active Directory, to the e-mail addresses, didn't happen until we implemented Microsoft Exchange 2007, which would have

201

C. Feinstein
been in late 2011, early 2012.
Q And who handled Mr. Tillerson's Microsoft Exchange connection in the connection between the e-mail addresses and the ADA?
A Ramona Helble, H-E-L-B-L-E.
Q What was her role?
A Ramona Helble is a Bit Manager in the EMIT organization.
Q And does she interact with your EMURALD system?
A E-M-U-R-A-L-D, "EMURALD."
Q Thank you.
A She has records in the EMURALD system. I don't know that she interacts with it. I don't know that she would query it or use it.
Q With the hypothetical employee who switches between Exxon affiliates and then switches their domains, how does it get registered in EMURALD? Does someone, whoever is setting up that new address, have to manually tell EMURALD to look for this former e-mail address?



Veritext Legal Solutions
212 267-6868 www.veritext.com 516 608-2400

C. Feinstein
A I don't know exactly how that happens. I'd have to -- to -- I'd have to see the process documentation and talk to the process advisor, exactly how they do that.
Q Who would that be?
A That would J.R. Brown. I know I have talked to him, and there is a process in place for managing that. I know there can be a delay of a couple of days while they're transitioning between domains and then they tie the information together.
Q Mr. Tillerson's secondary e-mail address was not picked up in this litigation hold.
Was it picked up in prior legal holds?
A So the files -- so -- let me go back and clarify a little bit.
When the litigation hold notice goes out, it goes out to the individual, which would have been Mr. Tillerson. So the litigation hold notice says that all



C. Feinstein
of the records should be retained. And so that would include Wayne Tracker. So Wayne Tracker's not an actual human, so --
Q Did the litigation hold notice go to the Wayne Tracker e-mail address?
A No. It goes to Mr. Tillerson's address. Goes to Mr. Tillerson, would be the one who would be using the account. So litigation hold notices go to an individual, not to accounts, okay.
So -- so restate your question. I will see if I can finish answering it.
Q I'm not sure I remember my question.
Were the records affiliated with the Wayne Tracker e-mail account preserved under prior litigation holds?
A I don't know about prior litigation holds.
Q Who would be the best person to ask about that? I assume the Management Committee custodians are on several legal holds.



C. Feinstein
A It wouldn't surprise me. I would think the Law Department would know that.
Q Would Mr. Lauck know?
A I don't know that Mr. Lauck would know that.
Q Did Mr. Lauck collect separately from the management custodians in this investigation only, or does he do that with every litigation hold?
A He -- I don't -- I think this has happened with the Management Committee in the past, although I don't know the details about it, and I don't know if he was the one that did it.
Q Did the CEO, prior to Mr. Tillerson, have a secondary account?
A No, he did not.
Q The description of the considerations in creating a secondary account are about large quantities of e-mail. I assume everybody on the Management Committee has large quantities of e-mail.



C. Feinstein
Did any of them ask for a secondary e-mail account and were declined?
A I don't know that. Mr. Woods has an e-mail account set up and it's never been used.
Q Which one is that?
A It's called J.E. Gray.
Q What is J.E. Gray?
A I'm sorry?
Q Is that "J" like first initial?
A J, E, and then I think it's G-R-A-Y.
Q And so the e-mail address is j.e.gray@ExxonMobil.com?
A I would have to look it up. I have seen the J.E. Gray. It's never been used, so I've never seen it used in the title, so I don't know where the periods are. I think it's -- I am not sure.
Q Is it "Gray" with an E-Y or an A-Y?
A I would have to look it up. I am not sure.

206

C. Feinstein
Q Did he ask for that to be set up?
A I don't know if he asked for it or not. He's never used it, so I don't -- I don't know if he is aware of it. I don't know.
Q Who would know that?
A Ramona Helble.
Q And is that secondary e-mail address for Mr. Woods affiliated with his ADA account?
A It's affiliated with Ramona Helble, again, just like Mr. Tillerson's -- just like the Wayne Tracker, sorry.
Q Can you explain the affiliation to me a little bit more, please?
A Okay, I will try, here.
So when the account was -- so there needs to be some way to link the account back to an identity. And there was a desire not to link it back to Mr. Tillerson because of the reasons described in the affidavit. So it is

207

C. Feinstein
linked to Ramona Helble in the EMURALD system.
Q And Mrs. Helble has her own e-mail address?
A She does.
Q And that is also linked to her ADA account?
A Her e-mail address is linked to her ADA account. Now, technically, the Wayne Tracker account has a separate ADA account, but it's linked to Ramona in the EMURALD system, which is what's visible to people.
Q Can she, Ms. Helble, review the e-mails that come into these two e-mail addresses?
A No, she cannot. You still have to have the password to log in.
Q Were both the J.E. Gray e-mail addresses and the Wayne Tracker e-mail addresses created at the same time?
A No, they were not.
Q When was the Gray e-mail address set up?

208

C. Feinstein
A I would have to look it up. It was much more recent.
Q The association or affiliation of Wayne Tracker to Helble occurred when you transferred to Microsoft Exchange?
A Right.
Q And who made the decision to affiliate it with Helble, if you know?
A I believe that Ms. Helble did. And I don't know who she consulted with, but -- but in her role as bit manager, decided to do that.
Q Would she have consulted with Mr. Tillerson before doing so?
A She would have consulted with Mr. Tillerson or someone that he gave instructions to on this. I don't know exactly who she consulted with.
Q How did you learn about the J.E. Gray e-mail address?
A When I learned about the existence of the Wayne Tracker account and I learned that it was linked to Ramona Helble, I went to the EMURALD

209

C. Feinstein
system to look it up and I saw the J.E. Gray account and I asked the question: Is there anyone else who has a second account? And I asked what is the J.E. Gray account. And so that is a how I found out that one had been set up, and never been used.
Q Does Ms. Helble have any other accounts associated with her?
A No. That's all I saw.
Q Were there other methods that the Management Committee custodians used to deal with the large influx of e-mail correspondence in the inability to prioritize important documents or important communications?
A I don't know what they did.
Q Who would know that?
A The Management Committee members, themselves, would know that. Their admins would know how they dealt with it.
Q When you were conducting the review of the collection process here,

210

C. Feinstein
did you see any of the Management Committee custodians using personal e-mail addresses to conduct business?
A No, I did not.
Q When you were conducting your review of this matter in March and April of this year, did you know if the assistants were aware of both the Wayne Tracker and J.E. Gray e-mail accounts?
A I do not know anything about whether the assistants were aware of the J.E. Gray. I know that some assistants were aware -- some of Mr. Tillerson's assistants were aware of the Wayne Tracker account.
Q How do you know that?
A Because I -- I talked to someone who dealt with him who told me that they sometimes move documents, that the assistant would sometimes move documents from -- that Mr. Tillerson needed to see immediately from his primary account over to the Wayne Tracker, so that he would spot them

211

C. Feinstein
immediately if he were traveling or something like that.
Q And who told you that?
A I'm trying to recall whether that would have been -- I am not sure. I think that would have probably been Bob Lauck that told me that.
Q Did you interview any of the assistants?
A I have not.
Q Do you know how an assistant manually moves a document from one e-mail account to another?
A I do not know how they would be doing that.
Q And who would know that?
A Mr. Lauck would probably know it or Ms. Helble might know how they were doing it.
Q Why would Ms. Helble know that?
A She provides support to them, so she may have had some conversations with them in the past. I'm not sure if she would know or if Bob would know.

212

C. Feinstein
Q What kind of support does Ms. Helble provide?
A So she is the corporate headquarters business IT manager, so she helps provide support for that group and makes sure that their IT needs are met. So it's possible that she may have that.
Q Would she have moved documents between accounts?
A I don't believe that she would have had access to do that. She would need the password, and I don't believe she would have done that.
Q Turning to paragraph 51 of your revised affidavit.
A (Complying.)
Q Paragraph 51 describes the file sweep.
A Yes.
Q Do you have personal knowledge of the contents of this paragraph?
A Yes, I do.
Q Who is Ye-Chin Lee?
A Ye-Chin Lee is the Messaging

213

C. Feinstein
Service Design Lead.
Q How did he or she provide information for you to draft this paragraph or to provide content for this paragraph?
A So I went back to verify that -- that -- that the file sweep was enabled at the time of migration.
Q And was it enabled at the time of migration?
A It was enabled at the time of migration.
Q Whose responsibility was it to disable the file sweep?
A The file sweep is -- there's an automated -- there is an automated program that runs. So there is a series of systems involved. And so the Law Department determines who is on litigation hold. There is a system in which a flag gets set, and then that is what disables the file sweep for folks on litigation hold.
Q The litigation triggers a flag

214

C. Feinstein
which triggers the disabling?
A So when someone is put on litigation hold, then there is a flag that is triggered that says this person is on litigation hold, and that flag then is set and that flag is used in the e-mail system to -- or in the file sweep, the automated file sweep system, to disable the file sweep program while that person is on litigation hold. And it's also used for -- to ensure that assets are retained.
Q Who physically or technologically changes the setting from enabled to disabled?
A So someone doesn't physically change it. The system changes it based on the flag.
Q And who creates the flag?
A The Law Department creates the flag. And they determine who goes on to litigation hold and they upset -- they update the Atlas tool and that provides a feed which then ultimately sets a flag in

215

C. Feinstein
another system.
Q Whose responsibility is it to ensure this is working correctly?
A So to ensure that the -- which piece are you asking about?
Q The disabling.
A The disabling of the file sweep? Overall, on the EMIT side, I have responsibility for making sure that the whole process, end to end, is working right on the EMIT side.
On the determination of who goes on to litigation hold and whether the Atlas tool is working correctly, then the Law Department has that responsibility. The tool -- there are several tools involved here that are owned by different folks in the IT department, in the EMIT department, so we have to coordinate to make sure they all work together, and I hold responsibility for coordinating that.
Q When the collection process in response to the subpoena was bifurcated

216

C. Feinstein
into nonmanagement custodians and management custodians, was the responsibility for the disabling of the file sweep moved to Mr. Lauck who handled the management custodian collection?
A I'm sorry, one more time? I'm not sure I got that.
Q When the collection process in response to the subpoena was bifurcated into nonmanagement custodians and management custodians, was the responsibility for the disabling of the file sweep moved to Mr. Lauck, who handled the management custodian collection?
A No. No.
Q It was still the Risk Management team under you and the Law Department?
A Right, for the file sweep, for the setting the litigation hold flag that disables the file sweep, that did not transfer to Mr. Lauck. That stayed with the folks who were responsible for that

217

C. Feinstein
process overall.
Q You had mentioned that several systems were involved in the disabling.
Have we covered all those systems?
A We talked about the Access Data Tool (sic), which provides information which sets a flag.
Q Are you responsible for the Access Data Tool?
A No, I am not.
Q Who is?
A The Law Department.
Q Okay.
A It provides -- it interfaces with the Enterprise Directory which provides some additional ExxonMobil-specific information. Which it also interfaces with the EMURALD system. The EMURALD system is used to set the flag, the R37 flag, which indicates that a person is on litigation hold. That then provides a feed over to the e-mail system and the file sweeper,



Veritext Legal Solutions
212 267-6868 www.veritext.com 516 608-2400

C. Feinstein
that functionality is tied in with the e-mail system. That's all I can recall off the top of my head.
MR. TOAL: Did you say the access system or the Atlas system at the beginning of that?
THE WITNESS: At the beginning the Atlas, the Atlas system is used to indicate who is on litigation hold and then it gathers some additional information from the Enterprise Directory -- I'm sorry, I am saying that wrong. Let me correct that, I apologize. Let me go back and correct that.
The Enterprise Directory comes in before that, actually. Atlas provides information over to EMURALD. It does not go through Enterprise Directory at that point. Enterprise was earlier in the conversation. So Atlas puts -- determines whether somebody is on litigation hold or not and that provides information to



C. Feinstein
EMURALD where the flag is set that indicates that someone is on litigation hold. And then that provides information to the e-mail system to disable the file sweeper routine, the automated file sweeper routine.
Q If Ms. Helble had been put on a litigation hold, would the e-mails of Wayne Tracker been preserved correctly?
A No, they still would not be.
Q Why?
A Because when the Wayne Tracker e-mail was set up, it was set up as a nonpersonal account directory. And because it was set up as an nonpersonal account, because of the way that this information flows and the flag works, it still would not have recognized that this was an identity that had a litigation hold flag set. It needed to be set as a personal account.
Q So it was not a personal account of Ms. Helble?



C. Feinstein
A No. Ms. Helble has her own personal account.
Q And the D.E. Gray (sic) e-mail address?
A J.E. Gray.
Q J.E. Gray was a personal account?
A It was not set up as a personal account. It would be a nonpersonal. It's never been used, so we haven't had to address that, but...
Q Footnote four to your paragraph 51 regarding the file sweep routine.
A Yes.
Q There is discussion of despite the disabling of the file sweep, that documents can be retained for 395 days.
Does that mean all e-mails, regardless of what the user has done with them, meaning foldering them, categorizing them, flags?
A So no, not exactly. What that means is that -- so this is an automated file sweep routine that will



C. Feinstein
automatically sweep e-mails over 13 months old, which is where the 395 days come from.
If someone -- someone could delete something before that, this is not the only delete mechanism, but this is intended to help people keep their -- their quotas down or their e-mail bogging down.
Q So in the Wayne Tracker instance, things could have been deleted during this 395-day period?
A When the person was not on litigation hold, yes. So -- so --
Q Well, the person was on litigation hold.
A Just -- okay, make sure I understand the question. So?
Q My question is: During the 13-month period where the file sweep has not run, while it's waiting to run, the user could have deleted contents?
A Under Microsoft Exchange 2007, they could do that. As we've migrated to

C. Feinstein
Microsoft Exchange -- as we've migrated to the later version of Microsoft Exchange, the data would still be retained, but under Microsoft Exchange 2007, that would have been true.
Q When did you migrate to the Microsoft Exchange --
A 2016.
Q When in 2016?
A So we have been doing it -- they don't typically migrate all at one time, so I'm not sure of the exact dates. I would have to get Cynthia to tell me the exact dates.
Q Was the file sweep disabled in the files in Microsoft Exchange, the later version? The Wayne Tracker e-mail was migrated over to the new Exchange server in 2016. At that time, was the file sweep setting changed?
A No. That migration would have not had anything to do with the -- the -- a change in the file sweep, so...
Q Does anyone check the file



C. Feinstein
sweep settings when they are doing a migration?
A I'm not sure what the migration protocol is on that.
Q Who might know that?
A Cynthia Leong would know that. The -- the piece that disables the file sweep is done in a separate system from the e-mail system. I know there was testing of that when they were migrating to the new version of Microsoft Exchange to make sure that it was working properly, but I don't know the exact protocol of how they do that.
Q Who conducted the testing?
A Cynthia Leong could tell you all who conducted the testing.
Q In paragraph 53, you describe the discovery that the Wayne Tracker account hadn't been searched in the prior searches.
Who discovered that at ExxonMobil?
A Discovered that it was never



C. Feinstein
exempted from the file sweep routine? The Law Department is the one who made me aware of it.
Q What other kind of nonpersonal accounts exist?
A There's -- there's personal, there's nonpersonal, but some other types might be accounts that we use to manage conference room reservations, calendars --
Q Distribution lists?
A Distribution lists is a good example.
Q And so if you have an e-mail address that's distribution list A@ExxonMobil.com and it goes to all the management custodians, where do the contents of the in-box and sent box for that distribution list lie?
A They lie in each of those members' e-mail. So that distribution list is just a way of aggregating those existing -- it's not a -- it's not really a separate e-mail address. It's -- it's



C. Feinstein
a way of aggregating a group of existing e-mail addresses, but it still gets picked up.
Q Is that true of all distribution lists?
A Yes. To my knowledge, I don't know if any would look a different way.
Q Are there any other nonpersonal accounts that exist?
A Are there any other types of nonpersonal accounts. So we've talked about the conference rooms. We've talked about -- there are some shared mailboxes that are used for processes and operational support.
Q Can you give me an example?
A Let me see if I can give a good example. Let's say that -- a good example of one that I used at one time.
So I used to have an operational team where they needed to take action and perform certain activities as part of their role. And so rotating where we handed over one

C. Feinstein
activity to another person. And so this would say, you know, this is -- this ticket is here and this is to document that we've done this. They're not used typically for ongoing communication. They are for operational purposes.
Q Do you know if anyone in the Management Committee or their assistants have shared mailboxes?
A We did check the Management Committee members and determined that they did not have shared mailboxes.
Q Who checked that?
A That would have been Cynthia Leong.
Q With the assistants, did anybody check if they had shared mailboxes?
A I don't know if anyone checked the assistants or not.
Q In paragraph 56, you describe Wayne Tracker e-mails not available for review between September 5, 2014, and November 27, 2014.



C. Feinstein
A That's right.
Q Can you describe why this time period was not available?
A So this time period was not available because the file sweeper was enabled, the file sweeper was enabled and so during that time there was some automatic deletions that happened.
Q What about the time period from the migration to the Exchange server in 2011 or 2012 through September 5, 2014; what happened to those e-mails?
A So 2012, those would have logically been swept.
Q So why doesn't it say that the e-mails in the Wayne Tracker account from 2011 or 2012 through November 27, 2014, were deleted?
A Well, those were -- that would have been before the subpoena was received, right? That would have been more than 13 months back from the date the subpoena was received.
Q So this time period is pegged



C. Feinstein
to the issuance of the subpoena, not the time period of the subpoena?
A Well, they would only know to put -- they would only know to disable the file sweeper once the subpoena came in.
Q And did they disable the file sweeper when the subpoena came in?
A For Mr. Tillerson, it was disabled, but the Wayne Tracker, there was a mistake and so the file sweeper did not get disabled for the Wayne Tracker account.
Q Is it true that documents before November 27, 2014, going back in time, were swept and deleted?
A I don't have evidence of that, but knowing how the file sweeper works, the date that the subpoena came in -- so if the subpoena came in on November 4th and file sweeper was disabled on -- or the litigation hold notice went out on November 6th, then what would have -- where the file sweeper should have been



C. Feinstein
disabled would have been from that point on. So 13 months back from that, 13 months back from that, e-mail before that time would logically have been automatically swept.
Q And did the file sweep work in Lotus Notes?
A There was no file sweep in Lotus Notes.
Q So the documents in Lotus Notes between 2007 and 2012 that were preserved either for other litigations or otherwise were available for searching for the Wayne Tracker account?
A Well, I don't know -- I don't know about that.
Q Okay.
A I don't know if there was another litigation hold. I don't know if there were any documents. I don't know if there was a litigation hold, was it released. So I don't know the answer to that.
Q In paragraph 57, footnote five,

C. Feinstein
you reference a Legacy Disk-Based Backup Device?
A That's right.
Q Can you explain to me who identified it and the contents thereof?
A I'm not sure who identified it. It would be one of the people who were working on this effort. John Rudisill could probably tell us who identified it. So on that, we were able to go back. That was the oldest full backup that we were able to find.
Q Where was it?
A Where was it? I'm not sure where it was. It was on one of the servers that were identified as potentially having some e-mail.
Q And what does Legacy Disk-Based mean?
A So Legacy Disk-Based means that we used to do backups -- we have changed the way we do backup processes over the years. And so in the past, we used to do -- use a disk-based, whereas now we do



C. Feinstein
something different than that. And so this would have been the older technology.
Q What is the new technology?
A I don't -- so today we use Convault for our backups.
Q Is that a proprietary system or a vendor system?
A I believe it's a vendor system.
Q Where were these Legacy Disk-Based Backup -- oh, you don't know.
A Yeah, I don't know, I haven't located them.
Q Was this backup device for the Management Committee server?
A I don't know specifically which server it was for. This would have been for -- for e-mail.
Q Who would know which server?
A Cynthia Leong would know which server this was. So in the Wayne Tracker account, we were looking for the e-mail because that's where the file sweep happened.



C. Feinstein
Q And the Management Committee server -- sorry if I asked this before -- this covers everyone in the Management Committee and their assistants?
A I don't know who all has access to the Management Committee system. I'm not sure what's in there.
MS. DeROCHE: If we could take a five-minute break.
[A recess was taken.]
EXAMINATION BY
MR. OLESKE:
Q I am going to finish up with hopefully not too many questions, and we will get out of here relatively quickly. And I am sorry if I seem to go over ground that's been covered. I just want to make sure that I have got some things clear. I will try to move quickly so that if I am duplicating, at least it will go quickly.
First of all, is it your understanding that there is, in fact, a Management Committee server for the



C. Feinstein
Microsoft Exchange 2007 system?
A I don't know that there is a server for the 2007 system. I know there is a Management Committee server. I don't know what's on it.
Q And you don't know who the custodians are who are assigned to that server; is that correct?
A That's correct.
Q And you don't know whether or not the Wayne Tracker e-mail is housed on that server as opposed to any other server; is that correct?
A I do have some knowledge of the servers that they looked at for the Wayne Tracker account. I don't recall any of those being the Management Committee server. But I was looking at the technical names of them, so there were multiple servers, I don't believe it was Management Committee, but I am not absolutely certain.
Q So the Wayne Tracker e-mails were located on more than one server?

234

C. Feinstein
A We looked for backups on more than one server.
Q Was there a primary server that hosted the Wayne Tracker e-mail account?
A I don't know if this was a primary -- well, there is always a primary server that hosts e-mail accounts. This account existed for a long time, so I -- I don't know that -- which of those, I would say, is the primary.
Q And do you know whether or not it was located on the same primary or secondary server as Mr. Tillerson's Rex Tillerson e-mail account?
A I do not know that.
Q In your affidavit, we discussed how the reason why the tracker e-mail account didn't get picked up is because in the Active Directory system, it was not identified as a personal account; is that correct?
A That's correct.
Q And the restraint that you

235

C. Feinstein
understand is that the Active Directory system can only assign one personal account per person; is that correct?
A I don't know that it's a technical constraint to Active Directory. That's the way we deployed it.
Q And your understanding is that when the Law Department puts up the flag for a legal hold on an individual, it will only automatically exempt the file sweep for personal accounts, the one personal account connected to that individual in the ADA system; is that correct?
A It -- repeat it one more time?
Q Sure. When the Law Department signals someone's on hold, that's who does that, correct, the Law Department?
A Yes, the Law Department.
Q And you said there is a system where that puts a flag into the system and that flag is what triggers the exemption from the file sweep, correct?
A They -- there -- when you say

236

C. Feinstein
"the system," it's not the same system as the litigation hold system.
Q Okay.
A Okay.
Q So a litigation hold is put in place by the Legal Department, and then someone at the Legal Department also has the responsibility to flip the flag --
A No.
Q That's not correct.
Who has the responsibility to flip the flag to say, exempt this person from the automatic file sweep?
A It's -- it's an automated process.
Q I guess that's what I am getting at.
A Okay.
Q When the Legal Department puts someone on hold, does that automatically trigger the system exempting that person's personal ADA account from the file sweep?
A Yes. That would disable the

237

C. Feinstein
automated file sweep on their e-mail account.
Q Now, you mentioned that there is a secondary system called EMURALD?
A EMURALD.
Q And that also identifies people's e-mail address by what individual they belong to, correct?
A So that's not as -- let me see if I can clear -- when you say "a secondary system," it is -- it is one of our identity in access management systems and tools.
Q One of those is the ADA system, correct?
A One of the tools in this sweep, this architecture, Active Directory is one piece of the architecture. EMURALD is another piece of the architecture.
Q Right. And but just talking about in the ADA tool, the Active Directory tool to start with, the Active Directory tool can know that an individual is connected to one active

C. Feinstein
personal account, that's the way Exxon has it set up, correct?
A That's the way we set it up.
Q And if I'm not mistaken, correct me if I am wrong, it could know, theoretically, that that person is connected to another inactive account; is that correct?
A I am not sure about that. I would have to talk to --
Q But it won't know whether that person is connected to an e-mail account that was previously designated as nonpersonal; is that correct?
A For the purposes of setting the litigation hold flag, if -- for the purposes of setting the litigation hold flag, if an account is flagged as nonpersonal, then the litigation hold flag won't be set appropriately.
Q Now, separate from that is the EMURALD system, correct?
A The litigation hold flag gets set in the EMURALD system.



C. Feinstein
Q The EMURALD system also identifies individuals, correct?
A Yes, it does.
Q And it separately connects them to different e-mail addresses, correct?
A It records in there which e-mail -- which e-mail accounts are associated with that identity.
Q And that system doesn't have any of the restrictions of the ADA system; in other words, it can have more than one e-mail account attached to a single person, correct?
A It can tell you -- it can tell you what e-mail accounts, personal or nonpersonal, are associated with that identity.
Q And in a way that ADA could not; is that correct?
A In a way that ADA, the Active Directory does not.
Q And if I am correct, your testimony is that when the Wayne Tracker e-mail was transitioned from Lotus Notes



C. Feinstein
to Microsoft Exchange, Ramona Helble linked the Wayne Tracker e-mail address to herself; is that correct?
A That is correct.
Q Now, you mentioned that that had something to do with the basis in your affidavit. And my understanding of the basis in the affidavit are that the Management Committee people would be getting e-mail traffic from outside the organization; is that one of them? Is that correct?
A Well, this is Mr. Tillerson?
Q Right.
A So yes, there was some concern about Mr. Tillerson, the e-mail traffic coming from the outside.
Q Because people could just write to Rex W. Tillerson and flood his e-mail box because they could know his identity?
A That's correct.
Q And the other issue is that he gets so many e-mails, this is the way for him to get the most important e-mails; is



C. Feinstein
that correct?
A That's correct.
Q But his account didn't need to be linked to Ramona Helble in EMURALD to achieve those objectives; did it?
A Well, if -- it didn't have to be Ramona Helble, per se, but had it been linked to something that said Mr. Tillerson, then the anonymity would not have been there.
Q That is my question: Is the anonymity from who? In other words, who can see who is linked to an e-mail account in EMURALD? It's just people who work for EMIT, right?
A I don't know who all has access to EMURALD. I think access is fairly broad. I am not sure. I would have to look up and see if it is people outside of EMURALD or not.
Q So the concern would be that someone inside of Exxon who has access to EMURALD would have been able to tell that Wayne Tracker was really Mr. Tillerson?

242

C. Feinstein
A Well, that was one of the concerns, as well.
Q Do you know at the time whether or not anyone raised any questions about Exxon, itself, not being able to keep track of who the Wayne Tracker e-mail was attached to?
A At which point in time?
Q When Ms. Helble transitioned it to herself.
A I'm not sure I understand your question. Tell me one more time.
Q You know what, scratch that.
A Okay.
Q Does Ms. Helble have any prior involvement in producing documents in response to litigations or investigations?
A I don't know.
Q You have never worked with her on something like that before?
A She is the Bit Manager. So she -- one of her responsibilities is -- is -- is understanding about the -- the

243

C. Feinstein
Litigation e-Discovery Services, but I have never worked with her on producing documents.
Q You previously mentioned that keeping these identities secure and straight is a key compliance role at Exxon, correct, a key control item; is that correct?
A It is a -- it is a key control. It's a control that we worry about because it's complex given the volume of what we have and it's something that's significant given the assets we have to protect.
Q And, ultimately, at ExxonMobil, that's your job, correct?
A Not -- no, not -- not exactly. I'm not responsible for all of the access management.
Q Are you responsible for identity in access management when it comes to the Microsoft Exchange servers?
A No. I -- I'm not.
Q Who is responsible for that?

244

C. Feinstein
A So the Microsoft Exchange servers have an owner -- and I don't recall exactly who the owner of the overall service is right now. There is a group in collaboration, E-Mail Collaboration Services that owns that. I do provide guidance about access management procedures and guidelines.
Q Prior to March of 2017, did you know the Wayne Tracker e-mail existed?
A I did not.
Q Did you learn that Ms. Helble had linked it to herself and EMURALD at the same time, basically, that you learned of the existence of the account?
A Several days later.
Q If you had known about that, would it have been part of your role to address any potential risks to Exxon's identity controls posed by this setup?
A Ask me the question one more time, make sure I'm clear.
Q Sure. If you had known about a secondary e-mail address, not designated

245

C. Feinstein
personal, linked to a different person in EMURALD, if you had known about that, would that be your role to investigate or address potential risks to Exxon and its internal controls posed by that kind of a setup?
A I certainly would have had part of that responsibility. I don't know that it would have been fully mine. There are several pieces involved in this, but certainly I would have had some responsibility in that.
Q Do you know whether there were any individuals who would have been responsible for addressing that kind of risk?
A For addressing that kind of risk. Let me think through for just a moment.
Q Sure.
A So I would think the folks who do our identity and access management and our ITOB organization would have played some role in that. The folks who own and

C. Feinstein

maintain the file sweeper tool would have had some responsibility in that.

Q Who owns and maintains the file sweeper tool?

A It is also owned by the same group that does the e-mail service.

Q Is it the e-mail collaboration?

A The e-mail collaboration service.

Q Going to the e-mails that were actually swept from the Wayne Tracker account. So I understand correctly, what you were testifying is the subpoena had come in because of this snafu, the sweeper wasn't exempted and kept sweeping, and by the time Mr. Lauck looked at the Wayne Tracker account e-mails for the first time in January of 2016, by that time the sweeper had already swept away the e-mails between September and November of 2014; is that correct?

A Let me double check this. Let me double check those dates.



C. Feinstein

Q This is paragraph 57.

A Okay. So between September 5, 2014, and November 27th.

Q I'm sorry, that's paragraph 56.

A 56, yeah.

Q So the previous stuff might have gotten swept, it might have been deleted, but as far as you know, it wasn't subject to the litigation hold here, and so that's why that time period wasn't examined. The time period that was examined was what could have been swept while hold was in place, correct?

A That is my understanding.

Q Do you know whether or not Exxon took any steps to see whether or not any data could be recovered for the material that was presumably swept prior to September 5, 2014?

A Well, that would have been as we were looking for the backups for the oldest backup in this, that would have been implied in that.

Q So you had been looking for any



C. Feinstein

old Wayne Tracker?

A Any Wayne Tracker, yeah. Because we were trying to find the oldest backups to find to go as far back as we could.

Q To go back a second, to what must Mr. Lauck had done in the beginning, I just want to understand.

So when all this happened originally, the subpoena is issued, litigation holds go out, which I understand you were not directly involved in, but correct me if I am wrong, what you are directly involved in is you get a ticket that says: Here are custodians, here are locations, go get this stuff; is that correct?

A When a collection is done.

Q Okay.

A Sometime after a litigation hold.

Q Right. But at some point in this case, that's what you got. You got tickets with custodians and what to



C. Feinstein

collect, correct?

A Correct. My team did.

Q Right. And your understanding now is that the Management Committee custodians were not included in that and done through this separate process, right?

A That's correct.

Q And so when that separate process was started, your understanding is Mr. Lauck took the single word search terms and went into the individual custodian's Microsoft Outlook account, correct?

A Correct.

Q And then he would put those individual terms into a little search box at the top of their e-mail box; is that correct?

A Correct.

Q And hit "enter" and see what came up, correct?

A That's correct.

Q And then whatever came up from

250

C. Feinstein
that, he would "select all" or "copy" or something and move it into a folder, correct?
A Begin a process to move it into a folder.
Q Do you have a lot of experience using Microsoft Outlook?
A Some. I mean, I am a user, but I am not a deep technical expert.
Q Do you know, for example, whether or not if you put a search term into that box, whether it searches the contents of just the e-mails, or if it also searches the contents of attachments to the e-mails?
A I don't know whether it searches the contents of the attachments.
Q So sitting here today, you don't know whether or not these searches that Mr. Lauck would have done would have captured attachments to e-mails through that process he used as opposed to just the e-mails themselves?
A Right. I don't know if it

251

C. Feinstein
captured the attachments or not.
Q And so then, basically, my understanding is this was done two more times by Mr. Lauck, effectively, just with more search terms; is that correct?
A Correct. So the second search was broaden the search terms, and then the third search was also an attempt to broaden the search terms.
Q Right. So when Mr. Lauck ran the first search, he would have gone into, for example, the Wayne Tracker Outlook box, correct, to run these searches?
A That's correct.
Q And there would have been a search box and underneath that would have been all the e-mails listed before a search, it would have just been all of them, right?
A Right.
Q And so when he ran those searches the first time, you don't know whether or not he noticed it, but three

252

C. Feinstein
months were missing, they had been swept, correct?
A About three months.
Q And when he came back to do the second and third searches, by the time he finished doing that process, another nine months had been swept, correct?
A That's correct, approximately nine is referenced here.
Q And you don't know whether or not he noticed that nine months of e-mails had disappeared from the last time he had seen that Outlook in-box?
A Right, I don't believe that he noticed. I don't know for sure whether or not he did, but I don't believe that he did.
Q Did you discuss with him whether or not he noticed that?
A I don't believe that I asked him that question.
Q Do you remember him saying anything about that to you?
A No. We discussed how he did

253

C. Feinstein
the searches, but I don't believe I ever asked him: Did you notice that anything was missing.
Q Did you guys ever discuss any kind of -- stepping back from that specific issue -- any kind of risk involved in conducting searches in this way as opposed to in the ordinary course, the way you would normally do them?
A I did not talk to Mr. Lauck about the risk of that. I was getting information from him about how he had done it, and so I did not talk to him about the risk of that.
Q So after it's discovered that, in fact, these things got swept, then that's when we have what you describe in paragraph 59, that talks about the steps to recover what had been swept, correct?
A Right.
Q And 50 members of EMIT spending more than a thousand hours over a seven-day period, and then you list what was done. And the first thing you list



Veritext Legal Solutions
212 267-6868 www.veritext.com 516 608-2400

254

C. Feinstein
is backup data. I believe earlier you testified there was an effort to find out if anything was recoverable from the server itself, correct?
A From the Microsoft Exchange server.
Q And one thing you mentioned was a dumpster; is that right?
A That's correct.
Q What is a dumpster?
A So a dumpster is inside Microsoft Exchange there is an additional file where items that -- that have already been processed and have been deleted be retained for 35 days.
Q But there was nothing in the dumpster in this case?
A I don't recall if there was anything in the dumpster or not. I know we went back and searched it and I'm not sure whether there was anything found in it or not.
Q And then in this same section, you talk about a Legacy Disk-Based Backup

255

C. Feinstein
Device. I just want to zero in on this.
You said there is a new process now, of backing up the server?
A That's correct.
Q What is the name of that again?
A Convault.
Q That is a third-party vendor controls that; is that correct?
A No. We do our backup service.
Q You do the backup?
A We do -- EMIT does the backup.
Q And where is it stored?
A It's stored on our infrastructure.
Q In Houston or Dallas?
A In Houston or Dallas. I don't know specifically where things are backed up, but we store it internally.
Q And prior to that system, it is your understanding there was some disk-based backup?
A There was some disk-based backup.
Q You don't know where that is

256

C. Feinstein
located?
A No. I know it was on our infrastructure as well.
Q And you don't know who was in charge of running that disk-based service?
A It would be the E-Mail Operations Group.
Q That same group that we were referencing before?
A Right.
Q If I could turn you back to --
A Sorry, which one?
Q -- Exhibit 8, previously marked.
A Yes.
Q If you turn to page -- why don't we start with page three. At the top of page three, it discusses SAN Storage Servers; do you see that?
A I do see that.
Q And then when you turn to page seven, it discusses near the top again Internal Storage Mailbox Servers; do you

257

C. Feinstein
see that?
A Yes, I do.
Q And then in that same paragraph, do you see how it states that the Management Committee Server will be an Internal Storage Server?
A Right.
Q If you turn to page 16 of this document.
A (Complying.)
Q There is a section that says: Exchange 2007 Backup.
A Okay.
Q And then you will see a series of four redactions there.
A Right.
Q The last two of those, it says: Exchange Mailbox Servers with SAN storage will use -- redacted -- and then Exchange servers using internal storage will be -- redacted.
A Right.
Q Do you know whether or not these redaction sections identify where

258

C. Feinstein
backups are to be stored?
A I don't know for certain. I believe this is the frequency and the type of backup, but I'm not certain.
Q Sitting here now, do you know whether or not internal storage servers like the management server are backed up or were backed up during the relevant time to any location other than the company's own Dallas or Houston locations?
A I do not. I would be very surprised if they were. I don't -- I don't know for certain, but I don't believe they were.
Q I guess kind of a broader question: Catastrophe strikes in Texas.
A Right.
Q The location for both the Houston and Dallas IT centers completely flooded.
A Right.
Q The servers are wiped out.
Does Exxon have another

259

C. Feinstein
location where it backs up its e-mails?
A I don't know about e-mail. I don't -- I would have to talk to the e-mail folks to see whether or not -- how critical the actual e-mails are.
We have a capability for restoring the functionality of highly critical systems, but the functionality of the system versus the data in the system are two different things.
Q So is it my understanding, then, that you know that there is a way to recover using e-mail --
A Using e-mail.
Q -- but you are not sure if there is a way to recover what is on the e-mails?
A Correct, correct.
Q When this process was undertaken to find what was lost from the Wayne Tracker e-mails, do you know what efforts were made to find out if or whether e-mails were stored in some third location besides the company's own Dallas

260

C. Feinstein
or Houston locations?
A I know that the -- the -- the e-mail folks who were -- who were working that issue would know that already. And so I know that we asked them to -- to make sure that they check any location where we might be able to get the data. So I don't know whether or not -- I didn't ask them specifically, is there any -- any location outside of ExxonMobil, because, typically, there's not. But -- but I don't know that for sure.
Q And this is, again, the same e-mail group that we are talking about?
A Yes, this would be the same e-mail group.
Q And you would presume they would know?
A They would know.
Q So for example, if Management Committee Server documents get backed up to a Cloud somewhere, those are the people who know that happens?

261

C. Feinstein
A Well, if there is a Management Committee e-mail server, then the e-mail folks would know how that backup occurs.
Q Okay.
A I don't know specifically what is on that Management Committee server.
Q And so the limit of what you know about what they did is you guys told them, go find everything, and they came back to you and said we looked everywhere; is that basically it?
A So it wasn't quite as simple as that.
Q Okay.
A There were a lot of people involved. A lot of daily consultations and calls and discussions about have you tried this, have you tried this and have we looked here and have we isolated this. It's a lot of technical detail. I can't recall the specifics, all of it, sitting here today, because it was too much detail.
Q Understood. I guess what I am

262

C. Feinstein
trying to make sure that we figure out is whether or not you know whether or not third-party outside vendor or Cloud-based backup storage was actually investigated and searched? It sound like you don't have that information.
A Yeah, I don't have that information specifically.
Q Okay. The jegray@ExxonMobil.com e-mail address.
A Yes.
Q You testified that that's never been used?
A That's correct.
Q How do you know that?
A I checked it.
Q And what do you do to check that?
A I go into EMURALD and it tells me whether there is a date that says whether the account's ever been used.
Q Does the EMURALD system log activity or does it just give you the last used date or what is it?

263

C. Feinstein
A It gives me the last used date. In this one it says something to the effect of never activated.
Q Would EMURALD be able to tell you the last used date of any e-mail in the Exxon system?
A No. Not e-mail. Remember, this is -- this is -- this is an account.
Q Right. But this is an e-mail account we are talking about, right?
A Well, this would be -- this would be -- this is the e-mail account, so would it be able to tell me the last -- EMURALD has -- so the Active Directory and e-mail accounts are linked. What I'm not sure, on that last -- last used date is whether that is the last date connected to the network, which is what I think it would be, or whether it would be connected to e-mail. So I'm not sure that I could answer that.
Q I just want to make sure I understand this.
So you go into EMURALD, you

264

C. Feinstein
look up -- I'm sorry, who is J.E. Gray connected to? Was it connected to Mr. Woods?
A Mr. Woods.
Q And you look up Mr. Woods and you see in the EMURALD system his Darren Woods e-mail address and this e-mail address?
A No. So Mr. Woods is set up under Ms. Helble's account, just like Wayne Tracker.
Q His regular e-mail address is connected to Ms. Helble?
A No.
Q So if you go into EMURALD and you look at Mr. Woods, you will see his Mr. Woods Exxon account. If you go to Mr. Tillerson in EMURALD, you will see his Mr. Tillerson account. If you go into Ms. Helble, you will see presumably Ms. Helble and Wayne Tracker and J.E. Gray?
A Correct.
Q Does it tell you separately for

265

C. Feinstein
each of those e-mail addresses, by what you just testified, the last time that e-mail address was connected to the e-mail network, or just the last time Ms. Helble was connected to the network?
A There are different dates for each of those accounts.
Q Okay.
A What I said is I'm not sure whether that is the date that it last hit the network, or that's the date that it hit e-mail.
Q I guess that's where my confusion is, what the difference between hit the network or hit e-mail is.
A I can log into network, but not log into e-mail.
Q Right, so if you are Ms. Helble, you can log into the network and check your own e-mail, for example?
A That's correct.
Q And you are not sure whether what's in EMURALD shows the last date she logged into the network --



Veritext Legal Solutions
212 267-6868 www.veritext.com 516 608-2400

266

C. Feinstein
A Right.
Q -- or whether it's the last date she used her own e-mail account?
A Right.
Q I guess my confusion is: Presumably, Ms. Helble has been working at Exxon this whole time, right?
A That's correct.
Q And so it must give you some actual recent date where Ms. Helble has logged into the network, right?
A Correct.
Q So what are these separate dates for the Wayne Tracker e-mail and the J.E. Gray e-mail?
A Those are different accounts.
Q And they have their own dates?
A They have their own dates.
Q So I am sorry to go over this, I just want to make sure we are clear.
It's one EMURALD page for Ms. Helble, correct?
A There are multiple tabs for Ms. Helble's account.

267

C. Feinstein
Q But she has one account. You go into EMURALD, I want to look up Ramona Helble.
A Right.
Q You go into something. Now there are multiple tabs.
There is one for her e-mail account; is that correct?
A No.
Q What is there? When you log into EMURALD for Ms. Helble, what do you see?
A So there is a tab that I go to that says ID information. And under that, I can see that -- Ramona's primary account, and then I could see the other two accounts.
Q And there is a date by each of those accounts?
A There is a date by each of those accounts.
Q And you are not sure whether that date is the date that that -- I guess this is my confusion with the

268

C. Feinstein
network versus the e-mail thing. All of those accounts are e-mail accounts, right?
A So -- let me see if I can clarify. Ms. Helble's is both her -- it would be her network account and her e-mail account.
Q Okay.
A Now, associated with it are two nonperson accounts, which would be just e-mail accounts. And so I believe that hers is the same. I would have to look at the record again to be absolutely certain on this, but what's in there, I think, is her network address and her e-mail, which I think are the same, right. I would have to look at it again to be sure, I may be wrong on this. But it tells me Ramona's account and then that one is set up as a personal account and then there are two nonperson, which J.E. Gray has never been logged into and then there is the date of the last activity for the Wayne Tracker.

269

C. Feinstein
Q So for the Wayne Tracker and the J.E. Gray, it will tell you some date, and you are not sure whether that is the date that someone logged onto the network as Wayne Tracker or as J.E. Gray or whether the last time they sent an e-mail as Wayne Tracker or J.E. Gray?
A That's correct.
Q But there is a date there for both of them separately?
A Right.
Q Do you know what the date was for the Wayne Tracker e-mail address?
A As I recall, I believe it was the date the account was disabled.
Q And these dates should show up for everybody's e-mail account at Exxon in the EMURALD system, right?
A So EMURALD has the identity information, so yes, all of their identity information should show up in EMURALD.
Q So if we want to find out the last time someone either logged into the

C. Feinstein
network or used an e-mail account at Exxon, the EMURALD system should be able to tell us that, right?
A The EMURALD system should be able to tell us the last time -- again, I would have to validate what exactly that date is showing and exactly what that account information is representing, but -- but that information is tracked for all of the -- the folks who we maintain identity identification on Exxon.
Q Help me resolve this confusion.
A Okay.
Q So I understand, Ms. Helble signs on to the network, she doesn't necessarily sign on to her e-mail, but she signs on to her network, and then she signs on to her e-mail using, what, a password?
A We have single sign on.
Q So she signs on to the network can automatically go into it?
A She can automatically go into



C. Feinstein
it, yes.
Q Can she bring up the Wayne Tracker or the Gray e-mail boxes on her own?
A Not to my knowledge. She does not have the passwords to do that, and I don't believe -- I don't believe that she can. I don't know, but I don't believe she can.
Q So she would log on, single logon, put in her password. That is going to get her into her access into Exxon's network, and, specifically, into her own Ramona Helble e-mail box?
A That's correct.
Q Back when Mr. Tillerson was working at Exxon, he puts in his password, it gives him access to the network, correct?
A Correct.
Q It gives him access to his rex.w.tillerson@ExxonMobil e-mail address, correct?
A It would have been set up to do



C. Feinstein
that, yes.
Q Does it also automatically give him access to the Wayne Tracker e-mail box?
A I don't know how that access was set up. I don't know how that was managed.
Q You don't know if he had to do a separate log in to get into that?
A I don't know how he got into it, specifically.
Q You don't know if there was a password required?
A I don't know.
Q Is it possible that the EMURALD page for Ms. Helble only records her activity in those e-mail accounts and that activity by someone else in the Wayne Tracker or the Mr. Grey e-mail account that were not accessed through Ms. Helble --
A Could you ask me that again?
Q Sure. So you said you went into Ms. Helble's EMURALD and it says the



C. Feinstein
Gray account, never used.
A Correct.
Q Are you sure that means that no one's ever sent an e-mail with the Gray account, or does that just mean that no one's used it via Ms. Helble's account?
A No, it means that no one's ever used of the account.
Q How do you know that?
A Because I checked -- I asked the folks who were knowledgable about it.
Q Who is that?
A So I asked J.R. Brown and Cynthia Leong and Ramona Helble.
Q So these are the people who know about what the EMURALD system tracks in terms of logging nothing or logging off with e-mail addresses; is that correct?
A Yes. J.R. is very knowledgable about EMURALD. Ramona, about the accounts.
Q Is it both of these people or one or both of them who would know the

274

C. Feinstein
information about how Mr. Tillerson would have gained access to the Wayne Tracker e-mail account?
A So Ms. Helble would know that. And I don't know that J.R. would know how he gets the access. So probably Cynthia Leong would also know.
Q Ms. Helble, you said she works closely with the Management Committee members, correct?
A She is the ExxonMobil Bit Representative For Corporate Headquarters.
Q Do you know whether or not she has regular interactions with the assistants to the Management Committee?
A I don't know that.
Q Do you know whether or not the assistants to the Management Committee are able to log into the Management Committee members' network access and e-mail?
A I don't know about network access. I don't know what access they've

275

C. Feinstein
been delegated from their Management Committee members. In Exchange, it is possible to delegate access, but I don't know what they have.
Q So just theoretically, Mr. Tillerson's assistant, he could have delegated to her full access to his e-mail box; is that correct?
A He -- he technically could have.
Q But you don't know whether or not --
A I don't know how that worked.
Q And not just in Mr. Tillerson's case, you don't know how that works at Exxon period; is that correct?
A I -- I -- I don't know how it works in the Management Committee. I know that technically, it's possible, but I don't know who's done what.
MR. OLESKE: Just give us five minutes, I think I am just cleaning up here.
[A recess was taken from

276

C. Feinstein
5:03 p.m. to 5:07 p.m.]
BY MR. OLESKE:
Q Just a few follow-ups.
Do you recall being involved in a United Kingdom Audit Special Review in 2013?
A I recall being involved to some extent. I recall some details of it. I was not heavily involved, so I am trying to refresh my memory on it.
Q Do you recall that there was some issue involved there where there had been some custom coding used and that had caused a problem?
A About -- I don't know if I knew specifically what the issue was. I remember there was something I had to help track to completion and handle the reporting of it. I guess I am including a SAP.
Q What is that?
A SAP is a large ERP system that we use.
Q And what kind of custom coding

277

C. Feinstein
are you familiar with?
A I don't recall what that was. I would have to look at the details. I vaguely remember it. I remember working on it, but I don't remember the details.
(Feinstein Exhibit 17 was marked for identification, as of this date.)
Q Now, the exhibits that I have shown you are an e-mail dated -- the top string of which is dated August 29, 2013, and it's got a document attached to it.
Now, you are not a sender or a recipient of any of these e-mails, so I don't know whether you have seen this e-mail chain before.
Does it look familiar to you?
A No. I remember the issue, but I have never seen these e-mails.
Q I want to direct your attention to after the first full paragraph of the e-mail, it says: The current plan to progress this with EMIT is...
And then it says: UB to follow



Veritext Legal Solutions
212 267-6868 www.veritext.com 516 608-2400

278

C. Feinstein
up on certain items outlined below with Connie Devine.
A Right.
Q Now, that was you, correct?
A That was me.
Q Do you know who UB is?
A UB, it looks like this would be Ulysses Burgess, I believe. I would have to keep reading, but I think it's UB.
Q Who is Ulysses Burgess?
A He is an EMIT manager who, at that time, was responsible for the financials, SAP financials module. The EMIT support of the SAP financials module.
Q And then if I turn your attention to the attachment.
A (Complying.)
Q And if you just take a look at that first paragraph under "Dear Mr. Norwood," does that refresh your recollection of how this issue you were involved in, in 2013, got an audit, in the UK?

279

C. Feinstein
A I don't know if I saw this level of detail or not.
Q Okay.
A I will just keep reading it for a minute. I do remember this part, the last part. I don't think I saw this e-mail, but if not, I recall what the issue was about.
Q You do?
A Yeah, vaguely, I recall what the issue was about.
Q So which part of it has refreshed your recollection?
A The missing bespoke coding was restored to the mapping table by EMIT.
Q So are you talking about on the second page of this document underneath Compounding Factors?
A Yes, under Compounding Factors.
Q And this is the section where it says: In November 2012, the missing bespoke coding was restored to the mapping table by EMIT following a separate investigation into incorrect

280

C. Feinstein
coding for a climate change accounting.
That is what you are referring to?
A Yeah. I don't think I knew at the time what this issue was about. I don't think I knew that it was related to climate change. Let me finish reading, here.
Yeah, I recall there was a change in the tables that had to be made, but I don't think I knew what the details of the issue were about, just that we had to make some coding changes on the SAP table, and the timing of how soon that could be done.
Q So at the time, were you aware of the substance of this issue with climate change accounting?
A I don't think so. I don't think I knew what the -- as I recall, you are jogging my memory, here, really big time. I don't think I knew that it was related to climate change. I don't think I had that much detail on it.

281

C. Feinstein
Q Do you know whether or not documents relating to an investigation into climate change accounting were searched in this investigation, in response to this investigation?
A Well, I've seen the search terms and the term "climate" would -- would have been searched, so I would presume that would include -- you know, I don't know who all of the custodians are.
Q I guess that's my question, is --
A No, I don't know -- I don't know who -- I don't have any insight into how the custodians were selected, or who those custodians are, other than what I have read.
Q Right. Do you know who the people at Exxon who would have been involved in a climate change accounting investigation in 2012 would have been?
A I think this is -- I think it's people on the e-mail, but I'm checking to see.



Veritext Legal Solutions
212 267-6868 www.veritext.com 516 608-2400

282

C. Feinstein
Q Okay.
A Okay. So ask me your question one more time, please?
Q I will scratch that.
Did you ever have any dealings with Mr. Roger Adams?
A I have dealt with Mr. Adams in the past.
Q In what capacity?
A He was the UK Audit Manager.
Q What is SAP?
A SAP is a large enterprise computing application.
Q Where is it located? Like where is data for SAP stored?
A So data has historically been stored onsite in either Houston or Dallas.
Q Is it used globally by Exxon employees?
A It is one of our global systems. SAP -- yes, it's used globally.
Q So folks all over the world will -- do they log into the SAP system

283

C. Feinstein
to use it?
A Those folks who have certain responsibilities would do that.
Q And will they conduct communications by SAP through the SAP system?
A You really can't do communications through SAP.
Q Will they create documents that are stored in the SAP system?
A No. SAP is a -- is an online transactional processing system. So we use modules like for accounting or for maintenance activities or for sales and distribution, but it's not a -- it's not an e-mail-type system.
Q Right, no, but when I say "document," I am also including, for example, spreadsheets, tables.
Will those be stored in the SAP system?
A SAP is made up of tables.
Q It is, okay.
And are these used in the

284

C. Feinstein
accounting functions at ExxonMobil?
A Yes. Our accounting functions are primarily very heavily done through SAP.
Q Do you know whether or not SAP was searched at any point in response to the subpoena?
A I do not know that.
Q Do you know whether or not reserve accounting is performed for the SAP system?
A I don't know. I'm not on the business side. I don't know exactly what -- what they do.
MR. OLESKE: I will give you what we want to mark as Exhibit 18.
(Feinstein Exhibit 18 was marked for identification, as of this date.)
Q Let me show when you have had a chance to review this.
A (Reviewing exhibit.) Okay.
Q Do you recognize this document?
A I do.

285

C. Feinstein
Q Do you recall being on a teleconference with Pricewaterhousecoopers in May of 2013?
A I vaguely recall it.
Q There are two dates. If you look at the front page, it says May 9, 2013, and the next says it's May 9, 2014.
Do you know which is the correct date?
A I don't know. It's probably -- let me look at it -- probably 2014.
Q And what is the purpose of this document?
A This document is when we have our Pricewaterhouse auditors come in to do our S-A- -- is this for SAP? This is for Pricewaterhouse auditing. It looks like -- it looks like it's for our SOX audit, but I can't tell that for sure.
Q If we look at the first substantive slide where it says: Overview of IT Changes in ExxonMobil? It's the very first page there.
A (Complying.)

286

C. Feinstein
Q Does this accurately reflect the different subject matters relating to IT changes that were discussed on this call?
A As far as I recall.
Q And it says: Application support, one of the items. SAP and non-SAP, Connie Devine?
A Correct.
Q That was you, correct?
A Correct.
Q And so is it fair to say that you were responsible for updating PWC about IT changes that have to do with applications at ExxonMobil; is that correct?
A SOX critical applications.
Q By "SOX," you mean Sarbanes-Oxley?
A Sarbanes-Oxley.
Q Rita Cormier -- am I pronouncing it correctly?
A Yes.
Q She is listed here for both

287

C. Feinstein
Chemicals and Corporate.
What is her job at Exxon?
A She is a Risk Advisor in the IT Risk Management group.
Q Like you; is that correct?
A Yes. I am a Manager, and she is a Risk Advisor, but very much like what I do.
Q Is yours a management-level position; hers is not? Is that the distinction?
A That's correct. That's correct. This was written at a different time, but --
Q Before you had become --
A No. At this time I was the S&C. I believe I was responsible for -- I have to look back to see the dates, but I was either a supervisor or a manager, and I was responsible for the S&C support for the applications organization, which included SAP and non-SAP applications.
Q And your responsibilities have changed since this time?

288

C. Feinstein
A My responsibilities are broader now. They have changed since that time.
Q Do you supervise someone now who was in the role you were in then?
A No.
Q Was the role that you were in then subsumed into the role that you are in now?
A No.
Q Who does the role that you did then?
A Karen Vieira.
Q Who is John Hickman?
A John Hickman is a Controls Advisor.
Q Excuse me?
A Risk Advisor, similar to Rita Cormier. He is a Risk Advisor.
Q And Ken Bloomfield?
A I believe that he is a retired Risk Advisor.
Q This next name, maybe you can help me out with it. Wole Olugbenle?
A Don't know Wole Olugbenle.

289

C. Feinstein
Q And then skipping you, Mr. -- or Cliff Carter; who is that?
A He is an EMIT employee.
Q And he was responsible for SAP Unix Infrastructure?
A Right.
Q So that is different for what you were responsible for, because were you responsible for applications that ran on SAP; is that correct?
A I was responsible for the application for the controls and compliance activities on the SAP applications and Middleware, and his is infrastructure.
Q And then Eddie Mc Brien, what does he do?
A Eddie Mc Brien is also an IT employee in the Mainframe area.
Q It says "Mainframe Infrastructure."
When we were talking earlier about infrastructure issues, would Mr. Mc Brien be someone who knew about



Veritext Legal Solutions
212 267-6868 www.veritext.com 516 608-2400

290

C. Feinstein
the infrastructure issues we talked about earlier?
A Which infrastructure issues?
Q When you were talking about infrastructure, for example, for the servers?
A Well, he's Mainframe.
Q So he wouldn't be?
A He wouldn't be.
Q Did any of the changes -- this document is about changes to Exxon Mobil's IT systems, correct?
A Yes, this is IT changes.
Q Did any of these major changes have any impact on the way that Exxon would collect or produce documents in response to an investigation or litigation?
A No. Let me check it, but I don't think so. Let me just check. Oh, I'm sorry, I'm wrong. So there was the e-Discovery Business Processing and Engineering Activities.
Q Where is that? What page are

291

C. Feinstein
you on?
A Page four.
Q But this was not something -- were you involved in this, or was this just Ms. Cormier?
A No. I was not involved in this.
Q If we go to page seven, this is you, though, right? This is the stuff that you were involved with?
A Page six -- no, page seven is -- oh, wait.
Q Do you have two page sevens?
A Two page sevens. I am on the second page seven.
Q There you go. Where it says "Application Support" at the top?
A Right.
Q And it has your former name, correct?
A That's correct.
Q There are a series of bullet points under Application/Business Systems; do you see that?

292

C. Feinstein
A Yes, I do.
Q The last one says: Provide and Support For Identity and Access Management Implementations?
A That is correct.
Q What is that?
A That was a project that we implemented a new tool that was initially aimed at providing better management for SAP access.
Q So did this have any connection with the EMURALD or ADA systems that we were discussing earlier?
A No, I don't think it would have.
Q Would anyone else at the company have a better idea of whether or not that process had impacted EMURALD or the ADA systems?
A Possibly.
Q Who would that be?
A J.R. Brown.
Q And then I guess I have a similar question on the very last bullet

293

C. Feinstein
point on this page. Continue to Implement Role-Based Access Through IAM.
What is role-based access?
A So role-based access is access that is granted depending on the role that a person is in, as opposed to I'm going to give this person this access, this person this access. It's more efficient if you can define what role that person plays.
Q Everybody who is a Controller gets access, for example?
A Everybody who is a Financial Analyst gets this access. Everybody who is Maintenance Specialist gets this access.
Q And are you likewise not of whether or not that would have impacted EMURALD or ADA, or does that differ from your previous answer?
A That would not have impacted EMURALD or ADA.
Q You mentioned being involved in the Mayflower Pipeline litigation; is

C. Feinstein
that correct?
A I was deposed.
Q You were deposed in that case.
Were you deposed with respect to your role in compliance with discovery in that case?
A E-Discovery.
Q Okay. What role did you play in e-Discovery in that case, and when did that start?
A I don't remember the exact dates. I can't remember if it's 2015 or 2016, but essentially the same role that I play today. My team supported the e-Discovery collection process.
Q And you are not sure of whether or not your role in that began 2015 or 2016; is that right?
A I am not sure when I was deposed. I don't remember the exact date.
Q I am not asking about when you were deposed. I am asking about when you actually started working on



C. Feinstein
e-Discovery --
A Oh.
Q -- in response to that lawsuit?
A Well, I was in e-Discovery before that -- that came up.
Q Oh, I understand.
A Okay.
Q I guess what I'm -- you were in e-Discovery, the Mayflower litigation came in, and you did work on it, correct?
A Yes.
Q Do you remember when that started; when you started doing work on e-Discovery response for the Mayflower litigation?
A If you are asking when I personally became involved, or when my team started responding?
Q Whichever started first.
A I don't remember the dates off the top of my head. I would have to look it up. I just don't remember.
Q Did you become involved at the same as your team, before or after your



C. Feinstein
team?
A I would have to look it up. I think it was after my team did the collections, but I would have to check that.
Q Do you know whether or not the company followed the same policy with the Mayflower litigation that it did in this one; in other words, having the Management Committee documents segregated and separately collected and reviewed?
A I don't know on the Mayflower.
Q Do you recall whether or not your team processed Management Committee custodians as custodians through your team?
A I -- I -- I don't know. I don't -- I don't know who the custodians were. I don't usually see the list of custodians.
Q Was there an allegation that documents were lost in the Mayflower litigation?
A I don't know the answer to



C. Feinstein
that. I don't know the answer to that.
Q Were you asked at your deposition about any documents being lost?
A Let me think about that. I was asked about hard copy documents that were quite old. I was asked a lot of questions about whether we had a separate network. I don't remember any questions about whether documents were lost.
Q You were asked questions about whether or not Exxon had a separate network to hold documents?
A Right. It was a misunderstanding.
Q Were they similar to my questions about there being a third-party vendor or Cloud-based --
A Sort of similar to that, but different.
Q And you were deposed sometime in 2015 or 2016?
A I think it was -- I think it was 2015. I believe it was 2015. I

298

C. Feinstein
would have to look it up. I don't recall the date.
Q And do you recall, did you not know the answer to those questions then?
A I did know the answer to most of -- there were many questions that they asked me that I did know the answer to. There were some that I didn't.
Q And were those questions that you didn't know the answer to, did they include questions about whether the company had another network or a third-party server or a cloud-based system for storing documents?
A Ask me that question one more time, make sure I understand.
Q Sure. Were there any questions that you weren't able to answer that involved cloud-based storage or third-party vendor storage of Exxon data?
A I -- I'd have to look at the -- the transcript. I don't recall them asking me that specifically, but, you know, it's been a long time. I don't

299

C. Feinstein
remember exactly what they asked.
Q Were you the only representative of Exxon Mobil's IT department who was deposed in that case?
A I don't know the answer to that.
Q Did you ever discuss that case with Bob Lauck?
A No, not to my knowledge.
MR. OLESKE: Last one. Exhibit 19.
(Feinstein Exhibit 19 was marked for identification, as of this date.)
Q Ms. Feinstein, I have shown you as Exhibit 19 what appears to be an e-mail from Mr. Swiger dated April 22, 2011. You are not a sender or a recipient or copied on any of this.
My question goes specifically to an issue that we have had with this production, which is, if you go down to the bottom of this e-mail chain, which is actually an e-mail from Sherri Stuewer to

300

C. Feinstein
Mr. Swiger. Do you see that e-mail? It begins "Andy," and then continues, "yesterday I reviewed the attached handout"?
A Yes.
Q At the end of that paragraph, you see there is a bracket that says "Statement," and it says, quote, "NGLCA April 20, 2011, with mdolan.ppt, close quote, deleted by Andrew P Swiger/R/Dallas/Exxon Mobil"?
A Right.
Q What does that mean? In other words, is it possible to delete the attachment to an e-mail without deleting the e-mail, itself?
A Yes.
Q How does one do that?
A I think you do that when you -- I don't remember if it's reply or forward, but depending on which -- which methods you use to reply -- actually, I'm not sure when this message comes up. I would have to talk to the e-mail folks to

301

C. Feinstein
see when this message comes up. I'm not sure if it happens as a result of that, or how it is possible to forward an e-mail without an attachment. But I don't know if that causes this message to come up or not, so I couldn't speak to specifically how that transpired.
Q Do you know whether or not Exxon has the capability to recover attachments that have been deleted from e-mails after the fact?
A I don't know that.
Q So is it fair to say that you don't -- sitting here today, you don't really know how it works when someone deletes an attachment to an e-mail, how that gets recorded in the system, or what happens to that attachment afterward?
A That's correct, I'm not sure.
MR. OLESKE: I think we are done.
(Time noted: 5:35 p.m.)



Veritext Legal Solutions
212 267-6868 www.veritext.com 516 608-2400

LITIGATION SUPPORT INDEX


| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| C. Feinstein | Ms. DeRoche | 3 |
| | Mr. Oleske | 232 |




E X H I B I T S


| FEINSTEIN EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | PNYAG 0182556 | 15 |
| Exhibit 2 | Subpoena, 3/24/17, 3 pages | 20 |
| Exhibit 3 | EMC 77-119 | 23 |
| Exhibit 4 | e-mail, 4/4/17, to J. Oleske from D. Toal and GREF page | 30 |
| Exhibit 5 | EMC 2747763-2747773 | 42 |
| Exhibit 6 | EMC 2747736-2747773 | 45 |
| Exhibit 7 | EMC 2747774-2747816 | 48 |
| Exhibit 8 | EMC 2747908-2747924 | 54 |
| Exhibit 9 | Subpoena for Production of Documents | 62 |
| Exhibit 10 | letter, 12/31/16 to OAG and material for production with Bates ranges | 72 |
| Exhibit 11 | letter, 4/24/17 to J. Oleske from D. Toal, Exhibit A-1, Exhibit A-2 | 86 |
| Exhibit 12 | EMC 1852537-1852542 | 109 |
| Exhibit 13 | letter, 3/21/17 to J. Oleske from N. Ahmed, Exhibit A | 121 |
| Exhibit 14 | affidavit, 3/31/17 | 160 |
| Exhibit 15 | amended affidavit, 4/21/17 | 160 |
| Exhibit 16 | 4/19/17 letter to J. Oleske from Paul Weiss, Exhibit A | 160 |
| Exhibit 17 | EMC 1205291-1205302 | 277 |




E X H I B I T S (CONTINUED):


| FEINSTEIN EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 18 | PNYAG 0182555 | 284 |
| Exhibit 19 | EMC 2742078 | 299 |


(Reporter retained exhibits.)



CERTIFICATION

I, JAMIE ANN STANTON, a Notary Public, do here hereby certify that the foregoing witness, CONNIE FEINSTEIN, was duly sworn on the date indicated, and that the foregoing is a true and accurate transcription of my stenographic notes.

I further certify that I am not employed by nor related to any parties to this action.

__________________________

JAMIE ANN STANTON

*   *   *

**A**
**A-1** 303:17
**A-2** 303:17
**A-3** 117:2,7
**A-8** 120:16
**A-9** 121:7
**A-Y** 205:23
**a.m** 1:8 47:25,25 89:17
**A@ExxonMobil.c...** 224:17
**ability** 6:12,19 43:14 51:17 87:19 159:2
**able** 22:19,22,25 23:4 59:10 140:24 150:17 158:14 159:3 199:11,14 230:11,13 241:24 242:6 260:8 263:5 263:14 270:3,6 274:21 298:19
**absolutely** 59:4 102:9 108:14 128:4,15,17 233:23 268:14
**abundance** 176:6
**access** 45:8 107:19 108:20 124:3,6 125:2,3,4,7,13,16 126:9 127:9,13,20 127:25 128:6 135:21 137:12 141:22 156:7,7,14 156:15,18,18 157:2,4 162:15,16 162:19 163:4 170:17,21,22,23 170:24 171:2,5,6 173:15,21 179:8,9 179:13,14 184:24 185:3,9,10 192:17 193:24 194:2,4,25 212:12 217:7,11 218:6 232:6 237:13 241:17,18 241:23 243:19,22 244:8 245:23 271:13,19,22 272:4,6 274:3,7,22 274:25,25 275:4,8 292:4,11 293:3,4,5 293:5,8,9,13,15,17
**accessed** 272:21
**accommodate** 6:5
**account** 44:15 71:16 78:19 81:10,13,25 82:21 91:18,20,20 91:25 92:5,13 93:8 93:9,15,16 94:24 97:19 98:16 132:9 132:17 146:22 155:21 158:16 159:22 175:23,25 192:6,19 196:8 197:5 198:7,10,17 198:19,24 199:2,5 200:15,22 203:10 203:18 204:18,22 205:3,6 206:12,20 206:22 207:8,10 207:11,12 208:23 209:3,5,6 210:16 210:24 211:14 219:16,18,23,25 220:3,8,10 223:21 227:17 228:14 229:15 231:23 233:17 234:5,9,16 234:20,22 235:4 235:13 236:23 237:3 238:2,8,13 238:19 239:13 241:4,15 244:16 246:13,18 249:14 263:9,11,13 264:11,18,20 266:4,25 267:2,9 267:17 268:7,8,20 268:21 269:16,18 270:2,9 272:21 273:2,6,7,9 274:4
**account's** 262:22
**accounting** 12:24 280:2,19 281:4,21 283:14 284:2,3,11
**accounts** 44:24 58:11 82:13 91:10 91:12 93:6 154:16 155:18,22 175:19 200:13 203:12 209:10 210:10 212:10 224:6,9 225:10,12 234:9 235:12 239:8,16 263:16 265:8 266:17 267:18,20 267:22 268:3,3,11 268:12 272:18 273:23
**accurate** 24:23 305:9
**accurately** 25:11 286:2
**achieve** 241:6
**acronym** 9:12
**action** 8:10,12 225:23 305:13
**activated** 263:4
**active** 43:7,14,24 44:2,4,9,11,24 45:18 46:4 47:11 192:14 193:5 196:12 198:3,6,9 198:13,25 199:15 200:21,22 234:21 235:2,6 237:18,22 237:23,25 239:21 263:15
**activities** 225:24 283:15 289:14 290:24
**activity** 226:2 262:24 268:25 272:18,19
**actual** 8:21 74:18 203:4 259:6 266:11
**AD** 200:15
**ADA** 196:8 198:24 199:5 201:6 206:12 207:8,10 207:11 235:14 236:23 237:15,22 239:11,19,21 292:13,20 293:20 293:23
**Adams** 282:7,8
**add** 199:17
**addition** 52:3 123:12 185:8
**additional** 56:12,15 95:17,23 117:19 141:7 159:4 176:7 176:11 177:8,23 179:10 180:23 181:16 190:12 217:18 218:12 254:13
**address** 6:23,25 92:9 196:7 197:19 197:21 198:11,18 198:20 199:4 201:23,25 202:16 203:7,9 205:15 206:11 207:5,9,25 208:21 220:5,12 224:16,25 237:8 240:3 244:20,25 245:5 262:11 264:8,9,13 265:4 268:16 269:14

271:24
**addresses** 45:2 92:8 92:10 196:23 197:2,7 198:2 199:12 200:2,5,23 201:5 207:17,21 207:22 210:4 225:3 239:6 265:2 273:19
**addressing** 245:16 245:18
**adequate** 64:24 66:15
**admin** 116:15 118:13,14,15,21 118:22
**administered** 125:11,12
**administers** 125:16
**administrator** 8:18 8:23
**admins** 76:11 77:3,6 77:9,12,14,24 100:18,25 101:10 101:16,23 106:25 107:5,10 114:24 115:14 118:25 127:9,24 128:5 133:17 153:3,13 156:25 170:14 183:22 209:22
**admins'** 100:21 102:13
**advisor** 13:13,14,15 14:4 15:2 195:2 202:5 287:4,8 288:16,18,19,22
**advisors** 11:5 35:13
**affect** 4:12 6:12,13 6:18,20
**affidavit** 9:5 17:18 18:5,8,10,12,24 19:2,12 20:18,21 97:24 160:8,20 161:2,11,13 162:2 162:12 167:6,8 174:6 186:10 192:2 206:25 212:16 234:18 240:8,9 303:21,22
**affiliate** 9:17 208:9
**affiliated** 200:13 203:17 206:11,13
**affiliates** 201:20
**affiliation** 206:17 208:4
**afterward** 301:19
**age** 46:17 47:3,5
**ages** 47:8
**aggregating** 224:23 225:2
**ago** 190:5
**agreed** 190:11
**Ahmed** 2:20 20:9 122:2 303:20
**aimed** 134:4 292:10
**Albers** 112:24 113:5 114:2 117:16 118:3 123:7,23 124:11 128:2 129:5,24 131:6 133:4 135:4 137:25 138:9 139:22
**Albers'** 130:24
**alcohol** 6:11
**Allan** 6:25
**allegation** 296:22
**amended** 161:10 303:22
**Americas** 2:17
**amount** 14:9
**analysis** 44:17 132:15 133:2 159:9
**Analyst** 164:19
293:15
**and/or** 26:23 27:23 27:25 143:16
**Andrew** 120:17 300:11
**Andy** 300:3
**Ann** 1:13 305:4,17
**anonymity** 241:10 241:13
**answer** 4:23 5:7,13 5:23 6:6,12,19 17:10,12 27:12,15 29:20,24 41:22 45:3 59:10 65:8 85:6 120:8 131:4 135:19 137:21 142:5 184:17 190:6 229:23 263:22 293:21 296:25 297:2 298:5,6,8,11,19 299:6
**answered** 60:5 188:23 189:5
**answering** 5:17 60:8 74:8,9 146:9 168:19 203:14
**answers** 4:20 40:19 138:8
**anybody** 132:18 226:18
**apologize** 218:15
**Apparently** 137:17
**appears** 299:17
**Apple** 157:9
**applicable** 49:3 60:7
**applicants** 12:19
**application** 28:7 187:9 282:14 286:7 289:13 291:18
**Application/Busi...** 291:24
**applications** 10:9,24 14:17,21 162:22 286:16,18 287:22 287:23 289:10,15
**applied** 75:9,15,18 76:22 116:16 124:9 152:25 153:9
**applies** 189:22 190:25
**apply** 35:10,11 56:24 68:22 185:18
**appropriate** 10:22 36:24 42:8
**appropriately** 11:4 37:15 38:5 238:21
**approximately** 252:9
**approximation** 115:10 154:19
**April** 1:7 40:3 63:6 71:11 73:15,17 78:7 105:21 119:25 132:24 160:11,13 210:7 299:18 300:10
**Archana** 139:7 146:5 185:14
**architecture** 61:17 237:18,19,20
**archive** 130:7,11,12 137:16
**archived** 127:7
**Archives** 126:21,23 127:10,15 128:9 135:2 136:4,5,11 137:24
**area** 11:6 13:24 14:16 70:16 164:15 193:12,13 193:15 289:20
**areas** 90:8

**ascertained** 80:10
**asked** 18:5,9,18 48:2 49:5 100:25 101:4 109:14 143:25 144:3,4,8,15,20 174:18 195:3 206:4 209:3,5 232:3 252:21 253:3 260:6 273:11,14 297:3,7 297:8,12 298:8 299:2
**asking** 4:18 5:6 17:19 41:16 43:13 47:10 49:8 65:14 83:24 84:2,4 85:3 85:5 129:20 188:22 189:3 190:4,6 215:6 294:23,24 295:17 298:24
**assess** 82:9
**assessments** 11:3
**assets** 162:20 163:4 214:12 243:14
**assign** 235:3
**assigned** 12:18 129:3 192:6 233:8
**assignment** 12:22 12:25 14:10,14
**assist** 54:13,16
**assistant** 12:16 210:21 211:12 275:7
**assistants** 156:11 171:9 185:24 210:9,12,13,15 211:10 226:9,17 226:21 232:5 274:17,20
**assisted** 181:5,7
**associated** 198:6 209:10 239:9,17 268:10
**associates** 199:25 200:3
**association** 208:4
**assume** 5:24 203:23 204:23
**Atlas** 111:12,17 163:6,9,11 164:22 164:23 166:20,21 214:24 215:15 218:6,9,9,18,23
**attached** 239:13 242:8 277:13 300:4
**attachment** 102:6 278:18 300:16 301:5,17,19
**attachments** 250:15 250:18,22 251:2 301:11
**attempt** 82:20 158:22 251:9
**attention** 277:21 278:18
**attorney** 1:12 2:5,16 3:9,10
**attorney/client** 4:5 5:14 19:19 76:24
**attorneys** 5:16 8:22 17:25
**audit** 11:7,7 276:6 278:24 282:11 285:20
**auditing** 88:16,18 285:18
**auditor** 15:17
**auditors** 285:16
**audits** 11:2
**August** 277:12
**authenticate** 163:3
**automated** 28:14 37:14,20,22 38:2 38:17,19 43:9,15 79:7 89:11 90:9 94:24 130:6,8 131:9,10 159:23 213:17,17 214:9 219:7 220:24 236:15 237:2
**automatic** 36:25 37:18 61:20 227:9 236:14
**automatically** 221:2 229:6 235:11 236:21 270:24,25 272:3
**available** 98:13 129:10 144:11 150:7 173:7,8,12 184:11 187:10,12 187:23 226:23 227:4,6 229:14
**Avenue** 2:17
**aware** 52:6 63:11,13 63:15 64:23 84:21 100:13 131:25 132:6 133:22 134:2 148:10 164:10,15 206:6 210:9,12,14,15 224:4 280:17

**B**

**B** 303:2 304:2
**back** 12:9,25 13:11 13:12 14:2,2 19:11 34:6 51:3,11 54:7 61:2,6 64:22 65:15 68:24 74:4 75:2 81:4,16 84:15 89:9 90:20 91:7 97:22 104:9,10 105:15 105:16 108:13 114:20 116:7 120:15 128:14 129:13 131:13,18 139:17 143:5 150:18 151:14 152:21 159:3,3 163:24 165:12,21 172:22 176:3 178:19 184:13 186:3 190:8 197:25 199:10 200:18 202:21 206:22,23 213:7 218:15 227:23 228:16 229:3,4 230:11 248:5,7 252:5 253:6 254:21 256:13 261:11 271:17 287:19
**backed** 53:18,19 59:20,21,22 61:25 62:8,12 99:10,12 99:14,24 100:4 147:17,18 157:8 157:15,20 255:18 258:8,9 260:23
**backing** 255:4
**backs** 259:2
**backup** 28:23,25 29:5 45:17 46:13 47:2 48:21 49:12 49:20,25 53:23 54:10 59:14,18,22 59:23 60:3,9 82:5 82:9 83:6,8,8,20 83:22 89:7,9 95:9 96:17,24 100:8,9 100:12 143:10 144:5 146:23 147:21,24 149:6 151:15 157:17 193:8 230:2,12,23 231:12,15 247:23 254:2,25 255:10 255:11,12,22,24 257:13 258:5

261:4 262:5
**backups** 28:12 46:19,21 47:4,6,10 50:14,15 54:14,17 60:2,15 79:10 89:8 90:23 94:21 95:11 98:14,15,18 99:21 143:6,8,14 144:24 145:8,9,12,19 146:7,11,16 149:8 149:12 150:4,7 157:10,24 230:22 231:7 234:2 247:22 248:5 258:2
**Barr** 164:7
**based** 60:19 107:15 107:17 112:16 115:17 156:3 214:18
**basic** 29:11 31:14
**basically** 56:11 144:12 244:15 251:3 261:12
**basis** 19:7 26:11 28:25 109:10 153:19,20 240:7,9
**Bates** 72:18 122:23 303:15
**Bay** 12:18
**bear** 39:18 147:9
**began** 12:9 71:18 113:15 294:18
**beginning** 127:3 218:7,9 248:8
**begins** 300:3
**behalf** 8:5 52:16,21
**belief** 109:11
**believe** 8:3 13:11 15:11 22:11 30:3,8 32:2,15 33:14 34:7 38:24 42:23 53:13 58:23 59:2,9 66:12 70:2 73:11,24 76:24 87:23 95:5 100:20,23 101:19 102:5 109:5 113:9 114:8 122:19 123:16 128:3,4 147:3,9 155:11 156:22 157:19 168:6,9 172:15 178:4 182:17 185:25 186:3,4 200:3 208:10 212:11,13 231:10 233:21 252:15,17 252:21 253:2 254:2 258:4,16 268:12 269:15 271:8,8,9 278:9 287:18 288:21 297:25
**belong** 237:9
**bespoke** 279:15,23
**best** 12:11 87:19 116:11 118:11 131:3 203:22
**better** 292:10,18
**bifurcated** 215:25 216:10
**big** 81:15 280:22
**bin** 133:11
**bit** 81:19 123:9 201:9 202:21 206:18 208:12 242:23 274:12
**BlackBerry** 92:9
**blank** 180:20
**Bloomfield** 288:20
**Bob** 70:20 73:18 75:3 83:12 88:13 95:16,20 101:14 105:14 115:8 116:12 118:12,12 119:22 124:24 126:18 127:18 135:15,20 136:12 136:13,15 140:7 145:10 147:25 148:23 152:25 153:22,22,25 154:23 156:22 171:20 172:2 174:18 176:21 178:9,22 180:16 181:21 182:3,21 183:5,6 184:25 211:7,25 299:9
**BOBET** 2:21
**bogging** 221:9
**Bolia** 20:8,13,15 73:20 76:3,19 169:11,12 183:5,6
**boolean** 191:3
**boss** 22:6 90:11
**bosses** 107:11
**bottom** 16:17 31:19 45:20 46:11 50:17 50:19 53:21 54:2 55:25 299:24
**box** 16:16 183:19 224:19 240:21 249:18,19 250:13 251:14,18 271:15 272:5 275:9
**boxes** 155:6,7 271:4
**bracket** 300:8
**brain** 189:6
**break** 6:4,7 47:22 89:15,21 103:5 142:23 152:8 188:16 232:10
**brief** 12:23
**Brien** 289:17,19,25
**bring** 271:3
**bringing** 12:21
**broad** 65:13 81:13 170:25 180:23 241:19
**broaden** 251:8,10
**broader** 175:17,18 180:17 258:17 288:2
**Broadway** 1:12 2:7
**broke** 97:11
**brought** 99:4
**Brown** 193:10,11 194:24 202:8 273:14 292:23
**BRRS** 32:19,22 33:3 33:14,16
**building** 13:2
**bullet** 291:23 292:25
**Burgess** 278:9,11
**business** 3:14 14:21 25:4 26:16,20 27:3 27:9,10,22 33:5 39:15 87:9 210:4 212:5 284:14 290:23

**C**

**C** 2:2 3:1,2 4:1 5:1 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1

64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1 147:1 148:1 149:1 150:1 151:1 152:1 153:1 154:1 155:1 156:1 157:1 158:1 159:1 160:1 161:1 162:1 163:1 164:1 165:1 166:1 167:1 168:1 169:1 170:1,18 171:1 172:1 173:1 174:1 175:1 176:1 177:1 178:1 179:1 180:1 181:1 182:1 183:1 184:1 185:1 186:1 187:1 188:1 189:1 190:1 191:1 192:1 193:1 194:1 195:1 196:1 197:1 198:1 199:1 200:1 201:1 202:1 203:1 204:1 205:1 206:1 207:1 208:1 209:1 210:1 211:1 212:1 213:1 214:1 215:1 216:1 217:1 218:1 219:1 220:1 221:1 222:1 223:1 224:1 225:1 226:1 227:1 228:1 229:1 230:1 231:1 232:1 233:1 234:1 235:1 236:1 237:1 238:1 239:1 240:1 241:1 242:1 243:1 244:1 245:1 246:1 247:1 248:1 249:1 250:1 251:1 252:1 253:1 254:1 255:1 256:1 257:1 258:1 259:1 260:1 261:1 262:1 263:1 264:1 265:1 266:1 267:1 268:1 269:1 270:1 271:1 272:1 273:1 274:1 275:1 276:1 277:1 278:1 279:1 280:1 281:1 282:1 283:1 284:1 285:1 286:1 287:1 288:1 289:1 290:1 291:1 292:1 293:1 294:1 295:1 296:1 297:1 298:1 299:1 300:1 301:1 302:4

**C:/Drive** 68:20 96:7 99:11,19 117:10 117:20,22,23 118:6 123:13,14 124:11,13 128:8 137:3,8 138:5,15 138:19 170:11,13 183:19 184:3
**C:/Drives** 75:18 80:21 127:25 170:21
**calendar** 157:11
**calendars** 224:11
**call** 36:10,13,14 78:23 286:5
**called** 57:10 59:13 66:3 85:11 200:6 205:9 237:5
**calls** 150:12,20 261:18
**capability** 28:9 51:19 56:16 191:2 259:7 301:10
**capacity** 8:16 282:10
**captured** 250:22 251:2
**card** 32:22,24 33:7,8
**cards** 33:4
**carried** 11:14
**Carter** 289:3
**carving** 91:2 99:6 151:12
**case** 28:10 48:24 60:23 61:3,11 131:13 133:18 137:10 172:15,23 197:20 248:24 254:18 275:16 294:4,7,10 299:5,8
**cases** 133:10
**Catastrophe** 258:18
**categorizing** 220:22
**cause** 44:17 90:5,19 91:10 132:14 133:2
**caused** 276:15
**causes** 301:6
**caution** 176:6
**center** 25:22 185:7
**centers** 51:2,5,11,16 51:18 258:21
**CEO** 204:17
**certain** 21:13 58:8 59:5 99:13 101:18 102:9 108:14 115:25 122:13 124:16 128:4,15 128:17 153:16 173:16 180:17 197:16 225:23 233:23 258:3,5,15 268:15 278:2 283:3
**certainly** 52:19 55:19 132:6 245:8 245:12
**CERTIFICATION** 305:2
**certify** 305:5,11
**chain** 277:17 299:24
**chance** 284:22
**change** 7:6,15 24:14 187:3,8 188:8 196:22,23 214:18 222:24 280:2,8,11 280:19,24 281:4 281:21
**changed** 14:24 93:2 110:10,11 188:5 222:21 230:22 287:25 288:3
**changes** 214:15,18 280:14 285:23 286:4,15 290:11 290:12,14,15
**changing** 198:18
**charge** 256:6
**chart** 10:16 16:7,9 16:23 17:7
**check** 102:4,4 114:10 115:22

123:24 125:2 131:25 132:3 136:6,16 147:2,5,6 147:8,13 155:13 157:21 158:10 172:18 184:24 185:12,14 191:10 200:4 222:25 226:11,18 246:24 246:25 260:7 262:18 265:21 290:20,21 296:5
**checked** 128:21 132:5,6,7 157:23 157:24,25 158:3 179:24 226:14,20 262:17 273:11
**checking** 132:23,25 281:24
**checklist** 32:18
**checklists** 32:12,13
**checks** 132:9,11,12
**Chemicals** 287:2
**chief** 194:15
**child** 13:8
**choose** 119:12,13
**clarification** 188:21
**clarified** 19:11
**clarify** 13:19 85:7 152:12 202:21 268:6
**classified** 56:5
**clause** 57:24 172:9 173:5
**cleaning** 275:24
**clear** 5:9 47:9 49:5,8 67:9 85:4 114:6 152:18 153:8 185:5 188:9 232:20 237:11 244:23 266:21
**click** 32:3
**Cliff** 289:3
**climate** 280:2,8,19 280:24 281:4,8,21
**close** 21:23,24 144:19 300:10
**closely** 274:10
**cloud** 52:4,6 80:7,8 157:9,9,16,18,20 260:24
**cloud-based** 80:2 262:4 297:19 298:14,20
**codes** 61:15
**coding** 276:14,25 279:15,23 280:2 280:14
**CoE** 25:3,19,20 26:7
**collaborate** 26:6,10
**collaboration** 25:3 38:25 39:2,6,21 45:7 194:22 244:6 244:7 246:8,9
**collect** 42:3 46:6 48:23 49:13 65:21 66:18,18 67:6,13 68:19,21,23 69:3 80:17 106:3 111:13,21,24 112:13 116:15 154:12 187:6 189:19 204:8 249:2 290:17
**collected** 58:21,22 68:8 69:7 74:19,22 76:4 80:14,20,23 83:14,16 101:16 105:9 109:2 112:7 112:9 113:12,16 113:19 115:23 116:3 117:14,17 123:18,22 124:2,3 124:11,13,15 127:14 128:23 135:18,22,25 136:8,25 137:13 139:10 153:13 154:13,15 170:14 170:16 171:13,17 171:24,25 174:23 177:12 183:22 184:22 190:21 191:20,23 296:12
**collecting** 26:22 27:25 58:20 70:2 106:25 108:8 127:11
**collection** 34:2 65:17 67:15 69:18 70:12,22,25 71:23 80:25 81:3 104:16 105:4,20 106:23 110:2 111:5,9 112:15 122:9 124:25 125:8 136:2 151:4 188:24 189:6,9,10 189:13 190:4 209:25 215:24 216:6,9,16 248:19 294:16
**collections** 66:14 69:14 75:25 112:14 116:22 125:5,6 127:17 150:8 170:20 185:8 296:5
**collects** 141:14
**come** 63:14 66:10 66:24 176:3 197:25 207:16 221:4 246:15 285:16 301:7
**Comer** 110:4
**comes** 218:18 243:23 300:24 301:2
**coming** 66:14 76:2 100:3 104:9 149:21 240:18
**comments** 11:8
**committee** 27:5,7 29:19 42:18 57:11 57:15,19,22,25 58:5,12 69:12,13 69:19 70:6,9,12 71:8,20 73:10 77:13 78:8,11,16 79:13 80:12,15,20 81:24 82:2,12,18 83:2,25 84:18 87:12 88:7 89:3 98:25 100:15,19 102:20,23,24 105:5,12,14,22 106:2,4,11 107:5 107:10,16 108:16 108:23,25 110:24 111:2 113:13,16 114:16 118:14 119:5,16 120:23 121:5 122:4 126:14 132:19,21 133:21 136:21 139:22 140:12,21 140:22 145:18 147:15 148:5,20 149:11 152:20 156:12,20 165:7 165:15 166:12 170:9,17 171:8,23 174:15 176:8 178:14,19,22,23 179:7,12,19,20,22 179:23 180:2,5,13 180:15 184:13,15 185:24 186:6 189:4,16,24 190:18,20 191:7 191:14 203:24 204:14,24 209:13

209:20 210:3 226:9,12 231:16 232:2,5,7,25 233:5 233:18,22 240:10 249:5 257:6 260:23 261:3,7 274:10,17,20,22 275:3,19 296:11 296:15
**communication** 226:6
**communications** 52:12,18 55:7,12 55:16,18,20 177:12 192:20 209:17 283:6,9
**company** 13:7,8 162:23 292:18 296:8 298:13
**company's** 258:11 259:25
**compared** 134:24 141:18
**complete** 40:22 187:10
**completed** 41:15,23
**completely** 258:21
**completion** 276:19
**complex** 115:11 169:18 191:2 243:12
**compliance** 10:24 10:25 24:15 35:15 41:5 243:7 289:14 294:6
**complicated** 131:3 154:19
**complies** 24:9
**comply** 24:6,8 34:5 35:17
**complying** 22:15 24:18 26:13,15 29:10 30:9 37:3,5 40:11 46:10,14 57:5 59:12 72:22 73:6 112:22 212:17 257:11 278:19 285:25
**Compounding** 279:19,20
**computing** 282:14
**conceptually** 47:15
**concern** 240:16 241:22
**concerns** 242:3
**condition** 6:18
**conduct** 11:3 86:7,8 95:17 101:2 143:19 210:4 283:5
**conducted** 71:21 73:9,19 77:4,6 81:23 84:17 113:24 114:3 115:8 118:18,23 123:13,21 137:12 138:18,22 143:7 143:13 145:8 159:8 168:25 174:7 176:18,20 177:25 181:19 183:9 190:15 191:8 223:16,18
**conducting** 83:12 143:21 209:24 210:6 253:8
**conference** 224:10 225:13
**confirm** 100:22 140:24 186:2
**confirmed** 166:13
**confused** 188:25
**confusing** 152:16,17
**confusion** 265:15 266:6 267:25 270:14
**Congratulations** 7:9
**connect** 56:15
**connected** 196:8 235:13 237:25 238:8,13 263:19 263:21 264:3,3,14 265:4,6
**connecting** 100:6,7
**connection** 201:4,5 292:12
**connects** 239:5
**Connie** 1:10 6:24 7:5,13 48:5 278:3 286:9 305:6
**considerations** 204:21
**considered** 27:8 150:5 195:18,24 198:12
**Constitutes** 46:12
**constitutional** 4:6
**constraint** 235:6
**consult** 39:22 50:14
**consultations** 261:17
**consulted** 26:22 27:24 49:13 50:12 168:7 208:11,14 208:16,19
**consulting** 9:6 10:19 15:5
**contact** 39:14 42:8 42:14,17 70:17,18 91:24
**contains** 72:25 123:3
**content** 62:9 97:14 157:8 213:5
**contents** 46:16,19 46:21 124:10,12 128:9 129:18 148:5 153:14 155:10,12 165:5 166:23 173:6 175:7 193:20 212:22 221:23 224:19 230:6 250:14,15,18
**context** 58:4,23 63:9
**Continue** 293:2
**CONTINUED** 304:2
**continues** 300:3
**continuity** 26:17,20 27:3
**contract** 13:10,21 53:5
**contributing** 91:3
**control** 134:6,10 143:23 169:4 243:8,10,11
**controlled** 51:14
**Controller** 293:12
**controllers** 12:22
**controls** 10:22 13:13 13:14,15 14:4,20 39:20 55:5 79:21 164:15 194:3 244:21 245:6 255:9 288:15 289:13
**Convault** 231:7 255:7
**conversation** 149:19 218:22
**conversations** 76:16 76:18 150:19 183:4 211:23
**convicted** 9:2
**coordinate** 38:6,7 39:9 135:25 215:21
**coordinating** 97:14 215:23
**coordination** 35:18 37:12,24 91:4,8

143:20
**copied** 299:20
**copies** 146:21
**copy** 67:23 76:14 115:4 133:20 153:5 250:2 297:7
**Cormier** 286:22 288:19 291:6
**corporate** 53:20 147:19,22 162:20 212:4 274:13 287:2
**corporation** 1:5 2:16 8:6 9:8,18 140:18
**corporation's** 194:3
**correct** 9:9,10 16:15 16:19,20,21 21:12 32:5 49:16 55:8 100:17 107:24 108:4 122:7 125:10 137:14 138:2,17 145:5 167:23 191:24 192:8 218:14,16 233:9,10,14 234:23,24 235:4 235:15,19,24 236:11 237:9,16 238:3,6,9,15,23 239:3,6,14,20,23 240:4,5,13,22 241:2,3 243:8,9,17 246:23 247:14 248:14,18 249:2,3 249:9,15,16,20,21 249:23,24 250:4 251:6,7,14,16 252:3,8,9 253:20 254:5,10 255:5,9 259:19,19 262:15 264:24 265:22 266:9,13,23 267:9 269:9 271:16,20 271:21,24 273:3 273:20 274:11 275:9,17 278:5 285:10 286:10,11 286:12,17 287:6 287:13,14 289:11 290:13 291:21,22 292:6 294:2 295:11 301:20
**correctly** 105:19 107:21 151:9 168:20 215:4,15 219:11 246:13 286:23
**correspondence** 75:2 209:15
**cost** 174:10,14 175:17
**counsel** 3:20,22,24 4:3 19:21,24 20:2 65:10 77:2 168:7 173:13 174:4 187:25 188:14
**couple** 14:8,22 89:20 190:2 202:11
**course** 41:11 71:22 253:9
**court** 4:12,19,25 5:4 15:23
**courtesy** 3:21
**cover** 104:22 112:20 113:4
**covered** 217:5 232:18
**covers** 232:4
**crafted** 176:6,10 181:2,18
**crafting** 180:23
**create** 197:18 283:10
**created** 111:4 195:13,13,17 197:21 200:19,20 207:22
**creates** 214:20,21
**creating** 204:21
**creation** 200:17
**crime** 9:3
**critical** 259:6,9 286:18
**Cunningham** 164:13
**current** 12:8 15:8,9 15:10 277:23
**custodian** 25:5 42:18 73:3 78:15 112:16 122:23 123:5 170:9 171:23 177:5 216:6,15
**custodian's** 154:25 249:14
**custodians** 37:23 42:19 64:5,14,18 65:17,20 67:5,12 67:25 68:8,18 69:4 69:7 70:2,7,8,13 70:23 72:3 73:10 78:9,11,16 79:13 80:13 81:20 82:2 82:13,18 84:19 88:8 89:3 99:2 100:16 101:3 102:6,7,23 105:6 106:2,5 108:8,9,10 108:16,20,25 109:3 110:24 111:2,7 112:6 113:13,17 121:10 121:13 126:5,8 134:13,16 145:18 156:6,12,21,25 163:16 165:25 166:12 171:8 174:12,15 175:15 176:9 177:15 178:12,14,16,17 178:18 179:2,7,21 180:3,5,19 184:14 186:5 190:10,13 191:6,7,13,15,20 203:24 204:9 209:13 210:3 216:2,3,11,12 224:18 233:8 248:16,25 249:6 281:11,16,17 296:16,16,19,21
**custodians'** 69:19 71:8 149:12 170:18
**custom** 276:14,25
**Customer** 96:21 194:21
**Cynthia** 39:13 59:9 60:21 61:23 62:6 62:16,16 84:10 87:19 94:12 136:13,15 143:15 152:4 159:11,18 222:14 223:7,17 226:15 231:21 273:15 274:7

**D**

**D** 303:8,17
**D.E** 220:4
**D.W** 16:18
**daily** 47:17 59:21,22 60:6 261:17
**Dallas** 50:25 51:10 52:4,23 70:18 255:16,17 258:11 258:21 259:25 282:19
**Dan** 20:8 73:19 76:18 169:10 183:5,6

**DANIEL** 2:19
**Darren** 121:14 264:7
**data** 28:24 51:2,10 51:16 52:20,20 53:4,7,9,17,19 61:10 64:5,10,18 64:19 65:17 67:12 68:8 69:19 71:9 73:2 75:13 76:7,21 79:2,13,14,19 80:13,14,18,19 82:15 83:8,10 84:14 91:2 98:13 99:6,16 108:8,18 108:20 109:25 110:2 113:5 114:4 114:25 117:8 119:3 123:4,8,10 123:17 124:3,6,8 124:14 125:2,3,4,7 125:13,16,18 126:21 127:20 128:10,22 129:9 129:17 130:17,19 130:20,23 131:5 131:11 134:7,23 135:21 137:7,12 137:13,18 138:4 138:14 141:13,17 141:22 144:12,23 146:15 150:7,18 151:12 159:4 172:13,14 174:22 179:8,9,13,14 183:16,17,18 184:5,7,21,22,25 185:3,9,10,22 186:6 189:11,14 189:17,19 190:13 190:21 191:19,21 191:22 217:7,11 222:4 247:18 254:2 259:10 260:8 282:16,17 298:21
**database** 173:21
**databases** 127:8
**date** 8:4 16:2 21:3 21:13,21 23:15,21 30:6 43:2 45:13 48:10 54:23 62:22 72:2,10 86:6,25 106:6,8 109:19 121:21 122:10 128:11,18 139:12 160:16 165:12 172:4 174:13 179:4 183:12,14 227:23 228:20 262:21,25 263:2,6 263:18,19 265:11 265:12,24 266:4 266:11 267:19,21 267:24,24 268:24 269:4,5,10,13,16 270:8 277:9 284:20 285:10 294:22 298:3 299:15 305:7
**dated** 16:8 21:11 40:3 122:5 160:10 160:12 277:11,12 299:18
**dates** 122:16 222:13 222:15 246:25 265:7 266:15,18 266:19 269:17 285:6 287:19 294:13 295:21
**day** 50:9 105:7
**days** 97:9 202:12 220:18 221:4 244:17 254:16
**DDR** 48:14,16,17
**deadline** 112:13
**deadlines** 65:3
**deal** 209:14
**dealings** 282:6
**dealt** 209:22 210:19 282:8
**Dear** 278:21
**December** 63:3 64:7 104:11,18,20,23 105:8 110:14 112:20 113:3 114:7 123:10 125:9 134:25 141:18 174:8 175:2,4,22 177:11
**decided** 13:6 78:25 112:6 170:5 194:10 208:13
**decision** 163:19 170:7 185:16,19 195:11 208:8
**decisionmaker** 194:15
**declined** 205:4
**deem** 119:11
**deep** 143:25 250:10
**defendant** 8:10,12
**define** 293:10
**definitively** 102:11
**delay** 202:11
**delegate** 275:4
**delegated** 107:19 275:2,8
**delete** 130:5,6,8 133:6 139:19 156:16 221:6,7 300:15
**deleted** 28:13 156:9 158:18,18 221:12 221:23 227:19 228:17 247:9 254:16 300:11 301:11
**deletes** 301:17
**deleting** 133:8,15 300:16
**deletion** 37:2,18 61:20,20
**deletions** 227:9
**Deloitte** 85:24 86:2 86:7 99:5 102:21 138:25 142:4 145:25 146:10,17 149:15 150:11 158:5
**Demuynck** 164:17 164:18
**department** 9:20,21 10:6 11:11 12:15 13:22,25 14:3 20:7 22:8 27:9 36:7,15 38:10 42:7,8,9,13 64:17,22 68:25 71:14,19 73:20,21 73:25 74:4 77:24 78:25 90:14 106:17 107:7,9,13 107:22 109:13 111:4,19 112:5 114:23 116:13,24 118:13 124:9 133:25 134:20 136:16 141:3,11 142:9,19,22 148:17 161:7 163:16 164:13 166:7 167:20 168:6 169:2,7,9,20 169:23 170:6 172:22 173:14,18 173:20 174:3 176:13,24 177:18 181:3,14 184:20 185:21 187:25 188:14 189:20 190:23 204:3 213:20 214:21

215:16,20,20 216:20 217:14 224:3 235:9,17,19 235:20 236:7,8,20 299:5
**Department's** 123:19
**departments** 25:4 27:10 42:13
**depend** 38:15 131:4 131:5 156:13
**depending** 61:7 62:8 129:6 293:6 300:22
**depends** 129:7,9 156:17
**deployed** 235:7
**deposed** 7:20,21 8:7 294:3,4,5,21,24 297:22 299:5
**deposition** 3:16,19 297:4
**depositions** 8:21
**DeROCHE** 2:10 3:7 3:9 15:20 20:22 23:11 29:25 34:12 34:16,20 42:21 45:9 47:12,20 48:6 54:18 62:17 71:3 72:6 75:12 86:21 89:13,18,23 91:14 103:4 104:8 109:15 121:17 148:25 149:5 152:6,13 160:5 188:15 232:9 302:4
**describe** 25:11 45:22 56:8 98:4 163:5 223:19 226:22 227:3 253:18
**described** 45:23 102:16 117:15 167:16 169:5 206:25
**describes** 169:25 172:10 174:7 177:22 180:22 194:6 212:18
**description** 24:23 47:14 110:11 204:20 303:3 304:3
**Design** 55:3 87:25 213:2
**designated** 182:15 199:4 238:14 244:25
**desire** 206:23
**desktop** 96:3 155:3
**despite** 220:16
**destroyed** 37:8,11 40:18,21 41:2
**destroying** 36:23
**destruction** 32:16 40:13,15,22 41:14 41:22,24 42:3
**detail** 261:21,24 279:3 280:25
**detailed** 54:4
**details** 19:13 109:8 130:14 136:8 204:15 276:9 277:4,6 280:12
**determination** 215:13
**determine** 44:14 64:6 90:5 114:24 144:20 157:7,15 158:13,23 187:15 193:14 214:22
**determined** 169:19 226:12
**determines** 163:16 213:20 218:23
**developed** 167:17 167:19
**development** 168:2
**device** 100:9 145:22 146:23 230:3 231:15 255:2
**devices** 86:17 92:4 93:6 96:4,11 98:22 99:23,25 100:2,5 100:10,12 102:19 141:25 142:16,19 145:17,20,24 146:19,20 150:9 151:10 157:5,12 157:14,16 158:4
**Devine** 7:5,12,17 278:3 286:9
**died** 8:18
**differ** 28:5 293:20
**difference** 189:8 265:15
**different** 3:18,24 14:14 25:24,25 33:4,5 42:12 56:23 56:25 58:13 59:25 62:7 69:14,15 80:24 90:8,12 92:7 97:11 108:21 111:8 123:9 147:21 150:22 182:16 187:17 190:17 196:5,16 196:22 198:9 215:19 225:8 231:2 239:6 245:2 259:11 265:7 266:17 286:3 287:14 289:8 297:21
**differently** 62:8 108:17 192:13
**diligently** 144:17
**direct** 11:22,24 62:14 65:7 172:19 277:21
**directed** 107:22 133:5
**direction** 176:22,24 185:20
**directly** 32:9 84:20 84:25 85:2 151:3,6 172:24 248:13,15
**Directories** 43:24 44:2,5
**directory** 43:7,14 44:9,11,24 45:18 46:4 47:11 192:14 193:5 196:12 198:6,10 199:2,15 200:22,23 217:17 218:13,17,21 219:16 234:21 235:2,6 237:18,23 237:24 239:22 263:16
**disable** 35:21 37:13 130:9 213:15 214:10 219:6 228:5,8 236:25
**disabled** 38:3 79:8 82:19 94:25 103:2 131:23 150:3 158:20 159:24 175:24 176:2 214:16 222:16 228:11,13,22 229:2 269:16
**disables** 213:23 216:23 223:8
**disabling** 214:2 215:7,8 216:4,13 217:4 220:17
**disappeared** 252:13
**disaster** 26:17,21 27:4 28:6 43:6 51:18 193:9

**Disasters** 44:20
**discovered** 223:23 223:25 253:16
**discovery** 58:16,18 168:2,10 223:20 294:6
**discuss** 252:19 253:5 299:8
**discussed** 147:16 177:7 186:14 234:18 252:25 286:4
**discusses** 256:20,24
**discussing** 37:17 69:24 169:17 186:22 292:14
**discussion** 71:5 220:16
**discussions** 60:20 84:23 107:8 167:4 261:18
**disk-based** 230:2,19 230:21,25 231:12 254:25 255:22,23 256:6
**displayed** 92:20
**distinction** 287:12
**distribution** 224:12 224:13,16,20,22 225:6 283:16
**divorce** 8:25
**document** 15:13,18 16:4,6 20:23 21:5 21:19,21 23:16,22 23:24 24:2,12,13 25:15 29:3,7,9 31:10,24 32:20 33:9 39:22 40:2 43:3,22 44:19 45:14 48:11,19 49:23 50:17 54:24 55:5,10 62:23 72:11 87:3,6 109:20,23 121:22 122:5 139:9 154:5 154:6 161:9,19 211:13 226:4 257:10 277:13 279:18 283:19 284:24 285:14,15 290:12
**document-by-doc...** 153:19
**documentation** 11:11 113:18 115:4 193:4 202:4
**documented** 67:2 192:24
**documents** 15:15 19:14,16,17 31:25 32:7,9 43:20 44:7 44:8 46:6 48:23 49:6,14 52:11,17 55:6,11 58:19 59:6 71:24 72:2,17 74:19 77:11,17 78:2 84:2 85:9 101:6,16,23 104:17 105:5 106:3,25 107:3,14 110:3 113:20 115:6,18,23 116:15,19 119:14 119:14 120:19 121:2 122:3,9 123:22 125:9 127:11 130:24 132:3 133:15 135:22 136:22 140:11,19 141:4,7 143:2 146:22 153:5,12,16,24 158:13 159:20 160:2,6 168:12 170:4 171:9,12,13 171:16 173:15 174:3,13 175:12 175:15 177:12 179:4 182:9,23 188:2,10 209:16 210:20,22 212:9 220:18 228:15 229:11,21 242:17 243:4 260:23 281:3 283:10 290:17 296:11,23 297:4,7,11,14 298:15 303:13
**doing** 10:11 14:12 14:14 49:20 50:2 70:22 84:6 91:4 108:19 132:15 186:23 198:21 208:15 211:16,20 222:11 223:2 252:7 295:14
**Dolan** 117:8 118:19 119:7 134:23 136:4 137:25 138:9 139:22
**Dolan's** 118:20
**Dom** 11:12
**domain** 197:18
**domains** 197:14,15 198:16 199:8 201:21 202:13
**Don** 11:20
**Donnie** 16:20 22:7
**double** 114:10 115:22 123:24 136:6,16 147:2,5,6 147:8 155:13 157:21 158:10 172:17 191:10 246:24,25
**Doug** 73:21
**downloading** 100:2
**downstream** 14:6
**draft** 161:2,4,12,14 161:16 162:8,9 167:10 213:4
**drafted** 161:5
**drawing** 180:20
**drive** 117:24,25 118:5 126:12 153:15 157:4 170:8 171:10,12 171:17 174:24 177:4,6,8,10,14
**drives** 75:24 88:7 96:8 99:20 126:19 170:10 171:22 174:24 177:20 182:2,2,5,5,7,18
**drugs** 6:11
**due** 40:18,21
**duly** 3:3 305:7
**dumpster** 90:24 254:9,11,12,18,20
**duplicating** 232:21
**duties** 10:18,20 23:25 24:3 35:7,10 35:11 40:15 47:18 63:24

**E**

**E** 2:2,2 3:2,2,2 104:6 104:6 205:13 303:2 304:2
**E-business** 14:14
**e-Discovery** 11:9 163:6 164:4,24 168:16,23 172:11 172:17,20 185:6,7 185:17 243:2 290:23 294:8,10 294:16 295:2,5,10 295:15
**E-M-U-R-A-L-D** 200:7 201:13
**e-mail** 28:22,23 29:2 29:5,5 37:19,22 38:17,19,21,25

39:6,17 44:25 45:6 45:6 55:4,13,14,18 55:20,24 60:21 68:19 72:15 76:10 76:13,14,20,25 80:21 81:10,25 83:4,4,9 85:15,16 87:13,17 88:3,24 90:25 91:18 92:7,9 93:6,19 94:2,14 96:22,25 97:2 100:2,3,3,21 110:12 113:5 114:2,19 115:2 116:2 117:10 120:18 121:2,8 127:2,6 130:12 131:9 137:2 143:11 149:6,8,12 150:2 152:23,25 154:16 155:5,7,18 155:22 159:10,15 159:16,17,23,24 175:12 176:8 181:24 183:18,24 183:25 184:2 185:8 192:6,18 194:20,23 195:14 196:7,23 197:2,4,7 197:19,21 198:2 198:10,18,19 199:3,12 200:2,5 200:23 201:5,25 202:16 203:7,18 204:23,25 205:3,6 205:15 206:10 207:5,9,16,20,21 207:24 208:21 209:14 210:4,10 211:13 214:8 217:25 218:3 219:5,15 220:4 221:9 222:18 223:10 224:15,22 224:25 225:3 229:4 230:18 231:19,23 233:12 234:5,8,16,19 237:2,8 238:13 239:6,8,8,13,16,25 240:3,11,17,20 241:14 242:7 244:6,11,25 246:7 246:8,9 249:19 256:8 259:3,5,14 259:15 260:4,16 260:18 261:3,3 262:11 263:6,8,10 263:13,16,21 264:8,8,13 265:2,4 265:5,13,16,18,21 266:4,15,16 267:8 268:2,3,8,12,17 269:8,14,18 270:2 270:18,20 271:4 271:15,23 272:4 272:18,20 273:5 273:19 274:4,23 275:9 277:11,17 277:23 279:8 281:24 299:18,24 299:25 300:2,16 300:17,25 301:5 301:17 303:7

**e-mail-type** 283:17

**e-mails** 61:14 82:24 83:3 90:2 98:24 99:3 100:15 101:22 102:18,19 107:19 143:2 144:6,25 154:8,13 154:13 157:11 170:3 177:2 182:24 183:2 207:16 219:10 220:19 221:2 226:23 227:13,17 233:24 240:24,25 246:11,19,21 250:14,16,22,24 251:19 252:13 259:2,6,18,22,24 277:15,20 301:12

**E-Y** 205:22

**E/:drives** 159:21

**earlier** 48:20 49:7 49:11 87:3 100:24 106:24 113:10 131:13 153:8 218:22 254:2 289:23 290:3 292:14

**early** 70:23 92:19 201:2

**easier** 12:11

**edb** 45:25 46:5

**edb.log** 45:21

**Eddie** 289:17,19

**effect** 263:4

**effective** 159:6

**effectively** 251:5

**efficient** 293:10

**effort** 80:25 81:12 81:15 82:4,8,14 87:10 90:5 94:7 95:13 98:8 120:9 143:20 230:9 254:3

**efforts** 50:3 78:7,10 81:8,22 89:2,6,7 94:11,17 101:21 119:25 120:2,4,5 259:23

**eight** 141:16

**either** 22:9 51:10 70:3 135:20 136:12 138:25 141:21 142:3 159:20 161:17 170:10,13 188:13 229:13 269:25 282:18 287:20

**elaborate** 42:10

**electronic** 25:2 27:19 55:17 115:3 159:20 160:2 162:21 167:25 168:4,10 170:3 175:11 182:9,23

**EMC** 303:6,9,10,11 303:12,18,24 304:5

**EMIT** 9:13,17 24:21 24:25 25:23 30:24 33:22 34:3 35:12 70:17 91:17 124:21,23 132:23 148:18 151:7 166:4,7,9 171:24 171:25 178:8,10 181:4,6 192:22 201:10 215:9,12 215:20 241:16 253:22 255:12 277:24 278:12,15 279:16,24 289:4

**EMIT's** 25:12

**employed** 305:12

**employee** 13:2 201:19 289:4,20

**employees** 35:13 58:11 119:10 192:5,18 282:21

**EMURALD** 200:7 200:12 201:12,13 201:15,22,24 207:2,13 208:25 217:20,21 218:19 219:2 237:5,6,19 238:23,25 239:2 241:5,15,18,21,24 244:14 245:3

262:20,23 263:5 263:15,25 264:7 264:16,19 265:24 266:22 267:3,12 269:19,20,23 270:3,5 272:16,25 273:17,22 292:13 292:19 293:20,23
**enabled** 89:11 150:2 213:9,10,12 214:16 227:7,7
**engaged** 79:3,10 85:25 86:2,3 149:15 150:14,18
**engagement** 149:17
**Engineer** 158:7,8
**Engineering** 194:23 290:24
**ensure** 11:2 24:8 35:15 38:2 214:12 215:4,5
**ensuring** 24:15 36:17 37:7,9,25 79:4
**entail** 149:17
**enter** 249:22
**enterprise** 217:17 218:13,17,20,21 282:13
**enters** 67:4
**entire** 148:12
**entities** 196:23
**entitled** 40:12 45:21 46:12
**entry** 126:20
**ERIC** 2:6
**Erick** 91:21,24 92:15,23 93:2,10 194:12,16 195:3
**ERP** 276:23
**ESQ** 2:10,11,19,20 2:21
**essentially** 294:14
**estate** 8:19,23 30:19
**etcetera** 162:22,22
**Evans** 87:20,23 194:17,18,19 196:16
**events** 88:21
**eventually** 14:25
**everybody** 111:17 111:20 133:14 204:23 293:12,14 293:15
**everybody's** 269:18
**everyday** 19:8
**evidence** 228:18
**ex-husband** 13:7
**exact** 8:4 14:9 21:21 172:4 194:21 222:13,15 223:14 294:12,21
**exactly** 10:16 17:24 18:14 39:19 49:18 50:4 54:5 63:22 73:24 87:24 95:15 97:10 99:17 113:22 126:8,16 130:13 154:6 158:25 171:4 182:17,18 202:2,5 208:19 220:23 243:18 244:4 270:7,8 284:14 299:2
**examination** 1:10 3:6,12,15 15:21 232:12 302:3
**examined** 3:4 7:20 247:12,13
**example** 53:2,11,21 156:10 197:7 224:14 225:17,19 225:20 250:11 251:13 260:22 265:21 283:20
290:6 293:13
**exception** 194:7,11 195:8,20,25
**exceptions** 190:2
**Exchange** 55:3 56:2 56:4 59:13,17 61:16 92:18,18 93:4,14 94:15,17 94:20 96:25 97:2 98:10,12 102:18 115:12 127:5 143:11,25 144:6 144:25 151:24 152:5 181:11,12 200:25 201:4 208:6 221:24 222:2,4,5,8,17,19 223:12 227:11 233:2 240:2 243:23 244:2 254:6,13 257:13 257:19,20 275:3
**exclude** 65:8
**Excuse** 288:17
**Executive** 3:13
**exempt** 235:11 236:13
**exempted** 224:2 246:16
**exempting** 236:22
**exemption** 235:24
**exhausted** 144:13 144:21
**exhibit** 15:22,24 17:13 20:24,25 21:5 23:12,12,13 30:2,2,4,8 34:7,8 34:18 42:22,23,24 45:10,10,11 48:7,7 48:8 54:19,20,21 57:8 62:18,18,20 72:7,8,25 73:5,7 86:22,22,23 87:4
104:11 109:16,16 109:17 112:19,21 113:4 117:2,4,7 120:15,16 121:18 121:19 122:22 123:3,7 129:17 154:18 160:9,10 160:17 161:8,18 162:5,7,8 256:15 277:7 284:17,18 284:23 299:12,13 299:17 303:3,4,5,6 303:7,9,10,11,12 303:13,14,16,17 303:17,18,19,20 303:21,22,23,23 303:24 304:3,4,5
**exhibits** 160:14 277:10 304:7
**exist** 31:8 197:10,22 224:6 225:10
**existed** 82:10 83:3 83:20 234:9 244:11
**existence** 208:23 244:16
**existing** 90:21 98:12 224:24 225:2
**experience** 250:7
**expert** 181:11 196:13 250:10
**expertise** 25:22 90:7 94:4,13,14 97:15 151:5,13 162:25
**experts** 90:13 93:24 94:4
**explain** 15:13 40:14 61:6 64:9 206:17 230:5
**extensive** 95:14
**extent** 56:19 57:16 276:9
**extra** 82:22

**extract** 64:5,10
**extracted** 64:19,20
**extraction** 64:21 68:9
**Exxon** 1:5 2:16 23:19 51:22 157:10 164:19 169:12 172:11 173:12 196:21 197:6 201:20 238:2 241:23 242:6 243:8 245:5 247:17 258:25 263:7 264:18 266:8 269:18 270:3,13 271:18 275:17 281:20 282:20 287:3 290:12,16 297:13 298:21 299:4 301:10
**Exxon's** 80:2 244:20 271:14
**Exxon-owned** 51:13
**ExxonMobil** 8:6,7 9:8,13,18,21 10:5 11:10,15 12:10 15:16 20:7 24:20 24:24 25:25 26:18 27:11,24 37:23 46:19 52:10,11,16 52:17,20 54:13,16 55:7,12 86:8 124:19,20 145:2,5 145:13 146:24 147:4 176:6,10,17 180:23 190:11 192:5,7 197:8 199:8,21 200:9 223:24 243:16 260:12 274:12 284:2 285:23 286:16
**ExxonMobil-cont...** 51:15
**ExxonMobil-spec...** 217:19

**F**

**F** 3:2 104:6
**face-to-face** 76:18
**Facilities** 30:20
**facility** 33:12
**fact** 232:24 253:17 301:12
**factor** 67:11
**Factors** 279:19,20
**failure** 28:8
**fair** 286:13 301:14
**fairly** 81:13 241:18
**familiar** 26:16 29:11,14 45:24 46:18,20 47:3,5,16 49:23 57:13 110:6 179:9 277:2,18
**familiarize** 73:8,13 73:16 74:12
**far** 16:17 62:11 86:11 90:25 91:7 92:20 108:12 128:14 131:18 150:4,7 164:24 169:14 247:9 248:5 286:6
**feed** 214:25 217:24
**Feinstein** 1:11 3:1,8 4:1 5:1 6:1,24 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1,21,24 16:1,3 17:1 18:1 19:1 20:1,25 21:1,6 22:1 23:1,13 24:1 25:1 26:1 27:1 28:1 29:1 30:1,4 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1,24 43:1 44:1 45:1,11 46:1 47:1 48:1,8 49:1 50:1 51:1 52:1 53:1 54:1,21 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1,20 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1,8 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1,23 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1,17 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1,19 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1 147:1 148:1 149:1 150:1 151:1 152:1 153:1 154:1 155:1 156:1 157:1 158:1 159:1 160:1 160:8,10,14 161:1 162:1 163:1 164:1 165:1 166:1 167:1 168:1 169:1 170:1 171:1 172:1 173:1 174:1 175:1 176:1 177:1 178:1 179:1 180:1 181:1 182:1 183:1 184:1 185:1 186:1 187:1 188:1 189:1 190:1 191:1 192:1 193:1 194:1 195:1 196:1 197:1 198:1 199:1 200:1 201:1 202:1 203:1 204:1 205:1 206:1 207:1 208:1 209:1 210:1 211:1 212:1 213:1 214:1 215:1 216:1 217:1 218:1 219:1 220:1 221:1 222:1 223:1 224:1 225:1 226:1 227:1 228:1 229:1 230:1 231:1 232:1 233:1 234:1 235:1 236:1 237:1 238:1 239:1 240:1 241:1 242:1 243:1 244:1 245:1 246:1 247:1 248:1 249:1 250:1 251:1 252:1 253:1 254:1 255:1 256:1 257:1 258:1 259:1 260:1 261:1 262:1 263:1 264:1 265:1 266:1 267:1 268:1 269:1 270:1 271:1 272:1 273:1 274:1 275:1 276:1 277:1,7 278:1 279:1 280:1 281:1 282:1 283:1 284:1,18 285:1 286:1 287:1 288:1

289:1 290:1 291:1 292:1 293:1 294:1 295:1 296:1 297:1 298:1 299:1,13,16 300:1 301:1 302:4 303:3 304:3 305:7
**fell** 190:19
**field** 162:24
**figure** 44:18 105:10 150:15 262:2
**file** 28:14 35:21,22 37:14,16,20,22 38:3,17,19 43:9,9 43:15 79:7 82:19 89:11 90:10 94:25 102:25 131:10,11 131:23 158:19 159:24 175:24,25 212:18 213:8,15 213:16,23 214:8,9 214:10 215:8 216:5,14,21,23 217:25 219:6,7 220:14,17,25 221:21 222:16,21 222:24,25 223:8 224:2 227:6,7 228:6,8,12,19,22 228:25 229:7,9 231:24 235:11,24 236:14,24 237:2 246:2,4 254:14
**filed** 67:19
**files** 45:22 46:5 61:20 95:23 127:7 137:3 168:22 176:8 185:2 202:20 222:17
**fill** 41:2
**filtering** 64:21 68:11,12
**Financial** 293:14
**financials** 278:14,14
278:15
**find** 33:13 89:7,8,8 133:12 144:23 150:17 230:13 248:4,5 254:3 259:21,23 261:10 269:24
**finish** 203:14 232:14 280:8
**finished** 5:6 35:5 252:7
**first** 3:3 12:9,12,18 15:14 22:2,4 27:18 31:5 34:25 36:21 56:3 59:16,24 60:2 63:4,5,18,23 66:8 67:20 69:17,25 71:7 77:8,20 98:9 108:24 112:23 113:4 123:7,8 152:15,19 172:16 173:2,18 205:12 232:23 246:19 251:12,24 253:25 277:22 278:21 285:21,24 295:20
**firsthand** 17:21
**five** 23:7 60:17 72:20 229:25 275:23
**five-minute** 47:22 152:7 188:16 232:10
**flag** 213:22,25 214:4 214:6,7,19,20,22 214:25 216:22 217:9,22,22 219:2 219:19,22 235:9 235:22,23 236:9 236:13 238:17,19 238:21,24
**flagged** 238:19
**flags** 220:22
**flip** 236:9,13
**flood** 240:20
**flooded** 258:22
**flows** 219:19
**focus** 78:16 81:18
**focused** 78:21 95:2 120:5
**folder** 78:3 99:14 101:7 115:7,24 116:19 153:7 154:2,6,6,22 170:25 177:4,19 250:3,6
**folder-by-folder** 153:20
**foldering** 220:21
**folders** 125:22,23,24 126:2,5 155:10,13 171:22 173:6 182:11,12,14
**folks** 11:25 35:12 36:6 38:3 39:11 40:20 84:6 118:5 163:20 164:11 165:22 193:11 197:24 199:7 213:23 215:19 216:25 245:22,25 259:5 260:4 261:4 270:11 273:12 282:24 283:3 300:25
**follow** 67:3 277:25
**follow-ups** 276:4
**followed** 50:5,7 296:8
**following** 104:3 279:24
**follows** 3:5
**footnote** 220:13 229:25
**force** 4:12
**foregoing** 305:6,8
**forensic** 84:17 85:22 85:23,24 149:16 149:22 151:11
**forensics** 99:6 102:21 150:5
**form** 3:25 32:15 40:23 41:14,18,23
**former** 197:2 199:12 201:25 291:20
**forms** 32:12,12,15 32:17 42:4
**forth** 51:4,11 61:3,6 75:3
**forward** 12:12 300:22 301:4
**found** 98:15 209:7 254:22
**four** 23:5 59:25 163:5 220:13 257:16 291:3
**fourth** 81:3 122:17 122:18,19 123:15 123:17 137:6 183:8,9,10 185:23
**freeze** 189:7
**frequency** 258:4
**frequently** 24:14,15 56:18 59:19 61:24
**fro** 103:7
**front** 285:7
**full** 13:11 33:17 59:23 60:3,9,14 230:12 275:8 277:22
**fully** 91:6 245:10
**functionality** 218:2 259:8,9
**functions** 284:2,3
**further** 120:24 131:14 165:12,21 305:11

**G**

**G-R-A-Y** 205:14
**G-R-E-F** 30:18
**gained** 274:3
**gaining** 71:22
**gap** 144:19
**GARRISON** 2:15
**gas** 12:24
**gathered** 109:12
**gathers** 218:11
**general** 1:12 2:5 3:10,13 11:17 164:22
**generally** 43:18 50:24 51:3,9 60:25 63:21 78:14 81:7 112:12 187:20
**generates** 111:17
**gentlemen** 22:9
**gestures** 4:22
**getting** 188:24 236:18 240:11 253:12
**give** 4:10 8:19 15:22 22:10 40:20,23 56:10 85:6 94:8 97:21 122:15 130:14 131:3 180:10 192:18 225:17,18 262:24 266:10 272:3 275:22 284:16 293:8
**given** 65:5,9,16,18 65:19 66:9 75:6 76:11 77:9,15,23 243:12,14
**gives** 87:8 263:2 271:19,22
**giving** 35:12
**global** 30:19 31:2 282:22
**globally** 282:20,23
**go** 22:17 31:5 47:20 67:14,16,20 71:3 79:17 82:23 84:14 89:9,14 90:20 97:22 102:15 104:10 105:15,16 108:13 110:9 122:14 129:13 131:13,19 133:11 143:5 149:2 152:6 159:2,3 184:12 186:3 187:15 197:24 199:10 202:20 203:7,11 218:15,20 230:11 232:17,22 248:5,7 248:12,17 261:10 262:20 263:25 264:16,18,20 266:20 267:3,6,14 270:24,25 291:9 291:17 299:23
**goes** 163:19 165:12 202:23,23 203:8,9 214:22 215:14 224:17 299:21
**going** 12:9 19:12 65:7 79:13,22 81:24 84:21,24 89:6 98:14 139:17 151:14 160:5 164:10,16 228:16 232:14 246:11 271:13 293:8
**good** 10:11 46:12 195:5 224:13 225:18,19
**gotten** 247:8
**govern** 29:4 55:10 55:24
**governs** 28:17 55:6 55:19,22,23
**granted** 170:23 293:6
**graph** 25:21
**Gray** 205:9,10,18,22 207:20,24 208:21 209:3,6 210:10,13 220:4,6,7 264:2,23 266:16 268:23 269:3,6,8 271:4 273:2,5
**great** 98:5
**GREF** 30:16,25 303:8
**Grey** 272:20
**ground** 232:18
**group** 9:22 10:10 25:20 45:7,8 46:4 46:23,24 47:2 60:21 85:17 87:14 87:17 88:24 125:11 212:6 225:2 244:6 246:7 256:9,10 260:16 260:18 287:5
**groups** 10:7
**guess** 38:13 116:25 236:17 258:17 261:25 265:14 266:6 267:25 276:20 281:12 292:24 295:9
**guidance** 10:21 24:4 24:4,5 28:17 35:12 40:20,23 86:12 151:5 244:8
**Guide** 45:18
**Guideline** 40:9
**guidelines** 23:20 24:7,8,10 30:22 31:2,7,8,10 33:18 34:5,11,14 35:9 244:9
**guides** 193:9
**guys** 63:14 253:5 261:9

**H**

**H** 303:2 304:2
**H-E-L-B-L-E** 201:7
**H-J-O-R-T-H** 147:14
**H:/Drive** 96:8 99:13 99:14 113:6 114:3 116:14 117:10 118:7 120:19 121:2,8 137:2 170:10,13 183:20
**H:/Drives** 170:18,21
**habits** 107:18
**Hamilton** 7:14
**handed** 225:25
**handle** 70:11 276:19
**handled** 108:16 201:3 216:5,15
**handout** 300:5
**hands** 86:13
**happen** 200:24
**happened** 17:24 18:19,21 44:18 71:17 87:11 90:16 90:17 112:3 114:22 204:13 227:9,13 231:25 248:10
**happening** 18:3 132:16
**happens** 163:13 189:17 196:25 197:24 202:3 260:25 301:3,19
**hard** 88:6 115:3 117:23,25 118:4 130:14 133:13 153:5 182:2,4 297:7
**hardware** 75:20,23 95:22,24,25
**head** 4:21 10:5,12 102:13 157:22

180:11 218:4 295:22
**heading** 24:19 56:2 177:22 183:8
**headquarters** 212:5 274:14
**heads** 66:13
**hear** 63:18 75:10
**heard** 5:24 63:15,20
**heavily** 276:10 284:4
**Helble** 201:7,9 206:9,14 207:2,4 207:15 208:5,9,10 208:25 209:9 211:19,21 212:3 219:9,25 220:2 240:2 241:5,8 242:10,16 244:13 264:14,21,22 265:6,20 266:7,11 266:23 267:4,12 270:16 271:15 272:17,22 273:15 274:5,9
**Helble's** 264:11 266:25 268:6 272:25 273:7
**held** 1:11 71:5
**help** 11:7 24:4 33:13 85:7,25 145:25 146:21 149:22 150:8 158:5,24 221:8 270:14 276:19 288:24
**helped** 93:21,22 146:10,14 186:14
**helpful** 159:2,7
**helping** 95:17
**helps** 24:5 32:25 193:14 212:6
**Hickman** 288:14,15
**high** 56:10 140:17
**highlights** 11:16,18
**highly** 259:8
**hired** 12:14,15
**historically** 165:21 282:17
**history** 12:8
**hit** 184:4 249:22 265:11,13,16,16
**Hitler** 12:6
**hits** 154:21
**Hjorth** 147:9,14 158:9,11
**hold** 35:20 36:3,8,10 38:4 67:10,14,16 67:20 68:2 101:17 101:20 109:22,25 110:18,20 111:7 111:11,21 128:10 128:22,24,25 129:3,6,8,25 130:4 131:6,8,12,18,20 132:4 133:5,14,17 133:21,23 134:14 134:17 139:18 148:3,9 156:9 163:7,9,12,14,17 163:20,22 165:25 166:13 182:15 199:10 200:12 202:17,22,25 203:6,11 204:11 213:21,24 214:4,6 214:11,23 215:14 215:22 216:22 217:24 218:11,24 219:4,10,22 221:15,17 228:23 229:20,22 235:10 235:18 236:3,6,21 238:17,18,20,24 247:10,14 248:22 297:14
**holds** 202:19 203:19 203:21,25 248:12
**home** 6:23,25
**hopefully** 232:15
**hosted** 234:5
**hosting** 44:23
**hosts** 234:8
**hours** 253:23
**housed** 233:12
**Houston** 7:2 50:25 51:10 52:4,23 255:16,17 258:11 258:21 260:2 282:18
**HR** 12:15,15 13:16 13:20 53:3
**HR-type** 53:4
**Hughes** 66:12,19,20
**human** 199:23,24 203:4
**hypothetical** 201:19

**I**

**I-A-N** 147:14
**I/:Drive** 125:19
**I/:Drives** 125:21 126:16 127:25 156:8
**I:/Drive** 125:20,25 126:3,4,6,10,14 127:22 128:8 135:2,3,6,22 137:3 137:8 138:6,15,19 141:19,21 156:5 156:10,16,23
**IAM** 293:3
**Ian** 147:9,14 158:9 158:11
**icons** 32:3
**ID** 90:18 99:4 115:14 120:6,7 200:19 267:15
**idea** 101:25 292:18
**identification** 15:25 21:2 23:14 30:5 42:25 45:12 48:9 54:22 62:21 72:9 86:24 109:18 121:20 160:15 270:12 277:8 284:19 299:14
**identified** 27:22 42:15 61:16 84:9 88:25 99:8 111:13 115:2,6 153:3,24 177:2 180:14 182:10 230:6,7,10 230:17 234:22
**identifier** 199:20,22
**identifies** 64:17 237:7 239:3
**identify** 64:13 77:10 77:16,25 84:13 98:9 101:5 107:9 107:13 116:18 163:3 199:11 200:12 257:25
**identifying** 79:16 91:9 98:11 119:2 133:25
**identities** 243:6
**identity** 45:8 58:10 162:15,16 163:2 192:16 193:24 194:25 199:16,20 206:22 219:21 237:13 239:9,18 240:21 243:22 244:21 245:23 269:20,22 270:12 292:4
**image** 50:19
**imaging** 84:17 85:3 85:11,13,15,22,23 85:24 86:8,9,17
**immediately** 210:23 211:2
**impact** 290:16

**impacted** 90:17 91:11,12 292:19 293:19,22
**Implement** 293:3
**Implementations** 292:5
**implemented** 192:16 200:24 292:9
**implications** 195:19 195:24
**implied** 247:24
**important** 209:16 209:17 240:25
**impossible** 196:6
**IMS** 25:3,19,20 26:6
**in-box** 116:2,4 224:19 252:14
**inability** 209:15
**inactive** 198:14,24 198:25 199:4,11 238:8
**incident** 7:24
**include** 10:7,20 11:9 70:6 81:24 96:5 110:23,25 182:23 183:2 185:23 203:3 281:10 298:12
**included** 96:6,7 165:22 249:6 287:23
**includes** 36:23 96:3
**including** 98:11 276:20 283:19
**incorrect** 279:25
**independent** 157:9
**independently** 148:6
**index** 32:6,10 302:2
**indicate** 218:10
**indicated** 305:8
**indicates** 217:23 219:3
**individual** 8:10,13 8:16 39:4 84:9 202:23 203:12 235:10,14 237:9 237:25 249:13,18
**individuals** 17:6 88:25 148:10 179:16 239:3 245:15
**influence** 6:11,17
**influx** 209:14
**information** 9:7,11 9:13,18 13:3,20 24:20,25 25:21 28:13 30:16 31:4 33:2,13 44:11,13 76:2 84:11,15 89:9 89:10 98:17 109:12 112:13,16 114:17 143:24 150:23,25 161:3 161:15,24 162:3,4 162:6,10,21 166:20 167:12,13 186:22 197:3 199:18,19 202:13 213:4 217:8,19 218:12,19,25 219:5,19 253:13 262:7,9 267:15 269:21,22 270:9 270:10 274:2
**infrastructure** 10:8 14:11 96:22 145:3 145:4,6,14 146:24 146:25 147:4 148:23 194:22 255:15 256:4 289:6,16,22,24 290:2,4,6
**initial** 18:15 71:20 91:23 149:19 205:12
**initially** 69:16 92:14 93:8,9 292:9
**input** 12:19
**inquiries** 11:7 167:3
**inside** 241:23 254:12
**insight** 281:15
**instance** 28:18,19 127:15 221:12
**instances** 197:17
**instruction** 155:15
**instructions** 65:4,9 65:16 66:9,17,24 67:8,9 75:5 76:11 77:9,16,23 107:6 116:8,13 154:4 155:12 208:18
**intact** 128:22 132:4
**intended** 115:10 154:18 221:8
**intent** 126:11
**interact** 40:15 150:10 201:11
**interacted** 150:12
**interactions** 274:16
**interacts** 201:16
**interfaces** 217:16,20
**internal** 11:2,3,13 56:6,13,16 57:9 245:6 256:25 257:7,21 258:7
**internally** 53:10,20 146:2 255:19
**interpose** 4:4
**interpret** 170:12
**interview** 211:9
**interviewed** 18:18 106:5,10,12
**interviewing** 17:22
**interviews** 105:25 106:14,19
**intranet** 14:13
**introduce** 15:14 20:23 23:12 30:2 42:22 45:10 48:7 54:19 62:19 72:7 86:22 109:16 160:6
**introducing** 87:3
**inventoried** 83:19 83:21,24
**investigate** 245:4
**investigated** 262:5
**investigation** 1:3 3:15 15:15 26:24 28:2 41:4,12 109:4 130:25 204:10 279:25 281:3,5,6 281:22 290:18
**investigations** 11:14 166:2 242:19
**Investor** 140:14
**involve** 27:20 35:7
**involved** 8:15 16:23 17:7 25:14 35:23 35:25 37:3,5,7,9 38:14 67:21 69:17 70:24 71:7 80:11 81:9 84:6,7,12,16 84:20,25 85:2,12 85:20,21 87:10 89:2,5,12 94:6,12 94:16,23 95:17 96:10,10,13 97:13 106:13,19 107:23 108:2,3 109:25 113:11,14 119:2 122:8,12 139:3,4 143:17,19,21 149:11 164:11 178:5,6,8,9 179:15 186:24 193:23 213:19 215:18 217:4 245:11 248:13,15 253:8

261:17 276:5,8,10 276:13 278:24 281:21 291:5,7,11 293:24 295:18,24 298:20
**involvement** 71:25 73:14 74:14 78:6 79:15,16 96:20 104:15 105:3,20 167:23 186:19 242:17
**iOS** 86:17 96:11 98:22 99:23,25,25 100:5,9,10,12 102:19 141:24 142:15,19 145:17 145:24 146:23 150:9 151:4,10 157:5,13,16 158:3
**IP-based** 54:10
**iPad** 98:23 138:15 138:23,24 139:10 139:23 140:3
**iPhone** 98:23 138:16 138:23,24 139:10 139:23 140:3
**isolated** 261:20
**issuance** 228:2
**issue** 26:10 71:18 132:8,18 240:23 253:7 260:5 276:13,17 277:19 278:23 279:9,12 280:6,13,18 299:22
**issued** 16:24 17:8 41:5 63:3 110:9,22 129:19 148:4 165:9,13,19 248:11
**issues** 4:5,6 289:24 290:2,4
**item** 243:8
**items** 116:3,6 157:11 182:16 254:14 278:2 286:8
**ITOB** 245:24
**ITSM** 66:4,10
**Ivy** 95:5,7 147:25

**J**

**J** 2:19 205:12,13 303:7,16,19,23
**J.E** 205:9,10,18 207:20 208:21 209:2,5 210:10,13 220:6,7 264:2,22 266:16 268:23 269:3,6,8
**j.e.gray@Exxon...** 205:16
**J.R** 193:10,11 194:24 200:4 202:8 273:14,21 274:6 292:23
**Jack** 139:15 190:3
**Jackie** 164:7
**Jamie** 1:13 12:5 125:15 139:8 146:5 305:4,17
**JANE** 2:21
**January** 15:11 77:21,22 152:21 155:24,25 169:13 169:15 170:2 172:6,8 175:5 177:13 246:19
**Jeff** 164:17,18,21 190:19
**Jeffrey** 140:9
**jegray@ExxonM...** 262:11
**job** 10:11,18,20 12:7 14:24 19:8,10 35:7 35:10,11 39:16 40:14 47:18 50:9 63:24 87:8 243:17 287:3
**jogging** 280:22
**John** 2:11 40:4 96:19 122:2 143:16 159:11,18 196:19 230:9 288:14,15
**June** 7:7

**K**

**Karen** 164:13 288:13
**Kathryn** 87:20,23 194:17,18,19,21 196:16
**keep** 221:8 242:6 278:10 279:5
**keeping** 243:6
**Ken** 288:20
**kept** 91:5 246:16
**key** 144:10 162:18 194:2 243:7,8,10
**keyboard** 86:14
**Keyword** 33:10
**kind** 28:21 32:12 61:8 95:24 147:20 212:2 224:5 245:6 245:16,18 253:6,7 258:17 276:25
**Kingdom** 276:6
**Kirsten** 168:17,23 173:3,11,19,21
**Kivalina** 110:3
**knew** 132:7 151:24 276:16 280:5,7,12 280:21,23 289:25
**know** 6:4 8:20 14:9 17:10,12 21:21 26:3,4 27:2,6,12 27:14,14,16 29:20 29:22,23 32:16 35:4 38:13 39:3,16 42:16 43:22 45:3,5 46:5,8 49:21,25 50:7,9,17,21,22 51:5,23,24,25 52:7 52:9,15 54:5,12,15 55:21,22 56:20,22 56:23 57:2,14,20 57:21,23 58:7,15 59:19 60:14 61:11 61:18,21,22,24 62:2,4,11,14 67:25 69:6,10 73:24 76:15 86:4,5,10,12 86:13 88:6,9,15,17 88:22,23 91:16,22 91:23 92:7,25 93:20 95:10,12 99:16,20,20,21 101:15,18,21,25 102:12 106:18,20 106:20,22 108:12 109:21 113:23 116:10,11,21,23 117:25 118:8,9,11 118:15,20,22,25 119:6,20,20,23,24 120:18,25 126:8 126:15,17,18 127:12 128:19,20 130:10,12 131:17 132:10 133:19,22 134:15,18,19,20 135:11,15,16 136:9,10,14,20,24 136:25 137:4,17 137:19 139:25 140:2,2,4,6,7,11 140:13 141:6,10 141:14,24 142:2,5 142:9,15 147:20 147:23,25 148:8 148:15,24 150:5 151:20,25 152:3,4 154:3 156:19

157:3,22 158:21 158:24 159:5,5,6,8 160:25 161:5 163:19 164:10 165:6 166:3,4,6,7 166:8,8,9,10 168:8 169:8,14,18,22,24 170:25 171:14,18 171:19,20 172:4,7 172:18 173:22,24 174:2,5,17 175:8 175:10 176:14,15 177:16,18 179:14 179:18,23 180:11 182:4,6,16,20 183:3,12,13 184:17,19 192:12 193:16 194:14 196:3,9,11,17 198:14 201:16,17 202:2,8,11 203:20 204:3,5,6,7,15,16 205:5,20 206:4,6,7 206:8 208:9,11,18 209:18,19,21,22 210:8,11,13,17 211:12,15,17,18 211:19,21,25,25 223:6,7,10,14 225:8 226:3,8,20 228:4,5 229:16,17 229:19,20,21,23 231:12,13,17,20 231:21 232:6 233:3,4,6,7,11 234:6,10,13,17 235:5 237:24 238:6,12 240:21 241:17 242:4,14 242:20 244:11 245:9,14 247:9,16 250:11,17,20,25 251:24 252:11,16 254:20 255:18,25 256:3,5 257:24 258:3,6,15 259:3 259:13,22 260:3,5 260:6,9,13,20,21 260:25 261:4,6,9 262:3,16 269:13 271:9 272:6,7,9,11 272:13,15 273:10 273:17,25 274:5,6 274:6,8,15,18,19 274:24,25 275:5 275:12,14,16,18 275:20,21 276:16 277:16 278:7 279:2 281:2,10,11 281:14,15,19 284:6,9,10,13,14 285:9,11 288:25 296:7,13,18,19,25 297:2 298:5,6,8,11 298:25 299:6 301:6,9,13,16

**knowing** 228:19

**knowledgable** 62:6 91:22,25 92:16 93:11 107:11 193:12 195:8 273:12,21

**knowledge** 17:2,20 17:21 26:25 31:13 31:17 33:20 34:4 54:5 56:19 57:17 59:8 62:10,14 63:17 80:9 90:7 91:3,8 92:4 96:23 107:15,17 115:17 115:21 134:4,10 144:2 149:13 151:14 163:25 164:21 165:4 166:23,25 167:2,5 168:5 181:13 193:19,22 194:4 194:16 212:21 225:7 233:15 271:6 299:10

**known** 137:22 244:18,24 245:3

**L**

**L-A-U-C-K** 70:20

**L-E-O-N-G** 39:13

**LAN** 170:10 198:17 198:19

**land** 125:21,22

**language** 190:10

**laptop** 96:6

**laptops** 75:17 98:20 99:9,11,15 102:19 145:7,9,12

**large** 10:2 94:10 95:13 98:8 162:23 204:22,24 209:14 276:23 282:13

**larger** 33:2

**late** 70:3,23 92:19 127:3 201:2

**Lauck** 70:20,21,24 73:18 76:2,17 83:12 88:13 95:16 95:20 96:9 101:14 105:14 106:18 107:23 115:8,15 115:24 116:12 118:12,12 119:22 124:24 126:18 127:18 130:16 135:15,20 136:13 136:13,15 137:11 140:7 141:12,21 142:20 145:10 148:2,24 149:10 153:2 154:9,23 155:16 156:22 168:25 170:15,19 171:20 172:2 174:18,20,21 176:21 178:9,22 180:16 181:21 182:21 183:5,6 204:5,6,8 211:8,18 216:5,14,24 246:17 248:8 249:12 250:21 251:5,11 253:11 299:9

**Lauck's** 116:6

**law** 3:13,14 4:13 11:11 20:7 22:8 36:7,14 38:10 64:16,22 68:25 71:14,19 73:20,21 73:25 74:4 77:24 78:25 90:14 106:17 107:7,9,12 107:22 109:13 111:19 112:4 114:23 116:13,24 118:12 123:19 133:25 134:20 136:15 141:3,11 142:9,18,22 148:16 161:7 163:15 164:13 166:7 167:19 168:6 169:2,6,8,20 169:22 170:6 172:16,22,25 173:14,17,20 174:3 176:12,24 177:18 181:3,14 184:20 185:20 187:25 188:14 189:20 190:22 204:3 213:19 214:21 215:16 216:19 217:14 224:3 235:9,17,19 235:20

**lawsuit** 295:4
**lawsuits** 110:4
**lawyer** 20:4
**lawyers** 20:4,5
**Lead** 87:25 213:2
**learn** 113:15 208:20 244:13
**learned** 208:22,24 244:16
**leave** 13:7
**leaving** 149:24
**Lee** 87:24 212:24,25
**left** 13:10 31:6
**Legacy** 230:2,19,21 231:11 254:25
**legal** 58:16,18 163:7 166:13 202:18 203:24 235:10 236:7,8,20
**Leong** 39:13 59:9 60:21 61:23 62:16 84:10 87:19 94:12 136:13 143:16 152:4 159:12,18 223:7,17 226:16 231:21 273:15 274:8
**let's** 7:16,17 10:10 77:19 96:16 153:10 158:2 190:8 196:13 225:19
**letter** 40:4 72:16,16 87:7 104:12,23 112:20 113:4 121:25 125:19 138:5 160:12 161:22 303:14,16 303:19,23
**level** 10:22 35:16 56:11 140:17 279:3
**Levy** 20:6,12,14 22:8,11 74:3 90:15 148:16
**lie** 224:20,21
**likewise** 293:18
**limit** 261:8
**limited** 177:20
**line** 14:21 56:4
**lined** 122:16
**lines** 59:25
**link** 55:23 206:21,23
**linked** 90:9 207:2,7 207:9,12 208:24 240:3 241:5,9,14 244:14 245:2 263:16
**list** 32:7 64:17 68:17 73:2 76:20 87:16 94:8 102:12 123:4 137:7 138:3,12 141:18 186:4 224:16,20,23 253:24,25 296:20
**listed** 40:6 73:3 102:5 117:9 123:5 123:9 137:18 139:24 141:25 176:16 251:19 286:25
**listened** 84:22
**lists** 224:12,13 225:6
**litigation** 8:15 35:20 36:3,8,10 38:4 64:12,16 65:5 66:21 67:4,10,14 67:16,18,20 68:16 101:17,20 109:4 109:22,25 110:18 110:20 111:11,21 112:4,5,17 129:6 129:25 130:4 131:6,8,12,18,20 133:5,14,17,23 134:14 139:18 148:3,9 156:9 163:12,20,22 199:9 202:17,22 202:25 203:6,11 203:19,21 204:11 213:21,24,25 214:4,6,11,23 215:14 216:22 217:23 218:11,24 219:4,10,21 221:15,17 228:23 229:20,22 236:3,6 238:17,18,20,24 243:2 247:10 248:12,21 290:19 293:25 295:10,16 296:9,24 302:2
**litigations** 165:25 229:13 242:18
**little** 81:18 123:9 130:14 202:21 206:18 249:18
**LLP** 2:15
**load** 172:19
**loading** 124:5 168:22
**local** 70:17,17
**locate** 144:12
**located** 52:22 107:15 153:25 231:14 233:25 234:14 256:2 282:15
**location** 52:3 79:25 80:2,4,5,6 85:11 119:7 135:4,6 144:22 153:15 258:10,20 259:2 259:25 260:7,11
**locations** 50:25 51:2 51:8 52:5,7,23,25 75:8,14 101:5 115:2 125:22 153:4 248:17 258:12 260:2
**locators** 191:3
**locked** 79:19
**log** 45:22 46:5 61:19 207:19 262:23 265:17,18,20 267:11 271:11 272:10 274:21 282:25
**logged** 265:25 266:12 268:23 269:5,25
**logging** 273:18,18
**Logical** 85:11,12,15
**logically** 227:15 229:5
**logon** 271:12
**logs** 45:25 60:22,24 60:25,25 61:25 62:3 151:15,19,22 151:24 152:5 158:13,15 159:14 159:16,17,19,25
**long** 6:5 14:7 15:7 60:14 67:15 171:16 234:10 298:25
**longer** 33:2 163:17 163:22
**look** 8:4 10:15 21:14 68:5 74:18,21 75:13,17,20,21,22 75:23,24 78:17 100:18 105:15,16 106:6,8 108:14 112:23 116:7 131:16 147:10 156:23 158:22 179:12 184:13 186:4 187:14 194:20 201:24 205:17,24 208:2

209:2 225:8 241:20 264:2,6,17 267:3 268:13,18 277:4,18 278:20 285:7,12,21 287:19 295:22 296:3 298:2,22
**looked** 49:22 74:4 74:23,25 75:5 90:16 100:21 140:4 144:22 150:21 159:6,25 166:21 233:16 234:2 246:18 261:11,20
**looking** 28:11,12 50:19 78:24 79:10 95:22 96:9 98:17 100:14 146:18,20 149:24 150:6 151:15 188:2 231:23 233:19 247:22,25
**looks** 59:5 110:5 278:8 285:18,19
**lost** 259:21 296:23 297:5,11
**lot** 86:12 118:5 134:10 140:19 167:12 250:7 261:16,17,21 297:8
**Lotus** 92:14,22 93:10,13 126:20 126:23,24,25 127:4,10,14 128:8 130:6,7,11 135:2 136:3,5,10 137:15 137:24 175:6,9 196:4 200:20,21 229:8,10,11 239:25
**loud** 25:7,9 72:24
**LST** 95:23
**Luettgen** 136:19,20
**Luettgen's** 137:2
**lunch** 89:21 97:25 103:5 142:23
**luncheon** 103:6 104:2

**M**

**maiden** 7:13
**mailbox** 56:2,5 57:10 59:17 60:3,7 60:9 62:7 88:15,17 88:21 256:25 257:19
**mailboxes** 225:14 226:10,13,19
**Mainframe** 289:20 289:21 290:8
**maintain** 163:2 246:2 270:12
**maintained** 28:24
**maintains** 30:25 246:4
**maintenance** 283:15 293:16
**major** 290:15
**majority** 189:18
**making** 37:12 195:19,25 215:10
**manage** 10:23 162:19 193:14 224:9
**managed** 272:8
**management** 9:8,12 9:16,25 11:6 15:3 15:6 16:18 23:20 25:12,21 27:4,7 29:19 30:16,22 31:2,3,7,8,9 33:19 34:11,14 35:8 40:9 42:14,17,17,18 45:8 57:10,15,18 57:22,25 58:5,12 66:7 69:12,13,18 70:6,12 71:8,20 72:3 73:10 77:13 78:8,11,15,15 79:12 80:12,15,20 81:23 82:2,12,18 83:2,25 84:18 87:12 88:7 89:3 98:25 100:15,19 101:3 102:20,23 102:24 105:5,12 105:13,22,25 106:4,11 107:4,10 107:16 108:10,15 108:23,25 110:23 110:25 113:13,16 114:16 118:13 119:5,16 120:23 121:5 122:4 126:13 132:19,21 133:20 136:21 139:21 140:12,17 140:21,22 145:18 147:15 148:4,19 149:11 152:20 156:6,11,20,25 162:15,17 165:6 165:15 166:12 170:9,17 171:8,23 174:15 175:15 176:8 177:5,14 178:14,21,23 179:18,19,22,23 180:12,15 184:13 184:14 185:24 186:5 192:17 193:24 194:2,25 203:23 204:9,13 204:24 209:13,20 210:2 216:3,6,12 216:15,19 224:18 226:9,11 231:16 232:2,4,7,25 233:5 233:18,22 237:13 240:10 243:20,22 244:9 245:23 249:5 257:6 258:8 260:22 261:2,7 274:10,17,20,21 275:2,19 287:5 292:5,10 296:11 296:15
**management-level** 287:10
**manager** 9:7 10:19 14:20 15:5 16:18 39:20 66:21 164:8 194:20 201:9 208:12 212:5 242:23 278:12 282:11 287:7,20
**managing** 194:3 202:10
**Mandy** 2:10 3:9
**manner** 4:24 109:2 117:15,18 120:22 121:5,10,12,16
**Manning** 12:5 125:15 139:8 146:6
**manual** 173:7 187:11,12,24 188:6,10
**manually** 115:2,14 187:15 188:13 201:24 211:13
**manuals** 193:5
**mapping** 32:20 279:16,24
**March** 21:11,16 63:5 71:10 73:14 73:17 78:7,20 86:5 105:21 113:11 119:25 122:6 132:24 134:24 139:11 141:8

160:7 178:3,4,4 183:11 210:7 244:10
**March/April** 69:21
**mark** 15:21,23 112:24 113:5 284:17
**marked** 15:25 21:2 21:4 23:14 30:5 42:25 45:12 48:9 54:22 62:21 72:9 86:24 109:18 121:20 160:15 256:16 277:8 284:19 299:14
**married** 7:8,16,17 13:6 48:3
**massive** 94:7
**material** 247:19 303:15
**materials** 83:20,22 140:19 170:15,16
**matter** 1:3 7:22 8:8 90:12 93:24 94:3 95:11 111:16 131:7,8 134:14 163:12,18 210:7
**matters** 286:3
**Mayflower** 7:23 293:25 295:10,15 296:9,13,23
**Mc** 289:17,19,25
**mdolan.ppt** 300:10
**mean** 36:19 55:15 55:17 61:13,14 68:10,13 72:4 77:5 88:19 129:4 173:9 183:15 185:6 187:13 189:13 192:9 195:22 220:19 230:20 250:9 273:6 286:19 300:14
**meaning** 91:10 220:21
**means** 4:13 47:15 160:25 187:14 192:11 220:24 230:21 273:4,8
**meant** 64:9 77:7
**mechanism** 88:20 221:7
**medical** 6:18
**medication** 6:17
**meet** 65:2
**meetings** 8:22
**member** 133:21
**member's** 186:6
**members** 70:9 83:2 100:19 102:20,25 106:11 120:23 121:6 122:4 140:22,23 165:7 179:15 180:13 189:4,16,24 190:18,21 209:21 226:12 253:22 274:11 275:3
**members'** 224:22 274:22
**memory** 6:14,20 17:23 180:18 276:11 280:22
**mentioned** 18:4 39:8 48:21 49:10 52:24 68:7 77:3 87:13 93:23 99:9 100:14,24 130:20 133:3 134:12 143:10 217:3 237:4 240:6 243:5 254:8 293:24
**mentions** 44:20 57:9
**message** 300:24 301:2,6
**messaging** 87:25
88:2,3 212:25
**met** 18:17 19:21,24 19:25 212:7
**metadata** 158:14,22 159:5
**methodology** 74:21 76:8,9 116:18
**methods** 209:12 300:23
**Michael** 117:8
**Microsoft** 53:13,15 54:7 92:18 93:3,14 94:15 98:10 115:12 127:5 176:18 181:11,12 200:25 201:4 208:6 221:24 222:2,3,5,8,17 223:12 233:2 240:2 243:23 244:2 249:14 250:8 254:6,13
**middle** 32:11,19 108:6
**Middleware** 289:15
**migrate** 199:7 222:7 222:12
**migrated** 93:13,14 93:15 221:25 222:2,19
**migrating** 127:4 223:11
**migration** 93:20,22 213:9,11,13 222:22 223:3,4 227:11
**mind** 47:21 142:11 188:15,21
**mine** 245:10
**minute** 178:20 279:6
**minutes** 149:2 275:23
**mirrored** 88:8,10
**missing** 252:2 253:4 279:15,22
**mistake** 228:12
**mistaken** 114:9 158:10 238:5
**misunderstanding** 297:16
**mm-hm** 44:22 57:12 59:15 87:15 96:18 97:20 117:12 129:22 135:14 146:13 149:9 179:5
**Mobil** 1:5 2:16 300:12
**Mobil's** 23:19 172:11 173:13 290:13 299:4
**mobility** 146:17 147:11 158:7,8
**module** 278:14,16
**modules** 283:14
**moment** 71:4 81:5 190:5 245:20
**monitor** 10:25
**monitored** 61:17
**monitoring** 61:10
**months** 131:12 221:3 227:23 229:3,4 252:2,4,8 252:12
**morning** 147:16 193:6
**move** 78:2 116:25 197:15 210:20,21 232:20 250:3,5
**moved** 13:22,24 15:4 116:4,6 197:14 212:9 216:5,14
**moves** 211:13
**moving** 17:13

112:21 134:22 168:22 197:17
**multiple** 108:5 125:24 126:2 233:21 266:24 267:7
**MySites** 117:10,20 119:8,9,12

N

**N** 2:2 3:2,2,2,2 104:6,6,6 303:20
**N-E-A-G-L-I** 73:23
**name** 3:8 6:22,24 7:4,6,11,13,15 39:5 73:22 87:21 119:2 137:6 138:3 138:11 147:10 158:10 255:6 288:23 291:20
**names** 12:3 29:7 40:5 48:3 65:20 67:5 102:8,12,13 110:10 132:20 139:20 233:20
**native** 115:12
**Neagli** 73:21,23
**near** 256:24
**necessarily** 61:12,13 270:18
**necessary** 79:21 200:21
**need** 6:3 25:8 26:9 35:14 40:22,25 58:2,4 64:23 103:2 112:6,14 124:7,17 125:2 160:3 163:4 172:17 196:12 212:13 241:4
**needed** 63:14 66:14 68:5 112:8 210:23 219:22 225:22
**needs** 41:14 64:20 206:21 212:7
**network** 10:25 44:20 53:20 100:7 147:19,22 162:20 192:16 263:19 265:5,6,12,16,17 265:20,25 266:12 268:2,7,16 269:6 270:2,17,19,23 271:14,20 274:22 274:24 297:10,14 298:13
**never** 113:20 205:7 205:18,19 206:5 209:8 220:11 223:25 242:21 243:3 262:13 263:4 268:23 273:2 277:20
**new** 1:12,13,14 2:4 2:8,8,18,18 3:11 3:12 93:16 125:18 126:21 128:7,22 129:16 132:4 134:23 137:7,13 138:4,14 141:17 160:6 197:4,19,20 201:23 222:19 223:12 231:5 255:3 292:9
**NGLCA** 300:9
**nine** 166:11 252:7 252:10,12
**nineteen** 48:4
**nod** 4:21
**non** 4:22
**non-e-mail** 153:4,6 153:12 170:3
**non-Management** 178:18
**non-SAP** 286:9 287:23
**nonmanagement** 70:8 179:6,11 180:2,5 189:4,15 189:23 190:18,20 191:6,14 216:2,11
**nonperson** 268:11 268:22
**nonpersonal** 219:16 219:17 220:10 224:5,8 225:9,12 238:15,20 239:17
**Nora** 2:20 121:25
**normal** 112:2 163:24
**normally** 109:6 172:21 253:10
**Norwood** 278:22
**Notary** 1:14 3:3 305:5
**noted** 301:23
**notes** 92:15,22 93:10,13 126:21 126:23,24 127:2,5 127:10,14 128:9 130:7,7,11 135:2 136:4,5,11 137:16 137:24 175:7,9 196:5 200:20,21 229:8,10,11 239:25 305:10
**notice** 32:16 67:11 109:22 110:8,21 110:23 111:7 129:25 130:4 131:20,21 133:17 133:21 139:18 163:21 166:14,18 166:19 202:22,25 203:6 228:23 253:3
**noticed** 251:25 252:12,16,20
**notices** 36:4,8 67:14 67:16,20 110:18 111:11 148:9 163:12 203:11
**notification** 40:13 40:16,23 42:4 67:12
**notified** 163:23
**November** 16:25 17:9 110:15,16,17 110:22 128:11 131:22 139:12 163:7 164:4 166:2 175:21 226:25 227:18 228:16,21 228:24 246:22 247:4 279:22
**number** 8:21 10:2,6 10:14 19:6 42:12 48:5 84:7,11 87:14 90:6 94:5,10 97:9 114:9,12 121:18 140:9 141:16 150:14,20 177:20
**numbers** 72:19
**numerous** 167:4

O

**O** 3:2 104:6,6,6
**OAG** 110:21 303:14
**oath** 4:11 160:23
**object** 3:25 76:23
**Objection** 19:18 65:6
**objections** 4:4
**objectives** 241:6
**objects** 65:21 68:18
**obviously** 94:12 110:10 181:10
**occur** 71:12 150:16
**occurred** 71:13 208:5
**occurs** 67:15 261:4
**October** 23:23
**office** 1:11 2:5 3:10 3:21 16:25 17:9 26:24 28:3 41:5,17

85:10 140:14
**office's** 41:12 49:15
**offsite** 50:20,22 51:5 51:14,21 52:2,10 52:16 56:21
**oh** 18:22 21:16 74:10 76:9 111:10 123:2 188:9 195:3 231:12 290:21 291:13 295:3,7
**okay** 3:17,23 4:7 10:13 18:23 21:17 34:24 35:3,6 44:10 47:13 50:6 65:11 74:10 81:4,6,17,21 82:3 84:5 85:8 86:15,20 87:18 88:4 89:18,22 91:15 92:24 96:15 97:7,18,21 98:2,8 104:13 111:10 123:3,11 143:9 144:9,16 145:23 146:14 162:13 176:4 190:17 203:12 206:19 217:15 221:18 229:18 236:4,5,19 242:15 247:3 248:20 257:14 261:5,15 262:10 265:9 268:9 270:15 279:4 282:2,3 283:24 284:23 294:9 295:8
**old** 127:6 130:12 221:3 248:2 297:8
**older** 231:3
**oldest** 230:12 247:23 248:4
**Oleske** 2:11 40:4 72:17 87:8 122:2 161:23 232:13 275:22 276:3 284:16 299:11 301:21 302:5 303:7,16,19,23
**Olugbenle** 288:24 288:25
**once** 5:12 132:7 160:6 228:6
**one's** 273:5,7,8
**one-to-one** 198:21
**ones** 111:21 146:16 154:20,21,21
**ongoing** 19:7,10 24:16 26:11 28:25 68:4 69:9 192:20 197:12 226:6
**online** 283:12
**onsite** 282:18
**opening** 14:12
**operation** 95:8
**operational** 225:16 225:22 226:7
**operations** 39:19 60:12 86:11 256:9
**opposed** 233:13 250:23 253:9 293:7
**ops** 70:16 148:23
**orally** 65:23
**order** 20:18 48:22 49:13 98:4 153:11
**ordinary** 253:9
**organization** 10:9 10:21 12:23 14:17 14:21 15:3 16:7 24:6 25:25 30:20 40:25 164:20 199:9 201:10 240:12 245:24 287:22
**organizational** 16:9 16:23 17:7
**organizations** 10:8 14:5,25 38:8
**organized** 42:12
**original** 17:11 186:9
**originally** 12:14 92:23 248:11
**outage** 28:8
**outline** 149:20
**outlined** 278:2
**outlines** 72:17
**outlining** 122:2
**Outlook** 92:6 154:25 155:8,17 174:25 175:4,10 175:13,16 176:18 249:14 250:8 251:14 252:14
**outside** 168:7 173:13 174:4 187:25 188:14 240:11,18 241:20 260:11 262:4
**overall** 215:9 217:2 244:5
**Overview** 285:23
**owned** 51:22 215:19 246:6
**owner** 38:22 244:3,4
**owners** 38:7,11
**owns** 30:25 31:3 39:4 244:7 246:4

**P**

**P** 2:2,2 300:11
**p.m** 89:17 103:7,7 149:4,4 152:10,10 188:19,19 276:2,2 301:23
**page** 21:14 22:13 24:17 26:12 29:8 30:7 34:8,15,22 40:8 44:19 45:19 46:9,15 50:16 53:22 54:2 55:25 57:3 59:11 72:20 113:7,8 117:2,7 120:16,24 121:7 122:21 140:9 256:18,19,20,23 257:9 266:22 272:17 279:18 285:7,24 290:25 291:3,9,12,12,14 291:15,16 293:2 302:3 303:3,8 304:3
**pages** 73:5 303:5
**paper** 113:6 114:3 116:20,21,22 117:11 120:19 121:2,9 137:3 175:14
**paragraph** 27:18 35:2 36:22 57:6 59:24 162:12,13 163:5 164:2,25 165:5 166:11,22 166:24 167:10,16 168:11 169:25 171:21 174:6 176:5,16,17,25 177:7 178:24 180:22 181:8,16 182:8,22 183:7 185:16 186:7,16 186:20 187:7 188:4 190:8 191:4 191:12,25 193:21 194:6 212:15,18 212:22 213:5,6 220:13 223:19 226:22 229:25 247:2,5 253:19 257:5 277:22 278:21 300:7
**paragraphs** 168:24 169:16 177:21

**parents** 8:17,17
**Parkway** 6:25
**part** 9:12 11:8 19:7 19:9 26:9 44:16 47:17 50:3,8 51:18 65:18 66:25 67:2 68:4 70:25 76:12 82:14 100:7 132:14 133:2 164:23 187:19 225:24 244:19 245:8 279:6,7,13
**part-time** 13:9
**participated** 74:2 90:4,4 193:25
**particular** 111:6 153:14 154:24
**parties** 305:13
**parts** 89:4
**party** 149:18
**password** 207:19 212:13 270:21 271:12,19 272:14
**passwords** 271:7
**Patel** 139:7 142:4,6 142:7,8 146:5 185:15
**Paul** 2:14 95:5,7 147:25 160:12 161:22 303:23
**pegged** 227:25
**pending** 5:12 6:6
**people** 11:24 16:22 17:19,22 18:6,7,9 18:17,18,23 19:6,7 32:25 39:9 40:6 49:19 50:2 84:7,12 87:9 90:6 94:6,9 94:10 99:18,19 107:18 150:14,20 156:7 163:2,3 165:14,18 196:21 197:11 207:14 221:8 230:8 240:10,19 241:15 241:20 260:25 261:16 273:16,24 281:20,24
**people's** 237:8
**perfect** 79:5
**perform** 225:23
**performed** 60:4,10 284:11
**performs** 60:11
**period** 12:23 13:5 68:20,21 79:8,11 82:17 101:24 129:8,19 133:12 149:25 165:9,11 165:16 184:8,9,15 221:13,21 227:4,5 227:10,25 228:3 247:11,12 253:24 275:17
**periodically** 99:12
**periods** 205:20
**perjury** 4:15
**permission** 179:24
**permissions** 156:23
**permit** 4:3
**permitting** 3:21
**person** 92:3 97:6 118:24 125:12 127:16 129:4 134:7 137:11 147:12 148:18 151:7 158:7 164:8 182:7 194:12 195:12,17 203:22 214:5,11 217:23 221:14,16 226:2 235:4 236:13 238:7,13 239:14 245:2 293:7,8,9,11
**person's** 236:23
**personal** 35:16 59:7 78:6 92:4 96:4 163:25 165:4 166:23,25 167:2,5 170:8 171:10,12 171:17,22 174:23 174:24 177:4,6,8 177:10,14,20 182:18 193:19,22 194:4 210:3 212:21 219:23,24 220:3,7,9 224:7 234:22 235:3,12 235:13 236:23 238:2 239:16 245:2 268:21
**personally** 90:3 108:2,3 150:10 295:18
**persons** 36:9 180:13
**photo** 31:5,14 32:19
**photograph** 31:20
**photos** 32:2
**physical** 75:20,23 80:5,6
**physically** 195:13 214:14,17
**picked** 202:16,18 225:4 234:20
**picture** 53:25
**piece** 78:24 85:5 152:23 215:6 223:8 237:19,20
**pieces** 78:22 245:11
**Pipeline** 7:23 293:25
**place** 79:21,22 131:10 133:23 166:18 202:10 236:7 247:14
**placed** 101:17,19
**places** 98:12 150:22
**plaintiff** 8:9,11
**plan** 27:3,4 277:23
**planning** 14:15
**plans** 26:17,18,21 26:21
**platform** 172:11 173:3,23 187:23 192:7
**play** 37:11,24 294:9 294:15
**played** 91:2 245:24
**plays** 140:17 293:11
**please** 4:20 5:6 6:4 6:22 52:14 57:4 152:8 206:18 282:4
**plus** 175:17
**PNYAG** 303:4 304:4
**point** 27:21 71:18 108:22 111:5,22 111:25 112:7 130:21 131:22 163:15,21 181:10 193:3 218:21 229:2 242:9 248:23 284:7 293:2
**points** 291:24
**policies** 33:18 56:24
**policy** 13:9 28:16 31:4 43:8,19 129:12 296:8
**populate** 92:8
**populated** 155:18
**posed** 244:21 245:6
**position** 12:8 39:5 287:11
**positions** 196:22
**possibility** 144:13 144:21 157:23
**possible** 148:13 171:7,11 192:13 196:10 198:23 212:8 272:16 275:4,20 300:15